**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **SUJEIL PEÑA-TORRES; et als.**<br><br>PLAINTIFFS<br><br>VS.<br><br>**UNIVERSITY OF SCIENCE, ARTS AND TECH a/k/a USAT a/k/a MEDICAL COLLEGE OF LONDON a/k/a MALINA MEDICAL COLLEGE a/k/a METROPOLITAN INNOVATIVE GROUP, INC. a/k/a USAT MONTSERRAT LLC; et als.**<br><br>DEFENDANTS | CIVIL NO. 19-1707<br><br>RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO);<br>FRAUDULENT INDUCEMENT;<br>BREACH OF CONTRACT;<br>UNJUST ENRICHMENT;<br>TORT DAMAGES<br><br>TRIAL BY JURY DEMANDED |

**OMNIBUS RESPONSE IN OPPOSITION TO DOCKETS 137 & 148 MOTIONS FOR SUMMARY JUDGMENT**

**TO THE HONORABLE COURT:**

COMES NOW, Sujeil Peña-Torres, Jose E. Blasco-Jusino, Lucero Rodriguez-Fernandez, Lisa M. Torres-Colon, Joffre E. Gomez-Frontera, Zabdiel A. Nieves-Rivera Enny de Jesus-Ureña, Loraima M. Rosado-Villafañe, Paola M. Prosper-Crespo and Wendoly M. Vazquez Oliveras (jointly referred as "Plaintiffs"), through the undersigned attorneys and very respectfully states, alleges and prays as follows:

**INTRODUCTION**

This Court should deny University of Science, Arts and Technology ("USAT"), Orien L. Tulp ("Tulp"), Carla M. Konyk ("Konyk"), Karen Baldwin ("Baldwin") Docket 137 Motion for Summary Judgment and Daniela Cabrera Pujada ("Cabrera") Docket 148 Motion for Summary Judgment because the Plaintiffs proffer sufficient evidence of the material facts that support the causes of actions pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO

Act"), 18 USC sec. 1961, *et seq,* Fraudulent Inducement ("*Dolo*") pursuant to Articles 1217 *et seq.* of Puerto Rico's Civil Code, 31 LPRA secs. 3404 *et seq.*; Material Breach of Contract pursuant to Articles 1206 *et seq.* of Puerto Rico's Civil Code, 31 LPRA secs. 3371 *et seq.*; Unjust Enrichment and Tort Damages pursuant to Articles 1802 and 1803 of Puerto Rico's Civil Code, 31 LPRA secs. 5141, 5142. Therefore, based on the evidence submitted before this Honorable Court, a reasonable jury may infer that USAT, Tulp, Konyk, Baldwin, Cabrera, in addition to Manuel Jose Ortiz-Bustillo ("Ortiz"), and Yanire Bustillo ("Bustillo") (jointly "Defendants") are all liable to the Plaintiffs for 1) violating the RICO Act, 2) for incurring in Fraudulent Inducement, 3) for breaching their contract and 4) for unjustly enriching themselves as well as causing tort damages to the Plaintiffs.

## FACTUAL BACKGROUND

I.    THE EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES, ITS POLICIES AND PROCEDURES

Educational Commission for Foreign Medical Graduates ("ECFMG") is a private non-profit organization based in Philadelphia, Pennsylvania. ECFMG promotes quality health care for the public by certifying international medical graduates ("IMG") for entry into U.S. graduate medical education, and by participating in the evaluation and certification of other physicians and health care professionals nationally and internationally. In other words, ECFMG was established to screen IMG who were coming to the United States seeking residency programs and turns into graduate medical education. (See page 64 of Exhibit 19) (See page 247 line 21 to page 248 line 1 of Exhibit 19).

ECFMG's responsibilities include (among other things): (i) certifying the readiness of IMGs for entry into graduate medical education and healthcare systems in the United States

2

through an evaluation of their qualifications, (ii) providing complete, timely, and accessible information to IMGs regarding entry into graduate medical education in the United States, (iii) verifying credentials and providing other services to health care professionals worldwide, and (iv) provide international access to testing and evaluation programs. (See page 64 of Exhibit 19).

To verify an applicant's credentials as part of ECFMG's certification process, ECFMG collects documentation, including records relating to an applicant's attendance at a recognized international medical school. (See pages 73-75 of Exhibit 19).

An "international medical school" is "an education facility located in a country outside of the United States and Canada with its primary campuses and main operations located in that country." (See page 66 of Exhibit 19).

If an international medical school has a branch campus outside the country where its primary campus is purportedly located, ECFMG "may require confirmation from the appropriate government authority" in the branch campus country that "the branch campus is authorized to operate as a medical school in the branch campus country" and that the international medical school "awards degrees that meet the medical education eligibility requirements for licensure to practice medicine in the branch campus country." (See page 66 of Exhibit 19).

Once an applicant's record is verified and complete and the applicant passes certain required substantive exams, ECFMG issues the applicant a certificate. (See pages 73-75 of Exhibit 19).

This certificate signals that an IMG seeking admission to a U.S. graduate medical program has met certain minimum standards of eligibility, including graduation from a *bona fide* international medical school. (See pages 73-75 of Exhibit 19).

ECFMG's Policies and Procedures Regarding Irregular Behavior define "irregular

behavior" to include: all actions or attempted actions on the part of applicants, examinees, potential applicants, others when solicited by an applicant and/or examinee, or any other person that would or could subvert the examination, certification or other processes, programs or services of ECFMG, including, but not limited to, the ECFMG Exchange Visitor Sponsorship Program, ECFMG International Credentials Services (EICS), the Electronic Portfolio of International Credentials (EPIC), and Electronic Residency Application Service (ERAS) Support Services at ECFMG. Such actions or attempted actions are considered irregular behavior, regardless of when the irregular behavior occurs, and regardless of whether the individual is certified by ECFMG. (See page 92 of Exhibit 19).

ECFMG's Policies and Procedures Regarding Irregular Behavior provide: "Examples of irregular behavior include, but are not limited to, submission of any falsified or altered document to ECFMG, whether submitted by the individual or by a third party, such as a medical school, on behalf of the individual; failing to comply with United States Medical Licensing Examination or ECFMG policies, procedures, and/or rules; falsification of information on applications, submissions, or other materials to ECFMG; taking an examination when not eligible to do so, or submission of any falsified or altered ECFMG document to other entities or individuals." (See page 92, 93-94 of Exhibit 19). (See page 267 line 9 to line 14 of Exhibit 19).

Irregular behavior charges can be brought against any individuals who are involved in the process of application for ECFMG certification or "any other person that would or could subvert the examination, certification or other processes programs or services of ECFMG," including medical school officials. (See page 92 of Exhibit 19). (See page 414 line 24 to page 415 line 3, page 418 line 22 to page 419 line 7 of Exhibit 19).

ECFMG's Policies and Procedures Regarding Irregular Behavior describe ECFMG's

4

process for investigating suspected irregular behavior, determining whether an individual engaged in irregular behavior, and taking appropriate action if a finding of irregular behavior is made. (See page 92-96 of Exhibit 19).

II.    THE ENTERPRISE, THE CONDUCT, THE PATTERN OF RACKETEERING ACTIVITIES: USAT AND ITS OFFICIALS' FALSE REPRESENTATIONS TO PLAINTIFFS IN ORDER TO RECEIVE PAYMENT FOR AN INVALID MEDICAL EDUCATION

A. USAT First Contact and Representations

Sujeil Peña-Torres ("Peña"), Jose E. Blasco-Jusino ("Blasco"), Lucero Rodriguez-Fernández ("Rodriguez"), Lisa M. Torres-Colon ("Torres"), Joffre E. Gómez-Frontera ("Gomez") Zabdiel A. Nieves-Rivera ("Nieves"), Enny de Jesús-Ureña ("de Jesus") Loraima M. Rosado-Villafañe ("Rosado") and Paola M. Prosper-Crespo ("Prosper") (jointly "Plaintiffs") were all searching for a medical school to apply in order to get into a career in medicine:

a. Peña was searching for a medical school around May 3rd, 2017. (See paragraph 3 of the Unsworn Declaration under Penalty of Perjury of Peña ("Declaration of Peña")- Page 1 of Exhibit 45).

b. Blasco was searching for a medical school around February of 2017. (See paragraph 3 of the Unsworn Declaration under Penalty of Perjury of Blasco ("Declaration of Blasco")- Page 1 of Exhibit 46).

c. Prosper was searching for a medical school around July of 2017. (See paragraph 3 of the Unsworn Declaration under Penalty of Perjury of Prosper ("Declaration of Prosper")- Page 1 of Exhibit 47).

d. Rosado was searching for a medical school around May 29, 2018. (See

paragraph 3 of the Unsworn Declaration under Penalty of Perjury of Rosado ("Declaration of Rosado")- Page 1 of Exhibit 48).

e. Torres was searching for a medical school around July 19th, 2017. (See paragraph 3 of the Unsworn Declaration under Penalty of Perjury of Torres ("Declaration of Torres")- Page 1 of Exhibit 49).

f. Gomez was searching for a medical school around May 29th, 2018. (See paragraph 3 of the Unsworn Declaration under Penalty of Perjury of Gomez ("Declaration of Gomez")- Page 1 of Exhibit 50).

g. Rodriguez was searching for a medical school around March 3rd, 2018. (See paragraph 3 of the Unsworn Declaration under Penalty of Perjury of Rodriguez ("Declaration of Rodriguez")- Page 1 of Exhibit 51).

h. De Jesus was searching for a medical school around 2017. (See paragraph 3 of the Unsworn Declaration under Penalty of Perjury of De Jesus ("Declaration of De Jesus")- Page 1 of Exhibit 52).

i. Nieves was searching for a medical school around May 29, 2018. (See paragraph 3 of the Unsworn Declaration under Penalty of Perjury of Nieves ("Declaration of Nieves")- Page 1 of Exhibit 53).

Plaintiffs were contacted by persons who represented themselves as officials of the medical school known as USAT, and accredited college of medicine in Puerto Rico:

a. Peña was contacted and interviewed by Manuel Jose Ortiz-Bustillo ("Ortiz") and Daniela Cabrera-Pujada ("Cabrera") on or around July 8th of 2017. Both Ortiz and Cabrera represented themselves as officials of the medical school known as USAT and that USAT is an accredited college in Puerto Rico. (See

6

paragraph 4-6 of the Declaration of Peña- Page 1 of Exhibit 45).

b.  Blasco met Ortiz at the Hilton Garden Miami Airport Hotel West Doral in Miami, FL on or around July 12th, 2017. Both Ortiz and Cabrera represented themselves as officials of the medical school known as USAT and that USAT is an accredited college in Puerto Rico. (See paragraph 4-6 of the Declaration of Blasco- Page 1 of Exhibit 46).

c.  Prosper was contacted by Cabrera on or around July of 2017. Both Ortiz and Cabrera represented themselves as officials of the medical school known as USAT and that USAT is an accredited college in Puerto Rico. (See paragraph 4-6 of the Declaration of Prosper- Page 1 of Exhibit 47).

d.  Rosado was contacted by Ortiz and Cabrera on or around June 1st of 2018. Both Ortiz and Cabrera represented themselves as officials of the medical school known as USAT and that USAT is an accredited college in Puerto Rico. (See paragraph 4-6 of the Declaration of Rosado- Page 1 of Exhibit 48).

e.  Torres was contacted by Cabrera on or around July, 21st, 2017. Both Ortiz and Cabrera represented themselves as officials of the medical school known as USAT and that USAT is an accredited college in Puerto Rico. (See paragraph 4-6 of the Declaration of Torres- Page 1 of Exhibit 49).

f.  Gomez was contacted by Ortiz and Cabrera, whom represented themselves as officials of the medical school known as USAT and that USAT is an accredited college in Puerto Rico. (See paragraph 4-5 of the Unsworn Declaration of Gomez- Page 1 of Exhibit 50).

g.  Rodriguez applied online to the USAT PR campus on April 4th, 2018. Between

7

April and May of 2018, she was contacted by Ortiz and Damaris Frias ("Frias") whom represented themselves as officials of the medical school known as USAT and that USAT is an accredited college in Puerto Rico. (See paragraph 4-6 of the Declaration of Rodriguez- Page 1 of Exhibit 51).

h. De Jesus searched for information about USAT and requested application requirements around December of 2017. She was contacted by Ortiz, Frias and Yanire Bustillo ("Bustillo"), whom represented themselves as officials of the medical school known as USAT and that USAT is an accredited college in Puerto Rico. (See paragraph 4-6 of the Declaration of De Jesus- Page 1 of Exhibit 52).

i. Nieves was contacted by Ortiz and Cabrera, whom represented themselves as officials of the medical school known as USAT and that USAT is an accredited college in Puerto Rico. (See paragraph 4-5 of the Declaration of Nieves- Page 1 of Exhibit 53).

Plaintiffs received various materials regarding USAT, such as brochures, applications and enrollment agreements, which made representations that USAT was an accredited college of medicine in Puerto Rico, as well as other states.

a. Peña received these materials on July 8th, 2017. (See paragraph 7 of the Declaration of Peña- Page 1 of Exhibit 45) (See Pages 8-19 of Exhibit 45).

b. Blasco received these materials between February and June 21st, 2017. (See paragraph 7 of the Declaration of Blasco- Page 1 of Exhibit 46). (See Pages 8-18 of Exhibit 46).

c. Prosper received these materials on August 1st, 2017. (See paragraph 7 of the

Declaration of Prosper- Page 1 of Exhibit 47).

d. Rosado received these materials on June 1st, 2018. (See paragraph 7 of the Declaration of Rosado- Page 1 of Exhibit 48). (See Pages 15-21 of Exhibit 48).

e. Torres received these materials on August 9th, 2017. (See paragraph 7 of the Declaration of Torres- Page 1 of Exhibit 49). (See Pages 8-23 of Exhibit 49).

f. Gomez received these materials on June 1st, 2018. (See paragraph 6 of the Unsworn Declaration of Gomez- Page 1 of Exhibit 50).

g. Rodriguez received these materials on March 3rd, 28th and April 4th of 2018. (See paragraph 7 of the Declaration of Rodriguez- Page 1 of Exhibit 51). (See Pages 6-11 of Exhibit 51).

h. De Jesus received these materials on January 2nd, 2018. (See paragraph 7 of the Declaration of De Jesus- Page 1 of Exhibit 52). (See Pages 7 of Exhibit 52).

i. Nieves received these materials on June 1st, 2018. (See paragraph 6 of the Declaration of Nieves- Page 1 of Exhibit 53). (See Pages 5-8 of Exhibit 52).

