CaseCase3a1e0-2v1-817005540YWBDDocumemt15261 FileFi02/05/127/23agePlagge 1135f 135

UNITED STATES DISTRICT COURT **EXHIBIT 15**

EASTERN DISTRICT OF PENNSYLVANIA

ORIEN L. TULP,

      Plaintiff,

v.

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES, et
al,

      Defendants.

Case No.  2:18-cv-05540-WB

Philadelphia, Pennsylvania
January 24, 2019
2:03 p.m.

TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
BEFORE THE HONORABLE WENDY BEETLESTONE
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | Tommy Swate, Esquire<br>403 Wild Plum<br>Houston, TX  77013 |
| | William C. Reil, Esquire<br>1515 Market Street, Suite 1200<br>Philadelphia, PA  19102 |
| For the Defendants: | Elisa P. McEnroe, Esquire<br>Matthew D. Klayman, Esquire<br>Caitlyn Barrett, Esquire<br>Morgan Lewis Bockius, LLP<br>1701 Market Street<br>Philadelphia, PA 19103-2921 |
| Court Recorder: | Michael Mani |
| Transcription Service: | Chris Hwang<br>PO Box 223282<br>Chantilly, Virginia 20153 |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**INDEX**

|                            | Page |
|----------------------------|------|
| Motion, denied             | 134  |

WITNESSES FOR PLAINTIFF

|               | Direct | Cross | Redirect | Recross |
|---------------|--------|-------|----------|---------|
| Kara Corrado  | 8      | 36    | 59       |         |
| Orien Tulp    | 63     | 102   |          |         |

WITNESSES FOR DEFENDANTS

|               | Direct | Cross | Redirect | Recross |
|---------------|--------|-------|----------|---------|
| Kara Corrado  | 52     | 74    | (102)    |         |

**INDEX OF EXHIBITS**

| EXHIBITS | | | Marked |
|---|---|---|---|
| PLAINTIFF'S | | | |
| | C | Agreement | 14 |
| | E | November 28, 2018 letter | 109 |
| | G | Letters | 110 |
| | | | |
| DEFENDANT'S | | | |
| | E | Sponsor Note | 46 |
| | D-1 | Video | 80 |
| | D-2 | Letter | 81 |
| | D-3 | USAT lecture schedule | 83 |
| | D-4 | Letter | 84 |
| | D-5 | Email | 86 |
| | D-6 | Affidavit | 90 |
| | D-7 | Determination | 93 |
| | 1 | Printout ECFMG website | 111 |
| | 2 | ECFMG school policy | 112 |
| | 3 | ECFMG information booklet | 113 |
| | 8 | Letter | 114 |
| | 13 | Message | 116 |

CaseCase0-2v1817005540YWBDDocument5261FileFi02/25/127/23agePage145f 135

(Call to order at 2:03 p.m.)

THE COURT RECORDER:  All rise.  Court is now in session, the Honorable Wendy Beetlestone presiding.

THE COURT:  Good afternoon, have a seat.

MR. REIL:  Good day, Your Honor.

THE COURT:  This is the matter of Tulp v. Educational Commission for Foreign Medical Graduates.  It's a hearing on the preliminary injunction.  Can I have some introductions, please?

MR. REIL:  I'm William C. Reil for the Plaintiff.

You introduce yourself.

MR. SWATE:  Tommy Swate for the Plaintiff.

THE COURT:  Okay.  This is the Plaintiff Mr. Tulp, Dr. Tulp?

MR. TULP:  I'm Orien Tulp, the Plaintiff.

THE COURT:  Okay.  Defense?

MS. MCENROE:  Good afternoon, Your Honor, Elisa McEnroe for Morgan Lewis on behalf of the Educational Commission for Foreign Medical Graduates and Dr. Pinsky, both of the Defendants.

Today with me, I have my colleagues Matt Klayman and Caitlyn Barrett.  I also have the General Counsel for ECFMG Francine Katz here at the table with us.

THE COURT:  Okay.

MS. MCENROE:  And we have two fact witnesses, who

Case 3:18-cv-01070-YWBD Document 152-16 Filed 02/25/19 Page 135 of 135

requested to attend as well, Ms. Kara Corrado and Lisa Cover, two executives from ECFMG.

THE COURT: Okay. So before we begin, I just want to clarify exactly what we're doing here today. So in looking at the complaint, it is a little unclear to me as exactly what causes of action are being asserted. And what I glean from it, and Mr. Reil or Mr. Swate, you should tell me if I'm incorrect.

The first cause of action is tortiously interfering with the contract between the students of USAT and against ECFMG. And that is a common law tortious interference with contract claim; is that correct?

MR. REIL: Yes, Your Honor.

THE COURT: Okay. Next one as I understand it is it's a violation of due process claim against -- do I refer to you as ECFMG or ECF? Or what's the best way of --

MS. MCENROE: ECFMG would be our preferred acronym, but whatever works for Your Honor.

THE COURT: That's fine. Okay, violation of due process against ECFMG, which appears to be a §1983 claim alleging that ECFMG violated Tulp's procedural due process rights as protected by the 14th Amendment; is that correct?

MR. REIL: Yes, Your Honor.

THE COURT: And then the third cause of action, fraudulent misrepresentation, abuse of process, and negligent representation against ECFMG appears to be three separate

6

common law claims -- common law fraud, common law abuse of process, and common law negligent misrepresentation. Is that correct?

MR. REIL: Yes, Your Honor.

THE COURT: And then finally, the fourth cause of action, a violation of procedural and substantive due process against all Defendants appears to be a §1983 claim alleging that Defendants violated Tulp's procedural and substantive due process rights as protected by the 14th Amendment. Is that correct?

MR. REIL: Yes, Your Honor.

THE COURT: Okay, and in terms of this hearing today, are you proceeding under each of the causes of action or any particular one?

MR. REIL: I think we're -- I think the emphasis today will be on the lack of due process. I won't say we're not proceeding on the others, but I think that would be featured as --

THE COURT: So procedural and substantive due process. So that is the second and the fourth cause of action?

MR. REIL: I think there are -- they'll be our main arguments, yes.

THE COURT: Okay, and if I look at your motion, I believe it is for a preliminary and a permanent injunction.

MR. REIL: Yeah, and/or a permanent.

THE COURT: And/or a permanent. Now obviously, at this stage, I'm not going to -- it's way too early in the game for a permanent injunction. So we are going to proceed under the preliminary injunction rubric.

MR. REIL: That's fine.

THE COURT: Okay, so your first witness, or if you want to make an argument, up to you.

MR. REIL: I think, given the time constraints we have here, maybe we would just call the first witness. I'd like to -- there's two witnesses here from ECFMG.

I'd like to make the motion for sequestration. I'm going to call Ms. Corrado. The other witness I believe is Ms. Cover. I request that she be submit --

THE COURT: Any objection to sequestering Ms. Cover?

MS. MCENROE: No objection.

THE COURT: Ms. Cover, could you please leave the courtroom and wait outside?

Ms. Corrado, could you please approach the bench? The witness chair is there.

And Mr. Mani, please swear the witness.

THE COURT RECORDER: Please raise your right hand. State and spell your name for the record?

THE WITNESS: Kara Corrado, K-A-R-A C-O-R-R-A-D-O.

KARA CORRADO

called as a witness for the Plaintiff, having been duly sworn

Case 2:18-cv-00545-YWBD   Document 526   Filed 02/27/23   Page 135 of 135

8

testified as follows:

THE COURT:  Have a seat.

THE WITNESS:  Thank you.

THE COURT:  Mr. Reil, your witness.

DIRECT EXAMINATION

BY MR. REIL:

Q    Ms. Corrado, I understand you're employed by ECFMG and I know I'm going to get the initials wrong a couple times. Sometimes even though I realize I'll refer them as the board, although I know the board is only part of them.

All right, can you tell the Court what you do for ECFMG?

A    Yes.  I am the vice president for operations at ECFMG.

Q    Okay, and what are those -- what are you duties?

A    I am primarily responsible for oversight of our ECFMG certificate program, as well as a primary source verification for some of our international clients, and oversight of our special investigations team and medical education resources team.

Q    I understand you're an attorney, is that --

MR. REIL:  Your Honor, I'd ask -- I didn't -- I'd ask that I be able to use leading questions with this witness. She's a managerial employee of the Defendant and she's sent several letters to the -- involving this case to the Plaintiff?

MS. MCENROE:  Your Honor, if I may?  If the request

Case 2:18-cv-00545-WBD Document 52616 Filed 02/15/27/23 Page Page 195 of 135

is to cross-examine the witness, I have no objection being that it's our witness.  If the request is to be hostile to the witness, I have an objection.

MR. REIL:  I'm not going to --

THE COURT:  Well --

MR. REIL:  -- use the term hostile.

THE COURT:  Well, I think we should be clear that in my courtroom, hostility towards a witness is completely forbidden.  Cross -- vigorous cross-examination is allowed.

MS. MCENROE:  No objection to that.

THE COURT:  And given that there's no objection, you should cross-examine.  And the aim of the allowing you to cross-examine a witness is simply to get things done as quickly as possible.

MR. REIL:  I understand.

BY MR. REIL:

Q    I don't know if I asked you, you're an attorney?

A    I have a J.D. from Temple University.

Q    Okay, now can you describe for the record briefly what is ECFMG?  I'll call them the board.

A    ECFMG is the Educational Commission for Foreign Medical Graduates.  We are a nonprofit, private organization that was established initially to screen international medical graduates, who were coming to the United States seeking residency programs, you know, and turns into graduate medical

education.

Q    Is ECFMG an accrediting agency?

A    No, sir.

THE COURT:  Did you say no?

THE WITNESS:  No.

THE COURT:  No.

BY MR. REIL:

Q    Okay, am I correct that a foreign medical student cannot practice as a physician in the United States without certification by ECFMG?  Is that substantially correct?

A    Generally, the licensing boards in the United States will require ECFMG certification for international medical graduates, but it's the discretion of each state board who they license.  But generally, yes, they require ECFMG certification.

Q    And I -- and we'll probably be using this term a lot, what does that mean ECFMG certification?  What exactly is it that they certify?

A    So in order to obtain ECFMG certification, an international medical graduate must meet the requirements for certification.

And roughly, there are two such requirements.  There are examination requirements and there are medical education requirements.

Q    And ECFMG certifies these things to state medical boards?

11

A    So we certify the individuals.  So if the individual meets those requirements, they will issued a certificate.  That certificate is what they can use then as part of the requirements to get into a graduate medical education program and to be able to take Step 3 of the USMLE and then to -- ultimately to be licensed.

Q    So undergraduates, foreign undergraduate students and even graduates register with the -- ECFMG; is that correct?

A    If they are seeking entrance to graduate medical education in the United States, then yes, they would have to come through ECFMG.

Q    Now Dr. Tulp had a hearing here in Philadelphia where ECFMG is located at 36th and Market on November 28th of this year, correct?

A    The meeting was actually at the Rittenhouse Hotel.

Q    Oh, right, it was your -- I stand corrected.

A    That's okay.

Q    It was the Rittenhouse Hotel that day.  Well, you were present at that immediate meeting?

A    Yes, sir.

Q    Okay, and Ms. Cover was present at that meeting?

A    She was.

Q    And Dr. Pinsky --

A    Yes.

Q    -- was present at that meeting?

A    Yes.

Q    Okay, now Dr. Tulp, that was a hearing for what's called irregular behavior, correct?

A    Yes.

Q    Before we talk about that, is Dr. Tulp -- is he a foreign medical student that's registered with the ECFMG?

A    No.

Q    Well, does he have some sort of a contract with ECFMG?

A    Not that I'm aware of.

Q    All right.  Did he ever agree to submit himself in any way to ECFMG?

A    I don't know if I understand, I'm sorry.  The --

Q    Well, did Dr. Tulp ever say I agree that ECFMG has power over me to determine whether I have met irregular behavior?  Is there any documents or verbal agreements like that?

A    Not that I'm aware of.

Q    I see.  All right.  Is -- to your knowledge, well, I don't want you to speak for your -- to your knowledge, has anyone from ECFMG ever visited the school, which Dr. Tulp is the president of, the USAT?  Has anybody ever visited the school do you know, inspection?

A    Not that I'm aware of.

Q    Okay, now the school in USAT, am I correct that it's

been in existence since about 2003, roughly about 15 years?
Were you aware of that?

A    I'm aware that we received a copy of a charter for USAT, which shows that it was incorporated in 2003, I believe, yes.

Q    A charter from the government of Montserrat?

A    Yes, sir.

MR. REIL:  Okay, well, maybe with the Court's permission, can I give the witness proposed exhibits that I made, one of the notes?

THE COURT:  You may.

MR. REIL:  May approach?

THE COURT:  You may.

BY MR. REIL:

Q    Will you take a moment to look at those and I'll have further questions.  And you were talking about, well, why don't you take a look at Exhibit 3 -- Exhibit C --

A    Uh-huh.

Q    -- on page 5 of the packet that I submitted to you?  Tell me when you have it.

A    I have it, sir.

Q    Okay, now that's several pages and I'm not going to ask you to read through that before.  Do you know whether that is a -- an agreement between -- with the government of Montserrat basically authorizing USAT?

A    My understanding is that this --

THE COURT:  Wait, wait, hold on a second.  Before you ask substantive questions about a particular document, you must seek to have it admitted.

MR. REIL:  Yes, Your Honor, okay.  Let me lay a foundation here.  Are you --

THE COURT:  Well, let's see if we can -- would you stipulate to the admissibility of this document?

MS. MCENROE:  I would stipulate that this is a document that Dr. Tulp submitted to ECFMG.  I don't know that we have the ability to stipulate to authenticity beyond that.

THE COURT:  Would you oppose its admissibility?

MS. MCENROE:  For these purposes today, no.

THE COURT:  Just for the -- okay, so for the purposes only of this preliminary injunction hearing, it is admitted.  You can ask substantive questions.

(Plaintiff's Exhibit C admitted into evidence)

MR. REIL:  Okay.

BY MR. REIL:

Q    All right, to your knowledge, is this document essentially a document from the government of Montserrat, where ECFMG has its main presence authorizing ECFMG to operate as a medical college?

MS. MCENROE:  Objection, Your Honor.  We would only ask for clarification that in the last question both instances

of use of ECFMG, I don't mean to be presumptuous, but that counsel intended to USAT as opposed to --

MR. REIL: Yes, I did, Your Honor.

THE COURT: Sustained, sustained. Why don't you repeat the question?

MR. REIL: Okay.

BY MR. REIL:

Q All right, have you seen this document before?

A Yes, sir.

Q What is it?

A It is a copy of what appears to be the charter for USAT with the government of Montserrat.

Q Thank you. All right, I would move that into evidence at this time.

THE COURT: That had been admitted. You can go ahead.

BY MR. REIL:

Q Okay, all right. Now why don't you take a look, if you would, at what's Exhibit D in the packet and to the complaint at page 10. Okay, it appears to be an affidavit. Do you recognize it?

A Yes, sir.

Q Who issued it?

A ECFMG.

Q Okay, and for what purpose?

A    ECFMG requested the students and graduates of USAT to complete the affidavit attesting to their medical school attendance.

Q    I see.

A    So we could determine in what location they took their basic sciences.

Q    And I see on this affidavit, if you go about two-thirds of the way down, you see where it says I'm attaching the following documentation.  Do you see that?

A    Yes.

Q    So this is an affidavit that also requests passports, airline tickets, various documents, correct?

A    Yes.

Q    Okay.  Now at the hearing, when we arrived at the hearing at the Rittenhouse Square in November 28th, we were given a big black book of exhibits.  Are you familiar with the, you know, that that happened?

A    Yes.

Q    Okay, and we hadn't seen that black book before the hearing, correct?

A    No.

Q    No.

A    That's not correct.

Q    All right now, were affidavits in the hearing?  Were affidavits in the black book at the hearing?

A     Yes.