Based on the various materials and the representations, the Plaintiffs understood that Orien L. Tulp ("Tulp") is the President of USAT, Carla M. Konyk ("Konyk") is the Vice-President and Director of Administration and Finances of USAT, and Karen Baldwin ("Baldwin") is the Administrator of USAT, Ortiz is the Dean of the USAT College of Medicine in Puerto Rico, Bustillo is the Registrar & Human Resource Supervisor and Cabrera is the Clinical Coordinator of Student Affairs of the USAT College of Medicine in Puerto Rico. Therefore, Tulp, Konyk, Baldwin, Ortiz and Cabrera (jointly "USAT Officials") were all USAT officials and representatives. (See paragraphs 8-10 of the Declaration of Peña – Pages 1-2 Exhibit 45) (See paragraphs 8-10 of the Declaration of Blasco – Pages 1-2 Exhibit 46) (See paragraphs 8-10 of the

Declaration of Prosper – Pages 1-2 Exhibit 47) (See paragraphs 8-10 of the Declaration of Rosado – Pages 1-2 Exhibit 48) (See paragraphs 8-10 of the Declaration of Torres – Pages 1-2 Exhibit 49) (See paragraphs 7-9 of the Declaration of Gomez – Pages 1-2 Exhibit 50) (See paragraphs 8-10 of the Declaration of Rodriguez – Pages 1-2 Exhibit 51) (See paragraphs 8-10 of the Declaration of De Jesus – Pages 1-2 Exhibit 52) (See paragraphs 7-9 of the Declaration of Nieves – Pages 1-2 Exhibit 53) (See pages 8, 10, 16, 34, 38, 43-44, 46, 51-52, 58-59, 67, 72, 78, 91-92, 94-95 of Exhibit 45) (See pages 9, 11, 13, 46-47, 59, 62-63, 71, 73, 76, 78, 89 of Exhibit 46) (See pages 7-8, 27-28, 30, 37-40 of Exhibit 47) (See page 5 of Exhibit 48) (See pages 7, 16, 20, 22, 38-41, 45-46, 49-51 of Exhibit 49) (See page 5 of Exhibit 50) (See pages 15, 18, 21, 23 of Exhibit 51) (See pages 7, 10-11, 13, 19, 21, 28, 33  of Exhibit 52) (See page 5 of Exhibit 53).

Based on the various materials and the representations made by the USAT Officials on behalf of USAT, the Plaintiffs understood that 1) USAT was accredited by the ECFMG so that USAT students may be able to take the United States Medical Licensing Examinations, and 2) being a student of USAT would allow the Plaintiffs to take the United States Medical Licensing Examinations. Additionally, the Plaintiffs understood that USAT operated satellite campuses or schools and had its main Administrative Office at other states in the United States, such as in Puerto Rico, Florida, Maryland, Texas, and Colorado. (See paragraphs 11-14 of the Declaration of Peña – Pages 2 Exhibit 45) (See paragraphs 11-14 of the Declaration of Blasco – Pages 2 Exhibit 46) (See paragraphs 11-14 of the Declaration of Prosper – Pages 2 Exhibit 47) (See paragraphs 11-14 of the Declaration of Rosado – Pages 2 Exhibit 48) (See paragraphs 11-14 of the Declaration of Torres – Pages 2 Exhibit 49) (See paragraphs 10-13 of the Declaration of Gomez – Pages 2 Exhibit 50) (See paragraphs 11-14 of the Declaration of Rodriguez – Pages 2 Exhibit 51) (See paragraphs 11-14 of the Declaration of De Jesus – Pages 2 Exhibit 52) (See paragraphs 10-13 of

the Declaration of Nieves – Pages 2 Exhibit 53) (See pages 8-22, 32, 39, 42, 47, 51, 53, 55, 61, 63, 65, 70, 74, 76, 78 of Exhibit 45) (See pages 9, 12-14 of Exhibit 46). (See pages 7-8, 28 of Exhibit 47).

### B.  USAT Enterprise, Conduct and Pattern of Racketeering Activity

The Plaintiffs understood that the USAT officials have been working at USAT for some time and that based on their representations, USAT's purpose was to provide the Plaintiffs an education in medicine if they applied to be a medical student. In consideration of USAT providing Plaintiffs the education of medicine, USAT would then request payments from the Plaintiffs. The USAT Officials made representations that once the payments would be received, USAT would provide the education in medicine and the Plaintiffs would be able to take the United States Medical Licensing Examinations. Based on the various materials and the representations made by the USAT Officials on behalf of USAT, the Plaintiffs were induced and made the decision to apply to USAT, thinking that the Plaintiffs were going to receive a valid medical education in Puerto Rico and will be later be able to apply for and take the United States Medical Licensing Examinations. (See paragraphs 15-19 of the Declaration of Peña – Pages 2 Exhibit 45) (See paragraphs 15-19 of the Declaration of Blasco – Pages 2 Exhibit 46) (See paragraphs 15-19 of the Declaration of Prosper – Pages 2 Exhibit 47) (See paragraphs 15-19 of the Declaration of Rosado – Pages 2 Exhibit 48) (See paragraphs 15-19 of the Declaration of Torres – Pages 2 Exhibit 49) (See paragraphs 14-18 of the Declaration of Gomez – Pages 2 Exhibit 50) (See paragraphs 15-19 of the Declaration of Rodriguez – Pages 2 Exhibit 51) (See paragraphs 15-19 of the Declaration of De Jesus – Pages 2 Exhibit 52) (See paragraphs 14-18 of the Declaration of Nieves – Pages 2 Exhibit 53)

Plaintiffs submitted all the required documents and required payments to USAT in order

to apply.

a. Peña submitted all the required documents and required payments on July 11th, 2017 and August 2nd, 2017. (See paragraph 20 of the Declaration of Peña- Page 2 of Exhibit 45)

b. Blasco submitted all the required documents and required payments on June 15th, 2017 and July 11th, 2017. (See paragraph 20 of the Declaration of Blasco- Page 3 of Exhibit 46).

c. Prosper submitted all the required documents and required payments on June 27th, 2017 and July 19th, 2017. (See paragraph 20 of the Declaration of Prosper- Page 2 of Exhibit 47).

d. Rosado submitted all the required documents and required payments on June 4th, 2018. (See paragraph 20 of the Declaration of Rosado- Page 2 of Exhibit 48).

e. Torres submitted all the required documents and required payments August 10-30, 2017. (See paragraph 20 of the Declaration of Torres- Page 2 of Exhibit 49).

f. Gomez submitted all the required documents and required payments on June 4th, 2018. (See paragraph 19 of the Unsworn Declaration of Gomez- Page 2 of Exhibit 50).

g. Rodriguez submitted all the required documents and required payments on April 4th, May 4th, June 4th, October 4th and November 4th of 2018. (See paragraph 20 of the Declaration of Rodriguez- Page 3 of Exhibit 51).

h. De Jesus submitted all the required documents and required payments on January 2nd, 2018. (See paragraph 20 of the Declaration of De Jesus- Page 3 of

Exhibit 52).

i. Nieves submitted all the required documents and required payments on June 4th, 2017. (See paragraph 19 of the Declaration of Nieves- Page 2 of Exhibit 53).

Plaintiffs received a letter from Tulp which informed the Plaintiffs that they were admitted to the medical doctor program of USAT. The letter said it was a typical four-year program of scientific and medical education. The letter indicated that Plaintiffs must pay no less than five thousand four hundred dollars ($5,400.00) per semester plus other expenses such as a Matriculation Fee, Medical Student Malpractice Insurance Fee, Anatomy Lab Fee, Technology Fee, Clinical Fee and Graduation Fee which amounted to approximately nine thousand one hundred forty-five dollars ($9,145.00).

a. Peña received the letter on July 12th, 2017. (See paragraph 21 of the Declaration of Peña- Page 3 of Exhibit 45) (See page 16 of Exhibit 45).

b. Blasco received the letter on June 21st, 2017. (See paragraph 21 of the Declaration of Blasco- Page 3 of Exhibit 46). (See page 13 of Exhibit 46).

c. Prosper received the letter on July 19th, 2017. (See paragraph 21 of the Declaration of Prosper- Page 3 of Exhibit 47). (See pages 8 of Exhibit 46).

d. Rosado received the letter on June 4th, 2018. (See paragraph 21 of the Declaration of Rosado- Page 3 of Exhibit 48).

e. Torres received the letter on September 14th, 2017. (See paragraph 21 of the Declaration of Torres- Page 3 of Exhibit 49). (See Page 7 of Exhibit 49).

f. Gomez received the letter on June 4th, 2018. (See paragraph 20 of the Unsworn Declaration of Gomez- Page 2-3 of Exhibit 50). (See Page 5 of Exhibit 50).

g. Rodriguez received the letter on April 17th, 2018. (See paragraph 21 of the Declaration of Rodriguez- Page 3 of Exhibit 51).

h. De Jesus received the letter on January 8th, 2018. (See paragraph 21 of the Declaration of De Jesus- Page 3 of Exhibit 52). (See Page 10 of Exhibit 52).

i. Nieves received the letter on June 4th, 2018. (See paragraph 20 of the Declaration of Nieves- Page 2-3 of Exhibit 53).

The letter from Tulp which informed the Plaintiffs that they were admitted to the medical doctor program of USAT, informed the Plaintiffs that the mailing address of the USAT campus in PR is PO Box 364363, San Juan, PR, 00936-4363. (See page 16 of Exhibit 45). (See pages 8 of Exhibit 46). (See Page 7 of Exhibit 49). (See Page 5 of Exhibit 50). (See Page 10 of Exhibit 52).

Once the Plaintiffs were admitted by USAT, USAT Officials from both Puerto Rico and Colorado came to attend the White Coat Ceremony making the representation that the Plaintiffs were going to start a valid medical education in Puerto Rico and they were going to be able to apply for and take the United States Medical Licensing Examinations. (See Photographic Evidence of the Event- Exhibit 23) (See paragraph 22 of the Declaration of Peña – Page 3 Exhibit 45) (See paragraph 22 of the Declaration of Blasco – Pages 2 Exhibit 46) (See paragraph 22 of the Declaration of Prosper – Page 3 Exhibit 47) (See paragraph 22 of the Declaration of Torres – Page 3 Exhibit 49) (See paragraph 21 of the Declaration of Gomez – Page 3 Exhibit 50) (See paragraph 22 of the Declaration of Rodriguez – Page 3 Exhibit 51) (See paragraph 22 of the Declaration of De Jesus – Page 3 Exhibit 52) (See paragraph 21 of the Declaration of Nieves – Page 3 Exhibit 53)

Once the Plaintiffs were admitted by USAT, the USAT officials oriented the Plaintiffs as to the manner of payments and the possibility of taking out a loan. Except for Peña and Rodriguez,

the USAT officials assisted the Plaintiffs in submitting a loan application with SouthEast Bank ("SB") in order to pay USAT. On different dates, the Plaintiffs submitted a loan application to SB, which were accepted and they provided a personal loan to the Plaintiffs. However, SB disbursed the personal loan and wire transferred said loan directly to the offices of USAT located in Colorado. The Plaintiffs did not receive the personal loan directly, but instead had to request USAT to deliver them or deduct certain sum amounts from the personal loan. The USAT officials located in Colorado were the ones that had full control of the SB loan money.

On June 18th-22nd, 2017, USAT officials assisted Blasco to submit a loan application with SB. Blasco's loan application was accepted and SB provided a personal loan for the sum amount of $60,000.00. Between September 1, 2017 and December 1, 2017, SB disbursed Blasco's personal loan by directed them directly to the offices of USAT in Colorado. From the date of Blasco's admission until September of 2018, USAT deducted and received the sum amount of $28,695.00 for providing what Blasco understood was a valid medical education in medicine in Puerto Rico and to be able to apply for and take the United States Medical Licensing Examinations. (See paragraphs 23-30 of the Declaration of Blasco- Page 3 of Exhibit 46). (See pages 20-50 of Exhibit 46). (See Exhibit 10).

On August 1st, 2017, USAT officials assisted Prosper to submit a loan application with SB. Prosper's loan application was accepted and SB provided a personal loan for the sum amount of $45,000.00. Between September 1, 2017 and December 1, 2017, SB disbursed Prosper's personal loan by directed them directly to the offices of USAT in Colorado. From the date of Prosper's admission until September of 2018, USAT deducted and received the sum amount of $22,500.00 for providing what Prosper understood was a valid medical education in medicine in Puerto Rico and to be able to apply for and take the United States Medical Licensing Examinations. (See

15

paragraphs 23-31 of the Declaration of Prosper- Page 3 of Exhibit 47). (See pages 9-30 of Exhibit 47). (See Exhibit 10).

On June 4th and July 13th 2018, USAT officials assisted Rosado to submit a loan application with SB. Rosado's loan application was accepted and SB provided a personal loan for the sum amount of $50,000.00. Between August 15th to August 25th of 2018, SB disbursed Rosado's personal loan by directed them directly to the offices of USAT in Colorado. From the date of Rosado's admission until September of 2018, USAT deducted and received the sum amount of $18,990.00 for providing what Rosado understood was a valid medical education in medicine in Puerto Rico and to be able to apply for and take the United States Medical Licensing Examinations. (See paragraphs 22-30 of the Declaration of Rosado- Page 3 of Exhibit 48). (See Exhibit 10).

On February 14th, 2018, USAT officials assisted Torres to submit a loan application with SB. Torres' loan application was accepted and SB provided a personal loan for the sum amount of $38,000.00. Between April 2nd to August 25th of 2018, SB disbursed Torres' personal loan by directed them directly to the offices of USAT in Colorado. From the date of Torres' admission until September of 2018, USAT deducted and received the sum amount of $23,300.00 for providing what Torres understood was a valid medical education in medicine in Puerto Rico and to be able to apply for and take the United States Medical Licensing Examinations. (See paragraphs 23-31 of the Declaration of Torres- Page 3 of Exhibit 49). (See Pages 27-36 of Exhibit 49). (See Exhibit 10).