Q     Okay, a couple hundred of them, correct?

A     Yes.

Q     Okay, and many of them were redacted, were they not?

A     They were.

Q     Okay.  So our -- we were given affidavits purportedly from our students with the names redacted, correct?

A     That's correct.

Q     Okay.  How are we supposed to investigate what those students said in the affidavit?

A     We redacted the names of the students --

Q     Uh-huh.

A     -- but not the attendance dates information --

Q     Okay.

A     -- to demonstrate that there was a significant number of students.

Q     Well, on a particular affidavit that was redacted, was there any way for Dr. Tulp to contact that student to see if the information was accurate?

MS. MCENROE:  Objection, Your Honor.  I just want to -- I wasn't sure if the witness was finished with her last answer before the question began.  I just want to --

THE COURT:  Were you finished with your answer?

THE WITNESS:  With respect to the affidavits?

THE COURT:  Correct.

Case 2:18-cv-00545-YWBD Document 152-6 Filed 02/27/23 Page 18 of 135

THE WITNESS: Yes. Sorry. Yeah, it's okay.

MS. MCENROE: I'm sorry about that.

BY MR. REIL:

Q Okay, so these affidavits were used by is it fair to say the board or ECFMG to investigate irregular behavior against Dr. Tulp?

A So the affidavits were presented to the board of trustee -- the redacted affidavits were presented to the board of trustees to demonstrate that a significant number of the students that had returned the affidavits to us indicated that they did not do their basic sciences in Montserrat.

There were a number of affidavits that were also included that were not redacted and those were specifically to show the instances where Dr. Tulp has provided information that conflicted with the affidavit information that we got from the students.

Q Did the -- I think there was a board of several doctors if I remember. Did they receive the affidavits prior to the hearing?

A Yes, they received the same materials that you received.

Q So the affidavits were used as an investigative material by ECFMG to give to the board?

A I mean, they were used as support --

Q Okay.

A    -- to the allegation that we made, yes.

Q    All right.  Okay, so ECFMG did the investigation in this case and then they submitted it to the board of ECFMG, correct?

A    Yes, ECFMG staff, that's our normal procedure in these types of cases.

Q    So that there was no distinction in the way this proceeding went, the proceeding for irregular behavior.  There was distinct between the investigatory and the adjudicatory.  It was all ECFMG?  Do you understand my question?

MS. MCENROE:  Objection.  Objection, Your Honor, to the extent it calls for a legal conclusion.  I'm not quite sure counsel's getting at with that question.

THE COURT:  Sustained.

BY MR. REIL:

Q    Did ECFMG employ outside investigators?

A    I'm sorry?

Q    In the -- with reference to the irregular charges against Dr. Tulp, did ECFMG employ outside investigators?

A    In our review of the school, yes.

Q    Okay, did they visit the school?

A    That's my understanding.

Q    They did?

A    Yes.

Q    Okay.  Did we receive at the hearing the identity of

those investigators and any report from them?

A    No.

Q    Okay.  Now let me ask you this.  Okay, why don't you take a look at page 4, if you will, that's Exhibit B.

A    Yes.

Q    Would you tell the Court what that is?

A    This, sir, is a -- appears to be a screenshot of the listing in the World Directory of Medical Schools for USAT.

Q    Okay, and do you see there where it says, oh, about a little more than a halfway down, note as of January 1st?

A    Yes, sir.

Q    Would you read that into the record?

MR. REIL:  It's short, Your Honor.

BY MR. REIL:

Q    Just that sentence and I'll have a follow up question.

A    Yes.  "Note, as of January 1st, 2019, students and graduates of this medical school with a graduation year of 2019 and later are not eligible to apply to ECFMG for ECFMG certification, which also renders them ineligible to apply to ECFMG for the United States medical licensing examinations as a step towards ECFMG certification."

Q    Okay, and this went on this World Directory of Medical Schools website?

A    I'm -- did you just ask me -- I'm sorry, did you ask

me if it was present there?

Q    Yes?

A    Yes.

Q    This is where --

A    Yes, it is.

Q    So students could see this, anybody could see it, right?

A    Yes, correct.

Q    Okay.  Now the hearing involving irregular behavior was on November 28th of 2018.  This was published, this meaning the document that we just referred to here about the World Directory of Medical Schools, this was put on the website well before the hearing, wasn't it?

A    Yes.

THE COURT:  Let me clarify that.  When you say this was put on the website, do you mean that the note was included in the website entry or that the entry was included in the website?

THE WITNESS:  The note, Your Honor, was published on the entry.

THE COURT:  Prior to the hearing?

THE WITNESS:  Prior to the hearing, yes.

BY MR. REIL:

Q    All right.  All right, now let's talk about the hearing on November 28th.  The hearing was supposed to take

place over a time span of 20 minutes, correct?

A    Yes, that's our usual procedure for --

Q    Right, right.

A    -- those types of hearings.

Q    Did the ECFMG Board of Physicians present any witnesses at the hearing?

A    No, that -- we don't normally present witnesses at our hearings.

Q    I see, did the ECFMG board present any documents at the hearing?

A    No, the documents are always produced before the hearing.

Q    Okay, what documents were produced at the hearing?

A    So we -- so ECFMG staff, whenever we have allegations irregular behavior and individuals who are coming to make a personal appearance as Dr. Tulp did, as a courtesy to them, we always provide a copy of the materials that we have previously sent to them at the meeting, so that if they are questioned about a document, they can reference it there if they haven't brought it themselves.

Q    At this particular point hearing on November 28th, isn't it a fact, Ms. Corrado, that no documents were entered into evidence at the hearing by ECFMG?

MS. MCENROE:  Objection, Your Honor.  To the extent it calls for a legal conclusion, the concept of evidence sounds

poor and legalish when this was more of an administrative proceeding by a private not-for-profit entity.

MR. REIL: If I may, Your Honor, this person's an attorney. They've been involved in the situation. I'm simply asking, and she was at the hearing, did she observe or did she acknowledge of any documents being entered into evidence at the hearing.

THE COURT: Is there any process whereby documents get introduced into evidence at such a hearing?

THE WITNESS: No, we don't have a process like that.

THE COURT: So in this case, there was no evidence that was introduced into --

THE WITNESS: No.

THE COURT: -- there were no documents that were introduced into evidence, because there was no process to do that?

THE WITNESS: Correct.

THE COURT: Okay, go ahead.

BY MR. REIL:

Q    Testimony, Ms. Corrado, you were at the hearing. Was there any testimony entered -- was there any testimony presented at the hearing?

A    No, because my recollection was that counsel would not let Dr. Tulp give any testimony.

Q    All right.

THE COURT: As in his counsel?

THE WITNESS: As in his counsel.

THE COURT: As in his counsel.

BY MR. REIL:

Q Now in any of the materials that were sent to us from ECFMG, did any of them address Dr. Tulp was being "tried" for irregular behavior, did any -- do any materials from ECFMG indicate which side Dr. Tulp or the board has the burden of proof?

A So our irregular behave -- we have a set of irregular behavior procedures that were sent with the letter that details the allegation.

We provided -- we list in the letter all of the information that we have to support the allegation, evidence, if you will and we provide that to the individual. And then the individual has to provide an explanation and can come to the hearing to provide an explanation if they wish.

Q ECFMG brought charges of irregular behavior against Dr. Tulp. Did they ever send out any sort of a letter, notice, document to Dr. Tulp or his attorneys indicating who had the burden of proof at the hearing?

A We sent a letter that outlined the allegation and asked for Dr. Tulp's response to that allegation. We did not use the phrase "you have the burden of proof", but we outlined what the allegation is and asked for a response.

Q    Okay.

A    And then presented him with an opportunity to appear personally at the hearing to respond to the allegations of irregular behavior and to answer any questions that our board of trustees may have had.

Q    But nowhere in its description of the hearing did ECFMG ever indicate that the burden of proof was on ECFMG or on Dr. Tulp?  Do I have that right?

A    Yes.

Q    All right, now ECFMG sent us a -- sent us the -- Dr. Tulp and his attorneys, they sent us a transcript of the November 28th hearing.  Were you aware of that?

A    Yes.

Q    Okay, does it indicate anywhere in those 32 pages that any evidence was introduced by ECFMG at the November 28th hearing?

MS. MCENROE:  Your Honor, if I may object?  There is a transcript of the proceeding that I would request be entered into evidence to serve as the record of what actually happened in that proceeding as the best evidence.

THE COURT:  Oh, you can do that in -- when you take over the witness if you like.

MS. MCENROE:  Sure.

THE COURT:  You can continue to ask your questions.

MR. REIL:  Okay.  I happen to have a copy of the

Case 2:18-cv-00545-YWBD Document 152-16 Filed 02/27/23 Page 26 of 135

transcript here, which I'd like to mark as Exhibit H, with the Court's permission and show it to the witness?

THE COURT: Go ahead.

BY MR. REIL:

Q Ms. Corrado --

MR. REIL: Oh, may the record reflect that I've handed the witness the exhibit, that I've handed -- I think it goes the other way around, I've handed the exhibit to the witness, okay.

BY MR. REIL:

Q All right, you have the transcript of the hearing there, 32 pages. Can you point to somewhere in the transcript where ECFMG is offering any evidence against Dr. Tulp?

THE COURT: I need you to ask a more focused question. You can't ask her to look through 32 pages of transcript at this point.

MR. REIL: Okay, all right.

BY MR. REIL:

Q You were at the hearing, correct?

A Yes.

Q Okay, do you have any recollection of ECFMG through its -- ECFMG entering any evidence into the record at the November 28th hearing?

A No, because we don't -- that's not part of our process. We provide the evidence in advance to both the board

and the individual.

Q    All right, and the hearing was terminated by Ms. McEnroe, correct?

A    That's correct.

Q    And is it fair to say, based on a administrative record that contains no evidence, that Dr. Tulp was found guilty of irregular behavior?

A    I -- there was evidence presented at the meeting.  So I can't agree to that statement, because we did have evidence presented to the parties before the meeting.

Q    At -- I'm talking about evidence in the record at the hearing?  Was --

A    We --

Q    -- we established there wasn't.

A    We don't have a process to enter evidence on a record at our administration meetings.

Q    But there's a transcript?

A    There's a transcript when an individual makes a personal appearance, we have a court reporter and we will --

Q    All right.

A    -- transcribe the appearance, yes.

Q    All right.  Was Dr. Tulp found guilty, and I'll use the word guilty because it's not a criminal case in quotes, was Dr. Tulp found guilty of irregular behavior on November 28th based on any evidence in the record?  And I'm talking about the

transcript.

THE COURT: Let me clarify that, because I don't think it's good to use the term guilty. What is the term used by --

MR. REIL: Culpable, Your Honor.

THE COURT: -- ECFMG in these contexts?

THE WITNESS: We determined that he engaged in irregular behavior.

THE COURT: Okay.

THE WITNESS: So we made a determination of irregular behavior.

BY MR. REIL:

Q My question is, is there anything in the -- from the hearing or in the transcript that you recall that supports that, any evidence in the record in the transcript?

A We don't --

Q I'm sorry.

A In the transcript, no, but the transcript is not the evidence -- it's not all of the evidence that we present. When someone makes a -- an appearance at the meeting, we take the information that we have already collected.

And if they make a personal appearance, the committee can consider the personal appearance that they make and any statements that they make together to make a determination about irregular behavior.

So the determination was made on the basis of the appearance and the evidence that we provided to the individual and to the board members to review.

Q    Did Dr. Tulp say anything at the hearing?

A    I don't recall him saying anything at the hearing.

Q    We've used the phrase "irregular behavior" several times here.  Can you explain to the Court what irregular behavior is?

A    Yes, ECFMG generally defines irregular behavior as any action or attempted action by an individual or on behalf of an individual that could or would subvert the processes of ECFMG.

So an example of an irregular behavior is providing false information to ECFMG or providing false documents to ECFMG.

MR. REIL:  So if I may have a moment, Your Honor.

BY MR. REIL:

Q    If you would look at page 12, Exhibit 5.  Do you have that?

A    Yes, yes, sir.

Q    That's a letter of November 21st from you, Ms. Corrado --

A    Yes.

Q    -- to my co-counsel Mr. Swate?

A    Yes, sir.

Q    Okay.  And down I think in the last paragraph, it

says in support of its mission. I'd like to read that and ask you a follow up question.

A Okay.

Q All right. "In support of its mission to protect the public, individuals that have or have attempted to subvert ECFMG's policies and procedures are subject to ECFMG's policies and procedures on irregular behavior." Are you defining irregular behavior there?

A In that particular sentence?

Q Yes, generally.

A I mean, we're saying individuals who have attempted to subvert our policies and procedures are subject to the irregular behavior policies and procedures.

Q Okay.

A And then we follow that with a link to the irregular behavior policies and procedures, which has the definition of irregular behavior contained within it.

Q Well, is there something more to the definition of irregular behavior than what I've just read?

A There is a definition of irregular behavior included in the irregular behavior policies and procedures, which is mentioned in the next sentence in the link.

Q Okay.

A That had all the -- had already been provided to counsel prior this November 21st letter.

Q    Other than -- what does the link, if you know --

A    Uh-huh.

Q    -- what does it add to what's in that sentence, what I just read you?

A    I don't know it from the top of my head, but it provides all of the definition of irregular behavior and all of our policies and procedures about irregular behavior, what we do when we allege irregular behavior, what the process is, et cetera.

Q    Uh-huh.  Now how is an individual supposed to know whether or not they've attempted to subvert ECFMG's policies and procedures?  How is a person supposed to know that?

        MS. MCENROE:  Objection, Your Honor.  Calls for speculation or a hypothetical.

        THE COURT:  Sustained.

BY MR. REIL:

Q    Is that the definition of irregular procedure I just read, give fair notice to an individual of what they're being accused of?

        MS. MCENROE:  Objection, Your Honor.  Misstates testimony.  I believe the witness just said that he had not provided the whole definition of irregular behavior and she could not recite it off the top of her head.

        THE COURT:  Sustained.

BY MR. REIL:

Q   All right.  And you can't tell us -- is there any place where you can tell us if that -- let's strike that.

Is that is that definition of irregular behavior in your letter to Dr. Swate, is that inaccurate?

A   Is my statement in the letter inaccurate?

Q   Yeah, what I just read in support of its mission?

A   No, no.

Q   Is that inaccurate?

A   No.

Q   Okay.  Okay, now the -- we went over I think it's Exhibit B, the placement in the World Directory of Medical Schools I'll call it.

A   Uh-huh.

Q   Was there any indication as to whether or not Dr. Tulp would be allowed to bring that up at his hearing?

A   I don't know what Dr. Tulp would have brought up at the hearing if he was --

Q   Well, let's put it this way.

THE COURT:  Let the witness finish.

BY MR. REIL:

Q   Yes.

A   If he testified, I don't know what he would have brought up.

Q   Okay, did you ever indicate that the placement involving the World Directory of Medical Schools was not a

subject for the hearing?

A    What I indicated was that the note that we placed in the World Directory was not related to the allegation of irregular behavior.

That is, it was related to our request for information from USAT.  USAT did not provide that information and we placed that note into the World Directory at that time.  It was not related to the allegations of irregular behavior.

Q    I see.

A    So we did in the letter tell, I think, Mr. Swate.

Q    Well, let's look at that letter that you wrote to Mr. Swate.  Would you go to page 23 of my exhibit pack.

A    Uh-huh.

Q    And I think that's the letter of 11/14/18 --

A    Uh-huh.

Q    -- to Dr. --

MR. REIL:  Yeah, and a lawyer, Your Honor --

BY MR. REIL:

Q    -- to Dr. Tommy Swate?  It's under Exhibit G.

A    Uh-huh.

Q    Do you have that?

A    I do.

Q    Okay, by the way, at this hearing, were any witnesses from the USAT besides Dr. Tulp allowed to be present?

A    You mean on behalf of Dr. Tulp or?

Q    Yes, on the 28th.

A    So no.