On June 4th-July 13th of 2018, USAT officials assisted Gomez to submit a loan application with SB. Gomez's loan application was accepted and SB provided a personal loan for the sum amount of $45,000.00. Between August 15th to August 25th of 2018, SB disbursed Gomez's personal loan by directed them directly to the offices of USAT in Colorado. From the date of

Gomez's admission until September of 2018, USAT deducted and received the sum amount of $18,990.00 for providing what Gomez understood was a valid medical education in medicine in Puerto Rico and to be able to apply for and take the United States Medical Licensing Examinations. (See paragraphs 22-30 of the Unsworn Declaration of Gomez- Page 3 of Exhibit 50). (See Pages 6-8 of Exhibit 50). (See Exhibit 10).

On January 8th of 2018, USAT officials assisted De Jesus to submit a loan application with SB. De Jesus' loan application was accepted and SB provided a personal loan for the sum amount of $45,000.00. Between February 19th, 2018, SB disbursed De Jesus' personal loan by directed them directly to the offices of USAT in Colorado. From the date of De Jesus' admission until September of 2018, USAT deducted and received the sum amount of $26,000.00 for providing what De Jesus understood was a valid medical education in medicine in Puerto Rico and to be able to apply for and take the United States Medical Licensing Examinations. (See paragraphs 23-31 of the Declaration of De Jesus- Page 3 of Exhibit 52). (See Page 11-14, 26-31 of Exhibit 52). (See Exhibit 10).

From June 4th to July 13th of 2018, USAT officials assisted Nieves to submit a loan application with SB. Nieves' loan application was accepted and SB provided a personal loan for the sum amount of $46,237.50. Between August 15th to August 25th of 2018 of 2018, SB disbursed Nieves' personal loan by directed them directly to the offices of USAT in Colorado. From the date of Nieves' admission until September of 2018, USAT deducted and received the sum amount of $18,990.00 for providing what Nieves understood was a valid medical education in medicine in Puerto Rico and to be able to apply for and take the United States Medical Licensing Examinations. (See paragraphs 22-30 of the Declaration of Nieves- Page 2-3 of Exhibit 53). (See Exhibit 10).

Peña and Rodriguez opted to pay USAT directly in exchange for providing medical

education.

Peña paid the following: On July 11th of 2017, Peña paid the amount of $125 corresponding to USAT application fee. On August 2nd of 2017, Peña paid the amount of $6,000 corresponding to USAT One Time Matriculation Fee ($600), Tuition of Semester August 2017 to December 2017 ($4,900) and Anatomy Lab Fee ($500). On January 24th of 2018, Peña paid the amount of $4,000 corresponding to USAT Semester of January 2018 to May 2018. Then on April 3rd of 2018, Peña paid $400 corresponding to USAT Semester January 18 to May 2018. On May 16th of 2018, Peña paid the amount of $5,400 corresponding to USAT Summer classes, including $500 corresponding to a pending balance of the Semester January 2018 to May 2018. On September 25th of 2018, Peña paid the amount of $4,900 corresponding to USAT Semester August 2018 to December 2018. From the date of Peña's admission until September of 2018, USAT had received the sum amount of $25,725, for providing what Peña understood was a valid medical education in medicine in Puerto Rico and to be able to apply for and take the United States Medical Licensing Examinations. (See paragraphs 23-31 of the Declaration of Peña- Pages 3 of Exhibit 45). (See Exhibit 10).

Rodriguez paid the following: On June 4th 2018, Rodriguez paid $125 for the application fee. On October 5th, 2018, Rodriguez paid $600 for enrollment fee and $1,400 for tuition. On August 14th, 2018, Rodriguez paid $1,800 for tuition. From the date of Rodriguez's admission until September of 2018, USAT had received the sum amount of $3,925, for providing what Rodriguez understood was a valid medical education in medicine in Puerto Rico and to be able to apply for and take the United States Medical Licensing Examinations. (See paragraphs 23-27 of the Declaration of Rodriguez- Page 3 of Exhibit 51). (See Exhibit 10).

When the Plaintiffs received USAT invoices asking for payments to be made or USAT Receipts to Confirm Payments received, all for providing what the Plaintiffs thought was a valid

education of medicine in Puerto Rico, USAT invoices and USAT receipts requested that the payments be either mailed or wire transferred to USAT's Administration Office at Colorado. (See pages 8-22, 32, 39, 42, 47, 51, 53, 55, 61, 63, 65, 70, 74, 76, 83-88 of Exhibit 45) (See pages 58, 84 of Exhibit 46). (See pages 31 of Exhibit 47). (See pages 9,14, 17 of Exhibit 48). (See pages 25-26, 56-57 of Exhibit 49). (See pages 12-14, 19-20, 24 of Exhibit 51). (See pages 23, 42 of Exhibit 52).

    C.  ECFMG's discovery of USAT's False Representations to ECFMG of USAT's Enterprise, Conduct and Pattern of Racketeering Activity and the Plaintiffs' Injury

In July and August of 2018, ECFMG received information indicating that USAT was offering classes in Miami, Florida. (See pages 155-160 of Exhibit 19).

On August 21, 2018, D. Scott Mealey, ECFMG's Manager of Medical Education Resources & Operations Support, sent a letter to Dr. Tulp via email, which stated:

> Dear Dr. Tulp,
> It has recently come to the attention of the Educational Commission for Foreign Medical Graduates (ECFMG) that USAT in Montserrat is operating a satellite (or branch) campus in Miami, Florida. In order for students and graduates of an international medical school, such as USAT, to have eligibility to apply for ECFMG Certification, ECFMG policy requires confirmation from the appropriate government authority in the branch campus country that the branch campus is authorized to operate as a medical school in such branch campus country. In light of this, ECFMG requests that USAT provide documentation from the United States Department of Education and/or the Florida Department of Education confirming that USAT's Miami branch campus is authorized to operate as a medical school in the United States. This documentation should cover the whole time period that the USAT Miami branch campus has been in operation. (See page 161 of Exhibit 19). (See page 282 line 9 to line 18, page 319 line 4 to page 320 line 11 of Exhibit 19).

The letter asked Dr. Tulp to provide the requested documentation "confirming that USAT's Miami branch campus is authorized to operate as a medical school in the United States" by

September 3, 2018. (See page 161 of Exhibit 19).

ECFMG never received documentation showing that USAT is authorized to conduct education in the United States. (See page 283 line 6 to line 9 of Exhibit 19).

Later on August 21, 2018, Dr. Tulp responded to Mr. Mealey via email, writing:

> Dear Mr. Mealey
> This is incorrect information. The Miami location is an information and testing site only, where a pre-usmle examination [an NBME] may be administered, and an Orientation for new students is conducted prior to their traveling to the Caribbean. It is NOT a campus. Our ONLY Campus is located in Olveston, Montserrat, British West Indies.
> Actually, recall that Montserrat is a volcanic Island, and the license issued to USAT in September, 2003 DOES actually permit the establishment of off-campus lecture and administrative sites as needed. USAT has students on island on a year round basis in its origination. I hope this will clarify your concern. (See page 162 of Exhibit 19); (See page 323 line 16 to page 325 line 8 of Exhibit 19).

Between August 21, 2018 and September 14, 2018, ECFMG received information that USAT was providing medical education lectures not only at its Miami site, but also at sites in Tampa, Florida and Dallas, Texas. (See page 165 of Exhibit 19).

On September 14, 2018, Kara Corrado, ECFMG's Vice President for Operations, sent a letter to Dr. Tulp via email, which stated:

> Dear Dr. Tulp:
> This is a follow-up to our August 21, 2018 letter in which ECFMG requested information from you about the University of Science, Arts & Technology (USAT) Faculty of Medicine's satellite (or branch) campus in Miami, FL. In response, you indicated, 'The Miami location is an information and testing site only, where a pre-usmle examination [an NBME] may [be] administered, and an Orientation for new students is conducted prior to their traveling to the Caribbean. It is NOT a campus. Our ONLY Campus is located in Olveston, Montserrat, British West Indies.' We thank you for your quick reply.'
> ECFMG has since received information that USAT is providing medical education lectures not only at its Miami site, but also at sites in Tamp, FL, and Dallas, TX.

20

It is critical that ECFMG ensure that information regarding international medical schools and their students provided to ECFMG complies with ECFMG policies and requirements. Therefore, ECFMG continues its review of this matter. This letter is to advise you that, as part of its review, ECFMG has reached out to students and graduates of USAT in order to collect information from them regarding their attendance at USAT.

Effective today, USAT students and graduates seeking services related to ECFMG Certification, including registration for USMLE examinations, release of USMLE scores, issuance of an ECFMG Certificate, or issuance of ECFMG Certification Status Reports to residency programs, must complete and submit an affidavit attesting to the accuracy of the medical school information provided to ECFMG. Services will not be provided to individuals who do not complete the affidavit. ECFMG has provided instructions about this process directly to the students and graduates. JA0102; *see* JA0216 (Injunction Hr'g Tr. 41:5-13 ("We had had information that USAT was operating a campus in the United States in Florida. And Dr. Tulp had indicated that that was not correct. So we still were getting information contrary to that. So we decided to send the affidavit to the students to get information from the students about where they actually did their basic sciences.")). (See page 165 of Exhibit 19). (See page 279 line 5 to line 13 of Exhibit 19).

ECFMG sent an affidavit to USAT students and graduates seeking ECFMG services, asking them to certify under penalty of perjury and under penalty of a finding of irregular behavior (1) their dates of attendance at USAT, and (2) the location where they took their basic science courses. (See page 182 of Exhibit 19).

More than 300 students submitted affidavits to ECFMG indicating that they took classes in the United States, and not a single student indicated that he or she took all of his or her basic science courses in Montserrat. (See pages 237-238 of Exhibit 19).

There were also a "number of affidavits" from USAT students where "Dr. Tulp ha[d] provided information that conflicted with the affidavit information that ECFMG got from the students." (See page 256 line 7 to line 16 of Exhibit 19).

Between August and October of 2018, the Plaintiffs were studying and applying to take

21

the United States Medical Licensing Examinations. After the Plaintiffs applied, ECFMG requested the Plaintiffs to submit information under penalty of perjury via an affidavit to describe the USAT medical school information and asking whether the Plaintiffs had physically attended the USAT medical classes at Montserrat. During those months, the Plaintiffs were informed by ECFMG that they were not eligible for the United States Medical Licensing Examination. (See paragraph 32-34 of the Declaration of Peña – Page 4 Exhibit 45) (See paragraphs 32-34 of the Declaration of Blasco – Page 4 Exhibit 46) (See paragraphs 32-34 of the Declaration of Prosper – Page 4 Exhibit 47) (See paragraphs 32-34 of the Declaration of Torres – Pages 3-4 Exhibit 49)

On September of 2018, the Plaintiffs were notified by the USAT Officials of the ECFMG irregularities. On September 24th of 2018, the USAT Officials notified the Plaintiffs of a telephone conference to be held on September 26th of 2018 to discuss the ECFMG irregularities. On September 26th of 2018, a telephone conference was held with Tulp and the attorneys of USAT to address the Plaintiffs and other students' concerns regarding the denial to take the United States Medical Licensing Examination. During that September 26th telephone conference, Tulp instructed the Plaintiffs and the other students to falsely inform ECFMG that the Plaintiffs and the other students took the USAT medical education at the Montserrat main campus. Tulp made the representation that ECFMG had been provided false information regarding USAT students and the USAT location of colleges of medicine. (See the Declaration of Peña –Exhibit 45) (See the Declaration of Blasco –Exhibit 46) (See the Declaration of Prosper –Exhibit 47) (See the Declaration of Rosado –Exhibit 48) (See the Declaration of Torres –Exhibit 49) (See the Declaration of Gomez –Exhibit 50) (See the Declaration of Rodriguez – Pages 1-2 Exhibit 51) (See the Declaration of De Jesus –Exhibit 52) (See the Declaration of Nieves –Exhibit 53)

After this telephone conference, the Plaintiffs began to send numerous communications to

the USAT Officials inquiring as to why the Plaintiffs could not take the United States Medical Licensing Examination. During September, October and November of 2018, the USAT Officials dodged and evaded questions by the Plaintiffs and other students regarding their lack of eligibility for the United States Medical Licensing Examination. (See the Declaration of Peña –Exhibit 45) (See the Declaration of Blasco –Exhibit 46) (See the Declaration of Prosper –Exhibit 47) (See the Declaration of Rosado –Exhibit 48) (See the Declaration of Torres –Exhibit 49) (See the Declaration of Gomez –Exhibit 50) (See the Declaration of Rodriguez – Pages 1-2 Exhibit 51) (See the Declaration of De Jesus –Exhibit 52) (See the Declaration of Nieves –Exhibit 53).

During early November of 2018, the USAT Officials instructed the Plaintiffs and the other students to not send additional information to ECFMG outside the instructions of USAT. During early November of 2018, the USAT Officials instructed the Plaintiffs and the other students to send all information regarding ECFMG to Konyk, who would then refer the Plaintiffs and the other students to USAT's attorney. (See the Declaration of Peña –Exhibit 45) (See the Declaration of Blasco –Exhibit 46) (See the Declaration of Prosper –Exhibit 47) (See the Declaration of Rosado –Exhibit 48) (See the Declaration of Torres –Exhibit 49) (See the Declaration of Gomez –Exhibit 50) (See the Declaration of Rodriguez – Pages 1-2 Exhibit 51) (See the Declaration of De Jesus – Exhibit 52) (See the Declaration of Nieves –Exhibit 53)

During September of 2018, Konyk, Tulp and Baldwin emailed the Plaintiffs and the other students that they will resolve our situation as to taking United States Medical Licensing Examination. (See the Declaration of Peña –Exhibit 45) (See the Declaration of Blasco –Exhibit 46) (See the Declaration of Prosper –Exhibit 47) (See the Declaration of Rosado –Exhibit 48) (See the Declaration of Torres –Exhibit 49) (See the Declaration of Gomez –Exhibit 50) (See the Declaration of Rodriguez – Pages 1-2 Exhibit 51) (See the Declaration of De Jesus –Exhibit 52)

23

(See the Declaration of Nieves –Exhibit 53).

On December 24th, 2018, USAT frivolously filed a lawsuit against ECFMG. This judicial proceeding was dismissed on the merits by the United States District Court for the Eastern District Court of Pennsylvania. The judgment was confirmed by the United States Court of Appeals for the Third Circuit. (See Exhibits 13-22).