Q    No, okay, all right.  How about students from the USAT?  Were they allowed to be present and testify?

A    No, but that's part of our normal process when --

Q    I see.

A    -- we have an allegation of irregular behavior, we don't let -- we don't typically permit anyone to bring witnesses.

Q    Okay, if you take a look at page 23 --

A    Uh-huh.

Q    -- in the letter of November 14th, 2018 to Mr. Swate?

A    Uh-huh.

Q    All right, down one, two, three, four paragraphs.

A    Uh-huh.

Q    Fourth paragraph, the second sentence, all right. Let me read it to you and I'll have a follow up question.

A    Okay.

Q    It says, you write, "Nor is there any right to a hearing with ECFMG for USAT for any matter."  It's the next sentence I'm interested in.

"ECFMG will not entertain any request to review the actions that is taken with respect to USAT's sponsor note at Dr. Tulp's irregular behavior here."  And that's sponsor note, we're talking about the Exhibit B we've already discussed,

right?

A    That's correct.

Q    Okay, now that decision to exclude that evidence from the hearing, did Dr. Tulp have any input in that?

A    Well, I sent it to his attorneys, so.

Q    Okay.  Well, was there a procedure whereby he could object to that?

A    There's no such procedure.

Q    I see.

MR. REIL:  Could I have one moment, Your Honor?

THE COURT:  Mike, can you put that computer down on the thing, on the podium?  Put it down, I can't see.

MR. REIL:  That's all the questions I have of this witness at this time, Your Honor.

THE COURT:  Cross?

Not that one.  This one.  This one here.  Thank you. And maybe put the microphone down.

MS. MCENROE:  Your Honor, I was actually going to ask if I could approach and approach the witness from the lectern if that's okay with you?

THE COURT:  That's fine, that's fine.  I just couldn't see above the computer monitor.

MS. MCENROE:  Neither can I.  So thank you.

(Counsel confer)

MS. MCENROE:  May I approach the lectern, Your Honor?

THE COURT:  You may.

CROSS-EXAMINATION

BY MS. MCENROE:

Q     Good afternoon, Ms. Corrado.

A     Hi.

Q     You understand I'm counsel for the Educational Commission for Foreign Medical Graduates and Dr. Pinsky today?

A     Yes.

Q     I'd like to ask you a couple questions about the areas of testimony you were just asked about.

A     Yes.

Q     First, I'd like to give you a chance to clarify, if you'd like to, about whether or not you are an attorney?

A     I am not an attorney.  I have a law degree, so I'm not a practicing attorney.

Q     Early on in the questioning from counsel for Dr. Tulp, you were asked to question about the relationship, if any, between ECFMG and Dr. Tulp, do you remember that testimony?

A     Yes.

Q     In particular, you were asked if there was a contract or any other kind of agreement.  Do you understand that testimony?

A     Yes.

Q     How is it that ECFMG has interfaced, if at all, with

Dr. Tulp?

A     Dr. Tulp is one of the -- what we refer to as our authorized signatory for USAT.  So he -- I believe, and I'm sorry if I get your title wrong, is the president and the dean of USAT.

As such, he can certify documents or he was able to certify documents and information to ECFMG on behalf of the medical school.

For international medical schools that we interact with, we will, once the school has established that it meets the requirements for its students and graduates to be eligible for ECFMG certification, we typically communicate with the school officials, collect the information that we need from them in order to be able to process the applications and the certifications of their students.  So in that way, we have communicated with Dr. Tulp since I believe around 2003.

Q     So speaking nuts and bolts in terms of Dr. Tulp doing anything --

A     Uh-huh.

Q     -- that comes to ECFMG --

A     Uh-huh.

Q     -- can you explain that a little bit more just from a practical standpoint?

A     Yes, so the individuals who are students and graduates of international medical schools would apply to ECFMG

to take the United States medical licensing examinations and also need to submit their credentials, which includes their final medical diploma and their final medical school transcript.

ECFMG has to authenticate that information. We need to authenticate whether you're actually a student at a school or not.

And so Dr. Tulp would sign off on applications, saying to ECFMG essentially this -- yes, this person is a student or is a graduate at USAT and they've completed their basic sciences.

In the same way, he would complete forms for diplomas. Yes, this diploma is authentic and fill out the information that we require to verify the credentials of students and graduates.

Q    You testified in response to questions from counsel about a finding of irregular behavior as against Dr. Tulp; is that correct?

A    That's correct.

Q    Could you explain what action, if any, ECFMG took as a result of that finding of irregular behavior against Dr. Tulp?

A    Yes, so ECFMG put a sanction on Dr. Tulp for a minimum of five years that we will not accept any documents from -- signed or certified by Dr. Tulp on behalf of USAT or any other medical school for that period of time.

After that period of time expires, we will consider accepting Dr. Tulp as a signatory again for medical school if he meets certain requirements. And I'm sorry I don't have them. I can't remember them off the top of my head, but basically, that he satisfies the requirements that we have, conditions that we have, to be able to accept him again.

Q    Is it fair to say that the action taken by ECFMG in light of the finding of irregular behavior with respect to Dr. Tulp was limited to his role as an authorized signatory on behalf of USAT to ECFMG?

A    Yes, that's correct, I mean, if he still signs transcripts for students, we wouldn't reject a transcript because that's an official document of USAT, but we would need another official from USAT to authenticate it.

Q    And really just briefly, what is the process or how hard is it to get somebody else to be, sorry, an authorized official from USAT?

A    We -- I mean, it's not that hard. We would just reach out to the medical school to ask who would be able to sign off for the school --

Q    For --

A    -- for just our, you know, vice dean, things like that.

Q    So USAT would not be disqualified then from having an authorized signatory?

A    Correct, that's correct.

Q    You were asked some questions about a black binder --

A    Yes.

Q    -- being given to counsel for Dr. Tulp at a November 28th hearing.  Do you remember that?

A    Yes.

Q    And I couldn't catch it in the testimony about your explanation about whether those materials had been provided to Dr. Tulp prior to the proceeding.  Could you explain that?

A    Yes, so we provide the materials to individuals prior to the hearing.  Those materials were sent via email to Dr. Tulp's counsel.

And I got an acknowledgement that they were received by email, but I also sent them by a hard copy by Federal Express, too.

Q    There was some discussion, sorry, there was some discussion about certain materials being redacted in the materials provided to Dr. Tulp.

A    Uh-huh.

Q    Can you explain why, please?

A    So we put about over 300, I think, affidavits in the materials.  And we redacted their names, the individuals' names on that bundle and their identification numbers, because we wanted to -- we just wanted to make sure that we're protecting the privacy of those students and that there would be no

Case 2:18-cv-01005-WBD Document 152-16 Filed 02/27/23 Page 41 of 135

adverse action taken against them for providing the information to ECFMG.

Q    And what was the purpose of sending the students those affidavits?

A    We sent the affidavits to the students, because we wanted to determine where they had done their basic sciences. We had had information that USAT was operating a campus in the United States in Florida. And Dr. Tulp had indicated that that was not correct.

So we still were getting information contrary to that. So we decided to send the affidavit to the students to get information from the students about where they actually did their basic sciences.

Q    Why, if at all, was it a concern for ECFMG about where the USAT students took their basic sciences?

A    So ECFMG has requirements about the medical schools that we will accept and --

MR. REIL:  Objection. Beyond the scope of my examination.

THE COURT:  Overruled.

BY MS. MCENROE:

Q    You may answer.

A    Okay, sorry. So we have requirements around, you know, what international medical school is.

In fact, an international medical -- we define an

international medical graduate as an individual who has received their education outside of the -- their medical education outside of the United States and Canada.

And so we have requirements from the government officials where the school is located that the school has to meet.

So the school has -- the government has to say, yes, essentially, I'm sort of oversimplifying, but the government has to say, yes, this is a medical school. You recognize it as such. And its graduates are eligible for licensure in our country. And then ECFMG will recognize that.

But if the school has a branch campus outside of that country, we also require the branch campus country to provide that same type of information. Do you recognize it as a medical school? And are its graduates eligible to practice in your country?

So if you were having only classes in the United States, we would need that documentation from the United States, but also, you might be a United States school.

Q   So you were asked some questions about the role and purpose of ECFMG? At the beginning of your testimony, you remember being asked that?

A   Yes.

Q   And can you explain a little bit more about why it's concern to ECFMG, for example, if there were to be

predominantly education in the United States that you were just talking about?

A    So, you know, if the person is educated only in the United States, then they may not be considered an international medical graduate.  So they might not even be eligible or subject to ECFMG certification if they're not an international medical graduate.

If they went to medical school in the United States, and my understanding is they would have to go to a school that was accredited by the LCME, which is the Liaison Committee on Medical Education.

So we have to make sure that we're not, you know, we are dealing with international medical graduates only because that is our scope.  That is what we are authorized to deal with.

Q    Does ECFMG certify U.S.-based medical school graduates?

A    No.

Q    So you -- ECFMG wouldn't grant a certificate to a Penn Med grad?

A    No, correct, we would not.  We could not.

Q    There was some discussion, jumping to back to the hearing that you were asked some questions about, you remember the November 28th hearing?

A    Yes.

Q    There was some discussion about a sponsor note in the

World Directory. And I believe you read some -- a note from that language out into the record. Do you remember that?

A Yes, uh-huh.

Q And there was a question about the sequence of events. Could you explain a little bit more in terms of the note and the sponsor note, I'm sorry, in the World Directory with regards to USAT vis a vis the irregular behavior proceeding against Dr. Tulp?

A Right. So when we became aware that there was a possibility that there was a campus in the United States for USAT, we reached out by letter officially to USAT to ask. We said we understand there's campus in the United States. Can you please provide us with the documentation from the Department of Education that authorizes you to have a medical school and to conduct your activities in the United States?

And we got a response that that was not accurate. We talked about the affidavit process. We asked the information from the students.

And around, I think it was October 18th, when we had asked for the documentation from USAT about the -- its U.S. branch campuses I had not receive it, then we made a determination that we could not accept students and graduates from that medical school. That would be effective Jan. 1, 2019.

We notified the students. We put the note in the directory, but that action was related only to not receiving

the documentation from the United States officials that the school was recognized in the United States.

And we offered in a letter, so if you get the documentation, give us the documentation so we can consider, we can reconsider the sponsor note.

Q   To date, has ECFMG gotten such documentation regarding authorization for USAT to conduct education in the United States?

A   No.

Q   Do you have an estimate of how many times ECFMG has asked for such documentation?

A   Um --

Q   Would it be fair to say multiple times?

A   Multiple, yeah, I mean, more than once.

Q   What is the purpose of a sponsor note in the World Directory just briefly?

A   So the sponsor note, the World Directory of Medical Schools is a listing of the world's medical schools.  And there are over 3,000 medical schools in the world.  We do not accept grad -- you know, we do not accept graduates from all 3,000.

There are a subset of those medical schools whose graduates are eligible to apply to ECFMG for certification, which means ultimately, they're allowed to continue to try and practice medicine in the United States.

We used a sponsor note in the World Directory on a medical

school to indicate to the public and to the students and graduates of that school whether or not those students and graduates are eligible to apply to ECFMG for certification.

So it's the way in which we communicate publicly the eligibility, if you will, of the school's graduates to start the process of ECFMG certification.

Q   And I'd like to direct your attention in the packet of exhibits that were given to you by counsel?

A   Uh-huh.

Q   Back to Exhibit E, which is the sponsor note.

A   Uh-huh.

Q   Let me know when you have it?

A   Okay, I have it.

Q   And it's fair to say earlier, you testified this is a copy of the sponsor note for USAT?

A   Yes, uh-huh.

MS. MCENROE:  Your Honor, I'm not sure that this got admitted into evidence.

THE COURT:  It did not.

MS. MCENROE:  So I'd like to move for its admission?

THE COURT:  Any objection?

MR. REIL:  No, Your Honor.

THE COURT:  It's admitted.

(Defendant's Exhibit E admitted into evidence)

BY MS. MCENROE:

Q    Ms. Corrado, if you could just very briefly, I know you were directed to one portion of this document.  I'd like to direct your attention up a little bit higher.

A    Uh-huh.

Q    There's a list of graduation -- there's a range from 2003 to 2018.

A    Uh-huh.

Q    What is that indicative of?

A    That is the listing of the graduate -- the graduation years for which ECFMG will accept graduates of this school.  So in other words, it's not just that your school is listed in the World Directory with our sponsor note.  Your school has to be listed and your graduation year has to be listed.

So if you graduated in 2005, we will still accept the 2005 graduate from USAT.  But if you graduated in 2020, currently, we will not accept your application for certification.

Q    So I just want to make sure it's clear.  So is it true that today, ECFMG would still accept, for example, 2018 USAT grads --

A    Yes.

Q    -- for certification if they meet all the other requirements?

A    Yes.

Q    And are there enhanced procedures on USAT applicants?

A    There are.

Q    Can you explain what that means?

A    Yes, so the affidavit process that we touched on earlier is a requirement for USAT students and graduates currently.

Essentially, in order to receive ECFMG services, they need to complete that affidavit and submit to ECFMG. And once ECFMG has reviewed it and accepted it, then we will continue to provide services to those graduates and students.

Q    So looking back to the November 28th hearing and I'll try to be quick.

THE COURT:  Hang on, wait. So the note talks about students and graduates of this medical school with a graduation year of 2019. You see that?

THE WITNESS:  Yes.

THE COURT:  When is -- when would students of USAT normally graduate? What month in 2019?

THE WITNESS:  I don't know, Your Honor, when they would normally graduate. This note is meant to indicate that as of the first of this year, 2019, we will not accept any graduates.

THE COURT:  Do you know whether there have been any graduates of USAT in 2019?

THE WITNESS:  I do not know that, Your Honor.

THE COURT:  Go ahead.

MS. MCENROE:  Thank you, Your Honor.

BY MS. MCENROE:

Q    So moving back to the November 28th hearing, you were asked a number of questions about submission into evidence and other procedural events at the November 28th hearing.

Just very briefly, can you estimate or how many years have you been attending or participating in this kind of irregular behavior proceeding with personal appearances on behalf of ECFMG?

A    Sure, 10.

Q    And so you say 10 years?

A    10 years, yes, sorry.

Q    And an estimate of, if you can ballpark, how many of these kind of proceedings you participated in?

A    So 30.

Q    And so, just very briefly, in terms of the process at the hearing, I know that there was some testimony that it's a 20-minute hearing.  Can you please explain the expected process --

A    Sure.

Q    -- of that type of hearing?

A    Sure, so when an individual makes a personal appearance before the board of trustees, we give a very brief -- staff will give a very brief outline of the allegation as -- of the irregular behavior.

The individual will be given approximately 20 minutes to

provide a statement, if they will. Usually, they have an opening statement. They can have counsel there with them if they want.

Once they've concluded their opening statement, then the board is able to ask questions. They'll generally ask questions of the individual.

Once the questioning is finished, the individual's invited to give a closing statement and then they're excused from the hearing.

Q In your experience, based just from your view, what is the purpose of that hearing?

A The --

MR. REIL: I'm going to object, Your Honor, to the extent that we're talking about hearings other than Dr. Tulp's hearing, I don't think it's relevant.

MS. MCENROE: That's fair, Your Honor. I can withdraw the question and ask it a different way.

THE COURT: Go ahead.

BY MS. MCENROE:

Q Ms. Corrado, what was the purpose of Dr. Tulp's hearing on November 28th?

A He was -- has a right to a personal appearance, which he elected to take. And the purpose would be for him to provide his explanation about the allegation and to answer any questions that the committee would have for him.

Q   We already discussed briefly the materials provided to him in advance of the hearing.  In your view, did you expect that additional evidence would be submitted by ECFMG at that hearing?

A   No.

MR. REIL:  Objection.

THE COURT:  Basis?

MR. REIL:  I think, Your Honor, in her personal view here, I'm not sure how that relate -- I don't think it's relevant.