    D.  <u>Defendants Deposition Testimonies corroborate that Defendants made False Representations to the Plaintiffs</u>

        i.  <u>Although USAT operated in the United States, it was not accredited nor authorized to operate in the United States or Puerto Rico, nor was it accredited by other accrediting agencies</u>

Tulp recognizes that USAT's license is based on an agreement that was reached with Government of Montserrat in order to operate USAT at Montserrat. Tulp states that Medical College of London was the original name proposed for the College of Medicine, whereas USAT is the overall university. Tulp explains that the Medical College of London is an entity within USAT and both were incorporated in Montserrat in 2003. (See Exhibit 41- See line 25 page 15 to line 11 of page 20 of the Tulp Deposition). (See Exhibit 11).

Although the agreement with USAT and the Government of Montserrat states that the Government of Montserrat must request the World Directory of Medical Schools to list USAT, Tulp admits that the World Directory of Medical Schools went out of publication. Tulp also admits that the International Medical Education Directory ("IMED") is maintained, administered and controlled by the ECFMG. (See Exhibit 41- See line 7 page 28 to line 12 of page 30 of the Tulp Deposition). (See Exhibit 11).

Tulp states that that the USAT medical school is modeled after the United States ("US") curriculum, in that it would take four years of medical school studies in order to obtain the medical degree. The medical student needs to go through two years of basic science and two years of clinical training studies. (See Exhibit 41- See line 7 page 31 to line 9 of page 32 of the Tulp Deposition).

Tulp testified that the classes that a medical student needs to take for the first year of the basic science portion are anatomy, physiology, biochemistry, medical ethics, embryology. Afterwards, the classes that a medical student needs to take for the second year of the basic science portion are nutritional biochemistry, clinical medicine, multiple organ systems, medical writing, ethics, public health, epidemiology, microbiology, advance microbiology, immunology. After taking those first two years of the basic science portion, then the medical student can enter the clinical part with the condition of taking a comprehensive examination in order to make sure they mastered the information. (See Exhibit 41- See line 14 page 36 to line 4 of page 38 of the Tulp Deposition).

Konyk and her husband, Tulp, founded USAT in Montserrat by obtaining a license with the Government of Montserrat. (See Exhibit 40- See line 7 page 15 to line 3 of page 16 of the Konyk Deposition). (See Exhibit 11). After setting up a campus in Olveston, Montserrat, Konyk and Tulp started recruiting students using a website that is a large part of drawing students to the school. (See Exhibit 40- See line 13 page 16 to line 21 of page 17 of the Konyk Deposition). (See Exhibit 37). Konyk testified that originally the students at first took basic science portion classes physically at Montserrat until 2006, but then Konyk and Tulp began to put courses online from 2006 to present time. (See Exhibit 40- See line 22 page 17 to line 21 of page 19 of the Konyk Deposition).

Konyk admits that USAT operated in the following places: 1) an office in Colorado for administrative work, 2) a campus in Montserrat, 3) a campus in Puerto Rico, 4) a lecture conference site in Miami, Florida, 5) a lecture conference site in Tamp, Florida, 6) a lecture conference site in Dallas-Fort Worth, Texas, and 7) a lecture conference site in Baltimore, Maryland. (See Exhibit 40- See line 9 page 36 to line 12 of page 38 of the Konyk Deposition). Konyk testified as to the actual locations where USAT operated by providing conferences, seminars and orientations. In Florida, USAT operated a conference seminar type of classes at two hotels: at the Hilton Garden in Miami and the Hilton Westshore in Tampa. In Texas, USAT operated a conference seminar type of classes at the Four Points by Sheraton in Dallas-Fort Worth. In Maryland, USAT operated a conference seminar type of classes at the Doubletree Hotel in Baltimore. In Puerto Rico, USAT operated a conference seminar type of classes at a building located at Barbosa Avenue under a lease.  (See Exhibit 40- See line 23 page 40 to line 3 of page 44 of the Konyk Deposition).

Tulp admits that USAT started giving medical school classes online. However, Tulp admitted that USAT gave seminars, orientation and conferences in Miami, Tampa, Baltimore, Dallas-Fort Worth and Puerto Rico. Most of these operations seized around December of 2018. (See Exhibit 41- See line 10 page 32 to line 13 of page 36 of the Tulp Deposition).

When confronted with Exhibit 7, Konyk admitted that in 2013, USAT made a trademark of the school seal in Florida. The trademark seal was used to validate the diplomas, to be used in different items. The trademark seal states that the College of Medicine and USA and UK. Additionally, the trademark seal was used for a USAT program brochure for a commencement ceremony for the of USAT students, which reflects that the commencement ceremony was held in Miami Hilton Gardens. Said brochure also states that USAT can operate outside Montserrat.  (See

Exhibit 40- See line 23 page 120 to line 10 of page 124 of the Konyk Deposition). (See pages 33-45 of Exhibit 7).

When confronted with Exhibit 9, Konyk recognized that USAT Fee Schedule document. Konyk explained that the USAT fee schedule is used to inform the student as to the expected cost of attendance. Said USAT Fee Schedule was used for all USAT students in Dallas-Fort Worth, Miami, Tampa, Baltimore or Puerto Rico, even though it says Olveston Campus. (See Exhibit 40-See line 21 page 148 to line 2 of page 150 of the Konyk Deposition). (See page 5 of Exhibit 9).

Konyk testified that Ortiz-Bustillo was a former USAT graduate. Ortiz-Bustillo contacted Konyk regarding assisting other medical students. Afterwards, Ortiz-Bustillo leased a building around April of 2017 on behalf of USAT. Ortiz-Bustillo was appointed as Associate Dean of USAT who would be charged in overseeing the faculty members, scheduling and other employees in San Juan, Puerto Rico. (See Exhibit 40- See line 18 page 45 to line 10 of page 49 of the Konyk Deposition). Konyk testified that Ortiz-Bustillo was tasked with supervising faculty members, handling the contracts of the faculty members, delegating tasks to faculty members, scheduling the dates and times of classes given by the faculty members and received by the students, coordinating delivery of equipment and supplies for students and staff and recruiting students. (See Exhibit 40-See line 11 page 49 to line 22 of page 50 of the Konyk Deposition).

Tulp explained that Ortiz-Bustillo at first was a clinical coordinator and assisted in establishing an administrative office in Puerto Rico, which later morphed into something larger. Ortiz-Bustillo later became an associate dean and opened the USAT medical school in Puerto Rico. (See Exhibit 41- See line 25 page 70 to line 22 of page 71 of the Tulp Deposition).

Tulp explained that he is the President and CEO of USAT. His functions and duties as President and CEO are to oversee the operations of USAT, to address needs as they arise, delegate

where necessary to achieve tasks. Tulp delegates the administration, finances, registrar, student applications and student files to Konyk. Meanwhile Tulp would focus on the medical education, would be in charge of interviewing professors for the medical classes and hiring the professors who would give out medical classes. However, Tulp states that Ortiz-Bustillo was delegated the task of hiring the professors in Puerto Rico.  (See Exhibit 41- See line 23 page 71 to line 17 of page 76 of the Tulp Deposition).

Tulp stated that he is the President and CEO of USAT. His functions and duties as President and CEO are to oversee the operations of USAT, to address needs as they arise, delegate where necessary to achieve tasks. Tulp delegates the administration, finances, registrar, student applications and student files to Konyk. Meanwhile Tulp would focus on the medical education, would be in charge of interviewing professors for the medical classes and hiring the professors who would give out medical classes. However, Tulp states that Ortiz-Bustillo was delegated the task of hiring the professors in Puerto Rico.  (See Exhibit 41- See line 23 page 71 to line 17 of page 76 of the Tulp Deposition).

Tulp admits that Ortiz-Bustillo recruited faculty in Puerto Rico to assist giving classes in Puerto Rico for the basic science portion of the medical school.  (See Exhibit 41- See line 17 page 88 to line 23 of page 89 of the Tulp Deposition).

Ortiz-Bustillo admitted that was approached by Tulp and Konyk to assist them as an associate dean in order to recruit students. (See Exhibit 43- See line 4 page 15 to line 7 of page 16 of the Ortiz-Bustillo Deposition). Ortiz-Bustillo testified that his main duties and functions as an associate dean was to recruit students, oriented students, and provide basic science classes via USAT lectures. (See Exhibit 43- See line 25 page 16 to line 18 of page 17 of the Ortiz-Bustillo Deposition). Ortiz-Bustillo testified that he was the person who registered USAT Monserrat, LLC

in Puerto Rico. (See Exhibit 43- See line 10 page 19 to line 11 of page 21 of the Ortiz-Bustillo Deposition). (See Exhibit 6). Ortiz-Bustillo testified that Tulp and Konyk were the persons who leased the USAT building in Puerto Rico, located at 598 Barbosa Ave. (See Exhibit 43- See line 12 page 21 to line 10 of page 22 of the Ortiz-Bustillo Deposition). (See Exhibit 6).

Ortiz-Bustillo admitted that he traveled to the Dominican Republic with Daniela Cabrera ("Cabrera") to talk and recruit prospective students for USAT in Puerto Rico. Ortiz-Bustillo explained to the prospective students the basic information related to USAT, which is also provided by USAT materials and documents which are contained in a package. (See Exhibit 43- See line 5 page 26 to line 6 of page 29 of the Ortiz-Bustillo Deposition). (See Exhibit 27).

Ortiz-Bustillo testified that he recognizes the USAT brochure contains his personal information such as his personal cell phone number and his USAT e-mail address. Additionally, it contains the postal address of USAT Puerto Rico. (See Exhibit 43- See line 16 page 41 to line 5 of page 44 of the Ortiz-Bustillo Deposition). (See Exhibit 24). When confronted with the USAT brochure, Ortiz-Bustillo admits that the basic science classes for the MD Program Curriculum were classes in a lecture setting that USAT students took in Puerto Rico, in the States and in Webinars. (See Exhibit 43- See line 14 page 45 to line 22 of page 54 of the Ortiz-Bustillo Deposition). (See page 2 of Exhibit 24).

When confronted with the USAT brochure, Ortiz-Bustillo admits that the section of accreditations states that USAT is accredited by ECFMG along with the USAT school seal that states USA and UK. Additionally, the USAT brochure states that it is a College of Medicine in Puerto Rico. However, Ortiz Bustillo admits that USAT was not accredited by Puerto Rico to have a college of medicine in Puerto Rico. (See Exhibit 43- See line 21 page 54 to line 25 of page 57 of the Ortiz-Bustillo Deposition). (See page 3 of Exhibit 24).

When asked questions about what his statements were to the Plaintiffs, Ortiz Bustillo admits that he spoke to the Plaintiffs to recruit them as students of USAT in Puerto Rico. However, Ortiz-Bustillo admits that he does not recall the exact conversations. Ortiz-Bustillo does not recall whether he said USAT is accredited by ECFMG (See Exhibit 43- See line 17 page 62 to line 8 of page 72 of the Ortiz-Bustillo Deposition). (See page 3 of Exhibit 24).

When confronted with Cabrera's e-mails, Ortiz-Bustillo recognizes the e-mail address of Cabrera who was an employee of USAT and was authorized to send information on behalf of USAT. Ortiz- Bustillo admits that Cabrera sent e-mails to the Plaintiffs attaching USAT Brochures and other materials. Additionally, Cabrera would inform the Plaintiffs if they were accepted into the MD Program of USAT, along with letters of acceptance from Tulp. (See Exhibit 43- See line 9 page 72 to line 21 of page 77 of the Ortiz-Bustillo Deposition). (See Exhibit 31).

Although Ortiz-Bustillo stated that he does not recall much of the process of interviewing and hiring faculty members and professors, ultimately Ortiz-Bustillo testified that Tulp was most likely the person who hired the faculty and professors at USAT in Puerto Rico. Ortiz-Bustillo limited himself in stating that he sought out faculty members and later recommended persons to Tulp. (See Exhibit 43- See line 6 page 85 to line 9 of page 90 of the Ortiz-Bustillo Deposition).

Although Ortiz-Bustillo stated that he does not recall much, eventually Ortiz-Bustillo admitted that professors in Puerto Rico taught basic science classes at the classroom located in Puerto Rico and in the States. (See Exhibit 43- See line 10 page 90 to line 13 of page 95, line 10 page 111 to line 25 page 113 of the Ortiz-Bustillo Deposition).

Ortiz- Bustillo, while recruiting students, would deliver the USAT Fee Schedule and Enrollment Agreement. Ortiz-Bustillo admitted that in order to become an USAT student, the USAT student needs to sign the enrollment agreement prior to starting with USAT. The enrollment

agreement was part of the information provided by USAT. Ortiz-Bustillo admits that the USAT Fee Schedule and Enrollment Agreement was modified to include new locations, such as Puerto Rico which Ortiz-Bustillo identified as a branch of USAT in Puerto Rico. (See Exhibit 43- See line 7 page 101 to line 11 of page 109 of the Ortiz-Bustillo Deposition). (See pages 6, 23 of Exhibit 9).  Ortiz- Bustillo stated that the Tuition and Fee Schedule, both the original and the modified PR version, were prepared by USAT in Colorado. Additionally, the Enrollment Agreements was modified in order to include new locations such as Florida, Texas and Puerto Rico. (See Exhibit 43- See line 8 page 117 to line 7 of page 119 of the Ortiz-Bustillo Deposition). (See pages 42 and 43 of Exhibit 9).

Ortiz-Bustillo recognized the Registration Schedule for the USAT Student. Said document reflects the courses that an USAT student would take in Puerto Rico. The Registration Schedule of the Courses was prepared by the registrar of USAT Puerto Rico, whereas it notified the student which classes would be taken on certain dates and hours. The Registration Schedule reflects the basic science classes taken in Puerto Rico.  (See Exhibit 43- See line 14 page 135 to line 13 of page 144 of the Ortiz-Bustillo Deposition). (See Exhibit 34). Ortiz-Bustillo recognized the Enrollment Certifications made by USAT with regards the Plaintiffs. Said documents were prepared when a student requests for it. Ortiz-Bustillo recognizes his signature and admits that the document certified that the Plaintiffs was in the medical doctorate program in Puerto Rico campus. (See Exhibit 43- See line 16 page 144 to line 2 of page 153 of the Ortiz-Bustillo Deposition). (See Exhibit 35).