THE COURT:  Re-ask the question.

BY MS. MCENROE:

Q   Sure.

THE COURT:  Different way.

BY MS. MCENROE:

Q   Did it surprise you, based on your experience of having gone to over 30 of these hearings in the past 10 years, that ECFMG did not present any additional materials beyond the black binder --

A   No.

Q   -- at the hearing of Dr. Tulp?

A   No.

MR. REIL:  Objection to whether the witness was surprised.  Ask that it be rephrased.

THE COURT:  Overruled.

Case 2:18-cv-07055-YWBD Document 152616 Filed 02/27/23 Page 52 of 135

Go ahead.

THE WITNESS:  No, I was not surprised.

MS. MCENROE:  Your Honor, I have nothing else on cross at this time.  I will have additional questions for the witness.  So it's at your prerogative if you'd rather me have the witness on the stand once.

THE COURT:  Let's just get, yeah, let's get this -- you now got the witness on direct in your case.

MS. MCENROE:  Great.

THE COURT:  Go ahead.

MS. MCENROE:  Thank you, Your Honor and I'll be as brief as I can.

DIRECT EXAMINATION

BY MS. MCENROE:

Q    Ms. Corrado, why did ECFMG change the sponsor note for USAT in the World Directory?

A    We changed the sponsor note in the World Directory, so that we could let students know what the status of the school was.

And the note was changed because we did not have the documentation from USAT from the Department of Education in Florida or the other states where they were operating that authorized their school in those states.

Q    And why did ECFMG allege irregular behavior against Dr. Tulp?

A     When we asked Dr. Tulp if he had a -- that we -- I'm sorry, we asked -- we advised Dr. Tulp that we understood that he had a -- that USAT had a campus in Miami and we asked for the documentation in a letter on August 21st.

And the response that we got from Dr. Tulp was that it is not a campus.  There was not -- education was not occurring there.  It was an administrative site only.

So when we got the affidavits from the students that essentially said they all took their classes in Miami or some other location in the United States, and had not gone to Montserrat, that conflicted with the information that Dr. Tulp had given us.  And then in our view, that was providing false information to ECFMG.  So we alleged irregular behavior.

Q     Just briefly, could you explain how this concern came to the attention of ECFMG regarding the location of the education for USAT?

A     Sure.  In roughly the summer of 2017, ECFMG, we were conducting a project to re-verify a number of medical schools located in the Caribbean.  And we were doing research on them. And we had not gotten any information back from Montserrat regarding USAT.

And our team was looking into it and found a number of videos online that seem to indicate that --

MR. REIL:  Objection to what the team found.  It's hearsay.

THE COURT: Sustained.

MR. REIL: And --

THE COURT: Sustained.

MR. REIL: -- I don't think it's -- it's not based on the witness' personal knowledge.

THE COURT: Sustained.

MR. REIL: I'm sorry, Your Honor. I didn't hear.

THE WITNESS: So we got an inkling that was some activity happening in the United States. We did some research. We -- but ultimately, we got an email on August 8th of 2018 from a prospective parent of a USAT student, who said my son is going to --

MR. REIL: Objection to what a prospective parent said.

THE COURT: Sustained. Sustained.

THE WITNESS: So then, we requested USAT to provide us with documentation about their Miami campus.

BY MS. MCENROE:

Q    And you mentioned doing some re-verification of schools in the Caribbean?

A    Uh-huh.

Q    Very briefly, why was ECFMG doing that?

A    So ECFMG had done another investigation on another medical school. And we wanted to reach out to make sure that that medical school still had its -- met the eligibility

requirements. And at the same time, we decided to do an eligibility requirement for all of the schools in that area.

And we are targeting actually different areas of the world moving forward to re-verify information that we previously received for schools.

Q    There's been some discussion of the change of the sponsor note and the finding for irregular behavior against Dr. Tulp.

We're just wondering what, if any impact, you know of those actions having been on students of USAT, how that's impacted them in any way?

A    My -- the students -- if the students did not graduate by December of 2018, then the students would have to transfer to other medical schools if they wanted to continue to take USMLE examinations and to pursue ECFMG certification, but those who had graduated prior are moving through the pipeline.

Q    And those students, you said if they wanted to proceed through USAT USMLE examinations, if they had transferred, what if any impact on their prior credits taken on USAT being eligible for ECFMG certification, what impact if any would that have been?

A    Well, so they -- their -- they would be able to transfer their prior credits from USAT to whatever their new medical school is.

Q    Do you have any understanding of what impact ECFMG's

actions vis a vis the sponsor note and the World Directory were -- as to Dr. Tulp would have on the ability for USAT to provide medical education generally to students in Montserrat, who have no inclination of coming to ECFMG?

A    Yeah, they --

MR. REIL:  Objection to the question.  It's compound and I think there has to be a foundation that the witness has some personal knowledge here.  She's not in as an expert.

MS. MCENROE:  I'll withdraw the question then.

THE COURT:  Okay.

BY MS. MCENROE:

Q    Ms. Corrado, we were talking briefly about recertification in the Caribbean.  Do you remember that?

A    Uh-huh.

Q    And you mentioned another school that had gone through a process of investigation.  What school was that?

A    Atlantic University School of Medicine in St. Lucia.

Q    And was --

THE COURT:  And I'm sorry, in where?

THE WITNESS:  In St. Lucia.

BY MS. MCENROE:

Q    And was there any finding of irregular behavior as to any medical school official in that --

A    Yes.

Q    -- investigation?

A    Yes.

Q    And what was the action or what was the finding, if any, of the -- ECFMG with respect to that medical school official?

A    The --

MR. REIL:  Objection to another investigation. Relevance.

THE COURT:  Relevance?

MS. MCENROE:  Your Honor, I'm just trying to establish there's a precedent here for how ECFMG conducted itself.

THE COURT:  Overruled.  Go ahead.

THE WITNESS:  So ECFMG found that officials and employees of the university had engaged in irregular behavior. And they were similarly sanctioned in that.

They are -- they have been -- we will not accept documents certified by those officials for a minimum of five years after which they have to meet certain requirements if we will consider them again for that school or for any other medical school.

Q    We also talked briefly a little earlier when looking at the sponsor note about enhanced procedures on students at USAT.  Do you remember that?

A    Yes.

Q    And you mentioned that pertained to the affidavit

process; is that correct?

A    That's correct.

Q    Was -- has ECFMG ever used a similar enhanced procedure on any other medical school?

A    Yes, in the case of the Atlantic University School of Medicine for one, but others as well.

Q    And in any of those other circumstances when ECFMG has imposed enhanced procedures involving these affidavits, has it ever been that there were then no findings of irregular behavior or no changes to a sponsor note as a result?

A    Yes.

Q    Has ECFMG ever investigated other medical schools where there was communication with the medical school about a change to a sponsor note and then the medical school was able to provide ECFMG with the information sought?

A    Yes, there has.

Q    And then in that circumstance, was there any change to the medical school listing the sponsor note?

A    Yes, we updated the sponsor note.

Q    To reflect?

A    To reflect that the graduates were eligible once again for certification.

Q    Was it your intention if that information had been provided that was requested from Dr. Tulp with regards to the eligibility -- sorry, authorization to have medical school

education in the United States been provided to ECFMG that ECFMG would do the same thing in this circumstance?

A    Yes.

MS. MCENROE:  I have no further questions at this time.

THE COURT:  Mr. Reil, you have redirect on your own witness and cross on Ms. McEnroe's witness.

MR. REIL:  Brief redirect, Your Honor.

THE COURT:  Go ahead.

REDIRECT EXAMINATION

BY MR. REIL:

Q    You just gave some testimony, Ms. Corrado, concerning the affidavits, Exhibit D, the affidavits of these students filled out that ECFMG sent to them.  Would you take a look at that affidavit on page 10?  I have a question on it.

A    I have it, sir.

Q    Okay, did ECFMG in that affidavit threaten the students with irregular behavior if they didn't fill out the affidavit?

A    No, sir.

Q    If you go to page 11 there.  Okay, if you go down on page 11 to I guess the second to the last paragraph, where it says ECFMG reserves the right.  Do you see that?

A    Uh-huh.

Q    Please read it into the record, that sentence.

A    "ECFMG reserves the right to bring allegations of irregular behavior against you in accordance with its policies and procedures showing ECFMG obtained information that indicates that you have engaged in irregular behavior with respect to any documentation submitted as part of this process."

Q    All right, now what was the purpose of ECFMG putting the -- that language with the affidavit?

A    This is to serve as a reminder to those students that they need to provide correct and accurate information to ECFMG. And that if they don't, they could be subject to our irregular behavior procedures.

Q    What if they didn't fill out the affidavit?

A    There were a number of students that didn't fill out the affidavit.  They -- we just don't -- we won't provide services to them until they fill it out.

Q    I see.  All right, when you say you won't provide services to them, if you don't provide services to them, that means they'll never be able to become a practicing physician in the United States, am I correct?

A    It means they won't be able to proceed to get ECFMG certification.

Q    ECFMG certification is necessary for a foreign medical student to practice as a physician in the United States?

MS. MCENROE: Objection, Your Honor. Asked and answered and also to the extent it purports to seek a legal conclusion.

MR. REIL: I'll withdraw the question, Your Honor.

BY MR. REIL:

Q Okay, there was some testimony that was elicited before my examination where you were asked about a campus. Do you remember that?

A Yes.

Q Does ECFMG define anywhere in its policies or procedures what a campus is?

A Not to my knowledge.

MR. REIL: That's all I have, Your Honor.

THE COURT: Okay, thank you very much. You can leave the stand.

THE WITNESS: Thank you, Your Honor.

(Witness excused)

THE COURT: We're going to take a five-minute break and get back and have Ms. Cover on the stand ready to go when we get back in.

THE COURT RECORDER: All rise.

THE COURT: Thank you.

(Recess at 3:21 p.m., until 3:32 p.m.)

THE COURT RECORDER: All rise.

THE COURT: Okay, Mr. Reil, the witness please?

THE COURT RECORDER:  Please raise your right hand.  State and spell your name for the record?

THE WITNESS:  Lisa Brenda Cover, L-I-S-A C-O-V-E-R.

                    LISA COVER

called as a witness for the Plaintiff, having been duly sworn testified as follows:

THE COURT:  Have a seat.  Your witness?

MR. REIL:  Your Honor, at this point, we have decided not to examine Ms. Cover.

THE COURT:  Oh, okay.

MR. REIL:  With no objection if the Court allows.

THE COURT:  Would you -- Ms. McEnroe, would have brought in Ms. Cover in your case in chief?

MS. MCENROE:  No questions.

THE COURT:  Okay, you can leave the stand.

THE WITNESS:  Thank you.

     (Witness excused)

THE COURT:  Okay, let's have -- would you want -- do you want to put Mr. Tulp on -- Dr. Tulp on the stand?

MR. REIL:  Yes.  And with the Court's permission, Attorney Swate will examine Dr. Tulp.

THE COURT:  Go ahead.

THE COURT RECORDER:  Raise your right hand.  State your name for the record?

THE WITNESS:  Dr. Orien Lee Tulp.

ORIEN TULP

Plaintiff, having been duly sworn testified as follows:

THE COURT:  Have a seat.

Your witness.

MR. SWATE:  If it please the Court.

DIRECT EXAMINATION

BY MR. SWATE:

Q    Dr. Tulp, what is your professional position currently?

A    I'm president of the University of Science, Art, and Technology.

Q    And that's USAT?

A    That's USAT.

Q    And how long has USAT been in operation?

A    15 years, 4 months.

Q    All right, are you a part owner of USAT?

A    Yes.

Q    What credentials that you have, just briefly, to support your position at present?

A    There -- I have a Ph.D., two PhDs, an M.D.  And I've been active as a professor for over 40 years.

Q    Now for most of your professional life, 43 years, do you -- what, a military officer?

A    Yes, I was.  I served in the United States Army, active in Reserve components 43 years, 5 months, and 26 days.

Q    Did you receive any awards?

A    Yes, I have many.

Q    Well, just a couple?

A    Including the Congressional Award of Regional Merit, including three meritorious service awards, two from the Commonwealth of Pennsylvania, and commendation metals, the Citizenship Medal from the Sons of American Resolution -- Revolution.

We have many, many awards that I've received over the course of my military career, including the eighth award of the Garde Nationale, the eighth one in history was awarded to me for having a significant academic and professional career and simultaneous to my military career.

Q    Have you received any public awards?

A    Yes, I've received several presidential voluntary service awards from several presidents of the United States. And I received an exultation from President William Jefferson Clinton in 1986.

Q    In the years that you operated in medical school, what has been the experience of your students as far as the results of the testing done by ECFMG and USMLE?

A    They've done very well.  We, you know, provide high quality instruction.  The vast majority of our courses, the -- the entire, the full first year they can take from Montserrat or they can take from virtually anywhere, because there's --

we've developed beginning 10 years ago, because of the volcano, we developed something called SPOC, Small Platform Online courses where you have high quality, the best we can find, all U.S. certified instructors all have taught in U.S. medical schools and are all -- were board certified in their fields.

They present these courses. So they can take them pretty from Montserrat, and many, many have over the years, from anywhere in the world.

Q    What has been your --

THE COURT:  Mr. -- sorry, can you just get to the chase?  I accept that Dr. Tulp has these qualifications and I am for the purposes of this preliminary injunction hearing, that is not what we're talking about.

MR. SWATE:  Yes, Your Honor.

THE COURT:  Just cut to the chase.

BY MR. SWATE:

Q    All right, what is required by every state in the union for an international medical graduate to apply for a medical license, whether either restricted or permanent?

A    They must have ECFMG certification.  There's the only access that's available to them.

Q    Can a medical student United -- international medical student be licensed without that certificate or license?

A    Not in the United States of America

MS. MCENROE:  Objection, Your Honor.  Foundation.

THE COURT: Basis? I mean, granted. Sustained.

MS. MCENROE: It's been a long afternoon, Your Honor.

THE COURT: Sustained.

MS. MCENROE: Thank you.

THE COURT: You can lay some foundation and perhaps get there.

BY MR. SWATE:

Q    Well, what -- getting to the chase, what evidence was presented by ECFMG owned on the 28th that you had committed any kind of bad act?

A    None.

Q    When did you find out about the notebook with the various evidence that was -- that had been given to the members of the committee that was supposed to hear your case?

A    On the 28th of November, it was placed on the table. It had no label. We didn't know what it was. It was just a black book that was sitting there. We had no opportunity to review it in advance.

Q    What evidence was produced by the ECFMG at that meeting that support any allegations?

A    None.

Q    What effect does ECFMG placing that notation on that world list of medical schools have on you personally, and then I'll get to the medical school?

A    Well, it certainly blemishes my reputation

tremendously.  In over 50 years, I've never had a single complaint from a student, a patient, a board, nothing.  I never expected this.

Q     When was that notation first placed?

A     Prior to September 11th, 2018.  That was the last date entered on the sponsor note when it was -- when it appeared.

Q     Was that note placed prior to any hearing or any allegations?

A     Yes.

Q     Now the ECFMG agreed that up until January the 1st, 2019, they would accept documentations from the USAT students, correct?

A     That is correct.

MS. MCENROE:  Your Honor, foundation about what ECFMG was sent.

THE COURT:  Sustained.

MR. SWATE:  Ma'am?

THE COURT:  Sustained, go ahead.  Lay some foundation.

BY MR. SWATE:

Q     You were given a letter from the ECFMG that stated that up until January the 1st, 2019, documentation would be accepted?

A     That is correct.

Q    What harm resulted from allowing the USAT to operate until January the 1st, 2019?

A    I am unaware of any harm whatsoever.

Q    Well, what magically happened at midnight on January the 1st, 2019 or December the 31st, 2018?

A    ECFMG would no longer accept --

MS. MCENROE:  Objection, Your Honor --

THE COURT:  What?  You finish your question.

You hold.

Finish your question.