When confronted with pictures of the White Coat Ceremony, Ortiz-Bustillo admits that the white coat ceremony was organized by USAT, after the students took basic science courses. Ortiz-Bustillo admits that he appeared along with Tulp and the USAT Puerto Rico Professors. (See

Exhibit 43- See line 5 page 166 to line 23 of page 169 of the Ortiz-Bustillo Deposition). (See Exhibit 23).

When confronted with Exhibit 9, Konyk recognized that USAT Enrollment Agreement document. Konyk explained that the USAT Enrollment Agreement is a list of rules and regulations of the medical school, which is required to be signed by the student, being understood as the contract between the student and USAT. The USAT Enrollment Agreement mentions all the campuses and locations of USAT that were operating, such as Olveston, Florida and Colorado. Notwithstanding, the USAT Enrollment Agreement was also used for the students in Puerto Rico. The USAT Enrollment Agreement states describes the degrees that USAT may award to a student if they comply with the rules and regulations, as well as the transcripts.  (See Exhibit 40- See line 3 page 150 to line 10 of page 158 of the Konyk Deposition). (See pages 6-10 of Exhibit 9).

When confronted with Exhibit 9, Konyk recognized that a new document was prepared regarding the USAT PR Fee Schedule. The USAT PR Fee Schedule was prepared by Ortiz-Bustillo for the medical students at the Puerto Rico USAT Branch, which reflects the physical address of the USAT school in Puerto Rico. The physical address of the USAT school in Puerto Rico was 598 Ave. Barbosa, Esq., Calle Guayama, San Juan PR 00919. Konyk reviewed USAT PR Fee Schedule and approved it.  (See Exhibit 40- See line 24 page 158 to line 12 of page 162 of the Konyk Deposition). (See page 23, 33 of Exhibit 9).

Konyk testified that ECFMG is an entity that coordinates which individuals are able to apply and take the USMLE, and they also control the electronic residency system. All IMG must go through ECFMG. (See Exhibit 40- See line 17 page 25 to line 4 of page 26 of the Konyk Deposition).

The World Federation for Medical Education ("WFME") determines which accrediting bodies would be required to accredit Caribbean medical schools, such as USAT which is a medical school in the Caribbean. (See Exhibit 40- See line 8 to line 22 of page 29 of the Konyk Deposition).

Konyk admits that USAT is not accredited by LCME, COCA nor ECFMG. Konyk clarifies that ECFMG does not accredit schools because ECFMG is in charge of determining what accrediting bodies are acceptable and ECFMG is in charge of the World Directory. (See Exhibit 40- See line 6 page 30 to line 7 of page 31 of the Konyk Deposition). Konyk admits that the two accrediting bodies for the any Caribbean medical school such as USAT are CAAM-HP and ACCM. ACCM stands for Accreditation Commission on Colleges of Medicine ("ACCM") and CAAM-HP stands for Caribbean Accreditation Authority for Education in Medicine and other Health Professions ("CAAM-HP").  However, Konyk admits that USAT is not accredited by either CAAM-HP or ACCM because the Government of Montserrat did not sign any agreement with CAAM-HP or ACCM. (See Exhibit 40- See line 8 page 31 to line 8 of page 35 of the Konyk Deposition).

Tulp explains that the LCME is an accrediting body for all US-based and Canadian -based medical schools. Tulp admits that USAT is not accredited by LCME because it's an international school. Additionally, Tulp explains that COCA is an organization analogous to the LCME that accredits medical schools licensed in the United States. Tulp admits that USAT is not eligible because it's an international medical school.  (See Exhibit 41- See line 2 page 40 to line 10 of page 41 of the Tulp Deposition). Tulp testified that ECFMG is a clearinghouse for IMG of international medical schools worldwide. Tulp states that USAT is not accredited by ECFMG because it is not an accrediting agency. IMG must individually apply for ECFMG in order to apply for the USMLE. (See Exhibit 41- See line 11 page 41 to line 8 of page 42 of the Tulp Deposition). Tulp testified

that CAAM-HP is an accrediting body that's quasi-similar to the LCME. CAAM-HP is an organization that accredits medical schools in the Caribbean, which includes schools in the northern parts of South America. USAT is not accredited by CAAM-HP. (See Exhibit 41- See line 6 page 43 to line 9 of page 44 of the Tulp Deposition). Tulp testified that ACCM is an accrediting body that's equivalent to CAAM. ACCM is an accrediting body for medical schools in the Caribbean. USAT is not accredited by ACCM. (See Exhibit 41- See line 10 page 44 to line 13 of page 45 of the Tulp Deposition). Tulp admitted that they applied to obtain the accreditation from CAAM but because the Government of Montserrat did not agree to sign off to accredit USAT, USAT is not accredited by CAAM. Accreditation is imposed by ECFMG. (See Exhibit 41- See line 16 page 50 to line 21 of page 52 of the Tulp Deposition).

Ortiz-Bustillo admitted that USAT is not accredited by CAAM-HP, which is the organization that accredits medical schools in the Caribbean. Additionally, Ortiz-Bustillo admitted that USAT is not licensed nor authorized to operate in Puerto Rico, even though he had knowledge that ECFMG policy stated that international medical schools need to be outside the US. Ortiz-Bustillo had knowledge that USAT operated campuses and lectures in Florida and Texas. Ortiz-Bustillo admitted that he had never been to Montserrat.  (See Exhibit 43- See line 24 page 169 to line 17 of page 173 of the Ortiz-Bustillo Deposition). (See Exhibit 12). (See page 66, 154 of Exhibit 19).

Tulp testified that USAT students have to go through ECFMG because USAT is not a US medical school, but instead an international school. The only way an USAT student can become a licensed physician in the US is if that student is certified by ECFMG which is the only organization that can coordinate the USMLE with IMG. (See Exhibit 41- See line 22 page 52 to line 1 of page 54 of the Tulp Deposition).

Tulp testified that the license agreement obtained with the Government of Montserrat was issued with the understanding that USAT will be responsible for ensuring that the medical school meets the accreditation standards. (See Exhibit 41- See line 2 to line 19 of page 54 of the Tulp Deposition). (See Exhibit 11). Tulp testified that the license agreement of 2003 obtained with the Government of Montserrat is the only agreement executed with the Government of Montserrat, and no other agreement has been executed. (See Exhibit 41- See line 20 page 54 to line 15 of page 55 of the Tulp Deposition). (See Exhibit 11). Tulp admitted that CAAM visited and inspected USAT twice in 2007 and 2012. CAAM did not accredit USAT after these two inspections. Additionally, Tulp admitted that the Government of Montserrat did not sign off with CAAM to accredit USAT. CAAM also made observations that they declined to accredit USAT because there was no evidence that teaching activities were taking place in Montserrat. (See Exhibit 41- See line 9 page 56 to line 21 of page 60 of the Tulp Deposition). (See Exhibit 12).

Konyk admitted that when she visited Puerto Rico and saw equipment that was used for basic science classes, such that students were taking basic science courses in Puerto Rico. (See Exhibit 40- See line 24 page 68 to line 21 of page 70 of the Konyk Deposition). However, Konyk admitted that the USAT Puerto Rico branch was not accredited by an organization in Puerto Rico. (See Exhibit 40- See line 24 page 65 to line 2 of page 66 of the Konyk Deposition).

Konyk testified that all medical schools have to be accredited by accrediting bodies in order in order that IMG students take the USMLE. (See Exhibit 40- See line 19 page 28 to line 13 of page 29 of the Konyk Deposition). Konyk recalls that around 2018, ECFMG sent a letter to Tulp requesting information that the USAT students were being taught basic science classes in the country where the foreign medical school is located which in USAT's case would be Montserrat. (See Exhibit 40- See line 3 page 66 to line 20 of page 67 of the Konyk Deposition).

Tulp admitted that he recognizes the projected class schedule for USAT. Tulp admits that a commencement graduation ceremony is held in Miami, where they would also have anatomy lab classes. (See Exhibit 41- See line 22 page 118 to line 7 of page 123 of the Tulp Deposition). (See page 154 of Exhibit 19). Tulp admitted that he recognizes himself in a series of photographs with Ortiz-Bustillo attending a white coat ceremony in Puerto Rico. (See Exhibit 41- See line 9 page 135 to line 5 of page 138 of the Tulp Deposition). (See Exhibit 23). Tulp admitted that the classes reflected in the USAT brochure are all the basic science courses that are similar to the classes that USAT provided. (See Exhibit 41- See line 6 page 139 to line 21 of page 143 of the Tulp Deposition). (See Exhibit 24).

Ortiz-Bustillo testified that ECFMG is an entity that verifies and validates an international medical student in order to allow that student to take the medical licensing exam at the United States, the USMLE. (See Exhibit 43- See line 20 page 31 to line 16 of page 32 of the Ortiz-Bustillo Deposition). (See Exhibit 27). Ortiz-Bustillo testified that the USAT materials and documents stated that USAT is accredited by ECFMG and USMLE, although he admits that he is unsure if USAT was accredited by ECFMG and USMLE because he was not a part of that. (See Exhibit 43- See line 21 page 32 to line 12 of page 33 of the Ortiz-Bustillo Deposition). (See Exhibit 27).

Tulp recognized the USAT information materials and documents where he would give guidance on what information to put in in response to a person looking for information of the USAT school. Tulp admits that this type of USAT information materials and documents would be reviewed by Tulp to verify if it was correct. However, when confronted with the statement that USAT is accredited with ECFMG and USMLE, which is contained in the USAT information materials and documents, Tulp admitted that said statement is incorrect. (See Exhibit 41- See line 18 page 156 to line 18 of page 162 of the Tulp Deposition). (See Exhibit 27)

ii. <u>The Defendants received payments originating from Puerto Rico and Tennessee to their Bank Account in Colorado based on the False Representations that they could Provide Medical Education in Puerto Rico and the States</u>

Konyk testified that as Director of Administration, she was also in charge of dealing with the students of USAT. Konyk took care of the financial/bursar's office such as tuition and fees. With regards to tuition, Konyk specifies that she receives the payments in exchange for the medical education. With regards to fees, Konyk specifies that there are fees for matriculation, graduation, technical fees for library materials, fees for lab materials and other student expenses. (See Exhibit 40- See line 23 page 50 to line 7 of page 52 of the Konyk Deposition).

Ortiz-Bustillo testified that his interactions with Tulp and Konyk varied. With Tulp he dealt with the academic, whereas with Konyk it was administrative. Ortiz-Bustillo would send everything to the main office located in Colorado. Ortiz-Bustillo would send money orders and checks from students to Colorado by mail. Ortiz-Bustillo would use a credit card machine that was provided by Konyk, which printed receipts that stated that the payment was sent to Colorado. (See Exhibit 43- See line 11 page 36 to line 7 of page 39 of the Ortiz-Bustillo Deposition).

Ortiz-Bustillo explained that he recalls assisting in sending payments to Colorado, including the student loans. Ortiz-Bustillo stated that he would assist the USAT students in applying for the student loan. Additionally, Ortiz-Bustillo understood that the only student loan that USAT had. (See Exhibit 43- See line 21 page 120 to line 25 of page 125, line 5 page 189 to line 12 page 190 of the Ortiz-Bustillo Deposition). (See Exhibit 10). (See Exhibit 38).

Ortiz-Bustillo recognized the Credit Card Authorization and Receipts of Payment from the Plaintiffs.  Ortiz-Bustillo admitted that said receipt would be printed from the machine from the United States, which was used to process the credit card payments from the USAT Puerto Rico school. Ortiz-Bustillo stated that the credit card machine to process the payments was located in the administrative office in Puerto Rico. Any USAT employees were authorized to make the credit card transaction including Ortiz-Bustillo and Cabrera. From said receipt, it showed that the credit card payment was sent to Colorado, directly to the USAT administration location. (See Exhibit 43- See line 16 page 128 to line 13 of page 135 of the Ortiz-Bustillo Deposition). (See Exhibit 33).

Konyk testified that with regards to receiving payments, the USAT students would send payments to the Colorado location by mail via checks or money orders. Additionally, USAT students could also send payment by using credit cards which were directed to the Colorado office. With regards to checks or money orders, Konyk testified that she would deposit the checks or money orders at a bank account at the Navy Federal Credit Union ("Navy Federal Bank Account") in Colorado. Both Tulp and Konyk were also authorized to use the USAT Bank Account. With regards to credit cards, Konyk testified that the credit card payments would be received by the Navy Federal Bank Account. USAT would also receive wire transfer payments, which would also be received at the Navy Federal Bank Account. (See Exhibit 40- See line 22 page 52 to line 3 of page 57 of the Konyk Deposition).

Konyk recalls that USAT students at the Puerto Rico branch campus obtained bank loans from Southeast Bank located at Tennessee. The proceeds of the bank loan were transferred to the Navy Federal Bank Account in Colorado. By the time these loans were disbursed, the students at the Puerto Rico USAT branch had been accepted and received a letter of acceptance with the

signature block of Tulp. (See Exhibit 40- See line 7 page 58 to line 13 of page 65 of the Konyk Deposition).

When confronted with Exhibit 10, Konyk recognized the document as one that reflects the USAT student accounts when USAT received the payment for Tuition and Fees for medical school. It contains a statement of the all the transactions that occurred on the USAT student account during the time the student was with USAT. Konyk used the software Quickbooks to record the financial information. Said statement reflects the Invoice, which is the sum amount that the student needs to pay for the tuition and the payments received. Exhibit 10 also contains the tuition statement and the fee schedule. (See Exhibit 40- See line 18 page 162 to line 14 of page 169 of the Konyk Deposition). (See Exhibit 10).

When confronted with Exhibit 10, Konyk clarifies that the document also reflects the receipt of the student loans. It specifies the amount that the USAT student borrowed. The statement reflects the loan proceeds, which was the loan received from the bank. All the loan proceeds were received by the Navy Federal Bank account in Colorado. (See Exhibit 40- See line 25 page 169 to line 4 of page 175 of the Konyk Deposition). (See page 6 of Exhibit 10).

Konyk admitted that Exhibit 10 reflects all the true and correct information of all the payments and loan proceeds received by Tulp, Konyk and USAT in their Navy Federal Bank Account in Colorado. (See Exhibit 40- See line 1 to line 19 of page 177 of the Konyk Deposition). (See Exhibit 10).