BY MR. SWATE:

Q    What occurred that would cause the ECFMG on December the 31st, 2018 to accept documentation and then after that date not accept documentation, if you know?

A    Nothing.

THE COURT:  Hold on.  Any objection?

MS. MCENROE:  Objection, Your Honor.  Foundation.

THE COURT:  Sustained.  Also, compound.

BY MR. SWATE:

Q    What damages, if any, is occurring while allowing ECFMG to post those notes on that world internet site listing medical schools?

MS. MCENROE:  Objection, Your Honor.  Foundation.

THE COURT:  Sustained.  Foundation?

BY MR. SWATE:

Q    Are you --

A    Yes.

Q    Are you aware that the notice has been posted, correct?

A    Yes, I'm aware the notice was posted.

Q    Do you have any personal knowledge of the effect of posting that notice?

A    Yes.

Q    What's your knowledge?

A    It really eliminates all new applications and it prevents the university from collecting any uncollected tuition.

Q    What harm would result from allowing USA -- by allowing ECFMG to continue accepting documents from USAT students until this matter's resolved?

A    There is no harm.

MS. MCENROE:  Objection, Your Honor.

THE COURT:  Basis?

MS. MCENROE:  Foundation and also vague.  I'm not sure exactly what he means by harm.

THE COURT:  Sustained, sustained.

THE WITNESS:  I'm unaware of any harm.

THE COURT:  Oh, no, don't.  If I sustain, you don't answer.

THE WITNESS:  Okay.

THE COURT: Go ahead.

THE WITNESS: I'm sorry, Your Honor.

BY MR. SWATE:

Q    Are you aware of the results of them posting the information?

A    Yes.

Q    And what's been the result?

A    The result has been that all tuition payments stopped on or before October 1st. And that has made a major impact on the economy at the university. We were admitting about 50 students per month prior to that. Since then, not one.

Q    And this was prior to any hearing or finding of irregular behavior, correct?

A    That is correct.

Q    Do you have an opinion of whether it would be a positive event to allow USAT to continue by ECFMG accepting documents until this matter's resolved?

MS. MCENROE: Objection, Your Honor. Calls for opinion testimony.

THE COURT: Sustained unless you think that this can be fact witness testimony, opinion testimony. Make that argument.

MR. SWATE: He has specialized knowledge. He's been an administrator for 15 years.

THE COURT: So you're trying to get him qualified as

CaseCase0-2v1017005545YWBDocumentt52616Filedi02d2571297/23agePageof7135f 135

an expert, is that what --

MR. SWATE:  Well, he is an expert.

THE COURT:  Well, he's not until I say he's an expert.

MR. SWATE:  Well, I understand it, Judge.

THE COURT:  So are you trying to get him qualified as an expert?

MR. SWATE:  Okay, I understand.  I will attempt to do that.

THE WITNESS:  Okay.

THE COURT:  Okay, I'm not suggesting -- I mean, if you want to do it, you can try and do it, but we've got go through the process.  So why don't you do it?

MR. SWATE:  Yes, Your Honor.  I understand.

THE WITNESS:  Okay, would you repeat that question now that we've had --

BY MR. SWATE:

     Q    You've been a president and professor for USAT for 15 years?

     A    That is correct.

     Q    Are you familiar with the standards for your students being licensed in the United States?

     A    Yes.

     Q    And what's this familiarity based on?

     A    It's based on experience and study.

MR. SWATE: Your Honor, I would have Dr. Tulp admitted as an expert in medical administration.

MS. MCENROE: Your Honor, we oppose. I don't really understand what an expert in medical administration is. I think that was factual testimony that was just being elicited about why -- the basis for a line of questioning, which I don't have an objection to that, but I don't understand him being put forward as an expert at this time.

THE COURT: Sustained.

BY MR. SWATE:

Q You -- the -- you have familiarity with the history of your students?

A Yes, I do.

Q Do you have familiarity with the history of your students in going into residency programs?

A Yes, we do.

Q And what has been that history?

A That history has been highly successful. Most successful -- most are successful in obtaining not only residencies, but some medical positions, faculty positions at U.S. medical schools following their board certification.

Q Your student, if you can do this, how would you describe your typical student?

A Our typical students are exceptional. They're way above -- there is a mix of other international medical schools

from the region that we've interacted with.

All -- the minimum requirement for most questions coming in is a Master's degree or higher. And that accounts for about 90 percent of the total.

Q    What about the age of your students? Do you have any information about that?

A    We have no age restriction. Our oldest graduate was 73.

Q    What kind of experience on the average do these students have?

A    10 to 20 years of clinical experience prior to coming into the program. So.

Q    Are you making a claim today that you were denied due process by the ECFMG?

A    Absolutely.

MS. MCENROE: Objection, Your Honor. Calls for a legal conclusion.

THE COURT: Sustained.

THE WITNESS: Absolutely.

THE COURT: If I say sustained, you don't answer the question.

THE WITNESS: Oh, I'm so sorry.

THE COURT: Go ahead.

BY MR. SWATE:

Q    Well, what notice were you given of the charges?

74

A    None.

Q    What evidence was presented at the hearing?

A    None.

Q    Who terminated the hearing?

A    Attorney McEnroe.

Q    Were you allowed to -- were your attorneys allowed to put on any evidence?

A    No.

MR. SWATE:  Pass the witness.

THE COURT:  All right.

MS. MCENROE:  May I approach the lectern, Your Honor?

THE COURT:  You may.

MS. MCENROE:  And per efficiencies, I would ask if it's all right if I go do my cross and my --

THE COURT:  Yes.

MS. MCENROE:  It's yes?

THE COURT:  Yes, that's fine.

MS. MCENROE:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. MCENROE:

Q    Hi, Dr. Tulp.

A    Good afternoon.

Q    Good afternoon.  You were just asked about a hearing on November 28th; is that correct?

A    Yes.

Q    And you heard testimony a little bit earlier today about a transcript of the hearing?

A    I heard it, but I haven't read it.

Q    Have you received a copy of it?

A    No.

Q    Do you know if your lawyers have gotten a copy of it?

A    I believe our attorneys have received a copy very recently.

Q    Does USAT have a campus in the United States?

A    No.

Q    Have you ever said that you USAT had a campus in the United States?

A    No.

MS. MCENROE:  Your Honor, if I may, we need a minute for a technical hookup so that we can --

THE COURT:  Go --

MS. MCENROE:  -- submit some evidence to refresh the witness' recollection.

THE COURT:  Go ahead.  How -- when you say a minute, do you mean one minute?

MS. MCENROE:  Literally a minute.  I think we have it --

THE COURT:  Got it.

MS. MCENROE:  And Your Honor, while that's getting queued up, I would like to submit it initially to refresh the

witness' recollection.

And once the Court gets to see it, I plan to move for its admission on the basis of a statement of a party opponent?

THE COURT: Any objection to submission of the transcript?

MS. MCENROE: I'm sorry, not the transcript, the video that we're about to watch.

THE COURT: The video, okay. Do you know what video she's talking about?

MR. SWATE: No. Have we --

THE COURT: Okay, well, we'll take a look and then I'll ask you that question again.

MS. MCENROE: Thank you, Your Honor.

Your Honor, I think we're having a volume problem.

THE COURT: Mr. Mani, can you solve that?

MR. SWATE: Judge, we would object to this evidence. It hasn't been authenticated.

THE COURT: Well, we're just about -- we're doing that right now. That's what we're doing right now.

While we're waiting, Dr. Tulp, have there been any 2019 graduates of USAT as of yet this year?

THE WITNESS: No, there have not been.

THE COURT: When would be the first graduation or when would have been the first graduation?

THE WITNESS: In June.

THE COURT: Okay.

MS. MCENROE: Your Honor, while they're working on that, in the interest of efficiency, I'd be happy to move on and then circle back if that's all right?

THE COURT: Go ahead.

BY MS. MCENROE:

Q Dr. Tulp, you testified a minute ago that you had not gotten any notice from ECFMG about the allegations against you; is that correct?

A That is correct.

MS. MCENROE: All right, before I move on, it seems like we got volume, so we'll circle back if we could?

THE COURT: Go ahead. The -- you'll be showing the video solely for the purposes of determining whether -- its admissibility?

MS. MCENROE: Correct. Yes, Your Honor.

THE COURT: Okay, go ahead.

MS. MCENROE: And Your Honor, we're only going to put in the first couple minutes. We're not going to --

(Video played at 3:53 p.m.)

(Music)

UNIDENTIFIED SPEAKER: Thank you for joining us. Our guests today are Professor George Einstein of USAT and Dr. Orien Tulp, the president of USAT, the British West Indies-based University of Science, Arts, and Technology.

It is this institution in which dozens of physicians graduate successfully, many from humble beginnings from nations including the United States regardless of race or gender or culture.

USAT has created a program of superior excellence and in training physicians and other professionals to meet the demand of scientific and medical needs in this global technological environment.

Professor Einstein and Dr. Tulp will tell us more about these achievements following these messages.

(Music)

With us now is Dr. Orien Tulp, president of USAT, the University of Science, Arts, and Technology, Montserrat. Pleasure and honor to have you back.

MR. TULP: Thank you, sir. Pleasure to be back.

UNIDENTIFIED SPEAKER: So many things are happening in education worldwide and of course in your part of the world. And you do classes in Miami, Denver, and Montserrat. What's new with USAT?

MR. TULP: USAT is now fully accredited in the United Kingdom. We're now preparing for our 2014 commencement, which would be held right here in Miami.

We expect to graduate more than 100 students, which is more than any other Caribbean school just by the way. And we'll have this -- we want family to come. It's a great

Case 0:10-cv-01705-WBD Document 152-6 Filed 02/27/23 Page 79 of 135

opportunity, a great experience. And it enables those who graduate to experience closure, because now it's another chapter of their career.

UNIDENTIFIED SPEAKER: And USAT is contributing so effectively in the lives and careers of many people in this part of the world.

MR. TULP: Yes, it is. Yes, it is. We have a lot of physicians now in the state of Florida. We have some who are practicing and many more are in residency in their specialty training.

It's moving ahead very quickly and very rapidly. We're now the fastest, near as I can see, we are the fastest growing medical school in the Caribbean.

UNIDENTIFIED SPEAKER: So the University of Science, Arts, and Technology also is expanding into other programs, I understand. Tell us of these?

MR. TULP: Yes, yes we are. We have a new program we intend to start by September. This would be medical acupuncture designed for physicians, licensed physicians that wish to add that.

We're going to create a unique new program, which will lead to a Master of Science in Medical Acupuncture. That'll be conducted in our Miami campus to start with and probably extend that into some of the other campuses.

(Video ended at 3:56 p.m.)

MS. MCENROE: Your Honor, I would make the argument that Dr. Tulp is appearing here on this video himself, saying referring to a Miami campus, which goes directly contradictory to testimony he said that he never uses the word campus to describe USAT's conduct in the United States. So I would submit that it's admissible as an admission of a party opponent.

THE COURT: Any objection?

MR. SWATE: It's not -- part of the controversy is the definition of campus.

THE COURT: We're not talking about the -- that particular issue. We're only talking about the admissibility of this tape. So tell me why you oppose its admission?

MR. SWATE: I don't.

THE COURT: Okay, it's admitted.

(Defendant's Exhibit D-1 admitted into evidence)

MS. MCENROE: Thank you, Your Honor.

BY MS. MCENROE:

Q Dr. Tulp, you were testifying just a minute ago about not having notice from ECFMG with respect to the issues on going with USAT; is that correct?

A That is correct.

MS. MCENROE: Your Honor, may I approach the witness?

THE COURT: You may.

MS. MCENROE: And Your Honor, I have a copy for you

as well if you'd like me to hand that up if that's all right.

THE COURT: Yes, please.

BY MS. MCENROE:

Q    Dr. Tulp, do you recognize this document?

A    I do.

Q    What is it?

A    I recognize it, yes.

Q    Okay, and this is a letter directed to you, correct?

A    That is correct.

Q    Did you get this letter?

A    I received it by email.

MS. MCENROE: Your Honor, I would move for the admission of this letter?

THE COURT: Any objection?

MR. SWATE: No objection.

THE COURT: It's admitted. What would you like to label this as? We'll label the video as D-1.

(Defendant's Exhibit D-2 admitted into evidence)

MS. MCENROE: Great. And how about we make this D-2?

THE COURT: Got it.

MS. MCENROE: Thank you, Your Honor.

BY MS. MCENROE:

Q    So starting from the top, and it's a brief letter, so I'm going to try not to go too long on it, but it's from August 21st, 2018. And it starts out saying, "It has recently come to

the attention of the Educational Commission for Foreign Medical Graduates that USAT in Montserrat is operating a satellite or branch campus in Miami, Florida." Do you see that?

A    I see that.

Q    Then it was explained that, "In order for students and graduates of an international medical school such as USAT to have eligibility to apply for ECFMG certification, ECFMG policy requires confirmation from the appropriate government authority in the branch campus country that the branch campus is authorized to operate as a medical school in such branch campus country." Do you see that?

A    Yeah, I see that, uh-huh.

Q    Have you ever provided such information to ECFMG about the operation of education in the United States from USAT?

A    No, because when I contacted the Florida Department of Education, they said it was unnecessary based on what our activities actually were. The bulk of our program was online, about 80 percent of it. And we have previously told you that.

            MS. MCENROE:  Your Honor, may I approach the witness?

            THE COURT:  You may.

            MS. MCENROE:  And the bench, Your Honor.

BY MS. MCENROE:

Q    Dr. Tulp, do you know what this document is?

A    Yes.

Q    What is it?

A    It's a site support and schedule.

Q    And it says -- you see it says lecture conference schedule at the top?

A    It does that.

Q    And this is from University of Science, Arts, and Technology; is that correct?

A    Yes, it is.

MS. MCENROE:  Your Honor, I would move for this admission of D-3, please?

THE COURT:  Any objection?

MR. SWATE:  No, Your Honor.

THE COURT:  It's admitted.

(Defendant's Exhibit D-3 admitted into evidence)

THE WITNESS:  I have one question if I'm allowed to ask?

THE COURT:  You're not.

MS. MCENROE:  At this juncture, you are --

THE COURT:  You are not.

THE WITNESS:  Okay.

BY MS. MCENROE:

Q    So you mentioned when you were questioned by counsel about the notice of the allegations of irregular behavior against you; is that correct?

A    That's correct.

Q    And you indicated you didn't have any notice of the claims of irregular behavior against you?

A    I did not have notice.

MS. MCENROE:  May I approach, Your Honor?

THE COURT:  You may.

MS. MCENROE:  And the bench, Your Honor?

THE COURT:  You may.

BY MS. MCENROE:

Q    Dr. Tulp, have you seen this letter before?

A    I've seen this letter before, yes, I have.

MS. MCENROE:  Your Honor, I would move for admission as D-4.

THE COURT:  Any objection?  Any objection?

MR. SWATE:  No.

THE COURT:  It's admitted.

(Defendant's Exhibit D-4 admitted into evidence)

BY MS. MCENROE:

Q    So Dr. Tulp, I'm going to direct you to a couple parts of this letter in particular, but I don't want to belabor the point or take too much time, but I'm just going to start from the beginning.

That it's addressed to you and it says, "I'm writing to advise you of the allegation that you individually and your capacity as an official of the USAT faculty of medicine Montserrat engaged in irregular behavior in connection with

providing false information to ECFMG." Do you see that?

A    I see that.

Q    And it goes on to say, "Specifically, you provided false information to ECFMG when you notified ECFMG that USAT does not operate a branch campus in Miami, Florida, and two, certified to the attendance dates of several USAT students and graduates when ECFMG has information that these students were not attending USAT during some the of time periods which you certified." Do you see that?

A    Yes, I see that.

MS. MCENROE:  May I approach, Your Honor?

THE COURT:  You may.

MS. MCENROE:  And the bench, Your Honor?

THE COURT:  You may.