Exhibit 10 states that USAT received the following payments at their Navy Federal Bank Account in Colorado:

> j.  Peña paid USAT the sum amount of $21,075.00.
>
> k.  Blasco paid USAT the sum amount of $120,000.00.

l.  Prosper paid USAT the sum amount of $45,000.00.

m.  Rosado paid USAT the sum amount of $50,000.00.

n.  Gomez paid USAT the sum amount of $45,000.00.

o.  Rodriguez paid USAT the sum amount of $3,925.00.

p.  De Jesus paid USAT the sum amount of $45,000.00.

q.  Nieves paid USAT the sum amount of $45,000.00.

r.  Vazquez paid USAT the sum amount of $35,000.00.

E.  Conclusion

In essence, USAT did not comply with the ECFMG requirements to operate the branch campus in Puerto Rico because USAT was not authorized to operate as a medical school in the Puerto Rico because it did not meet the medical education eligibility requirements to practice medicine in Puerto Rico. (See page 66 of Exhibit 19).

Unfortunately, the Plaintiffs' medical education from USAT was not accepted by other medical schools. All applications made for Schools of Medicine in the US by the Plaintiffs were rejected and they did not accept the USAT medical education. Therefore, the Plaintiffs had to start their medical education again because this situation. (See the Declaration of Peña –Exhibit 45) (See the Declaration of Blasco –Exhibit 46) (See the Declaration of Prosper –Exhibit 47) (See the Declaration of Rosado –Exhibit 48) (See the Declaration of Torres –Exhibit 49) (See the Declaration of Gomez –Exhibit 50) (See the Declaration of Rodriguez – Pages 1-2 Exhibit 51) (See the Declaration of De Jesus –Exhibit 52) (See the Declaration of Nieves –Exhibit 53).

Based on the above, USAT received a the beforementioned sum amounts from the Plaintiffs via mail and wire fraud, without providing a valid medical education in Puerto Rico. (See the Declaration of Peña –Exhibit 45) (See the Declaration of Blasco –Exhibit 46) (See the

Declaration of Prosper –Exhibit 47) (See the Declaration of Rosado –Exhibit 48) (See the Declaration of Torres –Exhibit 49) (See the Declaration of Gomez –Exhibit 50) (See the Declaration of Rodriguez – Pages 1-2 Exhibit 51) (See the Declaration of De Jesus –Exhibit 52) (See the Declaration of Nieves –Exhibit 53).

USAT incurred in mail and wire fraud by receiving various beforementioned sum amounts from the Plaintiffs for providing an invalid medical education that resulted in the Plaintiffs' inability to take the United States Medical Licensing Examinations. (See the Declaration of Peña –Exhibit 45) (See the Declaration of Blasco –Exhibit 46) (See the Declaration of Prosper –Exhibit 47) (See the Declaration of Rosado –Exhibit 48) (See the Declaration of Torres –Exhibit 49) (See the Declaration of Gomez –Exhibit 50) (See the Declaration of Rodriguez – Pages 1-2 Exhibit 51) (See the Declaration of De Jesus –Exhibit 52) (See the Declaration of Nieves –Exhibit 53).

All the USAT Officials participated in the false representation via mail and wire fraud when they represented that USAT would provide a valid medical education and the Plaintiffs would be able to take the United States Medical Licensing Examinations. USAT falsely represented, via mail and wire fraud, to the Plaintiffs and many other students throughout 2017 and 2018 that it would provide a valid medical education and the Plaintiffs would be able to take the United States Medical Licensing Examinations. (See the Declaration of Peña –Exhibit 45) (See the Declaration of Blasco –Exhibit 46) (See the Declaration of Prosper –Exhibit 47) (See the Declaration of Rosado –Exhibit 48) (See the Declaration of Torres –Exhibit 49) (See the Declaration of Gomez –Exhibit 50) (See the Declaration of Rodriguez – Pages 1-2 Exhibit 51) (See the Declaration of De Jesus –Exhibit 52) (See the Declaration of Nieves –Exhibit 53)

However, the reality is that USAT did not provide to the Plaintiffs and the other students a valid medical education, which resulted in the Plaintiffs being unable to take the United States

Medical Licensing Examinations. (See the Declaration of Peña –Exhibit 45) (See the Declaration of Blasco –Exhibit 46) (See the Declaration of Prosper –Exhibit 47) (See the Declaration of Rosado –Exhibit 48) (See the Declaration of Torres –Exhibit 49) (See the Declaration of Gomez –Exhibit 50) (See the Declaration of Rodriguez – Pages 1-2 Exhibit 51) (See the Declaration of De Jesus – Exhibit 52) (See the Declaration of Nieves –Exhibit 53).

## LEGAL ARGUMENT

### I.    THE COURT SHOULD DENY DEFENDANTS' DOCKET 55 MOTION FOR SUMMARY JUDGMENT AND DOCKET 73 MOTION TO DISMISS

The Court should deny Defendants' Dockets 55 Motion for Summary Judgment and Docket 73 Motion to Dismiss because genuine issues of material facts exist. The evidence submitted in the record demonstrates to this Court that issues as to genuine material facts exist.

A district court evaluates the facts of a motion for summary judgment in the light most favorable to the nonmoving party. *Houlton Citizens' Coal. v. Town of Houlton*, 175 F.3d 178, 184 (1st Cir. 1999). Summary judgment is warranted only if the record discloses no genuine issue of material fact and demonstrates that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a). "This standard is favorable to the nonmoving party, but it does not give him a free pass to trial." *Hannon v. Beard*, 645 F.3d 45, 48 (1st Cir. 2011). "To be genuine, a factual dispute must be built on a solid foundation — a foundation constructed from materials of evidentiary quality." *Nieves-Romero v. United States*, 715 F.3d 375, 378 (1st Cir. 2013); *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011); Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990). "[C]onclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative"

42

will not defeat a summary judgment motion that complies with Local Rule 56 and Fed. R. Civ. P. 56. Rogan v. City of Boston, 267 F. 3d    24, 27(1st Cir. 2001).

"In ruling on a motion for summary judgment, the court must view 'the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor.'" *Poulis-Minott v. Smit*h, 388 F.3d 354, 361 (1st Cir. 2004) (citing *Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 36 (1st Cir. 1995)). "In marshaling the facts for this purpose we must draw all reasonable inferences in the light most favorable to the nonmovant. That does not mean, however, that we ought to draw unreasonable inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective." *Caban Hernandez v. Philip Morris USA,* Inc., 486 F.3d 1, 8 (1st Cir. 2007).

Credibility issues fall outside the scope of summary judgment. "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). See also, *Dominguez-Cruz v. Suttle Caribe, Inc.,* 202 F.3d 424, 432 (1st Cir. 2000) ("court should not engage in credibility assessments"); *Simas v. First Citizens' Fed. Credit Union*, 170 F.3d 37, 49 (1st Cir. 1999) ("credibility determinations are for the factfinder at trial, not for the court at summary judgment"); *Perez-Trujillo v. Volvo Car Corp.,* 137 F.3d 50, 54 (1st Cir. 1998) (credibility issues not proper on summary judgment); *Molina Quintero v. Caribe G.E. Power Breakers, Inc.,* 234 F.Supp.2d 108, 113 (D.P.R. 2002). "There is no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, and no room for the judge to superimpose his own ideas of probability and likelihood. In fact, only if the record, viewed in this manner and without regard to credibility determinations, reveals no genuine issue

as to any material fact may the court enter summary judgment." Cruz-Baez v. Negron-Irizarry, 360 F.Supp.2d 326, 332 (D.P.R. 2005).

## THE EVIDENCE INFERS *PRIMA FACIE* RICO CIVIL CLAIM

This court will note that the Plaintiffs evidence in the record may give reasonable inference to meet the *prima facie* case elements for a RICO Civil Claim.Specifically, the evidence submitted in the record may give reasonable inference to meet the *prima facie* case elements for RICO because the Plaintiffs have sufficient evidence to infer that USAT's actions: 1) caused an injury to the Plaintiffs, 2) based on the conduct, 3) of USAT as an enterprise, 4) through a pattern, and 5) of racketeering activity.

### THE RICO STATUTE

First, 18 USCS sec. 1964 (c) states:

> (c)  Any person injured in his business or property by reason of a violation of section 1962 of this chapter [18 USCS § 1962] may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962 [18 USCS § 1962]. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.

Second, 18 USCS sec. 1962 states:

> **(b)**   It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.
>
> **(c)**   It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect,

> interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
>
> **(d)** It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

RICO's expansive reach provides a generous private right of action — successful plaintiffs are entitled to triple damages if they can prove they were "injured in [their] business or property by reason of a violation of section 1962." *Home Orthopedics Corp. v. Rodriguez*, 781 F.3d 521, 527 (1st Cir. 2015). 18 U.S.C. § 1964(c).

### THE BURDEN OF PROOF OF A RICO CIVIL CLAIM

To prove a civil RICO claim, a plaintiff must prove: (1) injury caused by (2) conduct, (3) of an enterprise, (4) through a pattern, (5) of racketeering activity. *Giuliano v. Fulton*, 399 F.3d 381, 386 (1st Cir. 2005).

### 1.  Did the Plaintiffs suffer an injury?

In this case, it can be shown that the Plaintiffs have shown an injury.

Plaintiffs paid USAT the certain sum amounts with the intent to receive valid medical education in Puerto Rico in order to take the United States Medical Licensing Examinations. (See the Declaration of Peña –Exhibit 45) (See the Declaration of Blasco –Exhibit 46) (See the Declaration of Prosper –Exhibit 47) (See the Declaration of Rosado –Exhibit 48) (See the Declaration of Torres –Exhibit 49) (See the Declaration of Gomez –Exhibit 50) (See the Declaration of Rodriguez – Pages 1-2 Exhibit 51) (See the Declaration of De Jesus –Exhibit 52) (See the Declaration of Nieves –Exhibit 53).

On June 18th-22nd, 2017, USAT officials assisted Blasco to submit a loan application with SB for the sum amount of $60,000.00. Blasco paid USAT the sum amount of $28,695.00 for providing what Blasco understood was a valid medical education in medicine in Puerto Rico and

to be able to apply for and take the United States Medical Licensing Examinations. (See paragraphs 23-30 of the Declaration of Blasco- Page 3 of Exhibit 46). (See pages 20-50 of Exhibit 46).

On August 1st, 2017, USAT officials assisted Prosper to submit a loan application with SB for the sum amount of $45,000.00. Prosper paid USAT the sum amount of $22,500.00 for providing what Prosper understood was a valid medical education in medicine in Puerto Rico and to be able to apply for and take the United States Medical Licensing Examinations. (See paragraphs 23-31 of the Declaration of Prosper- Page 3 of Exhibit 47). (See pages 9-30 of Exhibit 47).

On June 4th and July 13th 2018, USAT officials assisted Rosado to submit a loan application with SB for the sum amount of $50,000.00. Rosado paid USAT the sum amount of $18,990.00 for providing what Rosado understood was a valid medical education in medicine in Puerto Rico and to be able to apply for and take the United States Medical Licensing Examinations. (See paragraphs 22-30 of the Declaration of Rosado- Page 3 of Exhibit 48).

On February 14th, 2018, USAT officials assisted Torres to submit a loan application with SB for the sum amount of $38,000.00. Torres paid USAT the sum amount of $23,300.00 for providing what Torres understood was a valid medical education in medicine in Puerto Rico and to be able to apply for and take the United States Medical Licensing Examinations. (See paragraphs 23-31 of the Declaration of Torres- Page 3 of Exhibit 49). (See Pages 27-36 of Exhibit 49).

On June 4th-July 13th of 2018, USAT officials assisted Gomez to submit a loan application with SB for the sum amount of $45,000.00. Gomez paid USAT the sum amount of $18,990.00 for providing what Gomez understood was a valid medical education in medicine in Puerto Rico and to be able to apply for and take the United States Medical Licensing Examinations. (See paragraphs 22-30 of the Unsworn Declaration of Gomez- Page 3 of Exhibit 50). (See Pages 6-8 of Exhibit 50).

On January 8th of 2018, USAT officials assisted De Jesus to submit a loan application with

SB for the sum amount of $45,000.00. De Jesus paid USAT the sum amount of $26,000.00 for providing what De Jesus understood was a valid medical education in medicine in Puerto Rico and to be able to apply for and take the United States Medical Licensing Examinations. (See paragraphs 23-31 of the Declaration of De Jesus- Page 3 of Exhibit 52). (See Page 11-14, 26-31 of Exhibit 52).

From June 4th to July 13th of 2018, USAT officials assisted Nieves to submit a loan application with SB for the sum amount of $46,237.50. Nieves paid USAT the sum amount of $18,990.00 for providing what Nieves understood was a valid medical education in medicine in Puerto Rico and to be able to apply for and take the United States Medical Licensing Examinations. (See paragraphs 22-30 of the Declaration of Nieves- Page 2-3 of Exhibit 53).

Peña paid USAT via mail or wire transfer the following: On July 11th of 2017, Peña paid the amount of $125 corresponding to USAT application fee. On August 2nd of 2017, Peña paid the amount of $6,000 corresponding to USAT One Time Matriculation Fee ($600), Tuition of Semester August 2017 to December 2017 ($4,900) and Anatomy Lab Fee ($500). On January 24th of 2018, Peña paid the amount of $4,000 corresponding to USAT Semester of January 2018 to May 2018. Then on April 3rd of 2018, Peña paid $400 corresponding to USAT Semester January 18 to May 2018. On May 16th of 2018, Peña paid the amount of $5,400 corresponding to USAT Summer classes, including $500 corresponding to a pending balance of the Semester January 2018 to May 2018. On September 25th of 2018, Peña paid the amount of $4,900 corresponding to USAT Semester August 2018 to December 2018. In summary, Peña paid USAT the sum amount of $25,725, for providing what Peña understood was a valid medical education in medicine in Puerto Rico and to be able to apply for and take the United States Medical Licensing Examinations. (See paragraphs 23-31 of the Declaration of Peña- Pages 3 of Exhibit 45).

Rodriguez paid USAT via mail or wire transfer the following: On June 4th 2018, Rodriguez paid $125 for the application fee. On October 5th, 2018, Rodriguez paid $600 for enrollment fee and $1,400 for tuition. On August 14th, 2018, Rodriguez paid $1,800 for tuition. In summary, Rodriguez paid USAT the sum amount of $3,925, for providing what Rodriguez understood was a valid medical education in medicine in Puerto Rico and to be able to apply for and take the United States Medical Licensing Examinations. (See paragraphs 23-27 of the Declaration of Rodriguez-Page 3 of Exhibit 51).