BY MS. MCENROE:

Q    Dr. Tulp, this on its face is an email from you at the top. Do you see that from Orien Tulp? Is that your email address, o.tulp@usat.edu?

A    It is.

Q    Do you recognize this email?

A    I do.

MS. MCENROE:  Your Honor, I'd like to move for its admission as D-5?

THE COURT:  Any objection?

MR. SWATE:  No.

THE COURT: It's admitted.

(Defendant's Exhibit D-5 admitted into evidence)

BY MS. MCENROE:

Q    This is an email from you to Scott Mealey.  Do you know who Scott Mealey is?

A    No.

Q    Do you know whether or not he works at the ECFMG?

A    I -- according to a signature block, he does.

Q    Okay, do you have any reason to believe otherwise?

A    I have no reason to believe otherwise.

Q    And this email down below from Scott Mealey to you says, "Please see the attached letter regarding USAT U.S. satellite campus."  Do you see that?

A    I see that.

Q    And then up above, you wrote, "Dear Mr. Mealey."  Do you see where I am?

A    I see that.

Q    And is this an email you wrote?

A    This is incorrect information.

Q    Correct, you're reading the beginning of the email, right?

A    Right.

Q    This is correct information?  Did you write this email?

A    I did.

Q    And it says, like you were reading, "This is incorrect information.  The Miami location is an information and testing site only where a pre USMLE examination and MDME may administered and an orientation for new students is conducted prior to the travelling to the Caribbean.  It is NOT a campus.  Our only campus is located in Olveston, Montserrat, British West Indies."  Is that what you wrote?

A    That is exactly correct.

Q    Is it your position that USAT has done no educational services for students in the United States?

A    We have an online program.  They can take that program from anywhere in the world.  Our most distant graduate was from Thailand.

MS. MCENROE:  Your Honor, I'd move to strike as nonresponsive.

THE COURT:  Overruled.

BY MS. MCENROE:

Q    Do you have any students who have gotten medical education in the United States?

A    They received a review lecture, which is part of the orientation.  We like to showcase our faculty because our faculty are pretty strong and I like to showcase them.

Q    If you --

A    So we'll -- yes, we fly a couple of faculty in to give a demonstration before you join our schools, here's what

you're going to get.  The lectures are delivered online.

Q    Do USAT students dissect cadavers in connection with their medical education?

A    Yes, we have an agreement with the Miami Anatomic Research Center, who provides that service for us.

Q    So USAT students dissect dead human bodies in the United States, correct?

A    Cadavers.

Q    Yeah, the same thing, right? I just want to make sure.

A    Cadavers.

Q    I'm sorry, I'm not a medical doctor, I'm just making sure.

A    Yeah.

Q    But there is dissection of human remains, cadavers --

A    That is --

Q    -- in the United States by USAT students?

A    There is.  There we also have an anatomage machine, which they do a computerized dissection prior to that.

Q    In your view, is the dissection of human cadavers not education?

A    That is education that is provided by the Miami Anatomic Research Center at their location on their campus.

Q    To USAT students in the United States?

A    The USAT students are in the United States attending

that, as do students from around the world attending that same, very same anatomic research center for educational purposes.

Q    Dr. Tulp, did you instruct the students at USAT about how to fill out the affidavits requested by the Educational Commission for Medical Graduates?

A    Not specifically.  But if they asked me for guidance, I would provide to guide it, -- but haven't seen the affidavits until recently.

MS. MCENROE:  Your Honor, may I approach?

THE COURT:  You may.

MS. MCENROE:  And the bench, Your Honor?

THE COURT:  you may.

BY MS. MCENROE:

Q    Dr. Tulp, I'd like to direct your attention specifically to the bolded text in the middle.

A    Uh-huh, uh-huh.

Q    That's followed by your signature block.  Do you see that?

A    Right, I see that.

Q    Is this a message that you wrote?

A    It -- apparently I did.

Q    And who is Carla (phonetic) and I'm going to say this wrong I'm sorry, Cognier (phonetic)?

A    Carpanich (phonetic) is the vice president of the university.

MS. MCENROE: Your Honor, I would move for this admission -- admission of this document as D-6?

THE COURT: Any objection to admit it?

MR. SWATE: No, Your Honor.

THE COURT: Admitted.

(Defendant's Exhibit D-6 admitted into evidence)

BY MS. MCENROE:

Q And Dr. Tulp, this message says, "Please do NOT use the phrase 'campus' when referring to the U.S. sites as that implies approval from the U.S. Department of Education or the State Department of Education, which isn't possible or likely as an international medical school.

Someone reported to the ECFMG that we have a Miami campus. It is an administrative site where we do interviews, orientations, and pre USMLE proctored examinations." Did I read that correctly?

A You did.

Q Do you know if this message was disseminated to USAT students to not use the phrase campus?

A I do not know if it was or not.

Q Is USAT accredited by CAAM-HP?

A No, it is not required to be.

Q Can you explain --

A It is accredited in the United Kingdom. We're a British school.

Q    Where is the headquarters of USAT?

A    Montserrat, Olveston, Montserrat.

Q    And I had to get my crib sheet for all the acronyms in this case.  Is it correct that CAAM-HP is the Caribbean accreditation authority for education in medicine and other health professionals?

A    It's an emerging accrediting body.  It is accredited --

Q    You understand --

A    It has accredited --

Q    Go ahead, I'm sorry.

A    It's accredited maybe four schools so far.

MS. MCENROE:  Your Honor, may I approach?

THE COURT:  You may.

MR. SWATE:  Your Honor, I'll object to this evidence.  We don't know where it came from.  We don't know how it was generated.  We don't know whether it's changed or not.

MS. MCENROE:  Your Honor, I'm going to ask some questions to try and establish that.

THE COURT:  Okay, ask him foundational questions.

MS. MCENROE:  Thank you, Your Honor.

BY MS. MCENROE:

Q    Dr. Tulp, has USAT tried to become accredited by CAAM-HP?

A    We have tried, but the government of Montserrat do

not accept CAAM as an accrediting body until September 13th, 2018.

Q   I'm sorry, I didn't quite hear you.  Did you say we have tried or we haven't tried?

A   I have attempted, but the government in Montserrat would not accept CAAM as an accrediting body until September 13th of 2018.

Q   Do you --

A   Therefore, they would not endorse any accreditation by CAAM.  We were inspected by CAAM.  We passed it with flying colors.

They interviewed between 15 and 20 students on campus each time that they were there, but only one surveyor showed up.  He had always Alzheimer's.  He took no notes.  He took no pictures.  He even forgot to pay his hotel bill.  I had to.

Q   Had you seen this letter before or this determination?

A   I've seen it before.

Q   You have?

A   And I would like to remark that there were more than 100 violations of the LCME protocol, which they said that they applied when they conducted the site visit.

They're required to have three surveyors.  They have only one, a retired physician from Canada.  And the other two surveyors allegedly indicated here have never been to

Montserrat.

MS. MCENROE:  Your Honor, I'd like to try strike as nonresponsive everything after the witness said he's seen his document before?

THE COURT:  It's stricken.

MS. MCENROE:  Thank you, Your Honor.  I'd like to move for admission of this document as Exhibit D-7?

THE COURT:  Any objection?

MR. SWATE:  No objection.

THE COURT:  It's admitted.

(Defendant's Exhibit D-7 admitted into evidence)

BY MS. MCENROE:

Q    I'd like the record direct your attention to the red paragraphs in the middle.

A    Uh-huh.

Q    See the second paragraph there?

A    Yeah.

Q    It says, "Following discussions of the reviewers report, CAAM-HP determined that this whole had not provided sufficient evidence to indicate that teaching activities were actually taking place in Montserrat."  Do you see that?

A    I see that.  That is an incorrect statement.  They interviewed 15 students.  They observed classes in session. They were there for three days.

MS. MCENROE:  Your Honor, permission to approach?

THE COURT: You may.

BY MS. MCENROE:

Q    Dr. Tulp, what I just handed you is an email chain that includes a message that starts with "dear students" and then has your signature block at the bottom of the first page.

A    Uh-huh.

Q    Do you see this?

A    I see that.

Q    Is this a message that you've seen before?

A    I don't know if I've seen this or not.

Q    I'm going to read a little bit to you --

A    Yeah.

Q    -- to see if it refreshes your recollection?

A    Yeah.

Q    If that's all right?

A    I did not write this.

Q    Okay, but do you see your signature block there?

A    My signature block appears on everything, whether I've signed or seen it or not.

Q    Okay, well, I want to see if I can refresh your recollection.

A    That includes the documents from the ECFMG that I receive. They already have my signature attached. I have not signed it. I never gave authorization for them to sign my documents.

MS. MCENROE: Your Honor, I would move to strike as nonresponsive. I don't know what question the witness was responding to.

THE COURT: Stricken.

BY MS. MCENROE:

Q So I'd like to see if I can refresh your recollection about whether you've seen this before. So where it says "dear students" on the first page, then there's a paragraph that starts ECFMG. Do you see where I am?

A Uh-huh.

Q Okay, and it says, "ECFMG is questioning our delivery of the basic sciences because some students didn't attend on Montserrat due to past volcanic activity on Montserrat." Do you see that?

A I see that.

Q Okay, and then I'd like to go to the second paragraph there. It starts with, "We will now begin." Do you see that?

A I see that.

Q It says, "We will now begin offering the basic science portion of our program at our campus on Montserrat as early as October 1st, 2018 and at our new British Virgin Islands campus as soon as January 2019." Do you see that?

A I see that.

Q Does that refresh your recollection whether you've seen this message before, whether or not you've authored it?

Q    I didn't author it.  And I don't believe that I've actually seen this before.

Q    Okay, so stepping away from that --

A    But we've have basic sciences in Montserrat for many, many years.  We've just graduated the first two students who completed their entire four years in Montserrat, the first two that did the entire four years basic sciences and clinical sciences on the island of Montserrat.

The volcano was quieting down until about four years ago, it would erupt every -- about once a month.  That is not a safe environment.

MS. MCENROE:  Your Honor, I'd move to strike.

THE COURT:  Stricken.

BY MS. MCENROE:

Q    Stepping away from the document, because I understand that you say may not have seen it before, is it true that USAT opened a new campus on the British Virgin Islands in 2019?

A    We have been licensed in the British Virgin Islands for some time now.

Q    And is that going to be the same USAT or is that going to be a new medical school?

A    We haven't released that information yet.

THE COURT:  Well, can you respond to the question, please?

THE WITNESS:  It will not be USAT.

BY MS. MCENROE:

Q    So you're opening a new medical school on another island in the Caribbean; is that correct?

A    Not a volcanic island.

Q    Is USAT still in operation?

A    Yes.

Q    Does USAT have graduates that ever practiced medicine in Montserrat?

A    Yes.

Q    Does USAT have graduates that ever practiced medicine outside of Montserrat or the United States?

A    Yes.

Q    Does USAT have graduates that have ever practiced medicine in the United Kingdom?

A    I'm not aware of any.  We don't recruit from the United Kingdom that much.  My recollection is the United Kingdom has about 20 or 30 medical schools of its own and they're excellent medical schools.

Q    Are you aware of any USAT students having been charged with irregular behavior?

A    Yes.

Q    In connection with this circumstance that we're discussing today?

A    Yes.

Q    Who was that?

A     I'm not at liberty to say.

THE COURT:  Respond to the question.

THE WITNESS:  The one student that told me he'd made one call, a single call to the ECFMG.  And on the basis of that single call, he was assigned irregular behavior.

When he applied to take the Puerto Rico Medical Board Exam, they denied him because of irregular behavior on the basis of a single phone call to the ECFMG, when all he was asking for is guidance on how to apply for step one.

Q     When did that happen?

A     A couple years ago.

Q     Do you have any understanding whether that -- was it all in connection with the circumstances with regard to where USAT has conducted its medical education?

A     I am not aware that it was connected or not connected to that.

Q     Do -- what is that student's name?

A     I don't know whether it was connected or not, but that's -- but --

Q     I'm sorry, doctor, I was asking about the student's name?

A     I mean, I can't give you the student's name.

THE COURT:  Respond to the question.

BY MS. MCENROE:

Q     If you know?

A     Yeah, it'll come to me.  I know his name, but it's a very long Spanish name.

Q     Do you have an understanding of whether the action ECFMG took against you with respect to the allegation of irregular behavior prevents you from opening a new medical school in the British Virgin Islands?

A     Anyone can open a medical school if they have the resources to do so.

Q     Is it fair to say that it is not preventing you from opening a new medical school in the British Virgin Islands?

A     It doesn't prevent us from opening it, but it would prevent us from attracting students.

Q     So you said --

A     There's no chance that we could attract students with that note on the World Directory.  That's only two-thirds of the note.  The other third was removed after the subpoenas were delivered.

MS. MCENROE:  Your Honor, I strike as nonresponsive to any question that was pending.

THE COURT:  It's -- I'm not going to strike it, but would you please just answer the question?

THE WITNESS:  Would you rephrase the question, so I can understand it?

MS. MCENROE:  So I'm just trying to understand --

THE COURT:  Let me just ask a series of questions.

MS. MCENROE: Yeah, thank you, Your Honor.

THE COURT: Are you opening a new school in the British Virgin Islands?

THE WITNESS: None in our plan.

THE COURT: And when you say our, who is our?

THE WITNESS: The university.

THE COURT: So USAT?

THE WITNESS: USAT would sponsor it.

THE COURT: USAT will sponsor the university in the British Virgin Islands?

THE WITNESS: Yes, we were invited about two years ago to begin claiming for this. But I mean, by British Virgin Islands.

THE COURT: And will the new university be called USAT?

THE WITNESS: No.

THE COURT: What will it be called?

THE WITNESS: As far as I know, it will be called the University of Health and Humanities, British Virgin Islands or the Virgin Islands. You can leave out the British.

THE COURT: You indicated that it would have difficulty recruiting students?

THE WITNESS: Yes.

THE COURT: Well, when you said that, were you referring to USAT in Montserrat? Or were you suggesting that

Case 2:18-cv-00055-WBD Document 152-16 Filed 02/27/23 Page 101 of 135

the new British Virgin Island school would have difficulty recruiting students?

THE WITNESS: It would have difficulty recruiting students because of the activities with the sponsored note on the -- for USAT Montserrat.

THE COURT: Well, the sponsor note is associated with USAT, correct?

THE WITNESS: That's correct.

THE COURT: So what is your understanding about how that note can connect with the British Virgin Islands?

THE WITNESS: Because the ownership of the new university began with USAT.

BY MS. MCENROE:

Q    Dr. Tulp, do you have an understanding -- you testified a little earlier about some graduates from USAT being able to practice medicine in Montserrat and other places outside the United States; is that correct?

A    Yes, uh-huh.

Q    Do you have any understanding of whether ECFMG is at all involved in the licensure or certification of those graduates?

A    In 2005, there were not. The body there is the CAAM C exam, the Caribbean Medical Board Exam. If they were to apply today, they would not be able to.

Q    And that's a decision of the Montserratian

government?

A    No, that's a decision of the ECFMG, because the ECFMG sponsor note applies to the United States of America, but the ECFMG cooperates with virtually every medical board in the world.

They all refer to your services.  I've seen documents that you have sent to me to certify from Australia, from Denmark, from other countries, from any other -- and Canada.  Canada has already suspended access for USAT graduates based on the ECFMG sponsoring note.

Q    Dr. Tulp, has USAT sought accreditation to be a U.S. medical school?

A    No, it has not.

MS. MCENROE:  I have nothing further, Your Honor.

THE COURT:  Redirect and cross of Ms. McEnroe's direct?

CROSS-EXAMINATION

BY MR. SWATE:

Q    Doctor?

A    Yeah.

Q    As we sit here in this room today, is USAT a licensed medical school by Montserrat?

A    Yes, it is.

Q    And also, is there another entity other than Montserrat that licensed -- that accredits USAT?

A    Yes, the ASIC in the U.K., the accrediting system for international schools, colleges, and universities except -- and that's an institutional accreditation as opposed to a programmatic accreditation.