Although Plaintiffs paid USAT for what they thought was a valid medical education, the Plaintiffs suffered an injury because the medical education provided by USAT was not accepted by other medical schools. Additionally, USAT's invalid medical education resulted in the Plaintiffs inability to take the United States Medical Licensing Examination. (See the Declaration of Peña –Exhibit 45) (See the Declaration of Blasco –Exhibit 46) (See the Declaration of Prosper –Exhibit 47) (See the Declaration of Rosado –Exhibit 48) (See the Declaration of Torres –Exhibit 49) (See the Declaration of Gomez –Exhibit 50) (See the Declaration of Rodriguez – Pages 1-2 Exhibit 51) (See the Declaration of De Jesus –Exhibit 52) (See the Declaration of Nieves –Exhibit 53).

### 2. Did USAT and the USAT officials engage in conduct as an enterprise?

With regards to conduct, RICO section 1962(c)'s "conduct" element requires that a defendant "conduct or participate, directly or indirectly, in the conduct" of the enterprise. 18 U.S.C. § 1962(c). The United States Supreme Court interprets this element to mean that a defendant must "participate[] in the operation or management of the enterprise." *Reves v. Ernst & Young*, 507 U.S. 170, 183, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993).

In this case, USAT and the USAT officials engaged in a conduct to participate of an

enterprise because they were operating and managing the USAT Campus in Puerto Rico and the Administration office in Colorado.

USAT Officials represented themselves as officials USAT, the accredited college of medicine in Puerto Rico. The Plaintiffs were contacted by Ortiz, Cabrera, Frias and Bustillo, whom all represented represented themselves as officials of the medical school known as USAT and that USAT is an accredited college in Puerto Rico. (See the Declaration of Peña –Exhibit 45) (See the Declaration of Blasco –Exhibit 46) (See the Declaration of Prosper –Exhibit 47) (See the Declaration of Rosado –Exhibit 48) (See the Declaration of Torres –Exhibit 49) (See the Declaration of Gomez –Exhibit 50) (See the Declaration of Rodriguez – Pages 1-2 Exhibit 51) (See the Declaration of De Jesus –Exhibit 52) (See the Declaration of Nieves –Exhibit 53).

Plaintiffs received various materials regarding USAT, such as brochures, applications and enrollment agreements, which made representations that USAT was an accredited college of medicine in Puerto Rico, as well as other states. The Plaintiffs received all of these in different dates throughout 2017-2018. (See the Declaration of Peña –Exhibit 45) (See the Declaration of Blasco –Exhibit 46) (See the Declaration of Prosper –Exhibit 47) (See the Declaration of Rosado –Exhibit 48) (See the Declaration of Torres –Exhibit 49) (See the Declaration of Gomez –Exhibit 50) (See the Declaration of Rodriguez – Pages 1-2 Exhibit 51) (See the Declaration of De Jesus –Exhibit 52) (See the Declaration of Nieves –Exhibit 53).

### 3.  <u>Was USAT and the USAT Officials an enterprise?</u>

With regards to enterprise, a section 1962(c) RICO civil claim must include a properly alleged "enterprise." RICO defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The United States Supreme Court interprets an "associated

in fact enterprise" as one that has "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946, 129 S. Ct. 2237, 173 L. Ed. 2d 1265 (2009).

In this case, based on the various materials and the representations, the Plaintiffs understood that Tulp is the President of USAT, Konyk is the Vice-President and Director of Administration and Finances of USAT, Baldwin is the Administrator of USAT, Ortiz is the Dean of the USAT College of Medicine in Puerto Rico, Bustillo is the Registrar & Human Resource Supervisor and Cabrera is the Clinical Coordinator of Student Affairs of the USAT College of Medicine in Puerto Rico. Based on these representations of the USAT officials, the Plaintiffs understood that the USAT officials have been working at USAT for some time and that based on their representations, USAT's purpose was to provide the Plaintiffs an education in medicine if they applied to be a medical student. In consideration of USAT providing Plaintiffs the education of medicine, USAT would then request payments from the Plaintiffs. The USAT Officials made representations that once the payments would be received, USAT would provide the education in medicine and the Plaintiffs would be able to take the United States Medical Licensing Examinations. Based on the various materials and the representations made by the USAT Officials on behalf of USAT, the Plaintiffs were induced and made the decision to apply to USAT, thinking that the Plaintiffs were going to receive a valid medical education in Puerto Rico and will be later be able to apply for and take the United States Medical Licensing Examinations. (See paragraphs 15-19 of the Declaration of Peña – Pages 2 Exhibit 45) (See paragraphs 15-19 of the Declaration of Blasco – Pages 2 Exhibit 46) (See paragraphs 15-19 of the Declaration of Prosper – Pages 2 Exhibit 47) (See paragraphs 15-19 of the Declaration of Rosado – Pages 2 Exhibit 48) (See

paragraphs 15-19 of the Declaration of Torres – Pages 2 Exhibit 49) (See paragraphs 14-18 of the Declaration of Gomez – Pages 2 Exhibit 50) (See paragraphs 15-19 of the Declaration of Rodriguez – Pages 2 Exhibit 51) (See paragraphs 15-19 of the Declaration of De Jesus – Pages 2 Exhibit 52) (See paragraphs 14-18 of the Declaration of Nieves – Pages 2 Exhibit 53).

This understanding of the Plaintiffs meet the United States Supreme Court interprets an "associated in fact enterprise" as one that has "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.

**4.   Did the USAT engage in a pattern of racketeering activity?**

To establish a "pattern," RICO requires a plaintiff to show that at least two acts of racketeering occurred within ten years of each other. 18 U.S.C. § 1961(5). The United States Supreme Court adds to the "pattern" element a requirement "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989). This is known as the "continuity plus relationship" standard. *Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 15 (1st Cir. 2000). A plaintiff can satisfy the continuity requirement in one of two ways: open continuity or closed continuity. *H.J.*, 492 U.S. at 241.

Closed continuity involves "a series of related predicates extending over a substantial period of time." *Id.* at 242. If a plaintiff alleges only a few predicate acts, or acts that span only a few weeks or months, then closed continuity is not established. *Home Orthopedics Corp. v. Rodríguez*, 781 F.3d 521, 529 (1st Cir. 2015). But if "the temporal duration of the alleged activity and the alleged number of predicate acts are so extensive that common sense compels a conclusion of continuity, closed-ended continuity should be found." Id. (quoting *Giuliano v. Fulton*, 399 F.3d

381, 387 (1st Cir. 2005)). For example, in *Fleet Credit Corp. v. Sion*, 893 F.2d 441, 446-47 (1st Cir. 1990), ninety-five alleged racketeering acts over a four and one-half year period were sufficient, without more, to find closed continuity.

Other cases, though, fall somewhere in the middle because the "duration and extensiveness of the alleged conduct does not easily resolve the issue." *Giuliano*, 399 F.3d 381, at 387 (1st Cir. 2005). In those squishier cases, we look to other "indicia of continuity," id.; for instance, whether the defendants were involved in multiple schemes, as opposed to "one scheme with a singular objective"; whether the scheme affected many people, or only a "closed group of targeted victims"; and whether the scheme had the potential to last indefinitely, instead of having a "finite nature." Efron, 223 F.3d at 18-19. While these specific factors are ones we have considered in the past, at the end of the day, we just take a "natural and commonsense approach to RICO's pattern element," id. at 18 (citing *H.J. Inc.*, 492 U.S. at 237), to determine whether the specific fact pattern of the case before us suggests the "kind of broad or ongoing criminal behavior at which the RICO statute was aimed," *Efron*, 223 F.3d at 18.

Even in the absence of closed continuity, a plaintiff can still demonstrate a "pattern" by showing a "threat of" future criminal activity — that is, "a realistic prospect of continuity over an open-ended period yet to come." *Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 45 (1st Cir. 1991). "This approach necessitates a showing that the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future [or] . . . are part of an ongoing entity's regular way of doing business." Id. (quotations omitted).

RICO specifically enumerates what kinds of illegal acts count as "racketeering," and includes in that category of crimes extortion and mail and wire fraud. See 18 U.S.C. § 1961(1).

RICO provides that "racketeering activity" includes violations of the federal mail and wire fraud statutes. 18 U.S.C. § 1961(1)(B); see 18 U.S.C. §§ 1341, 1343.

With regards to mail fraud, 18 USC 1341 states:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing" 18 USC 1341

With regards to wire fraud, 18 USC 1343 states:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice. 18 USC 1343

A plaintiff must "go beyond a showing of fraud and state the time, place and content of the alleged mail and wire communications perpetrating that fraud." *Cordero-Hernandez v. Hernandez-Ballesteros*, 449 F.3d 240, 244 (1st Cir. 2006) (quoting *N. Bridge Assocs., Inc. v. Boldt*, 274 F.3d 38, 43 (1st Cir. 2001)).

In this case, based on the various materials and the representations made by the USAT Officials on behalf of USAT, the Plaintiffs understood that 1) USAT was accredited by the

ECFMG so that USAT students may be able to take the United States Medical Licensing Examinations, and 2) being a student of USAT would allow the Plaintiffs to take the United States Medical Licensing Examinations. Additionally, the Plaintiffs understood that USAT operated satellite campuses or schools and had its main Administrative Office at other states in the United States, such as in Puerto Rico, Florida, Maryland, Texas, and Colorado. (See paragraphs 11-14 of the Declaration of Peña – Pages 2 Exhibit 45) (See paragraphs 11-14 of the Declaration of Blasco – Pages 2 Exhibit 46) (See paragraphs 11-14 of the Declaration of Prosper – Pages 2 Exhibit 47) (See paragraphs 11-14 of the Declaration of Rosado – Pages 2 Exhibit 48) (See paragraphs 11-14 of the Declaration of Torres – Pages 2 Exhibit 49) (See paragraphs 10-13 of the Declaration of Gomez – Pages 2 Exhibit 50) (See paragraphs 11-14 of the Declaration of Rodriguez – Pages 2 Exhibit 51) (See paragraphs 11-14 of the Declaration of De Jesus – Pages 2 Exhibit 52) (See paragraphs 10-13 of the Declaration of Nieves – Pages 2 Exhibit 53) (See pages 8-22, 32, 39, 42, 47, 51, 53, 55, 61, 63, 65, 70, 74, 76, 78 of Exhibit 45) (See pages 9, 12-14 of Exhibit 46). (See pages 7-8, 28 of Exhibit 47).

Plaintiffs paid USAT the certain sum amounts with the intent to receive valid medical education in Puerto Rico in order to take the United States Medical Licensing Examinations. (See the Declaration of Peña –Exhibit 45) (See the Declaration of Blasco –Exhibit 46) (See the Declaration of Prosper –Exhibit 47) (See the Declaration of Rosado –Exhibit 48) (See the Declaration of Torres –Exhibit 49) (See the Declaration of Gomez –Exhibit 50) (See the Declaration of Rodriguez – Pages 1-2 Exhibit 51) (See the Declaration of De Jesus –Exhibit 52) (See the Declaration of Nieves –Exhibit 53).

When the Plaintiffs received USAT invoices asking for payments to be made or USAT Receipts to Confirm Payments received, all for providing what the Plaintiffs thought was a valid

education of medicine in Puerto Rico, USAT invoices and USAT receipts requested that the payments be either mailed or wire transferred to USAT's Administration Office at Colorado. (See pages 8-22, 32, 39, 42, 47, 51, 53, 55, 61, 63, 65, 70, 74, 76, 83-88 of Exhibit 45) (See pages 58, 84 of Exhibit 46). (See pages 31 of Exhibit 47). (See pages 9,14, 17 of Exhibit 48). (See pages 25-26, 56-57 of Exhibit 49). (See pages 12-14, 19-20, 24 of Exhibit 51). (See pages 23, 42 of Exhibit 52).

Unbeknownst to the Plaintiffs, ECFMG was unaware of USAT's representations. ECFMG only allows an international medical school that has a branch campus outside the country where its primary campus is purportedly located, if "the branch campus is authorized to operate as a medical school in the branch campus country" and that the international medical school "awards degrees that meet the medical education eligibility requirements for licensure to practice medicine in the branch campus country." (See page 66 of Exhibit 19).

Between August 21, 2018 and September 14, 2018, ECFMG received information that USAT was providing medical education lectures in Puerto Rico, Miami, Tampa, Florida and Dallas, Texas. (See page 165 of Exhibit 19).

ECFMG never received documentation showing that USAT is authorized to conduct education in the United States. (See page 283 line 6 to line 9 of Exhibit 19).

Tulp responded to Mr. Mealey via email, writing:

> Dear Mr. Mealey
>
> This is incorrect information. The Miami location is an information and testing site only, where a pre-usmle examination [an NBME] may be administered, and an Orientation for new students is conducted prior to their traveling to the Caribbean. It is NOT a campus. Our ONLY Campus is located in Olveston, Montserrat, British West Indies.
>
> Actually, recall that Montserrat is a volcanic Island, and the

> license issued to USAT in September, 2003 DOES actually permit the establishment of off-campus lecture and administrative sites as needed. USAT has students on island on a year round basis in its origination. I hope this will clarify your concern. (See page 162 of Exhibit 19); (See page 323 line 16 to page 325 line 8 of Exhibit 19).

This representation of Tulp to ECFMG directly contradicts the various materials and the representations made by the USAT Officials on behalf of USAT. All these representations demonstrated that Plaintiffs understood that USAT operated satellite campuses or schools and had its main Administrative Office at other states in the United States, such as in Puerto Rico, Florida, Maryland, Texas, and Colorado. With these satellite campuses or schools 1) USAT was accredited by the ECFMG so that USAT students may be able to take the United States Medical Licensing Examinations, and 2) being a student of USAT would allow the Plaintiffs to take the United States Medical Licensing Examinations. (See paragraphs 11-14 of the Declaration of Peña – Pages 2 Exhibit 45) (See paragraphs 11-14 of the Declaration of Blasco – Pages 2 Exhibit 46) (See paragraphs 11-14 of the Declaration of Prosper – Pages 2 Exhibit 47) (See paragraphs 11-14 of the Declaration of Rosado – Pages 2 Exhibit 48) (See paragraphs 11-14 of the Declaration of Torres – Pages 2 Exhibit 49) (See paragraphs 10-13 of the Declaration of Gomez – Pages 2 Exhibit 50) (See paragraphs 11-14 of the Declaration of Rodriguez – Pages 2 Exhibit 51) (See paragraphs 11-14 of the Declaration of De Jesus – Pages 2 Exhibit 52) (See paragraphs 10-13 of the Declaration of Nieves – Pages 2 Exhibit 53) (See pages 8-22, 32, 39, 42, 47, 51, 53, 55, 61, 63, 65, 70, 74, 76, 78 of Exhibit 45) (See pages 9, 12-14 of Exhibit 46). (See pages 7-8, 28 of Exhibit 47).