Q    And --

A    But we're also accredited by the AICP, which is in the United States.  That's the American Institute for Clinical Psychotherapy.  And also by the American Association for Higher Education and Accreditation.  And that latter one is also institutional.

Q    Is the ECFMG an accrediting agent of a medical school?

MS. MCENROE:  Objection, Your Honor.  Foundation.

THE COURT:  You can answer the question.

THE WITNESS:  I may answer?

THE COURT:  Go ahead.

THE WITNESS:  No, the ECFMG is not an accrediting body.

BY MR. SWATE:

Q    But they acted as an accrediting body, correct?

A    Yes, they do.

Q    Essentially what -- let's go through the process of what was happening to students who were sending in requests for information from the ECFMG, based on your knowledge of what was happening?

A    They were told they should transfer it to another medical school immediately.  They were told that they had to complete those affidavits or they could be assigned irregular behavior or be fined -- alleged for perjury.

There are various penalties for someone who may have graduated 10 years ago and may or may or not remember the exact dates that they started school.

Q    If you know, what was being -- what was happening to the students who didn't send in the affidavit, their records?  What was happening to their records, if you know?

A    Those records are frozen and they cannot proceed any farther until they complete the affidavits.

Q    What's the effect of having frozen records from the ECFMG?

A    You cannot proceed to the residency or licensure.

Q    These letters that they presented here today, did they present those letters to you?

A    No, they do not.

Q    Let me finish my question.

A    Oh.

Q    It -- by someone from the USFMG in the hearing?

A    No, they do not.

Q    They didn't give you an opportunity to respond to those letters, did they?

A    No, they do not.

Q    And one of the letters is obviously written by someone other than you?

A    Yes.

MS. MCENROE:  Objection, Your Honor.  Foundation.  And is that a question?

THE COURT:  Sustained.

BY MR. SWATE:

Q    Appendix H, do you have that in front of you?

A    What page would that be?

Q    I don't know, I just have exhibit that -- it would be one of the last letters she showed you.

MR. SWATE:  Your Honor, can I approach the witness?

THE COURT:  You may.

THE WITNESS:  Yeah.

MR. SWATE:  I'm going to show you what's the what I have is it's right here, Appendix H.  And on the back of that, there's a letter supposedly from you.  Would you read the last sentence of that letter?

MS. MCENROE:  Your Honor, this was a letter was not authenticated --

THE COURT:  Yeah.

MS. MCENROE:  -- and not admitted into evidence.

THE COURT:  Yeah, this document was not admitted.  So therefore, any questioning about it is not appropriate.

MR. SWATE:  I'm not questioning the letter or

anything it stands for.  I'm requesting other than redirect, as a cross of her redirect?  Because obviously, the letter is not from him.

THE COURT:  Right on direct, there was the talk about authentication and admissibility.  And it was determined during that examination that it was not from him.  So therefore, it was not admitted.

MR. SWATE:  Okay, thank you.

BY MR. SWATE:

Q    Now they talked a little bit about this CAAM accreditation.

A    Right.

Q    When does that have to be in place?

A    2023.

Q    It doesn't have to be in place now, does it?

A    No.

Q    Have you got a valid license from Montserrat?

A    That is correct.

Q    At this time?

A    That is correct.

Q    In 2023, it's going to be like Cinderella?

A    Yeah.

MS. MCENROE:  Objection.

THE COURT:  Sustained.

BY MR. SWATE:

Q    Okay.

A    In 2023, we'll have it done.

THE COURT:  So if I sustain an objection, you do not answer the question.

THE WITNESS:  So.

BY MR. SWATE:

Q    Just one last question and I'll pass the witness. And I believe I've asked you, but just to -- they presented none of this evidence to the committee at the hearing, did they?

A    No, they did not.

MR. SWATE:  Pass.

THE COURT:  Now Ms. McEnroe, I believe at this point, it would be your redirect of their cross?

MS. MCENROE:  Your Honor, I have no further questions.  Thank you.

THE COURT:  You can leave the stand.

Anyone else any other witnesses?  No.

(Witness excused)

MS. MCENROE:  Not from --

THE COURT:  Okay, from Plaintiff, any other witnesses?

MR. SWATE:  Your Honor, before we rest, we have some documents we'd like to put into evidence.

THE COURT:  Well, do you have a witness who can --

MR. SWATE:  Ask Dr. to --

THE COURT:  To Dr. Tulp?

MR. SWATE:  To Dr. Tulp.

THE COURT:  Okay.  Go ahead.

MR. SWATE:  Yeah.  Since --

THE COURT:  No, Dr. Tulp, you have to go back on the stand because he wants to introduce some documents through you.

MR. REIL:  Your Honor, before I understand the -- maybe I'm at the wrong point of juncture, I just wanted to before we rest indicate what documents we wanted to introduce into evidence.

THE COURT:  Well, I can tell you the ones that you have had had admitted.  You've had Exhibit B, which is the World Directory note.

MR. REIL:  That's one of them, yes.

THE COURT:  You've had Exhibit C, which is the Montserrat Agreement.

MR. REIL:  Okay.

THE COURT:  You have Exhibit D, which is the affidavit.

MR. REIL:  Yes.  I thought there was also --

THE COURT:  Wait a minute, we can -- you can say you thought that once live gone through everything.  Let me see.  I do not have records on Exhibit E, which is the November 21st, 2018 letter.  Is that something that you wanted to have

admitted?

MR. REIL:  Yes, there was testimony by Ms. Corrado on that.  I would move to admit it.

THE COURT:  Any objection?

MS. MCENROE:  No, Your Honor.

THE COURT:  That's admitted, too.

(Plaintiff's Exhibit E admitted into evidence)

MR. REIL:  And I have one more.

THE COURT:  Hold on.  Which is the other one?

MR. REIL:  The other one, I believe, that there was testimony on was --

THE COURT:  Identify it, yeah.

MR. REIL:  Yes, Exhibit G.  It was the fifth letter down, the letter of 11/14/18 to Dr. -- Attorney Swate at page 22.  I asked Ms. Corrado about that is my recollection about the faculty.

THE COURT:  Exhibit G, did you say?

MR. REIL:  Exhibit G.  And I have six letters listed. It would be at page 23.

THE COURT:  I have no indication that that was -- oh.

MR. REIL:  If I might.

THE COURT:  Okay, I don't an indication that that was admitted.  That was the page 23, correct?

MR. REIL:  Yes, Your Honor.

THE COURT:  Any objection to page 23 being admitted?

MS. MCENROE:  No objection.

THE COURT:  That's admitted.

(Plaintiff's Exhibit G admitted into evidence)

MR. REIL:  That's all I have, Your Honor.

THE COURT:  Okay.

MS. MCENROE:  And Your Honor, while we're admitting exhibits, if you wouldn't mind, we have a number of exhibits attached to our opposition to our motion -- sorry, our opposition to the motion for preliminary injunction.

If you -- with the Court's permission, I'd like to recall Ms. Corrado, if I could, to authenticate and can I just have the exhibits admitted?

THE COURT:  I have no -- you can leave the stand now.

THE WITNESS:  Okay.

(Witness excused)

THE COURT:  I have no problem with that, but it will be better if you could just stipulate.  Which documents are they?

MS. MCENROE:  I don't know if you have the --

THE COURT:  I do.

MS. MCENROE:  -- exhibits in question.  So I would like to -- Exhibit 1 is a printout of the ECFMG website about ECFMG.

THE COURT:  Any objection to Exhibit 1 being admitted?

MR. REIL: Your Honor, we weren't given any notice that these exhibits were going to be put into --

THE COURT: Well, you're getting notice now, okay, that's what we're talking about.

MR. REIL: Oh.

THE COURT: So let's talk about it.

MR. REIL: Okay.

THE COURT: Let's talk turkey. Exhibit 1 to the Defendant's motion, you have any objection to that being admitted?

MS. MCENROE: Sure, I don't think the note's in here.

MR. REIL: I have to --

Yeah, fine.

Yeah, no objection.

THE COURT: Admitted.

(Defendant's Exhibit 1 admitted into evidence)

MS. MCENROE: Exhibit 2, please, Your Honor?

THE COURT: The ECFMG Medical School policy -- international medical school definition. Any objection to that?

MR. REIL: I have to know what purpose it's being admitted for here?

MS. MCENROE: Your Honor, it's for the purposes as used in our opposition for the motion for preliminary injunction to help provide the factual background for the

Court, what we think is necessary to rebut the Plaintiff's motion for preliminary injunction.

In particular, this helps to lay out the fact that ECFMG defines international medical schools as an international medical school as an educational facility located in a country outside of the United States and Canada with its primary campus and main operations located in that country. And there's additional information in here, too.

THE COURT: Well, I'm going to tell you that I'm going to allow either Ms. Corrado or Ms. Cover to come up and talk about this document.

And I'm pretty sure it's admissible, given that it's an ECFMG school policy. So we can do the hard way or we can do it the easy way.

MR. REIL: Well, let's do it the easy way.

THE COURT: Excellent, that's admitted.

(Defendant's Exhibit 2 admitted into evidence)

MS. MCENROE: Thank you, Your Honor. Exhibit 3 is the 2009 information booklet for ECMG (sic). This -- each year, ECMG publishes an information booklet laying out a full range of information for the applicants coming through its processes.

This includes a copy of the irregular behavior policy. And I'd be prepared to introduce and have it authenticated by either Ms. Corrado or Ms. Clover.

THE COURT: Any objection?

MR. REIL: No, Your Honor -- yes, Your Honor. That applies to 2019. All right, that's what it says on there, ECFMG certification. I don't know how, if any, it is changed from what we were concerned of primarily, the hearing note in November of 2000.

THE COURT: What's your response to that?

MS. MCENROE: Understood, Your Honor. At the bottom, it has the September 13th, 2018. I believe this is sort of a school year 2019 document, but I'd be happy to get one of the witnesses up and they could testify as to any changes if necessary.

THE COURT: Okay.

MR. REIL: Would you be willing to stipulate -- oh, is your witness going to say that there are no changes?

MS. MCENROE: I think no relevant changes to the irregular behavior policy for certain.

MR. REIL: Yes, Your Honor.

THE COURT: Okay, that's admitted.

(Defendant's Exhibit 3 admitted into evidence)

MS. MCENROE: Thank you, Your Honor. Exhibit 4, I believe had already been admitted in the form of one of the D exhibits. So we can skip that one unless my co-counsel corrects me.

MR. REIL: That's correct.

MS. MCENROE:  Same with Exhibit 5 and Exhibit 6.

MR. REIL:  Just --

MS. MCENROE:  Sorry, I'm going fast.

MR. REIL:  My fingers don't work.  Okay, all right, all right.  4, we have to --

MS. MCENROE:  So --

THE COURT:  4 and 5 previously admitted?

MS. MCENROE:  Correct, Your Honor.  I believe 6 and 7 have also previously been admitted.

MR. REIL:  Counsel's representation, I agree.

THE COURT:  Okay.

MS. MCENROE:  Yeah, so I think we're up to Exhibit 8, Your Honor, which is another letter from Ms. Corrado to Dr. Tulp that we would submit for admission into evidence.

THE COURT:  Any objection?

MR. REIL:  No, Your Honor.

I have that anyway, I think.

(Defendant's Exhibit 8 admitted into evidence)

MS. MCENROE:  Your Honor, Exhibit 9 is a declaration from Ms. Corrado.  I submit for its admission into evidence today.

THE COURT:  That will not be admitted.  That's -- I'll just deal with that as a declaration.

MS. MCENROE:  Sure.

THE COURT:  All right.

MS. MCENROE:  I'd like to move for admission of Exhibit Number 10.  This is a letter from Mr. Swate counsel to Ms. Corrado

THE COURT:  Any objection?

MR. REIL:  One moment, Your Honor.  I'd like to know for what purpose this is being offered?

MS. MCENROE:  Again, this is another exhibit that's been submitted in conjunction with our opposition to preliminary injunction.  So I think it's on the face of our opposition about the facts that we've relied on before.

THE COURT:  Yeah, but it's a statement by an attorney containing his views on the litigation.  So I'm not going to allow that to be admitted.

MS. MCENROE:  Understood, Your Honor.

THE COURT:  Go ahead.

MS. MCENROE:  Exhibit 11's already been admitted. Sorry, Your Honor.  Just (indiscernible).  Again, Exhibit 12. Exhibit 13, I would move for admission of ECFMG meeting -- message that I'd be prepared to bring either Ms. Cover or Ms. Corrado up to authenticate.

MR. REIL:  One second, Your Honor or one moment, Your Honor.

THE COURT:  Uh-huh.  What is MECC Support?

MS. MCENROE:  The Medical Education Credentials Committee support.  So that committee that had the hearing in

November, it's called internally at ECFMG the MECC.

MR. REIL:  Yes, Your Honor.

THE COURT:  Okay.

(Defendant's Exhibit 13 admitted into evidence)

MS. MCENROE:  Your Honor, I'd move for admission of Exhibit 14.  This is an email from Ms. Corrado to Dr. Swate from November 2000 -- oh, you know what?  Has this one already been admitted?  I'm sorry.  I think in a different form, Plaintiffs have this email admitted.

THE COURT:  Okay, what else?

MS. MCENROE:  Exhibit 1 -- Exhibit 15 is a hearing transcript and I'd move for its admission.

THE COURT:  That I would just deal with as a transcript rather than an admitted document.

MS. MCENROE:  Thank you, Your Honor.  That's it from us, Your Honor.  Thank you.

THE COURT:  Okay, and argument?  Opportunity for argument if you wish.

MR. REIL:  Sure.

THE COURT:  Would you like to take a brief break before we started argument?

MS. MCENROE:  That would be appreciated.

MR. REIL:  Yes, Your Honor.

THE COURT:  Five minutes.

MS. MCENROE:  Thank you.

THE COURT RECORDER: All rise.

(Recess at 4:38 p.m., until 4:47 p.m.)

THE COURT RECORDER: All rise.

THE COURT: Okay, let's hear argument.

MS. MCENROE: Your Honor, it's my position that it's their burden of proof, so --

THE COURT: Yes, we already -- well, they would have to go first.

MS. MCENROE: Thank you, Your Honor.

MR. SWATE: If it pleases the Court, ECFMG had agreed on their own that all documents and applications from students of USAT would be honored until January the 1st, 2019.

Nothing has -- nothing changed on that date. This is not an allegation that you're running a rogue school. The result of the students have been exemplary students who normally wouldn't have the opportunity to go to medical school, they would go to medical school. They achieved great results on the test.

If the ECFMG tests are valid indications of education of the students, the students are getting a great education at USAT.

The harm that would result to USAT and Dr. Tulp would be it essentially closes the school down. That's the practical effect of not allowing the status quo to be maintained.

With its notations on the website, the student that

reads that is certainly not going to enroll in a school or not going to continue.

Now the damage to the students is the students are in various stages of education. Some are in their second year. Some are in their third year. Some are in their fourth year.

So by just wiping that out immediately, it would do a great harm to them, but also, it'd be great harm to the docket, too, because he has a property interest in the medical school.

Public policy, the students who have graduated in USAT have been a benefit to the medical system in the United States. You're not unleashing incompetent students. They go forward, and they do a good job, and they take care of American citizens that need medical care.

The damage to ECFMG by allowing the status quo to be maintained till this issue is resolved is minimal, because the issues we're going to be presenting is our position is that ECFMG is a quasi-government agency. They've been delegated by every state and agency -- every state and medical board in this country to qualify international medical students.

So if they can enter the system without opening a schedule, then the students are blocked from entering the system.

So there's no damage. They can't claim well, you're producing these horrible students, a locus on the United States and harming people. There's no harm to be done by allowing the

status quo to exist.

It also benefits the general public, because 25 percent of health care in the United States is rendered by international medical graduates that go through this ECFMG process.