More than 300 students submitted affidavits to ECFMG indicating that they took classes in the United States, and not a single student indicated that he or she took all of his or her basic science courses in Montserrat. (See pages 237-238 of Exhibit 19). There were also a "number of affidavits" from USAT students where "Dr. Tulp ha[d] provided information that conflicted with

the affidavit information that ECFMG got from the students." (See page 256 line 7 to line 16 of Exhibit 19).

Based on the beforementioned facts, the Plaintiffs have proven the "pattern," because the Plaintiffs have shown more than 300 acts of racketeering occurred within ten years of each other. 18 U.S.C. § 1961(5). Tulp admitted that he had been doing this pattern of activity for approximately fifteen (15) years, whereas no students took basic science courses in Montserrat, and that Tulp did not prove that the United States campuses were authorized. (See Exhibit 452-Whereas in 2007 and 2012 it was found that Tulp did not have students at Montserrat).

The Plaintiffs' evidence proves closed continuity because USATs and the USAT Officials' actions have been "a series of related predicates extending over a substantial period of time.", that is fifteen years. *Id*. at 242.

Even if this Court does not find closed continuity, the Plaintiffs' prove open ended continuity because USAT and USAT's officials actions had an "indicia of continuity," id.; for instance, in that USAT and the USAT officials were involved in multiple schemes, as opposed to "one scheme with a singular objective", of continuing to recruit students to their United States campuses in Florida, Texas, Puerto Rico and Maryland, demonstrating that it would have affected many potential students, and USAT's scheme had the potential to last indefinitely, instead of having a "finite nature." *Efron*, 223 F.3d at 18-19. USAT and the USAT Officials had a "pattern" by showing a "threat of" future criminal activity — that is, "a realistic prospect of continuity over an open-ended period yet to come." *Feinstein v. Resolution Trust Corp*., 942 F.2d 34, 45 (1st Cir. 1991). "This approach necessitates a showing that the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future [or] . . . are part of an ongoing entity's regular way of doing business." Id. (quotations omitted).

Finally, Plaintiffs have provided sufficient evidence that meets the illegal acts of racketeering, that includes in that category of crimes extortion and mail and wire fraud. See 18 U.S.C. § 1961(1).18 U.S.C. § 1961(1)(B); see 18 U.S.C. §§ 1341, 1343.

When the Plaintiffs received USAT invoices asking for payments to be made or USAT Receipts to Confirm Payments received, all for providing what the Plaintiffs thought was a valid education of medicine in Puerto Rico, USAT invoices and USAT receipts requested that the payments be either mailed or wire transferred to USAT's Administration Office at Colorado. (See pages 8-22, 32, 39, 42, 47, 51, 53, 55, 61, 63, 65, 70, 74, 76, 83-88 of Exhibit 45) (See pages 58, 84 of Exhibit 46). (See pages 31 of Exhibit 47). (See pages 9,14, 17 of Exhibit 48). (See pages 25-26, 56-57 of Exhibit 49). (See pages 12-14, 19-20, 24 of Exhibit 51). (See pages 23, 42 of Exhibit 52).

**THE EVIDENCE INFERS *PRIMA FACIE* FRAUDULENT INDUCEMENT CLAIM**

This Court will note that the Plaintiffs evidence in the record may give reasonable inference to meet the *prima facie* case elements for Fraudulent Inducement.

Under Civil Law, the English language notion of "bad faith" is encapsulated by the concept of "*dolo*." *Canales v. Pan American*, 12 P.R. Offic. Trans. 411, 112 P.R.Dec. 329, 340 (1982). "Dolo entails a malicious intent to do harm, and is thus differentiated from mere negligence.*" Event Producers, Inc. v. Tyser & Co.*, 854 F. Supp. 35, 38 (D.P.R. 1993) citing 19 Q.M. Scaevola, Codigo Civil, 617 (2d Ed.1957). Under Puerto Rico contract law, bad faith ("*dolo*") can be manifested in the performance of an obligation. 31 P.R.Laws Ann. Tit. 31 § 3018; *Marquez v. Torres Campos,* 11 P.R. Offic. Trans. 1085, 111 P.R.Dec. 854 (1982). A party acts with bad faith ("*dolo*") when it "knowingly and intentionally, through deceitful means, avoids complying with its contractual obligation." *Generadora De Electricidad Del Caribe, Inc. v. Foster Wheeler,* 92 F.Supp.2d 8, 18

(D.P.R. 2000). It is the voluntary and conscious breach of a legal duty. *Marquez*, 111 P.R.Dec. at 865. Moreover, bad faith ("dolo") is never presumed. See *Miranda Soto v. Mena Ero*, 9 P.R. Offic. Trans. 628, 109 P.R.Dec. 473, 478 (1980); *Mayaguez Corp. v. Betancourt*, 2002 TSPR 23, 156 P.R.Dec. 234, 2002 Juris P.R. 29 (2002). Whoever asserts the claim of bad faith ("*dolo*") has the burden of proof and may prove it either directly or through circumstantial evidence, like any other fact. Id.

To succeed in its claim of bad faith ("dolo"), Plaintiffs have to prove that USAT and the USAT Officials knowingly and intentionally avoided compliance with their duties to provide authorized medical education.

Based on the same evidence concerning Tulp's false representations to ECFMG, stating that he did not operate any United States Medical schools, directly contradicts the various materials and the representations made by the USAT Officials on behalf of USAT. All these representations demonstrated that Plaintiffs understood that USAT operated satellite campuses or schools and had its main Administrative Office at other states in the United States, such as in Puerto Rico, Florida, Maryland, Texas, and Colorado. With these satellite campuses or schools 1) USAT was accredited by the ECFMG so that USAT students may be able to take the United States Medical Licensing Examinations, and 2) being a student of USAT would allow the Plaintiffs to take the United States Medical Licensing Examinations. (See paragraphs 11-14 of the Declaration of Peña – Pages 2 Exhibit 45) (See paragraphs 11-14 of the Declaration of Blasco – Pages 2 Exhibit 46) (See paragraphs 11-14 of the Declaration of Prosper – Pages 2 Exhibit 47) (See paragraphs 11-14 of the Declaration of Rosado – Pages 2 Exhibit 48) (See paragraphs 11-14 of the Declaration of Torres – Pages 2 Exhibit 49) (See paragraphs 10-13 of the Declaration of Gomez – Pages 2 Exhibit 50) (See paragraphs 11-14 of the Declaration of Rodriguez – Pages 2 Exhibit 51) (See paragraphs 11-

14 of the Declaration of De Jesus – Pages 2 Exhibit 52) (See paragraphs 10-13 of the Declaration of Nieves – Pages 2 Exhibit 53) (See pages 8-22, 32, 39, 42, 47, 51, 53, 55, 61, 63, 65, 70, 74, 76, 78 of Exhibit 45) (See pages 9, 12-14 of Exhibit 46). (See pages 7-8, 28 of Exhibit 47).

Therefore, this evidence infers that USAT and the USAT Officials knowingly and intentionally avoided compliance with their duties to provide authorized medical education.

**THE EVIDENCE INFERS *PRIMA FACIE* BREACH OF CONTRACT**

This Court will note that the Plaintiffs evidence in the record may give reasonable inference to meet the *prima facie* case elements for breach of contract.

Under Puerto Rico law, the elements of a cause of action for breach of contract are 1) a valid contract and 2) a breach by one of the parties to the contract. *Torres*, 523 F. Supp. 2d at 152. Moreover, "[i]n order for an action for damages caused by nonperformance of contract to prosper, it is not sufficient that the plaintiff establish the nonfulfillment of the obligation, but it is also necessary that he establish the real and positive existence of the damages caused." *Fagot Rodriguez v. Republic of Costa Rica,* 139 F. Supp. 2d 173, 197 (D.P.R. 2001) (citing Perez v. Sampedro, 86 P.R.R. 498, 86 P.R. Dec. 526 (1962)); see also *Computec Sys. Corp. v. Gen. Automation, Inc.,* 599 F. Supp. 819, 826-27 (D.P.R. 1984).

A valid contract was created when the Plaintiffs understood that the USAT officials have been working at USAT for some time and that based on their representations, USAT's purpose was to provide the Plaintiffs an education in medicine if they applied to be a medical student. In consideration of USAT providing Plaintiffs the education of medicine, USAT would then request payments from the Plaintiffs. The USAT Officials made representations that once the payments would be received, USAT would provide the education in medicine and the Plaintiffs would be able to take the United States Medical Licensing Examinations. Based on the various materials

and the representations made by the USAT Officials on behalf of USAT, the Plaintiffs were induced and made the decision to apply to USAT, thinking that the Plaintiffs were going to receive a valid medical education in Puerto Rico and will be later be able to apply for and take the United States Medical Licensing Examinations. (See paragraphs 15-19 of the Declaration of Peña – Pages 2 Exhibit 45) (See paragraphs 15-19 of the Declaration of Blasco – Pages 2 Exhibit 46) (See paragraphs 15-19 of the Declaration of Prosper – Pages 2 Exhibit 47) (See paragraphs 15-19 of the Declaration of Rosado – Pages 2 Exhibit 48) (See paragraphs 15-19 of the Declaration of Torres – Pages 2 Exhibit 49) (See paragraphs 14-18 of the Declaration of Gomez – Pages 2 Exhibit 50) (See paragraphs 15-19 of the Declaration of Rodriguez – Pages 2 Exhibit 51) (See paragraphs 15-19 of the Declaration of De Jesus – Pages 2 Exhibit 52) (See paragraphs 14-18 of the Declaration of Nieves – Pages 2 Exhibit 53).

The Defendants breached the contract when the Defendants did not provide valid medical education which affected the Plaintiffs ability to take the United States Medical Licensing Examinations.

**THE EVIDENCE INFERS *PRIMA FACIE* DAMAGES CLAIM**

This Court will note that the Plaintiffs evidence in the record may give reasonable inference to meet the *prima facie* case elements for damages.

The existence of liability under Article 1802 requires (1) an act or omission caused through fault or negligence, (2) a damage suffered, and (3) a causal nexus between the damage and the other party's wrongful or negligent act. *Montalban v. Centro Com. Plaza Carolina*, 132 D.P.R. 785, 795-96, 1993 Juris P.R. No. 26, 1993 WL 840023 (1993); *Elba A.B.M. v. Univ. of P.R.*, 125 D.P.R. 294, 308, 1990 Juris P.R. No. 13, 1990 WL 658047 (1990).

Based on the evidence above, the Defendants acts or omissions to not get authorized at the United States to provide valid medical education, caused the injuries of the Plaintiffs for not being able to take the United States Medical Licensing Examinations.

**THE EVIDENCE INFERS *PRIMA FACIE* UNJUST ENRICHMENT CLAIM**

In the alternative to all, if this Honorable Court finds no other claims stated above, this Court will note that the Plaintiffs evidence in the record may give reasonable inference to meet the *prima facie* case elements for unjust enrichment.

The five elements of an unjust enrichment claim are: "1) Occurrence of an enrichment. 2) A correlative loss (impoverishment). 3) A connection between the loss (impoverishment) and the enrichment. 4) Absence of cause to justify the enrichment. 5) Lack of a legal provision which precludes application of an enrichment without cause." *Ortiz Andujar v. E.L.A.,* 122 P.R. Dec. 817, 22 P.R. Offic. Trans. 774, 780 (1988) (Ortiz).

USAT enriched themselves by receiving payments from the Plaintiffs. The Plaintiffs paid for an invalid medical education, thus suffering a loss. USAT's acts to enrich itself are connected to Plaintiffs' loss. There is no absence of cause to justify this enrichment if the Plaintiffs were seeking a valid medical education.

**CONCLUSION**

Based on the above, this Court should deny the Docket 137 Motion for Summary Judgment and the Docket 148 Motion for Summary Judgment because the Plaintiffs proffer sufficient evidence of the material facts that support the causes of actions pursuant to the RICO Act, 18 USC sec. 1961, *et seq,* Fraudulent Inducement ("*Dolo*") pursuant to Articles 1217 *et seq.* of Puerto Rico's Civil Code, 31 LPRA secs. 3404 *et seq.*; Material Breach of Contract pursuant to Articles 1206 *et seq.* of Puerto Rico's Civil Code, 31 LPRA secs. 3371 *et seq.*; Unjust Enrichment and Tort

Damages pursuant to Articles 1802 and 1803 of Puerto Rico's Civil Code, 31 LPRA secs. 5141, 5142. Therefore, based on the evidence submitted before this Honorable Court, a reasonable jury may infer that Defendants are all liable to the Plaintiffs for 1) violating the RICO Act, 2) for incurring in Fraudulent Inducement, 3) for breaching their contract and 4) for unjustly enriching themselves as well as causing tort damages to the Plaintiffs.

WHEREFORE, for all the foregoing reasons, it is a respectfully requested for this Honorable Court to 1) **DENY** Defendants Docket 137 & 148 Motions for Summary Judgment, 2) **SET** the date for trial in order for the jury to adjudicate the issues concerning the RICO claims and all other claims, and 3) **ORDER** any other relief it deems just.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record, and I hereby certify that I served the foregoing to the non CM/ECF Participants, Manuel Jose Ortiz-Bustillo and Yanire Bustillo, via their electronic mail addresses of ortizbustillo@yahoo.com and Yanirebustillo@hotmail.com.

**RESPECTFULLY SUBMITTED**: In San Juan, Puerto Rico, on 27th of July, 2023.

*/S/VICTOR M. RIVERA-RIOS*
VICTOR M. RIVERA-RIOS
USDC BAR NUMBER 301202
1420 FERNANDEZ JUNCOS AVE
SAN JUAN, PR 00909
Telephone: (787) 727-5710
Mobile: (787) 565-3477
Facsimile: (787) 268-1835
E-Mail: victorriverarios@rcrtrblaw.com
E-Mail: info.vrr@rcrtrblaw.com