And that -- our position is Dr. Tulp was obviously denied due process. Now whether he is entitled to it or not entitled to it is a question to be resolved. Whether ECFMG has to give him some degree of due process is a question to be answered later on.

And I think it will be answered in this case. But the question today is what harm or result of maintaining the status quo? And that's what we're asking to do, maintain the status quo until this case is decided.

And I don't think they can demonstrate any great harm to the students if they're allowed the next six months or eight months, however long it takes to resolve the case, because they will probably resolve very quick to continue with their education.

And then at the end, if they need to transfer, like they were -- they suggesting January the 1st, 2019, they can and the damage has been done.

That's the -- the fact issue in this case is what I believe is not the issue today. The issue today is not the facts, because they didn't -- they would not give us the facts

at the hearing. Just refused to do so.

And again, there's all kinds of questions about the process. But with respect to that, I ask the Court to issue a temporary injunction to allow the -- that would require that ECFMG to process the students' paperwork.

It doesn't mean that they have to agree to every piece of paper that comes along. They do their normal procedure, but they just process the paperwork in a normal fashion instead of just totally blocking it.

And if they have problems with the paperwork, of course, they could do whatever is reasonable to do. And I think that's our approach and we believe it's reasonable. Thank you.

THE COURT: Thank you. Ms. McEnroe?

MS. MCENROE: May I approach, Your Honor?

THE COURT: You may.

MS. MCENROE: Your Honor, I'm going to try to keep this brief, because we briefed it extensively in our papers. So I'm not going to hit every point, but there are a number of things I want to just make sure I clarify.

Mr. Swate said a number of times that he was seeking to maintain the status quo. This motion for preliminary injunction that's being cited today was filed on January 2nd, 2019.

The status quo as of that time is that the finding of

irregular behavior had already gone into effect and the sponsor note had already gone into effect.

What changed January 1st, 2019 is the issue that counsel brought up a number of times. That date had been noticed to the public and to USAT from October 2018.

Their public policy and student interest definitely keeps raising, notably, USAT is not a party here. The students are not a party here. ECFMG takes its role in trying to protect the public and interfacing with the students and graduates that it works with very seriously.

And what happened on January 1st, 2019 is that the notice ECFMG had provided in advance about the change in status of this school went into effect.

And why did it go into effect? Because ECFMG was not sure and hadn't been provided evidence that USAT is truly international medical school.

ECFMG only tries to reach as far as its grasp. It's not trying to issue sponsor notes to the University of Pennsylvania Medical School.

It's not trying to issue certificates to graduates of medical schools that it does not deem to be within its -- and within its definition of an international medical school.

University of Sciences, Arts, and Technology does not fall within that definition as far as ECFMG is concerned. And that's become abundantly clear.

Case 3:18-cv-01005-WBD Document 152-16 Filed 02/27/23 Page 122 of 135

There's a -- you know, we can talk semantics on campus, not campus, whatever. We heard today, and it's been admitted into evidence, Dr. Tulp has called it a Miami campus. There were cadavers dissected in Miami. There was education happening in the United States. But yet, he hasn't gotten his school to be accredited as a medical school in the United States.

At the same time, ECFMG has failed to declare that it doesn't feel capable of certifying its graduates going forward, because it's concerned that it's not an international medical school to meet ECFMG's definition.

That puts it as sort of a loophole school, that's not going to be getting its authorization from anybody, which is a concern to ECFMG, which tries and its mission is to protect the health of the public.

ECFMG is (indiscernible) to hear -- it's wonderful to hear that the USAT students are great doctors in serving the public in the United States because there are 13 years, or 15 years, sorry, 15 years of graduates from that school that are eligible to become medical professionals in the United States through residency programs and certification from the ECFMG.

We have not taken -- ECFMG has not taken action to file allegations of irregular behavior or take other sort of actions against students from USAT on this basis retrospectively.

Prospectively, ECFMG provided notice. But it may be I'm getting too much in the weeds, because the truth of it is we're here for a preliminary injunction.

And one day, I may be here arguing the full merits of the case. And Plaintiff just has not met the very high standard for a preliminary injunction.

The status quo issue, I think, is a big one. I think we're sitting here now where the status quo they're seeking to have overturned is that ECFMG would have to start recognizing USAT, when it already has stopped recognizing USAT, basically putting us in a position that if we were to be ordered to change the sponsor note now, ECFMG would be getting forced by this Court to tell the public that ECFMG deems graduates from USAT to be eligible to be certified by ECFMG when ECFMG does not deem that to be true.

If this Court were to go one step further, it would be on this Court's discretion to tell us that we must certify those graduates if they meet our other requirements substituting this Court's opinion for ECFMG's.

So that I'm just trying to make sure, practically speaking, it's clear what it is that an injunction here would be seeking to do.

We think that just proves too much and goes too far, especially on the very thin record that Plaintiffs have provided you.

Plaintiff notably has not provided any evidence that the underlying basis for ECFMG to take the action that it has is incorrect, other than semantics.

Trying to say an administrative location versus a campus, even though they admit that students were dissecting cadavers in the United States and taking other extensive lecture courses, which is in that lecture document we had admitted into evidence.

This is troubling to us. And they've had a lot of opportunities to fix it. They could have even handed us something today, said hey, Florida or Colorado, and somewhere in the United States where we're doing these things, authorizes us to do so and they haven't done that.

And we posit it's because they can't. And until they can satisfy that they are truly an authorized school, operating the way that they would need to, to qualify as an international medical school for our purposes, we just don't think we have the authority. We're trying to be limited here in what we can possibly do.

Now we communicated that publicly through our sponsor note, saying the truth of it is, hey, student -- potential students, hey, others in the medical world, so you know, if someone comes to us who's a 2019 grad, a 2020 grad, they're not going to be eligible for certification.

We're trying to -- we're not trying to besmirch

anyone. We're trying to just be accurate, so that there's fair warning out in the public, so that people know.

In terms of due process, I would encourage Your Honor to look at the extensive jurisprudence we've provided to you on ECFMG being a state actor or not.

The 3rd Circuit has held that ECFMG is not a state actor. Other courts in this district have similarly so held. We would posit that there hasn't been evidence taken or submitted to indicate otherwise.

Counsel argued that 25 percent of health care in the United States comes through the ECFMG. We take our obligation very seriously.

And we are very concerned that if we were to misrepresent USAT's role, if we were to abdicate on our obligation to try and say, hey, we think this is a legitimate school or we don't think this is a legitimate school, we worry that we would lose the credibility of doing that in the market place, which we find to be our goal.

That's what we do. We're good at it. We try and go around and certify that students have done what they need to do to enter residency programs in the United States.

We encourage Your Honor not to undermine that authority that we have reasonably exercised. Dr. Tulp got extensive notice. Dr. Tulp got extensive opportunities to present his facts to us.

I submit to Your Honor, when you read the transcript from the hearing on November 28th, it's correct. I shut down the hearing, because counsel was completely and utterly preventing the committee from asking any questions of Dr. Tulp, to get any sort of clarification on the facts and to understand.

We weren't trying to deny anyone due process. We were trying to provide an extra layer of due process above what we, a nonstate actor, even would need to provide.

So at the risk of not going on and on, Your Honor, if there's a particular thing you'd like to hear about, I'd be happy to argue further, but otherwise, I can let us bring this to a close.

THE COURT: Okay, thank you.

MS. MCENROE: Thank you.

THE COURT: Present and before the Court is Plaintiff's motion for a preliminary injunction against Defendant's Education Commission for Foreign Medical Graduates, known as ECFMG and Dr. William Pinsky, collectively Defendants.

Plaintiff is president of the University of Science, Arts, and Technology, USAT, a medical school located on the British overseas territory of Montserrat.

ECFMG is a private nonprofit organization based in Philadelphia, but certifies foreign medical school graduates, so that those students can pursue postgraduate medical training

in the United States.

With a certification from ECFMG, graduates of foreign medical schools like USAT begin the process of practicing medicine in the United States.  Pinsky is the president and CEO of ECFMG.

Plaintiff's suit is in effect, a response to disciplinary action taken by ECFMG against USAT and Tulp specifically.

According to documents attached to the complaint and admitted here at the hearing today, ECFMG investigated and subsequently sanctioned USAT and Tulp for providing false information to ECFMG regarding the school's activities.

Specifically, ECFMG found that, one, USAT was operating unauthorized branch campuses within the United States; and two, Tulp personally provided false information to ECFMG regarding USAT's student attendance.

Following a hearing before ECFMG's board, at which Pinsky presided, ECFMG concluded that Tulp had -- that Tulp and -- Tulp had engaged in behavior that violated ECFMG's policies and procedures.

As a result, ECFMG took the following action.  It determined that it will not accept any documents signed and/or certified by Tulp for a period of five years; two, it undertook steps to verify that USAT graduates had in fact attended USAT's Montserrat campus; and three, held that USAT graduates with a

graduation year of 2019 and beyond are no longer eligible to apply for ECFMG certification.

Plaintiff's suit alleges that Defendants violated his constitutional rights and committed various common law torts. He moved for a preliminary injunction, asking this Court to enjoin Defendants from taking any further adverse action against Plaintiff, resume processing the medical examinations of the students of USAT, and release their examination scores, and remove the negative advisory from the sponsor notes on the World Directory of Medical Schools listing for the USAT College of Medicine.

A Plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tip in his favor, and that an injunction is in the public interest, that is Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, page 20, 2008.

The failure to establish any element renders a preliminary injunction inappropriate. That is Nutrasweet Company v. Vit-Mar Enterprises, Inc., 176 F.3d 151, page 153, 3rd Circuit, 1999.

The movant bears the burden of showing that these four factors weigh in favor of granting the injunction. See Opticians Association of America v. Independent Opticians of

America, 920 F.2d 187, page 192, 3rd Circuit, 1990.

Plaintiff's complaint includes four causes of action or four claims labeled as causes of actions. At the beginning of this hearing, I clarified with Plaintiff what those claims were and also clarified which claims the Plaintiff was proceeding on in this preliminary injunction hearing. Plaintiff's lawyer informed me that he was proceeding on the constitutional claims, the §1983 claims.

Turning to the likelihood of success on the merits, and that is Counts II and IV, §1983 claims, I find that Plaintiff is unlikely to prevail on his §1983 claims because they require a showing of state action, which is not present here.

To prevail on a §1983 claim, Plaintiff must allegedly violation of a right secured by the constitutional laws of the United States committed by a person acting undercover of state law. That's West v. Atkins, 487 U.S. 42, page 48, 1988.

The 3rd Circuit has held that as a private not-for-profit organization, ECFMG is a private party and not a state actor.

That's Opoku v. Education Commission for Foreign Medical Graduates, 574 F.Appx. 197, page 201, 3rd Circuit of 2014.

As has the Southern District of New York in Stoninger (phonetic) v. Educational Commission for Foreign Medical

Graduates, 1993 Westlaw 138954 at page 2, SDNY, April 28th, 1993, concluding ECFMG is not a state actor.

To the extent that Opoku is a nonprecedential decision in that it is a nonpublished decision, I look to possible exceptions to the state or instances where a private actor can be found to engage in state action.

Those instances are limited and as set forth in McKeesport Hospital v. Accreditation Counsel for Graduate Medical Education, 24 F.3d 519, 524, 3rd Circuit, those instances are if the private party acted with the help of or in concert with state officials. In this case, there is no indication that that happened.

Two, when the private party has been delegated their power, traditionally exclusively reserved to the state. In this case, there is no evidence that that is the case.

Or three, if there is a sufficiently close nexus between the State and the challenge action of the private entity, so that the action of the latter may be fairly treated as the state itself.

In this case, the testimony was that ECFMG is a nonprofit organization. And although there was testimony that licensing boards in the United States generally require certification through -- of students through ECFMG, the testimony was that that requirement is a discretionary requirement. Accordingly, I find that ECFMG has not shown at

this juncture of the litigation that it is a state actor.

While the lack of state action ultimately dooms Plaintiff's constitutional claims, it is far from the only problem with the §1983 claiMs.

ECFMG's disciplinary hearing seemingly meet the -- meets the requirements of due process in that an essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case. Cleveland Board of Education v. Loudermill, 470 U.S. 532, 542, 1985. In this case, there was notice and an opportunity to be heard.

As for Plaintiff's substantive due process claims, the complaint does not identify a protected property interest that falls within the ambit of substantive of due process. Nicholas v. Pennsylvania State University, 227 F.3d, 133, page 141, 3rd Circuit, 2000.

Thus, Plaintiff's constitutional claims are likely to fail, such that a preliminary injunction should not issue on those claims.

Turning, however, in an excess of caution to the irreparable harm prong on the preliminary injunction standard, in addition to establishing a likelihood of success on the merit, Plaintiff must also establish that he stands to suffer irreparable harm if no injunction is issued.

Establishing a risk of irreparable harm is not

enough. A Plaintiff has the burden of proving a clear showing of immediate irreparable harm.

The requisite feared injury or harm must be irreparable, not merely serious or substantial and it must be of a peculiar nature, so that compensation in money cannot atone for it. That is Campbell Soup Company v. Conagra, Inc., 977 F.2d, 86, page 92, 93, 3rd Circuit, 1992.

Plaintiff has made several arguments with respect to the alleged harm that will befall USAT and its students. With respect to USAT, the testimony was that there has been a fall-off in applications and that tuition payments have ceased.

Nevertheless, the testimony was also that USAT may continue as an institution, so long as Dr. Tulp is not a signatory. Someone else from USAT could become an authorized signatory. And USAT is not disqualified from substituting a different person as the authorized signatory.

Similarly with students, the testimony is that as yet, there is -- no harm has befallen any students in that students who graduated in 2018, up and through 2018, can still go through the ECFMG process.

While students are -- who graduate in 2019 cannot, they can transfer for their credits and also the first graduation will be this summer. So is -- there is no immediate harm.

I go through the alleged harm to the students and to

USAT merely to illustrate that if the students or USAT were to bring this preliminary injunction at present on the evidence on the record, they would not have been able to meet the irreparable harm standard.

Turning now to the harm that Plaintiff, as in Dr. Tulp, says that he has or will suffer, he says in effect that his business will stand to suffer because of Defendant's actions.

Generally monetary harm in the form of lost business does not constitute irreparable harm, because damages would be an immediate remedy. And that is Franks GMC Truck Center v. -- Inc. v. General Motors, Corp., 847 F.2d 100, 102, 3rd Circuit, 1988.

However, some courts have recognized that the recoverable monetary loss may constitute irreparable harm where the loss threatens the very existence of the movant's business. See Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc., 559 F.2d 849, 843, note 2, D.C. Circuit, 1977.

Here, Plaintiff has the burden of proving through a clear showing of immediate irreparable injury that he will suffer such harm absent an injunction. That's ECRI, 809 F.2d at 226.

But as already discussed, there is no reason to believe that with a change of signatory, and that USAT will not be able to continue and therefore, in fact, the business need

Case 3:18-cv-01070-WBD Document 152-1 Filed 02/27/23 Page 184 of 135 Case 2:17-cv-05545-WBD Document 152-16 Filed 02/27/23 Page 134 of 135

not fail.

Thus, Plaintiff has not shown immediate irreparable injury resulting from ECFMG's action and thus I will deny the motion for preliminary injunction.

Turning now to one other issue, there was Defendant's motion to quash. And I think that was wanting Mr. Pinsky at the PI hearing. I understand that that is now moot?

MS. MCENROE: Correct.

THE COURT: Okay, so I will moot that out.

MR. REIL: Yes, Your Honor.

Now I'm going to turn to the Rule 16 conference.

MS. MCENROE: Your Honor, if I may with permission, some of my witnesses have child care obligations (indiscernible) if that's okay?

THE COURT: Go ahead. Yeah.

MS. MCENROE: Thank you.

THE COURT: I don't need those on the record. Okay, so --

(Proceedings concluded at 5:14 p.m.)

# CERTIFICATE

I, Chris Hwang, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____        February 14, 2019

Chris Hwang                          Date

Transcriber