**EXHIBIT 19**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DR. ORIEN L. TULP, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:18-cv-05540-WB |
| | ) | |
| v. | ) | Hon. Wendy Beetlestone |
| | ) | |
| EDUCATIONAL COMMISSION FOR | ) | |
| FOREIGN MEDICAL GRADUATES and | ) | |
| DR. WILLIAM W. PINSKY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

For the reasons set forth in the attached memorandum of law, Defendant Educational

Commission for Foreign Medical Graduates ("ECFMG"), by and through its undersigned counsel,

moves for summary judgment pursuant to Federal Rule of Civil Procedure 56.


Dated: May 3, 2019

Respectfully submitted,

*/s/ Elisa P. McEnroe*
Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA  19103-2921
Telephone:    +1.215.963.5917
Facsimile:    +1.215.963.5001
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for the Educational Commission for*
*Foreign Medical Graduates*

**CERTIFICATE OF SERVICE**

I do hereby certify that on this date, I caused true and correct copies of the foregoing document and its attachments to be served via electronic filing upon the following counsel of record using the ECF system and/or via email:

TOMMY SWATE
403 WILD PLUM
HOUSTON, TX 77013

WILLIAM C. REIL
1515 MARKET ST SUITE 1200
PHILADELPHIA, PA 19102
215-564-1635
Fax: 215-564-4292
Email: billreillaw@gmail.com

*Attorneys for Plaintiff*

DATED:  May 3, 2019

*/s/ Elisa P. McEnroe*
Elisa P. McEnroe

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DR. ORIEN L. TULP, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:18-cv-05540-WB |
| | ) | |
| v. | ) | Hon. Wendy Beetlestone |
| | ) | |
| EDUCATIONAL COMMISSION FOR | ) | |
| FOREIGN MEDICAL GRADUATES and | ) | |
| DR. WILLIAM W. PINSKY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES' <u>MOTION FOR SUMMARY JUDGMENT</u>**

Dated: May 3, 2019

Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone: +1.215.963.5917
Facsimile: +1.215.963.5001
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for the Educational Commission for Foreign Medical Graduates*

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     BACKGROUND .................................................................................................. 2

        A.      The Educational Commission for Foreign Medical Graduates ............................ 2

        B.      ECFMG's Policies and Procedures Regarding Irregular Behavior ...................... 3

        C.      Dr. Tulp Provided False Information to ECFMG During Its Investigation
                of USAT's Unauthorized Operations in the United States. ................................. 5

        D.      ECFMG Gave Dr. Tulp Notice of Allegations of His Irregular Behavior ............. 7

        E.      Dr. Tulp Received an Opportunity to Be Heard Regarding Allegations of
                His Irregular Behavior. ..................................................................................... 7

        F.      ECFMG Determined Dr. Tulp Engaged in Irregular Behavior. ........................... 9

        G.      The USAT Sponsor Note in the World Directory of Medical Schools ................. 9

        H.      Procedural History ........................................................................................... 10

III.    LEGAL STANDARD .......................................................................................... 11

IV.     ARGUMENT ...................................................................................................... 12

        A.      Dr. Tulp Was Afforded Due Process, Including Notice and an Opportunity
                to Be Heard. ..................................................................................................... 12

                1.      This Court Already Ruled Dr. Tulp Was Afforded Notice and an
                        Opportunity to Be Heard. ..................................................................... 13

                2.      Dr. Tulp Received Notice of the Irregular Behavior Allegations. ............ 14

                3.      Dr. Tulp Had Multiple Opportunities to be Heard. ................................. 15

                4.      ECFMG's Updates to the USAT Sponsor Note Cannot Establish A
                        Due Process Violation. .......................................................................... 17

        B.      The Action Taken as to Dr. Tulp Is Not One Of The Limited
                Circumstances Where Judicial Interference Is Appropriate. ............................... 19

        C.      Dr. Tulp Is Not Entitled To Legal Or Equitable Relief. .................................... 20

V.      CONCLUSION ................................................................................................... 23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970) .............................................................................................................11

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .............................................................................................................11

*Biliski v. Red Clay Consol. Sch.Dist. Bd. of Educ.*,
574 F.3d 214 (3d Cir. 2009) ....................................................................................14, 16, 17

*Boehm v. Univ. of Pa. Sch. of Veterinary Med.*,
573 A.2d 575 (Pa. Super. Ct. 1990) ...................................................................................13

*Brewer v. Quaker State Oil Ref. Corp.*,
72 F.3d 326 (3d Cir. 1995) .............................................................................................. 11-12

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985) .............................................................................................................13

*Celotex Corp. v. Caltrett*,
477 U.S. 317 (1986) .............................................................................................................11

*David v. Neumann Univ.*,
177 F. Supp. 3d 920 (E.D. Pa. 2016) .................................................................................14

*EBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) ........................................................................................................ 20-21

*ECRI v. McGraw–Hill, Inc.*,
809 F.2d 223 (3d Cir. 1987) ...............................................................................................21

*Fed. Deposit Ins. Corp. v. Mallen*,
486 U.S. 230 (1988) .............................................................................................................17

*Ferring Pharmaceuticals, Inc. v. Watson Pharmaceuticals, Inc.*,
765 F.3d 205 (3d Cir. 2014) ...............................................................................................21

*Fireman's Ins. Co. of Newark v. Du Fresne*,
676 F.2d 965 (3d Cir. 1982) ...............................................................................................12

*Fla. Coastal Sch. of Law, Inc. v. Am. Bar Ass'n*,
No. 3:18-cv-00621-BJD-JBT, ECF No. 39 (M.D. Fla. July 9, 2018) .................................22

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Guttenberg v. Emergy*,
  26 F. Supp. 3d 88 (D.D.C. 2014) ...............................................................................22

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
  882 F.2d 797 (3d Cir. 1989)........................................................................................21

*J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*,
  909 F.2d 1524 (3d Cir. 1990)......................................................................................11

*Kimberg v. Univ. of Scranton*,
  411 F. App'x 473 (3d Cir. 2010) .................................................................................14

*Marlboro Corp. v. Ass'n of Indep.Colleges and Schools*,
  556 F.2d 78 (1st Cir. 1977)..........................................................................................16

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986).....................................................................................................12

*Matthews v. Eldridge*,
  424 U.S. 319 (1976).....................................................................................................16

*McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ.*,
  24 F.3d 519 (3d Cir. 1994)................................................................................13, 15, 20

*Osei v. Temple Univ.*,
  518 F. App'x 86 (3d Cir. 2013) ...................................................................................15

*Pallante v. Those Certain Underwriters at Lloyd's, London*,
  311 F. Supp. 3d 692(E.D. Pa. 2018) ...........................................................................21

*Psi Upsilon of Phila. v. Univ. of Pa.*,
  591 A.2d 755 (Pa. Super. Ct. 1991)...................................................................... *passim*

*Sch. Dist. of City of Harrisburg v. Pa. Interscholastic Athletic Ass'n*,
  309 A.2d 353 (Pa. 1973) .........................................................................................19, 20

*Thomas M. Cooley Law Sch. v. Am. Bar Ass'n*,
  No. 17-13708, 2017 WL 6342629 (E.D. Mich. Dec. 12, 2017) ...........................22, 23

*Whitmore v. Liberty Mut. Fire Ins. Co.*,
  No. 07-5162, 2008 WL 4425227 (E.D. Pa. Sept. 30, 2008).......................................12

*Winter v. Nat. Res. Def. Counsel, Inc.*,
  555 U.S. 7 (2008).........................................................................................................22

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**Rules**

Fed. R. Civ. P. 56(a) ...................................................................................................................11

Fed. R. Civ. P. 56(c)(1)(A) .........................................................................................................11

## I.    INTRODUCTION

Defendant Educational Commission for Foreign Medical Graduates ("ECFMG") moves for summary judgment as to Plaintiff Dr. Orien L. Tulp's common law due process claim, the sole claim remaining in this action, because the undisputed material facts confirm that Dr. Tulp was afforded due process and he is not entitled to any relief.[1]

In his Complaint, Dr. Tulp alleges that ECFMG violated his due process rights by deciding not to accept documents signed by Dr. Tulp after finding that he made false representations to ECFMG in violation of ECFMG's policies and procedures.  But it is undisputed that ECFMG took action as to Dr. Tulp after giving Dr. Tulp (a) repeated notice of the allegations and evidence against him, and (b) multiple opportunities to present a substantive response—in writing and in person—to the allegations and evidence against him.  Indeed, following a lengthy hearing earlier in this case on Dr. Tulp's Motion for a Preliminary and/or Permanent Injunction (which was denied) and considering the facts here, this Court already concluded that "*[i]n this case, there was notice and an opportunity to be heard.*"  SOF ¶ 79.  Discovery confirms that the Court's conclusion cannot genuinely be disputed.  Moreover, discovery established that Dr. Tulp is entitled to neither legal nor equitable relief given the complete absence of proof of damages resulting from the alleged due process violation and Dr. Tulp's failure to satisfy the requirements for a permanent injunction.

Accordingly, there remain no genuine issues of material fact, and ECFMG is entitled to judgment as a matter of law on Dr. Tulp's sole remaining claim.  This Court should grant summary

---

[1]    On March 26, 2019, the Court dismissed all claims against Dr. William W. Pinsky.  *See* ECF No. 29.  As a result, the Motion for Summary Judgment is brought by and on behalf of ECFMG only, the sole remaining defendant.

judgment in favor of ECFMG on Dr. Tulp's common law due process claim, dismissing the remainder of Dr. Tulp's case in its entirety.

## II.   BACKGROUND

### A.   The Educational Commission for Foreign Medical Graduates

ECFMG is a private non-profit organization that promotes quality health care for the public by certifying physicians who receive their basic medical degree from an international medical school (known as international medical graduates or "IMGs") for entry into U.S. graduate medical education. SOF ¶¶ 1-2. ECFMG's responsibilities include (among other things): (i) certifying the readiness of IMGs for entry into graduate medical education and health care systems in the United States through an evaluation of their qualifications, (ii) providing complete, timely, and accessible information to IMGs regarding entry into graduate medical education in the United States, and (iii) verifying credentials and providing other services to health care professionals worldwide. SOF ¶ 3.

To verify an applicant's credentials as part of ECFMG's certification process, ECFMG collects documentation, including records relating to an applicant's attendance at a recognized international medical school. SOF ¶ 4. An "international medical school" is "an education facility located in a country **outside of the United States and Canada** with its primary campuses and main operations **located in that country**." SOF ¶ 5 (emphasis added). If an international medical school has a branch campus outside the country where its primary campus is located, ECFMG "may require confirmation from the appropriate government authority" in the branch campus country that "the branch campus is authorized to operate as a medical school in the branch campus country" and that the international medical school "awards degrees that meet the medical education eligibility requirements for licensure to practice medicine in the branch campus country." SOF ¶ 6.

2

Once an applicant's record is verified and complete and the applicant passes certain required substantive exams, ECFMG issues the applicant a certificate. SOF ¶ 7. This certificate signals that an IMG seeking admission to a U.S. graduate medical program has met certain minimum standards of eligibility, including graduation from a *bona fide* international medical school. SOF ¶ 8.

**B.  ECFMG's Policies and Procedures Regarding Irregular Behavior**

ECFMG's publicly available Policies and Procedures Regarding Irregular Behavior define irregular behavior as "all actions or attempted actions on the part of applicants . . . or any other person that would or could subvert the examination, certification or other processes, programs, or services of ECFMG." SOF ¶ 9. Examples of irregular behavior include, but are not limited to, failing to comply with an ECFMG policy, procedure and/or rule, or providing false information to ECFMG. SOF ¶ 10.

ECFMG's Policies and Procedures Regarding Irregular Behavior set forth the following steps for addressing suspected irregular behavior:

- Once ECFMG becomes aware of potential irregular behavior, ECFMG staff investigates the situation. SOF ¶ 13(a). Depending on the specific circumstances of the potential irregular behavior, that investigation can involve the gathering of additional information. SOF ¶ 13(a).

- "If ECFMG staff finds that there exists a reasonable basis to conclude that an individual may have engaged in irregular behavior, the matter will be referred to the Medical Education Credentials Committee[,]" a sub-committee of the ECFMG Board of Trustees. SOF ¶ 13(b).

- Individuals alleged to have engaged in irregular behavior are "advised in writing of the nature of the alleged irregular behavior and provided with a copy of the *Policies and*

3

*Procedures Regarding Irregular Behavior.*" SOF ¶ 13(c). In practice, they are also provided with a copy of materials supporting the allegation of irregular behavior that are to be provided to the Medical Education Credentials Committee. SOF ¶ 45.

- Individuals alleged to have engaged in irregular behavior are also given "an opportunity to provide written explanation and to present other relevant information" to ECFMG. SOF ¶ 13(d). They "may also request the opportunity to appear personally before the Medical Education Credentials Committee" to testify under oath (with representation by counsel, if desired) about the allegations of irregular behavior. SOF ¶ 13(e).

- After the Medical Education Credentials Committee reviews the evidence—including any written explanation, testimony, or other relevant information provided by the individual alleged to have engaged in irregular behavior—the Medical Education Credentials Committee votes on whether the allegations of irregular behavior are founded. SOF ¶ 13(h).

- If the Medical Education Credentials Committee determines that the allegations of irregular behavior are founded, "the Medical Education Credentials Committee will determine what action(s) will be taken as a result of the irregular behavior," and ECFMG notifies the individual as to the Medical Education Credentials Committee's decisions. SOF ¶ 13(h)-(i).

- Individuals found to have engaged in irregular behavior may appeal the Medical Education Credentials Committee's finding to ECFMG's Review Committee for Appeals, another sub-committee of the ECFMG Board of Trustees made up of members independent of the Medical Education Credentials Committee. SOF ¶ 13(j).

They also may petition the Medical Education Credentials Committee to reconsider its finding.  SOF ¶ 14.

**C.**  **Dr. Tulp Provided False Information to ECFMG During Its Investigation of USAT's Unauthorized Operations in the United States.**

Plaintiff Dr. Tulp is the President of the University of Science, Arts, and Technology Montserrat ("USAT"), a medical school with its primary campus and main operations supposedly in Montserrat.  SOF ¶ 15.  Even though Dr. Tulp is affiliated with USAT, he testified in this case that he has never earned money from USAT.  SOF ¶¶ 18-19.  Rather, he has been retired for decades and his income is derived entirely from pensions.  SOF ¶ 20.

In mid-2018, ECFMG received information indicating that USAT was operating a campus and providing medical education in Miami, Florida.  SOF ¶ 21.  ECFMG had never received evidence demonstrating that USAT had authorization from the United States or Florida to operate a branch campus in Miami.  SOF ¶ 23.

Accordingly, on August 21, 2018, ECFMG sent a letter to Dr. Tulp requesting that Dr. Tulp "provide documentation from the United States Department of Education and/or the Florida Department of Education confirming that USAT's Miami branch campus is authorized to operate as a medical school in the United States."  SOF ¶ 22.  ECFMG requested information covering "the whole time period that the USAT Miami branch campus has been in operation."  SOF ¶ 23.

Later that day, Dr. Tulp responded to ECFMG via email:

This is incorrect information.  The Miami location is an information and testing site only, where a pre-usmle examination [an NBME] may be administered, and an Orientation for new students is conducted prior to their traveling to the Caribbean.. [sic] It is NOT a campus.  Our ONLY Campus is located in Olveston, Montserrat, British West Indies.

Actually, recall that Montserrat is a volcanic Island, and the license issued to USAT in September, 2003 DOES actually permit the establishment of off-campus lecture and administrative sites as needed.  USAT has students on island on a year round basis in its origination.

5

SOF ¶ 24.

In the weeks that followed, ECFMG received additional information suggesting that Dr. Tulp's statement to ECFMG regarding USAT purportedly not providing education in the United States was false and that USAT was actually operating multiple satellite campuses in cities across the United States. SOF ¶ 25. In light of the additional information confirming that Dr. Tulp's representations to ECFMG were false, ECFMG sent another letter to Dr. Tulp on September 14, 2018, advising him that ECFMG was continuing its review of the matter to "ensure that information regarding international medical schools and their students provided to ECFMG complies with ECFMG policies and requirements." SOF ¶ 26. As part of that ongoing review, ECFMG informed Dr. Tulp that it had "reached out to students and graduates of USAT in order to collect information from them regarding their attendance at USAT" and that "USAT students and graduates seeking services related to ECFMG Certification . . . must complete and submit an affidavit attesting to the accuracy of the medical school information provided to ECFMG." SOF ¶ 26. The affidavit asked USAT students and graduates to certify (1) their dates of attendance at USAT, and (2) the location where they took their basic science courses. SOF ¶ 27.

More than 300 students submitted affidavits to ECFMG indicating that they took classes in the United States, and not a single student indicated that he or she took all of his or her basic science courses in Montserrat. SOF ¶ 28. There were also a "number of affidavits" from USAT students where "Dr. Tulp ha[d] provided information that conflicted with the affidavit information that ECFMG got from the students." SOF ¶ 29. As a result, ECFMG circulated a second affidavit to USAT students and graduates, in which ECFMG sought information about whether USAT students and graduates were given "advance standing" or exempted from taking required courses at USAT based on credits earned outside of USAT. SOF ¶ 30.

6

**D.      ECFMG Gave Dr. Tulp Notice of Allegations of His Irregular Behavior.**

On October 18, 2018, ECFMG sent a letter to Dr. Tulp advising him of an allegation that he engaged in irregular behavior by providing false information to ECFMG.  SOF ¶¶ 31-36.  The letter summarized the allegations in the opening paragraph as follows:

> Specifically, you provided false information to ECFMG when you (1) notified ECFMG that USAT does not operate a branch campus in Miami, Florida and (2) certified to the attendance dates of several USAT students and graduates when ECFMG has information that these students were not attending USAT during some of the time periods to which you certified.  The details of ECFMG's allegation are set forth below.

SOF ¶ 32.  The letter went on to describe at length the allegations against Dr. Tulp.  SOF ¶¶ 33-35.

The letter informed Dr. Tulp that ECFMG's Medical Education Credentials Committee would be meeting on November 28, 2018 to address the allegations of irregular behavior against him.  SOF ¶ 35.  The letter also listed and included many of the documents that would be presented to the Medical Education Credentials Committee in connection with their review of the allegations concerning Dr. Tulp.  SOF ¶ 35.  All of the documents that would be presented to the Medical Education Credentials Committee were provided later to Dr. Tulp's attorneys before the November 28 meeting.  SOF ¶¶ 45-46.

**E.      Dr. Tulp Received an Opportunity to Be Heard Regarding Allegations of His Irregular Behavior.**

In its October 18, 2018 letter, ECFMG invited Dr. Tulp to submit to ECFMG a written response to the allegations of irregular behavior and any relevant information that he wanted ECFMG to consider in connection with the allegations of irregular behavior.  SOF ¶ 35.  It also invited Dr. Tulp to appear personally and with counsel before the Medical Education Credentials Committee on November 28, 2018, which Dr. Tulp elected to do.  SOF ¶ 35.

7

Before the meeting of the Medical Education Credentials Committee, Dr. Tulp's counsel communicated with ECFMG about the allegations of irregular behavior and the Medical Education Credentials Committee. SOF ¶¶ 37-46. ECFMG also provided Dr. Tulp's counsel with copies of materials that the Medical Education Credentials Committee would review in connection with the allegations of irregular behavior concerning Dr. Tulp. SOF ¶¶ 45-46.

On November 28, 2018, Dr. Tulp appeared before the Medical Education Credentials Committee along with his two attorneys. SOF ¶ 47. ECFMG typically allows only one attorney to attend these meetings on behalf of an individual suspected of irregular behavior, but in this instance, it granted Dr. Tulp's request to bring both of his attorneys. SOF ¶ 39. One of his attorneys made an opening statement, in which he objected to the Medical Education Credentials Committee's authority and procedures; he did not present a substantive response to the allegations of irregular behavior. SOF ¶¶ 51-54. He concluded by stating, "That is our opening statement. If you have any questions, you can address them to me. ***Dr. Tulp will not be answering any questions.***" SOF ¶ 54 (emphasis added). Counsel for ECFMG repeatedly invited Dr. Tulp's counsel (and Dr. Tulp himself) to present a substantive response to the allegations of irregular behavior or the materials provided to Dr. Tulp and his counsel before the meeting. SOF ¶ 55. After much back and forth, Dr. Tulp's counsel stated on the record, "***Dr. Tulp is not going to be talking today. The next time you hear him talk is going to be in federal court.***" SOF ¶ 56 (emphasis added). After several more unsuccessful attempts by counsel for ECFMG to elicit a substantive response from Dr. Tulp and his counsel regarding the allegations of irregular behavior, counsel for ECFMG adjourned the meeting. SOF ¶¶ 57-62. A full read of the transcript gives a complete picture of Dr. Tulp's opportunity (and refusal) to be heard. *See* JA0139-JA0171.

8

**F.      ECFMG Determined Dr. Tulp Engaged in Irregular Behavior.**

By letter dated December 14, 2018, ECFMG notified Dr. Tulp that the Medical Education Credentials Committee had completed its review and determined that Dr. Tulp had engaged in irregular behavior. SOF ¶ 63. As a result, ECFMG decided it would "not accept any documents signed/certified by [Dr. Tulp] for ECFMG on behalf of USAT, or any other medical school, for a minimum of five years from today; thereafter, the prohibition shall end only upon a petition to ECFMG conclusively demonstrating to the satisfaction of the ECFMG Committee a familiarity with, and willingness to adhere to, ECFMG policies." SOF ¶ 63. The action taken by ECFMG does not prevent Dr. Tulp from operating a medical school in Montserrat or otherwise serving as a professor or administrator at a medical school because any medical school affiliated with Dr. Tulp could authorize a different official to sign documents for ECFMG. SOF ¶¶ 64-65. Indeed, USAT may continue to submit documents to ECFMG because it has other "authorized signatories." SOF ¶ 65. Thus, the limited practical effect of the irregular behavior finding is that ECFMG will not accept representations or certifications *by Dr. Tulp* as valid in connection with the ECFMG's certification process (at least for a period of five years).

**G.      The USAT Sponsor Note in the World Directory of Medical Schools**

The World Directory of Medical Schools is a listing of the world's medical schools. SOF ¶ 69. ECFMG uses a "Sponsor Note" in the World Directory to inform the public generally and students or graduates of the school specifically whether students and graduates from particular schools in particular years are eligible to apply for ECFMG certification. SOF ¶ 69.

On or around September 24, 2018, ECFMG updated its Sponsor Note for USAT to reflect the use of affidavits in the certification process as follows:

> Currently students and graduates of USAT are subject to enhanced procedures that must be met in order to be eligible for ECFMG Certification related services, including but not limited to: ECFMG Certification, USMLE examinations that lead to ECFMG certification,

9

and Electronic Residency Application Service (ERAS) Support Services. ECFMG will provide information and instructions to applicants upon receipt of application.

SOF ¶ 70. USAT was given notice of the "enhanced procedures" described in the Sponsor Note via letter from Ms. Corrado. SOF ¶ 71.

Then, as ECFMG's investigation continued into USAT's authorization (or lack thereof) to operate as it had, on or around October 18, 2018, ECFMG updated its Sponsor Note for USAT again, this time to reflect ECFMG's decision that beginning on January 1, 2019, future USAT students and graduates would not be eligible for ECFMG certification unless and until USAT provided satisfactory documentation from U.S.-based authorities allowing USAT to operate branch campuses in the United States. SOF ¶ 72. Accordingly, ECFMG updated its Sponsor Note to include the following language:

> Note: As of January 1, 2019, students and graduates of this medical school with a graduation year of 2019 and later are not eligible to apply to ECFMG for ECFMG Certification, which also renders them ineligible to apply to ECFMG for the United States Medical Licensing Examinations (USMLE) as a step towards ECFMG Certification.

SOF ¶ 72. USAT was given notice of the change to ECFMG's Sponsor Note via letter from Ms. Corrado. SOF ¶ 73. In that same letter, Ms. Corrado again invited USAT to provide the requested documentation. *See* JA0113-JA0114. USAT did not then and has never since provided the requested documentation. SOF ¶ 23.

ECFMG's Sponsor Note for USAT currently has both the language added in September 2018 and the language added in October 2018. SOF ¶ 74. ECFMG did not update its Sponsor Note for USAT to reflect the finding of irregular behavior against Dr. Tulp. SOF ¶ 75.

### H.    Procedural History

On December 24, 2018, Dr. Tulp sued ECFMG and its President, Dr. William W. Pinsky, alleging that they committed various constitutional and common law torts in the course of investigating and then taking action against Dr. Tulp. *See* ECF No. 1. Dr. Tulp moved for

10

injunctive relief on January 2, 2019, and following a full hearing on the motion on January 24, 2019, this Court denied Dr. Tulp's motion. *See* SOF ¶ 78. In explaining that Dr. Tulp had not proven a likelihood of success on his constitutional due process claim, the Court specifically noted that "*[i]n this case, there was notice and an opportunity to be heard.*" SOF ¶ 78.

On March 26, 2018, the Court granted in part Defendants' Motion to Dismiss and dismissed all of Dr. Tulp's claims against ECFMG and Dr. Pinsky, except for a single common law due process claim against ECFMG. *See* ECF No. 29. In its opinion allowing the common law due process claim to proceed, the Court focused on Dr. Tulp's allegations regarding his appearance before the Medical Education Credentials Committee, specifically his allegation in the Complaint that ECFMG ended the hearing "before allowing [Dr. Tulp] an opportunity to present his side of the story." *See* ECF No. 28 at 12. Presently, ECFMG moves for summary judgment on this sole remaining claim.

## III.  LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Then, the nonmoving party has the burden of showing there is a genuine issue for trial by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir. 1990) (holding that once the movant discharges its burden, the non-movant "must establish the existence of each element on which it bears the burden of proof") (citing *Celotex Corp. v. Caltrett*, 477 U.S. 317, 323 (1986)). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 330 (3d Cir.

11

1995) (recognizing that a genuine issue exists solely if the nonmoving party "provides sufficient evidence to allow a reasonable jury to find for him at trial").

The party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). He must present more than just "bare assertions, conclusory allegations or suspicions" to show the existence of a genuine dispute. *Fireman's Ins. Co. of Newark v. Du Fresne*, 676 F.2d 965, 969 (3d Cir. 1982). Rather, "[t]he party opposing summary judgment must support each essential element of that party's opposition with concrete evidence in the record. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. This requirement upholds the underlying purpose of summary judgment which is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense." *Whitmore v. Liberty Mut. Fire Ins. Co.*, No. 07-5162, 2008 WL 4425227, at *1 (E.D. Pa. Sept. 30, 2008) (citations and internal punctuation omitted).

## IV.    ARGUMENT

### A.    Dr. Tulp Was Afforded Due Process, Including Notice and an Opportunity to Be Heard.

Assuming for purposes of this Motion that ECFMG owes common law due process obligations to Dr. Tulp,[2] Dr. Tulp cannot succeed on his common-law due process claim because there is no genuine dispute that he was afforded due process. In Pennsylvania, the common law

---

[2]    Indeed, it is not clear that Dr. Tulp in fact pleaded a due process claim under the common law as opposed to under the United States Constitution. At the injunction hearing on January 24, 2019, this Court asked Dr. Tulp's counsel to confirm "exactly what causes of action are being asserted." SOF ¶ 76. When the Court twice described Dr. Tulp's due process claim as "a § 1983 claim alleging that ECFMG violated [Dr.] Tulp's procedural and substantive due process rights as protected by the 14th Amendment," Dr. Tulp's counsel twice responded, "Yes, Your Honor." SOF ¶ 77. Because Dr. Tulp failed to plead a common law due process claim in the Complaint, summary judgment in favor of ECFMG is also warranted on that basis.

duty of due process emerges from the private school and university context, in which "students who are being disciplined are entitled only to those procedural safeguards which the school specifically provides," provided that such procedures are "fundamentally fair." *Psi Upsilon of Phila. v. Univ. of Pa.*, 591 A.2d 755, 758 (Pa. Super. Ct. 1991) (quoting *Boehm v. Univ. of Pa. Sch. of Veterinary Med.*, 573 A.2d 575, 577 (Pa. Super. Ct. 1990)). Whether procedures are "fundamentally fair" is determined by whether a student being disciplined was given notice of the charges and an opportunity to be heard. *Id.* at 759–60.

"[T]he requirements of common law due process are quite similar to those for constitutional due process, and most courts treat them interchangeably." *McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ.*, 24 F.3d 519, 535 (3d Cir. 1994) (concurring, J. Becker). Constitutional due process similarly focuses on whether there was notice and opportunity for hearing appropriate to the nature of the case. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985).

### 1. This Court Already Ruled Dr. Tulp Was Afforded Notice and an Opportunity to Be Heard.

In denying Dr. Tulp's request for injunctive relief in this case, this Court concluded that ECFMG's disciplinary hearing met the requirements of constitutional due process and that there was notice and opportunity to be heard. *See* SOF ¶ 78; JA0306 (Injunction Hr'g Tr. 131:5-11 (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985))). Indeed, the Court specifically stated in its ruling that "*[i]n this case, there was notice and an opportunity to be heard.*" SOF ¶ 78 (emphasis added). This is confirmed by the facts discussed below, *see infra*, and Dr. Tulp can point to no evidence or disputes of material fact to disturb the Court's prior

conclusion. Thus, Dr. Tulp's irregular behavior proceeding also satisfies the notice and opportunity to be heard requirements of the common law duty of due process.[3]

### 2. Dr. Tulp Received Notice of the Irregular Behavior Allegations.

Dr. Tulp received notice of the allegations that he engaged in irregular behavior. Consistent with ECFMG's Policies and Procedures Regarding Irregular Behavior, on October 18, 2018, ECFMG sent a letter to Dr. Tulp summarizing and describing in detail the allegations of irregular behavior against him. SOF ¶¶ 31-36. Prior to the November 28, 2018 meeting of the Medical Education Credentials Committee, Dr. Tulp's counsel received copies of materials to be considered by the Medical Education Credentials Committee in reaching a decision regarding irregular behavior. SOF ¶¶ 45-46. Moreover, Dr. Tulp and his counsel received numerous letters explaining ECFMG's process for investigating and evaluating allegations of irregular behavior. SOF ¶¶ 37-46. Indeed, ECFMG's Policies and Procedures Regarding Irregular Behavior are both publicly available on the internet and were sent to Dr. Tulp in connection with the allegations of irregular behavior.[4] SOF ¶¶ 9, 35.

Courts routinely find that similar activities constitute sufficient notice of accusations and the procedures through which the accusations of misconduct may be resolved. *See, e.g.*, *Biliski v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 574 F.3d 214, 221–22 (3d Cir. 2009) (holding that a discharged employee was given sufficient notice of the reasons for his dismissal when he was

---

[3] ECFMG met these requirements despite the fact that "[p]rivate institutions need not endow their students with the constitutional due process protections that state [entities] are obliged to provide." *David v. Neumann Univ.*, 177 F. Supp. 3d 920, 926 (E.D. Pa. 2016) (quoting *Kimberg v. Univ. of Scranton*, 411 F. App'x 473, 481 (3d Cir. 2010)).

[4] ECFMG's actions complied with its Policies and Procedures Regarding Irregular Behavior. Because private entities bear "no obligation to afford [plaintiffs] protections in addition to those expressly embodied in" their written policies and procedures, *Kimberg v. Univ. of* Scranton, 411 F. App'x 473, 481 (3d Cir. 2010), ECFMG afforded Dr. Tulp due process.

14

provided with multiple disciplinary memos which described the alleged misconduct and what body would decide whether dismissal was appropriate); *McKeesport Hosp.*, 24 F.3d at 532 (defendant accrediting council's use of detailed letters to communicate areas in which plaintiff hospital needed to improve, coupled with allowance of opportunity for hospital to submit additional information to address these concerns, constituted adequate notice of deficiencies before withdrawal of accreditation) (Becker, J., concurring); *Psi Upsilon of Phila.*, 591 A.2d at 758–59 (holding that University's procedure of sending a statement explaining charges and violations to disciplined fraternity members before a disciplinary hearing was sufficient notice of pending charges); *Osei v. Temple Univ.*, 518 F. App'x 86, 89 (3d Cir. 2013) (holding that even a one-day notice of witness testifying against plaintiff at hearing was sufficient notice under the school disciplinary context and constituted due process).

It cannot be disputed that Dr. Tulp received a letter from ECFMG detailing the allegations of irregular behavior. SOF ¶¶ 31-36. It also cannot be disputed that Dr. Tulp received that letter more than a month before the meeting of the Medical Education Credentials Committee and nearly two months before a decision regarding the allegations of irregular behavior. SOF ¶ 47. This, along with the entire record of ECFMG's communications with Dr. Tulp and his counsel, confirms that Dr. Tulp received adequate notice of the allegations against him.

### 3. Dr. Tulp Had Multiple Opportunities to be Heard.

Consistent with ECFMG's Policies and Procedures Regarding Irregular Behavior, Dr. Tulp had ample opportunity to be heard in connection with the allegations of his irregular behavior.

***First***, Dr. Tulp had an opportunity to present a written response to the allegations of irregular behavior and provide any relevant information that he wanted the Medical Education Credentials Committee to consider. SOF ¶¶ 13(d), 35. Because "[t]here is no inexorable requirement that oral testimony must be heard in every administrative proceeding in which it is

15

tendered," *Biliski*, 574 F.3d at 223 (quoting *Fed. Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 247-48 (1988)), Dr. Tulp's opportunity to provide a written submission and relevant information in response to the allegations of irregular behavior constitute an adequate opportunity to be heard. *See Matthews v. Eldridge*, 424 U.S. 319, 334, 344–46 (1976) (explaining that some form of hearing with safeguards such as the opportunity to submit documentation, access to the file under review, and ability to be represented are safeguards which speak to whether adequate procedures were in place).

*Second*, Dr. Tulp also had an opportunity to appear personally before the Credentials Committee with two attorneys of his choosing. SOF ¶ 13(e)-(f), 35, 47. *See, e.g.*, *Psi Upsilon*, 591 A.2d at 759 (presence of legal counsel at hearing speaks to adequacy of process given). Dr. Tulp's counsel made a full opening statement and had the opportunity to present whatever argument or substantive response he wished. SOF ¶¶ 51-62. Indeed, counsel for ECFMG repeatedly invited Dr. Tulp to give testimony and Dr. Tulp's counsel to address specific parts of the materials presented for the Committee's consideration. SOF ¶ 55-61. It was only after Dr. Tulp's counsel refused to allow Dr. Tulp to testify and refused to address specific documents that the meeting was adjourned.

That Dr. Tulp did not take full advantage of his personal appearance before the Medical Education Credentials Committee to provide evidence or argument in his favor, does not change the fact that he had an opportunity to be heard on the allegations of irregular behavior. If a plaintiff is "given ample opportunity to present its position by written submission and to argue it orally," and fails to "make the best use of those opportunities . . . the blame cannot be placed on the Commission." *Marlboro Corp. v. Ass'n of Indep.Colleges and Schools*, 556 F.2d 78, 82 (1st Cir. 1977). Here, Dr. Tulp failed to make the best use of his opportunities to present his case to the

16

Medical Education Credentials Committee in that he failed to provide any substantive response to the allegations of irregular behavior, let alone "make best use of those opportunities" to be heard. That failure does not mean he was denied due process.

Nor does the due process analysis change simply because no witnesses were called to testify. For starters, "[t]here is no inexorable requirement that oral testimony must be heard in every administrative proceeding in which it is tendered," *Biliski*, 574 F.3d at 223 (quoting *Fed. Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 247 – 48 (1988)). Moreover, counsel for ECFMG repeatedly invited Dr. Tulp to speak or offer evidence, but he refused to do so. *See* SOF ¶¶ 54-56. In *Psi Upsilon of Philadelphia*, members of a disciplined fraternity argued that they were denied a fair opportunity to be heard at a disciplinary hearing because they invoked their privilege against self-incrimination given pending criminal charges, and thus did not testify or present evidence. 591 A.2d at 760. The court there found this contention to be without merit. *Id.* Similarly, Dr. Tulp's failure to testify at his own hearing or present any evidence, even though he was given multiple opportunities to do so, does not mean that he was denied a fair opportunity to be heard.

Because Dr. Tulp had an opportunity to be heard by the Medical Education Credentials Committee, both in writing and in person, he was afforded an opportunity to be heard consistent with his common law due process rights.

### 4. *ECFMG's Updates to the USAT Sponsor Note Cannot Establish A Due Process Violation.*

It is expected that Dr. Tulp may argue that the timing of ECFMG's updates to its Sponsor Note for USAT in the World Directory of Medical Schools somehow demonstrates that Dr. Tulp was denied due process. Not so. At all times, ECFMG updated its Sponsor Note to accurately reflect steps taken by ECFMG to validate that USAT students and graduates attended a *bona fide*

17

international medical school and were thus eligible for ECFMG certification. At no point was the Sponsor Note updated in violation of Dr. Tulp's common law due process rights.

In September 2018, ECFMG updated the USAT Sponsor Note so that USAT students and graduates would know to expect that additional procedures would be necessary to secure ECFMG certification. In October 2018, after USAT failed to provide the documentation ECFMG repeatedly requested to prove that its operations in the United States complied with ECFMG policy, ECFMG updated the USAT Sponsor Note so that USAT students and graduates would know that starting on January 1, 2019, future USAT students and graduates would not be eligible for ECFMG certification unless and until USAT proved it was in compliance with ECFMG policy. Neither of these updates to the USAT Sponsor Note violated Dr. Tulp's common law right to any form of due process.

Indeed, to the extent ECFMG notified Dr. Tulp of its intent to update the USAT Sponsor Note to reflect that Dr. Tulp had been found to have engaged in irregular behavior, that intent was made clear only *after* the finding of irregular behavior had been made, and the language was not been incorporated into the USAT Sponsor Note. SOF ¶¶ 63, 75. Thus, updates to the USAT Sponsor Note do not create any genuine dispute of material fact as to whether Dr. Tulp was denied due process and any argument to the contrary would be unavailing.

\*      \*      \*

As this Court previously concluded, Dr. Tulp was afforded notice of the allegations and evidence of irregular behavior, as well as an opportunity to be heard. This satisfies his common law right to due process in proceedings before the ECFMG and warrants summary judgment in favor of ECFMG on the sole remaining claim in this case.

18

**B.      The Action Taken as to Dr. Tulp Is Not One Of The Limited Circumstances Where Judicial Intervention Is Appropriate.**

Pennsylvania recognizes that "judicial interference in the affairs of private associations . . . is appropriate only under limited circumstances, as where the private association has deprived a member or prospective member of substantial economic or professional advantages or fundamental constitutional rights." *Sch. Dist. of City of Harrisburg v. Pa. Interscholastic Athletic Ass'n*, 309 A.2d 353, 357 (Pa. 1973); *see also Psi Upsilon of Phila. v. Univ. of Pa.*, 591 A.2d 755, 760 (Pa. Super. Ct. 1991) ("[C]ourts should not interfere with internal procedure and discipline unless real prejudice, bias or denial of due process is present."). This is a case in which judicial interference in the affairs of ECFMG, a private association, would not be appropriate.

There is no dispute that ECFMG took action as to Dr. Tulp by deciding it would "not accept any documents signed/certified by [Dr. Tulp] for ECFMG on behalf of USAT, or any other medical school, for a minimum of five years . . .  thereafter, the prohibition shall end only upon a petition to ECFMG conclusively demonstrating to the satisfaction of the ECFMG Committee a familiarity with, and willingness to adhere to, ECFMG policies." SOF ¶ 63. This does not deprive Dr. Tulp of a substantial economic or professional advantage or a fundamental constitutional right. It does not prevent Dr. Tulp from operating a medical school in Montserrat or otherwise serving as a professor of medicine. Indeed, it is undisputed that USAT has other authorized signatories, and there is no evidence to suggest that Dr. Tulp needs to serve as an authorized signatory in order for him or USAT to succeed. SOF ¶¶ 64-65. Moreover, Dr. Tulp has never derived income from USAT, SOF ¶¶ 18-20, so any interference with Dr. Tulp's ability to fulfil his duties as President of USAT could not possibly result in substantial economic harm to Dr. Tulp. Accordingly, ECFMG's action does not deprive Dr. Tulp of "substantial economic or professional advantages" or a "fundamental constitutional right[]," and judicial intervention is thus not appropriate here.

19

*See Sch. Dist. of City of Harrisburg*, 309 A.2d at 357; *see also McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ.*, 24 F. 3d 519, 534 (3d Cir. 1994) (Becker, J., concurring) ("Courts must pay special deference to a professional accreditation organization's substantive decisions in light of the special expertise required to determine professional competency.").

### C.     Dr. Tulp Is Not Entitled To Legal Or Equitable Relief.

Even if Dr. Tulp could establish a common law due process violation (and, as explained above, he cannot), ECFMG is also entitled to summary judgment because the undisputed material facts confirm that Dr. Tulp is not entitled to legal or equitable relief.

Dr. Tulp is not entitled to recover damages because there is no evidence in the record to support a damages award.  ECFMG requested that Dr. Tulp produce any and all documents he would use to support a damages award; no such documents were produced.  SOF ¶ 79.  To the contrary, Dr. Tulp testified that he never earned any money from USAT and that his income is derived entirely from pensions and has been for many years.  SOF ¶¶ 18-20.  Dr. Tulp has no evidence to substantiate a damages award, so summary judgment in favor of ECFMG is warranted on any claim for damages resulting from Dr. Tulp's common law due process claim.

Nor is Dr. Tulp entitled to equitable relief in the form of an injunction that would require ECFMG to grant an exception to its policies and procedures, which are in place to protect the health of the U.S. public.  In addition to demonstrating ***actual*** success on the merits (which Dr. Tulp cannot do), Dr. Tulp would only be entitled to permanent injunctive relief if he demonstrates that "(1) [he] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *EBay Inc. v. MercExchange,*

20

*L.L.C.*, 547 U.S. 388, 391 (2006).[5] Here, ECFMG is entitled to summary judgment on Dr. Tulp's claim for injunctive relief because the undisputed facts show that Dr. Tulp cannot satisfy any of these requirements.

*First*, to make a showing of irreparable harm, the requisite feared injury or harm must not be merely serious or substantial, but rather "must be of a peculiar nature so that compensation in money cannot atone for it." *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987). In denying Dr. Tulp's Motion for Preliminary and/or Permanent Injunction, this Court concluded that Dr. Tulp had "not shown immediate irreparable injury resulting from ECFMG's action . . . ." JA0309 (Injunction Hr'g Tr. 134:2-4). The evidence gathered in discovery confirms that conclusion. Dr. Tulp can present no evidence whatsoever of irreparable injury, which alone is grounds for denying injunctive relief. *See Pallante v. Those Certain Underwriters at Lloyd's, London*, 311 F. Supp. 3d 692, 695 n.3 (E.D. Pa. 2018) (denying injunction where movant "filed no relevant affidavit or verified pleading showing immediate and irreparable injury, loss, or damage"); *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989).

The types of harm allegedly suffered by Dr. Tulp are not irreparable as a matter of law. To the extent Dr. Tulp suggests that he would be irreparably harmed absent injunctive relief by virtue of his "removal . . . as a medical educator under the cloud of an indefinite sentence of 'irregular behavior' for a duration of not less than 5 years," Compl. ¶ 29, this argument fails as a matter of fact and law. Contrary to his naked allegations, the evidence shows that ECFMG's limited action did not cause the "removal of Dr. Tulp as a medical educator" for any period of time. SOF ¶¶ 63-

---

[5]     "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the expception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Ferring Pharmaceuticals, Inc. v. Watson Pharmaceuticals, Inc.*, 765 F.3d 205, 215 n.9 (3d Cir. 2014).

21

64. Notwithstanding ECFMG's actions, Dr. Tulp remains free to teach medicine, and ECFMG has no say over whether Dr. Tulp continues to teach medicine at USAT in Montserrat or elsewhere. Indeed, Dr. Tulp testified that he is involved in opening a new medical school in the British Virgin Islands. SOF ¶ 66. Moreover, as a matter of law, any injury to Dr. Tulp's reputation is not irreparable and would not be avoided through injunctive relief. ECFMG's finding of irregular behavior has already been made public, at the very least through Dr. Tulp having filed this lawsuit without filing under seal, and Dr. Tulp "is free to try to mitigate any reputational injury" as he sees fit, but it does not rise to the level of irreparable harm. *Thomas M. Cooley Law Sch. v. Am. Bar Ass'n*, No. 17-13708, 2017 WL 6342629, at *4 (E.D. Mich. Dec. 12, 2017); *Fla. Coastal Sch. of Law, Inc. v. Am. Bar Ass'n*, No. 3:18-cv-00621-BJD-JBT, ECF No. 39, at 14 (M.D. Fla. July 9, 2018) (removal of information that "is already published and available to the public and has been for nearly two months . . . will not undo whatever harm [movant] claims has already occurred"); *Guttenberg v. Emergy*, 26 F. Supp. 3d 88, 103 (D.D.C. 2014) ("As for injury to reputation, that chicken has already flown the coop. . . . Any adverse effects on [movant's] professional life . . . can be redressed through monetary compensation—if he is entitled to any—and hence that harm is by definition not irreparable.").

**Second**, Dr. Tulp cannot point to evidence showing that an injunction would be in the public interest. *See, e.g.*, *Winter v. Nat. Res. Def. Counsel*, 555 U.S. 7, 24 (2008) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."). It would be contrary to the public interest for this Court to mandate that ECFMG continue to credit Dr. Tulp's signature when it has concluded, following a thorough investigation and hearing process, that Dr. Tulp made misrepresentations to ECFMG. ECFMG has determined that Dr. Tulp made false statements to

ECFMG about USAT, and Dr. Tulp has failed to present any evidence to alleviate ECFMG's concerns. *See* SOF ¶ 62. ECFMG endeavors to protect the health of the public through application of its policies and procedures, *see* SOF ¶¶ 1-3, and an end-run around them would be adverse to the public interest.

*Third*, the balance of harms weighs against injunctive relief. As to Dr. Tulp, ECFMG only restricted his authority to sign documents to be relied upon by ECFMG in connection with ECFMG's certification process. SOF ¶¶ 63-64. This does not interfere with his ability to earn a living, teach medicine, or work at a medical school. By contrast, ECFMG would suffer *substantial* harm if it were forced to accept Dr. Tulp's signature on documents notwithstanding his record of falsehoods. Numerous courts have held that orders interfering with a certification process like that of ECFMG poses a serious risk of harm to the certifying body and weighs against injunctive relief. *See, e.g.*, *Thomas M. Cooley Law Sch.*, 2017 WL 6342629, at *4 (refusing to grant injunction interfering with the ABA's decision to sanction a law school because doing so would harm the ABA by preventing it from executing its duties).

## V. CONCLUSION

There remains no genuine issue of material fact, and ECFMG is entitled to judgment as a matter of law on Dr. Tulp's sole remaining claim. Accordingly, ECFMG respectfully requests that the Court grant ECFMG's Motion for Summary Judgment and enter an Order in the form attached.

Dated: May 3, 2019

Respectfully submitted,

*/s/ Elisa P. McEnroe*
Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA  19103-2921
Telephone:    +1.215.963.5917
Facsimile:    +1.215.963.5001
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for the Educational Commission for Foreign Medical Graduates*

24

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DR. ORIEN L. TULP, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:18-cv-05540-WB |
| | ) | |
| v. | ) | Hon. Wendy Beetlestone |
| | ) | |
| EDUCATIONAL COMMISSION FOR | ) | |
| FOREIGN MEDICAL GRADUATES and | ) | |
| DR. WILLIAM W. PINSKY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## [PROPOSED] ORDER

**AND NOW**, this ___ day of _____ 2019, upon consideration of Defendant Educational Commission for Foreign Medical Graduates' ("ECFMG's") Motion for Summary Judgment and any response thereto, **IT IS HEREBY ORDERED** that ECFMG's Motion for Summary Judgment is **GRANTED**. The Clerk of the Court shall enter judgment in favor of Defendant ECFMG and against Plaintiff with respect to Plaintiff's remaining claim.

BY THE COURT:

_____
Beetlestone, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DR. ORIEN L. TULP, | ) ) | |
| Plaintiff, | ) ) | Case No. 2:18-cv-05540-WB |
| v. | ) ) ) | Hon. Wendy Beetlestone |
| EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES and DR. WILLIAM W. PINSKY, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES' MOTION FOR SUMMARY JUDGMENT**

**I. The Educational Commission for Foreign Medical Graduates**

1. Defendant Educational Commission for Foreign Medical Graduates ("ECFMG") is a private non-profit organization based in Philadelphia, Pennsylvania. *See* JA0001 (*About ECFMG: Statement of Values, Mission, and Purposes*, ECFMG, https://www.ecfmg.org/about/statement-of-values.html, Dkt. No. 12-2).

2. ECFMG promotes quality health care for the public by, among other things, certifying physicians who received their basic medical degree from an international medical school (known as international medical graduates or "IMGs") for entry into graduate medical education in the United States. *See* JA0001 (*About ECFMG: Statement of Values, Mission, and Purposes*, ECFMG, https://www.ecfmg.org/about/statement-of-values.html, Dkt. No. 12-2); *see also* JA0184-JA0185 (Tr. of Jan. 24, 2019 Preliminary Injunction Hearing (hereinafter "Injunction Hr'g. Tr.") 9:21-10:1).

1

3. ECFMG's responsibilities include (among other things): (i) certifying the readiness of IMGs for entry into graduate medical education and healthcare systems in the United States through an evaluation of their qualifications, (ii) providing complete, timely, and accessible information to IMGs regarding entry into graduate medical education in the United States, and (iii) verifying credentials and providing other services to health care professionals world wide. *See* JA0001 (*About ECFMG: Statement of Values, Mission, and Purposes*, ECFMG, https://www.ecfmg.org/about/statement-of-values.html, Dkt. No. 12-2).

4. To verify an applicant's credentials as part of ECFMG's certification process, ECFMG collects documentation, including records relating to an applicant's attendance at a recognized international medical school. *See* JA0010-JA0012 (ECFMG, *2019 Information Booklet* 5-7 (last updated Sept. 13, 2018), https://www.ecfmg.org/2019ib/2019ib.pdf, Dkt. No. 12-4).

5. An "international medical school" is "an education facility located in a country ***outside of the United States and Canada*** with its primary campuses and main operations ***located in that country***." JA0003 (ECFMG Medical School Policy, Dkt. No. 12-3) (emphases added).

6. If an international medical school has a branch campus outside the country where its primary campus is purportedly located, ECFMG "may require confirmation from the appropriate government authority" in the branch campus country that "the branch campus is authorized to operate as a medical school in the branch campus country" and that the international medical school "awards degrees that meet the medical education eligibility requirements for licensure to practice medicine in the branch campus country." JA0003 (ECFMG Medical School Policy, Dkt. No. 12-3).

7.      Once an applicant's record is verified and complete and the applicant passes certain required substantive exams, ECFMG issues the applicant a certificate. *See* JA0010-JA0012 (ECFMG, *2019 Information Booklet* 5-7 (last updated Sept. 13, 2018), https://www.ecfmg.org/2019ib/2019ib.pdf, Dkt. No. 12-4).

8.      This certificate signals that an IMG seeking admission to a U.S. graduate medical program has met certain minimum standards of eligibility, including graduation from a *bona fide* international medical school. *See* JA0010-JA0012 (ECFMG, *2019 Information Booklet* 5-7 (last updated Sept. 13, 2018), https://www.ecfmg.org/2019ib/2019ib.pdf, Dkt. No. 12-4).

**II.     ECFMG's Policies and Procedures Regarding Irregular Behavior**

9.      ECFMG's publicly available Policies and Procedures Regarding Irregular Behavior define "irregular behavior" to include:

> all actions or attempted actions on the part of applicants, examinees, potential applicants, others when solicited by an applicant and/or examinee, or any other person that would or could subvert the examination, certification or other processes, programs or services of ECFMG, including, but not limited to, the ECFMG Exchange Visitor Sponsorship Program, ECFMG International Credentials Services (EICS), the Electronic Portfolio of International Credentials (EPIC), and Electronic Residency Application Service (ERAS) Support Services at ECFMG. Such actions or attempted actions are considered irregular behavior, regardless of when the irregular behavior occurs, and regardless of whether the individual is certified by ECFMG.

JA0029 (ECFMG, *2019 Information Booklet* 24 (last updated Sept. 13, 2018), https://www.ecfmg.org/2019ib/2019ib.pdf, Dkt. No. 12-4).

10.      ECFMG's Policies and Procedures Regarding Irregular Behavior provide: "Examples of irregular behavior include, but are not limited to, *submission of any falsified or altered document to ECFMG, whether submitted by the individual or by a third party, such as a medical school, on behalf of the individual*; failing to comply with United States Medical Licensing Examination or ECFMG policies, procedures, and/or rules; *falsification of information on applications, submissions, or other materials to ECFMG*; taking an examination when not

3

eligible to do so, or submission of any falsified or altered ECFMG document to other entities or individuals." JA0029 (ECFMG, *2019 Information Booklet* 24 (last updated Sept. 13, 2018), https://www.ecfmg.org/2019ib/2019ib.pdf, Dkt. No. 12-4) (emphases added); *see* JA0032-JA0033 (ECFMG, *2019 Information Booklet* 27-28 (last updated Sept. 13, 2018), https://www.ecfmg.org/2019ib/2019ib.pdf, Dkt. No. 12-4) (irregular behavior includes providing false information or documents to ECFMG)); *see also* JA0204 (Injunction Hr'g Tr. 29:9-14).

11.     Irregular behavior charges can be brought against any individuals who are involved in the process of application for ECFMG certification or "any other person that would or could subvert the examination, certification or other processes programs or services of ECFMG," including medical school officials. JA0029 (ECFMG, *2019 Information Booklet* 24 (last updated Sept. 13, 2018), https://www.ecfmg.org/2019ib/2019ib.pdf, Dkt. No. 12-4); *see* JA0351-JA0352, JA0355-JA0356 (Tr. of Deposition of Dr. William W. Pinsky (hereinafter "Pinsky Dep.") 41:24-42:3, 45:22-46:7).

12.     ECFMG's Policies and Procedures Regarding Irregular Behavior describe ECFMG's process for investigating suspected irregular behavior, determining whether an individual engaged in irregular behavior, and taking appropriate action if a finding of irregular behavior is made. *See* JA0029-JA0033 (ECFMG, *2019 Information Booklet* 24-28 (last updated Sept. 13, 2018), https://www.ecfmg.org/2019ib/2019ib.pdf, Dkt. No. 12-4).

13.     ECFMG's Policies and Procedures Regarding Irregular Behavior set forth the following steps for addressing suspected irregular behavior:

a. "After receipt of a report or other information suggesting irregular behavior on the part of an individual, ECFMG staff will review the information and will assess whether there is sufficient evidence of irregular behavior. When indicated and

4

feasible, staff will conduct a follow-up investigation to gather additional information." JA0030 (ECFMG, *2019 Information Booklet* 25 (last updated Sept. 13, 2018), https://www.ecfmg.org/2019ib/2019ib.pdf, Dkt. No. 12-4).

b. "If ECFMG staff finds that there exists a reasonable basis to conclude that an individual may have engaged in irregular behavior, the matter will be referred to the Medical Education Credentials Committee." JA0030 (ECFMG, *2019 Information Booklet* 25 (last updated Sept. 13, 2018), https://www.ecfmg.org/2019ib/2019ib.pdf, Dkt. No. 12-4).

c. The individual who may have engaged in irregular behavior "will be advised in writing of the nature of the alleged irregular behavior and will be provided with a copy of the *Policies and Procedures Regarding Irregular Behavior*." JA0030 (ECFMG, *2019 Information Booklet* 25 (last updated Sept. 13, 2018), https://www.ecfmg.org/2019ib/2019ib.pdf, Dkt. No. 12-4); *see* JA0199 (Injunction Hr'g Tr. 24:10-17).

d. "The individual will be given an opportunity to provide written explanation and to present other relevant information. Any such written explanation or other relevant information must be received by ECFMG by the deadline set forth in ECFMG's writing to the individual. Submissions received after the deadline will be considered by the Medical Education Credentials Committee at its discretion." JA0030 (ECFMG, *2019 Information Booklet* 25 (last updated Sept. 13, 2018), https://www.ecfmg.org/2019ib/2019ib.pdf, Dkt. No. 12-4).

e. "The individual may also request the opportunity to appear personally before the Medical Education Credentials Committee, and may be represented by legal

5

counsel, if the individual so wishes." JA0030 (ECFMG, *2019 Information Booklet* 25 (last updated Sept. 13, 2018), https://www.ecfmg.org/2019ib/2019ib.pdf, Dkt. No. 12-4); *see* JA0199 (Injunction Hr'g Tr. 24:10-17).

f.  "In instances in which the individual appears personally before the Medical Education Credentials Committee, a stenographic or audio recording will be made of that portion of the proceedings during which the individual is in attendance. Any statements made by the individual during a personal appearance before the Medical Education Credentials Committee will be under oath." JA0030-JA0031 (ECFMG, *2019 Information Booklet* 25-26 (last updated Sept. 13, 2018), https://www.ecfmg.org/2019ib/2019ib.pdf, Dkt. No. 12-4).

g.  "All pertinent information regarding the irregular behavior, including any explanation or other information that the individual may provide, will be provided to the Medical Education Credentials Committee. The Medical Education Credentials Committee, based on the information available to it, will determine whether the preponderance of the evidence indicates that the individual engaged in irregular behavior." JA0031 (ECFMG, *2019 Information Booklet* 26 (last updated Sept. 13, 2018), https://www.ecfmg.org/2019ib/2019ib.pdf, Dkt. No. 12-4).

h.  "If the Medical Education Credentials Committee determines that the individual engaged in irregular behavior, the Medical Education Credentials Committee will determine what action(s) will be taken as a result of the irregular behavior." JA0031 (ECFMG, *2019 Information Booklet* 26 (last updated Sept. 13, 2018), https://www.ecfmg.org/2019ib/2019ib.pdf, Dkt. No. 12-4).

6

i. "ECFMG will notify the individual whether the Medical Education Credentials Committee determined the individual engaged in irregular behavior and of any action(s) taken pursuant thereto." JA0031 (ECFMG, *2019 Information Booklet* 26 (last updated Sept. 13, 2018), https://www.ecfmg.org/2019ib/2019ib.pdf, Dkt. No. 12-4).

j. "The Medical Education Credentials Committee's determination of irregular behavior and any action(s) taken pursuant thereto (a 'decision' of the Medical Education Credentials Committee) may be appealed to the Review Committee for Appeals if the individual has a reasonable basis to believe the Medical Education Credentials Committee did not act in compliance with the Medical Education Credentials Committee Policies and Procedures or that the Medical Education Credentials Committee's decision was clearly contrary to the weight of the evidence before it. The notice of appeal must be received by ECFMG within thirty (30) days of the date on which the notification advising the individual of the Medical Education Credentials Committee's decision was mailed to the individual. The appeal of a decision of the Medical Education Credentials Committee is governed by the Rules of Appellate Procedure." JA0031-JA0032 (ECFMG, *2019 Information Booklet* 26-27 (last updated Sept. 13, 2018), https://www.ecfmg.org/2019ib/2019ib.pdf, Dkt. No. 12-4).

14. ECFMG's Policies and Procedures Regarding Irregular Behavior also allow individuals to submit petitions for reconsideration of a decision of the Medical Education Credentials Committee. *See* JA0032 (ECFMG, *2019 Information Booklet* 27 (last updated Sept. 13, 2018), https://www.ecfmg.org/2019ib/2019ib.pdf, Dkt. No. 12-4).

7

### III. Dr. Orien L. Tulp

15. Plaintiff Dr. Orien L. Tulp is the President of the University of Science, Arts, and Technology Montserrat ("USAT"), a medical school with its primary campus and main operations supposedly in Montserrat. JA0451 (Tr. of Deposition of Dr. Orien L. Tulp (hereinafter "Tulp Dep.") 24:2-6).

16. For years, Dr. Tulp was an "authorized signatory" for USAT, meaning that ECFMG would accept his signature on submissions to ECFMG made on behalf of USAT. *See* JA0474-JA0477 (Tulp Dep. 47:16-50:13).

17. Dr. Tulp was one of several "authorized signatories" for USAT. *See* JA0474-JA0475 (Tulp Dep. 47:16-48:23); *see also* JA0212-JA0213 (Injunction Hr'g Tr. 37:2-16).

18. Dr. Tulp has never earned money from USAT. JA0519 (Tulp Dep. 92:21-23).

19. Dr. Tulp is not, and has not previously been, paid by USAT. JA0519 (Tulp Dep. 92:10-15).

20. Dr. Tulp retired 20 years ago, and his income is derived entirely from pensions, including a military pension, Social Security, and a teacher's retirement pension. JA0519-0521 (Tulp Dep. 92:16-94:10).

### IV. Dr. Tulp Provided False Information to ECFMG During Its Investigation of USAT's Unauthorized Operations in the United States.

21. In July and August of 2018, ECFMG received information indicating that USAT was offering classes in Miami, Florida. *See* JA0092 (Aug. 8, 2018 email to ECFMG); JA0093-JA0097 (Aug. 14, 2018 email from C. Ostwalt to S. Mealy).

22. On August 21, 2018, D. Scott Mealey, ECFMG's Manager of Medical Education Resources & Operations Support, sent a letter to Dr. Tulp via email, which stated:

Dear Dr. Tulp,

It has recently come to the attention of the Educational Commission for Foreign Medical Graduates (ECFMG) that USAT in Montserrat is operating a satellite (or branch) campus in Miami, Florida.

In order for students and graduates of an international medical school, such as USAT, to have eligibility to apply for ECFMG Certification, ECFMG policy requires confirmation from the appropriate government authority in the branch campus country that the branch campus is authorized to operate as a medical school in such branch campus country.

In light of this, ECFMG requests that USAT provide documentation from the United States Department of Education and/or the Florida Department of Education confirming that USAT's Miami branch campus is authorized to operate as a medical school in the United States. This documentation should cover the whole time period that the USAT Miami branch campus has been in operation.

JA0098; *see* JA0219 (Injunction Hr'g Tr. 44:9-18); JA0256, (Injunction Hr'g Tr. 81:4-82:11 (Dr. Tulp testifying that he received the August 21, 2018 letter)).

23. The letter asked Dr. Tulp to provide the requested documentation "confirming that USAT's Miami branch campus is authorized to operate as a medical school in the United States" by September 3, 2018. JA0098. ECFMG never received documentation showing that USAT is authorized to conduct education in the United States. JA0220 (Injunction Hr'g Tr. 45:6-9).

24. Later on August 21, 2018, Dr. Tulp responded to Mr. Mealey via email, writing:

Dear Mr. Mealey

This is incorrect information. The Miami location is an information and testing site only, where a pre-usmle examination [an NBME] may be administered, and an Orientation for new students is conducted prior to their traveling to the Caribbean.. It is NOT a campus. Our ONLY Campus is located in Olveston, Montserrat, British West Indies.

Actually, recall that Montserrat is a volcanic Island, and the license issued to USAT in September, 2003 DOES actually permit the establishment of off-campus lecture and administrative sites as needed. USAT has students on island on a year round basis in its origination.

I hope this will clarify your concern.

JA0099; *see* JA0260-JA0262 (Injunction Hr'g Tr. 85:16-87:8 (Dr. Tulp testifying that he sent this email)).

25.     Between August 21, 2018 and September 14, 2018, ECFMG received information that USAT was providing medical education lectures not only at its Miami site, but also at sites in Tampa, Florida and Dallas, Texas.  *See* JA0102 (Sept. 14, 2018 letter from K. Corrado to Dr. O. Tulp).

26.     On September 14, 2018, Kara Corrado, ECFMG's Vice President for Operations, sent a letter to Dr. Tulp via email, which stated:

> Dear Dr. Tulp:
>
> This is a follow-up to our August 21, 2018 letter in which ECFMG requested information from you about the University of Science, Arts & Technology (USAT) Faculty of Medicine's satellite (or branch) campus in Miami, FL.  In response, you indicated, 'The Miami location is an information and testing site only, where a pre-usmle examination [an NBME] may [be] administered, and an Orientation for new students is conducted prior to their traveling to the Caribbean.  It is NOT a campus. Our ONLY Campus is located in Olveston, Montserrat, British West Indies.'  We thank you for your quick reply.'
>
> ECFMG has since received information that USAT is providing medical education lectures not only at its Miami site, but also at sites in Tamp, FL, and Dallas, TX.
>
> It is critical that ECFMG ensure that information regarding international medical schools and their students provided to ECFMG complies with ECFMG policies and requirements. Therefore, ECFMG continues its review of this matter.  This letter is to advise you that, as part of its review, ECFMG has reached out to students and graduates of USAT in order to collect information from them regarding their attendance at USAT.
>
> Effective today, USAT students and graduates seeking services related to ECFMG Certification, including registration for USMLE examinations, release of USMLE scores, issuance of an ECFMG Certificate, or issuance of ECFMG Certification Status Reports to residency programs, must complete and submit an affidavit attesting to the accuracy of the medical school information provided to ECFMG.  Services will not be provided to individuals who do not complete the affidavit.  ECFMG has provided instructions about this process directly to the students and graduates.

JA0102; *see* JA0216 (Injunction Hr'g Tr. 41:5-13 ("We had had information that USAT was operating a campus in the United States in Florida.  And Dr. Tulp had indicated that that was not correct.  So we still were getting information contrary to that.  So we decided to send the affidavit to the students to get information from the students about where they actually did their basic sciences.")).

10

27.     ECFMG sent an affidavit to USAT students and graduates seeking ECFMG services, asking them to certify under penalty of perjury and under penalty of a finding of irregular behavior (1) their dates of attendance at USAT, and (2) the location where they took their basic science courses.  *See* JA0119 (Affidavits Attesting to Medical School Attendance and Education Received at USAT); *see also* JA0191, JA0223 (Injunction Hr'g Tr. 16:1-6, 48:2-8 ("Essentially, in order to receive ECFMG services, they need to complete that affidavit and submit to ECFMG. And once ECFMG has reviewed it and accepted it, then we will continue to provide services to those graduates and students.")).

28.     More than 300 students submitted affidavits to ECFMG indicating that they took classes in the United States, and not a single student indicated that he or she took all of his or her basic science courses in Montserrat.  *See* JA0175 (Jan. 10, 2019 Declaration of K. Corrado ¶ 4, Dkt. No. 12-10).

29.     There were also a "number of affidavits" from USAT students where "Dr. Tulp ha[d] provided information that conflicted with the affidavit information that ECFMG got from the students."  JA0193 (Injunction Hr'g Tr. 18:7-16).

30.     A second affidavit was later circulated to USAT students and graduates, in which ECFMG sought information about whether USAT students and graduates were given "advance standing" or exempted from taking required courses at USAT based on credits earned outside of USAT.  JA0120-JA0121 (Affidavits Attesting to Medical School Attendance and Education Received at USAT).

## V.     ECFMG Initiated Irregular Behavior Proceedings Concerning Dr. Tulp.

31.     On October 18, 2018, Lisa Cover, ECFMG's Senior Vice President for Business Development and Operations, sent a letter to Dr. Tulp advising him of allegations that he

11

individually and in his capacity as an official at USAT engaged in irregular behavior by providing

false information to ECFMG. *See* JA0115-JA0118 (Oct. 18, 2018 letter from L. Cover to Dr. O.

Tulp).

32. At the beginning of the letter, Ms. Cover detailed the allegations of irregular

behavior as follows:

> Dear Dr. Tulp:
>
> I am writing to advise you of the allegation that you, individually and in your capacity as an official of the University of Science, Arts & Technology (USAT) Faculty of Medicine, Montserrat, engaged in irregular behavior in connection with providing false information to ECFMG. Specifically, you provided false information to ECFMG when you (1) notified ECFMG that USAT does not operate a branch campus in Miami, Florida and (2) certified to the attendance dates of several USAT students and graduates when ECFMG has information that these students were not attending USAT during some of the time periods to which you certified. The details of ECFMG's allegation are set forth below.

JA0115.

33. The letter included a section entitled "**Details of Allegation**" that summarized the

allegation of "*False Information Regarding U.S. Branch Campuses*" as follows:

**Details of Allegation**
*False Information Regarding U.S. Branch Campuses*
On August 21, 2018, ECFMG advised you that we had become aware that USAT was operating a "branch" campus in Miami, Florida. We advised you that in order for students and graduates of an international medical school, such as USAT, to have eligibility to apply for ECFMG Certification, ECFMG policy requires confirmation from the appropriate government authority in the branch campus country that the branch campus is authorized to operate as a medical school in such branch campus country. Therefore, we requested that USAT provide documentation from the United States Department of Education and/or the Florida Department of Education confirming that USAT's Miami branch campus is authorized to operate as a medical school in the United States. We indicated that this documentation should cover the whole time period that the USAT Miami branch campus has been in operation.

In response to ECFMG's August 21, 2018 letter, you replied:

"This is incorrect information. The Miami location is an information and testing site only, where a pre-usmle examination [an NBME] may administered, and an Orientation for new students is conducted prior to their traveling to the

Caribbean.. It is NOT a campus. Our ONLY Campus is located in Olveston, Montserrat, British West Indies.

Actually, recall that Montserrat is a volcanic Island, and the license issued to USAT in September, 2003 DOES actually permit the establishment of off-campus lecture and administrative sites as needed. USAT has students on island on a year round basis since its origination." [emphasis in original]

After receiving your reply, ECFMG received information that USAT was also providing medical education lectures not only at its Miami site, but also at sites in Tampa, Florida, Dallas, Texas, and Puerto Rico. As a result and to ensure that information regarding international medical schools and their students provided to ECFMG complies with ECFMG policies and requirements, ECFMG notified you that ECFMG would require USAT students and graduates to complete an affidavit, attesting to the accuracy of the medical school information provided to ECFMG.

In response to ECFMG's affidavit request, many USAT students and graduates have certified that they have not completed any courses on Montserrat, but instead completed courses on site in the United States at the direction of USAT officials due to volcanic and hurricane activity on Montserrat. ECFMG also received a copy of the "2018 University of Science, Arts and Technology Lecture Conference Schedule" which shows lectures occurring in Florida and Texas. We note that there are no lectures scheduled for Montserrat. We also note that graduation occurs in Miami, Florida.

This directly conflicts with the information that you provided, i.e. that "the Miami location is an information and testing site only, where a pre-usmle examination [an NBME] may administered, and an Orientation for new students is conducted prior to their traveling to the Caribbean.. It is NOT a campus. Our ONLY Campus is located in Olveston, Montserrat, British West Indies." [emphasis in original]. Further, though USAT's agreement with the Montserrat government indicates that USAT "agrees to maintain operations in Monserrat with regard to its Medical and other programmes for the duration of the agreement unless unforeseen circumstances and/or natural disaster arise that the MCL-USAT may choose to relocate to an area of convenience for the MCL-USAT for a time period to be determined by MCL-USAT. This would not effect any permission granted to MCL-USAT by the government of Montserrat," ECFMG has no record of receipt of any official communication from you or any other USAT official indicating that USAT relocated due to volcanic activity, from 2003 until present.

In ECFMG's September 15, 2017 announcement "Relocation of Caribbean Medical Schools Impacted by Hurricane Irma" ECFMG advised: "Schools that have relocated or plan to relocate their operations to the United States or elsewhere as a result of Hurricane Irma should provide ECFMG with: a) a formal notice to ECFMG that includes the address of where the school is temporarily located and the expected date of when the school will return to its home country, b) copies of approvals from the home country governmental authorities, and c) copies of approvals from the accrediting

> agency, if any. This information should be e-mailed to Medical Education Resources at medschoolreview@ecfmg.org, along with any questions or comments." ECFMG has no record of receipt of any correspondence from you or any other USAT official that USAT was relocating to the United States due to Hurricane Irma, or any other hurricane.

JA0115-JA0117.

34.        The letter then summarized the allegation of "***Certification of False Information***

***Regarding Students Attendance Dates***" as follows:

> **Certification of False Information Regarding Students Attendance Dates**
> During the course of the investigation into USAT's branch campuses, ECFMG has discovered information that indicates that you provided false information to ECFMG regarding the attendance dates of some of your students on some of their applications for United States Medical Licensing Examinations (USMLE). Specifically, you certified that students were attending USAT during time periods which they were not actually attending USAT.
>
> It is ECFMG's usual practice to consider any action or attempted actions by any person that would or could subvert the processes, programs or services of ECFMG to be *irregular behavior*. See Section A.1. of the enclosed *ECFMG Medical Education Credentials Committee Policies and Procedures*. Examples of irregular behavior include the provision of false information or falsified credentials to ECFMG. ECFMG investigates and considers allegations of irregular behavior in order to protect the integrity of its processes, programs, and services. The ECFMG Committee can impose serious sanctions if it finds irregular behavior has been committed.
>
> The review into the matters described in this letter are ongoing. ECFMG reserves the right to amend or make additional allegations of irregular behavior, in accordance with its policies and procedures, should ECFMG obtain information that supports such amendment or additional allegations.

JA0117.

35. The letter concluded by summarizing the forthcoming "**ECFMG Medical Education Credentials Committee Review of this Allegation**" as follows:

---

**ECFMG Medical Education Credentials Committee Review of this Allegation**

This matter will be referred to the ECFMG Committee for review at its next scheduled meeting on November 28, 2018 in Philadelphia. The ECFMG Committee will consider the information presented and take action in accordance with the enclosed *ECFMG Medical Education Credentials Committee Policies and Procedures.*

You will have the opportunity to appear personally before the ECFMG Committee, accompanied by legal counsel, if you so wish. Please indicate in your response if you wish to appear personally before the ECFMG Committee in your individual and/or official capacities. If you do wish to make a personal appearance, I will notify you of the particular time and location of the meeting.

The following documents will be included in the Agenda for the ECFMG Committee's review:

- ECFMG's August 21, 2018 letter to you and your August 21, 2018 e-mail reply;

---

- ECFMG's September 14, 2018 letter to you, including a copy of the affidavit sent to USAT students on September 14, 2018;
- Copy of "2018 University of Science, Arts and Technology Lecture Conference Schedule"
- September 15, 2017 ECFMG Announcement "Relocation of Caribbean Medical Schools Impacted by Hurricane Irma";
- Copy of "An Agreement Between the Government of Montserrat and Medical College of London (MCL) University of Science, Arts, and Technology (Montserrat) LTD. (USAT)"
- Affidavits completed by USAT students; and
- This letter.

Copies of these documents, with the exception of the completed affidavits by students, are enclosed.

**Please provide a response to ECFMG by November 1, 2018.** In your response, please note whether you wish to make a personal appearance before the ECFMG Committee. All documents should be submitted to Ms. Kara Corrado, Vice President for Operations, at the address above or via e-mail at kcorrado@ecfmg.org. If you have any questions, please do not hesitate to call me at (215) 883-7318.

---

JA0117-JA0118.

36.     The letter was sent to o.tulp@usat.edu, which is one of the email addresses used by Dr. Tulp. *See* JA0115; JA0260 (Injunction Hr'g Tr. 85:16-19); JA0479 (Tulp Dep. 52:12-16).

37.     In the time period between Ms. Cover's October 18, 2018 letter and the November 28, 2018 meeting of the Medical Education Credentials Committee, counsel for Dr. Tulp exchanged numerous letters with ECFMG relating to the allegations of irregular behavior against Dr. Tulp and the November 28, 2018 irregular behavior proceeding. *See, e.g.*, JA0124-JA0126 (Oct. 23, 2018 letter from T. Swate to K. Corrado, incorrectly dated Sept. 23, 2018); JA0127-JA0129 (Oct. 26, 2018 letter from K. Corrado to T. Swate); JA0130-JA133 (emails between K. Corrado ECFMG and counsel for Dr. Tulp dated Nov. 9-14, 2018); JA0134-JA0136 (emails between ECFMG and counsel for Dr. Tulp dated Nov. 9-16, 2018).

38.     On October 23, 2018, ECFMG received a letter from attorney Tommy Swate dated September 23, 2018. *See* JA0124-JA0126 (letter from T. Swate to K. Corrado, incorrectly dated Sept. 23, 2018); JA0127 (letter from K. Corrado confirming receipt on Oct. 23, 2018 of letter from T. Swate dated Sept. 23, 2018).  In that letter, Mr. Swate explained that he represented USAT and would attend the November 28, 2018 proceeding described in Ms. Cover's October 18, 2018 letter to Dr. Tulp.  He also sought to confirm that Ms. Cover's October 18, 2018 letter to Dr. Tulp contained all the allegations to be discussed at the November 28, 2018 proceeding and requested the complete file to be reviewed by the Medical Education Credentials Committee at that proceeding.  JA0124-JA0126.

16

39.      On October 26, 2018, Ms. Corrado responded to Mr. Swate in a letter sent via email,

writing:

Dear Mr. Swate:

I am writing in response to your letters dated September 15, 2018 and September 23, 2018. These letters were received at ECFMG on October 16, 2018 and October 23, 2018 respectively. We understand from your letters that you have been retained as counsel for University of Science, Arts & Technology (USAT) Faculty of Medicine, Montserrat. Your letters appear to conflate the issue that USAT is operating branch campuses in the United States without appropriate documentation with the allegations of irregular behavior for Dr. Tulp. We take this opportunity to clarify these issues for you.

**Allegations of Irregular Behavior for Dr. Orien Tulp**
ECFMG has *not* alleged irregular behavior on the part of USAT (the institution). The allegations of irregular behavior are specific to Dr. Tulp, both individually and in his capacity as an official of USAT. Therefore, before providing you with any materials relating to allegations of irregular behavior concerning Dr. Tulp, we ask that you advise ECFMG whether you also represent Dr. Tulp individually, in addition to USAT. We will be happy to share the entire case file that will be reviewed by the ECFMG Medical Education Credentials Committee ("ECFMG Committee") with you once you have officially advised that you are Dr. Tulp's legal counsel.

Please note that only Dr. Tulp is entitled to request a personal appearance at the ECFMG Committee hearing, with his legal counsel, as outlined in ECFMG's Policies and Procedures for Irregular Behavior. ECFMG will not permit any other person or official, from USAT or otherwise, to appear instead of Dr. Tulp at his hearing. If you are Dr. Tulp's legal counsel, Dr. Tulp has the right for you to appear with him at the hearing. There is no right or need for "local counsel" or "paralegals" to attend; therefore, they will not be permitted to attend Dr. Tulp's hearing.

Further, in your September 23, 2018 letter, you indicate that "a decision has already been made regarding October 18, 2018 allegations because the ECFMG has posted on various websites warning to USAT students that after January 1, 2018 USAT students will no longer be eligible to apply for the various Step tests." This is incorrect. No decision regarding the allegations against Dr. Tulp has been made as the ECFMG Committee has not yet reviewed these allegations. ECFMG carefully follows its policies and procedures, maintaining fairness and integrity throughout its processes. We trust this information disabuses you of the notion that ECFMG's "proceedings are not neutral."

JA0127.

17

40.     On November 9, 2018, Ms. Corrado emailed Mr. Swate and William Reil, another

attorney who had communicated with ECFMG on behalf of Dr. Tulp and USAT, writing:

Gentleman:

I am following up on ECFMG's October 26, 2018 letter to you regarding USAT. We
understand that you both are counsel for USAT.

As you know, ECFMG will review the allegations of irregular behavior for Dr. Tulp on
November 28, 2018.   Dr. Tulp has a right to a personal appearance at that meeting
with his legal counsel.

Please reply to this email by November 14, 2018 and indicate:
  If you are representing Dr. Tulp in this matter; and
  If Dr. Tulp plans to attend the meeting in person (and if so, which of his attorneys will be present).

If we do not receive a reply from you on or before November 14, 2018, we will
assume that Dr. Tulp is not making a personal appearance. Dr. Tulp's case is
scheduled to be reviewed on November 28, 2018 whether or not he makes a
personal appearance.

JA0132.

41.     Later that day, Mr. Swate responded via email and wrote, in part:  "Mr. Riel [sic]

and I will represent Dr. Tulp at the hearing on October [sic] 28th.  Please send a copy of the

October [sic] 28 agenda and written policy and procedure to my attention at swatemd@aol.com.

Please forward copies of all documents submitted to the committee members prior to the hearing."

JA0131.

42.     On November 14, 2018, Ms. Corrado responded via email and wrote, "Thank you

for your email. As we understand that you and Mr. Reil are representing Dr. Tulp in the matter

related to the allegations of irregular behavior, I am sending the materials that the ECFMG

Committee will review when considering these allegations. I will send the attachments in 5

18

separate emails, as they are quite large. Please let me know if you have not received them. Please note that this email will also be provided to the Committee." JA0130.

43.     In the email, Ms. Corrado also wrote, "**Dr. Tulp is scheduled to appear before the ECFMG Committee with you and Mr. Reil (Dr. Tulp's attorneys) on Wednesday November 28, 2018 at 9:00 AM at the Rittenhouse Hotel, 210 West Rittenhouse Square, Philadelphia, PA 19103.  Please arrive by 8:45 AM.**  In accordance with ECFMG's standard practice, Dr. Tulp will be scheduled for 20 minutes, during which time he will have the opportunity to present his response to these allegations (either personally or through his counsel) and the ECFMG Committee members, ECFMG counsel, and staff will have the opportunity to ask questions.  After that, Dr. Tulp may provide a brief, closing statement." JA0130 (emphasis in original).

44.     On November 14, 2018, ECFMG emailed to Tommy Swate the materials that the Medical Education Credentials Committee would review at its meeting on November 28, 2018 relating to the allegations of irregular behavior concerning Dr. Tulp.  JA0134.

45.     On November 16, 2018, Ms. Corrado emailed Dr. Tulp's counsel and wrote, "I am writing to confirm that you have received the materials that the ECFMG Committee will review at its meeting on November 28, 2018 related to the allegations of irregular behavior for Dr. Tulp." JA0134.  Ms. Corrado also wrote, "All documents were emailed to you on Wednesday, November 14, 2018.  I have also sent the documents to you via Federal Express today."  JA0134.  *See* JA 0215 (Injunction Hr'g Tr. 40:10-15 ("Yes, so we provide the materials to individuals prior to the hearing.  Those materials were sent via email to Dr. Tulp's counsel.")).

46.     That same day, Mr. Swate responded, "Thank you.  I have received documents[.]" JA0134.

19

## VI.   Dr. Tulp and His Counsel Appeared Before the Medical Education Credentials Committee.

47.     On November 28, 2018, Dr. Tulp appeared before the Medical Education Credentials Committee.  *See* JA0144 (Tr. of Medical Education Credentials Committee Hr'g Regarding Dr. Orien L. Tulp (hereinafter "MECC Hr'g Tr.") 6:18-22); JA0521-JA0522 (Tulp Dep. 94:17-95:20).   He was accompanied by his attorneys, Mr. Swate and Mr. Reil.   JA0135 (ECFMG00000506).

48.     Dr. Tulp and his counsel were again provided with a copy of the materials that would be considered by the Medical Education Credentials Committee.  *See* JA0145-JA0148 (MECC Hr'g Tr. 7:13-8:15, 8:19-24, 9:24-10:4); *see also* JA0361-JA0362, JA0365-JA0363 (Pinsky Dep. 51:24-52:3, 55:17-56:8 ("[T]he board received the same documents that had been sent to Dr. Tulp and his attorneys.  The board had that material and they reviewed that prior to coming to the committee meeting.")); JA0134 (Nov. 16, 2018 email from T. Swate confirming receipt of documents from ECFMG).

49.     At the outset of the hearing, the members of the Medical Education Credentials Committee and ECFMG's representatives introduced themselves to Dr. Tulp and his counsel. JA0142-JA0143 (MECC Tr. 4:6-5:23).

50.     Ms. Corrado then summarized the allegations of irregular behavior for the Committee as follows:  "The allegation is that Dr. Orien Tulp, professor and president of USAT engaged in irregular behavior in connection with providing false information to ECFMG, specifically that Dr. Tulp provided false information to ECFMG regarding USTAT's [sic] United States branch campuses and certifying to the attendance dates of several USTAT [sic] students and graduates when ECFMG has information that these students were not attending USTAT [sic]." JA0144 (MECC Tr. 6:1-22).

51. Mr. Swate then made an opening statement on behalf of Dr. Tulp. He began by stating, "I've asked and I've asked and I've asked for the packet that was presented to the committee members. I would like a copy of the packet, the information that was submitted to the committee members so that I will know what was considered by the committee before we came here today because you're considering information that I may or may not know about." JA0145-JA0146 (MECC Tr. 7:14-8:1).

52. Counsel for ECFMG directed Mr. Swate to the copy of the materials printed for him and reminded Mr. Swate that the materials had been provided to him "on more than one occasion prior to this proceeding, which is our usual practice even without you asking." JA0146 (MECC Tr. 8:10-14); *see* JA0147-JA0148 (MECC Tr. 9:24-10:4 (explaining that the materials were sent by email on November 14 and by Federal Express)).

53. Mr. Swate then presented a series of arguments on behalf of Dr. Tulp, including that (a) ECFMG lacked jurisdiction over Dr. Tulp, (b) ECFMG had no written contract with Dr. Tulp, (c) ECFMG should have the "sole and exclusive burden of proof," and (d) ECFMG appeared to be "co-mingling . . . the prosecutorial and jury functions." JA0149-JA0155 (MECC Tr. 11:17-17:2).

54. Mr. Swate concluded, "That is our opening statement. If you have any questions, you can address them to me. ***Dr. Tulp will not be answering any questions.***" JA0154-JA0155 (MECC Tr. 16:22-17:2) (emphasis added).

55. Counsel for ECFMG repeatedly invited Dr. Tulp and his counsel to present a substantive response or statement regarding the charges of irregular behavior against Dr. Tulp. *See, e.g.*, JA0155-JA0158, JA0162-JA0163 (MECC Tr. 17:3-7; 18:5-8, 17-21; 19:9-14; 19:23-20:2; 20:18-21; 24:9-25:1; 25:11-16).

21

56.　　At one point during the proceeding, counsel for ECFMG asked whether "USTAT [sic] provide[d] any student with any medical school basic science education in the United States." JA0157-JA0158 (MECC Tr. 19:23-20:2).  Mr. Swate responded, "Well, yes, it did," but counsel for ECFMG noted for the record that Dr. Tulp was "shaking his head, no, and you [Mr. Swate] just said, yes.  So maybe you should let your client speak to respond."  JA0158 (MECC Tr. 20:3-8).  In response, Mr. Swate stated, "***Dr. Tulp is not going to be talking today.  The next time you hear him talk is going to be in federal court.***"  JA0158 (MECC Tr. 20:9-12).

57.　　Counsel for ECFMG specifically asked for clarification of what Dr. Tulp meant when he used the word "campus" in his email to ECFMG, but Dr. Tulp and his counsel refused to provide any clarification.  JA0162-JA0164 (MECC Tr. 24:16-26:11).

58.　　Indeed, Dr. Tulp's counsel also refused to answer questions, stating, "I'm not a witness.  So you don't get to cross-examine me."  JA0160 (MECC Tr. 22:12-14).

59.　　Mr. Swate repeatedly stated that he was "prepared to go through every page" of the evidence presented to the Medical Education Credentials Committee.  JA0161 (MECC Tr. 23:17-18); *see* JA0162 (MECC Tr. 24:6-7); JA0169 (MECC Tr. 31:10-11).  But when asked by counsel for ECFMG to explain how the materials showed that Dr. Tulp did not provide false information to ECFMG, Mr. Swate responded repeatedly that he did not bear the burden of proof.  *See, e.g.*, JA0157 (MECC Tr. 19:7-17); JA0161-JA0162 (MECC Tr. 23:19-24:1).

60.　　Toward the end of the hearing, in response to Mr. Swate again referencing his "ability to go through" the materials, counsel for ECFMG again asked Mr. Swate whether "there [was] anything in particular you [Mr. Swate] want to go through." JA0164 (MECC Tr. 26:20-22).

61.　　When counsel for ECFMG finally attempted to terminate the hearing, Mr. Swate said, "ECFMG is terminating this prior to us presenting our evidence."  JA0169 (MECC Tr. 31:2-

4).  In response, counsel for ECFMG stated, "We asked you to present evidence, and all you did was present legal argument.  What's your offer of proof? What would you like to provide?"  JA0169 (MECC Tr. 31:5-9).  Mr. Swate responded, "We'll go through every page of this."  JA0169 (MECC Tr. 31:10-11).  But when counsel for ECFMG asked Mr. Swate to identify specifically the evidence he wanted to address, Mr. Swate responded, "I'm asking your evidence.  You're the one presenting the evidence and I'm asking what it is?"  JA0169-JA0170 (MECC Tr. 31:23-32:2).

62.  Counsel for ECFMG then adjourned the hearing.  Dr. Tulp refused to testify or present any evidence explaining or clarifying why the evidence previously gathered by ECFMG and disclosed to Dr. Tulp did not warrant a finding of irregular behavior.  JA0170 (MECC Tr. 32:3-10).

## VII.    ECFMG Determines that Dr. Tulp Engaged in Irregular Behavior.

63.    On December 14, 2018, ECFMG notified Dr. Tulp that the Medical Education

Credentials Committee had completed its review and determined that Dr. Tulp had engaged in

irregular behavior, writing:

Dear Dr. Tulp:

I am writing to inform you that the ECFMG Medical Education Credentials Committee ("ECFMG Committee") has completed its review of the allegation that you, individually and in your capacity as an official of University of Science, Arts & Technology (USAT) Faculty of Medicine, Montserrat, engaged in irregular behavior in connection with providing false information to ECFMG. Specifically, you provided false information to ECFMG when you (1) notified ECFMG that USAT does not operate a branch campus in Miami, FL and (2) certified to the attendance dates of several USAT students and graduates when ECFMG has information that these students were not attending USAT during some of the time periods to which you certified.

In advance of the review, the members of the ECFMG Committee were provided with the documents listed in ECFMG's October 18, 2018 letter and ECFMG's November 14, 2018 emails. A hardcopy of the complete file was also sent to your attorney, Mr. Tommy Swate, on November 16, 2018 via Federal Express. On November 16, 2018, Mr. Swate acknowledged receipt of this complete file. You made a personal appearance before the ECFMG Committee accompanied by your legal counsel, Mr. Swate. A copy of the transcript of the proceedings will be sent to you as soon as it is available.

The ECFMG Committee considered the documentation presented to it and Mr. Swate's statements. Following careful review, the ECFMG Committee determined that you engaged in irregular behavior in connection with providing false information to ECFMG.

The ECFMG Committee has determined that ECFMG will not accept any documents signed / certified by you for ECFMG on behalf of USAT, or any other medical school, for a minimum of five years from today; thereafter, the prohibition shall end only upon a petition to ECFMG conclusively demonstrating to the satisfaction of the ECFMG Committee a familiarity with, and willingness to adhere to, ECFMG polices. Your ECFMG Medical School Web Portal (EMSWP) account will remain deactivated.

In light of the ECFMG Committee's findings, the ECFMG Sponsor Note for USAT in the *World Directory of Medical Schools (World Directory)* will be updated as follows:

> In 2018, ECFMG determined that a certain official of the University of Science Arts & Technology engaged in irregular behavior in connection with providing false information to ECFMG.
>
> This note will remain in USAT's ECFMG Sponsor Note in the *World Directory* for five years, regardless of whether USAT changes its name, ownership, and/or location.
>
> Additionally, in accordance with the ECFMG *Policies and Procedures Regarding Irregular Behavior*, a permanent annotation that you engaged in irregular behavior will be included in your ECFMG record. ECFMG may report the ECFMG Committee's determination of irregular behavior to the Federation of State Medical Boards of the United States, U.S. state and international medical licensing authorities, directors of graduate medical education programs, and to any other organization or individual who, in the judgment of ECFMG, has a legitimate interest in such information.
>
> As noted in the enclosed ECFMG *Rules of Appellate Procedure*, decisions of the ECFMG Medical Education Credentials Committee may be appealed within the 30-day time period specified.

JA0172-JA0173.

64. The action taken regarding Dr. Tulp in connection with the finding of irregular behavior was limited to Dr. Tulp's role as an authorized signatory on behalf of USAT. *See* JA0214 (Injunction Hr'g Tr. at 39:7-14).

65. The action does not disqualify USAT from having an authorized signatory. *See* JA0214-JA0215 (Injunction Hr'g Tr. at 39:24-40:1); *see also* JA0475-JA0476 (Tulp Dep. 48:24-49:11). Excluding Dr. Tulp, USAT has two authorized signatories who can sign documents submitted to ECFMG on behalf of USAT. JA0476 (Tulp Dep. 48:24-49:11).

66. Dr. Tulp testified that he is involved in opening a new medical school in the British Virgin Islands. JA0271-JA0272, JA0274 (Injunction Hr'g Tr. 96:15-97:4, 99:3-12); JA0455 (Tulp Dep. 28:21-24).

67. Dr. Tulp never appealed from the decision of the Medical Education Credentials Committee as permitted by ECFMG's Policies and Procedures Regarding Irregular Behavior. JA0549 (May 2, 2019 Declaration of K. Corrado ¶ 3).

25

68.     Dr. Tulp never petitioned for reconsideration of the Medical Education Credentials Committee's decision as permitted by ECFMG's Policies and Procedures Regarding Irregular Behavior.  JA0549-JA0550 (May 2, 2019 Declaration of K. Corrado ¶ 4).

## VIII.    The ECFMG Sponsor Note for USAT in the World Directory of Medical Schools

69.     The World Directory of Medical Schools is a listing of the world's medical schools. ECFMG uses "a sponsor note in the World Directory on a medical school to indicate to the public and to the students and graduates of that school whether or not those students and graduates are eligible to apply to ECFMG for certification.  So it's the way in which [ECFMG] communicate[s] publicly the eligibility, if you will, of the school's graduates to start the process of ECFMG certification."  JA0220-JA0221 (Injunction Hr'g Tr. 45:17-46:6).

70.     On or around September 24, 2018, ECFMG updated its Sponsor Note for USAT to include the following language:

> Currently students and graduates of USAT are subject to enhanced procedures that must be met in order to be eligible for ECFMG Certification related services, including but not limited to:  ECFMG Certification, USMLE examinations that lead to ECFMG certification, and Electronic Residency Application Service (ERAS) Support Services.  ECFMG will provide information and instructions to applicants upon receipt of application.

JA0103-JA0107 (ECFMG00000498-ECFMG00000502); JA0550 (May 2, 2019 Declaration of K. Corrado ¶ 5).

71.     USAT was given notice of the "enhanced procedures" described in the Sponsor Note via letter from Ms. Corrado dated September 14, 2018.  JA0550 (May 2, 2019 Declaration of K. Corrado ¶ 6); *see* JA0102 (Sept. 14, 2018 letter from K. Corrado to Dr. O. Tulp).

72.     On or around October 18, 2018, ECFMG updated its Sponsor Note for USAT again, to include the following language:

26

Note: As of January 1, 2019, students and graduates of this medical school with a graduation year of 2019 and later are not eligible to apply to ECFMG for ECFMG Certification, which also renders them ineligible to apply to ECFMG for the United States medical Licensing Examinations (USMLE) as a step towards ECFMG Certification.

JA0550 (May 2, 2019 Declaration of K. Corrado ¶ 7); *see* JA0122-JA0123 (Oct. 18, 2018 email from C. Bede to S. Mealey and K. Corrado).

73. USAT was given notice of the change to the Sponsor Note via letter from Ms. Corrado dated October 18, 2018. JA0550 (May 2, 2019 Declaration of K. Corrado ¶ 8); *see* JA0113-JA0114 (Oct. 18, 2018 letter from K. Corrado to Dr. O. Tulp).

74. ECFMG's Sponsor Note currently has both the language added in September 2018 and the language added in October 2018. *See* JA0548.

75. ECFMG did not update its Sponsor Note for USAT to reflect the finding of irregular behavior against Dr. Tulp. JA0550 (May 2, 2019 Declaration of K. Corrado ¶ 9); *see* JA0548; JA0390-JA0391 (Pinsky Dep. 80:17-81:4).

## IX.    Procedural History

76. At the injunction hearing on January 24, 2019, the Court asked Dr. Tulp's counsel to confirm "exactly what causes of action are being asserted." JA0180 (Injunction Hr'g Tr. 5:3-7).

77. The Court twice described Dr. Tulp's due process claim as "a § 1983 claim" alleging that ECFMG violated Dr. Tulp's "procedural due process" or "procedural and substantive due process" rights "as protected by the 14th Amendment," and Dr. Tulp's counsel twice responded, "Yes, Your Honor." JA0180 (Injunction Hr'g Tr. 5:18-22); JA0181 (Injunction Hr'g Tr. 6:5-11).

27

78.     The Court denied Dr. Tulp's Motion for a Preliminary and/or Permanent Injunction at the conclusion of the January 24, 2019 hearing.  In explaining its decision, the Court specifically noted that "[i]n this case, there was notice and an opportunity to be heard."  JA0306 (Injunction Hr'g Tr. 131:5-11).

79.     ECFMG served discovery requests on Dr. Tulp asking him to describe in detail his alleged damages and produce any and all documents he would use to support a damages award, but Dr. Tulp provided no such description or documents.  JA0413 (ECFMG Request for Production No. 37 seeking "[a]ll documents and communications relating to the remedies you seek, including each element of damages or other relief to which you allegedly are entitled"); JA0409 (ECFMG Interrogatory No. 10 asking Dr. Tulp to "[d]escribe in detail any and all remedies that you seek in connection with this lawsuit"); JA0416-JA0427 (Dr. Tulp's discovery responses).

Dated: May 3, 2019                             Respectfully submitted,

                                               */s/ Elisa P. McEnroe*
                                               Elisa P. McEnroe, PA Bar No. 206143
                                               Matthew D. Klayman, PA Bar No. 319105
                                               MORGAN, LEWIS & BOCKIUS, LLP
                                               1701 Market Street
                                               Philadelphia, PA  19103-2921
                                               Telephone:     +1.215.963.5917
                                               Facsimile:     +1.215.963.5001
                                               elisa.mcenroe@morganlewis.com
                                               matthew.klayman@morganlewis.com

                                               *Attorneys for the Educational Commission for*
                                               *Foreign Medical Graduates*

28

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DR. ORIEN L. TULP, | ) ) | |
| Plaintiff, | ) ) | Case No. 2:18-cv-05540-WB |
| v. | ) ) ) | Hon. Wendy Beetlestone |
| EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES and DR. WILLIAM W. PINSKY, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**JOINT APPENDIX – TABLE OF CONTENTS**

| Tab | Document | Page(s) |
|---|---|---|
| 1. | *About ECFMG: Statement of Values, Mission, and Purposes, ECFMG*, https://www.ecfmg.org/about/statement-of-values.html | JA0001-JA0002 |
| 2. | ECFMG Medical School Policy | JA0003 |
| 3. | ECFMG, *2019 Information Booklet* (last updated Sept. 13, 2018), https://www.ecfmg.org/2019ib/2019ib.pdf | JA0004-JA0089 |
| 4. | *University of Science, Arts & Technology (USAT), Montserrat: Not Accredited*, CAAM-HP | JA0090 |
| 5. | 2018 USAT Lecture Conference Schedule | JA0091 |
| 6. | Email to ECFMG (Aug. 8, 2018) | JA0092 |
| 7. | Email from C. Ostwalt to S. Mealy (Aug. 14, 2018) | JA0093-JA0097 |
| 8. | Letter from S. Mealey to Dr. O. Tulp (Aug. 21, 2018) | JA0098 |

| Tab | Document | Page(s) |
|-----|----------|---------|
| 9. | Email from Dr. O. Tulp to S. Mealy & C. Konyk (Aug. 21, 2018) | JA0099-JA0100 |
| 10. | Email to S. Mealey (Aug. 22, 2018) | JA0101 |
| 11. | Letter from K. Corrado to Dr. O. Tulp (Sept. 14, 2018) | JA0102 |
| 12. | Emails between S. Mealey to C. Bede (Sept. 21-24, 2018) | JA0103-JA0107 |
| 13. | Letter from T. Swate to K. Corrado (Oct. 15, 2018) | JA0108-JA0112 |
| 14. | Letter from K. Corrado to Dr. O. Tulp (Oct. 18, 2018) | JA0113-JA0114 |
| 15. | Letter from L. Cover to Dr. O. Tulp (Oct. 18, 2018) | JA0115-JA0118 |
| 16. | Affidavits Attesting to Medical School Attendance and Education Received at USAT | JA0119-JA0121 |
| 17. | Email from C. Bede to S. Mealey and K. Corrado (Oct. 18, 2018) | JA0122-JA0123 |
| 18. | Letter from T. Swate to K. Corrado (dated Sept. 23, 2018) | JA0124-JA0126 |
| 19. | Letter from K. Corrado to T. Swate (Oct. 26, 2018) | JA0127-JA0129 |
| 20. | Emails between K. Corrado, W. Reil, C. Konyk, F. Katz, and T. Swate (Nov. 9-14, 2018) | JA0130-JA0133 |
| 21. | Emails between K. Corrado, W. Reil, C. Konyk, F. Katz, and T. Swate (Nov. 9-16, 2018) | JA0134-JA0136 |
| 22. | Email from K. Corrado to Dr. O. Tulp, W. Reil, and T. Swate (Jan. 10, 2019) | JA0137-JA0138 |

| Tab | Document | Page(s) |
|---|---|---|
| 23. | Nov. 28, 2018 Tr. of Dr. Tulp Irregular Behavior Proceeding before the Medical Education Credentials Committee | JA0139-JA0171 |
| 24. | Letter from Dr. W. Pinsky to Dr. O. Tulp (Dec. 14, 2018) | JA0172-JA0173 |
| 25. | Jan. 10, 2019 Declaration of Kara Corrado | JA0174-JA0175 |
| 26. | Jan. 24, 2019 Tr. of Preliminary Injunction Hrg before the Hon. Wendy Beetlestone | JA0176-JA0310 |
| 27. | Feb. 6, 2019 Tr. of Dep. Dr. William Pinsky | JA0311-JA0403 |
| 28. | Feb. 19, 2019 Defendants' First Interrogatories and Requests for Production to Dr. O. Tulp | JA0404-JA0415 |
| 29. | Mar. 27, 2019 Dr. Tulp's Responses to Defendants' First Interrogatories and Requests for Production | JA0416-JA0427 |
| 30. | Apr. 17, 2019 Tr. of Dep. Dr. Orien Tulp | JA0428-JA0547 |
| 31. | Apr. 19, 2019 Sponsor Note | JA0548 |
| 32. | May 2, 2019 Declaration of Kara Corrado | JA0549-JA0551 |

# About ECFMG

Overview | Statement of Values, Mission, and Purposes | Board of Trustees | ECFMG Leadership | Initiatives | History | Careers at ECFMG

## Statement of Values, Mission, and Purposes

### Values

The values of ECFMG are expressed in its vision statement:

"Improving world health through excellence in medical education in the context of ECFMG's core values of collaboration, professionalism and accountability."

### Mission

The charge of ECFMG is expressed in its mission statement:

"The ECFMG promotes quality health care for the public by certifying international medical graduates for entry U.S. graduate medical education, and by participating in the evaluation and certification of other physicians and I care professionals nationally and internationally. In conjunction with its Foundation for Advancement of Interna Medical Education and Research (FAIMER), and other partners, it actively seeks opportunities to promote medic education through programmatic and research activities."

### Purposes

The purposes (goals) that actuate and accomplish ECFMG's mission are to:

- Certify the readiness of international medical graduates for entry into graduate medical education and healt systems in the United States through an evaluation of their qualifications.
- Provide complete, timely, and accessible information to international medical graduates regarding entry into graduate medical education in the United States.
- Assess the readiness of international medical graduates to recognize the diverse social, economic and cultur needs of U.S. patients upon entry into graduate medical education.
- Identify the needs of international medical graduates to become acculturated into U.S. health care.
- Verify credentials and provide other services to health care professionals worldwide.
- Provide international access to testing and evaluation programs.
- Expand knowledge about international medical education programs and their graduates by gathering data, conducting research, and disseminating the findings.
- Improve international medical education through consultation and cooperation with medical schools and oth institutions relative to program development, standard setting, and evaluation.
- Improve assessment through collaboration with other entities in the United States and abroad.
- Improve the quality of health care by providing research and consultation services to institutions that evalua international medical graduates for entry into their country.
- Enhance effectiveness by delegating appropriate activities in international medical education to FAIMER.

Case 2:18-cv-07543-MG-WB Document 161-20 Filed 05/07/23 Page 5 of 5 JA 0002

Back to top

Last updated December 16, 2011.

® Registered in the US Patent and Trademark Office.

Copyright © 1996-2018 by the Educational Commission for Foreign Medical Graduates. All rights reserved.



| | |
|---|---|
| EDUCATIONAL COMMISSION FOR<br>FOREIGN MEDICAL GRADUATES | 3624 Market Street<br>Philadelphia PA 19104-2685 USA<br>215-386-5900 \| 215-966-3124 Fax<br>www.ecfmg.org |

## ECFMG MEDICAL SCHOOL POLICY

### International Medical School Definition

An "International Medical School" is an educational facility located in a country outside of the United States and Canada with its primary campuses and main operations located in that country.

### Additional Criteria for a Medical School's Students and Graduates to Be Eligible to Apply to ECFMG for ECFMG Certification

In addition to meeting ECFMG's current eligibility requirements for ECFMG Certification, in order for students and graduates of a medical school to be eligible to apply to ECFMG for ECFMG Certification, the following criteria must be met:

(1) ECFMG must have, among other things, confirmation from the appropriate government authority of the medical school country that:

    (a.) the medical school is recognized as a medical school and permitted to operate by the government; *and*

    (b.) the medical school meets governmental accreditation requirements if they apply; *and*

    (c.) the degree awarded to graduates of that medical school meet the medical education eligibility requirements for licensure to practice medicine in the medical school country; *and*

    (d.) the medical school is an educational facility located in that country with its primary campuses and main operations located in that country.

(2) If the medical school has a branch campus in another country, ECFMG may require confirmation from the appropriate government authority in the branch campus country that:

    (a.) the branch campus is authorized to operate as a medical school in the branch campus country;

    (b.) the medical school awards degrees that meet the medical education eligibility requirements for licensure to practice medicine in the branch campus country.

(3) The medical school must, upon request, be able to demonstrate that it has the staff, policies / procedures, and facilities necessary for the school's students and graduates to fulfill ECFMG's requirements to become ECFMG Certified. This includes, but is not limited to, having an authorized signatory in place to accurately primary source verify diplomas, or be otherwise acceptable to ECFMG.

**ECFMG, in its reasonable discretion, may apply the following additional criterion to medical schools whose students and graduates are not currently eligible to apply to ECFMG for ECFMG Certification:**

(4) The medical school must be accredited by an organization recognized by the World Federation for Medical Education.

*Page 1 of 1*
*Approved by Board of Trustees, August 2018*



**ECFMG®** EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES

# Information Booklet



# ECFMG CERTIFICATION 2019

## Visit www.ecfmg.org to



**Get updates** on ECFMG Certification and related policies and services.

**Complete** the Application for ECFMG Certification using the Interactive Web Applications (IWA).

**Apply** for Step 1 and Step 2 (Clinical Knowledge and Clinical Skills) of the United States Medical Licensing Examination® (USMLE®) using IWA.

**Subscribe** to *The ECFMG® Reporter* for important updates on ECFMG Certification and entry into graduate medical education in the United States.

**Access your information** using the On-line Applicant Status and Information System (OASIS).

**Educational Commission for Foreign Medical Graduates**
3624 Market Street, Philadelphia, PA 19104-2685 USA
www.ecfmg.org

Download the mobile app!

  

Form 100s. September 13, 2018

# TABLE OF CONTENTS

**About the ECFMG Information Booklet and Application Materials** ........................1

**ECFMG Certification**
About ECFMG Certification ...........................4
Requirements for ECFMG Certification .........5
Standard ECFMG Certificate........................ 8

**Your ECFMG Record**
USMLE/ECFMG Identification Number ........10
Your Name....................................................12
Changing Your Name ...................................14
Contact Information ......................................16

**Your ECFMG Financial Account**
Fees..............................................................18
Payment .......................................................19
Methods of Payment.....................................20
Refunds ........................................................22
Forfeiture of Funds ......................................23

**Irregular Behavior....................................24**

**Application for ECFMG Certification ........29**

**Examinations for ECFMG Certification**
Examination Requirements ...........................31
Time Limit for Completing
   Examination Requirements ......................33

**Eligibility for Examination**
Medical School Students..............................35
Medical School Graduates ...........................37
Reverification of Eligibility............................39

**The United States Medical Licensing Examination (USMLE)**
About USMLE................................................40
Registration and Test Delivery Entities.........41
Applying for Examination..............................43
Scheduling the Examination .........................47
Preparing for Examination............................50
Taking the Examination ................................51
USMLE Program and Irregular Behavior......54
Examination Results.....................................56
Reexamination and Reapplication...............59

**Medical Education Credentials**
Medical Education
   Credential Requirements..........................62
Transfer Credits ...........................................64
Credentials for ECFMG Certification ...........66
Final Medical Diploma and Transcript ..........68
Transcript(s) to Document
   Transferred Credits...................................70
Name on Medical Diploma
   and Transcript(s)......................................71
English Translations .....................................74
Verification of Credentials............................76

**Related ECFMG Services**
Confirming ECFMG Certification
   to Third Parties .........................................78
Electronic Residency Application
   Service (ERAS®) Support Services ...........80
J-1 Visa Sponsorship...................................82
ECFMG Certificate Holders Office...............84

® The terms ECFMG® and CSA® are registered in the U.S. Patent and Trademark Office.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved. Portions reprinted, with permission, from the USMLE 2019 *Bulletin of Information*, copyright © 2018 by the Federation of State Medical Boards of the United States, Inc., and the National Board of Medical Examiners® (NBME®).

# About the ECFMG Information Booklet and Application Materials

The ECFMG *Information Booklet* contains detailed information on ECFMG's program of certification. The information contained in this booklet pertains only to the ECFMG certification process and related applications and services. This booklet should not be used as a guide to ECFMG's other programs and services, such as the Electronic Portfolio of International Credentials (EPIC$^{SM}$). Please visit the [ECFMG website](#) for information on ECFMG's programs and services. You also can access this publication, the Application for ECFMG Certification, and the application for Step 1 and Step 2 (Clinical Knowledge and Clinical Skills components) of the United States Medical Licensing Examination$^{®}$ (USMLE$^{®}$) on the [ECFMG website](#).

Applicants for examination must use the applicable edition of the *Information Booklet*. The 2019 *Information Booklet* pertains to eligibility periods in 2019. If your eligibility period extends into 2020 and you test in 2020, you must become familiar with and will be subject to the policies and procedures detailed in the 2020 *Information Booklet*. The 2020 *Information Booklet* is expected to be available in September 2019. See the information on eligibility periods under *Applying for Examination* in *The United States Medical Licensing Examination (USMLE)* section of this booklet.

The [USMLE *Bulletin of Information*](#) provides information about the USMLE, a three-step examination for medical licensure in the United States. In the event that information about the USMLE in the ECFMG *Information Booklet* differs from the corresponding information in the USMLE *Bulletin of Information*, the information in the USMLE *Bulletin of Information* controls.

---

## IMPORTANT

**Applicants for examination are required to read and become familiar with the information contained in and referenced in both the ECFMG *Information Booklet* and the USMLE *Bulletin of Information*.** The USMLE *Bulletin of Information* is available on the [USMLE website](#). Exam applicants should also carefully read the exam application [overview](#) and [instructions](#) available in ECFMG's Interactive Web Applications (IWA). Applicants should review and be familiar with the *Policies and Procedures Regarding Irregular Behavior*.

---

Although current at the time of publication, the information contained in the 2019 *Information Booklet* is subject to change. If changes occur, information will be posted on

the [ECFMG website](#). You must obtain the most recent information to understand current policies and procedures.

ECFMG provides important updates on ECFMG Certification and entry into graduate medical education in the United States via an e-mail newsletter called *The ECFMG®Reporter* and via Facebook and Twitter. ECFMG encourages applicants to [subscribe](#) to *The ECFMG® Reporter* and follow ECFMG on [Facebook](#) and [Twitter](#).

The *Information Booklet* describes deadlines related to exam applications, scheduling, and other services. Unless otherwise indicated, deadlines are calculated using Eastern Time in the United States.

Consistent with ECFMG's Privacy Notice, ECFMG may share the information contained in your application, or that otherwise may become available to ECFMG, with any federal, state or local governmental department or agency, with any hospital or with any other organization or individual who, in the judgment of ECFMG, has a legitimate interest in such information. This may include reporting determinations of irregular behavior to the USMLE Committee for Individualized Review, Federation of State Medical Boards of the United States, U.S. state and international medical licensing authorities, graduate medical education programs, and to any other organization or individual who, in the judgment of ECFMG, has a legitimate interest in such information. For further information regarding ECFMG's data collection and privacy practices, please refer to our [Privacy Notice](#).

ECFMG strives to ensure proper processing of applications for ECFMG Certification and examination, other service requests related to ECFMG Certification and examination, and the information contained in such applications and requests. In the unlikely event that an error occurs in the processing of applications, requests, or associated materials, ECFMG will make reasonable efforts to correct the error, if possible, or permit you either to reapply at no additional fee or to receive a refund. These are the exclusive remedies available to applicants for errors in processing applications and other service requests related to ECFMG Certification, examination, and the other programs described in this booklet.

**Please note that ECFMG will not provide services of any kind if doing so would be considered violative of any applicable federal, state, or local laws or regulations. Additionally, ECFMG may delay provision of services while investigating whether the services or surrounding circumstances violate such laws, regulations, or ECFMG's policies and procedures.**

® The terms ECFMG® and CSA® are registered in the U.S. Patent and Trademark Office.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

Portions reprinted, with permission, from the USMLE 2019 Bulletin of Information, copyright © 2018 by the Federation of State Medical Boards of the United States, Inc., and the National Board of Medical Examiners® (NBME®).

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# ECFMG Certification

About ECFMG Certification | [Requirements for ECFMG Certification](#) | [Standard ECFMG Certificate](#)

## About ECFMG Certification

The Educational Commission for Foreign Medical Graduates (ECFMG), through its program of certification, assesses whether international medical graduates are ready to enter residency or fellowship programs in the United States that are accredited by the [Accreditation Council for Graduate Medical Education (ACGME)](#). ACGME requires international medical graduates who enter ACGME-accredited programs to be certified by ECFMG.

ECFMG Certification assures directors of ACGME-accredited residency and fellowship programs, and the people of the United States, that international medical graduates have met minimum standards of eligibility to enter such programs. ECFMG Certification does not, however, guarantee that these graduates will be accepted into programs; the number of applicants each year exceeds the number of available positions.

ECFMG Certification is also one of the eligibility requirements for international medical graduates to take Step 3 of the three-step [United States Medical Licensing Examination (USMLE)](#). Medical licensing authorities in the United States require that international medical graduates be certified by ECFMG, among other requirements, to obtain an unrestricted license to practice medicine.

ECFMG defines an international medical graduate as a physician who received his/her basic medical degree or qualification from a medical school located outside the United States and Canada*. Citizens of the United States who have completed their medical education in schools outside the United States and Canada are considered international medical graduates; non-U.S. citizens who have graduated from medical schools in the United States and Canada are not considered international medical graduates.


\* The United States and Canada refer to the geographic locations where citizens are issued passports by the governments of either the United States or Canada.


Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# ECFMG Certification

About ECFMG Certification | Requirements for ECFMG Certification | Standard ECFMG Certificate

## Requirements for ECFMG Certification

To be eligible for certification by ECFMG, international medical graduates must meet the following requirements.

## Medical School Requirements

The physician's medical school must meet requirements established by ECFMG. Schools that meet all requirements will be listed in the *World Directory of Medical Schools* as meeting eligibility requirements for their students and graduates to apply to ECFMG for ECFMG Certification and examination. To confirm that your medical school meets ECFMG's requirements, access the *World Directory* at www.wdoms.org. Medical schools that meet ECFMG's requirements will have an ECFMG note stating this in the schools' *World Directory* listing. The ECFMG note also will include the graduation years for which the school meets these requirements. Since ECFMG is a sponsor of the *World Directory*, the ECFMG note is located on the "Sponsor Notes" tab of the medical school listing. If there is no ECFMG note on the Sponsor Notes tab of your medical school's listing, you are not eligible to apply to ECFMG for ECFMG Certification and examination. For tips, see the quick guide on how to confirm that a medical school meets eligibility requirements.

> **Important Note:** Beginning in 2023, to be eligible for ECFMG Certification, ECFMG will require that applicants graduate from a medical school that has been appropriately accredited. To satisfy this requirement, medical schools must be accredited by an agency that has been recognized by the World Federation for Medical Education through its *Programme for Recognition of Accrediting Agencies*. ECFMG is in the process of establishing policies and procedures for implementing this requirement and will publish updates, as they become available, on the ECFMG website. International medical students and graduates interested in ECFMG Certification should monitor the ECFMG website for the latest information.

## Application for ECFMG Certification

International medical students/graduates who wish to pursue ECFMG Certification must submit an Application for ECFMG Certification. The Application for ECFMG Certification consists of an on-line application and the Certification of Identification Form (Form 186)

available through ECFMG's Interactive Web Applications (IWA). The Application for ECFMG Certification requires applicants to confirm their identity, contact information, and graduation from or enrollment in a medical school that is listed in the _World Directory_ as meeting ECFMG eligibility requirements. See _Medical School Requirements_. As part of the application, international medical students/graduates must also confirm their understanding of the purpose of ECFMG Certification and release certain legal claims. See _Application for ECFMG Certification_.

## Examination Requirements

The examination requirements for ECFMG Certification include passing Step 1 and Step 2 of the USMLE. The Step 2 exam has two separately administered components, the Clinical Knowledge (CK) component and the Clinical Skills (CS) component.

To meet the examination requirements for ECFMG Certification, applicants must:

**1. Satisfy the medical science examination requirement.**
Step 1 and Step 2 CK of the USMLE are the exams currently administered that satisfy this requirement.

**2. Satisfy the clinical skills requirement.**
Step 2 CS of the USMLE is the exam currently administered that satisfies this requirement.

ECFMG has established time limits for completing the examinations required for ECFMG Certification.

For detailed information, including information on time limits and using a passing performance on former exams to satisfy these requirements, see _Examinations for ECFMG Certification_.

## Medical Education Credential Requirements

The physician's graduation year must be included in the ECFMG note in the medical school's _World Directory_ listing. See _Medical School Requirements_. International medical graduates must have been awarded credit for at least four credit years (academic years for which credit has been given toward completion of the medical curriculum) by a medical school that is listed in the _World Directory_ as meeting ECFMG eligibility requirements. There are restrictions on credits transferred to the medical school that awards an applicant's medical degree that can be used to meet this requirement. See _Transfer Credits_ in _Medical Education Credentials_.

Applicants must document the completion of all requirements for, and receipt of, the **final medical diploma**. ECFMG verifies every applicant's medical school diploma with the appropriate officials of the medical school that issued the diploma and requests that the medical school provide the **final medical school transcript**. Verification by ECFMG with the issuing school may also be required for transcripts that are submitted to document transferred credits. See *Medical Education Credentials*.

> **Important Note:** Submitting falsified or altered documents may result in a finding of irregular behavior and permanent annotation of your ECFMG record. For more information and potential consequences, see *Policies and Procedures Regarding Irregular Behavior*.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# ECFMG Certification

About ECFMG Certification | Requirements for ECFMG Certification | Standard ECFMG Certificate

## Standard ECFMG Certificate

The Accreditation Council for Graduate Medical Education (ACGME) requires international medical graduates who enter ACGME-accredited programs of graduate medical education in the United States to be certified by ECFMG.

ECFMG issues the Standard ECFMG Certificate to applicants who meet all of the requirements for certification. International medical graduates must also pay any outstanding charges on their ECFMG financial accounts before their certificates are issued. Standard ECFMG Certificates are issued to applicants approximately two weeks after all of these requirements have been met. The date that the Standard ECFMG Certificate is issued is the date an international medical graduate is considered certified by ECFMG. Currently, ECFMG sends the Standard ECFMG Certificate to the applicant's address of record by Federal Express. For tips, see the quick guide on how to ensure you receive your ECFMG Certificate as soon as possible.

The Standard ECFMG Certificate includes:

- The name of the applicant;
- The certificate number;
- The dates that the examination requirements were met; and
- The date that the certificate was issued.

## Confirming ECFMG Certification to Third Parties

ECFMG offers the Certification Verification Service (CVS) to provide primary-source confirmation of the ECFMG certification status of international medical graduates. ECFMG will confirm your certification status when a request is received from a U.S. medical licensing authority, residency program director, hospital, or other organization that, in the judgment of ECFMG, has a legitimate interest in such information. For status reports sent to medical licensing authorities, the request can also be made by you. For more information, see *Confirming ECFMG Certification to Third Parties* in *Related ECFMG Services*.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# Your ECFMG Record

USMLE/ECFMG Identification Number | Your Name | Changing Your Name | Contact Information

## USMLE/ECFMG Identification Number

Before you can submit an Application for ECFMG Certification or apply to ECFMG for an exam, you must obtain a USMLE/ECFMG Identification Number. You can obtain a USMLE/ECFMG Identification Number by accessing Interactive Web Applications (IWA). Please allow approximately five business days to receive your Identification Number.

**The information you provide during the process of obtaining a USMLE/ECFMG Identification Number will become a part of your permanent ECFMG record.** If you fail to provide your correct and current legal name, you will be required to submit acceptable documentation, as described in *Changing Your Name* in *Your ECFMG Record*, to change the name in your ECFMG record. If ECFMG determines that the biographic information you submit is inaccurate, not complete, or insufficient to assign a USMLE/ECFMG Identification Number to you, your request for the USMLE/ECFMG Identification Number will not be processed.

Once ECFMG informs you of your number, you must include it on all communications, applications, medical education credentials, request forms, and payments that you send to ECFMG. You will also need your USMLE/ECFMG Identification Number to use ECFMG's on-line services.

Your USMLE/ECFMG Identification Number cannot be changed. If you forget or lose your USMLE/ECFMG Identification Number, you can obtain it by accessing IWA or by contacting ECFMG. Use the contact information for General Inquiries on the Contact ECFMG page of the ECFMG website. To protect the privacy of applicants, ECFMG will not provide USMLE/ECFMG Identification Numbers by telephone.

> **Important Note:** As part of the process of obtaining an Identification Number, you will be asked if you previously submitted an application to ECFMG for examination. You also will be asked if you were previously assigned a USMLE Identification Number. If you were previously assigned a USMLE Identification Number or have submitted a prior exam application to ECFMG, you must answer "Yes" to the applicable question(s), even if you submitted the prior application under a different name or did not take the exam for which you applied. You must answer "Yes" regardless of whether you submitted an on-line application or a paper application. If you were previously assigned a USMLE Identification Number or have submitted an application to ECFMG but indicate that you

were not previously assigned a number or have not applied previously, this may result in a finding of irregular behavior and permanent annotation of your ECFMG record. See *Policies and Procedures Regarding Irregular Behavior*.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# Your ECFMG Record

USMLE/ECFMG Identification Number | Your Name | Changing Your Name | Contact Information

## Your Name

You must ensure that the name in your ECFMG record is your correct and current legal name. This name will appear on your Standard ECFMG Certificate once you have met all requirements for certification. You must use this name consistently in all communications you send to ECFMG, including applications and requests for other services. Failure to use the name in your ECFMG record consistently in all communications with ECFMG may delay exam registration. It may also prevent you from taking an exam for which you are registered and scheduled.

You can check the name in your ECFMG record on-line using OASIS or the MyECFMG mobile app. If you legally change your name, you must submit acceptable documentation to ECFMG to change the name in your ECFMG record. See *Changing Your Name* in *Your ECFMG Record*.

- The name you submit on your exam **application** will appear on your exam **scheduling permit**. Your name, as it appears on your scheduling permit, must exactly match the name on the form(s) of **identification** you present at the test center. Please review your scheduling permit for details and limited exceptions. See information on required identification under *Taking the Examination* in *The United States Medical Licensing Examination (USMLE)*.

  If the name on your **scheduling permit** has been misspelled, contact ECFMG immediately by e-mail, telephone, or fax. Use the contact information for General Inquiries on the Contact ECFMG page of the ECFMG website.

  If you change the name in your ECFMG record while you are registered for an exam, a revised scheduling permit reflecting this change will be issued. ECFMG will send you an e-mail notification when your revised scheduling permit is available. You must present the revised scheduling permit at the test center on your exam date. Name changes must be received **and processed** by ECFMG no later than seven business days before your testing appointment, or you will not be able to test.

  If you have a valid *Certification of Identification Form* (Form 186) on file with ECFMG, it will be invalidated when the name in your ECFMG record is changed, and you will be required to complete a new *Certification of Identification Form* (Form 186) the next time you apply for examination.

- If the name on your **medical diploma, transcript, or other credential** does not match **exactly** the name in your **ECFMG record**, you must submit documentation, as described in *Verifying Your Name* in *Medical Education Credentials* that **verifies** the name on your medical diploma, transcript, or other credential is (or was) your name. See *Name on Medical Diploma and Transcript(s)* in *Medical Education Credentials* for examples of common name discrepancies that require name **verification**.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# Your ECFMG Record

USMLE/ECFMG Identification Number | Your Name | Changing Your Name | Contact Information

## Changing Your Name

If you have legally changed your name and want to request a **change** of name in your ECFMG record, send a completed *Request to Change Applicant Biographic Information (Form 182)* to ECFMG. Form 182 is available in the Resources section of the ECFMG website and from ECFMG, upon request. Form 182 requires you to provide a reason for the name change and must be accompanied by a copy of the appropriate document(s), as defined on Form 182. ECFMG must be able to determine from the document(s) you submit that your name has legally changed from the name currently in your ECFMG record to the name you are requesting to appear in your record and that you are using this new name consistently. This means that it may be necessary for you to submit more than one document to support your name change request. For the purpose of **changing** your name, the document(s) you provide must be **unexpired** (if applicable). These documents may include:

- Passport (including the pages with your photograph and the expiration date)
- Birth certificate
- Marriage certificate
- Official court order
- U.S. Resident Alien Card
- U.S. Naturalization Certificate
- U.S. Passport Card (a one-page document that includes your photograph and the expiration date)

See additional information on documents in Important Notes below.

**Important Notes:** If you change the name in your ECFMG record while you are registered for an exam, a revised scheduling permit reflecting this change will be issued. ECFMG will send you an e-mail notification when your revised scheduling permit is available. You must present the revised scheduling permit at the test center on your exam date. Name changes must be received **and processed** by ECFMG no later than seven business days before your testing appointment, or you will not be able to test.

If you have a valid *Certification of Identification Form* (Form 186) on file with ECFMG, it will be invalidated when the name in your ECFMG record is changed, and you will be

required to complete a new *Certification of Identification Form* (Form 186) the next time you apply for examination.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# Your ECFMG Record

USMLE/ECFMG Identification Number | Your Name | Changing Your Name | Contact Information

## Contact Information

The contact information in your ECFMG record consists of your e-mail address, your address of residence, your telephone number, and your fax number (if applicable). ECFMG will send information on the status of your applications by e-mail. You will also need an e-mail address to use ECFMG's on-line services. Be sure to include a full and complete address for your residence. ECFMG will use your address of residence as your mailing address. Certain ECFMG correspondence, including your Standard ECFMG Certificate, requires a full mailing address.

You should ensure that the contact information in your ECFMG record is current. You can check and update your contact information on-line using OASIS or the MyECFMG mobile app. You cannot submit changes to your contact information to ECFMG by e-mail. ECFMG will not process changes to contact information received from any person other than the applicant.

Changing your e-mail address using OASIS or MyECFMG does not update your e-mail address in your e-newsletter subscription(s). If you are subscribed to one or more of ECFMG's e-mail newsletters, such as *The ECFMG® Reporter* or *ECHO News*, and your e-mail address changes, you must update your e-mail address for **each** e-newsletter. To update your e-mail address in your e-newsletter subscription(s), visit the E-Newsletters page in the Resources section of the ECFMG website, click on the newsletter(s) you receive, unsubscribe your old e-mail address, and subscribe your new e-mail address.

To protect the privacy of applicants, ECFMG will e-mail applicant-specific information only to the e-mail address in the applicant's ECFMG record. If your e-mail inquiry requires a specific response, you must send your inquiry from the e-mail address in your ECFMG record.

All correspondence with ECFMG, including e-mails, will become a part of your permanent ECFMG record.

For further information regarding ECFMG's data collection and privacy practices, please refer to our Privacy Notice.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# Your ECFMG Financial Account

Fees | [Payment](#) | [Methods of Payment](#) | [Refunds](#) | [Forfeiture of Funds](#)

## Fees

For a list of fees for ECFMG services that applicants encounter most frequently while pursuing ECFMG Certification and entry into U.S. programs of graduate medical education, see the [Fees](#) page on the ECFMG website. Other fees may apply. All fees are in U.S. dollars and are subject to change without notice.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# Your ECFMG Financial Account

Fees | Payment | Methods of Payment | Refunds | Forfeiture of Funds

## Payment

Full payment is due at the time you submit an application or request a service. If your application/request is rejected, any payment received with that application/request will be credited to your ECFMG financial account.

Funds in an applicant's ECFMG financial account will be available for a period of two years to pay for applications/requests. Any funds not used during a two-year period will be forfeited to ECFMG; **this means that the applicant will lose those funds**. See *Forfeiture of Funds* in *Your ECFMG Financial Account*.

**If you owe money to ECFMG** at the time that your application/request is processed, ECFMG will apply the payment included with your application/request to the amount that you owe. Any money that is left after this will be used to pay for the application/request. If there is not enough money remaining to pay for the application/request, your application/request will be rejected.

If you submit a paper request and do not include payment, or if the payment you include is not sufficient to cover all fees, we will use the money in your ECFMG financial account to pay for the request. If the money in your account is not sufficient to cover all fees, your request will be rejected.

You can check the status of your ECFMG financial account and make on-line payments using OASIS or the MyECFMG mobile app. ECFMG's on-line payment is secured using industry-standard encryption technology.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# Your ECFMG Financial Account

Fees | Payment | Methods of Payment | Refunds | Forfeiture of Funds

## Methods of Payment

If you submit an application or request a service **on-line**, you can pay on-line at the time of application/request by:

- **Credit card** – To use this option, you must have a Visa, MasterCard, Discover, or American Express card with a security code.
- **Electronic check** – To use this option, you must have a checking account at a U.S. bank and either a U.S. Social Security Number or U.S. driver's license. Checks returned for insufficient funds will be subject to a $10 processing fee.

You can also pay in advance using one of the payment methods described above by accessing OASIS on the ECFMG website or using the MyECFMG mobile app.

You can also send payment in advance to ECFMG using *Payment for Service(s) Requested* (Form 900), available in the Resources section of the ECFMG website. If you submit payment using Form 900, you can pay by:

- **Credit card** – Visa, MasterCard, Discover, or American Express.
- **Check, bank draft, or money order** made payable to the Educational Commission for Foreign Medical Graduates (or ECFMG). All payments must be made in U.S. funds through a U.S. bank. **You must write your full name and USMLE/ECFMG Identification Number, if one has been assigned to you, on your payment.**

If you pay in advance, you should verify that the payment has been received and credited to your ECFMG financial account before you begin the application or request process. You can verify the status of your ECFMG financial account on-line using OASIS or the MyECFMG mobile app.

> **Important Note:** If you need to make multiple credit card transactions to pay for an application/request, you must make these payments to your ECFMG financial account in advance using OASIS, the MyECFMG mobile app, or by submitting multiple copies of Form 900.

Do **not** send payments in cash.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

Case 2:18-cv-01705-WB Document 132-20 Filed 05/03/23 Page 29 of 55 JA0026

# Your ECFMG Financial Account

Fees | Payment | Methods of Payment | Refunds | Forfeiture of Funds

## Refunds

If you have money in your ECFMG financial account, you may request a refund. Refund requests must be made in writing and should be sent via e-mail to finance@ecfmg.org. If the money in your account was a payment for an exam application that was rejected (because you were not eligible or the application was incomplete or otherwise deficient), your refund will be subject to a $100 processing fee. Approved refunds typically will be issued using the same method as the original payment. For example, if an applicant submits a payment using a credit card, then the refund will be made to the same card.

> **Important Note:** You should consider carefully the timing of your exam application, eligibility period, and test date. Once registered, you cannot cancel or postpone your registration. If you do not schedule and take the exam, you will not receive a refund or credit of your exam fee(s), and you will be required to reapply, including payment of all applicable fees, if you wish to take the exam.
>
> Although you cannot cancel or postpone your registration, there are options that provide registered applicants with flexibility. All registered applicants may change their scheduled test date and/or center, subject to availability. Applicants registered for Step 1/Step 2 CK may request extension of their eligibility periods. Applicants registered for Step 1/Step 2 CK also may request to change their testing region. See information on rescheduling under *Scheduling the Examination* in *The United States Medical Licensing Examination (USMLE)*. Applicants registered for Step 2 CS who are unable to obtain the appropriate visa to enter the United States to take the exam may request a full refund of the exam fee. Other requests for exceptions from Step 2 CS applicants are considered on a case-by-case basis. ECFMG will consider requests for exceptions only after the applicant's eligibility period has expired.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# Your ECFMG Financial Account

Fees | Payment | Methods of Payment | Refunds | Forfeiture of Funds

## Forfeiture of Funds

Funds in an applicant's ECFMG financial account will be available for a period of two years to pay for applications submitted or services requested. Any funds not used during a two-year period will be forfeited to ECFMG; **this means that the applicant will lose those funds**. The two-year period is calculated from the date of last transactional activity in the account.

It is your responsibility to monitor the status of your ECFMG financial account. You can check the status of your account, including dates on which payments were made to your account, using OASIS or the MyECFMG mobile app. A refund request should be made to claim any funds that will not be used prior to the expiration of the two-year period. See *Refunds* in *Your ECFMG Financial Account.*

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# Irregular Behavior

## Policies and Procedures Regarding Irregular Behavior

### A. Policies Regarding Irregular Behavior

1. *Irregular behavior* includes all actions or attempted actions on the part of applicants, examinees, potential applicants, others when solicited by an applicant and/or examinee, or any other person that would or could subvert the examination, certification or other processes, programs, or services of ECFMG, including, but not limited to, the ECFMG Exchange Visitor Sponsorship Program, ECFMG International Credentials Services (EICS), the Electronic Portfolio of International Credentials (EPIC), and Electronic Residency Application Service (ERAS) Support Services at ECFMG. Such actions or attempted actions are considered irregular behavior, regardless of when the irregular behavior occurs, and regardless of whether the individual is certified by ECFMG. Examples of irregular behavior include, but are not limited to, submission of any falsified or altered document to ECFMG, whether submitted by the individual or by a third party, such as a medical school, on behalf of the individual; failing to comply with United States Medical Licensing Examination® (USMLE®) or ECFMG policies, procedures, and/or rules; falsification of information on applications, submissions, or other materials to ECFMG; taking an examination when not eligible to do so, or submission of any falsified or altered ECFMG document to other entities or individuals.

2. The Medical Education Credentials Committee's determination of irregular behavior is sufficient cause for ECFMG to bar an individual from future examinations, to bar an individual from other ECFMG programs and services, to withhold and/or invalidate the results of an examination, to withhold an ECFMG Certificate, to revoke an ECFMG Certificate, or to take other appropriate actions for a specified period of time or permanently. ECFMG may report the Medical Education Credentials Committee's determination of irregular behavior to the USMLE Committee for Individualized Review, Federation of State Medical Boards of the United States, U.S. state and international medical licensing authorities, graduate medical education programs, and to any other organization or individual who, in the judgment of ECFMG, has a legitimate interest in such information.

3. If the Medical Education Credentials Committee determines that an individual engaged in irregular behavior, a permanent annotation to that effect will be included in the individual's ECFMG record. This annotation will appear on the ECFMG Certification Verification Service (CVS) and ECFMG Status Reports for the individual. If the individual

has an EPIC Portfolio, a permanent annotation will be included on all EPIC Reports with respect to that individual. Additional information explaining the basis for the determination of irregular behavior and the resulting action(s) will accompany every ECFMG Status Report, CVS Report, and EPIC Report, and may also be provided to legitimately-interested entities; this additional information may be provided, regardless of the date of the conduct or activity that comprises the irregular behavior. Notice of the Medical Education Credentials Committee's determination of irregular behavior is periodically reported to the ECFMG Board of Trustees.

## B. Procedures Regarding Irregular Behavior

1. After receipt of a report or other information suggesting irregular behavior on the part of an individual, ECFMG staff will review the information and will assess whether there is sufficient evidence of irregular behavior. When indicated and feasible, staff will conduct a follow-up investigation to gather additional information.

2. If the individual is an examinee and the review referenced above will not be concluded until after the typical period for the reporting of exam scores, the examinee will be notified that the reporting of the exam scores in question is being delayed.

3. If ECFMG staff finds that there exists a reasonable basis to conclude that an individual may have engaged in irregular behavior, the matter will be referred to the Medical Education Credentials Committee. ECFMG may withhold services from the individual pending a determination from the Medical Education Credentials Committee. If the individual is an examinee, the examinee's exam scores will be withheld, if not already released, and the examinee may not be permitted to sit for subsequent examinations, nor will applications for examination be processed.

4. Using the individual's last known address, the individual will be advised in writing of the nature of the alleged irregular behavior and will be provided with a copy of the *Policies and Procedures Regarding Irregular Behavior*. If the alleged irregular behavior is related to a shared ECFMG and USMLE policy, the USMLE Program will also be advised of the allegation. The individual will be given an opportunity to provide written explanation and to present other relevant information. Any such written explanation or other relevant information must be received by ECFMG by the deadline set forth in ECFMG's writing to the individual. Submissions received after the deadline will be considered by the Medical Education Credentials Committee at its discretion. The individual may also request the opportunity to appear personally before the Medical Education Credentials Committee, and may be represented by legal counsel, if the individual so wishes. In instances in which the individual appears personally before the

Medical Education Credentials Committee, a stenographic or audio recording will be made of that portion of the proceedings during which the individual is in attendance. Any statements made by the individual during a personal appearance before the Medical Education Credentials Committee will be under oath.

5. Individuals who have been charged with irregular behavior who wish to request a deferral of the ECFMG Committee's review of the allegation must (1) submit the request in writing and (2) provide the reason for the request. If ECFMG staff determine that the granting of the request could have a material impact on the individual's opportunity to refute the allegation then staff, at its discretion, can grant the request and defer an ECFMG action for up to six (6) months. Unless the individual can demonstrate compelling circumstances, ECFMG staff should not grant more than two deferral requests. Notwithstanding the foregoing, if the individual charged with irregular behavior is ECFMG Certified, a candidate for residency, or practicing medicine, ECFMG staff will only grant the request for deferral if, in its sole discretion, ECFMG believes that public health and safety is not at risk. If the deferral request is granted, ECFMG will notify appropriate institutions and authorities of the individual's pending irregular behavior charge.

6. All pertinent information regarding the irregular behavior, including any explanation or other information that the individual may provide, will be provided to the Medical Education Credentials Committee. The Medical Education Credentials Committee, based on the information available to it, will determine whether the preponderance of the evidence indicates that the individual engaged in irregular behavior. If the Medical Education Credentials Committee determines that the individual engaged in irregular behavior, the Medical Education Credentials Committee will determine what action(s) will be taken as a result of the irregular behavior. ECFMG will notify the individual whether the Medical Education Credentials Committee determined the individual engaged in irregular behavior and of any action(s) taken pursuant thereto.

7. The Medical Education Credentials Committee's determination of irregular behavior and any action(s) taken pursuant thereto (a "decision" of the Medical Education Credentials Committee) may be appealed to the Review Committee for Appeals if the individual has a reasonable basis to believe the Medical Education Credentials Committee did not act in compliance with the Medical Education Credentials Committee Policies and Procedures or that the Medical Education Credentials Committee's decision was clearly contrary to the weight of the evidence before it. The notice of appeal must be received by ECFMG within thirty (30) days of the date on which the notification advising the individual of the Medical Education Credentials Committee's decision was mailed to

the individual. The appeal of a decision of the Medical Education Credentials Committee is governed by the Rules of Appellate Procedure.

8. Petitions for reconsideration of a decision of the Medical Education Credentials Committee will be reviewed by the Medical Education Credentials Committee only in extraordinary cases. Any such petition must first be considered by ECFMG staff, who, after discussion with the Medical Education Credentials Committee Chair, may deny the request or place it on the agenda for consideration by the full Medical Education Credentials Committee at a regularly scheduled meeting. Absent the submission of newly discovered material evidence not previously available to the petitioner and, therefore, not available to the Medical Education Credentials Committee, petitions for reconsideration typically will be denied.

## C. Representative Examples of Irregular Behavior

Representative examples of allegations of irregular behavior and actions taken by the ECFMG Medical Education Credentials Committee include, but are not limited to, the following:

- **Providing false information on an application submitted to ECFMG**

  The ECFMG Medical Education Credentials Committee reviewed an allegation of irregular behavior in connection with an individual who provided false information on an application submitted to ECFMG as part of the certification process. In that application, the individual certified he was a student enrolled in medical school when, in fact, he previously had been dismissed from medical school and, therefore, was no longer a student.

  Following review, the ECFMG Medical Education Credentials Committee determined the individual had engaged in irregular behavior and **took action to bar the individual from ECFMG Certification, thereby rendering the individual ineligible to apply for USMLE examinations leading to ECFMG Certification. A permanent annotation was added to the individual's ECFMG record.**

- **Providing false information to ECFMG as part of the ECFMG On-line Authentication Process, which is a prerequisite to submitting an application for examination**

  The ECFMG Medical Education Credentials Committee reviewed an allegation of irregular behavior in connection with an individual who provided false information to ECFMG as part of the ECFMG On-line Authentication Process, which is used to obtain a USMLE/ECFMG Identification Number and is a prerequisite to submitting an application for examination. During the on-line authentication process, the individual certified he had

not previously submitted an application for examination to ECFMG when he had not only previously applied for, but had taken examinations.

Following review, the ECFMG Medical Education Credentials Committee determined the individual had engaged in irregular behavior and **took action to bar the individual from ECFMG Certification, thereby rendering the individual ineligible to apply for USMLE examinations leading to ECFMG Certification. A permanent annotation was added to the individual's ECFMG record.**

- **Submitting a fraudulent medical diploma and providing false information on an application submitted to ECFMG**

The ECFMG Medical Education Credentials Committee reviewed an allegation of irregular behavior in connection with an individual who submitted a fraudulent medical diploma and provided false information on an application submitted to ECFMG.

Following review, the ECFMG Medical Education Credentials Committee determined the individual had engaged in irregular behavior and **took action to bar the individual from ECFMG Certification, thereby rendering the individual ineligible to apply for USMLE examinations leading to ECFMG Certification. A permanent annotation was added to the individual's ECFMG record.**

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# Application for ECFMG Certification

To be eligible for ECFMG Certification, you must complete an Application for ECFMG Certification. The Application for ECFMG Certification consists of an on-line application available through ECFMG's Interactive Web Applications (IWA) and the Certification of Identification Form (Form 186) that must be completed and notarized using NotaryCam. Instructions on how to complete Form 186 using NotaryCam are included with the form. You must have your *USMLE/ECFMG Identification Number* before you can begin the Application for ECFMG Certification. For the current fee for submitting an Application for ECFMG Certification, see the Fees page of the ECFMG website.

As part of the Application for ECFMG Certification, you will be asked to confirm the name, date of birth, and gender in your ECFMG record. If this information is incorrect, you must have the information in your ECFMG record changed to reflect your correct name, date of birth, and/or gender before you can complete the Application for ECFMG Certification. Instructions for how to correct this information will be provided at the time of application.

If you are a medical school **student**, you will be asked to confirm that you are officially enrolled in a medical school located outside the United States and Canada that is listed in the *World Directory of Medical Schools (World Directory)* as meeting ECFMG eligibility requirements, and that the "Graduation Years" in the ECFMG note in your medical school's *World Directory* listing are listed as "Current." If you are a medical school **graduate**, you will be asked to confirm that you are a graduate of a medical school located outside the United States and Canada that is listed in the *World Directory* as meeting ECFMG eligibility requirements, and that your graduation year is included in the ECFMG note in your school's *World Directory* listing. See *Medical School Requirements*.

The Application for ECFMG Certification also will require you to confirm your understanding of the purpose of ECFMG Certification and release certain legal claims.

**The information submitted in your Application for ECFMG Certification will become a part of your permanent ECFMG record.**

An Application for ECFMG Certification will not be considered complete until ECFMG receives and processes both the on-line part of the application and the notarized Form 186 from NotaryCam. A notification will be sent to the e-mail address in your ECFMG record confirming receipt of the on-line part of your Application for ECFMG Certification. Once your Application for ECFMG Certification, including Form 186, has

been accepted by ECFMG, it typically remains valid throughout the certification process. If you are a student when you submit your Application for ECFMG Certification, you do not need to submit another one when you graduate. You can use OASIS or the MyECFMG mobile app to confirm that you have submitted an Application for ECFMG Certification and have a valid Form 186 on file.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# Examinations for ECFMG Certification

Examination Requirements | [Time Limit for Completing Examination Requirements](#)

## Examination Requirements

To be eligible for ECFMG Certification, you must satisfy both the medical science examination and clinical skills requirements. To satisfy these requirements, you must pass Step 1 and Step 2 of the United States Medical Licensing Examination (USMLE). Step 2 of the USMLE has two separately administered components, the Clinical Knowledge (CK) component and the Clinical Skills (CS) component. Refer to the [USMLE *Bulletin of Information*](#) for more information. ECFMG has established time limits for completing the examination requirements for ECFMG Certification. See [*Time Limit for Completing Examination Requirements*](#) in *Examinations for ECFMG Certification*.

Passing performance on certain formerly administered examinations can be used to meet these requirements as described below.

## Medical Science Examination Requirement

Step 1 and Step 2 CK of the USMLE are the exams currently administered that satisfy the medical science examination requirement. There are time limits for completing these examinations for ECFMG Certification. See [*Time Limit for Completing Examination Requirements*](#) in *Examinations for ECFMG Certification*.

ECFMG also accepts a passing performance on the following **former** examinations to satisfy the medical science examination requirement for ECFMG Certification: ECFMG Examination, Visa Qualifying Examination (VQE), Foreign Medical Graduate Examination in the Medical Sciences (FMGEMS), and the Part I and Part II Examinations of the National Board of Medical Examiners (NBME).

Combinations of exams are also acceptable. Specifically, if you have passed only part of the former VQE, FMGEMS, or the NBME Part I or Part II, you may combine a passing performance on the basic medical science component of one of these exams or USMLE Step 1 with a passing performance on the clinical science component of one of the other exams or USMLE Step 2 CK, provided that the components are passed within the period specified for the exam program.

Additionally, ECFMG accepts a score of 75 or higher on each of the three days of a single administration of the former Federation Licensing Examination (FLEX), if taken prior to June 1985, to satisfy this requirement.

## Clinical Skills Requirement

Step 2 CS of the USMLE is the exam currently administered that satisfies the clinical skills requirement. There are time limits for completing this examination for ECFMG Certification. See *Time Limit for Completing Examination Requirements* in *Examinations for ECFMG Certification*.

International medical students/graduates who have **both** passed the former ECFMG Clinical Skills Assessment (CSA®) **and** achieved a score acceptable to ECFMG on an English language proficiency test (such as the TOEFL exam or the former ECFMG English Test) can use these passing performances to satisfy the clinical skills requirement for ECFMG Certification.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# Examinations for ECFMG Certification

Examination Requirements | Time Limit for Completing Examination Requirements

## Time Limit for Completing Examination Requirements

ECFMG policy requires that international medical students/graduates pass the USMLE Steps and Step Components required for ECFMG Certification within a seven-year period. This means that once you pass a Step or Step Component, you will have seven years to pass all of the other Step(s) or Step Component(s) required for ECFMG Certification. This seven-year period begins on the exam date of the first Step or Step Component passed and ends **exactly seven years from that exam date**.

If you do not pass all required Steps and Step Components within a maximum of seven years, your earliest USMLE passing performance will no longer be valid for ECFMG Certification. **It is your responsibility to track your progress toward meeting the exam requirements for ECFMG Certification. ECFMG will not notify you of upcoming deadlines to meet the seven-year requirement and will not notify you if one (or more) of your passing performances becomes invalid for ECFMG Certification because you failed to meet the seven-year requirement.**

> **Example:** An international medical graduate took Step 1 on October 1, 2012 and passed. He has through October 1, 2019 to take and pass Step 2 CK and Step 2 CS, satisfying the remaining exam requirements for ECFMG Certification. If he does not take and pass Step 2 CK and Step 2 CS on or before October 1, 2019, his passing performance on Step 1 would no longer be valid for ECFMG Certification.

Under this policy, more than one USMLE passing performance can become invalid for ECFMG Certification.

> **Example:** An international medical graduate passed Step 1 on April 1, 2011, and passed Step 2 CK on May 1, 2012. She had through April 1, 2018 (seven years from her Step 1 passing performance) to pass Step 2 CS, satisfying the remaining exam requirements for ECFMG Certification. She did not pass Step 2 CS by April 1, 2018, so her passing performance on Step 1 is no longer valid for ECFMG Certification. Her earliest USMLE passing performance that is valid for ECFMG Certification is now the Step 2 CK passing performance on May 1, 2012. She now has through May 1, 2019 (seven years from her Step 2 CK passing performance) to pass Step 1 and Step 2 CS, satisfying the remaining exam requirements for ECFMG Certification. If she does not pass Step 1 and Step 2 CS

by May 1, 2019, her passing performance on Step 2 CK will no longer be valid for ECFMG Certification.

There are exceptions to this policy:

- This seven-year limit does **not** apply to the former ECFMG CSA because the CSA was not a USMLE Step or Step Component. International medical students/graduates who satisfied the clinical skills requirement for ECFMG Certification by passing the CSA are required to pass only Step 1 and Step 2 CK within seven years of each other for ECFMG Certification. For these individuals, the seven-year period begins on the exam date of the first USMLE Step or Step Component passed, regardless of when the CSA was passed.

- If your earliest USMLE passing performance that is valid for ECFMG Certification took place before June 14, 2004, you are required to pass only Step 1 and Step 2 CK within seven years of each other for ECFMG Certification; if required for ECFMG Certification, Step 2 CS can be passed outside the seven-year period.

If you have passed a Step or Step Component but this passing performance is no longer valid for ECFMG Certification, you may request an exception to retake the previously passed exam that is no longer valid. The USMLE program limits to six the total number of times an examinee can take the same Step or Step Component. See _Reexamination and Reapplication_ in _The United States Medical Licensing Examination (USMLE)_.

**Important Notes:** Time limits to complete the USMLE for the purpose of U.S. medical licensure are established by state medical licensing authorities and may require completion of all Steps or Step Components (including Step 3, which is not required for ECFMG Certification) within a certain number of years. Information regarding specific state requirements can be obtained on the Federation of State Medical Boards website.

Applicants who retake a previously passed Step or Step Component to comply with a time limit should understand the implications of a failing retake performance on their Step 3 eligibility. See _Retaking Previously Passed Steps_ in the USMLE _Bulletin of Information_.

A passing performance that is no longer valid for ECFMG Certification will still appear on a USMLE transcript.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# Eligibility for Examination

Medical School Students | [Medical School Graduates](#) | [Reverification of Eligibility](#)

The eligibility requirements for examination differ depending on whether you are a medical school **student** or a medical school **graduate**.

## Medical School Students

**To be eligible for Step 1, Step 2 CK, and Step 2 CS**, you must be officially enrolled in a medical school located outside the United States and Canada that is listed in the _World Directory_ as meeting ECFMG eligibility requirements, both at the time that you apply for examination and on your test day. In addition, the "Graduation Years" in the ECFMG note in your medical school's _World Directory_ listing must be "Current" at the time you apply and on your test day. See [Medical School Requirements](#). An authorized official of your medical school must certify your current enrollment status; instructions will be provided at the time of application for examination.

As soon as you graduate and receive your medical diploma, you must submit a copy of your medical diploma to ECFMG. See _[Final Medical Diploma and Transcript](#)_ in _Medical Education Credentials_.

**In addition to being currently enrolled as described above, to be eligible for Step 1, Step 2 CK, and Step 2 CS**, you must have completed at least two years of medical school. This eligibility requirement means that you must have completed the basic medical science component of the medical school curriculum by the beginning of your eligibility period. Although you may apply for and take the examinations after completing the basic medical science component of your medical school curriculum, it is recommended that you complete your core clinical clerkships, including actual patient contact, before taking Step 2 CK and Step 2 CS.

If you have passed the former ECFMG CSA, you are **not** eligible to take Step 2 CS, except under certain, well-defined circumstances. Eligible circumstances include: taking Step 2 CS to permanently validate an expired CSA examination date for the purpose of entering U.S. GME; taking Step 2 CS because your most recent performance on a clinical skills exam (CSA or Step 2 CS) is a failing performance (See _Retaking Previously Passed Steps_ in the [USMLE _Bulletin of Information_](#)); and retaking Step 2 CS to meet a time limit (See _[Reexamination and Reapplication](#)_ in _The United States Medical Licensing Examination (USMLE)_).

**Important Notes:** If your eligibility for an exam changes after you apply but before you take the exam, you are required to inform ECFMG immediately in writing of this change in your status. Such notification must be sent to ECFMG's Applicant Information Services. Use the contact information for General Inquiries on the Contact ECFMG page of the ECFMG website. Such changes in your eligibility status include, but are not limited to, the following:

- Medical school students who transfer to another medical school after submitting an application for examination must inform ECFMG immediately in writing of this transfer.

- Medical school students who have been dismissed or withdraw(n) from medical school are not eligible for USMLE, even if they are appealing the school's decision to dismiss them or are otherwise contesting their status. Medical school students who have been dismissed or withdraw(n) from medical school must inform ECFMG immediately in writing of their dismissal or withdrawal.

- Medical school students who take a leave of absence should consult with their medical schools about whether they will be considered officially enrolled in medical school during leave. Your medical school may consider a student on leave of absence to be withdrawn from medical school. Medical school students who are not officially enrolled in medical school are not eligible to apply for or take USMLE. Applicants who take a leave of absence after submitting an application for examination to ECFMG must inform ECFMG immediately in writing of this leave.

**Failure to inform ECFMG that you may no longer be eligible to take the examination may result in a finding of irregular behavior and permanent annotation of your ECFMG record. See _Policies and Procedures Regarding Irregular Behavior_.**

If you take a Step or Step Component for which you are not eligible, results for that exam may not be reported or, if previously reported, may be canceled.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# Eligibility for Examination

[Medical School Students](#) | Medical School Graduates | [Reverification of Eligibility](#)

The eligibility requirements for examination differ depending on whether you are a medical school **student** or a medical school **graduate**.

## Medical School Graduates

**To be eligible for Step 1, Step 2 CK, and Step 2 CS**, you must be a graduate of a medical school located outside the United States and Canada that is listed in the *[World Directory](#)* as meeting ECFMG eligibility requirements. Your graduation year must be included in the "Graduation Years" listed in the ECFMG note in your medical school's *World Directory* listing. See *[Medical School Requirements](#)*. You must have been awarded credit for at least four credit years (academic years for which credit has been given toward completion of the medical curriculum) by a medical school that is listed in the *World Directory* as meeting ECFMG eligibility requirements. An authorized official of your medical school must certify your status as a graduate of the school; instructions will be provided at the time of application for examination.

You must submit a copy of your medical diploma at the time of exam application if your diploma has not been sent to ECFMG previously. See the *[Reference Guide for Medical Education Credentials](#)* on the ECFMG website for the exact title of the final medical diploma you must provide. If you have graduated and met all requirements for your medical diploma but your medical diploma has not yet been issued, a letter signed by an authorized official of your medical school must be submitted with your exam application. The letter you submit must be the original document and must be written on your medical school's letterhead. The letter must include the following statement:

> **This is to confirm that [applicant name] has graduated and completed all requirements to receive the [degree title] degree from [medical school/university name]. The degree will be issued [month and year].**

You must then submit a copy of your medical diploma to ECFMG as soon as your diploma is issued. See *[Medical Education Credentials](#)*.

All documents that are not in English must be accompanied by an official English translation that meets ECFMG's translation requirements. See *[English Translations](#)* in *Medical Education Credentials*.

If you have passed the former ECFMG CSA, you are **not** eligible to take Step 2 CS, except under certain, well-defined circumstances. Eligible circumstances include: taking Step 2 CS to permanently validate an expired CSA examination date for the purpose of entering U.S. GME; taking Step 2 CS because your most recent performance on a clinical skills exam (CSA or Step 2 CS) is a failing performance (See *Retaking Previously Passed Steps* in the USMLE *Bulletin of Information*); and retaking Step 2 CS to meet a time limit (See *Reexamination and Reapplication* in *The United States Medical Licensing Examination (USMLE)*).

> **Important Notes:** If your eligibility for an exam changes after you apply but before you take the exam, you are required to inform ECFMG immediately in writing of this change in your status. Such notification must be sent to ECFMG's Applicant Information Services. Use the contact information for General Inquiries on the Contact ECFMG page of the ECFMG website. **Failure to inform ECFMG that you may no longer be eligible to take the examination may result in a finding of irregular behavior and permanent annotation of your ECFMG record. See** *Policies and Procedures Regarding Irregular Behavior*.
>
> If you take a Step or Step Component for which you are not eligible, results for that exam may not be reported or, if previously reported, may be canceled.
>
> If you have already been granted a physician license by a U.S. medical licensing authority based on other licensure examinations, such as the Federation Licensing Examination (FLEX), the NBME certifying examinations, or the National Board of Osteopathic Medical Examiners COMLEX-USA, you may not be eligible to take the USMLE. Please contact ECFMG if you have questions about your eligibility.

The American Medical Association's Council on Medical Education no longer supports the Fifth Pathway as a mechanism for eligibility to enter ACGME-accredited graduate medical education programs. Additionally, the USMLE Program no longer accepts Fifth Pathway Certificates to meet eligibility requirements to take Step 3. Individuals who hold Fifth Pathway Certificates and wish to apply to ECFMG for examination must apply for ECFMG Certification and meet the requirements for ECFMG Certification established for all medical school graduates.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# Eligibility for Examination

Medical School Students | Medical School Graduates | Reverification of Eligibility

## Reverification of Eligibility

ECFMG reserves the right to reverify your eligibility for examination at any time during the application and registration process. If your medical school informs ECFMG that your status has changed, and ECFMG determines you are no longer eligible for examination, your registration will be canceled. **If you have failed to inform ECFMG of this change in your status, it may result in a finding of irregular behavior and permanent annotation of your ECFMG record. See _Policies and Procedures Regarding Irregular Behavior_.**

For medical school students, ECFMG may reverify your status as a student officially enrolled in medical school. When a medical school does not participate in ECFMG Medical School Web Portal (EMSWP) Status Verification, ECFMG's reverification of the status of the school's students may include ECFMG sending a written request for reverification by postal mail to the medical school. If reverification is requested by ECFMG, ECFMG may cancel your registration or withhold your score report until ECFMG has received reverification of your status directly from the medical school. If your registration is canceled, you may be required to reapply.

For medical school graduates, ECFMG may reverify your medical education credentials with the issuing medical school. If such reverification is requested by ECFMG, you will be registered for examination only after ECFMG has received reverification of your credentials directly from the medical school. If reverification is requested by ECFMG after you have been registered for examination, ECFMG may cancel your registration or withhold your score report until ECFMG has received reverification of your medical education credentials directly from the issuing school. If your registration is canceled, you may be required to reapply.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# The United States Medical Licensing Examination (USMLE)

About USMLE | Registration and Test Delivery Entities | Applying for Examination | Scheduling the Examination | Preparing for Examination | Taking the Examination | USMLE Program and Irregular Behavior | Examination Results | Reexamination and Reapplication

## About USMLE

The USMLE is a three-step examination for medical licensure in the United States. The USMLE provides a common system to evaluate applicants for medical licensure. The USMLE is sponsored by the Federation of State Medical Boards (FSMB) and the National Board of Medical Examiners (NBME). The USMLE is governed by a committee consisting of representatives of FSMB, NBME, ECFMG, and the American public. If you apply for examination, you are **required** to read the USMLE *Bulletin of Information* for detailed information on the USMLE.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# The United States Medical Licensing Examination (USMLE)

About USMLE | Registration and Test Delivery Entities | Applying for Examination | Scheduling the Examination | Preparing for Examination | Taking the Examination | USMLE Program and Irregular Behavior | Examination Results | Reexamination and Reapplication

## Registration and Test Delivery Entities

### Step 1 and Step 2

ECFMG is the organization that registers international medical students/graduates for Step 1 and Step 2 (CK and CS). This means that ECFMG processes your exam application and payment, verifies your eligibility, and notifies you of the outcome of your application. The NBME serves as the registration entity for students/graduates of U.S. and Canadian medical school programs accredited by the Liaison Committee on Medical Education (LCME) and U.S. medical schools accredited by the American Osteopathic Association (AOA).

For eligible international medical students/graduates applying for Step 1/Step 2 CK, ECFMG forwards registration information to NBME, and NBME issues the exam scheduling permits. ECFMG sends an e-mail notification to these applicants when their scheduling permits are available. Scheduling and test centers for USMLE Step 1 and Step 2 CK are provided by Prometric. Prometric serves as the test delivery entity for all examinees taking Step 1/Step 2 CK. Step 1 and Step 2 CK are delivered at Prometric test centers worldwide.

For eligible international medical students/graduates applying for Step 2 CS, ECFMG issues the exam scheduling permits and sends an e-mail notification to applicants when the scheduling permits are available. The Clinical Skills Evaluation Collaboration (CSEC), a collaboration of ECFMG and NBME, is responsible for delivery of the Step 2 CS exam. Step 2 CS is delivered to all examinees at regional CSEC Centers in the United States.

For all applicants, NBME is responsible for determining the results of USMLE exams and for issuing the score reports. ECFMG sends an e-mail notification to international medical students/graduates when their Step 1, Step 2 CK, and Step 2 CS score reports are available.

### Step 3

The FSMB is the organization that registers all Step 3 applicants. To be eligible for Step 3, international medical graduates must have passed Step 1 and Step 2 (CK and CS) and

must be certified by ECFMG, among other requirements. See *Eligibility for the USMLE* in the USMLE *Bulletin of Information*. If you have not met all eligibility requirements, your application for Step 3 will not be accepted. For detailed information and application procedures for Step 3, contact the FSMB. Scheduling and test centers for Step 3 are provided by Prometric, which serves as the test delivery entity for all Step 3 examinees. USMLE Step 3 is delivered at Prometric test centers in the United States.

For all applicants, NBME is responsible for determining the results of USMLE exams and for issuing the score reports. FSMB notifies examinees when their Step 3 score reports are available.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# The United States Medical Licensing Examination (USMLE)

[About USMLE](#) | [Registration and Test Delivery Entities](#) | Applying for Examination | [Scheduling the Examination](#) | [Preparing for Examination](#) | [Taking the Examination](#) | [USMLE Program and Irregular Behavior](#) | [Examination Results](#) | [Reexamination and Reapplication](#)

## Applying for Examination

Before applying to ECFMG for examination:

- International medical students/graduates must complete an Application for ECFMG Certification, including the notarized Certification of Identification Form (Form 186). See *Application for ECFMG Certification*.

- ECFMG must accept the Application for ECFMG Certification, including the notarized Form 186.

- International medical students/graduates must read the applicable editions of the ECFMG *Information Booklet* and the USMLE *Bulletin of Information*.

To apply for USMLE Step 1, Step 2 CK, and/or Step 2 CS, use ECFMG's [Interactive Web Applications (IWA)](#). A complete application consists of the on-line part, which you complete using IWA; verification of your student or graduate status by your medical school; and any other required documents. You should read the detailed [overview](#) and [instructions](#) that accompany the application for examination in IWA before you begin working on the application; these resources will help you plan the timing of your application and outline any necessary items (such as official signatures) that require advance planning.

**Important Note:** You should also consider deadlines imposed by the [National Resident Matching Program (NRMP)](#) and graduate medical education (GME) programs. It is solely the responsibility of the applicant to complete the required exams in time to meet deadlines imposed by the NRMP and/or GME programs. Since the number of applicants seeking to complete these exams may exceed the spaces available in time to meet those deadlines, there is no guarantee that sufficient spaces will be available for all applicants to meet deadlines imposed by the NRMP and/or GME programs. ECFMG assumes no liability of any kind if an applicant does not complete the exams in time to have results available to meet NRMP and/or GME program deadlines. See *Examination Results* for information on scoring turnaround times.

## Exam Fees

For all exams, there is an examination fee. For Step 1 or Step 2 CK, there is an additional international test delivery surcharge, if you choose a testing region other than the United States/Canada. You must pay all applicable fees at the time you apply for examination. For the current exam fees and international test delivery surcharges, see the Fees page on the ECFMG website.

## Eligibility Periods

When you apply for Step 1 or Step 2 CK, you must select a three-month eligibility period, such as January-February-March, February-March-April, etc., during which you would prefer to take the exam. The eligibility period you are assigned will be listed on your scheduling permit. You must take the exam during the eligibility period assigned to you.

If you are unable to take Step 1/Step 2 CK during the three-month eligibility period assigned to you, you may request a one-time, contiguous eligibility period extension (EPEx) using ECFMG's IWA. Refer to the EPEx Overview in IWA for more information and instructions.

**If you do not take Step 1/Step 2 CK during your original or extended eligibility period or if you are unable to extend your eligibility period, you must reapply by submitting a new application and fee(s), if you wish to take the exam**.

When you apply for Step 2 CS, you are assigned a 12-month eligibility period that begins on the date that the processing of your application is completed. Your eligibility period will be listed on your scheduling permit.

Once your Step 2 CS eligibility period has been assigned, it cannot be changed or extended. You can schedule a testing appointment for any available date in your eligibility period, and reschedule a testing appointment within your eligibility period. See *Scheduling the Examination* for more information. **If you do not take Step 2 CS during your assigned eligibility period, you must reapply by submitting a new application and examination fee, if you wish to take the exam**.

## Testing Locations

Step 1 and Step 2 CK are delivered at Prometric test centers worldwide. Prometric's test centers are grouped into defined testing regions. When you apply for Step 1 or Step 2 CK, you must choose the testing region where you want to take the exam. A list of Prometric testing regions is available on the ECFMG website.

You can take the exam at any test center in your testing region that offers USMLE, provided there is space available on the date you choose. **The test centers available for USMLE Step 1 and Step 2 CK are subject to change**. To obtain current information on specific test centers, visit the [Prometric website](#) or follow instructions on the scheduling permit for contacting Prometric.

If you are unable to keep your Step 1 or Step 2 CK testing appointment at the test center you select, you can reschedule for a different test center within your testing region, subject to availability. To avoid a rescheduling fee, you must reschedule more than 30 calendar days before your scheduled testing appointment. Refer to your scheduling permit for details.

If you are unable to take Step 1 or Step 2 CK in the testing region you selected, you may request a change to your testing region. For more information, see the *Request to Change USMLE® Step 1/Step 2 CK Testing Region* (Form 312), available in the Resources section of the ECFMG website and from ECFMG, upon request.

Step 2 CS is administered at six test centers in five cities in the United States. Once you are registered for the exam, you will select a test center, subject to availability, when you schedule your testing appointment. If you are unable to keep your testing appointment at the test center you select, you can reschedule for a different center, subject to availability. To avoid a rescheduling fee, you must cancel or reschedule more than 14 calendar days before your scheduled testing appointment. Access [Step 2 CS Calendar and Scheduling](#) on the ECFMG website for more information.

## Examinees with Disabilities Requesting Test Accommodations

The USMLE program provides reasonable accommodations for examinees with disabilities under the Americans with Disabilities Act (ADA). If you are an individual with such a disability and require test accommodations, visit the [USMLE website](#) before you apply for each Step or Step Component for information regarding test accommodations, including procedures and documentation requirements.

## Examinees Who Require Additional Break Time

Examinees with physical or health conditions, such as lactation (to express breast milk) and diabetes (to monitor/treat blood glucose), may apply for additional break time. See the [USMLE *Bulletin of Information*](#) for more information.

## Personal Item Exceptions (PIE)

Unauthorized possession of personal items while you are in the secure areas of the testing center is prohibited. Exceptions to this policy may be made in certain limited circumstances. See the USMLE *Bulletin of Information* for more information.

**Important Note:** Please note that ECFMG will not provide services of any kind if doing so would be considered violative of any applicable federal, state, or local laws or regulations. Additionally, ECFMG may delay provision of services while investigating whether the services or surrounding circumstances violate such laws, regulations, or ECFMG's policies and procedures.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# The United States Medical Licensing Examination (USMLE)

About USMLE | Registration and Test Delivery Entities | Applying for Examination | Scheduling the Examination | Preparing for Examination | Taking the Examination | USMLE Program and Irregular Behavior | Examination Results | Reexamination and Reapplication

## Scheduling the Examination

Once ECFMG verifies that you are eligible and your registration is complete, your scheduling permit will be issued. If you apply for more than one exam at the same time, you will be issued separate scheduling permits for each exam. Once your scheduling permit is available, ECFMG will send a notification to the e-mail address in your ECFMG record. **You will not receive the scheduling permit or notification by postal mail**.

> **Important Note:** For Step 1 and Step 2 CK, if the beginning of your assigned eligibility period is more than six months in the future, your scheduling permit will not be available and the notification e-mail will not be sent until approximately six months before the beginning of the assigned eligibility period.

**The scheduling permit is a very important document**; it includes your assigned eligibility period, a description of the form(s) of identification you must bring to the test center on your exam date, and instructions for scheduling your testing appointment. You must bring your scheduling permit to the test center on your exam date. Your name, as it appears on your scheduling permit, must exactly match the name on your form(s) of identification. Please review your scheduling permit for details and limited exceptions. **If you do not bring a copy of your scheduling permit (electronic or paper) and required identification on each day of your exam, you will not be allowed to take the exam**. If you are not allowed to take the exam, you must pay a fee to reschedule your exam. Your rescheduled testing appointment must fall within your assigned eligibility period.

If the name listed on your scheduling permit is not correct, contact ECFMG immediately by e-mail, telephone, or fax. Use the contact information for General Inquiries on the Contact ECFMG page of the ECFMG website.

If the name in your ECFMG record is changed while you are registered for an exam, a revised scheduling permit reflecting this change will be issued. ECFMG will send you an e-mail notification when your revised scheduling permit is available. You must bring the revised scheduling permit to the test center. Name changes must be received **and processed** by ECFMG no later than seven business days before your testing appointment, or you will not be able to test. For Step 1 or Step 2 CK, if your eligibility period is extended or your testing region is changed while you are registered, a revised

Page 47

scheduling permit reflecting this change will be issued. You must bring the revised scheduling permit to the test center.

If you lose your scheduling permit, you can access it through IWA.

## Scheduling

You can schedule your testing appointment as soon as you obtain your exam scheduling permit. Please refer to your scheduling permit for instructions on reviewing available test dates and centers and scheduling a testing appointment. If you do not schedule and take the exam within your eligibility period, you must reapply by submitting a new application and exam fee(s), if you wish to take the exam.

Please refer to the schedule for reporting Step 2 CS results, available on the ECFMG and USMLE websites, **before scheduling a testing appointment if you need your Step 2 CS results by a specific deadline**.

## Rescheduling

If you are unable to keep your Step 1 or Step 2 CK testing appointment, you are permitted to reschedule your appointment within your eligibility period. A fee is charged if a change is made during the 30 calendar days before your scheduled testing appointment. A fee schedule is posted on the USMLE website. Refer to your scheduling permit for details on contacting Prometric to change your appointment.

If you cannot take the Step 1 or Step 2 CK exam during your assigned eligibility period, you may request a one-time, contiguous eligibility period extension (EPEx) using ECFMG's IWA. Refer to the EPEx Overview in IWA for more information and instructions.

If you cannot take the Step 1 or Step 2 CK exam in the testing region you selected, you may request to change your testing region. Refer to the *Request to Change USMLE®*
*Step 1/Step 2 CK Testing Region* (Form 312) for details. This form is available in the Resources section of the ECFMG website and from ECFMG, upon request.

If you are unable to keep your Step 2 CS testing appointment, you are permitted to reschedule your appointment within your eligibility period. A fee is charged if a change is made during the 14 calendar days before your scheduled appointment. For instructions on canceling and rescheduling a Step 2 CS testing appointment, rescheduling fees, and to cancel or reschedule your appointment, access Step 2 CS Calendar and Scheduling on the ECFMG website.

JA 0054

Step 2 CS eligibility periods cannot be extended. If you do not take the exam within your eligibility period, you must reapply by submitting a new application and examination fee, if you wish to take the exam.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# The United States Medical Licensing Examination (USMLE)

About USMLE | Registration and Test Delivery Entities | Applying for Examination | Scheduling the Examination | Preparing for Examination | Taking the Examination | USMLE Program and Irregular Behavior | Examination Results | Reexamination and Reapplication

## Preparing for Examination

For detailed information on test lengths and formats see *The USMLE: Purpose, Test Format, and Test Lengths* in the USMLE *Bulletin of Information*.

Practice materials for all Steps and Step Components are available in the Practice Materials section of the USMLE website.

The NBME offers web-based self-assessments to help medical students and graduates evaluate their readiness for computer-based Steps and Step Components (Step 1, Step 2 CK, and Step 3). For complete information, see NBME Self-Assessment Services on the NBME website.

Practice Sessions for USMLE Step 1, Step 2 CK, and Step 3 are available at Prometric test centers to registered applicants. These sessions are provided primarily to give examinees the opportunity to become familiar with the Prometric test center environment. For more information, see USMLE Computer-based Testing Practice Session on the USMLE website.

> **Important Note:** Test preparation courses and materials are available from individuals and companies not associated with the USMLE. It is unlawful for any test preparation service or program to use, disclose, distribute, or solicit content from recent test takers, or to otherwise provide access to questions or answers from actual USMLE exams. If there is evidence that you enrolled in, participated in, or used any test preparation program or service that distributes, provides access to, or uses USMLE content (questions or answers), or provides a forum for others to share such information, your registration and/or testing may be canceled, your scores on the USMLE may be withheld or canceled, and you may be subject to further sanctions. See *Irregular Behavior* in the USMLE *Bulletin of Information*. ECFMG also regularly reviews allegations of irregular behavior in conjunction with its programs and services. See *Policies and Procedures Regarding Irregular Behavior*, which may apply.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# The United States Medical Licensing Examination (USMLE)

<u>About USMLE</u> | <u>Registration and Test Delivery Entities</u> | <u>Applying for Examination</u> | <u>Scheduling the Examination</u> | <u>Preparing for Examination</u> | Taking the Examination | <u>USMLE Program and Irregular Behavior</u> | <u>Examination Results</u> | <u>Reexamination and Reapplication</u>

## Taking the Examination

For detailed information on arrival times, and procedures upon arrival and throughout the testing day, see *Examination Day and Testing* in the <u>USMLE *Bulletin of Information*</u>. You should also refer to your scheduling permit for important information.

> **Important Note:** After you start taking an examination, you cannot cancel or reschedule that examination. If you start the examination but do not complete it, the attempt may appear as "incomplete" on your USMLE transcript.

When you arrive at the test center, you must present your **scheduling permit** and the **required identification** as described on your scheduling permit. **If you do not bring a copy of your scheduling permit (electronic or paper) and required identification on each day of your exam, you will not be admitted to the test** and will be required to pay a fee to reschedule your test.

Your name, as it appears on your scheduling permit, must match the name on your form(s) of identification exactly. Please review your scheduling permit for details and limited exceptions. If the name listed on your scheduling permit is not correct, <u>contact ECFMG</u> immediately by e-mail, telephone, or fax. Use the contact information for General Inquiries on the Contact ECFMG page of the ECFMG website.

If the name in your ECFMG record is changed while you are registered for an exam, a revised scheduling permit reflecting this change will be issued. ECFMG will send you an e-mail notification when your revised scheduling permit is available. You must bring this revised scheduling permit to the test center. Name changes must be received **and processed** by ECFMG no later than seven business days before your testing appointment, or you will not be able to test. For Step 1 or Step 2 CK, if your eligibility period is extended or your testing region is changed while you are registered, a revised scheduling permit reflecting this change will be issued. You must bring the revised scheduling permit to the test center.

## Required Identification

Your name, as it appears on your scheduling permit, must exactly match the name on your form(s) of identification. Please review your scheduling permit for details and

limited exceptions. Since your name on the scheduling permit appears in the Latin alphabet (in "English language letters"), the name on your identification must also appear in the Latin alphabet. The spelling of the name on your scheduling permit must match **exactly** the spelling of the name on the form(s) of identification you present at the test center. If the names do not match as described above, you will not be allowed to take the exam. See *Your Name* in *Your ECFMG Record.*

The form of identification you present must be one of the forms of **unexpired**, government-issued identification listed below that contains your **name in the Latin alphabet**, your **signature**, and your recent **photograph**. The following forms of identification are acceptable, only if they meet all of these requirements:

- Passport
- Driver's license with photograph
- National identity card
- Other form of unexpired, government-issued identification

## Travel Status

Applicants traveling to the United States to take an exam are responsible for making the necessary travel and accommodation arrangements. If you are neither a U.S. citizen nor a U.S. lawful permanent resident, you are responsible for obtaining required travel documents. These documents may include a visa to enter the United States. The requirements of the U.S. Department of Homeland Security (DHS) and U.S. embassies and consulates regarding issuance of visas and travel to and from the United States are subject to change. You should review current requirements before applying for a visa. For additional information, visit the DHS website and the U.S. Department of State website.

Step 2 CS is administered only in the United States. Upon request, ECFMG provides Step 2 CS applicants with a letter that may assist during the process of applying for a visa. The letter indicates that the applicant is registered for Step 2 CS, one of the exams required for ECFMG Certification. The letter also indicates that the applicant is required to travel to the United States to take the exam and provides the date by which the applicant must complete the exam. You can request this letter when you apply for Step 2 CS. After completion of the registration process, ECFMG will issue the letter, and it will be available to you through IWA. If you are unable to obtain the appropriate visa to enter the United States to take Step 2 CS, you may request a full refund of the exam fee. See *Refunds* in *Your ECFMG Financial Account.*

If you are traveling from a distant location, you should consider arriving a day or two before the examination in order to be rested.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

Case 2:18-cv-00540-WB Document 152-20 Filed 05/08/23 Page 62 of 235
Case 2:18-cv-00540-WB Document 151-20 Filed 05/02/23 Page 122 of 614
JA00459

# The United States Medical Licensing Examination (USMLE)

[About USMLE](#) | [Registration and Test Delivery Entities](#) | [Applying for Examination](#) | [Scheduling the Examination](#) | [Preparing for Examination](#) | [Taking the Examination](#) | USMLE Program and Irregular Behavior | [Examination Results](#) | [Reexamination and Reapplication](#)

## USMLE Program and Irregular Behavior

The USMLE program defines irregular behavior as including, "any action by applicants, examinees, potential applicants, or others that could compromise the validity, integrity, or security of the USMLE process." Test center staff monitor, in person and via video/audio recording, administration of the USMLE Steps and are required to report any violations of the USMLE or test center rules. You must follow instructions from test center staff throughout the examinations; failure to do so may result in a finding that you have engaged in irregular behavior and permanent annotation of your USMLE transcript. See *Testing Regulations and Rules of Conduct* and *Irregular Behavior* in the [*USMLE Bulletin of Information*](#). See ECFMG's [*Policies and Procedures Regarding Irregular Behavior*](#), which also may apply.

> **Important Notes:** Seeking, providing, and/or obtaining information relating to examination content that may give or attempt to give unfair advantage to anyone who may be taking the examination, which includes postings regarding examination content and/or answers on the Internet, is a violation of the USMLE Rules of Conduct.
>
> Evidence of violation of any test administration rule, including the USMLE Rules of Conduct, will result in actions being taken under *USMLE Policies and Procedures Regarding Irregular Behavior*. If you are found to have engaged in irregular behavior, your score report and transcripts will include this finding, you may be barred from taking the USMLE in the future, and your score may be canceled.
>
> Anomalous performance and/or unusual testing history may impact your access to the USMLE. If your performance raises concerns about your readiness to test or your motivation to pass, the USMLE program reserves the right to restrict your future access to its examinations and/or to impose conditions upon future access. Do not test if you are not able or not ready on your scheduled test date. Taking a Step examination to familiarize yourself with the examination format, or for any reason other than to pass, is prohibited and may result in restrictions on your future access to the USMLE.

The above-described conduct may also be considered irregular behavior under ECFMG's [*Policies and Procedures Regarding Irregular Behavior*](#).

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# The United States Medical Licensing Examination (USMLE)

About USMLE | Registration and Test Delivery Entities | Applying for Examination | Scheduling the Examination | Preparing for Examination | Taking the Examination | USMLE Program and Irregular Behavior | Examination Results | Reexamination and Reapplication

## Examination Results

The USMLE program provides a recommended pass or fail outcome on all Step examinations. For ECFMG Certification, you must obtain at least the USMLE-recommended pass outcome for each required Step or Step Component. See *Examination Requirements* in *Examinations for ECFMG Certification*.

## Score Reporting

Results for Step 1 and 2 CK are typically available three to four weeks after your test date. However, a number of factors may delay score reporting. When selecting your test date and inquiring about results, you should allow at least eight weeks to receive notification that your score report is available. Results for Step 2 CS are available according to the Step 2 CS Schedule for Reporting Results, available on the USMLE and ECFMG websites. For more specific information about potential scoring delays, visit the Announcements section on the home page of the USMLE website.

ECFMG reserves the right to reverify with the medical school the eligibility of medical school students and graduates who are registered for examination. If ECFMG requests reverification of your student/graduate status with your medical school, your score report will be issued only after reverification of your status has been received by ECFMG.

Score reports are issued in electronic format only and can be accessed using ECFMG's OASIS; **you will not receive a paper score report by postal mail**. Once your score report has been issued, ECFMG will send a notification to the e-mail address in your ECFMG record.

Score reports are available for approximately 120 days from the date of e-mail notification. Once the score report is removed from OASIS, your results will be provided to you only in the form of an official USMLE transcript. To obtain a transcript, you will be required to submit a request and pay a fee through the organization that registered you for the examination. Therefore, it is strongly recommended that you print and/or save your score report while it is available.

> **Important Note:** ECFMG may provide your medical school with data on your performance on administrations of USMLE Step 1, USMLE Step 2 CK, and USMLE Step 2

CS. Data provided include whether you passed or failed the exam administration, and, for Step 1 and Step 2 CK, your numerical score. You have the option to withhold your exam results from your medical school. See ECFMG's Provision of Performance Data to Medical Schools in IWA for more information.

See *Score Reporting* in the USMLE *Bulletin of Information* for additional information. For up-to-date information on minimum passing scores, examination performance data, and general scoring methodology, please visit the USMLE website.

## Score Validity

The USMLE program reserves the right to cancel scores that are at or above the passing level if the USMLE program has a good faith basis for questioning whether they represent a valid measure of knowledge or competence as sampled by the examination. If there are questions related to the validity of your score, your score report may be delayed or withheld pending completion of further review and/or investigation. See *Score Validity* in the USMLE *Bulletin of Information*.

## USMLE Transcripts

To request an official USMLE transcript, you must contact the organization that registered you for the examination. You must contact the Federation of State Medical Boards if you are registered for or have taken Step 3 and/or you want to send your transcript to a U.S. medical licensing authority. In all other cases, submit your transcript request to ECFMG by sending a completed *Request for Official USMLE® Transcript (Form 172)* and the appropriate fee to ECFMG. Form 172 and additional information are available in the Resources section of the ECFMG website and from ECFMG, upon request. You can use OASIS to check whether your USMLE transcript has been sent.

If you apply to residency programs through the Electronic Residency Application Service (ERAS), you may request electronic transmittal of your USMLE transcript to these programs. For additional information, refer to the ERAS applicant information available in the ERAS Support Services section of the ECFMG website. Information on the status of requests for electronic transmittal of USMLE transcripts via ERAS is not available through OASIS. If the program does not participate in ERAS, you must submit a transcript request using Form 172 and pay the required fee.

> **Important Note:** If you took the former ECFMG CSA, your USMLE transcript will indicate only that you have CSA examination history. It will not provide any additional information on your attempt(s) on the CSA. To request official copies of your CSA

performance history, you must complete a *Request for an Official ECFMG® CSA® History Chart* (Form 297) and submit it to ECFMG with the appropriate fee. Form 297 is available in the Resources section of the ECFMG website and from ECFMG, upon request. For each attempt on the ECFMG CSA, the Official ECFMG CSA History Chart includes the month and year of the administration and the result of your performance. For additional information, refer to the instructions that accompany Form 297.

## Score Rechecks

For all Steps and Step Components, a rigorous process is used to ensure the accuracy of scores, including a double scoring method involving independent scoring systems. Therefore, a change in your score or in your pass/fail outcome based on a recheck is an extremely remote possibility. To date, the score recheck process has not resulted in a score change. However, a recheck will be performed if you submit a *Request for Recheck of USMLE® Step 1, Step 2 CK, or Step 2 CS Score* (Form 265) and the fee for this service to ECFMG. Form 265 is available in the Resources section of the ECFMG website and from ECFMG, upon request. Your request must be received by ECFMG no later than 90 days after your result was released to you. See *Score Rechecks* in the USMLE *Bulletin of Information* for more information.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# The United States Medical Licensing Examination (USMLE)

About USMLE | Registration and Test Delivery Entities | Applying for Examination | Scheduling the Examination | Preparing for Examination | Taking the Examination | USMLE Program and Irregular Behavior | Examination Results | Reexamination and Reapplication

## Reexamination and Reapplication

USMLE policy generally does not allow applicants to retake a Step or Step Component if they have already passed that Step or Step Component. However, there are exceptions for the purpose of complying with a time limit imposed by a U.S. physician licensing authority or another authority recognized by the USMLE program. See 'Time Limit for Completing Examination Requirements' below.

If you fail a Step or Step Component, you must reapply, including payment of the appropriate fee(s), to retake the exam. If you do not take an exam during your assigned eligibility period, you must reapply, including payment of the appropriate fee(s), if you wish to take the exam; **in this event, you may reapply at any time, however, ECFMG cannot begin to process a subsequent application for this exam until at least four weeks after the end of the eligibility period for the exam you did not take**.

## Number of Attempts Allowed

The USMLE program limits to six the total number of times an examinee can take the same Step or Step Component. An examinee is ineligible to take a Step or Step Component after **six or more prior attempts** to pass that Step or Step Component, including incomplete attempts. All attempts at a Step or Step Component are counted toward the limit, regardless of when the exams were taken.

For the purpose of U.S. medical licensure, state medical licensing authorities may limit the number of attempts allowed to pass each Step or Step Component. Information regarding specific state requirements can be obtained on the Federation of State Medical Boards website.

## Time Between Examination Attempts

The USMLE program has established rules on how quickly you can retake the same Step or Step Component. You may not take the same examination more than three times within a 12-month period. Your fourth and subsequent attempts must be at least 12 months after your first attempt at that exam **and** at least six months after your most recent attempt at that exam. This includes incomplete attempts.

**Example:** An examinee took and failed her first attempt at Step 1 on January 15, 2017, her second attempt at Step 1 on April 15, 2017, and her third attempt at Step 1 on September 15, 2017. In January 2018, the examinee applied for a fourth attempt at Step 1, and wanted the March-April-May eligibility period. The earliest date that was both 12 months after her first attempt on January 15, 2017 and six months after her most recent attempt on September 15, 2017 was March 15, 2018. Since the March-April-May eligibility period began before this date, the earliest eligibility period that the applicant could request was April-May-June.

When you reapply, your eligibility period will be adjusted, if necessary, to comply with these rules. You must read the editions of the ECFMG *Information Booklet* and the USMLE *Bulletin of Information* that pertain to the eligibility period in which you take the exam.

## Time Limit for Completing Examination Requirements

For the purpose of ECFMG Certification, you must pass the USMLE Steps and Step Components required for ECFMG Certification within a seven-year period. If you do not pass all Steps and Step Components required for ECFMG Certification within a maximum of seven years, your earliest USMLE passing performance will no longer be valid for ECFMG Certification. See *Time Limit for Completing Examination Requirements* in *Examinations for ECFMG Certification*.

If you have passed a Step or Step Component but this passing performance is no longer valid for ECFMG Certification, you may request an exception to retake the previously passed exam that is no longer valid.

For the purpose of U.S. medical licensure, time limits to complete the USMLE are established by state medical licensing authorities and may require completion of all Steps or Step Components (including Step 3, which is not required for ECFMG Certification) within a certain number of years from the date the first Step is passed. Information regarding specific state requirements can be obtained on the FSMB website. You may request an exception to retake a previously passed exam to comply with the time limit of a U.S. physician licensing authority. Visit the USMLE website for more information.

> **Important Notes:** You may only request an exception at the time that you apply for the previously passed exam. Complete requirements and instructions will be provided at the time of exam application. Exceptions to the reexamination policy are not approved prior to your submitting the exam application.

Applicants who retake a previously passed Step or Step Component to comply with a time limit should understand the implications of a failing retake performance on their Step 3 eligibility. See *Retaking Previously Passed Steps* in the USMLE *Bulletin of Information*.

If an applicant's earliest USMLE passing performance that is valid for ECFMG Certification took place before June 14, 2004, the applicant is required to pass only Step 1 and Step 2 CK within seven years of each other for ECFMG Certification; if required for ECFMG Certification, Step 2 CS can be passed outside the seven-year period. See *Time Limit for Completing Examination Requirements* in *Examinations for ECFMG Certification*. If this applicant passes Step 1 and Step 2 CK within a seven-year period, these passing performances will remain valid for ECFMG Certification, regardless of when Step 2 CS is taken and passed. **This applicant will not be eligible to retake Step 1 or Step 2 CK for the purpose of meeting a time limit imposed by a U.S. physician licensing authority until after he or she is certified by ECFMG.**

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# Medical Education Credentials

Medical Education Credential Requirements | Transfer Credits | Credentials for ECFMG Certification | Final Medical Diploma and Transcript | Transcript(s) to Document Transferred Credits | Name on Medical Diploma and Transcript(s) | English Translations | Verification of Credentials

## Medical Education Credential Requirements

To be eligible for ECFMG Certification, you must have been awarded credit for at least four credit years (academic years for which credit has been given toward completion of the medical curriculum) by a medical school that is listed in the *World Directory of Medical Schools* (*World Directory*) as meeting ECFMG eligibility requirements. Your graduation year must be included in the ECFMG note in your medical school's *World Directory* listing. See *Medical School Requirements*. There are restrictions on credits transferred to the medical school that awards your medical degree that can be used to meet ECFMG's medical education credential requirements.

> **Important Notes:** Graduates not eligible for admission to the exams or for ECFMG Certification include, but are not limited to: Graduates with degrees only in stomatology, ayurvedic or homeopathic medicine, or those awarded only the diploma of Physician-Epidemiologist-Hygienist, Physician-Biochemist, Physician- Cyberneticist, Physician-Biophysicist, Licensed Medical Practitioner, or Assistant Medical Practitioner.
>
> Beginning in 2023, to be eligible for ECFMG Certification, ECFMG will require that applicants graduate from a medical school that has been appropriately accredited. To satisfy this requirement, medical schools must be accredited by an agency that has been recognized by the World Federation for Medical Education through its *Programme for Recognition of Accrediting Agencies.* ECFMG is in the process of establishing policies and procedures for implementing this requirement and will publish updates, as they become available, on the ECFMG website. International medical students and graduates interested in ECFMG Certification should monitor the ECFMG website for the latest information.

International medical graduates must document the completion of all requirements for, and receipt of, the **final medical diploma**. ECFMG verifies every international medical graduate's final medical diploma with the appropriate officials of the medical school that issued the diploma. When ECFMG requests verification of your medical diploma from your medical school, ECFMG will request the medical school to provide your **final medical school transcript**. Verification by ECFMG with the issuing school may also be required for transcripts that are submitted to document transferred credits. An international medical graduate's credentials are not considered complete until ECFMG

receives and accepts verification of the final medical diploma, final medical school transcript, and, if required, transfer credit transcript(s) directly from the issuing school(s).

Please do not send original documents; copies of documents are sufficient. All documents submitted to ECFMG as part of the certification process, including translations, will become part of your permanent ECFMG record and will not be returned to you. Please do not send any credentials not required by ECFMG (such as licenses, certificates of full registration, high school diplomas, academic awards, etc.). Submission of unnecessary documents can delay the processing of your exam application.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# Medical Education Credentials

[Medical Education Credential Requirements](#) | Transfer Credits | [Credentials for ECFMG Certification](#) | [Final Medical Diploma and Transcript](#) | [Transcript(s) to Document Transferred Credits](#) | [Name on Medical Diploma and Transcript(s)](#) | [English Translations](#) | [Verification of Credentials](#)

## Transfer Credits

Transfer credits are credits earned for a course taken at one institution (such as a medical school) that are accepted by a medical school toward meeting its degree requirements. For example, a student attends a medical school for one year and earns credits for 12 courses. The student transfers to another medical school, which accepts the credits for those 12 courses toward meeting its degree requirements. The credits for those 12 courses are then referred to as transfer credits.

If you transferred credits to the medical school that awarded or will award your medical degree, you must disclose and document these credits when you apply to ECFMG for examination, **regardless of when the credits were earned**. See *Credentials for ECFMG Certification* in *Medical Education Credentials*. Failure to disclose and document these credits may have a number of negative consequences, including delaying exam registration and certification by ECFMG, and may result in a finding of irregular behavior and permanent annotation of your ECFMG record. See *Policies and Procedures Regarding Irregular Behavior*.

Additionally, for the purpose of ECFMG Certification, credits earned on or after January 1, 2008 that are transferred to the medical school that awarded or will award your medical degree must meet **all** of the following criteria:

- If credits for more than eight courses were transferred, all credits must have been transferred from a medical school that is either:

    - located in the United States or Canada and listed in the *World Directory*, or

    - listed in the *World Directory* as meeting ECFMG eligibility requirements.

- Credits must be for courses that were passed at the medical school at which the course was taken.

If your transferred credits do not comply with all the criteria listed above, you will not meet the requirements to be registered by ECFMG for examination or the requirements to be certified by ECFMG. If your transferred credits do not meet **all** the criteria listed

Page 64

above, you may request an exception from the ECFMG Medical Education Credentials Committee.

> **Important Note:** The requirement that credits must be transferred from a medical school that meets the criteria above does not apply to credits transferred **only to the pre-medical portion of the curriculum** of the medical school that awarded or will award the medical degree. If you transferred credits to the pre-medical portion of the curriculum at the medical school that awarded or will award your medical degree from an institution that does not meet the criteria listed above, you must provide ECFMG with a letter from the medical school that awarded or will award your medical degree confirming that the credits were transferred to the pre-medical portion of the curriculum only. This letter must be on the letterhead of the medical school and be signed by an authorized official of your medical school. This letter must be submitted in conjunction with the application for examination. Applications received without this letter may be rejected. **This letter is in addition to disclosing and documenting all transferred credits as described above.**

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# Medical Education Credentials

Medical Education Credential Requirements | Transfer Credits | Credentials for ECFMG Certification | Final Medical Diploma and Transcript | Transcript(s) to Document Transferred Credits | Name on Medical Diploma and Transcript(s) | English Translations | Verification of Credentials

## Credentials for ECFMG Certification

The credentials required for ECFMG Certification are:

- *Final Medical Diploma and Transcript*
- *Transcript(s) to Document Transferred Credits*, if applicable

All documents that are not in English must be accompanied by an official English translation that meets ECFMG's translation requirements. See *Final Medical Diploma and Transcript*, *Transcript(s) to Document Transferred Credits*, and *English Translations* for complete information on required items.

> **Important Note:** You must include your full name and USMLE/ECFMG Identification Number on the **front** of all credentials before sending them to ECFMG.

**If you are a medical school graduate** when you submit your first exam application, your diploma and transcript(s) to document transferred credits (if applicable) must be submitted with this initial exam application. If you have graduated and met all requirements for your medical diploma but your medical diploma has not yet been issued, a letter completed and signed by an authorized official of your medical school must be submitted with your exam application. Each medical school has been requested to provide ECFMG with a list of authorized officials. The letter you submit must be completed and signed by an official on this list. The official must provide his/her name, official title, and the institution name. The official must affix the institution's seal to the letter. The letter also must include the following statement:

> **This is to confirm that [applicant name] has graduated and completed all requirements to receive the [degree title] degree from [medical school/university name]. The degree will be issued [month and year].**

You must then submit a copy of your diploma to ECFMG as soon as the diploma is issued.

**If you graduated from medical school and do not submit a copy of your medical diploma or a letter from your medical school, as described above, and these documents have not been received previously by ECFMG, your exam application will be rejected.**

**If you are a medical school student** when you submit your first exam application, submit copies of your medical education credentials as soon as you graduate and receive them.

You may not submit the credentials required for ECFMG Certification to ECFMG until you apply for an exam. If you send credentials to ECFMG before you apply for an exam, they will not be processed. To submit your credentials at the time of application, follow the instructions for additional documents in the exam application in ECFMG's IWA.

After you have applied for an exam, if you need to send credentials to ECFMG separately from an exam application, you must submit the credentials to ECFMG via the MyECFMG mobile app or via mail at the address below.

Educational Commission for Foreign Medical Graduates (ECFMG)
Attn: Certification Credentials Services
3624 Market St., 4th Floor
Philadelphia, PA 19104-2685
USA

If your credentials are complete, you are generally not required to resend these documents when you apply for subsequent exams.

ECFMG will not accept letters or other deliveries that arrive with postage or other fees due.

When your credentials have been processed, ECFMG will notify you. You can also check the status of your credentials by accessing OASIS or the MyECFMG mobile app. If you have questions or concerns about your credentials, you can contact ECFMG using the contact information for General Inquiries on the Contact ECFMG page of the ECFMG website.

Documents submitted to ECFMG as part of the exam application and certification processes, including translations, will not be returned.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# Medical Education Credentials

[Medical Education Credential Requirements](#) | [Transfer Credits](#) | [Credentials for ECFMG Certification](#) | Final Medical Diploma and Transcript | [Transcript(s) to Document Transferred Credits](#) | [Name on Medical Diploma and Transcript(s)](#) | [English Translations](#) | [Verification of Credentials](#)

## Final Medical Diploma and Transcript

### Final Medical Diploma

ECFMG requires all medical school graduates to submit a copy of their final medical diploma to ECFMG. Do not send an original diploma. You must submit the copy of your diploma to ECFMG via the [MyECFMG mobile app](#) or via mail or courier service. The exact degree title of the final medical diploma you must provide is listed in the *Reference Guide for Medical Education Credentials* on the ECFMG website. The *Reference Guide* lists these medical credential qualifications by country of medical school. Although this *Reference Guide* is based upon information that was current at the time of publication, this information is subject to change.

If you are mailing a copy of your medical diploma, the photocopy **must be 216 mm x 279 mm (8½ in x 11 in). If the document is larger than 216 mm x 279 mm (8½ in x 11 in), you must send a reduced photocopy that is 216 mm x 279 mm (8½ in x 11 in).**

You must submit the copy of the final medical diploma in the original language, containing the issue date and all of the appropriate signatures of the medical school and/or university officials. Documents that are not in English must be accompanied by an official English translation. ECFMG will not accept a copy of a medical diploma that is not in English without an official English translation. Likewise, ECFMG will not accept an English translation of a diploma without a copy of the original language document from which the English translation was prepared. See *[English Translations](#)* in *Medical Education Credentials*.

Do not submit professional evaluations of your final medical diploma. ECFMG does not accept such evaluations in lieu of your final medical diploma.

If you are submitting the copy of your medical diploma with an exam application, follow the instructions for additional documents in the exam application in ECFMG's IWA.

The name on your medical diploma must match **exactly** the name in your ECFMG record. If the name on your diploma does not match the name in your ECFMG record, you must submit documentation that **verifies** the name on your diploma is (or was) your name. See *[Name on Medical Diploma and Transcript(s)](#)* in *Medical Education Credentials*.

## Final Medical School Transcript

When ECFMG requests verification of your medical diploma from your medical school, ECFMG will request the medical school to provide your final medical school transcript. If ECFMG is unable to obtain your final medical school transcript directly from your medical school, ECFMG will contact you and provide detailed instructions.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# Medical Education Credentials

[Medical Education Credential Requirements](#) | [Transfer Credits](#) | [Credentials for ECFMG Certification](#) | [Final Medical Diploma and Transcript](#) | Transcript(s) to Document Transferred Credits | [Name on Medical Diploma and Transcript(s)](#) | [English Translations](#) | [Verification of Credentials](#)

## Transcript(s) to Document Transferred Credits

If you have transferred credits to the medical school that awarded or will award your medical degree, you must document these credits when you apply for examination, regardless of when the credits were earned. You must send to ECFMG a copy of an official transcript issued by the school or institution at which the course was taken. You must submit the copy of your transcript to ECFMG via the MyECFMG mobile app or via mail or courier service.

If you are mailing a copy of the transcript, the photocopy **must be 216 mm x 279 mm (8½ in x 11 in). If the document is larger than 216 mm x 279 mm (8½ in x 11 in), you must send a reduced photocopy that is 216 mm x 279 mm (8½ in x 11 in).**

You must submit the copy of the transcript in the original language. Documents that are not in English must be accompanied by an official English translation. ECFMG will not accept a copy of a transcript that is not in English without an official English translation. Likewise, ECFMG will not accept an English translation of a transcript without a copy of the original language document from which the English translation was prepared. See *English Translations* in *Medical Education Credentials*.

Do not submit professional evaluations of your transcript. ECFMG does not accept such evaluations in lieu of your transcript.

To submit the transcript to ECFMG, follow the instructions for additional documents in the exam application in ECFMG's IWA.

The name on your transcript(s) to document transferred credits must match **exactly** the name in your ECFMG record. If the name on your transcript does not match the name in your ECFMG record, you must submit documentation that **verifies** the name on your transcript is (or was) your name. See *Name on Medical Diploma and Transcript(s)* in *Medical Education Credentials*.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# Medical Education Credentials

Medical Education Credential Requirements | Transfer Credits | Credentials for ECFMG Certification | Final Medical Diploma and Transcript | Transcript(s) to Document Transferred Credits | Name on Medical Diploma and Transcript(s) | English Translations | Verification of Credentials

## Name on Medical Diploma and Transcript(s)

Your name as it appears on **all** credentials sent to ECFMG must be consistent.

The name on your medical diploma and transcript(s) must match **exactly** the name in your ECFMG record. If the names do not match exactly, you must submit documentation that **verifies** the name on your medical diploma/transcript(s) is (or was) your name. The documentation must show your name exactly as it appears on your medical diploma/transcript(s). See *Your Name* in *Your ECFMG Record* and *Verifying Your Name*.

**If the name on your credentials does not match the name in your ECFMG record and you do not submit acceptable documentation that verifies the name on your credentials is (or was) your name, your exam application will be rejected.**

An example of a discrepancy that requires such verification would be if your ECFMG record lists your married name, but your medical diploma/transcript(s) lists your maiden name.

Other examples of discrepancies that require such verification include, but are not limited to, the following:

- Use of initials for the first name or last name (surname) on the medical diploma/transcript(s)
  **Example:** "Mary Smith" in your ECFMG record, but "M. Smith" or "Mary S." on your medical diploma/transcript(s).

- Difference in the sequence of names
  **Example:** "Pravin Chandra Patel" in your ECFMG record, but "Pravin Patel Chandra" or "Chandra Pravin Patel" on your medical diploma/transcript(s).

- Hyphenations and separations in names
  **Example:** "Alice Al Quigley" in your ECFMG record, but "Alice Al-Quigley" or "Alice Alquigley" on your medical diploma/transcript(s).

## Verifying Your Name

If the name in your ECFMG record is correct but this name does not match **exactly** your name as listed on your medical diploma, transcript, or other credential, you must **verify** that the name on these documents is (or was) your name. To verify your name, submit to ECFMG a copy of one of the documents listed below that verifies the name on your medical diploma, transcript, or other credential. The name in your ECFMG record will not be changed if you are verifying your name.

For the purpose of verifying your name, the document(s) you may submit include:

- Passport (including the pages with your photograph and the expiration date)
- Birth certificate
- Marriage certificate
- Official court order
- U.S. Resident Alien Card
- U.S. Naturalization Certificate
- U.S. Passport Card (a one-page document that includes your photograph and the expiration date)

As an alternative to one of the documents listed above, ECFMG will accept for purposes of verifying your name a letter from an authorized official of your medical school that verifies that the name on your medical diploma, transcript, or other credential is (or was) your name. If you choose to submit a letter from your medical school to verify the name on your medical diploma, transcript, or other credential, the letter must be completed and signed by an authorized official of your medical school. Each medical school has been requested to provide ECFMG with a list of authorized officials. The letter you submit must be completed and signed by an official on this list. The official must provide his/her name, official title, and the institution name. The official must affix the institution's seal to the letter. The letter also must include the following statement:

> **This certifies that the names [name on document] and [name in ECFMG record] belong to one and the same person.**

The document(s) you send must show your name exactly as it appears on your medical diploma/transcript.

See additional important information on documents below.

## Important Information on Documents for Changing or Verifying Your Name

- Attestations and affidavits are **not** acceptable as documentation to change or verify your name.

- Please do not submit an original document; a copy of the document is sufficient.

- All documents submitted to change or verify your name that are not in English must be accompanied by an official English translation that meets ECFMG's translation requirements. See *English Translations* in *Medical Education Credentials*.

- All documents submitted to change or verify your name, including translations, will become a part of your permanent ECFMG record and will not be returned to you.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# Medical Education Credentials

Medical Education Credential Requirements | Transfer Credits | Credentials for ECFMG Certification | Final Medical Diploma and Transcript | Transcript(s) to Document Transferred Credits | Name on Medical Diploma and Transcript(s) | English Translations | Verification of Credentials

---

## English Translations

Any document submitted to ECFMG that is not in English must be accompanied by an English translation that meets ECFMG's translation requirements.

**ECFMG strongly encourages you to obtain translations from its recommended translation service.** Translations from this service meet ECFMG's requirements and will not be rejected due to translation errors. See the Translation Service page in the Resources section of the ECFMG website.

Translations from other services may not meet ECFMG's requirements. If you obtain a translation from another service, the translation must:

- be a word-for-word translation of the original language document. An abstract or summary translation of the document is not acceptable.

- be prepared from the original document or a photocopy of the original document. ECFMG will not accept a translation prepared from a transcription (transcribed version) of the document.

- be prepared by a government official (for example, a Consular Officer), medical school official (for example, a Dean or Registrar), or a professional translation service.

- include a statement from the government or medical school official or representative of the translation service certifying that the word-for-word translation is correct.

- bear the signature and title of the government or medical school official or representative of the translation service and, if there is one, the seal of the government official, medical school, or translation service.

- appear on letterhead. If the translation service is a private company, the letterhead must identify the company as a translation service.

An English language certificate issued by the medical school that is not a word-for-word English language version of the degree, transcript, or other document in the original language is not acceptable as a translation. English translations that do not meet the requirements above will not be accepted. Examples of unacceptable translations include, but are not limited to:

JA0080

- translations prepared by a notary who is not a government or medical school official or representative of a professional translation service.

- a translation that was not signed by the translator or official or representative of the translation service, and

- a translation that is not a word-for-word translation of the original language document.

Additionally, applicants are not permitted to translate their own documents.

Documents submitted to ECFMG as part of the exam application and certification processes, including translations, will not be returned.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# Medical Education Credentials

[Medical Education Credential Requirements](#) | [Transfer Credits](#) | [Credentials for ECFMG Certification](#) | [Final Medical Diploma and Transcript](#) | [Transcript(s) to Document Transferred Credits](#) | [Name on Medical Diploma and Transcript(s)](#) | [English Translations](#) | Verification of Credentials

## Verification of Credentials

ECFMG verifies every international medical graduate's final medical diploma with the appropriate officials of the medical school that issued the diploma and requests the medical school to provide the final medical school transcript. Verification by ECFMG with the issuing school may also be required for transcripts that are submitted to document transferred credits. You will not fulfill the ECFMG medical education credential requirements until verification of your final medical diploma, final medical school transcript, and, if required, transfer credit transcript(s) is received directly from the issuing school(s) and accepted by ECFMG.

In some instances, the verification process can be lengthy due to the processing time required by the institutions and, for verifications done by mail, prevailing postal conditions. ECFMG will notify you when your diploma has been sent to your medical school for verification. As part of the verification process, ECFMG also may provide the medical school with other documents, including a copy of your *Certification of Identification Form* (Form 186), to aid in identification. If ECFMG does not receive a response from your medical school, ECFMG will follow up with your medical school. ECFMG will notify you after receiving and evaluating the verification from your medical school. You can check the status of your medical education credentials on-line using [OASIS](#).

ECFMG reserves the right to reverify with the medical school the eligibility of medical school graduates who apply for examination. This may include reverification of the graduate's medical education credentials with the issuing medical school. If such reverification is requested by ECFMG, the graduate will be registered for examination only after ECFMG has received reverification of the graduate's credentials directly from the medical school. If reverification is requested by ECFMG after the graduate has been registered for examination, ECFMG may cancel the graduate's registration or withhold the graduate's score report until ECFMG has received reverification of the graduate's medical education credentials directly from the issuing school. If your registration is canceled, you may be required to reapply.

**Important Notes:** Applicants are responsible for any fees associated with the verification of the final medical diploma, final medical school transcript, and transcript(s)

JA0082

to document transferred credits. If your medical school charges a fee for the verification of your diploma and/or transcript, ECFMG will advise you to contact your medical school directly regarding the fee and the method of payment.

If the final medical school transcript provided by your medical school is not in English or if an acceptable English translation is not provided by the medical school at the time of verification, ECFMG will have the transcript translated into English by an independent translation service, will charge your ECFMG financial account for the translation, and will notify you of the charge. ECFMG will not notify you before sending the document for translation. For information on the translation fee, see the Fees page in the Resources section of the ECFMG website. See *Methods of Payment* in *Your ECFMG Financial Account* for information on how to make a payment to your ECFMG financial account.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# Related ECFMG Services

Confirming ECFMG Certification to Third Parties | Electronic Residency Application Service (ERAS) Support Services | J-1 Visa Sponsorship | ECFMG Certificate Holders Office

## Confirming ECFMG Certification to Third Parties

ECFMG's Certification Verification Service (CVS) provides primary-source confirmation of the ECFMG certification status of international medical graduates. The Joint Commission, the organization that evaluates and accredits U.S. health care organizations and programs, has determined that direct verification with ECFMG of a physician's certification status satisfies The Joint Commission's requirement for primary-source verification of medical school completion for graduates of international medical schools.

ECFMG will confirm your certification status when a request is received from a U.S. medical licensing authority, residency program, hospital, or other organization that, in the judgment of ECFMG, has a legitimate interest in such information. For status reports sent to **medical licensing authorities**, the request can also be made by you. Requesting organizations must normally secure and retain your signed authorization to obtain certification information. Please note that there may be a fee for this service.

Requests for confirmation must contain your name, date of birth, USMLE/ECFMG Identification Number, and name and address of the organization to which the confirmation should be sent. To obtain the appropriate request form or to make an on-line request, visit the CVS section of the ECFMG website at www.ecfmg.org/cvs. Confirmations are sent to the requesting organization within approximately two weeks. Confirmations are not sent to applicants directly.

If the requesting organization requests to receive a paper report but does not receive the report, ECFMG will honor requests for duplicate reports at no additional cost up to 90 days after the date that the original report was processed.

If you apply to residency programs through the Electronic Residency Application Service (ERAS), ECFMG will transmit an electronic ECFMG Status Report automatically to the ERAS application, where it can be accessed by all of the programs to which you apply. If your ECFMG certification status changes during the ERAS application season, ECFMG will transmit an updated status report automatically to the ERAS application, where it can be accessed by all of the programs to which you apply.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# Related ECFMG Services

Confirming ECFMG Certification to Third Parties | Electronic Residency Application Service (ERAS) Support Services | J-1 Visa Sponsorship | ECFMG Certificate Holders Office

## Electronic Residency Application Service (ERAS®) Support Services

The Accreditation Council for Graduate Medical Education (ACGME) requires that international medical graduates who wish to enter ACGME-accredited graduate medical education programs in the United States be certified by ECFMG. ECFMG Certification does not, however, guarantee that an international medical graduate will be accepted into a graduate medical education program; the number of applicants for residency and fellowship programs each year exceeds the number of available positions.

The Association of American Medical Colleges (AAMC) established the Electronic Residency Application Service (ERAS) to allow medical students and graduates to apply electronically for residency positions in accredited U.S. programs of graduate medical education. Most U.S. graduate medical education programs participate in ERAS. If you apply to participating programs, you must submit your residency application using ERAS.

Since ERAS was established, ECFMG has served as the designated Dean's office for students and graduates of international medical schools, assisting these individuals with the ERAS application process for first- and second-year (PGY-1 and PGY-2) residency positions.

International medical students and graduates who apply to programs that participate in ERAS must request an ERAS Token, a unique identification number, from ECFMG. The Token allows applicants to access AAMC's MyERAS website, where they can complete their residency application, select the programs to which they will apply, and assign supporting documents to these programs.

As the designated Dean's office, ECFMG receives supporting documents for the ERAS application, such as medical student performance evaluations (MSPEs), medical school transcripts, and photographs from applicants and their medical schools. ECFMG then transmits these documents to the ERAS application. ECFMG also transmits to the ERAS application the applicant's ECFMG Status Report, which includes the applicant's ECFMG certification status and, if requested by the applicant, his/her USMLE transcript. Once supporting documents have been received by the ERAS application, they can be accessed by the programs to which the applicant has applied.

For detailed, up-to-date information on ERAS Support Services at ECFMG, visit the ERAS section of the ECFMG website at www.ecfmg.org/eras.

**Important Note About U.S. State Medical Licensure Requirements:** In the United States, medical licensure requirements vary by individual state medical licensing authorities. You should be aware that:

- A training or restricted license may be required to participate in programs of graduate medical education. Participants in graduate medical education programs may also be required to obtain an unrestricted medical license by a certain point in their training in order to progress in the program.

- Some states have established additional criteria with respect to international medical schools for the purpose of eligibility for licensure. When you plan to apply to residency programs, consult the state's medical licensing board to determine if graduates of your medical school are eligible for licensure in that state.

- If you are certified by ECFMG based on **former** medical science exams (such as the Visa Qualifying Examination [VQE] or the Foreign Medical Graduate Examination in the Medical Sciences [FMGEMS]), you should be aware that these exams may not be acceptable for the purpose of eligibility for a training license.

**ECFMG does not create or control the medical licensure requirements for any jurisdiction and does not create or control the eligibility requirements for any graduate medical education program. Additionally, ERAS does not preclude any students or graduates from participating in ERAS, based on their eligibility for licensure.** Before applying to residency programs in a given state, it is your responsibility to become familiar with that state's licensure requirements and to ensure that you meet any licensure requirements to enter and complete residency training in that state. For a directory of U.S. state medical licensing authorities, visit the Federation of State Medical Boards website.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

## Related ECFMG Services

Confirming ECFMG Certification to Third Parties | Electronic Residency Application Service (ERAS) Support Services | J-1 Visa Sponsorship | ECFMG Certificate Holders Office

## J-1 Visa Sponsorship

Foreign national physicians who seek entry into U.S. programs of graduate medical education or training must obtain an appropriate visa that permits clinical training activities. One visa commonly used by foreign national physicians is the J-1, a temporary nonimmigrant visa reserved for participants in the Exchange Visitor Program. As a public diplomacy initiative of the U.S. Department of State, the Exchange Visitor Program was established to enhance international educational and cultural exchange between the people of the United States and other nations. In keeping with the program's goals for international education, exchange visitor (J-1) physicians are required to return home for at least two years following their training before being eligible for certain U.S. visas.

The U.S. Department of State has designated ECFMG as the visa sponsor for all exchange visitor (J-1) physicians who participate in clinical training programs. ECFMG sponsorship is also available for physicians' eligible dependents. As the visa sponsor, ECFMG processes applications for J-1 visa sponsorship and, for eligible applicants, issues a document that the applicant can use to apply for the J-1 visa. ECFMG is responsible for ensuring that exchange visitor (J-1) physicians and host institutions meet the federal requirements for participation throughout the duration of sponsorship. ECFMG does not sponsor physicians for other U.S. visa types.

All initial applicants for ECFMG J-1 sponsorship are advised that sponsorship eligibility should not be presumed and cannot be determined until a complete review of an individual's U.S. visa history has been conducted.

For detailed, up-to-date information on J-1 visa sponsorship by ECFMG, visit the Exchange Visitor Sponsorship Program (EVSP) section of the ECFMG website at www.ecfmg.org/evsp.

> **Important Note:** Foreign national physicians who are international medical graduates and are seeking ECFMG J-1 visa sponsorship to enroll in graduate medical education programs must, among other requirements, have passed USMLE Step 1 and Step 2 CK; or the former Visa Qualifying Examination (VQE), National Board of Medical Examiners (NBME) Part 1 and Part 2, or Foreign Medical Graduate Examination in the Medical Sciences (FMGEMS) examinations; or an acceptable combination thereof. The former

one-day ECFMG Examination and three-day Federation Licensing Examination (FLEX) do **not** meet the requirements for J-1 visa sponsorship.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

# Related ECFMG Services

Confirming ECFMG Certification to Third Parties | Electronic Residency Application Service (ERAS) Support Services | J-1 Visa Sponsorship | ECFMG Certificate Holders Office

## ECFMG Certificate Holders Office

The ECFMG Certificate Holders Office (ECHO$^{SM}$) provides career planning resources for physicians pursuing ECFMG Certification and graduate medical education (GME) in the United States.

**Be connected.**

Use ECHO to stay connected with ECFMG and its expertise, programs, and services for international physicians. ECHO also provides connections to information from other organizations and experts. Through ECHO's IMG Advisors Network (IAN), you also can connect with ECFMG-certified physicians to ask questions about U.S. GME and about living and working in the United States. Subscribe to *ECHO News*, a free e-newsletter, to receive updates on resources, important deadlines, and more.

**Be heard.**

Your ideas are important to us. Let us know what you think about ECHO — what you like, what you don't like, what you want to see more of, what we can do to make ECHO a better resource for ECFMG-certified physicians. Contact ECHO using our feedback form.

**Be informed.**

Successfully navigating the application process for U.S. GME can be difficult. You need to interact with multiple organizations, each with its own roles, requirements, processes, and deadlines. ECHO provides resources that you can use when applying to U.S. GME programs as well as resources that address the practical challenges of relocating to the United States and adjusting to the U.S. GME and health care systems.

For more information, visit the ECHO section of the ECFMG website at www.ecfmg.org/echo.

Last updated September 13, 2018.

Copyright © 2018 by the Educational Commission for Foreign Medical Graduates (ECFMG®). All rights reserved.

Case 3:19-cv-1670-WGY-WB Document 152-20 Filed 05/22/23 Page 153 of 614

**Appendix J**

# University of Science, Arts & Technology (USAT), Montserrat
## *Not Accredited*

---

## June 2012 Determination: *Not Accredited*

---

Following the submission of documents to the CAAM-HP – unsolicited – and a request for accreditation, a visit was carried out in October 2011. Team members were:

1. Professor Renn Holness
2. Dr. Rhonda Sealey-Thomas

**Decision:**   The CAAM-HP at its meeting held June 22-23, 2012 received and considered the report of reviewers Professor Renn Holness and Dr Rhonda Sealey-Thomas on the site visit of October 7, 2011 to the campus of the University of Science, Arts and Technology (USAT) in Montserrat.

Following discussions of the reviewers' report CAAM-HP determined that the school had not provided sufficient evidence to indicate that teaching activities were actually taking place in Montserrat. Furthermore, CAAM-HP's requirements for adequate resources had not been satisfied. Consequently, CAAM-HP determined that there was not sufficient evidence to merit reversal of its initial decision of May 2007 not to grant initial provisional accreditation to USAT.

---

## February 2007 Determination: *Not Accredited*

---

Application for initial provisional accreditation was received from the University of Science, Arts and Technology (USAT) for the establishment of an offshore medical school on the island of Montserrat. In February 2007, a review was done by the following persons:

1. Dr. David Hawkins
2. Dr. George Mahy
3. Professor Phyllis Pitt-Miller

**Decision:**   The CAAM-HP after examination of the reports determined that it could not grant provisional accreditation for the programme as presented.

www.caam-hp.org/assessedprogrammes.html

CONFIDENTIAL

ECFMG00000027

JA0091

# 2018 University of Science, Arts and Technology
## LECTURE CONFERENCE SCHEDULE

| 2018 | Su | M | T | W | Th | F | Sa | Su | M | T | W | Th | F | Sa | Su | M | T | W | Th | F | Sa | Su | M | T | W | Th | F | Sa | Su | M | T | W |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | *11t | *12t | *13t | *14t | 15 | 16 | 17 | 18m | 19m | 20m | 21m | 22l | 23l | 24 | 25d | 26d | 27d | 28d | 29 | 30 | 31 |
| Feb | | | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8t | 9t | 10t | 11t | 12 | 13 | 14 | 15m | 16m | 17m | 18m | 19 | 20 | 21 | 22d | 23d | 24d | 25d | 26 | 27 | 28 |
| Mar | | | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8t | 9t | 10t | 11t | 12 | 13 | 14 | 15m | 16m | 17m | 18m | 19l | 20l | 21 | 22d | 23d | 24d | 25d | 26 | 27 | 29 | 30 |
| Apr | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12t | 13t | 14t | 15t | 16 | 17 | 18 | 19M | 20m | 21m | 22m | 23 | 24 | 25 | 26d | 27d | 28d | 29d | 30 | | |
| May | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10t | 11t | 12t | 13t | 14 | 15 | 16 | 17m | 18m | 19m | 20m | *21 | *22 | 23 | 24d | 25d | 26d | 27d | 28 | 29 | 30 | 31 |
| Jun | | | | | 1 | 2 | 3 | 4 | 5 | 6 | 7t | 8t | 9t | 10t | 11 | 12 | 13 | 14m | 15m | 16m | 17m | 18 | 19 | 20 | 21 | 22d | 23d | 24d | 25 | 26 | 27 | 28 |
| Jul | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12t | 13t | 14t | 15t | 16 | 17 | 18 | 19m | 20m | 21m | 22m | 23l | 24l | 25 | 26d | 27d | 28d | 29d | 30 | 31 | |
| Aug | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9t | 10t | 11t | 12t | 13 | 14 | 15 | 16m | 17m | 18m | 19m | 20 | 21 | 22 | 23d | 24d | 25d | 26d | 27 | 28 | 29 | 30 |
| Sep | | | | | | 1 | 2 | 3 | 4 | 5 | *6t | *7t | *8t | *9t | 10 | 11 | 12 | 13m | 14m | 15m | 16m | 17l | 18l | 19 | 20d | 21d | 22d | 23d | 24 | 25 | 26 | 27 |
| Oct | | 1 | 2 | 3 | 4t | 5t | 6t | 7t | 8 | 9 | 10 | 11m | 12m | 13m | 14m | 15 | 16 | 17 | 18d | 19d | 20d | 21d | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
| Nov | | | | | 1t | 2t | 3t | 4t | 5 | 6 | 7 | 8m | 9m | 10m | 11m | 12l | 13l | 14 | 15d | 16d | 17d | 18d | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| Dec | | | | | Nov-30t | 1t | 2t | 3 | 4 | 5 | 6m | 7m | 8m | 9m | 10 | 11 | 12 | 13 | 14d | 15d | 16d | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 |

| TAMPA | MIAMI | DALLAS |
|---|---|---|
| | | GRADUATION IN MIAMI |

**MUST SIGN-UP AND PREPAY FOR ANATOMY LAB**

## Tampa, FL Location = t
DoubleTree Tampa Airport Westshore
4500 West Cypress Street
Tampa, FL 33607
Reservations: 813-879-4800

## Miami, FL Location = m
Hilton Garden Miami Airport West Doral
3550 NW 74th Avenue
Miami, FL 33122
Reservations: 305-629-7701

## Dallas, TX Location = d
Hilton Garden DFW North
205 W. State Hwy 114
Grapevine, TX 76051
Reservations: 817-421-1172

**The Tampa site in January will be at the Hilton Westshore 2225 N. Lois Ave (813)877-6688**
**There is **NO** Anatomy Lab in May**
**The Tampa site in September will be at the Hilton Westshore 2225 N. Lois Ave (813)877-6688**

Class times are: Thursday 1300 - 1800 / Friday 0800 - 1800 / Saturday 0800 - 1800 (testing from 0900-1000) / Sunday 0800 - 1800

CONFIDENTIAL

ECFMG00000484

**Appendix 5**

**From:** REDACTED
**Sent:** Wednesday, August 08, 2018 3:32 PM
**To:** Info
**Subject:** Medical Scool in Montserrat

**External Email. Please Proceed with Caution.**

Dear Sirs


I have been in contact with USAT a medical university in Montserrat that is currently conducting classes in Miami. I have been told that USAT is approved to hold classes in Miami because of the volcano in Montserrat. I would like something in writing from the ECFMG that states my son will be eligible to take the USMLE exams if he attends USAT in Miami.

Regards

REDACTED

**Appendix 1**

**From:** Ostwalt, Cally [mailto:Cally.Ostwalt@fldoe.org]
**Sent:** Tuesday, August 14, 2018 11:12 AM
**To:** Mealey, Scott
**Cc:** Collins, Sara <Sara.Collins@fldoe.org>
**Subject:** RE: question about foreign medical schools having a US campus in FL

**External Email. Please Proceed with Caution.**

Hello Mr. Mealey,

The matter has been brought to CIE's attention. I am including Mrs. Sara Collins on this e-mail as Mrs. Collins is the primary contact regarding foreign medical schools/clinical clerkships in Florida. She is aware of the concern and is continuing to address the matter. Please direct any further questions to her attention.

Regards,

*Cally Ostwalt*

Program Specialist IV
Commission for Independent Education
P: 850.245.3200
F: 850.245.3233
E: cally.ostwalt@fldoe.org



Please note that Florida has a very broad public records law. Most written communications to or from state officials are public records available to the public and media upon request.

**From:** Mealey, Scott [mailto:SMealey@ECFMG.org]
**Sent:** Tuesday, August 14, 2018 8:00 AM
**To:** Ostwalt, Cally <Cally.Ostwalt@fldoe.org>
**Subject:** RE: question about foreign medical schools having a US campus in FL

Ms. Ostwalt – I am wondering if I should forward this matter to the U.S. Department of Education. We are still hearing from parents of USAT students that the school is telling them USAT is approved to hold classes in Miami because of the volcano in Montserrat many years ago. I know of no such authorization.

Please let me know the status.

Best regards,

D. Scott Mealey, CPMSM, CPCS
Manager
Medical Education Resources & Operations Support

CONFIDENTIAL

ECFMG00000453

Educational Commission for Foreign Medical Graduates



3624 Market Street
Philadelphia, PA, USA 19104
(T) 001-215-823-2285
(F) 001-215-386-9767
SMealey@ECFMG.org

**From:** Ostwalt, Cally [mailto:Cally.Ostwalt@fldoe.org]
**Sent:** Monday, August 14, 2017 11:52 AM
**To:** Mealey, Scott
**Subject:** RE: question about foreign medical schools having a US campus in FL

**This Email originated from an external sender. Please proceed with caution opening any attachments and clicking on any links.**

Mr. Mealey,

Thank you for bringing the operations of USAT to CIE's attention. This matter is being looked into by the Commission for any violation of Florida law.

Cally Ostwalt

Program Specialist IV
Commission for Independent Education
P: 850.245.3200
F: 850.245.3233
E: cally.ostwalt@fldoe.org



Please note that Florida has a very broad public records law. Most written communications to or from state officials are public records available to the public and media upon request.

**From:** Mealey, Scott [mailto:SMealey@ECFMG.org]
**Sent:** Monday, August 14, 2017 10:47 AM
**To:** Ostwalt, Cally <Cally.Ostwalt@fldoe.org>
**Subject:** RE: question about foreign medical schools having a US campus in FL

Hello Ms. Ostwalt – any update?

**From:** Ostwalt, Cally [mailto:Cally.Ostwalt@fldoe.org]
**Sent:** Monday, July 31, 2017 10:12 AM
**To:** Mealey, Scott
**Subject:** RE: question about foreign medical schools having a US campus in FL

CONFIDENTIAL
ECFMG00000454

**This Email originated from an external sender. Please proceed with caution opening any attachments and clicking on any links.**

Mr. Mealey,

I will need to discuss this with my supervisor. He is out of the office until next week. However, I will get back to you once I am able to speak with him.

*Cally Ostwalt*

Program Specialist IV
Commission for Independent Education
P: 850.245.3200
F: 850.245.3233
E: cally.ostwalt@fldoe.org



Please note that Florida has a very broad public records law. Most written communications to or from state officials are public records available to the public and media upon request.

**From:** Mealey, Scott [mailto:SMealey@ECFMG.org]
**Sent:** Thursday, July 20, 2017 9:36 AM
**To:** Ostwalt, Cally <Cally.Ostwalt@fldoe.org>
**Subject:** RE: question about foreign medical schools having a US campus in FL

We are not sure what the operations are; that is what we thought should be investigated if such a thing is not allowed. We think USAT is exploiting a loophole and stating the main campus is in Montserrat, when the vast majority of their operations (classes, graduations) are in FL.

**From:** Ostwalt, Cally [mailto:Cally.Ostwalt@fldoe.org]
**Sent:** Monday, July 17, 2017 8:54 AM
**To:** Mealey, Scott
**Subject:** RE: question about foreign medical schools having a US campus in FL

**This Email originated from an external sender. Please proceed with caution opening any attachments and clicking on any links.**

Mr. Mealey,

Please elaborate on "satellite campuses". In order to answer any questions you may have, I need clarification on what the operations in Florida are/would be.

*Cally Ostwalt*

Program Specialist IV
Commission for Independent Education
P: 850.245.3200
F: 850.245.3233
E: cally.ostwalt@fldoe.org



Please note that Florida has a very broad public records law. Most written communications to or from state officials are public records available to the public and media upon request.

**From:** Mealey, Scott [mailto:SMealey@ECFMG.org]
**Sent:** Monday, July 17, 2017 8:44 AM
**To:** Ostwalt, Cally <Cally.Ostwalt@fldoe.org>
**Subject:** RE: question about foreign medical schools having a US campus in FL

Hi Ms. Ostwalt,

The school in question does not list an actual address in FL on their website. I did however find a business license and address from the DOS website. The school's website mentions they have US satellite campuses, and videos posted on their website and youtube show classes and graduation ceremonies at the Intercontinental hotel in Miami.

The school is the University of Science, Arts & Technology (USAT) from Montserrat. Thanks for looking into this.

Scott

**From:** Ostwalt, Cally [mailto:Cally.Ostwalt@fldoe.org]
**Sent:** Monday, July 17, 2017 8:29 AM
**To:** Mealey, Scott
**Subject:** RE: question about foreign medical schools having a US campus in FL

**This Email originated from an external sender. Please proceed with caution opening any attachments and clicking on any links.**

Good Morning Mr. Mealey,

This e-mail is in response to your inquiring regarding having a satellite campus in Florida. Where is the school currently located? Can you provide more information on the institution's

proposed operations for Florida? Is the institution planning to enroll students from Florida? Will there be any classrooms, programs offered, administrative functions, etc. at this proposed location? Please elaborate.

Thank you,

*Cally Ostwalt*

Program Specialist IV
Commission for Independent Education
P: 850.245.3200
F: 850.245.3233
E: cally.ostwalt@fldoe.org



Please note that Florida has a very broad public records law. Most written communications to or from state officials are public records available to the public and media upon request.

**From:** Mealey, Scott <SMealey@ECFMG.org>
**Sent:** Thursday, July 13, 2017 3:48:26 PM
**To:** Smith, Joey
**Subject:** question about foreign medical schools having a US campus in FL

Hello Mr. Smith,

We are inquiring if it were possible for a foreign medical school to have a US satellite campus in FL?  If so, would they need to be licensed in some manner? and how would that work?

Thank you for any information you can provide.

Best regards,

Scott
D. Scott Mealey, CPMSM, CPCS
Manager
Medical Education Resources & Operations Support
Educational Commission for Foreign Medical Graduates



3624 Market Street
Philadelphia, PA, USA 19104
(T) 001-215-823-2285
(F) 001-215-386-9767
SMealey@ECFMG.org

CONFIDENTIAL

ECFMG00000457

Case 2:19-cv-01470-CWB Document 132-20 Filed 05/03/23 Page 101 of 514
Case 2:18-cv-07055-WB Document 132-20 Filed 05/08/19 Page 101 of 154
Meeting of the ECFMG Medical Education Credentials Committee - C. USAT REVIEW    0FA0098

**Appendix 6**



| | 3624 Market Street |
|---|---|
| EDUCATIONAL COMMISSION FOR | Philadelphia PA 19104-2685 USA |
| FOREIGN MEDICAL GRADUATES | 215-386-5900  \|  215-386-9767 Fax |
| | www.ecfmg.org |

August 21, 2018

VIA EMAIL: usat.edu@gmail.com

Orien Tulp, President
University of Science, Arts & Technology (USAT) Faculty of Medicine
Main Campus
S. Mayfield Estate Drive
Olveston, MONTSERRAT

Dear Dr. Tulp,

It has recently come to the attention of the Educational Commission for Foreign Medical Graduates (ECFMG) that USAT in Montserrat is operating a satellite (or branch) campus in Miami, Florida.

In order for students and graduates of an international medical school, such as USAT, to have eligibility to apply for ECFMG Certification, ECFMG policy requires confirmation from the appropriate government authority in the branch campus country that the branch campus is authorized to operate as a medical school in such branch campus country.

In light of this, ECFMG requests that USAT provide documentation from the United States Department of Education and/or the Florida Department of Education confirming that USAT's Miami branch campus is authorized to operate as a medical school in the United States. This documentation should cover the whole time period that the USAT Miami branch campus has been in operation.

Thank you in advance for your assistance with this inquiry. Please provide this documentation by September 3, 2018. Feel free to contact me at smealey@ecfmg.org should you have any questions.

Best Regards,

D. Scott Mealey, CPCS, CPMSM
Manager, Medical Education Resources & Operations Support

ECFMG® is an organization committed to promoting excellence in international medical education.

**Appendix E**

**From:** Orien Tulp [mailto:o.tulp@usat.edu]
**Sent:** Tuesday, August 21, 2018 11:01 AM
**To:** Mealey, Scott; Carla Konyk - Director/Student Accounts
**Subject:** Re: ECFMG notice regarding U.S. satellite campus

**External Email. Please Proceed with Caution.**

Dear Mr Mealey

This is incorrect information.  The Miami location is an information and testing site only,  where a pre-usmle examination [an NBME] may administered, and an Orientation for new students is conducted prior to their traveling to the Caribbean.. It is NOT a campus.  Our ONLY Campus is located in Olveston, Montserrat, British West Indies. .

Actually, recall that Montserrat is a volcanic Island, and the license issued to USAT in September, 2003 DOES actually permit the establishment of off-campus lecture and administrative sites as needed.  USAT  has students on island on a year round basis since its origination.

I hope this will clarify your concern.

Kindest Regards,


Orien L Tulp, PhD, MD, FACN, CNS
Professor and President
USAT Motserrat


Orien L Tulp, PhD, MD, FACN, CNS
Professor and President
USAT Montserrat
*www.usat.edu*
Cell: 727-252-6210

On Tue, Aug 21, 2018 at 6:13 AM, Mealey, Scott <SMealey@ecfmg.org> wrote:

Dr. Tulp,

Please see the attached letter regarding the USAT U.S. satellite campus.

Best regards,

D. Scott Mealey, CPMSM, CPCS
Manager
Medical Education Resources & Operations Support
Educational Commission for Foreign Medical Graduates



3624 Market Street
Philadelphia, PA, USA 19104
(T) 001-215-823-2285
(F) 001-215-386-9767
SMealey@ECFMG.org

**Disclaimer**

The information contained in this communication from **ECFMG® / Educational Commission for Foreign Medical Graduates** is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd.**

CONFIDENTIAL

ECFMG00000016

**From:** REDACTED
**Sent:** Wednesday, August 22, 2018 11:33 AM
**To:** Mealey, Scott
**Subject:** Re: RE: FW: REDACTED

**External Email. Please Proceed with Caution.**

Hello Scott,
Here is the latest release from the President of USAT:

<carla.konyk@gmail.com>

**Please do NOT use the phrase "CAMPUS'  WHEN REFERRING TO THE US SITES, as that implies approval from the US Dept of Education or the State Dept of Education which isn't possible or likely as an Interntional Medical School.   Someone reported to the ECFMG that we have a Miami Campus.   It is an administrative site, where we do interviews, orientations, and pre-USMLE proctored examinations.**


Orien L Tulp, PhD, MD, FACN, CNS
Professor and President
USAT Montserrat
*www.usat.edu*
Cell: 727-252-6210


They refer to all the sites as campuses (Tampa, Miami and Dallas).  These are called lecture sites where students attend from Thursday - Sunday.  I would also like to mail you a package if I could please get your information.


REDACTED

**Appendix G**

 EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES

3624 Market Street
Philadelphia PA 19104-2685 USA
215-386-5900 | 215-386-9767 Fax
www.ecfmg.org

VIA E-MAIL: usat.edu@gmail.com

September 14, 2018

Orien Lee Tulp, PhD, CNS
President and Dean of Academic Affairs
University of Science, Arts & Technology (USAT) Faculty of Medicine
Main Campus
S. Mayfield Estate Drive
Olveston
MONTSERRAT

Dear Dr. Tulp:

This is a follow-up to our August 21, 2018 letter in which ECFMG requested information from you about the University of Science, Arts & Technology (USAT) Faculty of Medicine's satellite (or branch) campus in Miami, FL. In response, you indicated, "The Miami location is an information and testing site only, where a pre-usmle examination [an NBME] may administered, and an Orientation for new students is conducted prior to their traveling to the Caribbean. It is NOT a campus. Our ONLY Campus is located in Olveston, Montserrat, British West Indies." We thank you for your quick reply.

ECFMG has since received information that USAT is providing medical education lectures not only at its Miami site, but also at sites in Tampa, FL, and Dallas, TX.

It is critical that ECFMG ensure that information regarding international medical schools and their students provided to ECFMG complies with ECFMG policies and requirements. Therefore, ECFMG continues its review of this matter. This letter is to advise you that, as part of its review, ECFMG has reached out to students and graduates of USAT in order to collect information from them regarding their attendance at USAT.

Effective today, USAT students and graduates seeking services related to ECFMG Certification, including registration for USMLE examinations, release of USMLE scores, issuance of an ECFMG Certificate, or issuance of ECFMG Certification Status Reports to residency programs, must complete and submit an affidavit attesting to the accuracy of the medical school information provided to ECFMG. Services will not be provided to individuals who do not complete the affidavit. ECFMG has provided instructions about this process directly to the students and graduates.

Should your students and graduates approach you with questions about this process, please advise them to contact ECFMG directly.

Sincerely,

*kcorrado*

Ms. Kara Corrado, J.D.
Vice President for Operations

ECFMG® is an organization committed to promoting excellence in international medical education.

CONFIDENTIAL

ECFMG00000018

| | |
|---|---|
| **From:** | Mealey, Scott <SMealey@ECFMG.org> |
| **Sent:** | Thursday, April 18, 2019 9:53 AM |
| **To:** | Corrado, Kara |
| **Subject:** | FW: Privileged and Confidential - Draft ECFMG Sponsor Note for USAT |

Email chain below

**From:** Mealey, Scott
**Sent:** Monday, September 24, 2018 8:24 AM
**To:** Bede, Carole
**Subject:** RE: Privileged and Confidential - Draft ECFMG Sponsor Note for USAT

Thanks!

**From:** Bede, Carole
**Sent:** Monday, September 24, 2018 8:23 AM
**To:** Mealey, Scott
**Subject:** RE: Privileged and Confidential - Draft ECFMG Sponsor Note for USAT

Fixed.  I had put a period after the HTML code

Best Regards,

*Carole Bede*

Ms. Carole Bede
Regional Coordinator, Medical Education Resources



Educational Commission for Foreign Medical Graduates
3624 Market Street
Philadelphia, PA 19104
USA
Email:  cbede@ecfmg.org

**From:** Mealey, Scott
**Sent:** Friday, September 21, 2018 5:52 PM
**To:** Bede, Carole
**Subject:** FW: Privileged and Confidential - Draft ECFMG Sponsor Note for USAT

I missed the extra black period at the very end.

**From:** Mealey, Scott
**Sent:** Friday, September 21, 2018 4:17 PM
**To:** Bede, Carole
**Subject:** RE: Privileged and Confidential - Draft ECFMG Sponsor Note for USAT

1

CONFIDENTIAL

ECFMG00000498

Proceed. Thanks!

---

**From:** Bede, Carole
**Sent:** Friday, September 21, 2018 4:16 PM
**To:** Mealey, Scott
**Subject:** RE: Privileged and Confidential - Draft ECFMG Sponsor Note for USAT

Screen print for approval:

## Sponsor Notes

The information below has been provided by the World Directory's sponsoring organizations.

**Educational Commission for Foreign Medical Graduates (ECFMG), United States of America**
- Students and graduates of this medical school are eligible to apply to ECFMG for ECFMG Certifica examination, provided that:
  - For medical school students officially enrolled in this school, the graduation years are listed "current".
  - For graduates of this medical school, their graduation year is included in the graduation yea Graduation Years:
    2003 - Current
  - All other eligibility requirements are met. Refer to the ECFMG Information Booklet for detaile

- **Currently, students and graduates of USAT are subject to enhanced procedures that must b order to be eligible to apply for ECFMG Certification related services, including but not limi ECFMG Certification, USMLE examinations that lead to ECFMG Certification, and Electronic Application Service (ERAS®) Support Services. ECFMG will provide information and instruc applicants upon receipt of application..**

Best Regards,

*Carole Bede*

Ms. Carole Bede
Regional Coordinator, Medical Education Resources



Educational Commission for Foreign Medical Graduates
3624 Market Street
Philadelphia, PA 19104
USA
Email:  cbede@ecfmg.org

---

**From:** Mealey, Scott
**Sent:** Friday, September 21, 2018 4:10 PM

CONFIDENTIAL

ECFMG00000499

**To:** Bede, Carole
**Subject:** FW: Privileged and Confidential - Draft ECFMG Sponsor Note for USAT

Carole – can you add this in Red/bold to USAT's sponsor note?

**Currently, students and graduates of USAT are subject to enhanced procedures that must be met in order to be eligible to apply for ECFMG Certification related services, including but not limited to: ECFMG Certification, USMLE examinations that lead to ECFMG Certification, and Electronic Residency Application Service (ERAS®) Support Services. ECFMG will provide information and instructions to applicants upon receipt of application.**

---

**From:** Katz, Francine
**Sent:** Friday, September 21, 2018 2:41 PM
**To:** Corrado, Kara
**Cc:** Cover, Lisa; Mealey, Scott
**Subject:** RE: Privileged and Confidential - Draft ECFMG Sponsor Note for USAT

PRIVILEGED

---

**From:** Corrado, Kara
**Sent:** Friday, September 21, 2018 2:33 PM
**To:** Katz, Francine
**Cc:** Cover, Lisa; Mealey, Scott
**Subject:** Privileged and Confidential - Draft ECFMG Sponsor Note for USAT

PRIVILEGED

3

CONFIDENTIAL

PRIVILEGED

CONFIDENTIAL

ECFMG00000501

Sponsor Notes

The information below has been provided by the World Directory's sponsoring organizations.

**Educational Commission for Foreign Medical Graduates (ECFMG), United States of America**

- Students and graduates of this medical school are eligible to apply to ECFMG for ECFMG Certification and for examination, provided that:
    - For medical school students officially enrolled in this school, the graduation years are listed below as "current".
    - For graduates of this medical school, their graduation year is included in the graduation years listed below.
        Graduation Years:
            2003 - Current
    - All other eligibility requirements are met. Refer to the ECFMG Information Booklet for detailed information.

- **Currently, students and graduates of USAT are subject to enhanced procedures that must be met in order to be eligible to apply for ECFMG Certification related services, including but not limited to: ECFMG Certification, USMLE examinations that lead to ECFMG Certification, and Electronic Residency Application Service (ERAS®) Support Services. ECFMG will provide information and instructions to applicants upon receipt of application..**

CONFIDENTIAL

ECFMG00000502

**Appendix M**

Tommy Swate
Attorney at Law
403 Wild Plum
Houston, Texas 77013
713-377-4860
swatemd@aol.com

September 15, 2018

Ms. Kara Corrado, J.D.
Vice President of Operations
Education Commission for Foreign Medical Graduates
3624 Market Street
Philadelphia, PA 19104-2685

Re: Letter of September 14, 2018

Dear Ms. Corrado:

I will be representing the University of Science, Art and Technology College of Medicine (USAT) regarding your September 14, 2018 letter. The letter appeared to terminate USAT's recognition by ECFMG's as a medical school. The letter has caused confusion and great anxiety for USAT's because the administration does not know how to advise its past students, present students and future students regarding ECFMG's policy regarding reporting test results, allowing test applications and the effect of ECFMG's policy on licensure, past and present. Would you please clarify ECFMG's position regarding the recognition of USAT as a medical school? Particularly, please clarify the effect of your September 14, 2018 letter on six groups of previous, current and future students:

1. Past students that have passed all three USMLE step examinations and are licensed by a United States Medical Board,
2. Past students that have past all three examinations and are seeking residencies,
3. Past students that have passed all three examinations and are currently in a residency program,
4. Present students who have taken some but not all of the USMLE Step tests,

1

5. Present students who have not applied to take the USMLE Step tests, but anticipate applying to take the examinations,

6. Potential students that may enrolled at USAT.

The administration of USAT had a good faith belief that USAT was in full compliance with ECFMG's recognition requirements based on the following facts. The University of Science, Arts and Technology College of Medicine, is an institution granted full recognition by the Government of Montserrat, a British Overseas Territory, on September 26, 2003 to provide medical education and grant the M.D. degree. USAT is legally authorized under Montserrat law to provide a medical education program. As a result of this legal authorization, USAT is included in the International Medical Directory (the "IMED" list) in the USA, CAPER(Canada) and WDOMS. Accordingly, students and graduates of the University may apply for and sit for all components of the United States Licensing Examination (USMLE, Steps I, II, and III).

IMED listing is required for ECFMG certification. IMED listing and recognition determination is not a part of the ECFMG's mandate. IMED requires in order to be listed and the school's students being eligible to take the USMLE examinations that USAT be recognized in the country where USAT is located. Accreditation is not required. USAT is recognized by the Montserrat's government, and graduates of USAT MD program have met the requirements for Montserrat medical registration.

As a recognized school, USAT is granted authority by the Montserrat's government to deliver an educational program and grant allowed degrees. Recognition is different from accreditation in that accreditation is a process of quality assurance. The Caribbean Accreditation Authority for Education in Medicine and other Health Professions (CAAM-HP) accreditation will be mandatory beginning in 2023.

Until 2023 USAT is only required to be recognized in order for its students to be allowed to take the USMLE Step I, Step II, and Step III examinations. USAT is Institutionally accredited in the United Kingdom by the Accreditation System for International Schools, Colleges and Universities [ASIC-UK] in their division of International Institutions. Montserrat is a dependent UK overseas territory.

As part of the agreement between the Government of Montserrat and USAT, USAT agrees to maintain operations in Montserrat unless natural

2

disasters arise. If a natural disaster arises USAT is allowed to relocate to an area of convenience and safety.  USAT's student safety is the prior concern of any school's administration. The right to relocate to a safe location does not affect recognition as granted to USAT by the Government of Montserrat.  Montserrat government's licensing agreement Paragraph 8.*13* allows USAT to move classes off shore in the event of a natural disaster.  A volcanic eruption is a natural disaster.

Montserrat's Licensing Agreement Paragraph 8.13 was invoked when the *Soufriere* Hills Volcano on Montserrat started producing volcanic ash as a result of pyroclastic flows. The volcanic ash that results from pyroclastic flows produces a serious threat to human and animal health, and has cost numerous lives. American University of the Caribbean [AUC] was able to relocate due to volcanic activity in 1996, and to date has not returned to Montserrat. As a result of the volcanic hazard USAT has been forced to conduct classes outside of Montserrat, almost entirely due to a development of a state-of-the-art online option that protects students from harm's way.

The ECFMG has allowed other Caribbean medical school to locate their classes away from the original accredited site without obtaining a license for the alternative site. Ross University School of Medicine was allowed to relocate to a cruise ship off the island of St. Kitts due to a natural disaster, and now to a campus in the state of Tennessee. The ECFMG allowed Ross to established a temporary campus off St. Kitts's shores and in the USA.  The online option developed by USAT does not require a fixed US campus.

The arbitrary withholding of USAT's students test scores or refusing permission for USAT's student to take the USMLE examinations is in effect allowing the ECFMG to act as an accrediting body. The ECFMG does not have authority to accredit medical schools. The only authority ECFMG has is to determine if a medical school is recognized.

USAT meets the recognition requirement.  Very few Caribbean medical schools have been accredited by CAAM-HP to date, *the only body that accredits Caribbean medical schools*. CAAM-HP Accreditation is not mandatory until 2023.  Not all Caribbean jurisdictions have accepted the CAAM-HP as an accrediting body to date, *and* Montserrat only accepted the CAAM-HP in 2018.

3

CONFIDENTIAL

542

ECFMG00000368

USAT has established a record that is the envy of both offshore and United States Medical school in the percentage of USAT students passing the various examinations on the first attempt. Over ninety percent of USAT student have passed all examinations on the first attempt. USAT graduates have been very successful in obtaining residencies and completing residencies. USAT graduates have established successful medical practices servicing United States citizens. If the ECFMG testing procedure is valid, USAT teaching programs are valid as measured by USMLE tests. The USAT's student results are a measure of the quality of USAT's teaching programs.

USAT test results provides assurances that USAT graduates exhibit general professional competencies that are appropriate for participating in United States post graduate medical programs. USAT student performance on both formal tests and residency programs demonstrate that USAT education program provides students with a solid foundation for proficient medical care. Indeed, some USAT graduates have become medical faculty members at United States Medical Schools.

The only possible ECFMG complaint is not the quality of USAT's program, but appears to be the definition of "recognition". USAT students and graduates have no knowledge of the definition of "recognition". Fairness and justice are not served by punishing innocent parties when there is a legitimate dispute over interpretation of recognition status. Neither USAT medical students nor USAT's administration had a "reason to know" or "should have known" the ECFMG's position on "recognition", which appears to have not have changed over the past 15 years. USAT has been licensed and operating successfully for the past 15 years without a blemish.

Prior to a right or property being taken from USAT there is a fundamental requirement of due process or in the alternative enforceable contract terms. Fundamental fairness requires either "due process" or "contract enforcement". Adequate notice and an opportunity to be heard before a fair and impartial hearing body is required before ECFMG can take USAT valuable recognition right or USAT students' rights to have ECFMG open the gateway to United States licensing and training. In order for the ECFMG to effectively deny USAT recognition, ECFMG's decision must be conducted by a fair decision-making body following defined rules. Fairness requires internal separation between advocate and decisions makers to preserve neutrality.

4

The essence of due process is a requirement that USAT be given the reason for the ECFMG's decision regarding recognition or non-recognition and an opportunity to defend its students, if necessary. Ex-parte communication by unknown USAT employees and unknown administrative procedures leads to property deprivation without a fair hearing. The ECFMG is asked not to *utilize* ex-parte evidence and unknown rules and procedures to take away valuable rights. USAT has a fundamental right to know what evidence is being used to deny it recognition as a medical school and what procedures are used to make the recognition determination.

It is well settled United States law that a medical license is property that cannot be taken without due process. USAT's right to operate a medical school is a valuable property right, also.  Operation as a medical school is a property right that is essentially being taken away without operation of law. if USAT students cannot be admitted to licensing examinations which entry is controlled by the ECFMG then the valuable right to operate as a medical school has been denied USAT.

On behalf of USAT I request that the ECFMG reassure USAT students and graduates attending USAT prior to September 14, 2018, that they will not be penalized for attending USAT under a good faith belief that the school was recognized and allowed to conduct classes in locations other than Montserrat *for 15 years* without incident prior to the current issue. If the ECFMG has concerns about the location or format of classes, USAT is requesting the opportunity to address any concerns and remedy any agreed deficiencies. Plus, USAT requests the ECFMG to  state its position on students enrolled after September 14, 2018? A response prior to  October 31, 2018 would be greatly appreciated so that USAT's students can be properly advised based on the ECFMG's position?

Yours truly,

Tommy Swate

5

544



**Appendix 11**

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES

3624 Market Street
Philadelphia, PA 19104-2685 USA
215-386-5900 | 215-386-9767 Fax
www.ecfmg.org

October 18, 2018

VIA EMAIL: usat.edu@gmail.com

Orien Tulp, President
University of Science, Arts & Technology (USAT) Faculty of Medicine
Main Campus
S. Mayfield Estate Drive
Olveston, MONTSERRAT

Dear Dr. Tulp,

This is a follow-up to my August 21 and September 14, 2018 letters to you. As you know, it has recently come to the attention of the Educational Commission for Foreign Medical Graduates (ECFMG) that USAT in Montserrat is operating a satellite (or branch) campus in Miami, Florida. ECFMG also understands that USAT is operating satellite campuses in Texas and Puerto Rico.

As I previously advised you, in order for students and graduates of an international medical school, such as USAT, to have eligibility to apply for ECFMG Certification, ECFMG policy requires confirmation from the appropriate government authority in the branch campus country that the branch campus is authorized to operate as a medical school in such branch campus country, among other requirements.

In light of this policy, ECFMG requested that USAT provide documentation from the United States Department of Education and/or the Florida Department of Education confirming that USAT's Miami branch campus is authorized to operate as a medical school in the United States. This documentation should cover the entire time period during which the USAT Miami branch campus has been in operation. To date, ECFMG has no record of receipt of such documentation from you or USAT.

**Therefore, effective today, ECFMG's Sponsor Note in the *World Directory of Medical Schools* (*World Directory*) for USAT has been updated to reflect that 2019 and later graduates of USAT are no longer eligible to apply for ECFMG Certification or USMLE examinations as a step toward ECFMG Certification.**

ECFMG is also writing to your current students to advise them that, if they graduate from USAT in 2019 or later, they will be ineligible for ECFMG Certification and ineligible to register for USMLE examinations as a step toward ECFMG Certification after December 31, 2018. We are also letting them know that in order to become eligible for ECFMG Certification (or to register for USMLE examinations as a step toward ECFMG Certification) on or after January 1, 2019, the United States Department of Education and/or the Departments of Education for Florida, Texas, and Puerto Rico

ECFMG® is an organization committed to promoting excellence in international medical education.

Dr. Orien L. Tulp
October 18, 2018
Page 2 of 2

must provide ECFMG with documentation that USAT is authorized to operate as a medical school in the United States. Otherwise, the students must transfer to and/or be officially enrolled in a medical school that is listed in the *World Directory* as meeting eligibility requirements for ECFMG Certification. In addition, the "Graduation Years" in the ECFMG note on the Sponsor Notes tab of the *World Directory* listing for the student's medical school must be listed as "Current" at the time he/she applies and on his/her test day.

USAT's 2018 and earlier graduates will continue to remain eligible to apply to ECFMG for ECFMG Certification.

Should the United States Department of Education and/or the Departments of Education for Florida, Texas, and Puerto Rico provide ECFMG with documentation that USAT is authorized to operate as a medical school in the United States, ECFMG will be happy to review USAT's eligibility for an ECFMG Sponsor Note in the *World Directory.*

Sincerely,

*kcorrado*

Ms. Kara Corrado, JD
Vice President for Operations

ECFMG® is an organization committed to promoting excellence in international medical education.

CONFIDENTIAL

ECFMG00000495

**Appendix L**

 EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES

3624 Market Street
Philadelphia PA 19104-2685 USA
215-386-5900
www.ecfmg.org

PERSONAL AND CONFIDENTIAL
VIA EMAIL: o.tulp@usat.edu

October 18, 2018

Dr. Orien L. Tulp
Professor and President
University of Science, Arts & Technology (USAT) Faculty of Medicine
Main Campus
S. Mayfield Estate Drive
Olveston
MONTSERRAT

Dear Dr. Tulp:

I am writing to advise you of the allegation that you, individually and in your capacity as an official of the University of Science, Arts & Technology (USAT) Faculty of Medicine, Montserrat, engaged in irregular behavior in connection with providing false information to ECFMG. Specifically, you provided false information to ECFMG when you (1) notified ECFMG that USAT does not operate a branch campus in Miami, Florida and (2) certified to the attendance dates of several USAT students and graduates when ECFMG has information that these students were not attending USAT during some of the time periods to which you certified. The details of ECFMG's allegation are set forth below.

**Details of Allegation**
***False Information Regarding U.S. Branch Campuses***
On August 21, 2018, ECFMG advised you that we had become aware that USAT was operating a "branch" campus in Miami, Florida. We advised you that in order for students and graduates of an international medical school, such as USAT, to have eligibility to apply for ECFMG Certification, ECFMG policy requires confirmation from the appropriate government authority in the branch campus country that the branch campus is authorized to operate as a medical school in such branch campus country. Therefore, we requested that USAT provide documentation from the United States Department of Education and/or the Florida Department of Education confirming that USAT's Miami branch campus is authorized to operate as a medical school in the United States. We indicated that this documentation should cover the whole time period that the USAT Miami branch campus has been in operation.

In response to ECFMG's August 21, 2018 letter, you replied:

"This is incorrect information. The Miami location is an information and testing site only, where a pre-usmle examination [an NBME] may administered, and an Orientation for new students is conducted prior to their traveling to the

ECFMG® is an organization committed to promoting excellence in medical education.

Dr. Orien L. Tulp
October 18, 2018
Page 2 of 4

Caribbean.. It is NOT a campus.  Our ONLY Campus is located in Olveston, Montserrat, British West Indies.

Actually, recall that Montserrat is a volcanic Island, and the license issued to USAT in September, 2003 DOES actually permit the establishment of off-campus lecture and administrative sites as needed.  USAT has students on island on a year round basis since its origination." [emphasis in original]

After receiving your reply, ECFMG received information that USAT was also providing medical education lectures not only at its Miami site, but also at sites in Tampa, Florida, Dallas, Texas, and Puerto Rico. As a result and to ensure that information regarding international medical schools and their students provided to ECFMG complies with ECFMG policies and requirements, ECFMG notified you that ECFMG would require USAT students and graduates to complete an affidavit, attesting to the accuracy of the medical school information provided to ECFMG.

In response to ECFMG's affidavit request, many USAT students and graduates have certified that they have not completed any courses on Montserrat, but instead completed courses on site in the United States at the direction of USAT officials due to volcanic and hurricane activity on Montserrat. ECFMG also received a copy of the "2018 University of Science, Arts and Technology Lecture Conference Schedule" which shows lectures occurring in Florida and Texas.  We note that there are no lectures scheduled for Montserrat.  We also note that graduation occurs in Miami, Florida.

This directly conflicts with the information that you provided, i.e. that "the Miami location is an information and testing site only,  where a pre-usmle examination [an NBME] may administered, and an Orientation for new students is conducted prior to their traveling to the Caribbean.. It is NOT a campus.  Our ONLY Campus is located in Olveston, Montserrat, British West Indies." [emphasis in original].   Further, though USAT's agreement with the Montserrat government indicates that USAT "agrees to maintain operations in Monserrat with regard to its Medical and other programmes for the duration of the agreement unless unforeseen circumstances and/or natural disaster arise that the MCL-USAT may choose to relocate to an area of convenience for the MCL-USAT for a time period to be determined by MCL-USAT.  This would not effect any permission granted to MCL-USAT by the government of Montserrat," ECFMG has no record of receipt of any official communication from you or any other USAT official indicating that USAT relocated due to volcanic activity, from 2003 until present.

In ECFMG's September 15, 2017 announcement "Relocation of Caribbean Medical Schools Impacted by Hurricane Irma" ECFMG advised: "Schools that have relocated or plan to relocate their operations to the United States or elsewhere as a result of Hurricane Irma should provide ECFMG with: a) a formal notice to ECFMG that includes the address of where the school is temporarily located and the expected date of when the school will return to its home country, b) copies of approvals from the home country governmental authorities, and c) copies of approvals from the accrediting

Dr. Orien L. Tulp
October 18, 2018
Page 3 of 4

agency, if any. This information should be e-mailed to Medical Education Resources at medschoolreview@ecfmg.org, along with any questions or comments." ECFMG has no record of receipt of any correspondence from you or any other USAT official that USAT was relocating to the United States due to Hurricane Irma, or any other hurricane.

***Certification of False Information Regarding Students Attendance Dates***

During the course of the investigation into USAT's branch campuses, ECFMG has discovered information that indicates that you provided false information to ECFMG regarding the attendance dates of some of your students on some of their applications for United States Medical Licensing Examinations (USMLE). Specifically, you certified that students were attending USAT during time periods which they were not actually attending USAT.

It is ECFMG's usual practice to consider any action or attempted actions by any person that would or could subvert the processes, programs or services of ECFMG to be *irregular behavior*. See Section A.1. of the enclosed *ECFMG Medical Education Credentials Committee Policies and Procedures*. Examples of irregular behavior include the provision of false information or falsified credentials to ECFMG. ECFMG investigates and considers allegations of irregular behavior in order to protect the integrity of its processes, programs, and services. The ECFMG Committee can impose serious sanctions if it finds irregular behavior has been committed.

The review into the matters described in this letter are ongoing. ECFMG reserves the right to amend or make additional allegations of irregular behavior, in accordance with its policies and procedures, should ECFMG obtain information that supports such amendment or additional allegations.

**ECFMG Medical Education Credentials Committee Review of this Allegation**

This matter will be referred to the ECFMG Committee for review at its next scheduled meeting on November 28, 2018 in Philadelphia. The ECFMG Committee will consider the information presented and take action in accordance with the enclosed *ECFMG Medical Education Credentials Committee Policies and Procedures*.

You will have the opportunity to appear personally before the ECFMG Committee, accompanied by legal counsel, if you so wish. Please indicate in your response if you wish to appear personally before the ECFMG Committee in your individual and/or official capacities. If you do wish to make a personal appearance, I will notify you of the particular time and location of the meeting.

The following documents will be included in the Agenda for the ECFMG Committee's review:

- ECFMG's August 21, 2018 letter to you and your August 21, 2018 e-mail reply;

CONFIDENTIAL

ECFMG00000352

Dr. Orien L. Tulp
October 18, 2018
Page 4 of 4

- ECFMG's September 14, 2018 letter to you, including a copy of the affidavit sent to USAT students on September 14, 2018;
- Copy of "2018 University of Science, Arts and Technology Lecture Conference Schedule"
- September 15, 2017 ECFMG Announcement "Relocation of Caribbean Medical Schools Impacted by Hurricane Irma";
- Copy of "An Agreement Between the Government of Montserrat and Medical College of London (MCL) University of Science, Arts, and Technology (Montserrat) LTD. (USAT)"
- Affidavits completed by USAT students; and
- This letter.

Copies of these documents, with the exception of the completed affidavits by students, are enclosed.

**Please provide a response to ECFMG by November 1, 2018.**  In your response, please note whether you wish to make a personal appearance before the ECFMG Committee.  All documents should be submitted to Ms. Kara Corrado, Vice President for Operations, at the address above or via e-mail at kcorrado@ecfmg.org.  If you have any questions, please do not hesitate to call me at (215) 883-7318.

Sincerely,

Lisa L. Cover
Senior Vice President for Business
Development and Operations

Encl: As noted.

ECFMG00000353



**EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES**

3624 Market Street
Philadelphia, PA 19104-2685 USA
215-386-5900 | 215-386-9767 Fax
www.ecfmg.org

# AFFIDAVIT ATTESTING TO MEDICAL SCHOOL ATTENDANCE

I, _____

*ECFMG Applicant Name*                                                                 *ECFMG ID Number*

hereby declare, under penalty of perjury under the laws of all applicable jurisdictions, including the United States of America, and under penalty of a finding of irregular behavior under applicable ECFMG rules and regulations, that:

### Section 1: Attendance Dates at University of Science, Arts & Technology (USAT) Faculty of Medicine

I attended University of Science, Arts & Technology (USAT) Faculty of Medicine located in Montserrat during the following dates:

| From (Month/Year) | To (Month/Year) |
|---|---|
|  |  |

### Section 2: Dates and Location of Basic Sciences Courses Taken in Montserrat

I was physically present and took basic sciences courses in Montserrat, during the following dates and at the following location *(If you did not complete your basic sciences course work at a facility located in Montserrat, complete Section 3)*:

| Dates of Basic Sciences Courses Taken while Physically Located In Montserrat | | |
|---|---|---|
| (Do not include dates if you were not physically present in Montserrat. Do not include breaks in time where you were not physically located in Montserrat. Only list the beginning and end date for when you were physically present in Montserrat attending basic sciences courses.) | | |
| From (Month/Year) | To (Month/Year) | Address of Facility Where Basic Sciences Classes Were Held |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

While I took my basic sciences classes in Montserrat, I resided at the following location(s):

| Residence Address in Montserrat | Residence Dates in Montserrat | |
|---|---|---|
|  | From (Month/Year) | To (Month/Year) |
|  |  |  |
|  |  |  |

I am attaching the following documentation to demonstrate my physical presence in Montserrat during the time I was taking basic sciences classes at University of Science, Arts & Technology (USAT) Faculty of Medicine. *(check all that apply)*:

☐ My passport, showing travel to Montserrat and visas for Montserrat

☐ My airline tickets/boarding passes documenting travel to Montserrat

☐ My lease, utility bills, etc. for my housing

☐ Other (please specify)

### Section 3: TO BE COMPLETED ONLY IF YOU CANNOT COMPLETE SECTION 2

I did *not* take basic sciences courses at a facility located in Montserrat because:

I also declare that this information is comprehensive, complete and accurate as of the date of my signature.

_____                         _____  _____  _____
*Signature of Applicant*                                                              *(day)*      *(month)*      *(year)*

### Certification by Official

I certify that on the date set forth below the individual named above did appear personally before me and that the statements in this document are subscribed and sworn to before me by the individual on this _____ day, of the month of _____ in the year _____ .

_____
*Signature of Notary Public*                                                              *Official Seal*

_____
*Printed Name of Offical*

**CONFIDENTIAL**

ECFMG00000475

**Appendix 9**

| | |
|---|---|
| **From:** | MECCSupport |
| **Subject:** | IMPORTANT INFORMATION FROM ECFMG / ACTION REQUIRED |
| **Date:** | Monday, October 15, 2018 2:46:38 PM |
| **Attachments:** | 2nd USAT Affidavit - FINAL.pdf |

Dear Doctor:

Our records indicate that you have listed University of Science, Arts & Technology (USAT) Faculty of Medicine in Montserrat as the medical school from which you will graduate or have already graduated and that you are participating in the 2019 Electronic Residency Application Service (ERAS).

As you know, ECFMG is currently conducting a review of its records to ensure that information provided to ECFMG regarding international medical schools and their students/graduates complies with ECFMG policies and requirements. As part of this review, on September 18, 2018, we sent you an affidavit to be completed attesting to your medical school attendance information.

In addition to the previous affidavit, we are also requiring you to submit the attached affidavit which provides additional information to ECFMG about your attendance at USAT.

WHAT YOU NEED TO DO
Effective immediately, as a USAT student or graduate seeking a service or services related to ECFMG Certification, including registration for the United States Medical Licensing Examination (USMLE), release of USMLE scores, issuance of an ECFMG Certificate, or issuance of ECFMG Certification Status Reports to residency programs, you must complete the attached affidavit, attesting to the education you received at USAT. Completion of the affidavit is required and will facilitate ECFMG's review.

**NOTE: FAILURE TO COMPLETE AND SUBMIT THIS AFFIDAVIT BY NOVEMBER 1, 2018 MAY RESULT IN YOU BEING UNABLE TO PARTICPATE IN THE NATIONAL RESIDENT MATCHING PROGRAM (NRMP) "THE MATCH."**

The affidavit must also be notarized by NotaryCam, which provides secure on-line notarization of documents. To use NotaryCam, go to https://www.notarycam.com/ecfmg-affidavit/ and follow NotaryCam's instructions. NotaryCam will e-mail your affidavit to ECFMG directly.

**YOU MUST COMPLETE AND SUBMIT THIS AFFIDAVIT NO LATER THAN NOVEMBER 1, 2018**.

Please allow two to four weeks processing time after the above-described affidavit has been submitted to ECFMG. ECFMG will notify you in writing after your affidavit has been processed.

ECFMG reserves the right to bring allegations of irregular behavior against you, in accordance with its policies and procedures, should ECFMG obtain information that indicates that you have engaged in irregular behavior with respect to any documentation submitted as part of this process.

If you have any questions, please contact MECCsupport@ecfmg.org and you will be assigned a Case Manager. If you prefer, you may call 215-386-5900 and ask to be transferred to a Case Manager for USAT.

Sincerely,

ECFMG

CONFIDENTIAL

ECFMG00000476



**EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES**

3624 Market Street
Philadelphia, PA 19104-2685 USA
215-386-5900 | 215-386-9767 Fax
www.ecfmg.org

## AFFIDAVIT ATTESTING TO EDUCATION RECEIVED AT
## UNIVERSITY OF SCIENCE, ARTS & TECHNOLOGY (USAT) FACULTY OF MEDICNE, MONTSERRAT

I, _____        ☐–☐☐☐–☐☐☐–☐

*ECFMG Applicant Name*                                            *ECFMG ID Number*

hereby declare, under penalty of perjury under the laws of all applicable jurisdictions, including the United States of America, and under penalty of a finding of irregular behavior under applicable ECFMG rules and regulations, that (**initial all that apply**):

(1)   I did ***not*** receive "advanced standing" at USAT or was otherwise exempted from taking courses at USAT for credits I earned at other educational institutions or their programs, including but not limited to other medical schools or allied health schools (nursing schools, chiropractic schools, physician assistant programs, etc.).

_____
*Initials*

(2)   I did ***not*** receive "advanced standing" at USAT or was otherwise exempted from taking courses at USAT for previous work or life experience (e.g. employment as a physician assistant, chiropractor, or nurse practitioner).

_____
*Initials*

(3)   I was ***not*** exempted from taking courses required for graduation from USAT.

_____
*Initials*

(4)   ***All*** of the credits that I earned at USAT for my basic sciences courses (as listed on my USAT transcript) were earned for completion of courses taken at USAT, administered by USAT faculty or staff.

_____
*Initials*

(5)   ***All*** of the credits that I earned at USAT for my clinical rotations (as listed on my USAT transcript) were earned for completion of rotations that were facilitated by USAT for me.

_____
*Initials*

I cannot certify to statement 1 above because:

I cannot certify to statement 2 above because:

I cannot certify to statement 3 above because:

I cannot certify to statement 4 above because:

I cannot certify to statement 5 above because:

I also declare that this information is comprehensive, complete, and accurate as of the date of my signature.

_____        _____   _____   _____
*Signature of Applicant*                          *(day)*    *(month)*   *(year)*

**Certification by Official**

I certify that on the date set forth below that the individual named above did appear personally before me and that the statements in this document are subscribed and sworn to before me by the individual on this _____ day, of the month of January in the year _____ .

Official Seal

_____
*Signature of Notary Public*

_____
*Printed Name of Offical*

CONFIDENTIAL

651

ECFMG00000477

| | |
|---|---|
| **From:** | Bede, Carole <CBede@ECFMG.org> |
| **Sent:** | Thursday, October 18, 2018 8:24 AM |
| **To:** | Corrado, Kara; Mealey, Scott |
| **Subject:** | RE: text for USAT - 10:30am |

I'm glad I mentioned it then. I will keep both notes.

Best Regards,

*Carole Bede*

Ms. Carole Bede
Regional Coordinator, Medical Education Resources



Educational Commission for Foreign Medical Graduates
3624 Market Street
Philadelphia, PA 19104
USA
Email: cbede@ecfmg.org

---

**From:** Corrado, Kara
**Sent:** Thursday, October 18, 2018 8:00 AM
**To:** Mealey, Scott; Bede, Carole
**Subject:** RE: text for USAT - 10:30am

Correct, both notes should appear with the 2019 Sponsor Note one being fist.

_____
Ms. Kara Corrado, J.D.
Vice President for Operations
Educational Commission for Foreign Medical Graduates (ECFMG)
3624 Market Street
Philadelphia, PA 19104

TEL: +1.215.823.2273
kcorrado@ecfmg.org I www.ecfmg.org

---

**From:** Mealey, Scott
**Sent:** Thursday, October 18, 2018 7:58 AM
**To:** Bede, Carole
**Cc:** Corrado, Kara
**Subject:** RE: text for USAT - 10:30am

I think we want both notes to still appear – Kara? With the new one on top.

The new note is below and the current note is

1

CONFIDENTIAL

ECFMG00000503

**Currently, students and graduates of USAT are subject to enhanced procedures that must be met in order to be eligible to apply for ECFMG Certification related services, including but not limited to: ECFMG Certification, USMLE examinations that lead to ECFMG Certification, and Electronic Residency Application Service (ERAS®) Support Services. ECFMG will provide information and instructions to applicants upon receipt of application.**

---

**From:** Bede, Carole
**Sent:** Thursday, October 18, 2018 7:56 AM
**To:** Mealey, Scott
**Subject:** RE: text for USAT - 10:30am

Ok, I'm ready with the HTML codes and text, I will just have to remove the old note and put this one in.

Best Regards,

*Carole Bede*


Ms. Carole Bede
Regional Coordinator, Medical Education Resources



Educational Commission for Foreign Medical Graduates
3624 Market Street
Philadelphia, PA 19104
USA
Email:  cbede@ecfmg.org

---

**From:** Mealey, Scott
**Sent:** Thursday, October 18, 2018 7:52 AM
**To:** Bede, Carole
**Subject:** text for USAT - 10:30am

**Note: As of January 1, 2019, students and graduates of this medical school with a graduation year of 2019 and later are not eligible to apply to ECFMG for ECFMG Certification, which also renders them ineligible to apply to ECFMG for the United States Medical Licensing Examinations (USMLE) as a step toward ECFMG Certification.**

2

**Appendix N**

Tommy Swate
Attorney at Law
403 Wild Plum
Houston, Texas 77013
713-377-4860
swatemd@aol.com

September 23, 2018

Ms. Kara Corrado, J.D.
Vice President of Operations
Education Commission for Foreign Medical Graduates
3624 Market Street
Philadelphia, PA 19104-2685

Re: Letter of October 18, 2018

Dear Ms. Corrado:

This letter is notice that USAT will be represented at the November 28, 2018 hearing by Tommy Swate, Chris Blinn and a USAT representative. I have already given you notice that I am USAT's counsel. Also, local counsel will all so attend the hearing. Chris Blinn is my paralegal. USAT has not made a decision as to what person will be representing the school.

I assume ECFMG's October 18, 2018 letter to Dr. Tulp contains all the allegations that will be discussed at the November 28, 2018 meeting. If any further allegations are to be considered, please inform me of the allegations at least 10 days prior to the meeting. If any further evidence is to be presented at the meeting other than what is listed in your October 18 letter, please forward this information to me 10 days prior to the November 28th meeting. At this time I am requesting the complete file regarding each allegation. What the ECFMG may consider evidence and what USAT may consider exculpatory evidence may certainly be disputed. Thus, in order to defend USAT, I am requesting the complete file be made available to USAT's counsel.

It is my understanding that the ECFMG Medical Education Credentials Committee(MECC) is the entity tasked with making a decision regarding the ECFMG's October 18, 2018 allegations. The MECC is charged, I

CONFIDENTIAL

ECFMG00000371

believe, with making a decision based on a preponderance of the evidence standard. However, it has been brought to my attention that apparently a decision has already been made regarding October 18, 2018 allegations because the ECFMG has posted on various websites warning to USAT students that after January 1, 2018 USAT students will no longer be eligible to apply for the various Step tests. Of course, I appreciate the fact that ECFMG has given the students until January 1, 2019 the benefit of previous test scores and education. However, by ECFMG rules the only entity that is charged with making a decision regarding USAT is the MECC and only after hearing evidence. The administrative staff could not have based its decision to post the unfortunate statements on a preponderance of evidence standard because no evidence has been heard.

The ECFMG actions in placing notation on various websites suggest that the ECFMG proceedings are not neutral. The posting suggest that the ECFMG administrative staff has made a decision and is just going through the motions to have the MECC ratify the administrative staffs' decision. Plus the administrative staff is have ex parte communication with the MECC that USAT is not privy to the communication. I am requesting all communication with the MECC members regarding these allegations be disclosed.

Please remove the comments posted by the ECFMG administrative staff until after the November 28, 2018 hearing. I am requesting a copy of the rules governing the removal of a Caribbean medical school's physical location to another location based on a natural disaster? What rule or rules were applied to Ross University when it move its whole school to the United States after a natural disaster. What are the time frames allowed for the physical relocation? What time frame is allowed any school to correct any deficiency found by the ECFMG? When did the MECC meet and give permission for the UCFMG to send out its September 14, 2018 letter? Under what authority was the letter mailed? Did the MEEC authorized the unfortunate comments on the internet regarding USAT?

On behalf of USAT, we look forward to the November 28, 2018 hearing to discuss these serious allegations. As requested above, USAT's counsel needs to know all the facts in order to advise the USAT administration on the proper action to take. USAT cannot crafted a solution without knowing the rules governing its actions and all the facts concerning the allegations . Fundamental fairness requires disclosure of rules and facts.

CONFIDENTIAL

ECFMG00000372

Please respond to my request no later than 10 days before the November 28, 2018 hearing.

Yours truly,

Tommy Swate
Counsel for USAT

**Appendix O**

 EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES

3624 Market Street
Philadelphia PA 19104-2685 USA
215-386-5900 | 215-386-9767 Fax
www.ecfmg.org

VIA EMAIL: swatemd@aol.com

October 26, 2018

Mr. Tommy Swate
Attorney at Law
403 Wild Plum
Houston, Texas 77013

Dear Mr. Swate:

I am writing in response to your letters dated September 15, 2018 and September 23, 2018. These letters were received at ECFMG on October 16, 2018 and October 23, 2018 respectively. We understand from your letters that you have been retained as counsel for University of Science, Arts & Technology (USAT) Faculty of Medicine, Montserrat. Your letters appear to conflate the issue that USAT is operating branch campuses in the United States without appropriate documentation with the allegations of irregular behavior for Dr. Tulp. We take this opportunity to clarify these issues for you.

### Allegations of Irregular Behavior for Dr. Orien Tulp

ECFMG has *not* alleged irregular behavior on the part of USAT (the institution). The allegations of irregular behavior are specific to Dr. Tulp, both individually and in his capacity as an official of USAT. Therefore, before providing you with any materials relating to allegations of irregular behavior concerning Dr. Tulp, we ask that you advise ECFMG whether you also represent Dr. Tulp individually, in addition to USAT. We will be happy to share the entire case file that will be reviewed by the ECFMG Medical Education Credentials Committee ("ECFMG Committee") with you once you have officially advised that you are Dr. Tulp's legal counsel.

Please note that only Dr. Tulp is entitled to request a personal appearance at the ECFMG Committee hearing, with his legal counsel, as outlined in ECFMG's Policies and Procedures for Irregular Behavior. ECFMG will not permit any other person or official, from USAT or otherwise, to appear instead of Dr. Tulp at his hearing. If you are Dr. Tulp's legal counsel, Dr. Tulp has the right for you to appear with him at the hearing. There is no right or need for "local counsel" or "paralegals" to attend; therefore, they will not be permitted to attend Dr. Tulp's hearing.

Further, in your September 23, 2018 letter, you indicate that "a decision has already been made regarding October 18, 2018 allegations because the ECFMG has posted on various websites warning to USAT students that after January 1, 2018 USAT students will no longer be eligible to apply for the various Step tests." This is incorrect. No decision regarding the allegations against Dr. Tulp has been made as the ECFMG Committee has not yet reviewed these allegations. ECFMG carefully follows its policies and procedures, maintaining fairness and integrity throughout its processes. We trust this information disabuses you of the notion that ECFMG's "proceedings are not neutral."

### USAT's Operation of Branch Campuses in the United States

ECFMG's update to USAT's ECFMG Sponsor Note in the *World Directory of Medical Schools* is a wholly separate matter from the allegations against Dr. Tulp. Our letters of August

ECFMG® is an organization committed to promoting excellence in international medical education.

CONFIDENTIAL

ECFMG00000374

Case 3:19-cv-01075-WGB   Document 132-20   Filed 05/03/23   Page 191 of 614

Mr. Tommy Swate
October 26, 2018
Page 2 of 3

21, 2018, September 14, 2018, and October 18, 2018 (enclosed for your reference) are related to the issue surrounding USAT's operation of branch campuses in the United States.  Through these correspondences, ECFMG advised USAT of ECFMG's policy regarding branch campuses operating in countries outside the main campus country.   To reiterate: in order for students and graduates of an international medical school to have eligibility to apply for ECFMG Certification, ECFMG policy requires (among other things) confirmation from the appropriate government authority in the branch campus country that the branch campus is authorized to operate as a medical school in the branch campus country.

When ECFMG became aware that USAT was operating a campus in Miami, FL, United States, ECFMG requested USAT to provide ECFMG with the documentation from the United States Department of Education and/or the Florida Department of Education confirming that USAT's Miami branch campus is authorized to operate as a medical school in the United States. This documentation should cover the entire time period during which the USAT Miami branch campus has been in operation. To date, ECFMG has no record of receipt of such documentation from USAT.

As a result, ECFMG updated its ECFMG's Sponsor Note in the *World Directory of Medical Schools* (*World Directory*) for USAT to reflect that 2019 and later graduates of USAT are no longer eligible to apply for ECFMG certification.  ECFMG also provided USAT students with this information and guidance on how this information impacted them.   If USAT students still have questions about this, they should contact ECFMG directly as outlined in ECFMG's message to them.

ECFMG does not dispute that USAT's charter has a provision in which the government of Montserrat permits USAT to "relocate to an area of convenience" if faced with "natural disaster or unforeseen circumstances." The charter indicates "This would not affect any permission granted to the MCL-USAT by the Government of Montserrat."   However, the government of Montserrat is not in a position to authorize the establishment of a medical school campus or conduction of other educational activity in another country.  Thus, this section of USAT's charter is irrelevant to the matter of the United States' recognition of USAT's activities within its sovereign borders.

In reference to your question regarding ECFMG's temporary relocation of some medical schools impacted by natural disasters, it is not appropriate for ECFMG to disclose its communication with other medical school officials.  However, we can assure you that the safety of students and school officials is of the highest priority to ECFMG and ECFMG has and will continue to be supportive of and flexible with students and medical schools during periods of temporary relocation and operational recovery.  ECFMG is not aware of any recent natural disasters impacting the island of Montserrat that would require a temporary relocation of USAT.

ECFMG now understands that in addition to Florida, USAT operates campuses in Texas, Puerto Rico, and Maryland.  Should the United States Department of Education and/or the Departments of Education for Florida, Texas, Puerto Rico, and Maryland provide ECFMG with documentation that USAT is authorized to operate its medical school branch campuses in the United States, ECFMG will be happy to review USAT's eligibility for an ECFMG Sponsor Note in the *World Directory.*  Until that time, USAT's ECFMG Sponsor Note for USAT will remain as is.

CONFIDENTIAL

ECFMG00000375

Mr. Tommy Swate
October 26, 2018
Page 3 of 3

Finally, we note that your letter indicates that USAT has conducted classes "in locations other than Montserrat *for 15 years* without incident…" [emphasis in original].  This is troubling to ECFMG, as ECFMG defines an international medical graduate as a physician who received his/her basic medical degree or qualification from a medical school located _**outside**_ the United States and Canada. If USAT has not conducted any medical education in Montserrat for the entirety of its existence, but instead has done so at facilities in the United States, then its graduates, by definition, are not international medical graduates and therefore are not eligible for ECFMG Certification.  As a US medical school, we understand that USAT would be subject to accreditation by the Liaison Committee on Medical Education (LCME) which is the U.S. Department of Education-recognized accrediting body for programs leading to the M.D. degree in the United States.  ECFMG is not aware that USAT has been so accredited by LCME.

Sincerely,

Ms. Kara Corrado, JD
Vice President for Operations

Encl: As noted.

CONFIDENTIAL

550

ECFMG00000376

**Appendix R**

| | |
|---|---|
| **From:** | Corrado, Kara |
| **To:** | "swatemd" |
| **Cc:** | "carla.konyk@gmail.com"; "billreillaw@gmail.com"; Katz, Francine |
| **Subject:** | RE: Hearing for Dr. Tulp -- Response Required |
| **Date:** | Wednesday, November 14, 2018 3:19:00 PM |

Dear Mr. Swate,

Thank you for your email. As we understand that you and Mr. Reil are representing Dr. Tulp in the matter related to the allegations of irregular behavior, I am sending the materials that the ECFMG Committee will review when considering these allegations.  I will send the attachments in 5 separate emails, as they are quite large.  Please let me know if you have not received them.  Please note that this email will also be provided to the Committee.

ECFMG's Medical Education Credentials Committee is comprised of members of ECFMG's Board of Trustees and ECFMG's President and CEO.  ECFMG staff and legal counsel will also be present at the meeting.  These individuals will introduce themselves to you and Dr. Tulp at the meeting; thus it is not necessary for ECFMG to give you the names of these individuals in advance of the meeting.  Further, it is not appropriate for ECFMG to give you the addresses of these individuals, either now or at the meeting.

Again, and as stated in my October 26, 2018 letter, we clarify for you that ECFMG's update to its *World Directory of Medical Schools* Sponsor Note for USAT is unrelated to the allegations of irregular behavior for Dr. Tulp.  ECFMG's update to USAT's Sponsor Note is related to its branch campus activities in the United States.  ECFMG requested USAT to provide ECFMG with the documentation from the United States Department of Education and/or the Florida Department of Education confirming that USAT's Miami branch campus is authorized to operate as a medical school in the United States. To date, ECFMG has no record of receipt of such documentation from USAT.  Should the United States Department of Education and/or the Departments of Education for Florida, Texas, Puerto Rico, and Maryland (where ECFMG understand USAT has branch campuses) provide ECFMG with documentation that USAT is authorized to operate its medical school branch campuses in the United States, ECFMG will be happy to review USAT's eligibility for an ECFMG Sponsor Note in the *World Directory.* Until that time, USAT's ECFMG Sponsor Note for USAT will remain as is.

Since ECFMG has not alleged irregular behavior against USAT (the institution) there is no need for a hearing for USAT. Nor is there any right to a hearing with ECFMG for USAT for any matter.  ECFMG will not entertain any request to review the actions it has taken with respect to USAT's Sponsor Note at Dr. Tulp's irregular behavior hearing.

**Dr. Tulp is scheduled to appear before the ECFMG Committee with you and Mr. Reil (Dr. Tulp's attorneys) on Wednesday November 28, 2018 at 9:00 AM at the Rittenhouse Hotel, 210 West Rittenhouse Square , Philadelphia , PA 19103.  Please arrive at 8:45 AM.**  In accordance with ECFMG's standard practice, Dr. Tulp will be scheduled for 20 minutes, during which time he will have the opportunity to present his response to these allegations (either personally or through his counsel) and the ECFMG Committee members, ECFMG counsel, and staff will have the opportunity to ask questions.  After that, Dr. Tulp may provide a brief, closing statement.

Sincerely,

Kara Corrado

_____

Ms. Kara Corrado, J.D.
Vice President for Operations
Educational Commission for Foreign Medical Graduates (ECFMG)

CONFIDENTIAL

ECFMG00000380

3624 Market Street
Philadelphia, PA 19104

TEL: +1.215.823.2273
kcorrado@ecfmg.org I www.ecfmg.org

**From:** swatemd@aol.com [mailto:swatemd@aol.com]
**Sent:** Friday, November 09, 2018 6:28 PM
**To:** Corrado, Kara; carla.konyk@gmail.com
**Subject:** Re: Hearing for Dr. Tulp -- Response Required

**External Email. Please Proceed with Caution.**

Mr. Riel and I will represent Dr. Tulp at the hearing on October 28th.  Please send a copy of the October 28 agenda and written policy and procedure to my attention at swatemd@aol.com. Please forward copies of all documents submitted to the committee members prior to the hearing.

 I did not receive your letter of October 26 until this afternoon by e mail. I am requesting the names and addresses of the committee members plus the individuals other than the committee members that will be at the hearing. Also, please send me ALL the evidence that will be presented at the hearing so that Dr. Tulp  can prepare for the hearing.

I represent both Dr. Tulp and USAT. I will send a formal demand by certified mail for ECFMG to stop the tortious  inference with the operation of USAT immediately. The ECFMG has taken action against USAT without giving USAT the opportunity to respond in a formal setting. To save time and expense, I am request a hearing on behalf of USAT on October 28, 2018.  Please inform me of the person or persons who authorized the letters to USATs' students? What person or entity made a decision to arbitrarily without a hearing block certain USATs' students scores from being disclosed?  Tommy Swate
-----Original Message-----
From: Corrado, Kara <KCorrado@ecfmg.org>
To: swatemd <swatemd@aol.com>
Sent: Fri, Nov 9, 2018 2:19 pm
Subject: RE: Hearing for Dr. Tulp -- Response Required

Dear Mr. Swate,

I just resent the letter to you. I had emailed it to you on October 26, 2018.  Please let me know if you have received it.

Please advise if you are representing Dr. Tulp and if Dr. Tulp will be appearing at the meeting.

Sincerely,

Kara Corrado

_____

Ms. Kara Corrado, J.D.
Vice President for Operations
Educational Commission for Foreign Medical Graduates (ECFMG)
3624 Market Street
Philadelphia, PA 19104

CONFIDENTIAL

ECFMG00000381

TEL: +1.215.823.2273
kcorrado@ecfmg.org I www.ecfmg.org

---

**From:** swatemd [mailto:swatemd@aol.com]
**Sent:** Friday, November 09, 2018 3:03 PM
**To:** Corrado, Kara
**Subject:** Re: Hearing for Dr. Tulp -- Response Required

**External Email. Please Proceed with Caution.**

---

I have not received a letter dated October 26th from you. Please e mail the LETTER to me . Both attorrneys will appear on the 28th. I can not respond until I receive your letter. Tommy Swate

Sent from my T-Mobile 4G LTE Device

-------- Original message --------
From: "Corrado, Kara" <KCorrado@ecfmg.org>
Date: 11/9/18 1:01 PM (GMT-06:00)
To: swatemd@aol.com, billreillaw@gmail.com
Cc: "Katz, Francine" <fkatz@ECFMG.org>
Subject: Hearing for Dr. Tulp -- Response Required

Gentleman:

I am following up on ECFMG's October 26, 2018 letter to you regarding USAT. We understand that you both are counsel for USAT.

As you know, ECFMG will review the allegations of irregular behavior for Dr. Tulp on November 28, 2018. Dr. Tulp has a right to a personal appearance at that meeting with his legal counsel.

Please reply to this email by November 14, 2018 and indicate:

If you are representing Dr. Tulp in this matter; and
If Dr. Tulp plans to attend the meeting in person (and if so, which of his attorneys will be present).

If we do not receive a reply from you on or before November 14, 2018, we will assume that Dr. Tulp is not making a personal appearance. Dr. Tulp's case is scheduled to be reviewed on November 28, 2018 whether or not he makes a personal appearance.

Sincerely,

CONFIDENTIAL

556

ECFMG00000382

Kara Corrado

_____

Ms. Kara Corrado, J.D.

Vice President for Operations

Educational Commission for Foreign Medical Graduates (ECFMG)

3624 Market Street

Philadelphia, PA 19104


TEL: +1.215.823.2273

kcorrado@ecfmg.org I www.ecfmg.org


**Disclaimer**

The information contained in this communication from **ECFMG® / Educational Commission for Foreign Medical Graduates** is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd.**


**Disclaimer**

The information contained in this communication from **ECFMG® / Educational Commission for Foreign Medical Graduates** is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd.**

| | |
|---|---|
| **From:** | swatemd <swatemd@aol.com> |
| **Sent:** | Friday, November 16, 2018 2:16 PM |
| **To:** | Corrado, Kara |
| **Subject:** | RE: Hearing for Dr. Tulp -- Response Required |

**External Email. Please Proceed with Caution.**

Thank you . I have received documents Tommy Swate

Sent from my T-Mobile 4G LTE Device

-------- Original message --------
From: "Corrado, Kara" <KCorrado@ecfmg.org>
Date: 11/16/18 1:04 PM (GMT-06:00)
To: swatemd <swatemd@aol.com>
Cc: carla.konyk@gmail.com, billreillaw@gmail.com, "Katz, Francine" <fkatz@ECFMG.org>
Subject: RE: Hearing for Dr. Tulp -- Response Required

Dear Mr. Swate,

I am writing to confirm that you have received the materials that the ECFMG Committee will review at its meeting on November 28, 2018 related to the allegations of irregular behavior for Dr. Tulp. All documents were emailed to you on Wednesday, November 14, 2018. I have also sent the documents to you via Federal Express today.

Please let us know if you have not received the documents.

Sincerely,

Kara Corrado

_____

Ms. Kara Corrado, J.D.
Vice President for Operations
Educational Commission for Foreign Medical Graduates (ECFMG)
3624 Market Street
Philadelphia, PA 19104

TEL: +1.215.823.2273
kcorrado@ecfmg.org I www.ecfmg.org

**From:** Corrado, Kara
**Sent:** Wednesday, November 14, 2018 3:19 PM
**To:** 'swatemd'
**Cc:** 'carla.konyk@gmail.com'; 'billreillaw@gmail.com'; Katz, Francine
**Subject:** RE: Hearing for Dr. Tulp -- Response Required

Dear Mr. Swate,

1

CONFIDENTIAL

ECFMG00000505

Thank you for your email. As we understand that you and Mr. Reil are representing Dr. Tulp in the matter related to the allegations of irregular behavior, I am sending the materials that the ECFMG Committee will review when considering these allegations.  I will send the attachments in 5 separate emails, as they are quite large.  Please let me know if you have not received them.  Please note that this email will also be provided to the Committee.

ECFMG's Medical Education Credentials Committee is comprised of members of ECFMG's Board of Trustees and ECFMG's President and CEO.  ECFMG staff and legal counsel will also be present at the meeting.  These individuals will introduce themselves to you and Dr. Tulp at the meeting; thus it is not necessary for ECFMG to give you the names of these individuals in advance of the meeting.  Further, it is not appropriate for ECFMG to give you the addresses of these individuals, either now or at the meeting.

Again, and as stated in my October 26, 2018 letter, we clarify for you that ECFMG's update to its *World Directory of Medical Schools* Sponsor Note for USAT is unrelated to the allegations of irregular behavior for Dr. Tulp.  ECFMG's update to USAT's Sponsor Note is related to its branch campus activities in the United States.  ECFMG requested USAT to provide ECFMG with the documentation from the United States Department of Education and/or the Florida Department of Education confirming that USAT's Miami branch campus is authorized to operate as a medical school in the United States. To date, ECFMG has no record of receipt of such documentation from USAT.  Should the United States Department of Education and/or the Departments of Education for Florida, Texas, Puerto Rico, and Maryland (where ECFMG understand USAT has branch campuses) provide ECFMG with documentation that USAT is authorized to operate its medical school branch campuses in the United States, ECFMG will be happy to review USAT's eligibility for an ECFMG Sponsor Note in the *World Directory.* Until that time, USAT's ECFMG Sponsor Note for USAT will remain as is.

Since ECFMG has not alleged irregular behavior against USAT (the institution) there is no need for a hearing for USAT.  Nor is there any right to a hearing with ECFMG for USAT for any matter.  ECFMG will not entertain any request to review the actions it has taken with respect to USAT's Sponsor Note at Dr. Tulp's irregular behavior hearing.

**Dr. Tulp is scheduled to appear before the ECFMG Committee with you and Mr. Reil (Dr. Tulp's attorneys) on Wednesday November 28, 2018 at 9:00 AM at the Rittenhouse Hotel, 210 West Rittenhouse Square , Philadelphia , PA 19103.  Please arrive at 8:45 AM.**  In accordance with ECFMG's standard practice, Dr. Tulp will be scheduled for 20 minutes, during which time he will have the opportunity to present his response to these allegations (either personally or through his counsel) and the ECFMG Committee members, ECFMG counsel, and staff will have the opportunity to ask questions.  After that, Dr. Tulp may provide a brief, closing statement.

Sincerely,

Kara Corrado

_____

Ms. Kara Corrado, J.D.
Vice President for Operations
Educational Commission for Foreign Medical Graduates (ECFMG)
3624 Market Street
Philadelphia, PA 19104

TEL: +1.215.823.2273
kcorrado@ecfmg.org | www.ecfmg.org

**From:** swatemd@aol.com [mailto:swatemd@aol.com]
**Sent:** Friday, November 09, 2018 6:28 PM
**To:** Corrado, Kara; carla.konyk@gmail.com
**Subject:** Re: Hearing for Dr. Tulp -- Response Required

**External Email. Please Proceed with Caution.**

Mr. Riel and I will represent Dr. Tulp at the hearing on October 28th.  Please send a copy of the October 28 agenda and written policy and procedure to my attention at swatemd@aol.com. Please forward copies of all documents submitted to the committee members prior to the hearing.

2

ECFMG00000506

 I did not receive your letter of October 26 until this afternoon by e mail. I am requesting the names and addresses of the committee members plus the individuals other than the committee members that will be at the hearing. Also, please send me ALL the evidence that will be presented at the hearing so that Dr. Tulp  can prepare for the hearing.

I represent both Dr. Tulp and USAT. I will send a formal demand by certified mail for ECFMG to stop the tortious  inference with the operation of USAT immediately. The ECFMG has taken action against USAT without giving USAT the opportunity to respond in a formal setting. To save time and expense, I am request a hearing on behalf of USAT on October 28, 2018.  Please inform me of the person or persons who authorized the letters to USATs' students? What person or entity made a decision to arbitrarily without a hearing block certain USATs' students scores from being disclosed?  Tommy Swate
-----Original Message-----
From: Corrado, Kara <KCorrado@ecfmg.org>
To: swatemd <swatemd@aol.com>
Sent: Fri, Nov 9, 2018 2:19 pm
Subject: RE: Hearing for Dr. Tulp -- Response Required

Dear Mr. Swate,

I just resent the letter to you. I had emailed it to you on October 26, 2018.  Please let me know if you have received it.

Please advise if you are representing Dr. Tulp and if Dr. Tulp will be appearing at the meeting.

Sincerely,

Kara Corrado

_____

Ms. Kara Corrado, J.D.
Vice President for Operations
Educational Commission for Foreign Medical Graduates (ECFMG)
3624 Market Street
Philadelphia, PA 19104

TEL: +1.215.823.2273

3

CONFIDENTIAL

ECFMG00000507

| From: | Corrado, Kara <KCorrado@ecfmg.org> |
|---|---|
| Sent: | Thursday, January 10, 2019 10:31 AM |
| To: | Katz, Francine; McEnroe, Elisa P.; Klayman, Matthew D.; Cover, Lisa |
| Subject: | FW: Transcript from Hearing |
| Attachments: | olt112818.pdf |

PRIVILEGED

**From:** Corrado, Kara
**Sent:** Thursday, January 10, 2019 9:44 AM
**To:** o.tulp@usat.edu
**Cc:** billreillaw@gmail.com; 'swatemd@aol.com'
**Subject:** Transcript from Hearing

Dear Dr. Tulp,

Please find attached the transcript of the November 28, 2018 proceedings.

Sincerely,

Kara Corrado

_____

Ms. Kara Corrado, J.D.
Vice President for Operations
Educational Commission for Foreign Medical Graduates (ECFMG)
3624 Market Street
Philadelphia, PA 19104

TEL: +1.215.823.2273
kcorrado@ecfmg.org l www.ecfmg.org

**Disclaimer**

The information contained in this communication from **ECFMG® / Educational Commission for Foreign Medical Graduates** is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

1

CONFIDENTIAL                                                                 ECFMG00000509

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd.**

Case 2:18-cv-05540-GWB Document 152-20 Filed 05/02/19 Page 14 of 15 JA01 38

2

CONFIDENTIAL

ECFMG00000510

MEETING OF THE ECFMG MEDICAL

EDUCATION CREDENTIALS COMMITTEE

- - -

RE:  ORIEN L. TULP, USAT

- - -

NOVEMBER 28, 2018

- - -

Hearing taken pursuant to notice, was held at RITTENHOUSE HOTEL, 210 West Rittenhouse Square, Philadelphia, Pennsylvania, commencing at 10:00 a.m., on the above date, before LISA MARIE CAPALDO, RPR, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

GOLKOW LITIGATION SERVICES

877.370.3377 ph | 917.591.5672 fax

Deps@golkow.com

CONFIDENTIAL                                ECFMG00000511

APPEARANCES:

ECFMG STAFF

Mr. William W. Pinsky

Mr. Dennis M. Donohue

Ms. Kara Corrado

Ms. Lisa L. Cover

Ms. Svetlana Gridneva

Mr. Scott Mealey

Ms. Rosemary Carlin


ECFMG Board Members


Dr. Maryellen Gusic

Dr. Ronald R. Blanck

Dr. Barbara Barzansky

Dr. Peter Buckley

Dr. Andrew Filak

Dr. Ram Krishna

Dr. Dotun Ogunyemi

Dr. James Pelegano

CONFIDENTIAL                                ECFMG00000512

                              -   -   -

                          I N D E X

                              -   -   -


        Statement of:

                    ORIEN L. TULP, USAT


              By Mr. Swate

CONFIDENTIAL                                      ECFMG00000513

- - -

PROCEEDING

- - -

O R I E N  T U L P, Sworn.

- - -

DR. GUSIC: We will begin by asking the committee members and the staff to introduce themselves. We will swear in Dr. Tulp and then if there are any opening statements.

MS. McENROE: Elisa McEnroe, outside counsel for ECFMG.

MS. KATZ: I'm Francis Katz. I'm the general counsel at ECFMG.

DR. CRAIG: Steve Craig, board member.

DR. OGUNYEMI: Dr. Ogunyemi, ECFMG board member.

DR. BUCKLEY: Peter Buckley, I'm also an ECFMG board member.

DR. PELEGANO: Jim Pelegano, ECFMG board member.

DR. KRISHNA: Dr. Krishna,

CONFIDENTIAL                                   ECFMG00000514

board member.

DR. FILIK:  Andy Filik, ECFMG board member.

DR. PINSKY:  Bill Pinsky, President and CEO of ECFMG.

DR. GUSIC:  Maryellen Gusic, board member and chair of this committee.

DR. BLANCK:  Ronald Blanck, chair and board member of this committee.

DR. BARZANSKY:  Barbara Barzansky, ECFMG board member.

MS. CORRADO:  Kara Corrado, ECFMG staff.

MS. COVER:  Lisa Cover, ECFMG staff.

MR. DONOHUE:  Dennis Donohue, ECFMG staff.

MS. GRIDNEVA:  Svetlana Gridneva, ECFMG staff.

MS. CARLIN:  Rosemary Carlin, ECFMG staff.

MS. CORRADO:  Just briefly,

CONFIDENTIAL                                    ECFMG00000515

I'm just going to iterate the allegations for the committee. The allegation is that Dr. Orien Tulp, professor and president of USAT engaged in irregular behavior in connection with providing false information to ECFMG, specifically that Dr. Tulp provided false information to ECFMG regarding USTAT's United States branch campuses and certifying to the attendance dates of several USTAT students and graduates when ECFMG has information that these students were not attending USTAT during some of the time periods to which Dr. Tulp certified.

Dr. Tulp is here today along with his attorneys to address these allegations and to answer any questions that the committee may have.

DR. GUSIC: Opening statements.

CONFIDENTIAL                                      ECFMG00000516

MR. SWATE:  Thank you.  I asked the name of the officer outside the door, and he refused to give me his name.  Could you tell me who the officer outside the door is?

MS. McENROE:  It's a security officer we've brought in for our own protection in case we need it throughout our day's proceedings.  He's an off-duty Philadelphia police officer.

MR. SWATE:  First, I would like to ask for the -- I've asked and I've asked and I've asked for the packet that was presented to the committee members.  I would like a copy of the packet, the information that was submitted to the committee members so that I will know what was considered by the committee before we came here today because you're considering information that I may or may not

know about.  And that's
fundamentally unfair to my client,
for my client to have to defend
against potential information that
we don't have.

First, I would ask for a
copy of that.

MS. McENROE:  There's
actually a black binder right in
front of you.  We also have
provided that on more than one
occasion prior to this proceeding,
which is our usual practice even
without you asking.  That's what
we do.

MR. SWATE:  Where is the
letter that you sent to the
committee members addressing this?

MS. McENROE:  The materials
presented to the committee
regarding this circumstance with
Dr. Tulp's charges of irregular
behavior are presented in that
binder to you.

MR. SWATE:  I'm asking you for the letter you sent to the committee members.

MS. McENROE:  I don't know what you're talking about.

MR. SWATE:  You didn't send them a letter explaining what this was?

MS. McENROE:  We sent those materials.

MR. SWATE:  What about the letter that went with the materials?

MS. McENROE:  Those are the materials including any correspondence with it.

MR. SWATE:  All the correspondence would be included with this material?

MS. McENROE:  Correct.

MR. SWATE:  I'm sorry.  Where is the correspondence that you sent to the committee?

MS. McENROE:  This is the

same material that you were provided. November 14th you got it by e-mail, and November 15th you got it by Federal Express.

MR. SWATE: I'm asking for the letters that you sent to these committee members. You just didn't send this out to the committee members just blindly.

MS. McENROE: Unfortunate for them, potentially there's a lot of materials they have to review, and they carefully review the materials presented to them as presented to you. We get an electronic copy, myself included which you were provided by e-mail on November 14th.

MR. SWATE: So you're telling me that you did not send them a letter explaining this material and explaining the allegation to the committee members.

MS. McENROE:  That material is as presented to the committee.

MR. SWATE:  You're not answering my question.

MS. McENROE:  I'm not here to answer your questions, sir. We're here for your client to explain to us the charges of irregular behavior against him.

If you have an opening statement you would like to make, we're interested in hearing it. Our committee has questions for your client, and then we will consider the charges of irregular behavior.

MR. SWATE:  This committee has no jurisdiction over Dr. Tulp. We showed up today as it stands for negotiation. You all have no legal jurisdiction to determine anything.

So accordingly, please be advised that we're not waiving

CONFIDENTIAL

because we're here any jurisdictional issues that may be addressed at another forum at another day.

Since the ECFMG has made the allegation, it should have the sole and exclusive burden of proof.  So who is presenting the evidence against Dr. Tulp?

This is not the U.S. Congress where you can make blind allegations and attempt to have the person prove they are not guilty.  And that's what's occurring here today, just blatant accusations and then assuming he's guilty.  And you have him come here for 20 minutes to explain why he's not guilty.

You have a duty of presenting your evidence, credible evidence before Dr. Tulp has to answer anything.  It's your burden.

Now, you claim you are basing this on the preponderance of evidence. What evidence are you presenting here today that Dr. Tulp violated anything? None.

Also, there appears to be a co-mingling of the prosecutorial and jury functions. You are both making the claims and acting as judge and jury.

We have asked for discovery of documents, especially any letters or correspondence that have been sent to the committee members. The claim that you just sent the committee members this without any explanation doesn't meet any kind of test of credibility.

The ECFMG is either acting as quasi government entity or acting under a contract basis. Now, you claim that you are a private nonprofit entity. So the

CONFIDENTIAL
ECFMG00000523

only reason that you could be interacting with Dr. Tulp is on the basis of contract.  Where is the contract?

Dr. Tulp's doesn't have a contract with you all.  So you have no right to tortuously interfere with his business practices or tortuously interfere with his students.

ECFMG has printed and published derogatory information about USAT.  Whether it's true or not true, at least the target of those accusations should have had the opportunity to address those accusations before you go out and attempt to ruin the school, which is what you have done causing probably millions of dollars worth of damages.

If you're not a quasi government entity, everybody in this room is going to be liable

for whatever damages we can prove. You've already prejudged the case by taking action against USAT by refusing to release documents of their students. Totally have refused to release documents of students the students are entitled to have released.

Again, repeating myself, you're either a quasi government agency or you are a private agency. A private agency you got to have a contract. Quasi government agency you got to have at least an assemblance of due process which there's none here.

I asked for the rules and regulations and the protocols for these meetings. Apparently, there is none other than what's in the eyes of the beholders of the people who run the ECFMG.

What's the protocol? I asked for the agenda. I got a

CONFIDENTIAL

brief statement to show up at 8:45. And here we are at ten o'clock, total disrespectful to my client and myself to have us show up at 8:45 and then be ten o'clock before you have us come in and address you.

So we have not received the rules and regulations for the hearing nor have we seen any right that you have other than essentially blackmailing the students and telling the students, well, if you don't send in these forms, we're going to hold your records hostage, which has resulted in students either being accepted for residency and not being able to continue with the residency or not being able to be interviewed for the residency.

That is our opening statement. If you have any questions, you can address them to

CONFIDENTIAL

me.  Dr. Tulp will not be answering any questions.

MS. McENROE:  Mr. Swate, do you have any substantive response or statement with respect to the charges of irregular behavior against your client?

We've heard your procedural concerns.  And just for the purposes of the record, we disagree across the board with your allegations and your statements about the state of affairs.  I think for everybody's time I'm not going to go through them and enumerate each and every single one of them.

If and when we ever ended up dealing with these issues in the court of law, we would deal with them then and we feel very confident --

MR. SWATE:  I can assure you we're going to end up in federal

CONFIDENTIAL                                        ECFMG00000527

court.

MS. McENROE:  I let you speak.  Can you let me speak?

MR. SWATE:  I'm sorry.

MS. McENROE:  Do you have any statement with regard to the actual substantive allegations of irregular behavior?

MR. SWATE:  We can go through this page by page.

MS. McENROE:  I don't mean to go through it page by page. Are you here today saying that -- is it Dr. Tulp?  I would say Tulp with an L.

DR. TULP:  It's Tulp.

MS. McENROE:  Are you saying that Dr. Tulp did not provide incorrect information to ECFMG with regard to branch campuses in the United States?

MR. SWATE:  Show me your evidence that he did.

MS. McENROE:  We have e-mail

CONFIDENTIAL

correspondence from him in all caps saying that there were not campuses in the United States. And we have significant evidence to the contrary. We were wondering if --

MR. SWATE: What's your definition of campus?

MS. McENROE: Maybe that's something you can illuminate for us about what your client's view is of a campus, whether there was education taking place in the United States for USTAT.

MR. SWATE: The burden of proof is not on Dr. Tulp. The burden of proof is on the ECFMG.

Now, Dr. Tulp is not going to address a nebulous definition of campuses. You show me your written definition of campuses and we'll address that.

MS. McENROE: Did USTAT provide any student with any

CONFIDENTIAL                                      ECFMG00000529

medical school basic science

education in the United States?

MR. SWATE:  Well, yes, it
did.

MS. McENROE:  He's shaking
his head, no, and you just said,
yes.  So maybe you should let your
client speak to respond.

MR. SWATE:  Dr. Tulp is not
going to be talking today.  The
next time you hear him talk is
going to be in federal court.

MS. McENROE:  So, yes, there
was education in the United
States?

MR. SWATE:  There was no
campus in the United States.

MS. McENROE:  So my question
was, was there any education for
basic medical sciences provided in
the United States?

MR. SWATE:  What do you mean
by education?

MS. McENROE:  Were there any

CONFIDENTIAL                                   ECFMG00000530

live lectures provided in the
United States for USAT?

MR. SWATE:  My
understanding is the lectures were
for some extent was prepared by
the Internet, that type of thing.

MS. McENROE:  That was not
responsive to my question.  My
question was --

MR. SWATE:  You're not
cross-examining me, Counsel.

MS. McENROE:  Well, I'm
asking you questions and trying to
be more specific --

MR. SWATE:  We can't answer
the questions because you haven't
defined what campus is.  You
haven't defined what the
regulations for having an off-site
campus where you allowed other
schools to have off-site campuses,
but you attacked USTAT for some
reason.

Now, you cannot disagree

CONFIDENTIAL                                        ECFMG00000531

that you have allowed other schools to have off-site campuses due to natural problems. You've been told what the natural problems were.

MS. McENROE: That was not my question. My question was, were there any live lectures provided to students of USTAT or basic medical sciences in the United States?

MR. SWATE: I'm not a witness. So you don't get to cross-examine me.

MS. McENROE: I may not be able to ask you questions as a witness. I would normally ask your client.

MR. SWATE: You're not going to be able to do that because you haven't given me enough information to prepare my client. This star chamber proceedings, he's not going to participate in.

CONFIDENTIAL                                    ECFMG00000532

MS. McENROE:  Despite the four inches of paper --

MR. SWATE:  Let's go through each of the --

MS. McENROE:  You had some concerns that by not taking you exactly at 8:45 when we asked that you be here for a 9:00 hearing until 10:00 was a waste of time. We apologize if you feel that way. That was not at all the intention. This is a busy committee.  We don't have the time or the man with to sit here and go through every single page that we provided you weeks ago.

MR. SWATE:  I'm prepared to go through every page of this.

MS. McENROE:  Tell me where in there it proves that your client did not provide any medical school education in the United States.

MR. SWATE:  He doesn't have

CONFIDENTIAL

the burden of proof.

MS. McENROE:  We're just going around in circles.  I don't know that it's going to be much more helpful to try and proceed.

MR. SWATE:  I'm willing to go through every page of this.

MS. McENROE:  To what end? You're not answering my questions. What are you hoping to get out of every single page of that?

If you want to sit here and look for something specific, tell me.  We've all read the materials. We can help direct you.

Take a look at Appendix E at the e-mail from your client saying, it is not a campus.  Our only campus is located in Olveston, Montserrat, British West Indies.

My questions are trying to understand whether there was medical school education in the

CONFIDENTIAL                                              ECFMG00000534

United States.

MR. SWATE:  That's not what -- what you're trying to do is ask that question and then leap frog to make like that's the campus.

Give me your definition of what a campus is and then give me the cases in which you've allowed campuses to operate outside of their original address.

MS. McENROE:  Perhaps your client, if we would be allowed, could provide us an explanation of what he meant by campus in this e-mail because the committee is interested in hearing that.

MR. SWATE:  I would like to know what your definition of campus is.

MS. McENROE:  He's the one who used the word here.  I'm interested to know what he means by it.

MR. SWATE:  I'm asking you,

CONFIDENTIAL                                    ECFMG00000535

what's your definition of campus?
Secondly, what's the exceptions to
having an off-site campus?

MS. McENROE:  We appreciate
you being here today.  We're
working on trying to understand
the facts and circumstances in
this case.  Apparently, we're
going to be left with a cold
record because your client is
refusing to answer any questions.

I think at this time it
makes sense, unless there's any
closing statement you want to
make, that we adjourn.

MR. SWATE:  ECFMG is
adjourning this without us having
the ability to go through their
efforts.

MS. McENROE:  Is there
anything in particular you want to
go through?  We provided this to
you --

MR. SWATE:  I want to go

CONFIDENTIAL

through the whole thing.

MS. McENROE:  Start on page one.  What is it you want to talk to us about it?

MR. SWATE:  The matter has been brought to the CIE's attention.  Where is the letter or whatever information was brought to the attention?

MS. McENROE:  We're not here to answer questions, sir.  If you have a closing statement or something specific you want to point out to us so we understand the allegations better that are lodged against your client, that would be helpful.

That's why we're here today, the due process you're saying that you wanted.  We're here to try to understand what it is that you're trying to do here.

And candidly, I appreciate you advocating on behalf of your

CONFIDENTIAL

client.  It's not productive here if we can't understand the underlying facts as your client means them and wants ECFMG to understand them.

So if this is your position that you're just going to come here and obstruct, then that's just how it's going to be and we're not wasting this committee's time.  They have a busy agenda, and we've got to keep going.

MR. SWATE:  It's a waste of the committee's time when you're going to destroy somebody's good name and good reputation without telling them what you're claiming. At least in Texas, before we execute somebody, we at least tell them what the claim is for executing them.

You've refused.  You've stone walled me on the procedures. I've asked for written procedures

for this committee.  Apparently, there's none.  It's whatever you want to make them.

MS. McENROE:  Sir, you've gotten the policy and procedures on irregular behavior multiple times.  You'd like to say that the record says what you say it says.  It just doesn't.

We're trying to follow the best procedure we possibly can, and you and your client are obstructing us in being able to collect the information.  At this point, I don't think that it's productive to continue the proceeding.

MR. SWATE:  We're entitled to know what procedure this committee is operating under.  You just can't operate under whatever you want to make it.

MS. McENROE:  You've gotten the policies and procedures.

CONFIDENTIAL  ECFMG00000539

MR. SWATE:  No, I haven't.
I've gotten --

MS. McENROE:  They're
available on the Internet.

MR. SWATE:  I have received
broad statements, you can do
whatever you want.

MS. McENROE:  The record
will reflect --

MR. SWATE:  And that's not a
written policy and procedure.  And
that will not stand up under any
theory.

MS. McENROE:  We've provided
them to you in writing and the
link to the URL where they are
available publically on the
Internet.  I don't think at this
point there's anything else that's
worth us discussing at this
moment.  Thank you.

MR. SWATE:  You're
terminating --

MS. McENROE:  Yes, I'm

CONFIDENTIAL                                  ECFMG00000540

terminating the proceeding.

MR. SWATE: ECFMG is terminating this prior to us presenting our evidence.

MS. McENROE: We asked you to present evidence, and all you did was present legal argument.

What's your offer of proof? What would you like to provide?

MR. SWATE: We'll go through every page of this.

MS. McENROE: In particular, what would you like to provide?

MR. SWATE: First, I'd like to know who Ms. Sara Colins is?

MS. McENROE: From the Florida Department of Education?

MR. SWATE: I don't know who this is.

MS. McENROE: So what evidence is that that you are presenting to us?

MR. SWATE: I'm asking your evidence. You're the one

CONFIDENTIAL                                        ECFMG00000541

presenting the evidence and I'm asking what it is?

MS. McENROE: You're not providing any evidence. So thank you for coming today, Dr. Tulp. We appreciate it.

MR. SWATE: So you're adjourning the --

MS. McENROE: Yes, I'm adjourning the proceeding.

- - -

(Whereupon, the hearing concluded at approximately 10:39 a.m.)

- - -

C E R T I F I C A T E

I hereby certify that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
LISA CAPALDO
Dated:

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying shorthand reporter.)

CONFIDENTIAL                ECFMG00000543

 **ECFMG**®  EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES

3624 Market Street
Philadelphia PA 19104-2685 USA
215-386-5900 | 215-386-9767 Fax
www.ecfmg.org

PERSONAL AND CONFIDENTIAL
VIA EMAIL: o.tulp@usat.edu

December 14, 2018

Dr. Orien L. Tulp
Professor and President
University of Science, Arts & Technology (USAT) Faculty of Medicine
Main Campus
S. Mayfield Estate Drive
Olveston
MONTSERRAT

Dear Dr. Tulp:

I am writing to inform you that the ECFMG Medical Education Credentials Committee ("ECFMG Committee") has completed its review of the allegation that you, individually and in your capacity as an official of University of Science, Arts & Technology (USAT) Faculty of Medicine, Montserrat, engaged in irregular behavior in connection with providing false information to ECFMG. Specifically, you provided false information to ECFMG when you (1) notified ECFMG that USAT does not operate a branch campus in Miami, FL and (2) certified to the attendance dates of several USAT students and graduates when ECFMG has information that these students were not attending USAT during some of the time periods to which you certified.

In advance of the review, the members of the ECFMG Committee were provided with the documents listed in ECFMG's October 18, 2018 letter and ECFMG's November 14, 2018 emails. A hardcopy of the complete file was also sent to your attorney, Mr. Tommy Swate, on November 16, 2018 via Federal Express. On November 16, 2018, Mr. Swate acknowledged receipt of this complete file. You made a personal appearance before the ECFMG Committee accompanied by your legal counsel, Mr. Swate. A copy of the transcript of the proceedings will be sent to you as soon as it is available.

The ECFMG Committee considered the documentation presented to it and Mr. Swate's statements. Following careful review, the ECFMG Committee determined that you engaged in irregular behavior in connection with providing false information to ECFMG.

The ECFMG Committee has determined that ECFMG will not accept any documents signed / certified by you for ECFMG on behalf of USAT, or any other medical school, for a minimum of five years from today; thereafter, the prohibition shall end only upon a petition to ECFMG conclusively demonstrating to the satisfaction of the ECFMG Committee a familiarity with, and willingness to adhere to, ECFMG polices. Your ECFMG Medical School Web Portal (EMSWP) account will remain deactivated.

In light of the ECFMG Committee's findings, the ECFMG Sponsor Note for USAT in the *World Directory of Medical Schools (World Directory)* will be updated as follows:

ECFMG® is an organization committed to promoting excellence in international medical education.

Dr. Orien L. Tulp
December 14, 2018
Page 2 of 2

> *In 2018, ECFMG determined that a certain official of the University of Science Arts & Technology engaged in irregular behavior in connection with providing false information to ECFMG.*

This note will remain in USAT's ECFMG Sponsor Note in the *World Directory* for five years, regardless of whether USAT changes its name, ownership, and/or location.

Additionally, in accordance with the ECFMG *Policies and Procedures Regarding Irregular Behavior*, a permanent annotation that you engaged in irregular behavior will be included in your ECFMG record. ECFMG may report the ECFMG Committee's determination of irregular behavior to the Federation of State Medical Boards of the United States, U.S. state and international medical licensing authorities, directors of graduate medical education programs, and to any other organization or individual who, in the judgment of ECFMG, has a legitimate interest in such information.

As noted in the enclosed ECFMG *Rules of Appellate Procedure*, decisions of the ECFMG Medical Education Credentials Committee may be appealed within the 30-day time period specified.

Sincerely,

William W. Pinsky, MD FAAP FACC
President and CEO

CC: Tommy Swate, Esq. swatemd@aol.com
    William Reil, Esq. billreillaw@gmail.com

Encl: As noted.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DR. ORIEN L. TULP,<br><br>                Plaintiff,<br><br>v.<br><br>EDUCATIONAL COMMISSION FOR<br>FOREIGN MEDICAL GRADUATES and DR.<br>WILLIAM W. PINSKY,<br><br>                Defendants. | Case No. 2:18-cv-05540-WB<br><br>Hon. Wendy Beetlestone |

## DECLARATION OF KARA CORRADO IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY AND/OR PERMANENT INJUNCTION

I, Kara Corrado, declare as follows:

1. I am currently employed as the Vice President for Operations at the Educational Commission for Foreign Medical Graduates ("ECFMG"). I have been employed in various capacities at ECFMG since 2004.

2. I make this Declaration in connection with the above-captioned action. I have personal knowledge of the facts stated herein and if called as a witness could and would testify to those facts.

3. Beginning in September 2018, students and graduates of University of Science, Arts and Technology ("USAT") seeking services related to ECFMG Certification were required to complete and submit an affidavit attesting to the accuracy of the medical school information provided to ECFMG.

4.      Ultimately, more than 300 USAT students and graduates submitted affidavits to ECFMG indicating that they took classes in the United States.  None of the students indicated that he or she took all of his or her basic science courses in Montserrat.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge.

EXECUTED:  January 10, 2019

_Kara Corrado_

Kara Corrado

2

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ORIEN L. TULP, | Case No. 2:18-cv-05540-WB |
| Plaintiff, | |
| v. | Philadelphia, Pennsylvania |
| | January 24, 2019 |
| EDUCATIONAL COMMISSION FOR | 2:03 p.m. |
| FOREIGN MEDICAL GRADUATES, et al, | |
| Defendants. | |

TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
BEFORE THE HONORABLE WENDY BEETLESTONE
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | Tommy Swate, Esquire |
| | 403 Wild Plum |
| | Houston, TX  77013 |
| | |
| | William C. Reil, Esquire |
| | 1515 Market Street, Suite 1200 |
| | Philadelphia, PA  19102 |
| For the Defendants: | Elisa P. McEnroe, Esquire |
| | Matthew D. Klayman, Esquire |
| | Caitlyn Barrett, Esquire |
| | Morgan Lewis Bockius, LLP |
| | 1701 Market Street |
| | Philadelphia, PA 19103-2921 |
| | |
| Court Recorder: | Michael Mani |
| Transcription Service: | Chris Hwang |
| | PO Box 223282 |
| | Chantilly, Virginia 20153 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

**INDEX**

|                        | Page |
| ---------------------- | ---- |
| Motion, denied         | 134  |

WITNESSES FOR PLAINTIFF

|                | Direct | Cross | Redirect | Recross |
| -------------- | ------ | ----- | -------- | ------- |
| Kara Corrado   | 8      | 36    | 59       |         |
| Orien Tulp     | 63     | 102   |          |         |

WITNESSES FOR DEFENDANTS

|                | Direct | Cross | Redirect | Recross |
| -------------- | ------ | ----- | -------- | ------- |
| Kara Corrado   | 52     | 74    | (102)    |         |

**INDEX OF EXHIBITS**

EXHIBITS                                                      Marked

PLAINTIFF'S

| C | Agreement | 14 |
| E | November 28, 2018 letter | 109 |
| G | Letters | 110 |

DEFENDANT'S

| E | Sponsor Note | 46 |
| D-1 | Video | 80 |
| D-2 | Letter | 81 |
| D-3 | USAT lecture schedule | 83 |
| D-4 | Letter | 84 |
| D-5 | Email | 86 |
| D-6 | Affidavit | 90 |
| D-7 | Determination | 93 |
| 1 | Printout ECFMG website | 111 |
| 2 | ECFMG school policy | 112 |
| 3 | ECFMG information booklet | 113 |
| 8 | Letter | 114 |
| 13 | Message | 116 |

(Call to order at 2:03 p.m.)

THE COURT RECORDER:  All rise.  Court is now in session, the Honorable Wendy Beetlestone presiding.

THE COURT:  Good afternoon, have a seat.

MR. REIL:  Good day, Your Honor.

THE COURT:  This is the matter of Tulp v. Educational Commission for Foreign Medical Graduates.  It's a hearing on the preliminary injunction.  Can I have some introductions, please?

MR. REIL:  I'm William C. Reil for the Plaintiff.

You introduce yourself.

MR. SWATE:  Tommy Swate for the Plaintiff.

THE COURT:  Okay.  This is the Plaintiff Mr. Tulp, Dr. Tulp?

MR. TULP:  I'm Orien Tulp, the Plaintiff.

THE COURT:  Okay.  Defense?

MS. MCENROE:  Good afternoon, Your Honor, Elisa McEnroe for Morgan Lewis on behalf of the Educational Commission for Foreign Medical Graduates and Dr. Pinsky, both of the Defendants.

Today with me, I have my colleagues Matt Klayman and Caitlyn Barrett.  I also have the General Counsel for ECFMG Francine Katz here at the table with us.

THE COURT:  Okay.

MS. MCENROE:  And we have two fact witnesses, who

requested to attend as well, Ms. Kara Corrado and Lisa Cover, two executives from ECFMG.

THE COURT: Okay. So before we begin, I just want to clarify exactly what we're doing here today. So in looking at the complaint, it is a little unclear to me as exactly what causes of action are being asserted. And what I glean from it, and Mr. Reil or Mr. Swate, you should tell me if I'm incorrect.

The first cause of action is tortiously interfering with the contract between the students of USAT and against ECFMG. And that is a common law tortious interference with contract claim; is that correct?

MR. REIL: Yes, Your Honor.

THE COURT: Okay. Next one as I understand it is it's a violation of due process claim against -- do I refer to you as ECFMG or ECF? Or what's the best way of --

MS. MCENROE: ECFMG would be our preferred acronym, but whatever works for Your Honor.

THE COURT: That's fine. Okay, violation of due process against ECFMG, which appears to be a §1983 claim alleging that ECFMG violated Tulp's procedural due process rights as protected by the 14th Amendment; is that correct?

MR. REIL: Yes, Your Honor.

THE COURT: And then the third cause of action, fraudulent misrepresentation, abuse of process, and negligent representation against ECFMG appears to be three separate

common law claims -- common law fraud, common law abuse of process, and common law negligent misrepresentation. Is that correct?

MR. REIL: Yes, Your Honor.

THE COURT: And then finally, the fourth cause of action, a violation of procedural and substantive due process against all Defendants appears to be a §1983 claim alleging that Defendants violated Tulp's procedural and substantive due process rights as protected by the 14th Amendment. Is that correct?

MR. REIL: Yes, Your Honor.

THE COURT: Okay, and in terms of this hearing today, are you proceeding under each of the causes of action or any particular one?

MR. REIL: I think we're -- I think the emphasis today will be on the lack of due process. I won't say we're not proceeding on the others, but I think that would be featured as --

THE COURT: So procedural and substantive due process. So that is the second and the fourth cause of action?

MR. REIL: I think there are -- they'll be our main arguments, yes.

THE COURT: Okay, and if I look at your motion, I believe it is for a preliminary and a permanent injunction.

MR. REIL: Yeah, and/or a permanent.

THE COURT: And/or a permanent. Now obviously, at this stage, I'm not going to -- it's way too early in the game for a permanent injunction. So we are going to proceed under the preliminary injunction rubric.

MR. REIL: That's fine.

THE COURT: Okay, so your first witness, or if you want to make an argument, up to you.

MR. REIL: I think, given the time constraints we have here, maybe we would just call the first witness. I'd like to -- there's two witnesses here from ECFMG.

I'd like to make the motion for sequestration. I'm going to call Ms. Corrado. The other witness I believe is Ms. Cover. I request that she be submit --

THE COURT: Any objection to sequestering Ms. Cover?

MS. MCENROE: No objection.

THE COURT: Ms. Cover, could you please leave the courtroom and wait outside?

Ms. Corrado, could you please approach the bench? The witness chair is there.

And Mr. Mani, please swear the witness.

THE COURT RECORDER: Please raise your right hand. State and spell your name for the record?

THE WITNESS: Kara Corrado, K-A-R-A C-O-R-R-A-D-O.

KARA CORRADO

called as a witness for the Plaintiff, having been duly sworn

testified as follows:

THE COURT:  Have a seat.

THE WITNESS:  Thank you.

THE COURT:  Mr. Reil, your witness.

DIRECT EXAMINATION

BY MR. REIL:

Q    Ms. Corrado, I understand you're employed by ECFMG and I know I'm going to get the initials wrong a couple times. Sometimes even though I realize I'll refer them as the board, although I know the board is only part of them.

All right, can you tell the Court what you do for ECFMG?

A    Yes.  I am the vice president for operations at ECFMG.

Q    Okay, and what are those -- what are you duties?

A    I am primarily responsible for oversight of our ECFMG certificate program, as well as a primary source verification for some of our international clients, and oversight of our special investigations team and medical education resources team.

Q    I understand you're an attorney, is that --

MR. REIL:  Your Honor, I'd ask -- I didn't -- I'd ask that I be able to use leading questions with this witness. She's a managerial employee of the Defendant and she's sent several letters to the -- involving this case to the Plaintiff?

MS. MCENROE:  Your Honor, if I may?  If the request

is to cross-examine the witness, I have no objection being that it's our witness. If the request is to be hostile to the witness, I have an objection.

MR. REIL: I'm not going to --

THE COURT: Well --

MR. REIL: -- use the term hostile.

THE COURT: Well, I think we should be clear that in my courtroom, hostility towards a witness is completely forbidden. Cross -- vigorous cross-examination is allowed.

MS. MCENROE: No objection to that.

THE COURT: And given that there's no objection, you should cross-examine. And the aim of the allowing you to cross-examine a witness is simply to get things done as quickly as possible.

MR. REIL: I understand.

BY MR. REIL:

Q    I don't know if I asked you, you're an attorney?

A    I have a J.D. from Temple University.

Q    Okay, now can you describe for the record briefly what is ECFMG? I'll call them the board.

A    ECFMG is the Educational Commission for Foreign Medical Graduates. We are a nonprofit, private organization that was established initially to screen international medical graduates, who were coming to the United States seeking residency programs, you know, and turns into graduate medical

education.

Q    Is ECFMG an accrediting agency?

A    No, sir.

THE COURT:  Did you say no?

THE WITNESS:  No.

THE COURT:  No.

BY MR. REIL:

Q    Okay, am I correct that a foreign medical student cannot practice as a physician in the United States without certification by ECFMG?  Is that substantially correct?

A    Generally, the licensing boards in the United States will require ECFMG certification for international medical graduates, but it's the discretion of each state board who they license.  But generally, yes, they require ECFMG certification.

Q    And I -- and we'll probably be using this term a lot, what does that mean ECFMG certification?  What exactly is it that they certify?

A    So in order to obtain ECFMG certification, an international medical graduate must meet the requirements for certification.

And roughly, there are two such requirements.  There are examination requirements and there are medical education requirements.

Q    And ECFMG certifies these things to state medical boards?

A    So we certify the individuals.  So if the individual meets those requirements, they will issued a certificate.  That certificate is what they can use then as part of the requirements to get into a graduate medical education program and to be able to take Step 3 of the USMLE and then to -- ultimately to be licensed.

Q    So undergraduates, foreign undergraduate students and even graduates register with the -- ECFMG; is that correct?

A    If they are seeking entrance to graduate medical education in the United States, then yes, they would have to come through ECFMG.

Q    Now Dr. Tulp had a hearing here in Philadelphia where ECFMG is located at 36th and Market on November 28th of this year, correct?

A    The meeting was actually at the Rittenhouse Hotel.

Q    Oh, right, it was your -- I stand corrected.

A    That's okay.

Q    It was the Rittenhouse Hotel that day.  Well, you were present at that immediate meeting?

A    Yes, sir.

Q    Okay, and Ms. Cover was present at that meeting?

A    She was.

Q    And Dr. Pinsky --

A    Yes.

Q    -- was present at that meeting?

A     Yes.

Q     Okay, now Dr. Tulp, that was a hearing for what's called irregular behavior, correct?

A     Yes.

Q     Before we talk about that, is Dr. Tulp -- is he a foreign medical student that's registered with the ECFMG?

A     No.

Q     Well, does he have some sort of a contract with ECFMG?

A     Not that I'm aware of.

Q     All right.  Did he ever agree to submit himself in any way to ECFMG?

A     I don't know if I understand, I'm sorry.  The --

Q     Well, did Dr. Tulp ever say I agree that ECFMG has power over me to determine whether I have met irregular behavior?  Is there any documents or verbal agreements like that?

A     Not that I'm aware of.

Q     I see.  All right.  Is -- to your knowledge, well, I don't want you to speak for your -- to your knowledge, has anyone from ECFMG ever visited the school, which Dr. Tulp is the president of, the USAT?  Has anybody ever visited the school do you know, inspection?

A     Not that I'm aware of.

Q     Okay, now the school in USAT, am I correct that it's

been in existence since about 2003, roughly about 15 years? Were you aware of that?

A    I'm aware that we received a copy of a charter for USAT, which shows that it was incorporated in 2003, I believe, yes.

Q    A charter from the government of Montserrat?

A    Yes, sir.

MR. REIL:  Okay, well, maybe with the Court's permission, can I give the witness proposed exhibits that I made, one of the notes?

THE COURT:  You may.

MR. REIL:  May approach?

THE COURT:  You may.

BY MR. REIL:

Q    Will you take a moment to look at those and I'll have further questions.  And you were talking about, well, why don't you take a look at Exhibit 3 -- Exhibit C --

A    Uh-huh.

Q    -- on page 5 of the packet that I submitted to you? Tell me when you have it.

A    I have it, sir.

Q    Okay, now that's several pages and I'm not going to ask you to read through that before.  Do you know whether that is a -- an agreement between -- with the government of Montserrat basically authorizing USAT?

A    My understanding is that this --

THE COURT:  Wait, wait, hold on a second.  Before you ask substantive questions about a particular document, you must seek to have it admitted.

MR. REIL:  Yes, Your Honor, okay.  Let me lay a foundation here.  Are you --

THE COURT:  Well, let's see if we can -- would you stipulate to the admissibility of this document?

MS. MCENROE:  I would stipulate that this is a document that Dr. Tulp submitted to ECFMG.  I don't know that we have the ability to stipulate to authenticity beyond that.

THE COURT:  Would you oppose its admissibility?

MS. MCENROE:  For these purposes today, no.

THE COURT:  Just for the -- okay, so for the purposes only of this preliminary injunction hearing, it is admitted.  You can ask substantive questions.

    (Plaintiff's Exhibit C admitted into evidence)

MR. REIL:  Okay.

BY MR. REIL:

Q    All right, to your knowledge, is this document essentially a document from the government of Montserrat, where ECFMG has its main presence authorizing ECFMG to operate as a medical college?

MS. MCENROE:  Objection, Your Honor.  We would only ask for clarification that in the last question both instances

of use of ECFMG, I don't mean to be presumptuous, but that counsel intended to USAT as opposed to --

MR. REIL: Yes, I did, Your Honor.

THE COURT: Sustained, sustained. Why don't you repeat the question?

MR. REIL: Okay.

BY MR. REIL:

Q    All right, have you seen this document before?

A    Yes, sir.

Q    What is it?

A    It is a copy of what appears to be the charter for USAT with the government of Montserrat.

Q    Thank you. All right, I would move that into evidence at this time.

THE COURT: That had been admitted. You can go ahead.

BY MR. REIL:

Q    Okay, all right. Now why don't you take a look, if you would, at what's Exhibit D in the packet and to the complaint at page 10. Okay, it appears to be an affidavit. Do you recognize it?

A    Yes, sir.

Q    Who issued it?

A    ECFMG.

Q    Okay, and for what purpose?

A    ECFMG requested the students and graduates of USAT to complete the affidavit attesting to their medical school attendance.

Q    I see.

A    So we could determine in what location they took their basic sciences.

Q    And I see on this affidavit, if you go about two-thirds of the way down, you see where it says I'm attaching the following documentation.  Do you see that?

A    Yes.

Q    So this is an affidavit that also requests passports, airline tickets, various documents, correct?

A    Yes.

Q    Okay.  Now at the hearing, when we arrived at the hearing at the Rittenhouse Square in November 28th, we were given a big black book of exhibits.  Are you familiar with the, you know, that that happened?

A    Yes.

Q    Okay, and we hadn't seen that black book before the hearing, correct?

A    No.

Q    No.

A    That's not correct.

Q    All right now, were affidavits in the hearing?  Were affidavits in the black book at the hearing?

A     Yes.

Q     Okay, a couple hundred of them, correct?

A     Yes.

Q     Okay, and many of them were redacted, were they not?

A     They were.

Q     Okay.  So our -- we were given affidavits purportedly from our students with the names redacted, correct?

A     That's correct.

Q     Okay.  How are we supposed to investigate what those students said in the affidavit?

A     We redacted the names of the students --

Q     Uh-huh.

A     -- but not the attendance dates information --

Q     Okay.

A     -- to demonstrate that there was a significant number of students.

Q     Well, on a particular affidavit that was redacted, was there any way for Dr. Tulp to contact that student to see if the information was accurate?

MS. MCENROE:  Objection, Your Honor.  I just want to -- I wasn't sure if the witness was finished with her last answer before the question began.  I just want to --

THE COURT:  Were you finished with your answer?

THE WITNESS:  With respect to the affidavits?

THE COURT:  Correct.

THE WITNESS: Yes. Sorry. Yeah, it's okay.

MS. MCENROE: I'm sorry about that.

BY MR. REIL:

Q Okay, so these affidavits were used by is it fair to say the board or ECFMG to investigate irregular behavior against Dr. Tulp?

A So the affidavits were presented to the board of trustee -- the redacted affidavits were presented to the board of trustees to demonstrate that a significant number of the students that had returned the affidavits to us indicated that they did not do their basic sciences in Montserrat.

There were a number of affidavits that were also included that were not redacted and those were specifically to show the instances where Dr. Tulp has provided information that conflicted with the affidavit information that we got from the students.

Q Did the -- I think there was a board of several doctors if I remember. Did they receive the affidavits prior to the hearing?

A Yes, they received the same materials that you received.

Q So the affidavits were used as an investigative material by ECFMG to give to the board?

A I mean, they were used as support --

Q Okay.

A    -- to the allegation that we made, yes.

Q    All right.  Okay, so ECFMG did the investigation in this case and then they submitted it to the board of ECFMG, correct?

A    Yes, ECFMG staff, that's our normal procedure in these types of cases.

Q    So that there was no distinction in the way this proceeding went, the proceeding for irregular behavior.  There was distinct between the investigatory and the adjudicatory.  It was all ECFMG?  Do you understand my question?

MS. MCENROE:  Objection.  Objection, Your Honor, to the extent it calls for a legal conclusion.  I'm not quite sure counsel's getting at with that question.

THE COURT:  Sustained.

BY MR. REIL:

Q    Did ECFMG employ outside investigators?

A    I'm sorry?

Q    In the -- with reference to the irregular charges against Dr. Tulp, did ECFMG employ outside investigators?

A    In our review of the school, yes.

Q    Okay, did they visit the school?

A    That's my understanding.

Q    They did?

A    Yes.

Q    Okay.  Did we receive at the hearing the identity of

those investigators and any report from them?

A    No.

Q    Okay.  Now let me ask you this.  Okay, why don't you take a look at page 4, if you will, that's Exhibit B.

A    Yes.

Q    Would you tell the Court what that is?

A    This, sir, is a -- appears to be a screenshot of the listing in the World Directory of Medical Schools for USAT.

Q    Okay, and do you see there where it says, oh, about a little more than a halfway down, note as of January 1st?

A    Yes, sir.

Q    Would you read that into the record?

MR. REIL:  It's short, Your Honor.

BY MR. REIL:

Q    Just that sentence and I'll have a follow up question.

A    Yes.  "Note, as of January 1st, 2019, students and graduates of this medical school with a graduation year of 2019 and later are not eligible to apply to ECFMG for ECFMG certification, which also renders them ineligible to apply to ECFMG for the United States medical licensing examinations as a step towards ECFMG certification."

Q    Okay, and this went on this World Directory of Medical Schools website?

A    I'm -- did you just ask me -- I'm sorry, did you ask

me if it was present there?

Q   Yes?

A   Yes.

Q   This is where --

A   Yes, it is.

Q   So students could see this, anybody could see it, right?

A   Yes, correct.

Q   Okay.  Now the hearing involving irregular behavior was on November 28th of 2018.  This was published, this meaning the document that we just referred to here about the World Directory of Medical Schools, this was put on the website well before the hearing, wasn't it?

A   Yes.

THE COURT:  Let me clarify that.  When you say this was put on the website, do you mean that the note was included in the website entry or that the entry was included in the website?

THE WITNESS:  The note, Your Honor, was published on the entry.

THE COURT:  Prior to the hearing?

THE WITNESS:  Prior to the hearing, yes.

BY MR. REIL:

Q   All right.  All right, now let's talk about the hearing on November 28th.  The hearing was supposed to take

place over a time span of 20 minutes, correct?

A    Yes, that's our usual procedure for --

Q    Right, right.

A    -- those types of hearings.

Q    Did the ECFMG Board of Physicians present any witnesses at the hearing?

A    No, that -- we don't normally present witnesses at our hearings.

Q    I see, did the ECFMG board present any documents at the hearing?

A    No, the documents are always produced before the hearing.

Q    Okay, what documents were produced at the hearing?

A    So we -- so ECFMG staff, whenever we have allegations irregular behavior and individuals who are coming to make a personal appearance as Dr. Tulp did, as a courtesy to them, we always provide a copy of the materials that we have previously sent to them at the meeting, so that if they are questioned about a document, they can reference it there if they haven't brought it themselves.

Q    At this particular point hearing on November 28th, isn't it a fact, Ms. Corrado, that no documents were entered into evidence at the hearing by ECFMG?

MS. MCENROE:  Objection, Your Honor.  To the extent it calls for a legal conclusion, the concept of evidence sounds

poor and legalish when this was more of an administrative proceeding by a private not-for-profit entity.

MR. REIL: If I may, Your Honor, this person's an attorney. They've been involved in the situation. I'm simply asking, and she was at the hearing, did she observe or did she acknowledge of any documents being entered into evidence at the hearing.

THE COURT: Is there any process whereby documents get introduced into evidence at such a hearing?

THE WITNESS: No, we don't have a process like that.

THE COURT: So in this case, there was no evidence that was introduced into --

THE WITNESS: No.

THE COURT: -- there were no documents that were introduced into evidence, because there was no process to do that?

THE WITNESS: Correct.

THE COURT: Okay, go ahead.

BY MR. REIL:

Q    Testimony, Ms. Corrado, you were at the hearing. Was there any testimony entered -- was there any testimony presented at the hearing?

A    No, because my recollection was that counsel would not let Dr. Tulp give any testimony.

Q    All right.

THE COURT:  As in his counsel?

THE WITNESS:  As in his counsel.

THE COURT:  As in his counsel.

BY MR. REIL:

Q    Now in any of the materials that were sent to us from ECFMG, did any of them address Dr. Tulp was being "tried" for irregular behavior, did any -- do any materials from ECFMG indicate which side Dr. Tulp or the board has the burden of proof?

A    So our irregular behave -- we have a set of irregular behavior procedures that were sent with the letter that details the allegation.

We provided -- we list in the letter all of the information that we have to support the allegation, evidence, if you will and we provide that to the individual.  And then the individual has to provide an explanation and can come to the hearing to provide an explanation if they wish.

Q    ECFMG brought charges of irregular behavior against Dr. Tulp.  Did they ever send out any sort of a letter, notice, document to Dr. Tulp or his attorneys indicating who had the burden of proof at the hearing?

A    We sent a letter that outlined the allegation and asked for Dr. Tulp's response to that allegation.  We did not use the phrase "you have the burden of proof", but we outlined what the allegation is and asked for a response.

Q    Okay.

A    And then presented him with an opportunity to appear personally at the hearing to respond to the allegations of irregular behavior and to answer any questions that our board of trustees may have had.

Q    But nowhere in its description of the hearing did ECFMG ever indicate that the burden of proof was on ECFMG or on Dr. Tulp?  Do I have that right?

A    Yes.

Q    All right, now ECFMG sent us a -- sent us the -- Dr. Tulp and his attorneys, they sent us a transcript of the November 28th hearing.  Were you aware of that?

A    Yes.

Q    Okay, does it indicate anywhere in those 32 pages that any evidence was introduced by ECFMG at the November 28th hearing?

MS. MCENROE:  Your Honor, if I may object?  There is a transcript of the proceeding that I would request be entered into evidence to serve as the record of what actually happened in that proceeding as the best evidence.

THE COURT:  Oh, you can do that in -- when you take over the witness if you like.

MS. MCENROE:  Sure.

THE COURT:  You can continue to ask your questions.

MR. REIL:  Okay.  I happen to have a copy of the

transcript here, which I'd like to mark as Exhibit H, with the Court's permission and show it to the witness?

THE COURT:  Go ahead.

BY MR. REIL:

Q    Ms. Corrado --

MR. REIL:  Oh, may the record reflect that I've handed the witness the exhibit, that I've handed -- I think it goes the other way around, I've handed the exhibit to the witness, okay.

BY MR. REIL:

Q    All right, you have the transcript of the hearing there, 32 pages.  Can you point to somewhere in the transcript where ECFMG is offering any evidence against Dr. Tulp?

THE COURT:  I need you to ask a more focused question.  You can't ask her to look through 32 pages of transcript at this point.

MR. REIL:  Okay, all right.

BY MR. REIL:

Q    You were at the hearing, correct?

A    Yes.

Q    Okay, do you have any recollection of ECFMG through its -- ECFMG entering any evidence into the record at the November 28th hearing?

A    No, because we don't -- that's not part of our process.  We provide the evidence in advance to both the board

and the individual.

Q   All right, and the hearing was terminated by Ms. McEnroe, correct?

A   That's correct.

Q   And is it fair to say, based on a administrative record that contains no evidence, that Dr. Tulp was found guilty of irregular behavior?

A   I -- there was evidence presented at the meeting.  So I can't agree to that statement, because we did have evidence presented to the parties before the meeting.

Q   At -- I'm talking about evidence in the record at the hearing?  Was --

A   We --

Q   -- we established there wasn't.

A   We don't have a process to enter evidence on a record at our administration meetings.

Q   But there's a transcript?

A   There's a transcript when an individual makes a personal appearance, we have a court reporter and we will --

Q   All right.

A   -- transcribe the appearance, yes.

Q   All right.  Was Dr. Tulp found guilty, and I'll use the word guilty because it's not a criminal case in quotes, was Dr. Tulp found guilty of irregular behavior on November 28th based on any evidence in the record?  And I'm talking about the

transcript.

THE COURT:  Let me clarify that, because I don't think it's good to use the term guilty.  What is the term used by --

MR. REIL:  Culpable, Your Honor.

THE COURT:  -- ECFMG in these contexts?

THE WITNESS:  We determined that he engaged in irregular behavior.

THE COURT:  Okay.

THE WITNESS:  So we made a determination of irregular behavior.

BY MR. REIL:

Q    My question is, is there anything in the -- from the hearing or in the transcript that you recall that supports that, any evidence in the record in the transcript?

A    We don't --

Q    I'm sorry.

A    In the transcript, no, but the transcript is not the evidence -- it's not all of the evidence that we present.  When someone makes a -- an appearance at the meeting, we take the information that we have already collected.

And if they make a personal appearance, the committee can consider the personal appearance that they make and any statements that they make together to make a determination about irregular behavior.

So the determination was made on the basis of the appearance and the evidence that we provided to the individual and to the board members to review.

Q    Did Dr. Tulp say anything at the hearing?

A    I don't recall him saying anything at the hearing.

Q    We've used the phrase "irregular behavior" several times here.  Can you explain to the Court what irregular behavior is?

A    Yes, ECFMG generally defines irregular behavior as any action or attempted action by an individual or on behalf of an individual that could or would subvert the processes of ECFMG.

So an example of an irregular behavior is providing false information to ECFMG or providing false documents to ECFMG.

MR. REIL:  So if I may have a moment, Your Honor.

BY MR. REIL:

Q    If you would look at page 12, Exhibit 5.  Do you have that?

A    Yes, yes, sir.

Q    That's a letter of November 21st from you, Ms. Corrado --

A    Yes.

Q    -- to my co-counsel Mr. Swate?

A    Yes, sir.

Q    Okay.  And down I think in the last paragraph, it

says in support of its mission.  I'd like to read that and ask you a follow up question.

A     Okay.

Q     All right.  "In support of its mission to protect the public, individuals that have or have attempted to subvert ECFMG's policies and procedures are subject to ECFMG's policies and procedures on irregular behavior."  Are you defining irregular behavior there?

A     In that particular sentence?

Q     Yes, generally.

A     I mean, we're saying individuals who have attempted to subvert our policies and procedures are subject to the irregular behavior policies and procedures.

Q     Okay.

A     And then we follow that with a link to the irregular behavior policies and procedures, which has the definition of irregular behavior contained within it.

Q     Well, is there something more to the definition of irregular behavior than what I've just read?

A     There is a definition of irregular behavior included in the irregular behavior policies and procedures, which is mentioned in the next sentence in the link.

Q     Okay.

A     That had all the -- had already been provided to counsel prior this November 21st letter.

Q    Other than -- what does the link, if you know --

A    Uh-huh.

Q    -- what does it add to what's in that sentence, what I just read you?

A    I don't know it from the top of my head, but it provides all of the definition of irregular behavior and all of our policies and procedures about irregular behavior, what we do when we allege irregular behavior, what the process is, et cetera.

Q    Uh-huh.  Now how is an individual supposed to know whether or not they've attempted to subvert ECFMG's policies and procedures?  How is a person supposed to know that?

        MS. MCENROE:  Objection, Your Honor.  Calls for speculation or a hypothetical.

        THE COURT:  Sustained.

BY MR. REIL:

Q    Is that the definition of irregular procedure I just read, give fair notice to an individual of what they're being accused of?

        MS. MCENROE:  Objection, Your Honor.  Misstates testimony.  I believe the witness just said that he had not provided the whole definition of irregular behavior and she could not recite it off the top of her head.

        THE COURT:  Sustained.

BY MR. REIL:

Q    All right.  And you can't tell us -- is there any place where you can tell us if that -- let's strike that.

Is that is that definition of irregular behavior in your letter to Dr. Swate, is that inaccurate?

A    Is my statement in the letter inaccurate?

Q    Yeah, what I just read in support of its mission?

A    No, no.

Q    Is that inaccurate?

A    No.

Q    Okay.  Okay, now the -- we went over I think it's Exhibit B, the placement in the World Directory of Medical Schools I'll call it.

A    Uh-huh.

Q    Was there any indication as to whether or not Dr. Tulp would be allowed to bring that up at his hearing?

A    I don't know what Dr. Tulp would have brought up at the hearing if he was --

Q    Well, let's put it this way.

THE COURT:  Let the witness finish.

BY MR. REIL:

Q    Yes.

A    If he testified, I don't know what he would have brought up.

Q    Okay, did you ever indicate that the placement involving the World Directory of Medical Schools was not a

subject for the hearing?

A   What I indicated was that the note that we placed in the World Directory was not related to the allegation of irregular behavior.

That is, it was related to our request for information from USAT.  USAT did not provide that information and we placed that note into the World Directory at that time.  It was not related to the allegations of irregular behavior.

Q   I see.

A   So we did in the letter tell, I think, Mr. Swate.

Q   Well, let's look at that letter that you wrote to Mr. Swate.  Would you go to page 23 of my exhibit pack.

A   Uh-huh.

Q   And I think that's the letter of 11/14/18 --

A   Uh-huh.

Q   -- to Dr. --

MR. REIL:  Yeah, and a lawyer, Your Honor --

BY MR. REIL:

Q   -- to Dr. Tommy Swate?  It's under Exhibit G.

A   Uh-huh.

Q   Do you have that?

A   I do.

Q   Okay, by the way, at this hearing, were any witnesses from the USAT besides Dr. Tulp allowed to be present?

A   You mean on behalf of Dr. Tulp or?

Q    Yes, on the 28th.

A    So no.

Q    No, okay, all right.  How about students from the USAT?  Were they allowed to be present and testify?

A    No, but that's part of our normal process when --

Q    I see.

A    -- we have an allegation of irregular behavior, we don't let -- we don't typically permit anyone to bring witnesses.

Q    Okay, if you take a look at page 23 --

A    Uh-huh.

Q    -- in the letter of November 14th, 2018 to Mr. Swate?

A    Uh-huh.

Q    All right, down one, two, three, four paragraphs.

A    Uh-huh.

Q    Fourth paragraph, the second sentence, all right. Let me read it to you and I'll have a follow up question.

A    Okay.

Q    It says, you write, "Nor is there any right to a hearing with ECFMG for USAT for any matter."  It's the next sentence I'm interested in.

"ECFMG will not entertain any request to review the actions that is taken with respect to USAT's sponsor note at Dr. Tulp's irregular behavior here."  And that's sponsor note, we're talking about the Exhibit B we've already discussed,

right?

A   That's correct.

Q   Okay, now that decision to exclude that evidence from the hearing, did Dr. Tulp have any input in that?

A   Well, I sent it to his attorneys, so.

Q   Okay.  Well, was there a procedure whereby he could object to that?

A   There's no such procedure.

Q   I see.

MR. REIL:  Could I have one moment, Your Honor?

THE COURT:  Mike, can you put that computer down on the thing, on the podium?  Put it down, I can't see.

MR. REIL:  That's all the questions I have of this witness at this time, Your Honor.

THE COURT:  Cross?

Not that one.  This one.  This one here.  Thank you. And maybe put the microphone down.

MS. MCENROE:  Your Honor, I was actually going to ask if I could approach and approach the witness from the lectern if that's okay with you?

THE COURT:  That's fine, that's fine.  I just couldn't see above the computer monitor.

MS. MCENROE:  Neither can I.  So thank you.

(Counsel confer)

MS. MCENROE:  May I approach the lectern, Your Honor?

THE COURT: You may.

CROSS-EXAMINATION

BY MS. MCENROE:

Q    Good afternoon, Ms. Corrado.

A    Hi.

Q    You understand I'm counsel for the Educational Commission for Foreign Medical Graduates and Dr. Pinsky today?

A    Yes.

Q    I'd like to ask you a couple questions about the areas of testimony you were just asked about.

A    Yes.

Q    First, I'd like to give you a chance to clarify, if you'd like to, about whether or not you are an attorney?

A    I am not an attorney. I have a law degree, so I'm not a practicing attorney.

Q    Early on in the questioning from counsel for Dr. Tulp, you were asked to question about the relationship, if any, between ECFMG and Dr. Tulp, do you remember that testimony?

A    Yes.

Q    In particular, you were asked if there was a contract or any other kind of agreement. Do you understand that testimony?

A    Yes.

Q    How is it that ECFMG has interfaced, if at all, with

Dr. Tulp?

A    Dr. Tulp is one of the -- what we refer to as our authorized signatory for USAT.  So he -- I believe, and I'm sorry if I get your title wrong, is the president and the dean of USAT.

As such, he can certify documents or he was able to certify documents and information to ECFMG on behalf of the medical school.

For international medical schools that we interact with, we will, once the school has established that it meets the requirements for its students and graduates to be eligible for ECFMG certification, we typically communicate with the school officials, collect the information that we need from them in order to be able to process the applications and the certifications of their students.  So in that way, we have communicated with Dr. Tulp since I believe around 2003.

Q    So speaking nuts and bolts in terms of Dr. Tulp doing anything --

A    Uh-huh.

Q    -- that comes to ECFMG --

A    Uh-huh.

Q    -- can you explain that a little bit more just from a practical standpoint?

A    Yes, so the individuals who are students and graduates of international medical schools would apply to ECFMG

to take the United States medical licensing examinations and also need to submit their credentials, which includes their final medical diploma and their final medical school transcript.

ECFMG has to authenticate that information. We need to authenticate whether you're actually a student at a school or not.

And so Dr. Tulp would sign off on applications, saying to ECFMG essentially this -- yes, this person is a student or is a graduate at USAT and they've completed their basic sciences.

In the same way, he would complete forms for diplomas. Yes, this diploma is authentic and fill out the information that we require to verify the credentials of students and graduates.

Q    You testified in response to questions from counsel about a finding of irregular behavior as against Dr. Tulp; is that correct?

A    That's correct.

Q    Could you explain what action, if any, ECFMG took as a result of that finding of irregular behavior against Dr. Tulp?

A    Yes, so ECFMG put a sanction on Dr. Tulp for a minimum of five years that we will not accept any documents from -- signed or certified by Dr. Tulp on behalf of USAT or any other medical school for that period of time.

Case 2:18-cv-05540-GWB  Document 132-20  Filed 05/03/23  Page 217 of 275
Case 2:17-cv-05470-GWB  Document 132-20  Filed 05/03/23  Page 217 of 275

JA0244

39

After that period of time expires, we will consider accepting Dr. Tulp as a signatory again for medical school if he meets certain requirements.  And I'm sorry I don't have them.  I can't remember them off the top of my head, but basically, that he satisfies the requirements that we have, conditions that we have, to be able to accept him again.

Q    Is it fair to say that the action taken by ECFMG in light of the finding of irregular behavior with respect to Dr. Tulp was limited to his role as an authorized signatory on behalf of USAT to ECFMG?

A    Yes, that's correct, I mean, if he still signs transcripts for students, we wouldn't reject a transcript because that's an official document of USAT, but we would need another official from USAT to authenticate it.

Q    And really just briefly, what is the process or how hard is it to get somebody else to be, sorry, an authorized official from USAT?

A    We -- I mean, it's not that hard.  We would just reach out to the medical school to ask who would be able to sign off for the school --

Q    For --

A    -- for just our, you know, vice dean, things like that.

Q    So USAT would not be disqualified then from having an authorized signatory?

A    Correct, that's correct.

Q    You were asked some questions about a black binder --

A    Yes.

Q    -- being given to counsel for Dr. Tulp at a November 28th hearing.  Do you remember that?

A    Yes.

Q    And I couldn't catch it in the testimony about your explanation about whether those materials had been provided to Dr. Tulp prior to the proceeding.  Could you explain that?

A    Yes, so we provide the materials to individuals prior to the hearing.  Those materials were sent via email to Dr. Tulp's counsel.

And I got an acknowledgement that they were received by email, but I also sent them by a hard copy by Federal Express, too.

Q    There was some discussion, sorry, there was some discussion about certain materials being redacted in the materials provided to Dr. Tulp.

A    Uh-huh.

Q    Can you explain why, please?

A    So we put about over 300, I think, affidavits in the materials.  And we redacted their names, the individuals' names on that bundle and their identification numbers, because we wanted to -- we just wanted to make sure that we're protecting the privacy of those students and that there would be no

adverse action taken against them for providing the information to ECFMG.

Q   And what was the purpose of sending the students those affidavits?

A   We sent the affidavits to the students, because we wanted to determine where they had done their basic sciences. We had had information that USAT was operating a campus in the United States in Florida.  And Dr. Tulp had indicated that that was not correct.

So we still were getting information contrary to that.  So we decided to send the affidavit to the students to get information from the students about where they actually did their basic sciences.

Q   Why, if at all, was it a concern for ECFMG about where the USAT students took their basic sciences?

A   So ECFMG has requirements about the medical schools that we will accept and --

MR. REIL:  Objection.  Beyond the scope of my examination.

THE COURT:  Overruled.

BY MS. MCENROE:

Q   You may answer.

A   Okay, sorry.  So we have requirements around, you know, what international medical school is.

In fact, an international medical -- we define an

42

international medical graduate as an individual who has received their education outside of the -- their medical education outside of the United States and Canada.

And so we have requirements from the government officials where the school is located that the school has to meet.

So the school has -- the government has to say, yes, essentially, I'm sort of oversimplifying, but the government has to say, yes, this is a medical school. You recognize it as such. And its graduates are eligible for licensure in our country. And then ECFMG will recognize that.

But if the school has a branch campus outside of that country, we also require the branch campus country to provide that same type of information. Do you recognize it as a medical school? And are its graduates eligible to practice in your country?

So if you were having only classes in the United States, we would need that documentation from the United States, but also, you might be a United States school.

Q    So you were asked some questions about the role and purpose of ECFMG? At the beginning of your testimony, you remember being asked that?

A    Yes.

Q    And can you explain a little bit more about why it's concern to ECFMG, for example, if there were to be

predominantly education in the United States that you were just talking about?

A So, you know, if the person is educated only in the United States, then they may not be considered an international medical graduate. So they might not even be eligible or subject to ECFMG certification if they're not an international medical graduate.

If they went to medical school in the United States, and my understanding is they would have to go to a school that was accredited by the LCME, which is the Liaison Committee on Medical Education.

So we have to make sure that we're not, you know, we are dealing with international medical graduates only because that is our scope. That is what we are authorized to deal with.

Q Does ECFMG certify U.S.-based medical school graduates?

A No.

Q So you -- ECFMG wouldn't grant a certificate to a Penn Med grad?

A No, correct, we would not. We could not.

Q There was some discussion, jumping to back to the hearing that you were asked some questions about, you remember the November 28th hearing?

A Yes.

Q There was some discussion about a sponsor note in the

World Directory. And I believe you read some -- a note from that language out into the record. Do you remember that?

A    Yes, uh-huh.

Q    And there was a question about the sequence of events. Could you explain a little bit more in terms of the note and the sponsor note, I'm sorry, in the World Directory with regards to USAT vis a vis the irregular behavior proceeding against Dr. Tulp?

A    Right. So when we became aware that there was a possibility that there was a campus in the United States for USAT, we reached out by letter officially to USAT to ask. We said we understand there's campus in the United States. Can you please provide us with the documentation from the Department of Education that authorizes you to have a medical school and to conduct your activities in the United States?

And we got a response that that was not accurate. We talked about the affidavit process. We asked the information from the students.

And around, I think it was October 18th, when we had asked for the documentation from USAT about the -- its U.S. branch campuses I had not receive it, then we made a determination that we could not accept students and graduates from that medical school. That would be effective Jan. 1, 2019.

We notified the students. We put the note in the directory, but that action was related only to not receiving

the documentation from the United States officials that the school was recognized in the United States.

And we offered in a letter, so if you get the documentation, give us the documentation so we can consider, we can reconsider the sponsor note.

Q   To date, has ECFMG gotten such documentation regarding authorization for USAT to conduct education in the United States?

A   No.

Q   Do you have an estimate of how many times ECFMG has asked for such documentation?

A   Um --

Q   Would it be fair to say multiple times?

A   Multiple, yeah, I mean, more than once.

Q   What is the purpose of a sponsor note in the World Directory just briefly?

A   So the sponsor note, the World Directory of Medical Schools is a listing of the world's medical schools.  And there are over 3,000 medical schools in the world.  We do not accept grad -- you know, we do not accept graduates from all 3,000.

There are a subset of those medical schools whose graduates are eligible to apply to ECFMG for certification, which means ultimately, they're allowed to continue to try and practice medicine in the United States.

We used a sponsor note in the World Directory on a medical

school to indicate to the public and to the students and graduates of that school whether or not those students and graduates are eligible to apply to ECFMG for certification.

So it's the way in which we communicate publicly the eligibility, if you will, of the school's graduates to start the process of ECFMG certification.

Q    And I'd like to direct your attention in the packet of exhibits that were given to you by counsel?

A    Uh-huh.

Q    Back to Exhibit E, which is the sponsor note.

A    Uh-huh.

Q    Let me know when you have it?

A    Okay, I have it.

Q    And it's fair to say earlier, you testified this is a copy of the sponsor note for USAT?

A    Yes, uh-huh.

MS. MCENROE:  Your Honor, I'm not sure that this got admitted into evidence.

THE COURT:  It did not.

MS. MCENROE:  So I'd like to move for its admission?

THE COURT:  Any objection?

MR. REIL:  No, Your Honor.

THE COURT:  It's admitted.

(Defendant's Exhibit E admitted into evidence)

BY MS. MCENROE:

Q    Ms. Corrado, if you could just very briefly, I know you were directed to one portion of this document.  I'd like to direct your attention up a little bit higher.

A    Uh-huh.

Q    There's a list of graduation -- there's a range from 2003 to 2018.

A    Uh-huh.

Q    What is that indicative of?

A    That is the listing of the graduate -- the graduation years for which ECFMG will accept graduates of this school.  So in other words, it's not just that your school is listed in the World Directory with our sponsor note.  Your school has to be listed and your graduation year has to be listed.

So if you graduated in 2005, we will still accept the 2005 graduate from USAT.  But if you graduated in 2020, currently, we will not accept your application for certification.

Q    So I just want to make sure it's clear.  So is it true that today, ECFMG would still accept, for example, 2018 USAT grads --

A    Yes.

Q    -- for certification if they meet all the other requirements?

A    Yes.

Q    And are there enhanced procedures on USAT applicants?

A    There are.

Q    Can you explain what that means?

A    Yes, so the affidavit process that we touched on earlier is a requirement for USAT students and graduates currently.

Essentially, in order to receive ECFMG services, they need to complete that affidavit and submit to ECFMG. And once ECFMG has reviewed it and accepted it, then we will continue to provide services to those graduates and students.

Q    So looking back to the November 28th hearing and I'll try to be quick.

THE COURT:  Hang on, wait.  So the note talks about students and graduates of this medical school with a graduation year of 2019.  You see that?

THE WITNESS:  Yes.

THE COURT:  When is -- when would students of USAT normally graduate?  What month in 2019?

THE WITNESS:  I don't know, Your Honor, when they would normally graduate.  This note is meant to indicate that as of the first of this year, 2019, we will not accept any graduates.

THE COURT:  Do you know whether there have been any graduates of USAT in 2019?

THE WITNESS:  I do not know that, Your Honor.

THE COURT:  Go ahead.

MS. MCENROE:  Thank you, Your Honor.

BY MS. MCENROE:

Q   So moving back to the November 28th hearing, you were asked a number of questions about submission into evidence and other procedural events at the November 28th hearing.

Just very briefly, can you estimate or how many years have you been attending or participating in this kind of irregular behavior proceeding with personal appearances on behalf of ECFMG?

A   Sure, 10.

Q   And so you say 10 years?

A   10 years, yes, sorry.

Q   And an estimate of, if you can ballpark, how many of these kind of proceedings you participated in?

A   So 30.

Q   And so, just very briefly, in terms of the process at the hearing, I know that there was some testimony that it's a 20-minute hearing.  Can you please explain the expected process --

A   Sure.

Q   -- of that type of hearing?

A   Sure, so when an individual makes a personal appearance before the board of trustees, we give a very brief -- staff will give a very brief outline of the allegation as -- of the irregular behavior.

The individual will be given approximately 20 minutes to

provide a statement, if they will.  Usually, they have an opening statement.  They can have counsel there with them if they want.

Once they've concluded their opening statement, then the board is able to ask questions.  They'll generally ask questions of the individual.

Once the questioning is finished, the individual's invited to give a closing statement and then they're excused from the hearing.

Q    In your experience, based just from your view, what is the purpose of that hearing?

A    The --

MR. REIL:  I'm going to object, Your Honor, to the extent that we're talking about hearings other than Dr. Tulp's hearing, I don't think it's relevant.

MS. MCENROE:  That's fair, Your Honor.  I can withdraw the question and ask it a different way.

THE COURT:  Go ahead.

BY MS. MCENROE:

Q    Ms. Corrado, what was the purpose of Dr. Tulp's hearing on November 28th?

A    He was -- has a right to a personal appearance, which he elected to take.  And the purpose would be for him to provide his explanation about the allegation and to answer any questions that the committee would have for him.

Q    We already discussed briefly the materials provided to him in advance of the hearing.  In your view, did you expect that additional evidence would be submitted by ECFMG at that hearing?

A    No.

MR. REIL:  Objection.

THE COURT:  Basis?

MR. REIL:  I think, Your Honor, in her personal view here, I'm not sure how that relate -- I don't think it's relevant.

THE COURT:  Re-ask the question.

BY MS. MCENROE:

Q    Sure.

THE COURT:  Different way.

BY MS. MCENROE:

Q    Did it surprise you, based on your experience of having gone to over 30 of these hearings in the past 10 years, that ECFMG did not present any additional materials beyond the black binder --

A    No.

Q    -- at the hearing of Dr. Tulp?

A    No.

MR. REIL:  Objection to whether the witness was surprised.  Ask that it be rephrased.

THE COURT:  Overruled.

Go ahead.

THE WITNESS:  No, I was not surprised.

MS. MCENROE:  Your Honor, I have nothing else on cross at this time.  I will have additional questions for the witness.  So it's at your prerogative if you'd rather me have the witness on the stand once.

THE COURT:  Let's just get, yeah, let's get this -- you now got the witness on direct in your case.

MS. MCENROE:  Great.

THE COURT:  Go ahead.

MS. MCENROE:  Thank you, Your Honor and I'll be as brief as I can.

DIRECT EXAMINATION

BY MS. MCENROE:

Q    Ms. Corrado, why did ECFMG change the sponsor note for USAT in the World Directory?

A    We changed the sponsor note in the World Directory, so that we could let students know what the status of the school was.

And the note was changed because we did not have the documentation from USAT from the Department of Education in Florida or the other states where they were operating that authorized their school in those states.

Q    And why did ECFMG allege irregular behavior against Dr. Tulp?

A    When we asked Dr. Tulp if he had a -- that we -- I'm sorry, we asked -- we advised Dr. Tulp that we understood that he had a -- that USAT had a campus in Miami and we asked for the documentation in a letter on August 21st.

And the response that we got from Dr. Tulp was that it is not a campus.  There was not -- education was not occurring there.  It was an administrative site only.

So when we got the affidavits from the students that essentially said they all took their classes in Miami or some other location in the United States, and had not gone to Montserrat, that conflicted with the information that Dr. Tulp had given us.  And then in our view, that was providing false information to ECFMG.  So we alleged irregular behavior.

Q    Just briefly, could you explain how this concern came to the attention of ECFMG regarding the location of the education for USAT?

A    Sure.  In roughly the summer of 2017, ECFMG, we were conducting a project to re-verify a number of medical schools located in the Caribbean.  And we were doing research on them. And we had not gotten any information back from Montserrat regarding USAT.

And our team was looking into it and found a number of videos online that seem to indicate that --

MR. REIL:  Objection to what the team found.  It's hearsay.

54

THE COURT:  Sustained.

MR. REIL:  And --

THE COURT:  Sustained.

MR. REIL:  -- I don't think it's -- it's not based on the witness' personal knowledge.

THE COURT:  Sustained.

MR. REIL:  I'm sorry, Your Honor.  I didn't hear.

THE WITNESS:  So we got an inkling that was some activity happening in the United States.  We did some research.  We -- but ultimately, we got an email on August 8th of 2018 from a prospective parent of a USAT student, who said my son is going to --

MR. REIL:  Objection to what a prospective parent said.

THE COURT:  Sustained.  Sustained.

THE WITNESS:  So then, we requested USAT to provide us with documentation about their Miami campus.

BY MS. MCENROE:

Q    And you mentioned doing some re-verification of schools in the Caribbean?

A    Uh-huh.

Q    Very briefly, why was ECFMG doing that?

A    So ECFMG had done another investigation on another medical school.  And we wanted to reach out to make sure that that medical school still had its -- met the eligibility

requirements.  And at the same time, we decided to do an eligibility requirement for all of the schools in that area.

And we are targeting actually different areas of the world moving forward to re-verify information that we previously received for schools.

Q    There's been some discussion of the change of the sponsor note and the finding for irregular behavior against Dr. Tulp.

We're just wondering what, if any impact, you know of those actions having been on students of USAT, how that's impacted them in any way?

A    My -- the students -- if the students did not graduate by December of 2018, then the students would have to transfer to other medical schools if they wanted to continue to take USMLE examinations and to pursue ECFMG certification, but those who had graduated prior are moving through the pipeline.

Q    And those students, you said if they wanted to proceed through USAT USMLE examinations, if they had transferred, what if any impact on their prior credits taken on USAT being eligible for ECFMG certification, what impact if any would that have been?

A    Well, so they -- their -- they would be able to transfer their prior credits from USAT to whatever their new medical school is.

Q    Do you have any understanding of what impact ECFMG's

actions vis a vis the sponsor note and the World Directory were -- as to Dr. Tulp would have on the ability for USAT to provide medical education generally to students in Montserrat, who have no inclination of coming to ECFMG?

A    Yeah, they --

MR. REIL:  Objection to the question.  It's compound and I think there has to be a foundation that the witness has some personal knowledge here.  She's not in as an expert.

MS. MCENROE:  I'll withdraw the question then.

THE COURT:  Okay.

BY MS. MCENROE:

Q    Ms. Corrado, we were talking briefly about recertification in the Caribbean.  Do you remember that?

A    Uh-huh.

Q    And you mentioned another school that had gone through a process of investigation.  What school was that?

A    Atlantic University School of Medicine in St. Lucia.

Q    And was --

THE COURT:  And I'm sorry, in where?

THE WITNESS:  In St. Lucia.

BY MS. MCENROE:

Q    And was there any finding of irregular behavior as to any medical school official in that --

A    Yes.

Q    -- investigation?

A    Yes.

Q    And what was the action or what was the finding, if any, of the -- ECFMG with respect to that medical school official?

A    The --

MR. REIL:  Objection to another investigation. Relevance.

THE COURT:  Relevance?

MS. MCENROE:  Your Honor, I'm just trying to establish there's a precedent here for how ECFMG conducted itself.

THE COURT:  Overruled.  Go ahead.

THE WITNESS:  So ECFMG found that officials and employees of the university had engaged in irregular behavior. And they were similarly sanctioned in that.

They are -- they have been -- we will not accept documents certified by those officials for a minimum of five years after which they have to meet certain requirements if we will consider them again for that school or for any other medical school.

Q    We also talked briefly a little earlier when looking at the sponsor note about enhanced procedures on students at USAT.  Do you remember that?

A    Yes.

Q    And you mentioned that pertained to the affidavit

process; is that correct?

A    That's correct.

Q    Was -- has ECFMG ever used a similar enhanced procedure on any other medical school?

A    Yes, in the case of the Atlantic University School of Medicine for one, but others as well.

Q    And in any of those other circumstances when ECFMG has imposed enhanced procedures involving these affidavits, has it ever been that there were then no findings of irregular behavior or no changes to a sponsor note as a result?

A    Yes.

Q    Has ECFMG ever investigated other medical schools where there was communication with the medical school about a change to a sponsor note and then the medical school was able to provide ECFMG with the information sought?

A    Yes, there has.

Q    And then in that circumstance, was there any change to the medical school listing the sponsor note?

A    Yes, we updated the sponsor note.

Q    To reflect?

A    To reflect that the graduates were eligible once again for certification.

Q    Was it your intention if that information had been provided that was requested from Dr. Tulp with regards to the eligibility -- sorry, authorization to have medical school

education in the United States been provided to ECFMG that ECFMG would do the same thing in this circumstance?

    A    Yes.

        MS. MCENROE:  I have no further questions at this time.

        THE COURT:  Mr. Reil, you have redirect on your own witness and cross on Ms. McEnroe's witness.

        MR. REIL:  Brief redirect, Your Honor.

        THE COURT:  Go ahead.

                    REDIRECT EXAMINATION

BY MR. REIL:

    Q    You just gave some testimony, Ms. Corrado, concerning the affidavits, Exhibit D, the affidavits of these students filled out that ECFMG sent to them.  Would you take a look at that affidavit on page 10?  I have a question on it.

    A    I have it, sir.

    Q    Okay, did ECFMG in that affidavit threaten the students with irregular behavior if they didn't fill out the affidavit?

    A    No, sir.

    Q    If you go to page 11 there.  Okay, if you go down on page 11 to I guess the second to the last paragraph, where it says ECFMG reserves the right.  Do you see that?

    A    Uh-huh.

    Q    Please read it into the record, that sentence.

A    "ECFMG reserves the right to bring allegations of irregular behavior against you in accordance with its policies and procedures showing ECFMG obtained information that indicates that you have engaged in irregular behavior with respect to any documentation submitted as part of this process."

Q    All right, now what was the purpose of ECFMG putting the -- that language with the affidavit?

A    This is to serve as a reminder to those students that they need to provide correct and accurate information to ECFMG. And that if they don't, they could be subject to our irregular behavior procedures.

Q    What if they didn't fill out the affidavit?

A    There were a number of students that didn't fill out the affidavit.  They -- we just don't -- we won't provide services to them until they fill it out.

Q    I see.  All right, when you say you won't provide services to them, if you don't provide services to them, that means they'll never be able to become a practicing physician in the United States, am I correct?

A    It means they won't be able to proceed to get ECFMG certification.

Q    ECFMG certification is necessary for a foreign medical student to practice as a physician in the United States?

MS. MCENROE: Objection, Your Honor. Asked and answered and also to the extent it purports to seek a legal conclusion.

MR. REIL: I'll withdraw the question, Your Honor.

BY MR. REIL:

Q   Okay, there was some testimony that was elicited before my examination where you were asked about a campus. Do you remember that?

A   Yes.

Q   Does ECFMG define anywhere in its policies or procedures what a campus is?

A   Not to my knowledge.

MR. REIL: That's all I have, Your Honor.

THE COURT: Okay, thank you very much. You can leave the stand.

THE WITNESS: Thank you, Your Honor.

(Witness excused)

THE COURT: We're going to take a five-minute break and get back and have Ms. Cover on the stand ready to go when we get back in.

THE COURT RECORDER: All rise.

THE COURT: Thank you.

(Recess at 3:21 p.m., until 3:32 p.m.)

THE COURT RECORDER: All rise.

THE COURT: Okay, Mr. Reil, the witness please?

THE COURT RECORDER: Please raise your right hand. State and spell your name for the record?

THE WITNESS: Lisa Brenda Cover, L-I-S-A C-O-V-E-R.

LISA COVER

called as a witness for the Plaintiff, having been duly sworn testified as follows:

THE COURT: Have a seat. Your witness?

MR. REIL: Your Honor, at this point, we have decided not to examine Ms. Cover.

THE COURT: Oh, okay.

MR. REIL: With no objection if the Court allows.

THE COURT: Would you -- Ms. McEnroe, would have brought in Ms. Cover in your case in chief?

MS. MCENROE: No questions.

THE COURT: Okay, you can leave the stand.

THE WITNESS: Thank you.

(Witness excused)

THE COURT: Okay, let's have -- would you want -- do you want to put Mr. Tulp on -- Dr. Tulp on the stand?

MR. REIL: Yes. And with the Court's permission, Attorney Swate will examine Dr. Tulp.

THE COURT: Go ahead.

THE COURT RECORDER: Raise your right hand. State your name for the record?

THE WITNESS: Dr. Orien Lee Tulp.

ORIEN TULP

Plaintiff, having been duly sworn testified as follows:

THE COURT:  Have a seat.

Your witness.

MR. SWATE:  If it please the Court.

DIRECT EXAMINATION

BY MR. SWATE:

Q    Dr. Tulp, what is your professional position currently?

A    I'm president of the University of Science, Art, and Technology.

Q    And that's USAT?

A    That's USAT.

Q    And how long has USAT been in operation?

A    15 years, 4 months.

Q    All right, are you a part owner of USAT?

A    Yes.

Q    What credentials that you have, just briefly, to support your position at present?

A    There -- I have a Ph.D., two PhDs, an M.D.  And I've been active as a professor for over 40 years.

Q    Now for most of your professional life, 43 years, do you -- what, a military officer?

A    Yes, I was.  I served in the United States Army, active in Reserve components 43 years, 5 months, and 26 days.

Q    Did you receive any awards?

A    Yes, I have many.

Q    Well, just a couple?

A    Including the Congressional Award of Regional Merit, including three meritorious service awards, two from the Commonwealth of Pennsylvania, and commendation metals, the Citizenship Medal from the Sons of American Resolution -- Revolution.

We have many, many awards that I've received over the course of my military career, including the eighth award of the Garde Nationale, the eighth one in history was awarded to me for having a significant academic and professional career and simultaneous to my military career.

Q    Have you received any public awards?

A    Yes, I've received several presidential voluntary service awards from several presidents of the United States. And I received an exultation from President William Jefferson Clinton in 1986.

Q    In the years that you operated in medical school, what has been the experience of your students as far as the results of the testing done by ECFMG and USMLE?

A    They've done very well.  We, you know, provide high quality instruction.  The vast majority of our courses, the -- the entire, the full first year they can take from Montserrat or they can take from virtually anywhere, because there's --

we've developed beginning 10 years ago, because of the volcano, we developed something called SPOC, Small Platform Online courses where you have high quality, the best we can find, all U.S. certified instructors all have taught in U.S. medical schools and are all -- were board certified in their fields.

They present these courses.  So they can take them pretty from Montserrat, and many, many have over the years, from anywhere in the world.

Q     What has been your --

THE COURT:  Mr. -- sorry, can you just get to the chase?  I accept that Dr. Tulp has these qualifications and I am for the purposes of this preliminary injunction hearing, that is not what we're talking about.

MR. SWATE:  Yes, Your Honor.

THE COURT:  Just cut to the chase.

BY MR. SWATE:

Q     All right, what is required by every state in the union for an international medical graduate to apply for a medical license, whether either restricted or permanent?

A     They must have ECFMG certification.  There's the only access that's available to them.

Q     Can a medical student United -- international medical student be licensed without that certificate or license?

A     Not in the United States of America

MS. MCENROE:  Objection, Your Honor.  Foundation.

THE COURT: Basis? I mean, granted. Sustained.

MS. MCENROE: It's been a long afternoon, Your Honor.

THE COURT: Sustained.

MS. MCENROE: Thank you.

THE COURT: You can lay some foundation and perhaps get there.

BY MR. SWATE:

Q Well, what -- getting to the chase, what evidence was presented by ECFMG owned on the 28th that you had committed any kind of bad act?

A None.

Q When did you find out about the notebook with the various evidence that was -- that had been given to the members of the committee that was supposed to hear your case?

A On the 28th of November, it was placed on the table. It had no label. We didn't know what it was. It was just a black book that was sitting there. We had no opportunity to review it in advance.

Q What evidence was produced by the ECFMG at that meeting that support any allegations?

A None.

Q What effect does ECFMG placing that notation on that world list of medical schools have on you personally, and then I'll get to the medical school?

A Well, it certainly blemishes my reputation

tremendously.  In over 50 years, I've never had a single complaint from a student, a patient, a board, nothing.  I never expected this.

Q    When was that notation first placed?

A    Prior to September 11th, 2018.  That was the last date entered on the sponsor note when it was -- when it appeared.

Q    Was that note placed prior to any hearing or any allegations?

A    Yes.

Q    Now the ECFMG agreed that up until January the 1st, 2019, they would accept documentations from the USAT students, correct?

A    That is correct.

MS. MCENROE:  Your Honor, foundation about what ECFMG was sent.

THE COURT:  Sustained.

MR. SWATE:  Ma'am?

THE COURT:  Sustained, go ahead.  Lay some foundation.

BY MR. SWATE:

Q    You were given a letter from the ECFMG that stated that up until January the 1st, 2019, documentation would be accepted?

A    That is correct.

Q      What harm resulted from allowing the USAT to operate until January the 1st, 2019?

A      I am unaware of any harm whatsoever.

Q      Well, what magically happened at midnight on January the 1st, 2019 or December the 31st, 2018?

A      ECFMG would no longer accept --

MS. MCENROE:  Objection, Your Honor --

THE COURT:  What?  You finish your question.

You hold.

Finish your question.

BY MR. SWATE:

Q      What occurred that would cause the ECFMG on December the 31st, 2018 to accept documentation and then after that date not accept documentation, if you know?

A      Nothing.

THE COURT:  Hold on.  Any objection?

MS. MCENROE:  Objection, Your Honor.  Foundation.

THE COURT:  Sustained.  Also, compound.

BY MR. SWATE:

Q      What damages, if any, is occurring while allowing ECFMG to post those notes on that world internet site listing medical schools?

MS. MCENROE:  Objection, Your Honor.  Foundation.

THE COURT:  Sustained.  Foundation?

BY MR. SWATE:

Q    Are you --

A    Yes.

Q    Are you aware that the notice has been posted, correct?

A    Yes, I'm aware the notice was posted.

Q    Do you have any personal knowledge of the effect of posting that notice?

A    Yes.

Q    What's your knowledge?

A    It really eliminates all new applications and it prevents the university from collecting any uncollected tuition.

Q    What harm would result from allowing USA -- by allowing ECFMG to continue accepting documents from USAT students until this matter's resolved?

A    There is no harm.

MS. MCENROE:  Objection, Your Honor.

THE COURT:  Basis?

MS. MCENROE:  Foundation and also vague.  I'm not sure exactly what he means by harm.

THE COURT:  Sustained, sustained.

THE WITNESS:  I'm unaware of any harm.

THE COURT:  Oh, no, don't.  If I sustain, you don't answer.

THE WITNESS:  Okay.

THE COURT: Go ahead.

THE WITNESS: I'm sorry, Your Honor.

BY MR. SWATE:

Q   Are you aware of the results of them posting the information?

A   Yes.

Q   And what's been the result?

A   The result has been that all tuition payments stopped on or before October 1st. And that has made a major impact on the economy at the university. We were admitting about 50 students per month prior to that. Since then, not one.

Q   And this was prior to any hearing or finding of irregular behavior, correct?

A   That is correct.

Q   Do you have an opinion of whether it would be a positive event to allow USAT to continue by ECFMG accepting documents until this matter's resolved?

MS. MCENROE: Objection, Your Honor. Calls for opinion testimony.

THE COURT: Sustained unless you think that this can be fact witness testimony, opinion testimony. Make that argument.

MR. SWATE: He has specialized knowledge. He's been an administrator for 15 years.

THE COURT: So you're trying to get him qualified as

an expert, is that what --

MR. SWATE:  Well, he is an expert.

THE COURT:  Well, he's not until I say he's an expert.

MR. SWATE:  Well, I understand it, Judge.

THE COURT:  So are you trying to get him qualified as an expert?

MR. SWATE:  Okay, I understand.  I will attempt to do that.

THE WITNESS:  Okay.

THE COURT:  Okay, I'm not suggesting -- I mean, if you want to do it, you can try and do it, but we've got go through the process.  So why don't you do it?

MR. SWATE:  Yes, Your Honor.  I understand.

THE WITNESS:  Okay, would you repeat that question now that we've had --

BY MR. SWATE:

Q    You've been a president and professor for USAT for 15 years?

A    That is correct.

Q    Are you familiar with the standards for your students being licensed in the United States?

A    Yes.

Q    And what's this familiarity based on?

A    It's based on experience and study.

MR. SWATE:  Your Honor, I would have Dr. Tulp admitted as an expert in medical administration.

MS. MCENROE:  Your Honor, we oppose.  I don't really understand what an expert in medical administration is.  I think that was factual testimony that was just being elicited about why -- the basis for a line of questioning, which I don't have an objection to that, but I don't understand him being put forward as an expert at this time.

THE COURT:  Sustained.

BY MR. SWATE:

Q   You -- the -- you have familiarity with the history of your students?

A   Yes, I do.

Q   Do you have familiarity with the history of your students in going into residency programs?

A   Yes, we do.

Q   And what has been that history?

A   That history has been highly successful.  Most successful -- most are successful in obtaining not only residencies, but some medical positions, faculty positions at U.S. medical schools following their board certification.

Q   Your student, if you can do this, how would you describe your typical student?

A   Our typical students are exceptional.  They're way above -- there is a mix of other international medical schools

from the region that we've interacted with.

All -- the minimum requirement for most questions coming in is a Master's degree or higher.  And that accounts for about 90 percent of the total.

Q    What about the age of your students?  Do you have any information about that?

A    We have no age restriction.  Our oldest graduate was 73.

Q    What kind of experience on the average do these students have?

A    10 to 20 years of clinical experience prior to coming into the program.  So.

Q    Are you making a claim today that you were denied due process by the ECFMG?

A    Absolutely.

MS. MCENROE:  Objection, Your Honor.  Calls for a legal conclusion.

THE COURT:  Sustained.

THE WITNESS:  Absolutely.

THE COURT:  If I say sustained, you don't answer the question.

THE WITNESS:  Oh, I'm so sorry.

THE COURT:  Go ahead.

BY MR. SWATE:

Q    Well, what notice were you given of the charges?

A    None.

Q    What evidence was presented at the hearing?

A    None.

Q    Who terminated the hearing?

A    Attorney McEnroe.

Q    Were you allowed to -- were your attorneys allowed to put on any evidence?

A    No.

MR. SWATE:  Pass the witness.

THE COURT:  All right.

MS. MCENROE:  May I approach the lectern, Your Honor?

THE COURT:  You may.

MS. MCENROE:  And per efficiencies, I would ask if it's all right if I go do my cross and my --

THE COURT:  Yes.

MS. MCENROE:  It's yes?

THE COURT:  Yes, that's fine.

MS. MCENROE:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. MCENROE:

Q    Hi, Dr. Tulp.

A    Good afternoon.

Q    Good afternoon.  You were just asked about a hearing on November 28th; is that correct?

A    Yes.

Q    And you heard testimony a little bit earlier today about a transcript of the hearing?

A    I heard it, but I haven't read it.

Q    Have you received a copy of it?

A    No.

Q    Do you know if your lawyers have gotten a copy of it?

A    I believe our attorneys have received a copy very recently.

Q    Does USAT have a campus in the United States?

A    No.

Q    Have you ever said that you USAT had a campus in the United States?

A    No.

MS. MCENROE:  Your Honor, if I may, we need a minute for a technical hookup so that we can --

THE COURT:  Go --

MS. MCENROE:  -- submit some evidence to refresh the witness' recollection.

THE COURT:  Go ahead.  How -- when you say a minute, do you mean one minute?

MS. MCENROE:  Literally a minute.  I think we have it --

THE COURT:  Got it.

MS. MCENROE:  And Your Honor, while that's getting queued up, I would like to submit it initially to refresh the

witness' recollection.

And once the Court gets to see it, I plan to move for its admission on the basis of a statement of a party opponent?

THE COURT:  Any objection to submission of the transcript?

MS. MCENROE:  I'm sorry, not the transcript, the video that we're about to watch.

THE COURT:  The video, okay.  Do you know what video she's talking about?

MR. SWATE:  No.  Have we --

THE COURT:  Okay, well, we'll take a look and then I'll ask you that question again.

MS. MCENROE:  Thank you, Your Honor.

Your Honor, I think we're having a volume problem.

THE COURT:  Mr. Mani, can you solve that?

MR. SWATE:  Judge, we would object to this evidence.  It hasn't been authenticated.

THE COURT:  Well, we're just about -- we're doing that right now.  That's what we're doing right now.

While we're waiting, Dr. Tulp, have there been any 2019 graduates of USAT as of yet this year?

THE WITNESS:  No, there have not been.

THE COURT:  When would be the first graduation or when would have been the first graduation?

THE WITNESS:  In June.

THE COURT: Okay.

MS. MCENROE: Your Honor, while they're working on that, in the interest of efficiency, I'd be happy to move on and then circle back if that's all right?

THE COURT: Go ahead.

BY MS. MCENROE:

Q    Dr. Tulp, you testified a minute ago that you had not gotten any notice from ECFMG about the allegations against you; is that correct?

A    That is correct.

MS. MCENROE: All right, before I move on, it seems like we got volume, so we'll circle back if we could?

THE COURT: Go ahead. The -- you'll be showing the video solely for the purposes of determining whether -- its admissibility?

MS. MCENROE: Correct. Yes, Your Honor.

THE COURT: Okay, go ahead.

MS. MCENROE: And Your Honor, we're only going to put in the first couple minutes. We're not going to --

(Video played at 3:53 p.m.)

(Music)

UNIDENTIFIED SPEAKER: Thank you for joining us. Our guests today are Professor George Einstein of USAT and Dr. Orien Tulp, the president of USAT, the British West Indies-based University of Science, Arts, and Technology.

It is this institution in which dozens of physicians graduate successfully, many from humble beginnings from nations including the United States regardless of race or gender or culture.

USAT has created a program of superior excellence and in training physicians and other professionals to meet the demand of scientific and medical needs in this global technological environment.

Professor Einstein and Dr. Tulp will tell us more about these achievements following these messages.

(Music)

With us now is Dr. Orien Tulp, president of USAT, the University of Science, Arts, and Technology, Montserrat. Pleasure and honor to have you back.

MR. TULP:  Thank you, sir.  Pleasure to be back.

UNIDENTIFIED SPEAKER:  So many things are happening in education worldwide and of course in your part of the world. And you do classes in Miami, Denver, and Montserrat.  What's new with USAT?

MR. TULP:  USAT is now fully accredited in the United Kingdom.  We're now preparing for our 2014 commencement, which would be held right here in Miami.

We expect to graduate more than 100 students, which is more than any other Caribbean school just by the way.  And we'll have this -- we want family to come.  It's a great

opportunity, a great experience. And it enables those who graduate to experience closure, because now it's another chapter of their career.

UNIDENTIFIED SPEAKER: And USAT is contributing so effectively in the lives and careers of many people in this part of the world.

MR. TULP: Yes, it is. Yes, it is. We have a lot of physicians now in the state of Florida. We have some who are practicing and many more are in residency in their specialty training.

It's moving ahead very quickly and very rapidly. We're now the fastest, near as I can see, we are the fastest growing medical school in the Caribbean.

UNIDENTIFIED SPEAKER: So the University of Science, Arts, and Technology also is expanding into other programs, I understand. Tell us of these?

MR. TULP: Yes, yes we are. We have a new program we intend to start by September. This would be medical acupuncture designed for physicians, licensed physicians that wish to add that.

We're going to create a unique new program, which will lead to a Master of Science in Medical Acupuncture. That'll be conducted in our Miami campus to start with and probably extend that into some of the other campuses.

(Video ended at 3:56 p.m.)

MS. MCENROE: Your Honor, I would make the argument that Dr. Tulp is appearing here on this video himself, saying referring to a Miami campus, which goes directly contradictory to testimony he said that he never uses the word campus to describe USAT's conduct in the United States. So I would submit that it's admissible as an admission of a party opponent.

THE COURT: Any objection?

MR. SWATE: It's not -- part of the controversy is the definition of campus.

THE COURT: We're not talking about the -- that particular issue. We're only talking about the admissibility of this tape. So tell me why you oppose its admission?

MR. SWATE: I don't.

THE COURT: Okay, it's admitted.

(Defendant's Exhibit D-1 admitted into evidence)

MS. MCENROE: Thank you, Your Honor.

BY MS. MCENROE:

Q    Dr. Tulp, you were testifying just a minute ago about not having notice from ECFMG with respect to the issues on going with USAT; is that correct?

A    That is correct.

MS. MCENROE: Your Honor, may I approach the witness?

THE COURT: You may.

MS. MCENROE: And Your Honor, I have a copy for you

as well if you'd like me to hand that up if that's all right.

THE COURT:  Yes, please.

BY MS. MCENROE:

Q    Dr. Tulp, do you recognize this document?

A    I do.

Q    What is it?

A    I recognize it, yes.

Q    Okay, and this is a letter directed to you, correct?

A    That is correct.

Q    Did you get this letter?

A    I received it by email.

MS. MCENROE:  Your Honor, I would move for the admission of this letter?

THE COURT:  Any objection?

MR. SWATE:  No objection.

THE COURT:  It's admitted.  What would you like to label this as?  We'll label the video as D-1.

(Defendant's Exhibit D-2 admitted into evidence)

MS. MCENROE:  Great.  And how about we make this D-2?

THE COURT:  Got it.

MS. MCENROE:  Thank you, Your Honor.

BY MS. MCENROE:

Q    So starting from the top, and it's a brief letter, so I'm going to try not to go too long on it, but it's from August 21st, 2018.  And it starts out saying, "It has recently come to

the attention of the Educational Commission for Foreign Medical Graduates that USAT in Montserrat is operating a satellite or branch campus in Miami, Florida."  Do you see that?

A    I see that.

Q    Then it was explained that, "In order for students and graduates of an international medical school such as USAT to have eligibility to apply for ECFMG certification, ECFMG policy requires confirmation from the appropriate government authority in the branch campus country that the branch campus is authorized to operate as a medical school in such branch campus country."  Do you see that?

A    Yeah, I see that, uh-huh.

Q    Have you ever provided such information to ECFMG about the operation of education in the United States from USAT?

A    No, because when I contacted the Florida Department of Education, they said it was unnecessary based on what our activities actually were.  The bulk of our program was online, about 80 percent of it.  And we have previously told you that.

MS. MCENROE:  Your Honor, may I approach the witness?

THE COURT:  You may.

MS. MCENROE:  And the bench, Your Honor.

BY MS. MCENROE:

Q    Dr. Tulp, do you know what this document is?

A    Yes.

Case 2:17-cv-05546-CWB   Document 132-20   Filed 05/08/23   Page 261 of 546
Case 2:17-cv-05546-CWB   Document 132-20   Filed 05/08/23   Page 261 of 546   JA0258

83

Q    What is it?

A    It's a site support and schedule.

Q    And it says -- you see it says lecture conference schedule at the top?

A    It does that.

Q    And this is from University of Science, Arts, and Technology; is that correct?

A    Yes, it is.

MS. MCENROE:  Your Honor, I would move for this admission of D-3, please?

THE COURT:  Any objection?

MR. SWATE:  No, Your Honor.

THE COURT:  It's admitted.

(Defendant's Exhibit D-3 admitted into evidence)

THE WITNESS:  I have one question if I'm allowed to ask?

THE COURT:  You're not.

MS. MCENROE:  At this juncture, you are --

THE COURT:  You are not.

THE WITNESS:  Okay.

BY MS. MCENROE:

Q    So you mentioned when you were questioned by counsel about the notice of the allegations of irregular behavior against you; is that correct?

A    That's correct.

Q    And you indicated you didn't have any notice of the claims of irregular behavior against you?

A    I did not have notice.

MS. MCENROE:  May I approach, Your Honor?

THE COURT:  You may.

MS. MCENROE:  And the bench, Your Honor?

THE COURT:  You may.

BY MS. MCENROE:

Q    Dr. Tulp, have you seen this letter before?

A    I've seen this letter before, yes, I have.

MS. MCENROE:  Your Honor, I would move for admission as D-4.

THE COURT:  Any objection?  Any objection?

MR. SWATE:  No.

THE COURT:  It's admitted.

(Defendant's Exhibit D-4 admitted into evidence)

BY MS. MCENROE:

Q    So Dr. Tulp, I'm going to direct you to a couple parts of this letter in particular, but I don't want to belabor the point or take too much time, but I'm just going to start from the beginning.

That it's addressed to you and it says, "I'm writing to advise you of the allegation that you individually and your capacity as an official of the USAT faculty of medicine Montserrat engaged in irregular behavior in connection with

providing false information to ECFMG." Do you see that?

A    I see that.

Q    And it goes on to say, "Specifically, you provided false information to ECFMG when you notified ECFMG that USAT does not operate a branch campus in Miami, Florida, and two, certified to the attendance dates of several USAT students and graduates when ECFMG has information that these students were not attending USAT during some the of time periods which you certified." Do you see that?

A    Yes, I see that.

MS. MCENROE:  May I approach, Your Honor?

THE COURT:  You may.

MS. MCENROE:  And the bench, Your Honor?

THE COURT:  You may.

BY MS. MCENROE:

Q    Dr. Tulp, this on its face is an email from you at the top. Do you see that from Orien Tulp? Is that your email address, o.tulp@usat.edu?

A    It is.

Q    Do you recognize this email?

A    I do.

MS. MCENROE:  Your Honor, I'd like to move for its admission as D-5?

THE COURT:  Any objection?

MR. SWATE:  No.

THE COURT:  It's admitted.

(Defendant's Exhibit D-5 admitted into evidence)

BY MS. MCENROE:

Q     This is an email from you to Scott Mealey.  Do you know who Scott Mealey is?

A     No.

Q     Do you know whether or not he works at the ECFMG?

A     I -- according to a signature block, he does.

Q     Okay, do you have any reason to believe otherwise?

A     I have no reason to believe otherwise.

Q     And this email down below from Scott Mealey to you says, "Please see the attached letter regarding USAT U.S. satellite campus."  Do you see that?

A     I see that.

Q     And then up above, you wrote, "Dear Mr. Mealey."  Do you see where I am?

A     I see that.

Q     And is this an email you wrote?

A     This is incorrect information.

Q     Correct, you're reading the beginning of the email, right?

A     Right.

Q     This is correct information?  Did you write this email?

A     I did.

Q   And it says, like you were reading, "This is incorrect information.  The Miami location is an information and testing site only where a pre USMLE examination and MDME may administered and an orientation for new students is conducted prior to the travelling to the Caribbean.  It is NOT a campus.  Our only campus is located in Olveston, Montserrat, British West Indies."  Is that what you wrote?

A   That is exactly correct.

Q   Is it your position that USAT has done no educational services for students in the United States?

A   We have an online program.  They can take that program from anywhere in the world.  Our most distant graduate was from Thailand.

MS. MCENROE:  Your Honor, I'd move to strike as nonresponsive.

THE COURT:  Overruled.

BY MS. MCENROE:

Q   Do you have any students who have gotten medical education in the United States?

A   They received a review lecture, which is part of the orientation.  We like to showcase our faculty because our faculty are pretty strong and I like to showcase them.

Q   If you --

A   So we'll -- yes, we fly a couple of faculty in to give a demonstration before you join our schools, here's what

you're going to get.  The lectures are delivered online.

Q    Do USAT students dissect cadavers in connection with their medical education?

A    Yes, we have an agreement with the Miami Anatomic Research Center, who provides that service for us.

Q    So USAT students dissect dead human bodies in the United States, correct?

A    Cadavers.

Q    Yeah, the same thing, right? I just want to make sure.

A    Cadavers.

Q    I'm sorry, I'm not a medical doctor, I'm just making sure.

A    Yeah.

Q    But there is dissection of human remains, cadavers --

A    That is --

Q    -- in the United States by USAT students?

A    There is.  There we also have an anatomage machine, which they do a computerized dissection prior to that.

Q    In your view, is the dissection of human cadavers not education?

A    That is education that is provided by the Miami Anatomic Research Center at their location on their campus.

Q    To USAT students in the United States?

A    The USAT students are in the United States attending

that, as do students from around the world attending that same, very same anatomic research center for educational purposes.

Q  Dr. Tulp, did you instruct the students at USAT about how to fill out the affidavits requested by the Educational Commission for Medical Graduates?

A  Not specifically.  But if they asked me for guidance, I would provide to guide it, -- but haven't seen the affidavits until recently.

MS. MCENROE:  Your Honor, may I approach?

THE COURT:  You may.

MS. MCENROE:  And the bench, Your Honor?

THE COURT:  you may.

BY MS. MCENROE:

Q  Dr. Tulp, I'd like to direct your attention specifically to the bolded text in the middle.

A  Uh-huh, uh-huh.

Q  That's followed by your signature block.  Do you see that?

A  Right, I see that.

Q  Is this a message that you wrote?

A  It -- apparently I did.

Q  And who is Carla (phonetic) and I'm going to say this wrong I'm sorry, Cognier (phonetic)?

A  Carpanich (phonetic) is the vice president of the university.

MS. MCENROE: Your Honor, I would move for this admission -- admission of this document as D-6?

THE COURT: Any objection to admit it?

MR. SWATE: No, Your Honor.

THE COURT: Admitted.

(Defendant's Exhibit D-6 admitted into evidence)

BY MS. MCENROE:

Q   And Dr. Tulp, this message says, "Please do NOT use the phrase 'campus' when referring to the U.S. sites as that implies approval from the U.S. Department of Education or the State Department of Education, which isn't possible or likely as an international medical school.

Someone reported to the ECFMG that we have a Miami campus. It is an administrative site where we do interviews, orientations, and pre USMLE proctored examinations." Did I read that correctly?

A   You did.

Q   Do you know if this message was disseminated to USAT students to not use the phrase campus?

A   I do not know if it was or not.

Q   Is USAT accredited by CAAM-HP?

A   No, it is not required to be.

Q   Can you explain --

A   It is accredited in the United Kingdom. We're a British school.

Q    Where is the headquarters of USAT?

A    Montserrat, Olveston, Montserrat.

Q    And I had to get my crib sheet for all the acronyms in this case.  Is it correct that CAAM-HP is the Caribbean accreditation authority for education in medicine and other health professionals?

A    It's an emerging accrediting body.  It is accredited --

Q    You understand --

A    It has accredited --

Q    Go ahead, I'm sorry.

A    It's accredited maybe four schools so far.

MS. MCENROE:  Your Honor, may I approach?

THE COURT:  You may.

MR. SWATE:  Your Honor, I'll object to this evidence.  We don't know where it came from.  We don't know how it was generated.  We don't know whether it's changed or not.

MS. MCENROE:  Your Honor, I'm going to ask some questions to try and establish that.

THE COURT:  Okay, ask him foundational questions.

MS. MCENROE:  Thank you, Your Honor.

BY MS. MCENROE:

Q    Dr. Tulp, has USAT tried to become accredited by CAAM-HP?

A    We have tried, but the government of Montserrat do

not accept CAAM as an accrediting body until September 13th, 2018.

Q    I'm sorry, I didn't quite hear you.  Did you say we have tried or we haven't tried?

A    I have attempted, but the government in Montserrat would not accept CAAM as an accrediting body until September 13th of 2018.

Q    Do you --

A    Therefore, they would not endorse any accreditation by CAAM.  We were inspected by CAAM.  We passed it with flying colors.

They interviewed between 15 and 20 students on campus each time that they were there, but only one surveyor showed up.  He had always Alzheimer's.  He took no notes.  He took no pictures.  He even forgot to pay his hotel bill.  I had to.

Q    Had you seen this letter before or this determination?

A    I've seen it before.

Q    You have?

A    And I would like to remark that there were more than 100 violations of the LCME protocol, which they said that they applied when they conducted the site visit.

They're required to have three surveyors.  They have only one, a retired physician from Canada.  And the other two surveyors allegedly indicated here have never been to

Montserrat.

MS. MCENROE:  Your Honor, I'd like to try strike as nonresponsive everything after the witness said he's seen his document before?

THE COURT:  It's stricken.

MS. MCENROE:  Thank you, Your Honor.  I'd like to move for admission of this document as Exhibit D-7?

THE COURT:  Any objection?

MR. SWATE:  No objection.

THE COURT:  It's admitted.

(Defendant's Exhibit D-7 admitted into evidence)

BY MS. MCENROE:

Q    I'd like the record direct your attention to the red paragraphs in the middle.

A    Uh-huh.

Q    See the second paragraph there?

A    Yeah.

Q    It says, "Following discussions of the reviewers report, CAAM-HP determined that this whole had not provided sufficient evidence to indicate that teaching activities were actually taking place in Montserrat."  Do you see that?

A    I see that.  That is an incorrect statement.  They interviewed 15 students.  They observed classes in session. They were there for three days.

MS. MCENROE:  Your Honor, permission to approach?

THE COURT: You may.

BY MS. MCENROE:

Q    Dr. Tulp, what I just handed you is an email chain that includes a message that starts with "dear students" and then has your signature block at the bottom of the first page.

A    Uh-huh.

Q    Do you see this?

A    I see that.

Q    Is this a message that you've seen before?

A    I don't know if I've seen this or not.

Q    I'm going to read a little bit to you --

A    Yeah.

Q    -- to see if it refreshes your recollection?

A    Yeah.

Q    If that's all right?

A    I did not write this.

Q    Okay, but do you see your signature block there?

A    My signature block appears on everything, whether I've signed or seen it or not.

Q    Okay, well, I want to see if I can refresh your recollection.

A    That includes the documents from the ECFMG that I receive. They already have my signature attached. I have not signed it. I never gave authorization for them to sign my documents.

MS. MCENROE: Your Honor, I would move to strike as nonresponsive. I don't know what question the witness was responding to.

THE COURT: Stricken.

BY MS. MCENROE:

Q So I'd like to see if I can refresh your recollection about whether you've seen this before. So where it says "dear students" on the first page, then there's a paragraph that starts ECFMG. Do you see where I am?

A Uh-huh.

Q Okay, and it says, "ECFMG is questioning our delivery of the basic sciences because some students didn't attend on Montserrat due to past volcanic activity on Montserrat." Do you see that?

A I see that.

Q Okay, and then I'd like to go to the second paragraph there. It starts with, "We will now begin." Do you see that?

A I see that.

Q It says, "We will now begin offering the basic science portion of our program at our campus on Montserrat as early as October 1st, 2018 and at our new British Virgin Islands campus as soon as January 2019." Do you see that?

A I see that.

Q Does that refresh your recollection whether you've seen this message before, whether or not you've authored it?

Q    I didn't author it.  And I don't believe that I've actually seen this before.

Q    Okay, so stepping away from that --

A    But we've have basic sciences in Montserrat for many, many years.  We've just graduated the first two students who completed their entire four years in Montserrat, the first two that did the entire four years basic sciences and clinical sciences on the island of Montserrat.

The volcano was quieting down until about four years ago, it would erupt every -- about once a month.  That is not a safe environment.

MS. MCENROE:  Your Honor, I'd move to strike.

THE COURT:  Stricken.

BY MS. MCENROE:

Q    Stepping away from the document, because I understand that you say may not have seen it before, is it true that USAT opened a new campus on the British Virgin Islands in 2019?

A    We have been licensed in the British Virgin Islands for some time now.

Q    And is that going to be the same USAT or is that going to be a new medical school?

A    We haven't released that information yet.

THE COURT:  Well, can you respond to the question, please?

THE WITNESS:  It will not be USAT.

BY MS. MCENROE:

Q    So you're opening a new medical school on another island in the Caribbean; is that correct?

A    Not a volcanic island.

Q    Is USAT still in operation?

A    Yes.

Q    Does USAT have graduates that ever practiced medicine in Montserrat?

A    Yes.

Q    Does USAT have graduates that ever practiced medicine outside of Montserrat or the United States?

A    Yes.

Q    Does USAT have graduates that have ever practiced medicine in the United Kingdom?

A    I'm not aware of any.  We don't recruit from the United Kingdom that much.  My recollection is the United Kingdom has about 20 or 30 medical schools of its own and they're excellent medical schools.

Q    Are you aware of any USAT students having been charged with irregular behavior?

A    Yes.

Q    In connection with this circumstance that we're discussing today?

A    Yes.

Q    Who was that?

A    I'm not at liberty to say.

THE COURT:  Respond to the question.

THE WITNESS:  The one student that told me he'd made one call, a single call to the ECFMG.  And on the basis of that single call, he was assigned irregular behavior.

When he applied to take the Puerto Rico Medical Board Exam, they denied him because of irregular behavior on the basis of a single phone call to the ECFMG, when all he was asking for is guidance on how to apply for step one.

Q    When did that happen?

A    A couple years ago.

Q    Do you have any understanding whether that -- was it all in connection with the circumstances with regard to where USAT has conducted its medical education?

A    I am not aware that it was connected or not connected to that.

Q    Do -- what is that student's name?

A    I don't know whether it was connected or not, but that's -- but --

Q    I'm sorry, doctor, I was asking about the student's name?

A    I mean, I can't give you the student's name.

THE COURT:  Respond to the question.

BY MS. MCENROE:

Q    If you know?

A    Yeah, it'll come to me.  I know his name, but it's a very long Spanish name.

Q    Do you have an understanding of whether the action ECFMG took against you with respect to the allegation of irregular behavior prevents you from opening a new medical school in the British Virgin Islands?

A    Anyone can open a medical school if they have the resources to do so.

Q    Is it fair to say that it is not preventing you from opening a new medical school in the British Virgin Islands?

A    It doesn't prevent us from opening it, but it would prevent us from attracting students.

Q    So you said --

A    There's no chance that we could attract students with that note on the World Directory.  That's only two-thirds of the note.  The other third was removed after the subpoenas were delivered.

MS. MCENROE:  Your Honor, I strike as nonresponsive to any question that was pending.

THE COURT:  It's -- I'm not going to strike it, but would you please just answer the question?

THE WITNESS:  Would you rephrase the question, so I can understand it?

MS. MCENROE:  So I'm just trying to understand --

THE COURT:  Let me just ask a series of questions.

MS. MCENROE: Yeah, thank you, Your Honor.

THE COURT: Are you opening a new school in the British Virgin Islands?

THE WITNESS: None in our plan.

THE COURT: And when you say our, who is our?

THE WITNESS: The university.

THE COURT: So USAT?

THE WITNESS: USAT would sponsor it.

THE COURT: USAT will sponsor the university in the British Virgin Islands?

THE WITNESS: Yes, we were invited about two years ago to begin claiming for this. But I mean, by British Virgin Islands.

THE COURT: And will the new university be called USAT?

THE WITNESS: No.

THE COURT: What will it be called?

THE WITNESS: As far as I know, it will be called the University of Health and Humanities, British Virgin Islands or the Virgin Islands. You can leave out the British.

THE COURT: You indicated that it would have difficulty recruiting students?

THE WITNESS: Yes.

THE COURT: Well, when you said that, were you referring to USAT in Montserrat? Or were you suggesting that

the new British Virgin Island school would have difficulty recruiting students?

THE WITNESS: It would have difficulty recruiting students because of the activities with the sponsored note on the -- for USAT Montserrat.

THE COURT: Well, the sponsor note is associated with USAT, correct?

THE WITNESS: That's correct.

THE COURT: So what is your understanding about how that note can connect with the British Virgin Islands?

THE WITNESS: Because the ownership of the new university began with USAT.

BY MS. MCENROE:

Q   Dr. Tulp, do you have an understanding -- you testified a little earlier about some graduates from USAT being able to practice medicine in Montserrat and other places outside the United States; is that correct?

A   Yes, uh-huh.

Q   Do you have any understanding of whether ECFMG is at all involved in the licensure or certification of those graduates?

A   In 2005, there were not. The body there is the CAAM C exam, the Caribbean Medical Board Exam. If they were to apply today, they would not be able to.

Q   And that's a decision of the Montserratian

government?

A    No, that's a decision of the ECFMG, because the ECFMG sponsor note applies to the United States of America, but the ECFMG cooperates with virtually every medical board in the world.

They all refer to your services.  I've seen documents that you have sent to me to certify from Australia, from Denmark, from other countries, from any other -- and Canada.  Canada has already suspended access for USAT graduates based on the ECFMG sponsoring note.

Q    Dr. Tulp, has USAT sought accreditation to be a U.S. medical school?

A    No, it has not.

MS. MCENROE:  I have nothing further, Your Honor.

THE COURT:  Redirect and cross of Ms. McEnroe's direct?

CROSS-EXAMINATION

BY MR. SWATE:

Q    Doctor?

A    Yeah.

Q    As we sit here in this room today, is USAT a licensed medical school by Montserrat?

A    Yes, it is.

Q    And also, is there another entity other than Montserrat that licensed -- that accredits USAT?

A    Yes, the ASIC in the U.K., the accrediting system for international schools, colleges, and universities except -- and that's an institutional accreditation as opposed to a programmatic accreditation.

Q    And --

A    But we're also accredited by the AICP, which is in the United States.  That's the American Institute for Clinical Psychotherapy.  And also by the American Association for Higher Education and Accreditation.  And that latter one is also institutional.

Q    Is the ECFMG an accrediting agent of a medical school?

MS. MCENROE:  Objection, Your Honor.  Foundation.

THE COURT:  You can answer the question.

THE WITNESS:  I may answer?

THE COURT:  Go ahead.

THE WITNESS:  No, the ECFMG is not an accrediting body.

BY MR. SWATE:

Q    But they acted as an accrediting body, correct?

A    Yes, they do.

Q    Essentially what -- let's go through the process of what was happening to students who were sending in requests for information from the ECFMG, based on your knowledge of what was happening?

A    They were told they should transfer it to another medical school immediately.  They were told that they had to complete those affidavits or they could be assigned irregular behavior or be fined -- alleged for perjury.

There are various penalties for someone who may have graduated 10 years ago and may or may or not remember the exact dates that they started school.

Q    If you know, what was being -- what was happening to the students who didn't send in the affidavit, their records?  What was happening to their records, if you know?

A    Those records are frozen and they cannot proceed any farther until they complete the affidavits.

Q    What's the effect of having frozen records from the ECFMG?

A    You cannot proceed to the residency or licensure.

Q    These letters that they presented here today, did they present those letters to you?

A    No, they do not.

Q    Let me finish my question.

A    Oh.

Q    It -- by someone from the USFMG in the hearing?

A    No, they do not.

Q    They didn't give you an opportunity to respond to those letters, did they?

A    No, they do not.

Q   And one of the letters is obviously written by someone other than you?

A   Yes.

MS. MCENROE:  Objection, Your Honor.  Foundation. And is that a question?

THE COURT:  Sustained.

BY MR. SWATE:

Q   Appendix H, do you have that in front of you?

A   What page would that be?

Q   I don't know, I just have exhibit that -- it would be one of the last letters she showed you.

MR. SWATE:  Your Honor, can I approach the witness?

THE COURT:  You may.

THE WITNESS:  Yeah.

MR. SWATE:  I'm going to show you what's the what I have is it's right here, Appendix H.  And on the back of that, there's a letter supposedly from you.  Would you read the last sentence of that letter?

MS. MCENROE:  Your Honor, this was a letter was not authenticated --

THE COURT:  Yeah.

MS. MCENROE:  -- and not admitted into evidence.

THE COURT:  Yeah, this document was not admitted.  So therefore, any questioning about it is not appropriate.

MR. SWATE:  I'm not questioning the letter or

anything it stands for.  I'm requesting other than redirect, as a cross of her redirect?  Because obviously, the letter is not from him.

THE COURT:  Right on direct, there was the talk about authentication and admissibility.  And it was determined during that examination that it was not from him.  So therefore, it was not admitted.

MR. SWATE:  Okay, thank you.

BY MR. SWATE:

Q    Now they talked a little bit about this CAAM accreditation.

A    Right.

Q    When does that have to be in place?

A    2023.

Q    It doesn't have to be in place now, does it?

A    No.

Q    Have you got a valid license from Montserrat?

A    That is correct.

Q    At this time?

A    That is correct.

Q    In 2023, it's going to be like Cinderella?

A    Yeah.

MS. MCENROE:  Objection.

THE COURT:  Sustained.

BY MR. SWATE:

Q   Okay.

A   In 2023, we'll have it done.

THE COURT:  So if I sustain an objection, you do not answer the question.

THE WITNESS:  So.

BY MR. SWATE:

Q   Just one last question and I'll pass the witness. And I believe I've asked you, but just to -- they presented none of this evidence to the committee at the hearing, did they?

A   No, they did not.

MR. SWATE:  Pass.

THE COURT:  Now Ms. McEnroe, I believe at this point, it would be your redirect of their cross?

MS. MCENROE:  Your Honor, I have no further questions.  Thank you.

THE COURT:  You can leave the stand.

Anyone else any other witnesses?  No.

(Witness excused)

MS. MCENROE:  Not from --

THE COURT:  Okay, from Plaintiff, any other witnesses?

MR. SWATE:  Your Honor, before we rest, we have some documents we'd like to put into evidence.

THE COURT:  Well, do you have a witness who can --

Case 2:18-cv-07543-CWB Document 132-20 Filed 05/02/23 Page 286 345 546283

MR. SWATE: Ask Dr. to --

THE COURT: To Dr. Tulp?

MR. SWATE: To Dr. Tulp.

THE COURT: Okay. Go ahead.

MR. SWATE: Yeah. Since --

THE COURT: No, Dr. Tulp, you have to go back on the stand because he wants to introduce some documents through you.

MR. REIL: Your Honor, before I understand the -- maybe I'm at the wrong point of juncture, I just wanted to before we rest indicate what documents we wanted to introduce into evidence.

THE COURT: Well, I can tell you the ones that you have had had admitted. You've had Exhibit B, which is the World Directory note.

MR. REIL: That's one of them, yes.

THE COURT: You've had Exhibit C, which is the Montserrat Agreement.

MR. REIL: Okay.

THE COURT: You have Exhibit D, which is the affidavit.

MR. REIL: Yes. I thought there was also --

THE COURT: Wait a minute, we can -- you can say you thought that once live gone through everything. Let me see. I do not have records on Exhibit E, which is the November 21st, 2018 letter. Is that something that you wanted to have

admitted?

MR. REIL: Yes, there was testimony by Ms. Corrado on that. I would move to admit it.

THE COURT: Any objection?

MS. MCENROE: No, Your Honor.

THE COURT: That's admitted, too.

(Plaintiff's Exhibit E admitted into evidence)

MR. REIL: And I have one more.

THE COURT: Hold on. Which is the other one?

MR. REIL: The other one, I believe, that there was testimony on was --

THE COURT: Identify it, yeah.

MR. REIL: Yes, Exhibit G. It was the fifth letter down, the letter of 11/14/18 to Dr. -- Attorney Swate at page 22. I asked Ms. Corrado about that is my recollection about the faculty.

THE COURT: Exhibit G, did you say?

MR. REIL: Exhibit G. And I have six letters listed. It would be at page 23.

THE COURT: I have no indication that that was -- oh.

MR. REIL: If I might.

THE COURT: Okay, I don't an indication that that was admitted. That was the page 23, correct?

MR. REIL: Yes, Your Honor.

THE COURT: Any objection to page 23 being admitted?

MS. MCENROE:  No objection.

THE COURT:  That's admitted.

(Plaintiff's Exhibit G admitted into evidence)

MR. REIL:  That's all I have, Your Honor.

THE COURT:  Okay.

MS. MCENROE:  And Your Honor, while we're admitting exhibits, if you wouldn't mind, we have a number of exhibits attached to our opposition to our motion -- sorry, our opposition to the motion for preliminary injunction.

If you -- with the Court's permission, I'd like to recall Ms. Corrado, if I could, to authenticate and can I just have the exhibits admitted?

THE COURT:  I have no -- you can leave the stand now.

THE WITNESS:  Okay.

(Witness excused)

THE COURT:  I have no problem with that, but it will be better if you could just stipulate.  Which documents are they?

MS. MCENROE:  I don't know if you have the --

THE COURT:  I do.

MS. MCENROE:  -- exhibits in question.  So I would like to -- Exhibit 1 is a printout of the ECFMG website about ECFMG.

THE COURT:  Any objection to Exhibit 1 being admitted?

MR. REIL: Your Honor, we weren't given any notice that these exhibits were going to be put into --

THE COURT: Well, you're getting notice now, okay, that's what we're talking about.

MR. REIL: Oh.

THE COURT: So let's talk about it.

MR. REIL: Okay.

THE COURT: Let's talk turkey. Exhibit 1 to the Defendant's motion, you have any objection to that being admitted?

MS. MCENROE: Sure, I don't think the note's in here.

MR. REIL: I have to --

Yeah, fine.

Yeah, no objection.

THE COURT: Admitted.

   (Defendant's Exhibit 1 admitted into evidence)

MS. MCENROE: Exhibit 2, please, Your Honor?

THE COURT: The ECFMG Medical School policy -- international medical school definition. Any objection to that?

MR. REIL: I have to know what purpose it's being admitted for here?

MS. MCENROE: Your Honor, it's for the purposes as used in our opposition for the motion for preliminary injunction to help provide the factual background for the

Court, what we think is necessary to rebut the Plaintiff's motion for preliminary injunction.

In particular, this helps to lay out the fact that ECFMG defines international medical schools as an international medical school as an educational facility located in a country outside of the United States and Canada with its primary campus and main operations located in that country. And there's additional information in here, too.

THE COURT: Well, I'm going to tell you that I'm going to allow either Ms. Corrado or Ms. Cover to come up and talk about this document.

And I'm pretty sure it's admissible, given that it's an ECFMG school policy. So we can do the hard way or we can do it the easy way.

MR. REIL: Well, let's do it the easy way.

THE COURT: Excellent, that's admitted.

(Defendant's Exhibit 2 admitted into evidence)

MS. MCENROE: Thank you, Your Honor. Exhibit 3 is the 2009 information booklet for ECMG (sic). This -- each year, ECMG publishes an information booklet laying out a full range of information for the applicants coming through its processes.

This includes a copy of the irregular behavior policy. And I'd be prepared to introduce and have it authenticated by either Ms. Corrado or Ms. Clover.

THE COURT: Any objection?

MR. REIL: No, Your Honor -- yes, Your Honor. That applies to 2019. All right, that's what it says on there, ECFMG certification. I don't know how, if any, it is changed from what we were concerned of primarily, the hearing note in November of 2000.

THE COURT: What's your response to that?

MS. MCENROE: Understood, Your Honor. At the bottom, it has the September 13th, 2018. I believe this is sort of a school year 2019 document, but I'd be happy to get one of the witnesses up and they could testify as to any changes if necessary.

THE COURT: Okay.

MR. REIL: Would you be willing to stipulate -- oh, is your witness going to say that there are no changes?

MS. MCENROE: I think no relevant changes to the irregular behavior policy for certain.

MR. REIL: Yes, Your Honor.

THE COURT: Okay, that's admitted.

(Defendant's Exhibit 3 admitted into evidence)

MS. MCENROE: Thank you, Your Honor. Exhibit 4, I believe had already been admitted in the form of one of the D exhibits. So we can skip that one unless my co-counsel corrects me.

MR. REIL: That's correct.

MS. MCENROE:  Same with Exhibit 5 and Exhibit 6.

MR. REIL:  Just --

MS. MCENROE:  Sorry, I'm going fast.

MR. REIL:  My fingers don't work.  Okay, all right, all right.  4, we have to --

MS. MCENROE:  So --

THE COURT:  4 and 5 previously admitted?

MS. MCENROE:  Correct, Your Honor.  I believe 6 and 7 have also previously been admitted.

MR. REIL:  Counsel's representation, I agree.

THE COURT:  Okay.

MS. MCENROE:  Yeah, so I think we're up to Exhibit 8, Your Honor, which is another letter from Ms. Corrado to Dr. Tulp that we would submit for admission into evidence.

THE COURT:  Any objection?

MR. REIL:  No, Your Honor.

I have that anyway, I think.

(Defendant's Exhibit 8 admitted into evidence)

MS. MCENROE:  Your Honor, Exhibit 9 is a declaration from Ms. Corrado.  I submit for its admission into evidence today.

THE COURT:  That will not be admitted.  That's -- I'll just deal with that as a declaration.

MS. MCENROE:  Sure.

THE COURT:  All right.

MS. MCENROE:  I'd like to move for admission of Exhibit Number 10.  This is a letter from Mr. Swate counsel to Ms. Corrado

THE COURT:  Any objection?

MR. REIL:  One moment, Your Honor.  I'd like to know for what purpose this is being offered?

MS. MCENROE:  Again, this is another exhibit that's been submitted in conjunction with our opposition to preliminary injunction.  So I think it's on the face of our opposition about the facts that we've relied on before.

THE COURT:  Yeah, but it's a statement by an attorney containing his views on the litigation.  So I'm not going to allow that to be admitted.

MS. MCENROE:  Understood, Your Honor.

THE COURT:  Go ahead.

MS. MCENROE:  Exhibit 11's already been admitted. Sorry, Your Honor.  Just (indiscernible).  Again, Exhibit 12. Exhibit 13, I would move for admission of ECFMG meeting -- message that I'd be prepared to bring either Ms. Cover or Ms. Corrado up to authenticate.

MR. REIL:  One second, Your Honor or one moment, Your Honor.

THE COURT:  Uh-huh.  What is MECC Support?

MS. MCENROE:  The Medical Education Credentials Committee support.  So that committee that had the hearing in

November, it's called internally at ECFMG the MECC.

MR. REIL: Yes, Your Honor.

THE COURT: Okay.

(Defendant's Exhibit 13 admitted into evidence)

MS. MCENROE: Your Honor, I'd move for admission of Exhibit 14. This is an email from Ms. Corrado to Dr. Swate from November 2000 -- oh, you know what? Has this one already been admitted? I'm sorry. I think in a different form, Plaintiffs have this email admitted.

THE COURT: Okay, what else?

MS. MCENROE: Exhibit 1 -- Exhibit 15 is a hearing transcript and I'd move for its admission.

THE COURT: That I would just deal with as a transcript rather than an admitted document.

MS. MCENROE: Thank you, Your Honor. That's it from us, Your Honor. Thank you.

THE COURT: Okay, and argument? Opportunity for argument if you wish.

MR. REIL: Sure.

THE COURT: Would you like to take a brief break before we started argument?

MS. MCENROE: That would be appreciated.

MR. REIL: Yes, Your Honor.

THE COURT: Five minutes.

MS. MCENROE: Thank you.

THE COURT RECORDER: All rise.

(Recess at 4:38 p.m., until 4:47 p.m.)

THE COURT RECORDER: All rise.

THE COURT: Okay, let's hear argument.

MS. MCENROE: Your Honor, it's my position that it's their burden of proof, so --

THE COURT: Yes, we already -- well, they would have to go first.

MS. MCENROE: Thank you, Your Honor.

MR. SWATE: If it pleases the Court, ECFMG had agreed on their own that all documents and applications from students of USAT would be honored until January the 1st, 2019.

Nothing has -- nothing changed on that date. This is not an allegation that you're running a rogue school. The result of the students have been exemplary students who normally wouldn't have the opportunity to go to medical school, they would go to medical school. They achieved great results on the test.

If the ECFMG tests are valid indications of education of the students, the students are getting a great education at USAT.

The harm that would result to USAT and Dr. Tulp would be it essentially closes the school down. That's the practical effect of not allowing the status quo to be maintained.

With its notations on the website, the student that

reads that is certainly not going to enroll in a school or not going to continue.

Now the damage to the students is the students are in various stages of education. Some are in their second year. Some are in their third year. Some are in their fourth year.

So by just wiping that out immediately, it would do a great harm to them, but also, it'd be great harm to the docket, too, because he has a property interest in the medical school.

Public policy, the students who have graduated in USAT have been a benefit to the medical system in the United States. You're not unleashing incompetent students. They go forward, and they do a good job, and they take care of American citizens that need medical care.

The damage to ECFMG by allowing the status quo to be maintained till this issue is resolved is minimal, because the issues we're going to be presenting is our position is that ECFMG is a quasi-government agency. They've been delegated by every state and agency -- every state and medical board in this country to qualify international medical students.

So if they can enter the system without opening a schedule, then the students are blocked from entering the system.

So there's no damage. They can't claim well, you're producing these horrible students, a locus on the United States and harming people. There's no harm to be done by allowing the

status quo to exist.

It also benefits the general public, because 25 percent of health care in the United States is rendered by international medical graduates that go through this ECFMG process.

And that -- our position is Dr. Tulp was obviously denied due process. Now whether he is entitled to it or not entitled to it is a question to be resolved. Whether ECFMG has to give him some degree of due process is a question to be answered later on.

And I think it will be answered in this case. But the question today is what harm or result of maintaining the status quo? And that's what we're asking to do, maintain the status quo until this case is decided.

And I don't think they can demonstrate any great harm to the students if they're allowed the next six months or eight months, however long it takes to resolve the case, because they will probably resolve very quick to continue with their education.

And then at the end, if they need to transfer, like they were -- they suggesting January the 1st, 2019, they can and the damage has been done.

That's the -- the fact issue in this case is what I believe is not the issue today. The issue today is not the facts, because they didn't -- they would not give us the facts

at the hearing. Just refused to do so.

And again, there's all kinds of questions about the process. But with respect to that, I ask the Court to issue a temporary injunction to allow the -- that would require that ECFMG to process the students' paperwork.

It doesn't mean that they have to agree to every piece of paper that comes along. They do their normal procedure, but they just process the paperwork in a normal fashion instead of just totally blocking it.

And if they have problems with the paperwork, of course, they could do whatever is reasonable to do. And I think that's our approach and we believe it's reasonable. Thank you.

THE COURT: Thank you. Ms. McEnroe?

MS. MCENROE: May I approach, Your Honor?

THE COURT: You may.

MS. MCENROE: Your Honor, I'm going to try to keep this brief, because we briefed it extensively in our papers. So I'm not going to hit every point, but there are a number of things I want to just make sure I clarify.

Mr. Swate said a number of times that he was seeking to maintain the status quo. This motion for preliminary injunction that's being cited today was filed on January 2nd, 2019.

The status quo as of that time is that the finding of

Case 2:18-cv-01054-GWB Document 132-20 Filed 05/02/17/23 Page 299 35 554 0296

irregular behavior had already gone into effect and the sponsor note had already gone into effect.

What changed January 1st, 2019 is the issue that counsel brought up a number of times. That date had been noticed to the public and to USAT from October 2018.

Their public policy and student interest definitely keeps raising, notably, USAT is not a party here. The students are not a party here. ECFMG takes its role in trying to protect the public and interfacing with the students and graduates that it works with very seriously.

And what happened on January 1st, 2019 is that the notice ECFMG had provided in advance about the change in status of this school went into effect.

And why did it go into effect? Because ECFMG was not sure and hadn't been provided evidence that USAT is truly international medical school.

ECFMG only tries to reach as far as its grasp. It's not trying to issue sponsor notes to the University of Pennsylvania Medical School.

It's not trying to issue certificates to graduates of medical schools that it does not deem to be within its -- and within its definition of an international medical school.

University of Sciences, Arts, and Technology does not fall within that definition as far as ECFMG is concerned. And that's become abundantly clear.

There's a -- you know, we can talk semantics on campus, not campus, whatever. We heard today, and it's been admitted into evidence, Dr. Tulp has called it a Miami campus. There were cadavers dissected in Miami. There was education happening in the United States. But yet, he hasn't gotten his school to be accredited as a medical school in the United States.

At the same time, ECFMG has failed to declare that it doesn't feel capable of certifying its graduates going forward, because it's concerned that it's not an international medical school to meet ECFMG's definition.

That puts it as sort of a loophole school, that's not going to be getting its authorization from anybody, which is a concern to ECFMG, which tries and its mission is to protect the health of the public.

ECFMG is (indiscernible) to hear -- it's wonderful to hear that the USAT students are great doctors in serving the public in the United States because there are 13 years, or 15 years, sorry, 15 years of graduates from that school that are eligible to become medical professionals in the United States through residency programs and certification from the ECFMG.

We have not taken -- ECFMG has not taken action to file allegations of irregular behavior or take other sort of actions against students from USAT on this basis retrospectively.

Prospectively, ECFMG provided notice.  But it may be I'm getting too much in the weeds, because the truth of it is we're here for a preliminary injunction.

And one day, I may be here arguing the full merits of the case.  And Plaintiff just has not met the very high standard for a preliminary injunction.

The status quo issue, I think, is a big one.  I think we're sitting here now where the status quo they're seeking to have overturned is that ECFMG would have to start recognizing USAT, when it already has stopped recognizing USAT, basically putting us in a position that if we were to be ordered to change the sponsor note now, ECFMG would be getting forced by this Court to tell the public that ECFMG deems graduates from USAT to be eligible to be certified by ECFMG when ECFMG does not deem that to be true.

If this Court were to go one step further, it would be on this Court's discretion to tell us that we must certify those graduates if they meet our other requirements substituting this Court's opinion for ECFMG's.

So that I'm just trying to make sure, practically speaking, it's clear what it is that an injunction here would be seeking to do.

We think that just proves too much and goes too far, especially on the very thin record that Plaintiffs have provided you.

Plaintiff notably has not provided any evidence that the underlying basis for ECFMG to take the action that it has is incorrect, other than semantics.

Trying to say an administrative location versus a campus, even though they admit that students were dissecting cadavers in the United States and taking other extensive lecture courses, which is in that lecture document we had admitted into evidence.

This is troubling to us. And they've had a lot of opportunities to fix it. They could have even handed us something today, said hey, Florida or Colorado, and somewhere in the United States where we're doing these things, authorizes us to do so and they haven't done that.

And we posit it's because they can't. And until they can satisfy that they are truly an authorized school, operating the way that they would need to, to qualify as an international medical school for our purposes, we just don't think we have the authority. We're trying to be limited here in what we can possibly do.

Now we communicated that publicly through our sponsor note, saying the truth of it is, hey, student -- potential students, hey, others in the medical world, so you know, if someone comes to us who's a 2019 grad, a 2020 grad, they're not going to be eligible for certification.

We're trying to -- we're not trying to besmirch

anyone. We're trying to just be accurate, so that there's fair warning out in the public, so that people know.

In terms of due process, I would encourage Your Honor to look at the extensive jurisprudence we've provided to you on ECFMG being a state actor or not.

The 3rd Circuit has held that ECFMG is not a state actor. Other courts in this district have similarly so held. We would posit that there hasn't been evidence taken or submitted to indicate otherwise.

Counsel argued that 25 percent of health care in the United States comes through the ECFMG. We take our obligation very seriously.

And we are very concerned that if we were to misrepresent USAT's role, if we were to abdicate on our obligation to try and say, hey, we think this is a legitimate school or we don't think this is a legitimate school, we worry that we would lose the credibility of doing that in the market place, which we find to be our goal.

That's what we do. We're good at it. We try and go around and certify that students have done what they need to do to enter residency programs in the United States.

We encourage Your Honor not to undermine that authority that we have reasonably exercised. Dr. Tulp got extensive notice. Dr. Tulp got extensive opportunities to present his facts to us.

I submit to Your Honor, when you read the transcript from the hearing on November 28th, it's correct. I shut down the hearing, because counsel was completely and utterly preventing the committee from asking any questions of Dr. Tulp, to get any sort of clarification on the facts and to understand.

We weren't trying to deny anyone due process. We were trying to provide an extra layer of due process above what we, a nonstate actor, even would need to provide.

So at the risk of not going on and on, Your Honor, if there's a particular thing you'd like to hear about, I'd be happy to argue further, but otherwise, I can let us bring this to a close.

THE COURT: Okay, thank you.

MS. MCENROE: Thank you.

THE COURT: Present and before the Court is Plaintiff's motion for a preliminary injunction against Defendant's Education Commission for Foreign Medical Graduates, known as ECFMG and Dr. William Pinsky, collectively Defendants.

Plaintiff is president of the University of Science, Arts, and Technology, USAT, a medical school located on the British overseas territory of Montserrat.

ECFMG is a private nonprofit organization based in Philadelphia, but certifies foreign medical school graduates, so that those students can pursue postgraduate medical training

in the United States.

With a certification from ECFMG, graduates of foreign medical schools like USAT begin the process of practicing medicine in the United States.  Pinsky is the president and CEO of ECFMG.

Plaintiff's suit is in effect, a response to disciplinary action taken by ECFMG against USAT and Tulp specifically.

According to documents attached to the complaint and admitted here at the hearing today, ECFMG investigated and subsequently sanctioned USAT and Tulp for providing false information to ECFMG regarding the school's activities.

Specifically, ECFMG found that, one, USAT was operating unauthorized branch campuses within the United States; and two, Tulp personally provided false information to ECFMG regarding USAT's student attendance.

Following a hearing before ECFMG's board, at which Pinsky presided, ECFMG concluded that Tulp had -- that Tulp and -- Tulp had engaged in behavior that violated ECFMG's policies and procedures.

As a result, ECFMG took the following action.  It determined that it will not accept any documents signed and/or certified by Tulp for a period of five years; two, it undertook steps to verify that USAT graduates had in fact attended USAT's Montserrat campus; and three, held that USAT graduates with a

Case 2:18-cv-07540-GWB Document 132-20 Filed 05/03/23 Page 306 of 614
Case 2:17-cv-05540-GWB Document 132-20 Filed 05/03/23 Page 306 of 614   JA0303

128

graduation year of 2019 and beyond are no longer eligible to apply for ECFMG certification.

Plaintiff's suit alleges that Defendants violated his constitutional rights and committed various common law torts. He moved for a preliminary injunction, asking this Court to enjoin Defendants from taking any further adverse action against Plaintiff, resume processing the medical examinations of the students of USAT, and release their examination scores, and remove the negative advisory from the sponsor notes on the World Directory of Medical Schools listing for the USAT College of Medicine.

A Plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tip in his favor, and that an injunction is in the public interest, that is Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, page 20, 2008.

The failure to establish any element renders a preliminary injunction inappropriate. That is Nutrasweet Company v. Vit-Mar Enterprises, Inc., 176 F.3d 151, page 153, 3rd Circuit, 1999.

The movant bears the burden of showing that these four factors weigh in favor of granting the injunction. See Opticians Association of America v. Independent Opticians of

Case 2:18-cv-07540-CWB   Document 132-20   Filed 05/08/19   Page 307 of 365   JA0304

*America*, 920 F.2d 187, page 192, 3rd Circuit, 1990.

Plaintiff's complaint includes four causes of action or four claims labeled as causes of actions. At the beginning of this hearing, I clarified with Plaintiff what those claims were and also clarified which claims the Plaintiff was proceeding on in this preliminary injunction hearing. Plaintiff's lawyer informed me that he was proceeding on the constitutional claims, the §1983 claims.

Turning to the likelihood of success on the merits, and that is Counts II and IV, §1983 claims, I find that Plaintiff is unlikely to prevail on his §1983 claims because they require a showing of state action, which is not present here.

To prevail on a §1983 claim, Plaintiff must allegedly violation of a right secured by the constitutional laws of the United States committed by a person acting undercover of state law. That's West v. Atkins, 487 U.S. 42, page 48, 1988.

The 3rd Circuit has held that as a private not-for-profit organization, ECFMG is a private party and not a state actor.

That's Opoku v. Education Commission for Foreign Medical Graduates, 574 F.Appx. 197, page 201, 3rd Circuit of 2014.

As has the Southern District of New York in Stoninger (phonetic) v. Educational Commission for Foreign Medical

Graduates, 1993 Westlaw 138954 at page 2, SDNY, April 28th, 1993, concluding ECFMG is not a state actor.

To the extent that Opoku is a nonprecedential decision in that it is a nonpublished decision, I look to possible exceptions to the state or instances where a private actor can be found to engage in state action.

Those instances are limited and as set forth in McKeesport Hospital v. Accreditation Counsel for Graduate Medical Education, 24 F.3d 519, 524, 3rd Circuit, those instances are if the private party acted with the help of or in concert with state officials. In this case, there is no indication that that happened.

Two, when the private party has been delegated their power, traditionally exclusively reserved to the state. In this case, there is no evidence that that is the case.

Or three, if there is a sufficiently close nexus between the State and the challenge action of the private entity, so that the action of the latter may be fairly treated as the state itself.

In this case, the testimony was that ECFMG is a nonprofit organization. And although there was testimony that licensing boards in the United States generally require certification through -- of students through ECFMG, the testimony was that that requirement is a discretionary requirement. Accordingly, I find that ECFMG has not shown at

this juncture of the litigation that it is a state actor.

While the lack of state action ultimately dooms Plaintiff's constitutional claims, it is far from the only problem with the §1983 claiMs.

ECFMG's disciplinary hearing seemingly meet the -- meets the requirements of due process in that an essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case. Cleveland Board of Education v. Loudermill, 470 U.S. 532, 542, 1985. In this case, there was notice and an opportunity to be heard.

As for Plaintiff's substantive due process claims, the complaint does not identify a protected property interest that falls within the ambit of substantive of due process. Nicholas v. Pennsylvania State University, 227 F.3d, 133, page 141, 3rd Circuit, 2000.

Thus, Plaintiff's constitutional claims are likely to fail, such that a preliminary injunction should not issue on those claims.

Turning, however, in an excess of caution to the irreparable harm prong on the preliminary injunction standard, in addition to establishing a likelihood of success on the merit, Plaintiff must also establish that he stands to suffer irreparable harm if no injunction is issued.

Establishing a risk of irreparable harm is not

enough. A Plaintiff has the burden of proving a clear showing of immediate irreparable harm.

The requisite feared injury or harm must be irreparable, not merely serious or substantial and it must be of a peculiar nature, so that compensation in money cannot atone for it. That is Campbell Soup Company v. Conagra, Inc., 977 F.2d, 86, page 92, 93, 3rd Circuit, 1992.

Plaintiff has made several arguments with respect to the alleged harm that will befall USAT and its students. With respect to USAT, the testimony was that there has been a fall-off in applications and that tuition payments have ceased.

Nevertheless, the testimony was also that USAT may continue as an institution, so long as Dr. Tulp is not a signatory. Someone else from USAT could become an authorized signatory. And USAT is not disqualified from substituting a different person as the authorized signatory.

Similarly with students, the testimony is that as yet, there is -- no harm has befallen any students in that students who graduated in 2018, up and through 2018, can still go through the ECFMG process.

While students are -- who graduate in 2019 cannot, they can transfer for their credits and also the first graduation will be this summer. So is -- there is no immediate harm.

I go through the alleged harm to the students and to

USAT merely to illustrate that if the students or USAT were to bring this preliminary injunction at present on the evidence on the record, they would not have been able to meet the irreparable harm standard.

Turning now to the harm that Plaintiff, as in Dr. Tulp, says that he has or will suffer, he says in effect that his business will stand to suffer because of Defendant's actions.

Generally monetary harm in the form of lost business does not constitute irreparable harm, because damages would be an immediate remedy. And that is Franks GMC Truck Center v. -- Inc. v. General Motors, Corp., 847 F.2d 100, 102, 3rd Circuit, 1988.

However, some courts have recognized that the recoverable monetary loss may constitute irreparable harm where the loss threatens the very existence of the movant's business. See Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc., 559 F.2d 849, 843, note 2, D.C. Circuit, 1977.

Here, Plaintiff has the burden of proving through a clear showing of immediate irreparable injury that he will suffer such harm absent an injunction. That's ECRI, 809 F.2d at 226.

But as already discussed, there is no reason to believe that with a change of signatory, and that USAT will not be able to continue and therefore, in fact, the business need

not fail.

Thus, Plaintiff has not shown immediate irreparable injury resulting from ECFMG's action and thus I will deny the motion for preliminary injunction.

Turning now to one other issue, there was Defendant's motion to quash. And I think that was wanting Mr. Pinsky at the PI hearing. I understand that that is now moot?

MS. MCENROE: Correct.

THE COURT: Okay, so I will moot that out.

MR. REIL: Yes, Your Honor.

Now I'm going to turn to the Rule 16 conference.

MS. MCENROE: Your Honor, if I may with permission, some of my witnesses have child care obligations (indiscernible) if that's okay?

THE COURT: Go ahead. Yeah.

MS. MCENROE: Thank you.

THE COURT: I don't need those on the record. Okay, so --

(Proceedings concluded at 5:14 p.m.)

**CERTIFICATE**

I, Chris Hwang, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____        <u>February 14, 2019</u>

Chris Hwang                    Date

Transcriber

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NO. 2:18-cv-05540-WB

DR. ORIEN L. TULP          )  DEPOSITION UPON
                           )
         Plaintiff,        )  ORAL EXAMINATION
                           )
    - vs -                 )             OF
                           )
EDUCATIONAL                )  WILLIAM W.
COMMISSION FOR             )  PINSKY, M.D.
FOREIGN MEDICAL            )
GRADUATES and DR.          )
WILLIAM W. PINSKY          )
                           )
         Defendants.       )

- - - - - - - - - -

TRANSCRIPT OF DEPOSITION, taken by and before DANA M. JONES, Professional Reporter and Notary Public, at the offices of MORGAN LEWIS, 1701 Market Street, 18th Floor, Philadelphia, Pennsylvania, on Wednesday, February 6, 2019, commencing at 10:00 a.m.

GOLKOW LITIGATION SERVICES

877.370.3377 ph/917.591.5672 fax

Deps@golkow.com

A P P E A R A N C E S:

        LAW OFFICES OF WILLIAM C.
        REIL
        BY:  WILLIAM C. REIL,
        ESQUIRE
          1515 Market Street
          Suite 1200
          Philadelphia, PA  19102
             Attorney for the
        Plaintiff

        MORGAN LEWIS & BOCKIUS LLP
        BY:  ELISA P. MCENROE,
        ESQUIRE
          1701 Market Street
          18th Floor
          Philadelphia, PA  19103
             Attorney for the
        Defendants

        ECFMG/FAIMER
        BY:  FRANCINE HALUSHKA KATZ,
        ESQUIRE
          3624 Market Street
          Philadelphia, PA  19104
             Senior Vice President
        and General Counsel

A L S O   P R E S E N T:

Dr. Orien Tulp

Christina Beatrice - Paralegal to William
Reid, Esquire.

                        I N D E X


     WITNESS                                    PAGE


     WILLIAM W. PINSKY, M.D.


          By:  Mr. Reil                          6

          By:  Ms. McEnroe                        X




                          - - -




                      E X H I B I T S




     NUMBER           DESCRIPTION         PAGE


     Pinsky-1      Compilation of
                   Documents            6

LITIGATION SUPPORT PAGE

INSTRUCTION NOT TO ANSWER

PAGE     LINE

(None)


     REQUEST FOR PRODUCTION OF DOCUMENTS


PAGE   LINE


(None)

(By agreement of counsel, the sealing, filing, and certification of the transcript has been waived; and all objections, except as to the form of the question, have been reserved until the time of trial.)

DR. WILLIAM PINSKY, after having been duly sworn, was examined and testified as follows:

(At this time, Compilation of documents was marked for identification as Exhibit Pinsky-1.)

COURT REPORTER:  Usual stipulations?

MS. MCENROE:  We'll reserve all objections --

MR. REIL:  Okay.

MS. MCENROE:  -- other than as to form until the time of trial.

I don't know if there are other stipulations you were

looking for.

MR. REIL:  The -- let's go off the record.

(At this time, a discussion was held off the record.)

MS. MCENROE:  And we will read and sign.

MR. REIL:  Before we begin, I have this as Pinsky-1.  It's identical to what I used at the hearing.  I just put the moniker Pinsky-1 on there.

I have one for the witness and does the court reporter need one?

COURT REPORTER:  Sure.

(At this time, a packet of exhibits was marked for identification as Exhibit Pinsky-1.)

- - -

EXAMINATION

- - -

BY MR. REIL:

Q.    Dr. Pinsky, I'm Bill Reil. I'm the attorney, one of the attorneys, along with Tommy Swate for Dr. Tulp.  I'm not going to go through a lot of instructions for depositions because I'm sure your attorney has done that with you.  I guess there's a couple that, you know, that I should mention, that I'm sure you've already heard.

Your answers have to be verbal.  So shakes of the head and things like that are hard to get down on the record.  We don't want you to guess or I don't want you to guess but, you know, you can estimate things if you want to.

If you don't understand the question, you're allowed to say you don't understand, you know, the question.  And then there's another litany of things, which I'm sure you've heard that I'm not going to -- that I'm not going to bother to go over.

Oh, yeah, one I guess I should, right -- is there any reason that

you can't give a deposition today:  Don't feel well, medical problems, anything like that?

A.    No.

Q.    All right.  I think I'm going to begin by finding out a little bit of your background if I might.

Let's see.  How long have you been a medical doctor?

A.    I graduated from medical school in 1973.

Q.    And where was that?

A.    Saint Louis University.

Q.    And can you give me a thumbnail sketch of what your medical practice has consisted of from 1973 to the present?

MS. MCENROE:  Objection to form.  You can answer.

THE WITNESS:  Yes.  So my goals after graduating from medical school was to be a pediatric cardiologist and to be an academic pediatric

William W. Pinsky, M.D.

cardiologist.  And I, after doing my residency and fellowship, was on the faculty full time at several different universities.

BY MR. REIL:

Q.    And how did you come to be associated with the ECFMG?

A.    The prior CEO was retiring and a search firm was engaged to find a successor and they contacted me to see if I had interest.

Q.    Okay.  And I am going to, even though I know the board is not the ECFMG, it's just part of it, right, maybe sometime I'll say the board, it's a little shorter than all the initials.

When did you first join the ECFMG?

A.    I came in this position in July of 2016.

Q.    When you say you came in this position, what position is that?

A.    As President and CEO.

Q.    Okay.  Were you a member of

the, if I'm phrasing it right, were you a member of the ECFMG before that?

MS. MCENROE: Objection to form.

THE WITNESS: I don't know what member means.

BY MR. REIL:

Q. Well, let's talk about -- I don't know if we -- when was your first association with the ECFMG?

A. As an employee?

Q. Yes. In any capacity.

A. Well, I became aware of ECFMG when I was in medical school --

Q. Okay.

A. -- because I knew that there were certain physicians that had to come through the ECFMG to be able to practice.

Q. Go ahead. I'm sorry, I'm interrupting.

A. No. That's when I first heard of ECFMG.

Q. Right. And does one do -- did you -- how does it work? Did you

join the ECFMG as a member, as an employee?  Did you -- did your association become more formal at some time?

MS. MCENROE:  Objection to form.

THE WITNESS:  So July 1st I was hired -- I began my employment as President and CEO.

BY MR. REIL:

Q.    President and CEO.  Okay.

And before that, were you employed at all by the ECFMG?

A.    No.

Q.    Can you give me a summary of what your job duties are as President and CEO?  I'll call it the board but I mean ECFMG because I can say it easy.

MS. MCENROE:  Objection to form.

THE WITNESS:  So I am responsible and accountable to the board.  I'm the single employee that's accountable to them.  And I

have the responsibility and accountability for meeting the expectations of the board in terms of overall performance of the organization.

BY MR. REIL:

Q.   When you say you're accountable to the board, can you elaborate on that?

A.   They do an annual review of my performance.

Q.   And how many people are on the board?

A.   I think that there are 17 at the moment.  I could be off by one or two because we've gone through some transition of right sizing --

Q.   -- well, that's good enough. And you're also the CEO of the board?

A.   No.

Q.   No.  Who is?

A.   There's a Chairman of the board.

Q.   There's a Chairman of the

board.  And who would that person be?

A.   Currently the Chair of the board is Dr. Andy Filak.

Q.   Could you spell that for me?

A.   F, like in Frank, I-L-A-K.

Q.   Okay.  And does Dr. Filak work out of the building where you work at, 36th and Market?

A.   No.

Q.   Where does he work out of?

A.   In Cincinnati.

Q.   36th and Market is the headquarters of the ECFMG; right?

A.   Yes.

Q.   What is in Cincinnati?

A.   That's where Dr. Filak is employed.  Our board members are voluntary board members so they have all have other positions.

Q.   Now, I believe, and correct me if I'm wrong, that you said you're the President and CEO.

A.   Yes.

Q.   Okay.  What do you do in

your capacity as CEO?

MS. MCENROE:  Objection to form.

BY MR. REIL:

Q.    You can answer.

A.    I oversee the operations of the organization.

Q.    Is one of your functions to carry out the policies of the organization?

MS. MCENROE:  Objection to form.

THE WITNESS:  It's my responsibility to assure that the leadership and employees follow the policies of the organization.

BY MR. REIL:

Q.    I see.  And how do you generally -- how do you do that?

A.    By trust and verify.

Q.    So is it fair to say that a part of your job is to be familiar with the policies of -- I like your word, the organization?

A.    Yes.

Q.    Now, when did you become aware of my client, Dr. Tulp?

A.    Probably somewhere partway through 2018.

Q.    And how did Dr. Tulp come to your attention?

A.    Conversation was initiated to inform me of a possible policy violation.

Q.    And with whom did you have that conversation?

A.    I have to assume it was with the leadership of the Operations Group and I think probably with counsel as well.

Q.    Well, we don't want anything you told counsel.

But you said you had that conversation, do you remember the name of the person you had the conversation with?

A.    I would assume it was with Ms. Corrado and Cover.

Q.    And what were you told?

MS. MCENROE:  So I'll object to the extent it calls for privileged information.  I don't know if that's why you're hesitating.

THE WITNESS:  That's why I'm hesitating, yes.

MS. MCENROE:  So substantively not to divulge anything that was communicated to counsel for the purpose of getting legal advice.  But facts communicated to you unrelated to seeking legal advice you can testify about.

MR. REIL:  I agree with that.

THE WITNESS:  So as I recall, I was told that there was an issue that a medical school was operating in the United States and not as an international school.

BY MR. REIL:

Q.    And you we're talking about

William W. Pinsky, M.D.

USAT?

A. Yes.

Q. And did Ms. Corrado or Ms. Cover give any sort of written report or memo about this illegal operation to you?

MS. MCENROE: Objection to form.

THE WITNESS: I don't recall receiving it.

BY MR. REIL:

Q. Well, if you didn't receive one, where would it be?

MS. MCENROE: Objection to form.

THE WITNESS: I'm not sure what you're asking me.

BY MR. REIL:

Q. Well, I think you said you didn't recall receiving one. Okay?

A. I recall this as a conversation not as a written report.

Q. Did you ask either -- have you received any memos from or -- from Ms. Corrado about either Dr. Tulp or the

William W. Pinsky, M.D.

USAT?

MS. MCENROE:  Objection to form.

THE WITNESS:  Yeah, I don't recall receiving it.

BY MR. REIL:

Q.   Okay.  You don't recall.

If you did receive them, where would they be?

A.   If they were electronic they would be in an e-mail I assume.

Q.   I didn't hear you.

A.   I said if it was electronic I assume it would be in an e-mail somewhere, but I don't recall receiving anything.

Q.   By the way, I have a question, I don't want to go too far afield.  I have a question about Ms. Corrado.  We have several documents from her where she has JD, Juris Doctor after her name, is she an attorney?

MS. MCENROE:  Objection to form.

William W. Pinsky, M.D.

THE WITNESS:  Yes.  I believe she graduated from law school.

BY MR. REIL:

Q.    Do you know what law school it was?

A.    No.

Q.    Now, I take it, did you in your conversation with Ms. Corrado and Ms. Cover, do you recall how they got the information, alleged information, about the illegal activities of USAT?

MS. MCENROE:  Objection to form.

THE WITNESS:  So I recall in the conversation that there was a parent of a, I believe, a prospective student, who had been told that they -- if they enrolled into school they would be going to a campus in the United States.

BY MR. REIL:

Q.    Prior to that time, had USAT come to your attention with regard to any

alleged infractions?

MS. MCENROE:  Objection to form.

THE WITNESS:  I don't believe so.

BY MR. REIL:

Q.    Was there any prior initiation of irregular behavior prior to this particular, shall we say incident --

MS. MCENROE:  Objection --

MR. REIL:  -- against Dr. Tulp.

MS. MCENROE:  Objection to form.

THE WITNESS:  Not that I'm aware of.

BY MR. REIL:

Q.    You say it came to your -- you mentioned a question or two ago about a letter from a parent.  Okay?

A.    Well, I'm not sure if it was a letter.  It was some sort of communication, not to me, but to the Operations Department.

Q.    To the Operations Department?

A.    To Ms. Corrado's department.

Q.    Ms. Corrado is the head of the Operations Department?

A.    Ms. Cover is.

Q.    Ms. Corrado works in the Operations Department?

A.    Yes.

Q.    Do you know if that conversation was memorialized anywhere by e-mail or writing?

A.    I don't know.

Q.    If it was, who would -- who would have it, would it be Ms. Cover?

MS. MCENROE:  Objection to form.

THE WITNESS:  I would assume so.

BY MR. REIL:

Q.    Did the -- is there -- oh, I should have asked you, I've been a little remiss.  Let me back up.

Before you came to the

William W. Pinsky, M.D.

deposition today, did you review any

documents?

A.    Just a couple.

Q.    Can you remember what they

were?

A.    So one was the letter that

we sent to Dr. Tulp following the

appearance before the committee and the

other was the order for the deposition

today.

Q.    And you were actually

present at Dr. Tulp's hearing before the

committee on, I think it was 11/24?

MS. MCENROE:  Objection to

form.

THE WITNESS:  Yes.

DR. TULP:  11/28.

BY MR. REIL:

Q.    11/28.

MR. REIL:  Thank you,

Doctor.

THE WITNESS:  Whatever the

day was, yes.

BY MR. REIL:

William W. Pinsky, M.D.

Q.   And were you present for the whole hearing?

A.   Yes.

Q.   Now, at some point did you become aware that ECM launched a formal investigation of Dr. Tulp and USAT?

I'm talking other than what the parent communicated to you.

MS. MCENROE:  Objection to form.

THE WITNESS:  So I'm not sure exactly what you mean by formal investigation.

BY MR. REIL:

Q.   Well, at some point did the organization hire people or use employees to investigate these allegations of campuses in the United States?

MS. MCENROE:  Objection to form.

THE WITNESS:  So I'm aware that we requested affidavits from students to determine where they were attending school.  And staff

reviewed, I believe, other information that was available.

BY MR. REIL:

Q.   In this investigation of USAT and its alleged United States campuses, were any outside people hired? And by outside people, I mean, private investigators or people who were not working for the organization.

MS. MCENROE:  Objection to form.

THE WITNESS:  So people not working for the organization, you mean, that are not full time employees; is that what you're asking?

BY MR. REIL:

Q.   Yes, like private investigators.

A.   I believe I'm aware at some point somebody was hired to visit the campus.

Q.   And when you say somebody was hired, was that somebody who worked

for the organization or was that an outside person?

MS. MCENROE:  Objection to form.

THE WITNESS:  Outside person that was hired to do that.

BY MR. REIL:

Q.    Okay.  Was it just one person or do you know if it was more than one person?

A.    I have no idea.

Q.    Who hired them?

A.    I don't know.

Q.    Who would know that?

MS. MCENROE:  Objection to form.

THE WITNESS:  The person that hired them.

Somebody in the Operations Department would know.

BY MR. REIL:

Q.    Is it likely that Ms. Cover would know that?

MS. MCENROE:  Objection to

form.

THE WITNESS:  Possibly.

BY MR. REIL:

Q.   And when this -- was -- strike that.

When this person reviewed the alleged campuses, did they make a report back to the organization, if you know?

A.   I don't know.

MS. MCENROE:  Objection to form.

THE WITNESS:  I never saw a report.

BY MR. REIL:

Q.   Well, did you ever speak with Ms. Cover or any other employee of your organization and say, well, what's happening with the investigation of Dr. Tulp?

A.   I don't remember having a direct conversation about that.

Q.   Well, how about what you know?

MS. MCENROE: Objection to form.

THE WITNESS: I believe that somebody visited the campus and saw that there was -- there was -- they were building a building or buildings. But I don't know anything more than that.

BY MR. REIL:

Q. And did you see any -- did you see any pictures?

A. No.

Q. Did you see any deeds for property?

A. No.

MS. MCENROE: Objection to form.

THE WITNESS: No.

BY MR. REIL:

Q. By the way, in any of its documents or bulletins, does the organization define the term campus?

MS. MCENROE: Objection to form.

JA0338

BY MR. REIL:

Q.   As far as you know?

A.   I'm not sure.

Q.   Does the organization have a file on Dr. Tulp?

A.   I'm not sure what you mean by a file.

Q.   Repository where investigative reports, things pertinent to the investigation would be kept?

A.   I assume that records are collated in reference to USAT.

Q.   And where would that information be?

A.   It would be within the Operations Group.

Q.   Within the Operations Group.

And Ms. Cover is the head of the Operations Group?

A.   Yes.

Q.   And is it fair to say she's also your second in command?

MS. MCENROE:  Objection to form.

THE WITNESS:  No.

MR. REIL:  No.  Okay.

BY MR. REIL:

Q.    Who is the second in command underneath you?

A.    Mr. Donohue.  Dennis Donohue.

Q.    Perhaps we can save some time, if you could enlighten me, starting with yourself at the top of the pyramid and give me a little idea of how the chain of command works at the organization?

MS. MCENROE:  Objection to form.

THE WITNESS:  So my direct reports are Mr. Donohue.  Mr. Donohue has his direct reports that include Ms. Cover, the Head of HR, CFO, project management person.  I believe that's his direct reports.

My other direct reports are general counsel, the Director and

Secretary of the Board and the President of FAIMER. Capital F, A-I-M-E-R. All capitalized.

BY MR. REIL:

Q. Would you explain to me what FAIMER is?

A. It's the Foundation For the Advancement of International Medical Education and Research. It's a separate 501 (c3) but basically a subsidiary 501 (c3) and they're involved in international medical education. Basically, to improve medical education by mentoring and training medical educators around the world.

Q. To your knowledge, did anyone from the organization ever visit USAT in Montserrat?

MS. MCENROE: Objection to form.

THE WITNESS: Not that I know.

BY MR. REIL:

Q. Why not?

William W. Pinsky, M.D.

A.    I don't know how to answer that question.

Q.    Well, as president of USAT, what was the relationship -- and we're talking about 15 years, I believe the university started around 2003.

Let me rephrase that question.

What was the relationship between the organization and Dr. Tulp?

MS. MCENROE:  Objection to form.

THE WITNESS:  Well, I can't speak prior to two-and-a-half years ago.  I'm not sure there was any relationship at all.

BY MR. REIL:

Q.    And two years ago you received the -- you heard of a conversation -- the organization heard of a conversation or communication from a parent that there were campuses in the United States.  Do I have that right?

MS. MCENROE:  Objection to

William W. Pinsky, M.D.

form.

THE WITNESS:  Yes.

BY MR. REIL:

Q.   Are you aware if anyone from the organization was able to attend a lecture at any one of these campuses?

MS. MCENROE:  Objection to form.

THE WITNESS:  No.

BY MR. REIL:

Q.   And where were these campuses allegedly located?

A.   I'm not sure of all the locations.  Florida, Texas, Colorado were mentioned.

Q.   Was anyone from the organization able to go down to Florida and see a building that said USAT on it?

MS. MCENROE:  Objection to form.

THE WITNESS:  What I am aware of is that individuals from the organization saw a YouTube presentation by Dr. Tulp

describing the opportunity to
attend a campus in Florida.  And I
have an understanding that many of
these activities occurred at
hotels.

BY MR. REIL:

Q.    Did anyone actually see a
building in Florida or anywhere else in
the United States that said USAT on it?

MS. MCENROE:  Objection to
form.

THE WITNESS:  No.  I don't
know.

BY MR. REIL:

Q.    So there was more than --
was more than one person assigned to go
down to Florida to check out if there
were campuses?

MS. MCENROE:  Objection to
form.

THE WITNESS:  I never said
anybody was assigned to go to
Florida.

BY MR. REIL:

Q.    Okay.  Fair qualification.

Did anyone ever go to Florida to physically check out if there was --

MS. MCENROE:  -- objection to form.  Asked and answered repeatedly.

MR. REIL:  Okay.

BY MR. REIL:

Q.    You may answer.

A.    I'm not aware.

Q.    And why don't you tell me, to your knowledge, what efforts were made by the organization to determine if USAT had a campus, had any campuses in the United States?

MS. MCENROE:  Objection to form.

THE WITNESS:  So I don't know all the details, but what I'm aware of, are that efforts were made through, as I mentioned before, looking through YouTube and finding video presentations

that talked about the campuses.

There may have been other social media, you know, inspections as well.  And affidavits were requested from students asking them where they attended classes.

BY MR. REIL:

Q.   Okay.  Did you authorize those affidavits that we're talking about?

A.   It wouldn't be my job --

MS. MCENROE:   -- objection to form.

THE WITNESS:  It wouldn't be my job to do that.

BY MR. REIL:

Q.   Well, since we're talking about -- since we're talking about affidavits, maybe I want to look at what I've designated as Pinsky-1 for the purposes of this deposition.

And I'll represent on the record, that this is the same material which I presented at the Injunction

Hearing before Judge Beetlestone, I think was a couple Thursdays ago.

MS. MCENROE:  And for the record, it's a compilation of documents with an index appended to the front.

MR. REIL:  Correct.

BY MR. REIL:

Q.   Okay.  I'm looking for the affidavit.  Do you see the first page where it has sort of like an index?  Maybe we should go to page 10.  Take a look at page 10.

A.   (Witness complies.)

Q.   Page 10 says at the top, it's a blank affidavit.  It says, ECFMG at the top.  And it says, Affidavit Attesting to Medical School Attendance.

Have you seen that before?

A.   No.

Q.   Haven't seen it before. Okay.

Well, you spoke about an affidavit in your testimony.  Is it that

you were aware that there were affidavits being used but you didn't actually see them or am I missing what you're saying?

A. Yes, that's what I said.

Q. So you don't have any personal knowledge as to how this affidavit was used by the organization?

MS. MCENROE: Objection to form.

THE WITNESS: I just know that they were sent to the students.

BY MR. REIL:

Q. Who sent them?

A. The Operations Group.

Q. And that would be the one that Mr. Cover heads?

A. Yes.

Q. Did you see any of the affidavits that came back?

A. No.

Q. I want to direct your attention to page 11 -- oh, before I do that, let's stay with page 10.

William W. Pinsky, M.D.

This affidavit would be directed, I think we said to students of USAT?

MS. MCENROE:  Objection to form.

THE WITNESS:  That's what I understand.

BY MR. REIL:

Q.   I see.  If you go about two-thirds of the way down the document on page 10, there's a part there requesting documentation possibly passport, airline tickets, so forth and so on.

Do you see that?

A.   Yes.

Q.   So this is an affidavit which also requests documents?

MS. MCENROE:  Objection to form.

THE WITNESS:  Is that a question?

BY MR. REIL:

Q.   Yes.

A.     I believe that's what it says.

Q.     At the hearing of Dr. Tulp back on November 28th, right, do you recall that Dr. Tulp, through his attorneys, were furnished with some of these affidavits?

MS. MCENROE:  Objection to form.

BY MR. REIL:

Q.     If you know?

A.     I don't remember.

Q.     Why don't we take a look at page 11.  On page 11, let me read this into the record.

Almost the next to the last paragraph before the bottom it says: ECFMG reserves the right.

Do you see that?

A.     Yes.

Q.     ECFMG reserves the right to bring allegations of irregular behavior against you, in accordance with its policies and procedures, should ECFMG

obtain information that indicates that you have engaged in irregular behavior with respect to any documentation submitted as part of the process.

Well, the you would refer to the students of USAT; right?

MS. MCENROE:  Objection to form.

THE WITNESS:  I believe so.

BY MR. REIL:

Q.   Is this -- is what I just read, telling the students that they can be charged with irregular behavior if they haven't filled out this document correctly?

MS. MCENROE:  Objection to form.  The document speaks for itself.  You may answer.

THE WITNESS:  I believe the document speaks for itself.

BY MR. REIL:

Q.   Okay.  And does the document say that students can be charged with irregular behavior?

MS. MCENROE: Objection to form.

THE WITNESS: Same answer.

I believe the document speaks for itself.

It states that ECFMG reserves -- I'm quoting. "ECFMG reserves the right to bring allegations of irregular behavior."

BY MR. REIL:

Q. What's irregular behavior?

A. It's a term that is used for actions that are not in accordance with the policy of ECFMG.

Q. And who would it apply to generally? I mean, I couldn't be -- I'm not a medical person, I couldn't be found guilty of irregular behavior, maybe I could. Could you give me an idea who it's directed to?

MS. MCENROE: Objection to form.

THE WITNESS: It's directed

to individuals who are involved in
the process of applications for
ECFMG certification.

BY MR. REIL:

Q.    I see.  Is that -- I
wouldn't want -- I didn't expect you to
have an exact quote.  But is what you
say, is that stated in some sort of
document the ECFMG has?

A.    Probably.  It's probably on
a policy statement somewhere.

Q.    Where are the policy
statements kept?

MS. MCENROE:  Objection to
form.

THE WITNESS:  In the offices
at 36th and Market.

BY MR. REIL:

Q.    Is there a book or something
like that that has a -- that has the
various policy statements from ECFMG?

A.    I'm sure there's a
depository, maybe electronic, but I'm
sure there's a depository.

Q.    I'm curious, does the organization, I like your word, does the organization have a charter?

A.    What do you mean by charter?

Q.    Well, some document when it came into being that explains its form and function and where it gets its power I guess?

A.    I think, I'm assuming there's a document from 60 plus years ago when ECFMG was formed at the request of several organizations, and we have our mission statement that's available.

Q.    The mission statement was composed by the organization; correct?

A.    Yes.

Q.    Are there any outside documents that -- by outside, I mean outside the organization, that deal with the powers of the organization?

                MS. MCENROE:  Objection to form.

                THE WITNESS:  I don't know.

BY MR. REIL:

Q.    Now, if ECFMG, and I'm asking you hypothetically because you're the head of the organization, if ECFMG finds a person culpable of irregular behavior, what does that mean in terms of what does that sanction mean if you're found culpable of irregular behavior?

MS. MCENROE:  Objection to form.

THE WITNESS:  So there's not a single answer to that because there's different types of irregular behavior.

BY MR. REIL:

Q.    Okay.

A.    So an individual who is found of irregular behavior has a notation of that put into their file. And then there are different sanctions that could occur depending on the type of irregular behavior.

Q.    Well, are there, somewhere specified in writing, the different types of irregular behavior?

MS. MCENROE:  Objection to

form.

THE WITNESS:  No.  Irregular

behavior is just irregular

behavior.  Then it's what -- what

the individual did to be found to

have irregular behavior and the

sanctions are determined; if there

are any sanctions, there's not

always sanctions.  If there are

any sanctions to be found.

BY MR. REIL:

Q.    Is it a fair statement that

irregular behavior could be applied to an

individual who runs afoul of the policies

of the organization?

MS. MCENROE:  Objection to

form.

THE WITNESS:  I believe

that's what I said before.

BY MR. REIL:

Q.    Can persons, other than

foreign medical students, be found

culpable of irregular behavior?

MS. MCENROE: Objection to form.

THE WITNESS: Medical school officials can be.

BY MR. REIL:

Q. Medical school officials can be.

And where does the organization get that authority to find medical school officials potentially guilty of irregular behavior?

MS. MCENROE: Objection to form.

BY MR. REIL:

Q. Is it -- where does that come from?

MS. MCENROE: Objection to form.

THE WITNESS: Again, it has to do with accuracy and legitimacy of documents that are provided to ECFMG.

BY MR. REIL:

Q. Can you comment for me on

William W. Pinsky, M.D.

the relationship between the organization

and the State Medical Boards, how does

that work?  I'm a lay person.

MS. MCENROE:  Objection to

form.

THE WITNESS:  We have no

direct relationship with any of

the State Medical Boards.  The

State Medical Boards develop

policy and regulations that

usually are through legislation;

and ECFMG is recognized by the

State Boards to be the agency that

verifies documents, primary source

verification.

BY MR. REIL:

Q.   Is it fair to say that if

ECFMG does not certify a foreign medical

student or foreign medical graduate, that

they can't practice medicine in the

United States?

MS. MCENROE:  Objection to

form.

THE WITNESS:  No, that's not

true.

BY MR. REIL:

Q.    What is true?

A.    State board can make an independent decision on their own.

Q.    So there's an appeal process to the State board?

MS. MCENROE:  Objection to form.

THE WITNESS:  I don't understand the question.

BY MR. REIL:

Q.    Well, you -- I asked you about ECFMG and a foreign medical student and I think you said the State board, right --

MR. REIL:  Could you read that response back?  The question and the answer.

(At this time, the court reporter read back from the record as requested.)

BY MR. REIL:

Q.    And I'm asking you to expand

on that answer.  What is the mechanism by which that occurs?

                MS. MCENROE:  Objection to
        form.

                THE WITNESS:  So those are
        State board policies that I can't
        give you details on.  I do know
        that a State board can make an
        exception when they wish to.

BY MR. REIL:

        Q.    So the -- so I think what you're saying is, the State board could somehow examine a decision by ECFMG and decide if they are going to override it or not?

                MS. MCENROE:  Objection to
        form.

                THE WITNESS:  I believe so.

BY MR. REIL:

        Q.    Does that happen very often, if you know?

                MS. MCENROE:  Objection to
        form.

                THE WITNESS:  I would guess

not.

BY MR. REIL:

Q.    When is the last time you remember that happening?

A.    I can't remember.

Q.    Well, let's put it this way: If a foreign medical student or graduate does not obtain, I think certification by ECFMG, it would be as a practical matter, it would be difficult for that person to practice medicine in the United States?

A.    Yes.

MS. MCENROE:  Objection to form.

THE WITNESS:  Yes.

BY MR. REIL:

Q.    You were at the hearing of Dr. Tulp on November 28, 2018.  I think we already established that; right?

A.    Correct.

Q.    Did any witnesses testify at that hearing?

MS. MCENROE:  Objection to form.

THE WITNESS:  Dr. Tulp was

invited to be a witness.

BY MR. REIL:

Q.    But I'm talking actually at

the hearing, did any witnesses testify at

the hearing?

A.    Dr. Tulp was invited to be a

witness and testify at the hearing.

Q.    Did he testify?

A.    No.

Q.    Did any witnesses testify?

A.    His attorney did.

Q.    Well, his attorney wasn't a

witness; right?

MS. MCENROE:  Objection to

form.

MR. REIL:  I won't quibble

over that.

BY MR. REIL:

Q.    Were any -- were any

documents introduced at that hearing?

MS. MCENROE:  Objection to

form.

THE WITNESS:  Documents were

William W. Pinsky, M.D.

sent to Dr. Tulp and his

representation prior to the

hearing.

BY MR. REIL:

Q.    Were any of those documents

introduced at the hearing?

MS. MCENROE:  Objection to

form.

BY MR. REIL:

Q.    That you recall.

A.    What does introduce mean?

Q.    Put into evidence, you know,

this paper was put into evidence like

we're doing here.

MS. MCENROE:  Objection to

form.

THE WITNESS:  That's not the

format for that committee.

BY MR. REIL:

Q.    What is the format?

A.    The documents are

distributed prior to the hearing and then

the hearing is to answer any questions

relative to them.

Q. I see. So the -- how many -- was the full board, maybe 16 or 17, doctors there at the hearing?

MS. MCENROE: Objection to form.

THE WITNESS: No.

BY MR. REIL:

Q. How many were there roughly?

A. It was the Medical Education Credentials Committee Membership, which is made up of people from the board.

Q. All doctors?

A. I don't think so. I'm just trying to remember. I think we -- I think -- I don't have a list of the committee in front of me.

Q. Mostly doctors?

A. Mostly doctors.

Q. Let's leave it at that.

A. We have nonphysicians on the board, I just can't remember.

Q. Are there any attorneys on the board?

A. Yes.

Q.    There are?

A.    Yes.

Q.    Okay.  Now, was Dr. Tulp allowed to bring witnesses to present at that hearing?

MS. MCENROE:  Objection to form.

THE WITNESS:  I don't recall.

BY MR. REIL:

Q.    Well, would there be somewhere in the rules and regulation of the organization that would describe what you're allowed to do at the hearing?

MS. MCENROE:  Objection to form.

THE WITNESS:  I don't know. I think there probably was in the communications to Dr. Tulp about the opportunity to appear at the hearing.

BY MR. REIL:

Q.    Do you know if there's anything about the opportunity to bring

witnesses?

MS. MCENROE:  Objection to form.

THE WITNESS:  I don't remember.

BY MR. REIL:

Q.    Did the board present any witnesses at Dr. Tulp's hearing?

MS. MCENROE:  Objection to form.

THE WITNESS:  No.

BY MR. REIL:

Q.    What did the board present at Dr. Tulp's hearing?

MS. MCENROE:  Objection to form.

THE WITNESS:  The board received the same documents that had been sent to Dr. Tulp and his attorneys.  The board had that material and they reviewed that prior to coming to the committee meeting.

BY MR. REIL:

Q.    So that -- I think black binder that we got.

A.    Yes.

Q.    The board received that prior to the meeting?

A.    Yes.

Q.    Hearing?

A.    Yes.  The committee did.

Q.    Okay.  And for what purpose?

MS. MCENROE:  Objection to form.

THE WITNESS:  To be informed about the work that was going to go on during the committee meeting that day.

BY MR. REIL:

Q.    Was that black binder ever submitted into evidence, if you know?

MS. MCENROE:  Objection to form.

BY MR. REIL:

Q.    Do you know what that means?

MS. MCENROE:  Objection to form.

THE WITNESS:  That's not the format of the committee.

BY MR. REIL:

Q.    What is the format?

A.    It's not a committee where things are submitted as evidence.

Q.    So it's basically a proceeding where Dr. Tulp has an opportunity to make a statement on his behalf; is that a fair statement?

MS. MCENROE:  Objection to form.

THE WITNESS:  Yes.

BY MR. REIL:

Q.    Now, is there any procedure -- I'm sure you've been to a lot of the these hearings; is that a fair statement?

MS. MCENROE:  Objection to form.

THE WITNESS:  Well, in the two-and-a-half years I've been to several.

BY MR. REIL:

Q.   Okay.  That's good enough for me.

Is there -- and there's -- there was a black binder that I remember that had a lot of material in it; right?

A.   Yes.

Q.   Who gathered that material?

A.   The operations people.

Q.   Was Dr. Tulp, through his attorneys, given any ability to object to any of that material in the binder?

MS. MCENROE:  Objection to form.

THE WITNESS:  The purpose of the hearing was for them to be able to raise questions -- or answer questions or raise questions in terms of anything that they wanted to talk about.

BY MR. REIL:

Q.   Well, let's put it this way: Did Dr. Tulp have any input as to what material went into that binder?

MS. MCENROE:  Objection to

form.

THE WITNESS:  This was the material that had been accrued, you know, through working through this by ECFMG.

BY MR. REIL:

Q.  Working through -- I didn't hear that part.

A.  Working through this -- working through the issues.

Q.  It was accrued by the organization?

A.  Yes.

Q.  Was there a section of the binder that contained material that was submitted by Dr. Tulp or his attorneys?

MS. MCENROE:  Objection to form.

BY MR. REIL:

Q.  You can answer.

A.  I'm guessing there might have been some correspondence that was in there, that had been submitted to Dr. Tulp or his attorneys.

Q.   Well, we don't want you to guess.  Let's take a look at -- I may have covered this already.

Did we establish that part of your job as the President and the CEO, is to carry out the policies of the organization?

MS. MCENROE:  Objection to form.

THE WITNESS:  Yes, it is.

BY MR. REIL:

Q.   Let's take a look at the letter that you sent out to Dr. Tulp after the hearing.  I believe in Pinsky-1, that's page 2 actually.  Let me know when you have that.

A.   Yes.

Q.   Why don't you just take a moment to look it over and then I have some questions.

A.   (Witness complies.)  Okay.

Q.   Would you describe for the record, if this is a letter from you to Dr. Tulp, dated December 14, 2018, would

you identify this for the record?  In other words, explain what it is.

MS. MCENROE:  Objection to form.

THE WITNESS:  This is a letter that summarizes the Credential Committee review of the allegations.  And in some brief way, a listing of what the process was in terms of providing documents to Dr. Tulp and his attorneys.  And then the consideration of the committee following the review of the documentation and the appearance at the committee.

BY MR. REIL:

Q.   A few questions about that letter.

By the way, were you a member of the Credentials Committee?

A.   Yes.

Q.   Were you the head of the Credentials Committee?

A.   No.

Q.   Who was?

A.   Dr. Gusic.

COURT REPORTER:  Gusic?

THE WITNESS:  I'm sorry.

G-U-S-I-C.

COURT REPORTER:  Thank you.

BY MR. REIL:

Q.   And does Dr. Gusic work at 36th and Market?

A.   No.

Q.   Let's take a look at that letter on page 2 from December 14, 2018.

In the first sentence there you say that the Credentials Committee has completed its review.

Do you see that?

A.   Yes.

Q.   What did it review?

MS. MCENROE:  Objection to form.

THE WITNESS:  It reviewed the documentation.  It participated in -- the committee

participated in the appearance

before the committee and then

discussion afterwards.

BY MR. REIL:

Q.   Is it fair to say that since
no witnesses testified at the hearing and
Dr. Tulp didn't make a statement, the
review that we're talking about
essentially were the documents that were
in that black book?

MS. MCENROE:  Objection to
form.

THE WITNESS:  Because Dr.
Tulp did not make a statement,
even though he was asked to, it
was primarily the documentation
that were in the book.

BY MR. REIL:

Q.   Was it ever explained as far
as you're aware, whether Dr. Tulp --
whether the organization had to prove its
case against Dr. Tulp or Dr. Tulp had to
prove his case?  Did you ever get into
that?

MS. MCENROE:  Objection to form.

THE WITNESS:  You know it's not a trial situation.

BY MR. REIL:

Q.   I see.

A.   It's a situation of reviewing all information.

Q.   Well, the ECFMG brought charges, if you will, against Dr. Tulp and you were on the Credentials Committee, was there any discussion of what's called the burden of proof?

MS. MCENROE:  Objection to form.  Asked and answered.

THE WITNESS:  Again, it's not a trial so that terminology is not used.

BY MR. REIL:

Q.   Is that defined anywhere in the ECFMG bulletins or documents as to who has the burden of proof in one of these hearings?

MS. MCENROE:  Objection to

form.

THE WITNESS:  I don't think the terminology burden of proof is used.

MS. MCENROE:  Counsel, we've been going for about an hour.  If there's a good time to take a break, let us know.

MR. REIL:  I would say -- let's go off the record.

(At this time, a discussion was held off the record.)

BY MR. REIL:

Q.    Now, if you go down to line three or four of the letter.  It says -- the letter that we're talking about on December 14th.

It says:  Specifically, you provided -- you I think referring to Dr. Tulp -- false information to ECFMG when you (1) notified ECFMG that USAT does not operate a branch campus in Miami, Florida; right?

Are you aware of what that

alleged false information was?

A.   I believe the false information is that USAT holds itself to be a medical school located in Montserrat.

Q.   And then if you go down further it says:

In the first paragraph, it talks about, it says:  ECFMG has information that these students were not attending USAT during the time periods to which you certified.

What's that in reference to, No. 2 there?

A.   I believe that is in reference to the dates of students matriculation at USAT.

Q.   How was that information obtained?

A.   I believe that's from the affidavits.

Q.   To your knowledge, was any other source for the information other than the affidavits used?

MS. MCENROE:  Objection to form.

THE WITNESS:  I don't know.

BY MR. REIL:

Q.    Did Dr. Tulp have an opportunity to challenge the accuracy of any of these affidavits which were in the black book at the hearing?

MS. MCENROE:  Objection to form.

THE WITNESS:  Yes.

BY MR. REIL:

Q.    Yes.  Okay.

Well, was he supplied those affidavits prior to the hearing?

A.    I don't know.

Q.    Isn't it true that many of the affidavits, the information about the individuals was redacted?

A.    I don't know that.

Q.    Under your procedures was Dr. Tulp allowed to bring any of these individuals who filled out affidavits to the hearing on November 28th?

MS. MCENROE: Objection to form.

THE WITNESS: I'm not sure about that.

BY MR. REIL:

Q. Now, if you look, I think it's the next to the last paragraph, the one that starts, ECFMG Committee.

Do you see that one?

A. The next to last paragraph on the first page?

Q. On the first page, on page 2.

A. Yes.

Q. The last sentence there I have a question about that.

It says: Your ECFMG Medical School Web Portal, and then in parenthesis it has, EMSWP, account will remain deactivated.

Can you explain what that means, Doctor?

A. Yes. I believe that's the electronic interface between the school

and ECFMG.

Q. And it says, remains deactivated, so -- well, strike that.

What's the purpose of this, of deactivating this portal?

MS. MCENROE: Objection to form.

THE WITNESS: The purpose of deactivating it?

BY MR. REIL:

Q. Yes. I think it was, will remain deactivated.

What's the idea behind deactivating it?

A. Because of the finding of irregular behavior.

Q. And it says: Will remain deactivated.

It was deactivated before the hearing, wasn't it?

MS. MCENROE: Objection to form.

THE WITNESS: I believe so but I don't remember that exactly,

but I believe so.

BY MR. REIL:

Q.    And who made the decision to deactivate the web portal prior to the hearing?

A.    If it was, it would have been from Operations.

Q.    And who in Operations, if you know, would have made that decision?

A.    I think it could have been, you know, one of a couple different senior people within Operations.

Q.    For instance?

MS. MCENROE:  Objection to form.

THE WITNESS:  Ms. Corrado, Ms. Cover.

BY MR. REIL:

Q.    To your knowledge, was there a particular person who was leading the investigation into Dr. Tulp and USAT?

A.    Not to my knowledge.

Q.    Well, besides Ms. Corrado and Ms. Cover, who else was prominent in

the investigation?

MS. MCENROE:  Objection to form.

THE WITNESS:  I really don't know at that level.  There are other people, you know, at a variety of different levels in that department.

BY MR. REIL:

Q.  Would you receive reports at regular intervals about the investigation into Dr. Tulp and USAT?

A.  I didn't receive reports. We had conversations with counsel prior to the hearing.

Q.  And I don't want anything you told counsel.

Let's take a look at page 3 if we might.

At the top of page 3 it says:  In 2018, and there's one sentence there, I'd ask that you read that into the record?

A.  The one that starts, in

2018?

Q. Yes. In 2018, just that one sentence.

A. In 2018, ECFMG determined that a certain official of the University of Science Arts & Technology engaged in irregular behavior in connection with providing false information to ECFMG.

Q. That certain official, was Dr. Orien Tulp; correct?

A. Yes.

Q. And was this -- was what you just read, was that placed on the WDOMS?

MS. MCENROE: Objection to form.

THE WITNESS: Yes. It's what the prior sentence says at the bottom of page 2.

BY MR. REIL:

Q. Can you explain for the record what the WDOMS is?

A. So it's WDMS, the World Directory of Medical Schools, is a directory that we co-sponsor that, to the

William W. Pinsky, M.D.

best of our knowledge, lists all

operating medical schools in the world.

Q.    And what's the, you know, in

general, I know your organization doesn't

own the WDMS.  In general, can you, as an

insider in the field, describe the

audience for the WDMS?

MS. MCENROE:  Objection to

form.

THE WITNESS:  So the

audience is varied.  It can be

anywhere from individuals who are

interested in going to medical

school, individuals who are in

medical school.  It can be

individuals that have

responsibility for post-graduate

training.  It can be individuals

who were being recruited to a job

that might look at that.

BY MR. REIL:

Q.    Now, that sentence that you

just read, I think you said it was posted

on the WDMS, the web, the internet,

right; am I right about that?

A. In the World Directory.

Q. Was it placed there before the November 28th hearing?

A. I don't know. But I believe probably not.

Q. Who would know?

A. Operations people.

Q. And why do you say probably not?

A. I assume it was waiting for the outcome of the hearing.

Q. Because it discusses irregular behavior. So you would assume it would -- strike that.

Well, let me ask you this question: That last sentence that you read, should it have been placed by the organization on the WDMS prior to the hearing?

MS. MCENROE: Objection to form.

THE WITNESS: I assume so.

BY MR. REIL:

Q.   Can you explain what you mean when you say I assume so?

A.   I assume that could be the way we would do it.

Q.   That it should not be placed on the WDMS prior to the hearing?  I want to make sure I understand what you're saying.

A.   That that would be placed after the committee has reviewed and made a determination of irregular behavior.

Q.   Why not before?

MS. MCENROE:  Objection to form.

BY MR. REIL:

Q.   You can answer.

A.   I think the hearing is a step that gives Dr. Tulp the opportunity to comment on the findings.

Q.   Within your organization, who would be the person who would likely know when that was placed, that sentence we just talked about, when that was placed on the WDMS?

MS. MCENROE:  Objection to form.

THE WITNESS:  I think you asked that before, but that's the Operations Group.

BY MR. REIL:

Q.    In your opinion, is it likely that Ms. Cover would know or could find out when that was placed?

MS. MCENROE:  Objection to form.

THE WITNESS:  Yes.

BY MR. REIL:

Q.    Now, at the end, the last paragraph, it says:  As noted in the enclosed ECFMG Rules of Appellate Procedure.

Do you see that?

A.    Yes.

Q.    ECFMG has written Rules of Appellate Procedure; right?

A.    Yes.

Q.    Does the ECFMG have written rules about procedure at a hearing?

MS. MCENROE:  Objection to form.

THE WITNESS:  I assume so.

BY MR. REIL:

Q.    And where would they be?

A.    They would be at the 36th and Market office.

Q.    And who would have access to it?  Would you be able to get them or would it be somebody else?

A.    It would be more efficient to have the Operations Group.

Q.    And again, that would be Ms. Cover?

A.    Yes.

MR. REIL:  Can we -- I just want to talk to my client briefly.

MS. MCENROE:  Sure.  Let's take a break and go off the record.

(At this time, a short break was taken.)

BY MR. REIL:

Q.    Dr. Pinsky, that letter of

December 14th of this year, a two-page letter beginning on page 2 and ended on page 3.

A.    Of 2018?

Q.    2018, not this year.  Thank you.  I stand corrected.

It's signed by you?

A.    Yes.

Q.    Did you draft it?

A.    No.

Q.    Who did draft it?

A.    The Operations Group.

Q.    When you say the Operations Group, who presented it to you?  Did you have some sort of discussion with somebody about the particulars before you signed it?

A.    The discussion on the particulars occurred at the committee and so this is the outcome of the committee discussion.

Q.    Did Ms. Cover ever present this letter to you for your review?

A.    In draft form, is that what

you're asking?

Q. Yes. In draft form.

A. I don't recall.

Q. But if I understand correctly, you didn't actually draft the letter?

A. Correct.

Q. Before you signed it, what efforts did you make to ensure that the letter was accurate?

MS. MCENROE: Objection to form.

THE WITNESS: I read the letter, and to assure myself that it accurately reflected the discussion and the outcome of the committee meeting.

BY MR. REIL:

Q. Of the committee meeting?

A. (Witness nods head.)

MS. MCENROE: That was a yes for the record.

THE WITNESS: That was a yes. I'm sorry.

BY MR. REIL:

Q.   And did you ever give an address or a presentation regarding Caribbean medical schools?

MS. MCENROE:  Objection to form.

THE WITNESS:  No.

BY MR. REIL:

Q.   Did you ever draft a document or a memo concerning Caribbean medical schools?

MS. MCENROE:  Objection to form.

THE WITNESS:  Not that I can recall.

BY MR. REIL:

Q.   Now, let me just finish up again by going on page 3 that sentence, in 2018 ECFMG, down to ECFMG.  The one sentence you read in italics in your letter.

Isn't it a fact that that was placed on the WDMS on or before September 11, 2018?

MS. MCENROE:  Objection to form.

THE WITNESS:  I'm very confident it was not.

BY MR. REIL:

Q.    When do you believe that it was placed on the WDMS?

A.    I believe that the intention is to place this after a determination has been made.  I'm not even sure that this particular statement has been placed on it yet.

Q.    So the -- do you know as a fact when or if this sentence that we're talking about, when it was placed or if it was placed on the WDMS?

MS. MCENROE:  Objection to form.

THE WITNESS:  I don't know if it's been placed yet.

BY MR. REIL:

Q.    And you don't know if it was placed before the hearing or you are certain that it was not placed before --

William W. Pinsky, M.D.

well --

A.    I'm certain it was not placed before.  And I'm not certain whether it's been placed yet.

Q.    Okay.  Where is the -- when you communicate with the WDMS, if you know that, where are they located?

MS. MCENROE:  Objection to form.

BY MR. REIL:

Q.    If you know?

A.    So I don't communicate directly with them.  WDMS is, you know, a partnership, you know, it's among organizations.

Q.    Do you know where they're located?  And I'm interested in terms of contacting them to verify when this was placed.

MS. MCENROE:  Objection to form.

THE WITNESS:  I think there's individuals that work on the WDMS that are situated in

various cities, including France and Philadelphia.

BY MR. REIL:

Q.    And Philadelphia?

A.    Right.

Q.    Do you know where they are in Philadelphia?

A.    It would be in our building.

Q.    They are in your building. Okay.

And are they under WDMS or are they under another name?

A.    They are under FAIMER, it's the FAIMER Partnership.

THE WITNESS:  You have that from before; right?

COURT REPORTER:  Yes.  Thank you.

BY MR. REIL:

Q.    F-A-I-M-E-R?

A.    Yes.

Q.    It's one of the few things I do well, spell.

And that's in your building?

William W. Pinsky, M.D.

A.     Yes.

Q.     And who is the head person, if you know, at FAIMER Partnership?

A.     So the President is John Norcini, N-O-R-C-I-N-I.

Q.     And does he work out of your building?

A.     Yes.

Q.     Now, to your knowledge, has any other university president ever been charged with irregular behavior by the ECFMG?

MS. MCENROE:  Objection to form.

THE WITNESS:  I know of another senior official, I'm not sure what his title was.

BY MR. REIL:

Q.     How about a university president are you sure, as you sit there, other than Dr. Tulp, does it come to mind that another university president has been charged with irregular behavior?

MS. MCENROE:  Objection to

form.

THE WITNESS:  I'll say yes but I'm not exactly sure of the individual's title.

BY MR. REIL:

Q.    Who would that individual be?

A.    The official that was in charge of Atlantic University School of Medicine.

Q.    And his name is?

A.    I'm blanking on his name right now.

Q.    He was in charge?

A.    Yes.

Q.    Now -- so there's Dr. Tulp and there's one other official from Atlantic?

A.    Yes.

Q.    And they are the only two you can recall in the history of the ECFMG?

MS. MCENROE:  Objection to form.

THE WITNESS:  I believe there were two officials at Atlantic University that were charged.

BY MR. REIL:

Q.   Anybody else you can recall?

A.   No.

Q.   The ECFMG is not an accrediting agency; correct?

MS. MCENROE:  Objection to form.

THE WITNESS:  Correct.

BY MR. REIL:

Q.   And one of the things Dr. Tulp was charged with in connection with the irregular behavior, dealt with having campuses in the United States; right?

MS. MCENROE:  Objection to form.

THE WITNESS:  Giving us false information --

MR. REIL:  False information.

THE WITNESS:  -- about the

campuses.

BY MR. REIL:

Q.   To your recollection, was any other university president ever charged with the same thing?

MS. MCENROE:  Objection to form.

THE WITNESS:  Not to my knowledge.

BY MR. REIL:

Q.   Did you ever ask, by you, the ECFMG, did they ever ask for a curriculum from the USAT?

MS. MCENROE:  Objection to form.

THE WITNESS:  I don't know.

BY MR. REIL:

Q.   Did you or any of your senior people ever visit the USAT?

MS. MCENROE:  Objection to form.  Asked and answered.

THE WITNESS:  As I said before, not that I know.

BY MR. REIL:

Q.    And why not?

A.    As I said before, I'm not sure how to answer that question.

Q.    Okay.  You did say that. I'll withdraw that question.

MR. REIL:  I think that's all I have.  Let me just confer with my superiors here and I think that will be it.

(At this time, a discussion was held off the record.)

BY MR. REIL:

Q.    To your knowledge, are there other international schools of medicine, of course, that have campuses in the United States besides the USAT, which is something that you allege?

MS. MCENROE:  Objection to form.

THE WITNESS:  Not that I'm aware of yet.

BY MR. REIL:

Q.    So presently, the only one that you're aware of that has campuses in

the United States is the USAT?

MS. MCENROE:  Objection to form.

THE WITNESS:  From our current knowledge, yes.

MR. REIL:  That's all I have.

MS. MCENROE:  No questions from us.  Thank you very much.

Thank you, Dr. Pinsky.

(Deposition concluded at 11:50 a.m.)

C E R T I F I C A T I O N

I, DANA M. JONES, Professional Court Reporter and Notary Public, certify that the foregoing is a true and accurate transcript of the deposition held before me at the time, place and on the date hereinbefore set forth.

I further certify that I am neither attorney nor counsel for, not related to or employed by, any of the parties to the action in which this deposition was taken; further, that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

_____

DANA M. JONES

INSTRUCTION TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

William W. Pinsky, M.D.

ACKNOWLEDGEMENT OF DEPONENT

I, WILLIAM W. PINSKY, M.D., do hereby certify that I have read the foregoing pages, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached errata sheet.

Date                    _____

Subscribed and sworn to before me.

My commission expires _____.

- - - - - - - -

ERRATA SHEET

- - - - - - - -

PAGE      LINE           CHANGE/ REASON

_ _ _        _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

_

_ _ _        _ _ _        _ _ _ _ _ _ _ _ _ _ _ _

_ _ _

_ _ _        _ _ _        _ _ _ _ _ _ _ _ _ _ _ _

_ _ _

_ _ _        _ _ _        _ _ _ _ _ _ _ _ _ _ _ _

_ _ _

_ _ _        _ _ _        _ _ _ _ _ _ _ _ _ _ _ _

_ _ _

_ _ _        _ _ _        _ _ _ _ _ _ _ _ _ _ _ _

_ _ _

_ _ _        _ _ _        _ _ _ _ _ _ _ _ _ _ _ _

_ _ _

_ _ _        _ _ _        _ _ _ _ _ _ _ _ _ _ _ _

_ _ _

_ _ _        _ _ _        _ _ _ _ _ _ _ _ _ _ _ _

_ _ _

_ _ _        _ _ _        _ _ _ _ _ _ _ _ _ _ _ _

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DR. ORIEN L. TULP, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:18-cv-05540-WB |
| | ) | |
| v. | ) | Hon. Wendy Beetlestone |
| | ) | |
| EDUCATIONAL COMMISSION FOR | ) | |
| FOREIGN MEDICAL GRADUATES and | ) | |
| DR. WILLIAM W. PINSKY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' FIRST SET OF INTERROGATORIES AND FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DR. ORIEN L. TULP

Pursuant to Federal Rules of Civil Procedure 26, 33, and 34, Defendants Educational Commission for Foreign Medical Graduates ("ECFMG") and Dr. William W. Pinsky, by and through their counsel, hereby propound this First Set of Interrogatories and First Set of Requests for Production of Documents on Plaintiff Orien L. Tulp and direct that he respond separately, in writing and under oath, to each of the following interrogatories, and produce and permit the inspection and copying of the documents and/or other tangible things requested herein within thirty (30) days of the date of service to the undersigned counsel.

## DEFINITIONS AND INSTRUCTIONS

1.      The term "ECFMG" refers to Defendant Educational Commission for Foreign Medical Graduates or any other person or entity acting or purporting to act on its behalf, including any employees, agents, or representatives.

1

2. The term "Dr. Pinsky" refers to Dr. William W. Pinsky or any other person or entity acting or purporting to act on his behalf, including any employees, agents, or representatives.

3. The terms "you," "your," or "Plaintiff" refer to Plaintiff Dr. Orien L. Tulp or any other person or entity acting or purporting to act on behalf of Plaintiff Dr. Orien L. Tulp, including any employees, agents, or representatives of Plaintiff Dr. Orien L. Tulp.

4. The term "USAT" refers to the University of Science, Arts, and Technology or any other person or entity acting or purporting to act on his behalf, including any employees, agents, or representatives.

5. The term "Sponsor Note" refers to ECFMG's sponsor note in the World Directory of Medical Schools.

6. The term "document" has the same meaning and scope as in Federal Rule of Civil Procedure 34(a), including without limitation, electronic or computerized data compilations. A draft or non-identical copy is a separate document within the meaning of this term.

7. The term "communication" refers to any transmission of information whether face-to-face or by telephone, telecopy, letter, telex, cable, electronic mail, text message, electronic means or other means whereby thoughts, opinions, facts or other matters are transmitted between two or more persons.

8. The term "person" means any individual, association, public or private organization, institution, partnership, corporation, or other entity.

9. The term "Complaint" refers to the "Complaint – Civil Action" filed in this action on December 24, 2018, in the United States District Court of the Eastern District of Pennsylvania.

2

10. The term "including" means including but not limited to.

11. The term "relating to" means constituting, comprising, discussing, covering, evidencing, supporting, reflecting, or referring to directly or indirectly, the subject matter identified in a particular Request.

12. The term "describe in detail" means to describe fully by reference to underlying facts rather than by ultimate facts or conclusions of law, and to particularize as to time, place, and manner.

13. The term "identify" when used with reference to an oral communication, discussion, conversation, meeting, conference, or any other oral statements means to describe in detail the substance of, to state the date and location of, and to identify the participants in each such communication, discussion, conversation, meeting, conference, or statement.

14. The term "identify" when used with reference to an individual person means to state his or her full name (or if not known, provide sufficient description so that he or she will be identifiable to the recipients of your answer), job title, employer or business affiliation, last known business or home address, and telephone number.

15. The term "identify" when used with reference to a document or written communication means to state the type of document or communication (e.g., memorandum, letter, handwritten notes, etc.), to state its date, to briefly describe its contents, to identify the author (and if different, the originator and signer), and to identify the person (or, if widely distributed, the group of persons) to whom the document or communication was sent. You may produce the document or written communication in lieu of identifying it.

3

16.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Request all responses that might otherwise be construed to be outside of its scope.

17.     The use of the singular form of any word includes the plural and vice versa.

18.     In answering the Interrogatories, furnish all information that is available to you, including information in the possession of your attorneys or investigators, and not merely such information known of your own personal knowledge.  If you cannot answer these Interrogatories in full after exercising due diligence to secure the information to do so, so state and answer to the extent possible.

19.     If any information requested in these Interrogatories is withheld pursuant to a claim of any privilege or that the information constitutes attorney work product or trial preparation material, expressly state the privilege or protection claimed for each item of information, and describe the nature of such information withheld in a manner that, without revealing the privileged or protected information, will enable other parties to assess the applicability of the privilege or protection.

20.     If you object to the production of any document on the grounds of privilege, you are required to provide a log of such privileged documents, which log shall, as to each withheld document, identify the nature of the document, its subject matter, the title, author, and date of the document, the addressee(s) of the document, if any, and the basis for the claim of privilege.

21.     In responding to the Requests, you shall produce all documents that are available to you, including documents in the possession of your attorneys, investigators or experts, and not merely documents in your own personal possession.  If you cannot produce a particular document after exercising due diligence to find or obtain the document, you should so state.

4

22.     Unless otherwise indicated, all Interrogatories and Requests refer to the period January 1, 2003 through the present.

## INTERROGATORIES

1.     Describe in detail anything that USAT does or has done in the United States, including without limitation any administrative, informational, lecture, educational and testing operations.

2.     Describe in detail all facts supporting your contention that ECFMG engaged in "illegal actions," as alleged in paragraph 22 of the Complaint.

3.     Identify any students who you contend have been adversely affected by ECFMG's actions and describe in detail how they have been adversely affected.

4.     Identify any USAT graduates who have not gone to the United States for their post-graduate medical training and describe in detail where (if anywhere) these students completed their medical training and where (if anywhere) they are licensed to practice medicine.

5.     Describe in detail USAT's relationship with the Medical College of London (MCL), which is referenced in USAT's agreement with Montserrat (Compl. Ex. C), including without limitation all facts relating to USAT's and/or MCL's accreditation status with the General Medical Council or any other accrediting body in the United Kingdom.

6.     Describe in detail all facts supporting your contention that the information about USAT in the Sponsor Note was misleading, as alleged in paragraph 45 of the Complaint.

7.     Describe in detail all facts supporting your contention that the ECFMG affidavits are "misleading," as alleged in paragraphs 10 and 35 of the Complaint.

8.     Describe in detail all facts supporting your contention that ECFMG holds itself out as a governmental entity, as alleged in paragraph 28 of the Complaint.

5

9.      Describe in detail all facts relating to the "break-in at the office of USAT in Colorado" referred to in Plaintiff's Self-Executing Discovery Statement dated January 23, 2019, including without limitation all efforts to investigate the break-in (including details about the reporting officers), which items and documents related to the allegations in this Complaint were taken, and whether the items and documents taken have been recovered and/or had back-up copies.

10.      Describe in detail any and all remedies that you seek in connection with this lawsuit, including each element of damages or other relief to which you claim you are entitled, the method of calculating each such element of damages or other relief, the amount of each element of damages or other relief, and the time period for which you are seeking damages or other relief.

11.      Identify each and every person who provided information used to answer these Interrogatories, and identify the Interrogatory or Interrogatories for which that person provided information.

12.      Identify all persons with knowledge relating to the allegations and claims in the Complaint, and for each person, describe the subject(s) about which they have knowledge.

13.      Identify any and all persons you may call as a fact witness relating to this lawsuit at the time of trial.

## DOCUMENT REQUESTS

1.      All documents identified in Plaintiff's Self-Executing Discovery Statement dated January 23, 2019.

2.      All documents identified in or relied upon in the course of answering the Interrogatories served contemporaneously with these Requests.

3.	All documents relating to anything that USAT does or has done in the United States, including without limitation documents relating to any administrative, information, lecture, and testing activities.

4.	All documents relating to USAT's relationship with the Miami Anatomical Research Center, including without limitation service contracts.

5.	All documents relating to USAT's commencement ceremonies occurring in the United States.

6.	All documents relating to any permission or authorization sought by USAT from federal, state, or local authorities and/or accrediting bodies to conduct business or maintain any operations in the United States.

7.	All communications between USAT and federal, state or local authorities and/or accrediting bodies in the United States relating to anything that USAT does or has done in the United States.

8.	All communications between USAT and accrediting bodies relating to USAT's accreditations and/or efforts to obtain accreditations.

9.	All documents relating to accreditation activities completed for or by USAT, including without limitation applications for accreditation, assessments, and documents relating to site visits.

10.	All documents relating to USAT's relationship with the Medical College of London (MCL), which is referenced in USAT's agreement with Montserrat (Compl. Ex. C), including without limitation all documents relating to USAT's and/or MCL's accreditation status with the General Medical Council or any other accrediting body in the United Kingdom.

11.     Documents sufficient to show the number of students who applied to USAT from January 2003 to present and indicating whether each was admitted, deferred, denied or placed into some other category.

12.     Documents sufficient to show USAT's revenue for calendar years 2003 through 2018.

13.     All documents forecasting or projecting USAT's revenues after January 1, 2003.

14.     Copies of and all documents relating to contracts between USAT and USAT students.

15.     Copies of and all documents relating to prospective contracts between USAT and prospective USAT students.

16.     Copies of and all documents relating to contracts between you and USAT students.

17.     Copies of and all documents relating to prospective contracts between you and prospective USAT students.

18.     All documents relating to volcanic activity that allegedly displaced USAT from Montserrat, including without limitation all correspondence with authorities in Montserrat discussing such displacement and requesting to relocate back to Montserrat.

19.     Copies of and all documents relating to USAT's small platform online courses ("SPOC").

20.     Documents sufficient to show current enrollment at USAT.

21.     Documents sufficient to show all your past, current, and anticipated compensation from USAT.

22.     Documents sufficient to show all past, current, and anticipated compensation you receive from USAT students.

23.     All documents relating to your ownership interest in USAT, as alleged in paragraphs 1 and 10 of the Complaint.

24.     All communications between you and ECFMG relating to the claims or facts underlying the claims you are asserting in the Complaint.

25.     All communications between you and USAT administrators relating to ECFMG or ECFMG affidavits.

26.     All communications between you and USAT faculty members relating to ECFMG or ECFMG affidavits.

27.     All communications between you and USAT students or graduates relating to ECFMG or ECFMG affidavits.

28.     All documents relating to plans by you or USAT to open or operate a medical school in the British Virgin Islands.

29.     All documents relating to your contention that ECFMG is attempting to close down USAT, as alleged in paragraph 10 of the Complaint.

30.     All documents relating to your contention that doctors who graduated from USAT have been unable to commence their residency due to ECFMG's actions, as alleged in paragraph 10 of the Complaint.

31.     All documents relating to your contention that ECFMG wants to remove you as President of USAT, as alleged in paragraph 26 of the Complaint.

32.     All documents relating to your contention that ECFMG represented itself to be a government agency, as alleged in paragraph 46 of the Complaint.

33.     All documents relating to Dr. Pinsky and USAT, including without limitation documents relating to your contention that Dr. Pinsky "authorized the illegal actions of the ECFMG," as alleged in paragraph 50 of the Complaint.

34.     All documents relating to the closure of administrative conference venues in the United States, as alleged in paragraph 57 of the Complaint.

35.     All documents relating to the "break-in at the office of USAT in Colorado" referred to in Plaintiff's Self-Executing Discovery Statement dated January 23, 2019, including all police reports, summaries, text messages and e-mails pertaining to same.

36.     All statements you or your attorneys have obtained from individuals concerning the allegations in the Complaint or any alleged unlawful conduct by ECFMG.

37.     All documents and communications relating to the remedies you seek, including each element of damages or other relief to which you allegedly are entitled, as alleged in paragraph 30 of the Complaint.

38.     All documents and communications referenced in or used, reviewed, or relied upon in preparing the Complaint.

39.     All documents and communications relating to the claims asserted in the Complaint.

40.     All documents you may introduce as exhibits at trial in this lawsuit.

DATED:  February 19, 2019                 */s/ Elisa P. McEnroe*
                                          Elisa P. McEnroe, PA Bar No. 206143
                                          Matthew D. Klayman, PA Bar No. 319105
                                          MORGAN, LEWIS & BOCKIUS, LLP
                                          1701 Market Street
                                          Philadelphia, PA  19103-2921
                                          Telephone:        +1.215.963.5917
                                          Facsimile:        +1.215.963.5001

10

elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for the Educational Commission for Foreign Medical Graduates and Dr. William W. Pinsky*

11

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that on this date, I caused true and correct copies of the foregoing

document to be served upon the following counsel of record via electronic and regular mail:


TOMMY SWATE
403 WILD PLUM
HOUSTON, TX 77013

WILLIAM C. REIL
1515 MARKET ST SUITE 1200
PHILADELPHIA, PA 19102
215-564-1635
Fax: 215-564-4292
Email: billreillaw@gmail.com

*Attorneys for Plaintiff*

/s/ Elisa P. McEnroe
Elisa P. McEnroe

**William C. Reil, Esquire**
**1515 Market Street, Suite 1200, Philadelphia, PA 19102**
**Tel: 215-564-1635 Fax: 215-564-4292**
**BillReilLaw@gmail.com**

March 27, 2019                    **BY EMAIL ONLY**
                                 elisa.mcenroe@morganlewis.com

Elisa P. McEnroe, Esquire
Morgan, Lewis, and Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921

          Re:  Dr. Tulp v. ECFMG and Dr. Pinsky
               Docket No: 2:18-cv-05540-WB
               **Plaintiff's Answers to Defendants' Initial Discovery;**
               **Outstanding Depositions**

Dear Ms. McEnroe:

Enclosed please find a true and correct copy of plaintiff's answers to defendants' initial interrogatories and request for production of documents. In light of Judge Bettlestone's recent Order on defendants' motion to dismiss, I would like to discuss the outstanding deposition situation with you, as soon as possible.

Sincerely yours,

*William C. Reil*

William C. Reil

cc:  Tommy Swate, Esq.
     Dr. Orien L. Tulp

enc: Plaintiff's Answers to Defendants' Initial Discovery with:
        - Judge Bettlestone's Order of 03/26/19
        - Plaintiff's Proposed Exhibits
        - Plaintiff's Self-Executing Discovery

LAW OFFICES OF WILLIAM C. REIL
BY: William C. Reil, Esquire
Identification No. 26833
1515 Market Street, Suite 1200
Philadelphia, PA 19102
215-564-1635          ATTORNEY FOR PLAINTIFF

| | |
|---|---|
| Dr. Orien L. Tulp    : | UNITED STATES DISTRICT |
| President of the    : | COURT FOR THE EASTERN |
| University of Science, Arts, and Technology : | DISTRICT OF PENNSYLVANIA |
| 4288 Youngfield Street    : | |
| Wheat Ridge, CO 80033    : | Case No. 2:18-cv-05540-WB |
| vs.    : | |
| Educational Commission for    : | |
| Foreign Medical Graduates    : | |
| 3624 Market Street    : | |
| Philadelphia, PA 19104    : | |
| and    : | |
| Dr. William W. Pinsky    : | |
| President and CEO    : | |
| Educational Commission for    : | |
| Foreign Medical Graduates    : | |
| 3624 Market Street    : | |
| Philadelphia, PA 19104    : | JURY TRIAL DEMANDED |

### PLAINTIFF'S ANSWERS TO DEFENDANTS' INTERROGATORIES

Plaintiff, through his undersigned counsel, submits the following answers to defendants' initial interrogatories and request for production of documents, and in support thereof, it is averred as follows:

**Preliminary Statement:**

These interrogatories were dictated before the Court's recent Order attached hereto, which limits Plaintiff's Lawsuit to Violation of Due Process by the Defendants. Accordingly, Plaintiff objects to any discovery which is inadmissible discovery under the Court's Order.

1. The entire interrogatory is objected to as vague; notwithstanding, students in the United States have access to Internet courses. See transcript of Tulp court testimony.

2. Inter alia, the Complaint explicates illegal actions of ECFMG. See also the exhibits to the Complaint, the Court testimony of Dr. Tulp, and the deposition testimony of Dr. Pinsky. ECFMG has the primary evidence in their redacted affidavits, which plaintiff herein requests. Essentially, ECFMG has erected a number of illegal barriers which make it difficult, if not impossible, for many of USAT's students to complete the process for which ECFMG is the gatekeeper. This effectively means that the defendants have the ability to foreclose foreign medical students from obtaining medical licensure in the United States, even where such licensure is merited.

3. ECFMG would have the information in their possession about the particular students from USAT who have paid to take examinations, have been denied by ECFMG their right to take these examinations, and have not had their money refunded.

4. Objection that this interrogatory does not lead to admissible evidence on any material issue in this case. By way of further response, Plaintiff objects based on the privacy of these individuals, as defendant did when they redacted names of individuals from their so called subpoenas. In addition, plaintiff is unable to answer this question as stated.

5. Objected to as not leading to relevant, discoverable evidence. By way of further response, USAT at present has no relationship with the Medical College of London except what is indicated in the document therein.

6. Inter alia, the sponsor note by the ECFMG, which was put on the WDOMS website, implied that misconduct by Dr. Tulp and/or USAT was committed before the Hearing by the ECFMG for Dr. Tulp.

7. Inter alia, the affidavits referred to in this interrogatory are not affidavits. Among other reasons, they request documents. There are more akin to illegal subpoenas. It should be noted that plaintiff has not been supplied all the redacted affidavits by ECFMG. The trial testimony of Dr. Tulp is incorporated herein, as though fully set forth.

8. Paragraph 20 of the Complaint as well as 29 and 30 speak for themselves. It is noted that ECFMG never indicated in its affidavits to any USAT students that it was not a governmental entity, and that is the impression that ECFMG was trying to convey. Also, ECFMG is the sole gatekeeper for the admission of foreign medical students to practice medicine in the United States.

9. The break-in at the USAT offices in Colorado was reported by the building manager, who has not yet reported the outcome to USAT. To date, no items were recovered. The primary location targeted was a former registrar's desk and the computers used by her.

10. The elements of damages are included in the Complaint and supplemented by the trial testimony of Dr. Tulp. Essentially, ECFMG has destroyed the reputation of Dr. Tulp and the act of functioning of USAT. Many of the damages indicated herein are intangible in nature.

11. The plaintiff, Orien Tulp.

12. The interrogatory is objected to as overbroad. For example, there are probably dozens, if not hundreds, of students who have information relevant to the Complaint, including those students who were illegally sent so called "affidavits" by ECFMG. Dr. Orien Tulp was the source for the information used in the Complaint, and the exhibits attached thereto.

13. This is a litigation decision which has not yet been made, and is contingent upon further discovery and any rulings by the Court. Without waiving any objection hereto, it is anticipated that the parties, Kara Corrado and Lisa L. Cover, may be called as witnesses. While plaintiff has not made a final determination as to witnesses, it is anticipated that witnesses involved with the WDOMS and administrative personnel used in the investigation of Dr. Tulp and ECFMG may also be called as witnesses.

Respectfully submitted,

William C. Reil, Esquire
Attorney for Plaintiff
03/27/19

LAW OFFICES OF WILLIAM C. REIL
BY: William C. Reil, Esquire
Identification No. 26833
1515 Market Street, Suite 1200
Philadelphia, PA 19102
215-564-1636                                ATTORNEY FOR PLAINTIFF

| | | |
|---|---|---|
| Dr. Orien L. Tulp | : | UNITED STATES DISTRICT |
| President of the | : | COURT FOR THE EASTERN |
| University of Science, Arts, and Technology | : | DISTRICT OF PENNSYLVANIA |
| 4288 Youngfield Street | : | |
| Wheat Ridge, CO 80033 | : | Case No. 2:18-cv-05540-WB |
| vs. | : | |
| Educational Commission for | : | |
| Foreign Medical Graduates | : | |
| 3624 Market Street | : | |
| Philadelphia, PA 19104 | : | |
| and | : | |
| Dr. William W. Pinsky | : | |
| President and CEO | : | |
| Educational Commission for | : | |
| Foreign Medical Graduates | : | |
| 3624 Market Street | : | |
| Philadelphia, PA 19104 | : | JURY TRIAL DEMANDED |

## PLAINTIFF'S ANSWER TO THE FIRST SET OF DOCUMENTS

**Preliminary Statement:**

Plaintiff herein incorporates the Preliminary Statement to his interrogatory answers,
as fully set forth herein.

1. Plaintiff has no documentary evidence with the exception of the exhibits used at
the preliminary injunction hearing at this time. Plaintiff would also identify the "black
binder" given to counsel at the "irregular behavior" hearing on 11/28/18. This binder
appears to contain at several hundred pages of information. Plaintiff would request any
documents in the possession of defendants involving allegations of "irregular behavior"
which have not been provided. Plaintiff would request rules and regulations pertinent to
the ECFMG and the state medical boards in the possession of ECFMG.

2. ECFMG brought charges and has all documents in its possession upon which plaintiff was found guilty of "irregular behavior":

a) A black binder handed out by defendants consisting of several hundred pages, which was made available to the committee prior to the Hearing, but to the plaintiff Dr. Tulp on the date of the Hearing.

b) Transcripts from the Injunction Hearing involving Dr. Tulp, including testimony by Dr. Tulp and Kara Corrado.

c) The transcripts of Dr. Pinsky's deposition.

d) Exhibits used at the Injunction Hearing.(see cover page attached).

e) Transcript of the ECFMG Administrative Hearing of Dr. Tulp.

3. Objected to as inadmissible discovery evidence in light of the Court's ruling confining issues to the Due Process claims of defendant.

4. Objected to as inadmissible in Discovery because these documents do not relate to the Hearing of Dr. Tulp before the ECFMG and the denial of due process prior to the Hearing.

5-40. Plaintiff incorporates his answers to paragraphs 1, 2, 3, and 4, as though fully set forth herein.

Respectfully submitted,

*William C. Reil*

William C. Reil, Esquire
Attorney for Plaintiff
03/27/19

## CERTIFICATE OF SERVICE

I certify that I will serve in accordance with P.A.R.C.P. 440 all parties not served electronically. I further certify that a true and correct copy of the attached document (s) was served upon all other parties or their counsel of record by:

| | |
|---|---|
| _____ | Regular First Class Mail |
| _____ | Facsimile |
| _____ | Certified Mail |
| _____ | Hand-Delivered |
| _____ | Electronic Filing |
| _____X_____ | Email |

Respectfully submitted,

William C. Reil, Esquire
Attorney for Plaintiff
03/27/19

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DR. ORIEN L. TULP,
            **Plaintiff,**

       **v.**

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES AND
DR. WILLIAM W. PINSKY,
            **Defendants.**

CIVIL ACTION

NO.  18-5540

## ORDER

**AND NOW**, this 26th day of March, 2019, upon consideration of Defendants' Motion to

Dismiss and support thereof (ECF Nos. 20 & 25), and Plaintiff's Response in Opposition thereto

(ECF No. 24), it is hereby **ORDERED** that Defendants' Motion to Dismiss is **GRANTED IN**

**PART AND DENIED IN PART**, as follows:

1. Defendants' Motion to Dismiss Plaintiff's common law due process claim against

   ECFMG is **DENIED**;

2. Defendants' Motion to Dismiss the remainder of Plaintiff's claims against

   Defendants is **GRANTED**.  Such claims are **DISMISSED WITHOUT**

   **PREJUDICE**.

                            **BY THE COURT:**

                            /s/ Wendy Beetlestone

                            **WENDY BEETLESTONE, J.**

Dr. Tulp v. ECFMG and Dr. Pinsky
Docket No: 2:18-cv-05540-WB

## PLAINTIFF'S PROPOSED EXHIBITS

|                                                                      | PAGE |
|----------------------------------------------------------------------|------|
| Acronym Sheet                                                        | 1    |
| (Exhibits A-F from Complaint)                                        |      |
| Exhibit A: Letter of 12/14/18 from Dr. Pinsky To Dr. Orien L. Tulp   | 2    |
| Exhibit B: World Directory of Medical Schools Printout on USAT       | 4    |
| Exhibit C: Agreement between USAT and the Government of Montserrat   | 5    |
| Exhibit D: ECFMG Affidavit Attesting to Medical School Attendance   | 10   |
| Exhibit E: Letter of 11/21/18 from Ms. Kara Corrado to Dr. Tommy Swate | 12 |
| Exhibit F: Letter of 10/18/18 from Lisa L. Cover to Dr. Orien L. Tulp | 14  |
| Exhibit G: (Letters from Kara Corrado, Esq.)                        |      |
| Letter of 11/27/18 to Dr. Tommy Swate                               | 18   |
| Letter of 11/25/18 to Dr. Tommy Swate                               | 19   |
| Letter of 10/18/18 to Dr. Orien L. Tulp                             | 21   |
| Letter of 11/14/18 to Dr. Tommy Swate                               | 23   |
| Letter of 10/26/18 to Dr. Tommy Swate                               | 28   |
| Letter of 9/14/18 to Dr. Orien L. Tulp                              | 31   |

**William C. Reil, Esquire**
**1515 Market Street, Suite 1200, Philadelphia, PA 19102**
**Tel: 215-564-1635 Fax: 215-564-4292**
**BillReilLaw@gmail.com**

January 23, 2019                           **BY EMAIL AND REGULAR MAIL**
                                           elisa.mcenroe@morganlewis.com

Elisa P. McEnroe, Esquire
Morgan, Lewis, and Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921

       Re:  Dr. Tulp v. ECFMG and Dr. Pinsky
           Docket No: 2:18-cv-05540-WB
           **Plaintiff's Self-Executing Discovery Statement**

Dear Ms. McEnroe:

I submit the following as plaintiff's self-executing discovery statement pursuant to Rule 26. Plaintiff reserves the right to amend or supplement these responses through the discovery process.

    a)    **Witnesses**: Plaintiff, all defendants, and Lisa Cover. Plaintiff particularly wishes to take the deposition of Dr. William Pinsky. All of these witnesses, with the exception of Dr. Pinsky, should have been present at the hearing on the preliminary injunction on 1/24/19. In addition, plaintiff will want to take the deposition of any person from ECFMG or hired by ECFMG to investigate the issue of "irregular behavior." Plaintiff may want to take the deposition of any person who has information concerning the allegation of a false statement by Dr. Tulp. Plaintiff may also want to take the deposition of any person who has any information that Dr. Tulp allegedly committed "irregular behavior." Plaintiff has not retained an expert witness at this time.

    b)    **Documents and Evidence**: Plaintiff has no documentary evidence with the exception of the exhibits used at the preliminary injunction hearing at this time. Plaintiff would also the identify the "black binder" given to counsel at the "irregular behavior" hearing on 11/28/18. This binder appears to contain at least 200 pages of information. Plaintiff would request any documents in the possession of defendants involving allegations of "irregular behavior" which have not been provided, as well as any information in the possession of defendant concerning alleged improper campuses" by the USAT including photographs. Plaintiff would request rules and regulations pertinent to the ECFMG and the state medical boards in the possession of ECFMG.

c)  **Damages**: Essentially, the decision of the ECFMG board has destroyed the career of Dr. Tulp, the existence of USAT, and the possibly the careers of a number of students and graduates of USAT. There are significant lost tuition payments, as well as the destruction of Dr. Tulp's reputation.

d)  **Insurance**: Not Applicable to Plaintiff.

Sincerely yours,

*William C. Reil*

William C. Reil
WCR/cmb

cc:  Dr. Orien L. Tulp
     Tommy Swate, Esquire

**P.S. I first became aware yesterday  that there was a break-in at the office of USAT in Colorado on Friday evening. The police were called. Computers and other items were taken. No one has been arrested at this time.**

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NO. 2:18-cv-05540-WB

DR. ORIEN L. TULP    ) VIDEO DEPOSITION
                     )
       Plaintiff,    ) OF
                     )
     - vs -          ) ORIEN L. TULP,
                     ) Ph.D., M.D.
EDUCATIONAL          )
COMMISSION FOR       )
FOREIGN MEDICAL      )
GRADUATES and DR.    )
WILLIAM W. PINSKY    )
                     )
       Defendants.   )

─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─

TRANSCRIPT OF VIDEO DEPOSITION, taken by and before DANA M. JONES, Professional Reporter and Notary Public, at the offices of MORGAN LEWIS, 1701 Market Street, 18th Floor, Philadelphia, Pennsylvania, on Wednesday, April 17, 2019, commencing at 9:20 a.m.

GOLKOW LITIGATION SERVICES

877.370.3377 ph/917.591.5672 fax

Deps@golkow.com

A  P  P  E  A  R  A  N  C  E  S:


        LAW OFFICES OF WILLIAM C. REIL
        BY:  WILLIAM C. REIL, ESQUIRE
           1515 Market Street
           Suite 1200
           Philadelphia, PA  19102
              Attorney for the
        Plaintiff


        T. E. SWATE, LAW OFFICE
        BY:  TOMMY SWATE, ESQUIRE
           403 Wild Plum Street
           Houston, Texas 77013
                Attorney for Plaintiff



        MORGAN LEWIS
           BY:  ELISA P. MCENROE, ESQUIRE
           MATTHEW KLAYMAN,ESQUIRE
           1701 Market Street
           18th Floor
           Philadelphia, PA  19103
              Attorneys for the
        Defendants

        ECFMG/FAIMER
        BY:  FRANCINE HALUSHKA KATZ,ESQUIRE
           3624 Market Street
           Philadelphia, PA  19104
              Senior Vice President
        and General Counsel

    A L S O   P R E S E N T:

    Devyn Mulholland - Videographer
    Christina Beatrice - Paralegal to William
    Reid, Esquire.
    Christopher Blinn

Orien L. Tulp, Ph.D., M.D.

                    I N D E X


    WITNESS                                    PAGE


    ORIEN L. TULP, Ph.D., M.D.


       By:  Ms. McEnroe                       5, 114
       By:  Mr. Swate                         96


                          - - -




                    E X H I B I T S




    NUMBER          DESCRIPTION         PAGE


    Exhibit-1   Resume                    32

Orien L. Tulp, Ph.D., M.D.

LITIGATION SUPPORT PAGE


INSTRUCTION NOT TO ANSWER


PAGE      LINE

(None)



    REQUEST FOR PRODUCTION OF DOCUMENTS


PAGE   LINE


77        7

P R O C E E D I N G,

VIDEOGRAPHER:  We are now on the record.  My name is Devyn Mulholland.  I'm a videographer with Golkow Litigation Services.

Today's date is April 17, 2019.  The time is 9:20 a.m. This video deposition is being held in Philadelphia, Pennsylvania in the matter of Tulp, Ph.D. versus ECFMG, et al. The defendant is Orien L.  Tulp, Ph.D., M.D.

Counsel will be noted on the stenographic record.  The court reporter is Dana Jones and will now swear in the witness.

ORIEN L. TULP, Ph.D., M.D., after having been duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY MS. MCENROE:

Q.   Good morning, Dr. Tulp.  My is Elisa McEnroe, counsel for the Educational Commission for Foreign Medical Graduates, which we'll call it ECFMG today.

A.   Okay.

Q.   Is that okay?

A.   All right.

Q.   Have you been deposed before?

A.   Not very often.

Q.   Not very often but ever before?

A.   Only once.

Q.   Only once.  Okay.  So you understand that you're under oath today?

A.   I understand.

Q.   Just as if you were in a court room before Judge Beetlestone?

A.   Yes.

Q.   And we will expect that you'll tell the true?

A.   I don't know any other way.

Q.   Great.  And if you could

speak up a little bit louder that will be helpful for all of us.

A. I will try.

Q. Thank you so much.

Do you know where you were on January 18, 2019?

A. January 18, 2019?

Q. Correct.

A. Wasn't I here?

Q. I don't know. That's the date of the alleged break in for the --

A. -- oh, that break in.

Q. Yeah. Do you know where you were the day of the break in?

A. I was not in Colorado that day.

Q. And was the break in in Colorado?

A. It was in Colorado, yes.

Q. What kind of facility was it a break in into?

A. It was an office complex.

Q. And what office is in that complex?

A.     USAT had their administrative admission's office there and an office for the registrar. Administrative offices.

Q.     Does it still have offices there?

A.     No.

Q.     When did it cease having offices there?

A.     March 1st.

Q.     And where did the documents or other possessions from USAT move to?

A.     5400 Ward Road, Aspen Business Complex.

Q.     Also in Colorado?

A.     Aspen Park Business.

Q.     Also in Colorado?

A.     Also in Colorado, yes.

Q.     What's the reason for the move?

A.     The lease was up and they put the building up for sale.

Q.     Do you know what was stolen during the theft on January 18, 2019?

A.    What was missing?  They appeared to have targeted the former registrar's desk.  They took the two computers that she had been using during her employ.  And some files that had been in her desk and little else.

COURT REPORTER:  I'm sorry?

THE WITNESS:  A few minor other items but they only targeted her desk and that was about it.

BY MS. MCENROE:

Q.    And who was that former registrar?

A.    That was Nadine Cruz.

Q.    When did she cease being a registrar for USAT?

A.    About one month before that. I don't recall the exact date.

Q.    When you say two computers, were they desktop computers or laptops?

A.    They were laptops, desktops, yes.

Q.    Desktops or laptops?

A.    You know, laptops.

Q.   And when you say some files in her desk were stolen, were those hard copy or electronic files?

A.   They were paper files.  It was actually the application for her replacement.

Q.   And who was her replacement?

A.   A trainee, Nicole Perez.

Q.   You said a couple of other small things were taken as well.

A.   Speakers.

Q.   Speakers, computer speakers?

A.   Laptop speakers.

Q.   Anything else?

A.   A couple of flash drives.

Q.   Do you remember the contents of those flash drives?

A.   I do not know the content of the flash drives, no.

Q.   Anything else?

A.   I think they took a water bottle that belonged to Ms. Cruz, I believe.

Q.   Anything else?

A.    I don't know of any other items.

Q.    Do you if a police report was made?

A.    Yes.

Q.    Have you ever seen that?

A.    No.

Q.    Who made the police report?

A.    The building owner made the report -- or the building manager made the report.

Q.    Who was that?

A.    The building manager, I don't know her name.

Q.    A lady?

A.    A lady.  I don't know her name.

Q.    Has anything been recovered?

A.    No.

Q.    Do you know if it's an open investigation?

A.    I believe it's still open.

Q.    Do you have a suspicion or understanding about why those things may

have been stolen from the USAT building?

A.    A very strong suspension.

Q.    And what is your suspension?

A.    The suspension would be that it would have been linked to Ms. Cruz because it specifically targeted her desk and her previous -- her former computers. And because the nature of the break in where it occurred, how it occurred, one would have to be very familiar with the building to know how to gain entrance.

Q.    Was there any, as far as you know, evidence of a break in, broken locks, broken windows?

A.    Broken window.

Q.    A broken window?

A.    A broken window in the conference room.

Q.    Glass broken or broken like the lock --

A.    -- glass broken.

Q.    So if you could just let me finish my questions --

A.    Okay.

Q.    -- and I'll let you finish your answer, so we don't talk on top of each other.  But we're doing great so far.

A.    That's fine.

Q.    Okay.  Thank you.

So there was broken glass you said?

A.    Yes.

Q.    And what are the circumstances of Ms. Cruz leaving USAT?

A.    There were work performance issues.

Q.    What do you mean by that?

A.    Repeated errors on transcripts.

Q.    What do you mean by repeated errors on transcripts?

A.    Misspelling of names, misspelling of course selections, miscalculation of grade point averages, things that a registrar has to be very accurate about.

Q.    Who communicated to Ms. Cruz

that she was no longer going to be employed by USAT?

A.    The vice president.

Q.    And who is that?

A.    Carla Konyk, Director Konyk.

Q.    And could you spell Carla's last name for us?

A.    K-O-N-Y-K.

Q.    And you say that Konyk?

A.    Konyk.

Q.    Great.  Thank you.

Was that communication in writing or oral, do you know?

A.    Both.  And it was a longstanding communication over a number of months.

Q.    Prior to January 2019?

A.    Prior to her dismissal.

Q.    And which was in December 2018, does that sound right?

A.    I don't remember the exact date.  I don't know.

Q.    But towards the end of 2018 would you say?

A.   Probably, yes.

Q.   Do you know if any valuables were taken in the theft?

A.   Any?

Q.   Valuables.

A.   Valuables.  Well, laptops in this case would be considered valuables.

Q.   Aside from the laptops.

A.   I don't -- I'm not aware of any other significant valuables.  There's no money stored on campus, for example, in the office.

Q.   Have you been in touch with the police to tell them your suspicion about the cause of the theft?

A.   I have requested through the vice president who communicates with the former manager who has been unresponsive.

Q.   The former building manager?

A.   Building manager is unresponsive.

Q.   But you have not gone directly to the police yourself?

A.   No, I haven't gone directly

to the police myself.

Q. I'd like to talk about USAT a little bit.

Do you understand what I'm talking about by saying USAT?

A. Uh-huh. I'm familiar with the term.

MR. REIL: Counsel, before we get into your next issue, could we go off the record?

MS. MCENROE: Sure.

MR. REIL: Okay.

VIDEOGRAPHER: Off the record at 9:29 a.m.

(At this time, a discussion was held off the video and stenographic record.)

VIDEOGRAPHER: Back on the record at 9:30 a.m.

MS. MCENROE: Counsel can correct me if I'm wrong but we've agreed that for the purposes of this deposition, that all objection -- all objections aside

to those to form are reserved

until the time of trail.

            MR. SWATE:  Yes, that's the

agreement.

            MR. REIL:  So agreed.

            MS. MCENROE:  Thank you.

BY MS. MCENROE:

        Q.    So what does USAT stand for?

        A.    University of Science, Arts

and Technology.

        Q.    Do you know when USAT came

into existence?

        A.    I didn't hear that.

        Q.    Do you know when USAT came

into existence?

        A.    September 26, 2003.

        Q.    And how do you know that

date?

        A.    Because I was there.

        Q.    Tell me a little bit about

your involvement in the starting of USAT?

        A.    We -- while I was residing

in the UK I'm often, as a professor,

often asked to write letters of

recommendation for students to go to other schools, and I became aware while I was on a leave in Cambridge that there were a number of offshore schools based, you know, satellite programs running in the UK, and while I was there one of them invited me to be a dean of his school. I went down and looked at it and I began to investigate and discovered that, number one, his school was never licensed. And I used the credential for the Pentagon for medical professionals, so I did a little background research to find out that this whole school was bogus at the time.

Q. And what school was that?

A. Saint Christopher's School of Medicine -- or St. Christopher's College of Medicine it became, and I'm not when that transition occurred.

I declined the invitation on the grounds that I've -- I was attending professor at Drexel and it would have been a conflict of my contract and I

didn't want to do it anyway.  And so --
but it gave me a reason to look into the
business of offshore schools, being many
of them.  I think they're right now 78
offshore schools in the Caribbean region
alone, in the Caricom.

COURT REPORTER:  In where?

THE WITNESS:  In the
Caricom.

And so I looked into that
and I realized that they're all
entrepreneurial, all of them.  And
we got the idea that if one were
to form a university based on an
academic platform, it should go
far because there's a real need
and that's when we created USAT.

BY MS. MCENROE:

Q.   You say when we created
USAT, who else worked with you to help
create USAT?

A.   Several other individuals.
We got together in a pub in Cambridge,
the Eagle Pub.  Very famous.  I'm sure

you know about it.

Q.    I studied at Oxford not at Cambridge so I apologize, I don't know that one.

A.    I see.  That's where they first outlined DNA on a napkin.  Anyway. So we decided that we would form this school, form a university based on an academic platform because we're all academics.

Q.    And who is the we?

A.    We -- my other primary contributor at that time was Dr. Jeffrey Mvenge.

Q.    How do you spell the last name?

A.    M-V-E-N-G-E.

Q.    And anybody else?

A.    And he and I were the two principles.

Q.    You said offshore schools a number of times, what do you mean by that in this setting?

A.    Offshore schools that are

schools that are located off the shores of the US or major continents.  They're offshore schools I believe where virtually every major land to me.

Q.    So are you and Jeffrey Mvenge the two founders of USAT?

A.    He went back to Zimbabwe.

Q.    Did he found USAT with you?

A.    He was on the organizing committee.

Q.    Did he found USAT with you?

A.    He was a contributor, I will say that.

Q.    Does he have any ownership interest in USAT today?

A.    No.

Q.    Do you?

A.    Yes.

Q.    What's your ownership interest in USAT?

A.    50 percent.

Q.    Who owns the other 50 percent?

A.    Carla Konyk.

Why is that relevant?

MR. REIL:  Let counsel ask her questions.

THE WITNESS:  All right.

MR. REIL:  We'll object if we think it's necessary.

THE WITNESS:  Okay.

MS. MCENROE:  Thank you.

BY MS. MCENROE:

Q.    And what's your relationship to Ms. Konyk?

A.    She's the vice president.

Q.    Do you have a personal relationship?

A.    I've known her for many years.

Q.    Is she your wife?

MR. REIL:  You can answer.

THE WITNESS:  She is.

BY MS. MCENROE:

Q.    Is she a medical doctor?

A.    Yes.

Q.    Where did she get her medical degree?

A. In the UK.

Q. At what school?

A. I think it was called London Medical College or something like that.

Q. Is that before or after you guys had met?

A. Probably after. I met her many years ago on a humanitarian medical mission.

Q. And pardon me for not nothing but does she have an M.D. or is there a different medical degree from the UK?

A. They're MBBS.

Q. MBBS. And is that what she has?

A. Yes.

Q. Since the founding of USAT has the ownership split been 50 percent you and 50 percent Ms. Konyk?

A. Yes.

Q. From the beginning?

A. From the beginning.

Q. Still today?

A.    Until today.

Q.    And what is your title aside from owner at USAT?

A.    Professor.

Q.    Are you also the president?

A.    Yes.

Q.    Do you have any other titles at USAT?

A.    No.

Q.    Have you had any other titles at USAT?

A.    No.

Q.    Speaking first about your role as president, what specifically do you do at USAT as president?

A.    I provide overall direction of the University, administrative professor -- I tend to spend more of my time working on the professional side, on the academic side, curriculum, corporation, guiding the curriculum development, that sort of thing.

Q.    Anything else?

A.    That's about it.

Q.    For professor, what do you teach or have you taught at USAT?

A.    Nutritional medicine mostly. And that would include things like pharmacology.

COURT REPORTER:  I'm sorry?

THE WITNESS:  That would include pharmacology.

MR. REIL:  Wait until there's a question.

MS. MCENROE:  I think he was just clarifying for the court reporter.

MR. REIL:  Oh, okay.  Fine.

BY MS. MCENROE:

Q.    And have you been both the professor and the president of USAT since its founding?

A.    Yes.

Q.    And you mentioned that Ms. Konyk is the vice president?

A.    Yes.

Q.    Is she a professor as well?

A.    No, she's administrator.

Q.   Just very briefly, what her role is at USAT?

A.   She's vice president and -- administration.

Q.   So what does that mean?

A.   Well, she takes care of all the administrative details, makes sure the bills get paid and that sort of thing.  Faculty get paid, making sure the administrative policies, managing the office and that sort of thing.

Q.   Where is she based?

A.   Colorado.

Q.   And where are you based?

A.   Colorado and Montserrat.  I split my time.

Q.   How would you estimate your split of time percentage-wise?

A.   Recently, probably if I go back, in the average over the last 15 years about 50/50.

Q.   About 50/50.

You have a home there in Montserrat?

A.    Yes.

Q.    Is there any other USAT faculty or employees who are located in Montserrat?

A.    Yes.

Q.    And who is that?

A.    Dr. Lewis.  Consultant surgeon.

Q.    What's Dr. Lewis' first name?

A.    Lowell.

Q.    And is he a professor?

A.    He's a professor.  He's a very senior surgeon.

Q.    Anybody else?

A.    Tracy Scipio, who is the office manager.

Q.    Yup.

A.    Roy Abrams who is the building engineer of the campus.

Q.    Yup.

A.    Another fellow who is -- Charles Rooney, who is the grounds keeper.

Q.    Yup.

A.    We have a housekeeper whose name I don't recall, it just changed.

Q.    Yup.

A.    We have some other staff that worked there on a regular basis to make sure that, you know, the buildings are maintained in good condition and the administrative stuff gets managed.

Q.    Any other professors located in Montserrat?

A.    They travel in as are needed.

Q.    Are you currently employed at the University of Health and Humanities in the British Virgin Islands?

A.    No.

Q.    Has that school been founded?

A.    I believe so.

Q.    Were you involved in it getting founded?

A.    Yes and no.  I provided some guidance.

Q.    Is Ms. Konyk involved in its founding?

A.    I believe so.

Q.    Is she an owner, in part or in whole, of the University of Health and Humanities BVI?

A.    I believe so.

Q.    What percentage owner is she?

A.    I'm not sure.

Q.    Do you know any of the other owners at the University of Health and Humanities BVI?

A.    Not really.

Q.    So is that a no?

A.    That's a no.

Q.    Do you know what the status is of that school, is it open and operating?

A.    It's been operating, yes.

Q.    Since when?

A.    Since January.

Q.    Does it have students enrolled?

A.    I believe so.  I believe they do have.

Q.    Are you a professor at the University of Health and Humanities BVI?

A.    No.

Q.    Do you plan to be?

A.    Not sure.

Q.    Is there any relationship between USAT and the University of Health and Humanities in BVI?

A.    No direct relationship that I'm aware of.

Q.    Is there an indirect relationship?

MR. REIL:  Objection to the form of the question.  Can we go off the record?

VIDEOGRAPHER:  Off the record at 9:43 a.m.

(At this time, a discussion was held off the video and stenographic record.)

MR. REIL:  I object to that question because -- the form of

the question because I think the term indirect relationship is very vague. I'd appreciate it if you can clarify that.

MS. MCENROE: Are you directing him not to answer?

MR. REIL: Absolutely not.

MS. MCENROE: Then let's go back on the record.

VIDEOGRAPHER: Back on the video record at 9:44 a.m.

BY MS. MCENROE:

Q. Is there an indirect relationship between USAT and the University of Health and Humanities BVI?

A. I would say probably yes. I don't -- I can't clarify that. I'm not privy to that information.

Q. So Dr. Tulp, I am not going to try to go through your whole employment history and education history because it's quite impressive and long. I'm not going to belabor the point here today but I do want to talk through a

couple of things in particular. And we
have what we believe is a copy of your
resume.

MS. MCENROE: I'd like to
mark Exhibit-1.

(At this time, a Resume was
marked for identification as
Exhibit-1.)

BY MS. MCENROE:

Q. So Dr. Tulp, I'm handing you
what's been marked as Exhibit-1. Is that
your name at the top?

A. It is indeed, yes.

Q. And are those your titles
listed out, Ph.D., M.D., F.A.C.N.,
C.N.S.?

A. Yes.

Q. Is this your resume?

A. It does appear to be, yes.

Q. Is this a familiar document
to you?

A. It is familiar, yes.

Q. Did you prepare it?

A. I most likely did some time

ago.

Q.    Do you have any reason to believe you did not prepare it?

A.    No.

Q.    So I know what a Ph.D. and an M.D. is.  What is an F.A.C.N.?

A.    Fellow of the American College of Nutrition.

Q.    And what is C.N.S.?

A.    Certified Nutritional Specialist.

Q.    I'd like to take a look at the second page of that document and I'd like to go through a couple things in your education briefly.

So as I see it you have a number of different degrees listed here but I want to start from the top and work my way down for the M.D. related degrees. So the first that I see is a Ph.D., M.D., from the University of Vermont in 1968 to 1974; is that correct?

A.    Correct, uh-huh.

Q.    So am I understanding that

correct to say that you did both a

Medical Doctor degree and a Doctor of

philosophy at the University of Vermont?

A.    Yes, I did the Ph.D.

Q.    The M.D., Ph.D. program?

A.    That's right.

Q.    And so if I called the

University of Vermont would they tell me

that you graduated with an M.D.?

MR. REIL:  Objection as to

what the University of Vermont

would say.  You can answer.

THE WITNESS:  I have no

idea.

BY MS. MCENROE:

Q.    Do you have an diploma from

the University of Vermont with an M.D.

degree on it?

A.    I have a diploma.  I had

one.

Q.    Have you ever seen one for

yourself?

A.    Yes, I have.  I've had one.

When I went to Montserrat they wanted my

original diploma so I took it out of the frame and it has yet to be returned.

Q.    And when I asked you if I called the University of Vermont if they would tell me that you had an M.D. degree or not, you didn't say emphatically yes. Why not?

A.    Because I don't have a copy of that certificate anymore, it's gone.

Q.    Do you have a transcript from when you attended the University of Vermont and got your medical doctorate degree?

A.    I'm sure I do.  It's been many years.

Q.    Moving a little bit further down there's listed as a medical degree from St. Petersburg Medical Academy/IUFS in St. Petersburg, Russia in 2005.  What is IUFS?

A.    I think that's the International University for Fundamental Studies.  And I'm not sure what the relationship of that is with St.

Petersburg Medical Academy. Medical

Academy is the medical school.

Q. Was that education in

Russian or in English?

A. It was in English.

Q. Have you ever tried to come

through the Educational Commission for

Foreign Medical Graduates with your

foreign medical diploma to enter graduate

medical education in the United States?

A. No.

Q. That diploma is listed as

2005?

A. Correct.

Q. Why did you attend St.

Petersburg Medical Academy for a medical

doctor degree in 2005?

A. They wanted me to be -- they

offered me a seated faculty position and

that was an enticement to get me to

accept it.

Q. Did you do course work for

that M.D. degree?

A. It was transfer credit.

Q. From where?

A. From University of Vermont.

Q. Did you do any course work at St. Petersburg Medical Academy?

A. No. It was all transfer credit.

Q. And I'd like to look at your M.D. degree next, it's from California University, Los Angeles?

A. That's a foreign degree equivalence.

Q. So can you explain what that means?

A. They reviewed everything, they did a -- just like when similar to I assume with the ECFMG does when you submit your credentials, they do an evaluation of that credential through some agency and then they issue the certificate accordingly.

Q. And was that a degree awarded for course work done there?

A. No, that's an equivalency.

Q. Is that school, the

Orien L. Tulp, Ph.D., M.D.

California University, Los Angeles

located in the United States?

        A.      Yes.

        Q.      In California?

        A.      In California.

        Q.      In Los Angeles?

        A.      In Los Angeles.

        Q.      Did you go to Los Angeles in connection with receiving this degree?

        A.      I've been to Los Angeles many times.

        Q.      In connection with receiving this degree?

        A.      I didn't -- no, I didn't have to go in connection with that because it's an equivalency certificate, not, you know, not in a classroom base.

        Q.      And what served as the basis for that equivalency?

        A.      They evaluate your course work and compare it to the US standard.

        Q.      And what course work was that for you?

        A.      That was course work taken

Orien L. Tulp, Ph.D., M.D.

at the University of Vermont and I presume -- it's a collection of everything.

Q.   And why did you pursue getting the M.D. degree at California University, Los Angeles?

A.   I guess for the same reason we had to do it for NARIC in the UK. When I was residing there, they evaluate your credentials to see if they're equivalent to their credentials.  Even though I never actually took a position in the UK.  We did do -- I did to the NARIC evaluation and they considered everything equivalent up to and including the Ph.D., which is pretty good because I'm aware that they don't accept a lot of US credentials.

Q.   So I want to make sure I understand.  So the Doctor of Medicine, California University, Los Angeles, were they evaluating to see if you had the equivalent of a US degree?

A.   US and UK.

Q.    US and UK.

A.    Yes.

Q.    Okay.  And so -- but you already had a US degree from the University of Vermont; correct?

A.    Right.

Q.    So you were doing that for the purposes of having the equivalency of a UK degree?

A.    Yes, because I was considering an appointment at Cambridge.

Q.    So did you take an appointment at Cambridge?

A.    No, I did not.

Q.    But you mentioned having been at Cambridge when you had the idea for USAT?

A.    Yes, right.

Q.    So were you a ever affiliated with a college in Cambridge?

A.    I was invited to give a few lectures at different colleges while I was there.

Q.    What colleges?

A.   I don't remember the names of the colleges.  It's many years ago.

Q.   Would that have been in the 2004 timeframe?

A.   It would have been 2001, '02, '03, '04 because I resided in the UK for about six years.

Q.   And what were you doing professionally when you lived in Cambridge for six years?

A.   I was on leave from Drexel University.

Q.   Doing what?

A.   I was on a medical leave.

Q.   Why did you take your medical leave from Drexel University in the United Kingdom?

A.   I had a serious back injury from a car accident and I needed to have a year away when Drexel would stop ringing up my phone every day.

Q.   So did you work while you were there?

A.   I gave guest lectures,

occasional guest lectures there and on the continent.

Q. The next degree is an M.D. (AM.) What does that mean?

A. Yes.

Q. What does that mean, the AM?

A. Alternative medicine.

Q. So is that different than a Doctor of Medicine degree?

A. Yes. That's natural medicine.

Q. And you received that degree in 2004 from Open International University, Columbo, Sri Lanka India?

A. Correct.

Q. Did you actually physically go to India to receive that degree?

A. No, I did not.

Q. Did you take any course work to receive that degree?

A. They used my course work from the University of Vermont and other institutions because I have a strong interest in complementary medicine.

Q.    You also have another M.D. (AM) received in 2004, this time labeled as Doctor of Medicine in Alternative, slash, Integrated Medicine, Medicina Alternativa?

A.    Yes.

Q.    If I didn't butcher that. Okay.

From the Indian Board of Alternative Medicine Calcutta?

A.    That's correct.

Q.    And did you go to Calcutta in connection with that degree?

A.    No, I did not have to.  I didn't go to.

Q.    What did they accept in order to award you that degree?

A.    They reviewed my transcripts and my entire profile to do that.

Q.    So was that again the University of Vermont course work?

A.    It included University of Vermont, yes.

Q.    Did it return -- sorry.

Strike that.

Did it include anything else?

A.   They probably did but I don't recall.

Q.   Do you have any other M.D. or medical degree or equivalent?  Or did we review all of them?

A.   No, I think you've got it covered.

Q.   Are you a practicing doctor in the United States?

A.   No.

Q.   Are you licensed to practice medicine in United States?

A.   I was at one time.

Q.   In what state?

A.   West Virginia.

Q.   When was that?

A.   A long time ago.

Q.   If it refreshes your recollection at all, take a look at page 4, if it would be helpful.  And of course, I want your current answer.  But

just there's a section at the top, it says, Medical Licensure, West Virginia, USA.

A.    Right.

Q.    And it says that it expired in July of 2010.  Do you see that?

A.    Right.

Q.    Does that sound right to you?

A.    That seems right.  I just didn't bother renewing it.

Q.    Have you ever treated patients in the United States as a medical doctor?

A.    No.  I've been an academic and a researcher.

Q.    Do you know when you received your medical degree in West Virginia?  I'm sorry, strike that.

Do you know when you received your medical license from West Virginia?

A.    I don't recall the year.

Q.    It also says here that you

are an Allied Health Professional in California.  Is that a medical doctor?

A.    That was Allied Health.  It was when I first -- I did a sabbatical in California at a pharmaceutical firm.

Q.    But is that the same as a medical license in California?

A.    No, that's more pathology.

Q.    In the District of Columbia you have listed Naturopathic Medicine?

A.    Yes.  I was registered their Naturopathic Medicine.

Q.    Is that the same as a license to practice medicine?

A.    It was in that domain, yes.

Q.    So you are able to practice medicine in the District of Columbia?

A.    Natural medicine.

Q.    Just natural medicine?

A.    Natural medicine.  Yes.

Q.    But it was an unrestricted -- it was not an unrestricted license to practice medicine?

A.    No.  No.

THE WITNESS:  I don't think they issue those anymore, I don't know.  I haven't kept up with it.

MS. MCENROE:  Well, it's almost 10 o'clock and we're about to have a fire alarm so we're going to take a quick break.

VIDEOGRAPHER:  Off the record at 9:57 a.m.

(At this time, a short break was taken.)

VIDEOGRAPHER:  We're back on the record at 10:08 a.m.

BY MS. MCENROE:

Q.    Dr. Tulp, I'd like to talk a little bit about your work at USAT.  And in particular, your role as an authorized signatory on behalf of USAT for purposes of the Educational Commission for Foreign Medical Graduates?

A.    Sure.

Q.    When I say an authorized signatory, do you know what I'm talking

about?

A.    I think I do.

Q.    What does that mean to you?

A.    It means I get to sign things.

Q.    You get to sign things for what purpose?

A.    Diplomas and I suppose also it would include anything that requires an official signature.

Q.    In order to communicate to the Educational Commission for Foreign Medical Graduates, that the information is correct?

A.    Presuming it's correct as presented to me.

Q.    To the best of your knowledge?

A.    To the best of my knowledge.

Q.    Do you understand that you are not presently permitted by the ECFMG to be an authorized signatory?

A.    I understand that.

Q.    Do you know if USAT has

different authorized signatories at present aside from yourself?

A.    Yes, it does.

Q.    And who is that?

A.    Carla Konyk is the authorized signature now.

Q.    Anybody else?

A.    The registrar which would be --

Q.    Mary Hickling?

A.    Mary Hickling, yes.

Q.    And they are both presently employees of USAT?

A.    Yes.

Q.    Do you know whether they were both authorized signatories previously when you were also an authorized signatory?

A.    I was not aware that they were.

Q.    Do you know one way or the other?

A.    I did not know that they were authorized signatories at that time.

I only knew that the registrar, because her signature has to be recorded with an official ECFMG form of some sort.  And I knew that she was but I didn't know any of the others were.

Q.    And when you say the registrar, you're talking about Ms. Hinkling?

A.    Ms. Hinkling, yes.

Q.    And how long has she been the registrar at USAT?

A.    About five years I think.  I'm guessing.

Q.    Previously when you were an authorized signatory to ECFMG, when documents were signed with your name, were you the actually the one signing them?

A.    I hope I was but I can't attest that I always was.

Q.    And why do you say that?

A.    Well, some of the forms are already signed when I get them.

Q.    By you?

A.     Some by the ECFMG.

Q.     Right.  But if you sign a document as the authorized signatory on behalf of USAT previously and submitted it to ECFMG, did it have your signature on it before you received it?  Is that what you're saying?

A.     I can't say yes or no.  That it was always that way.

Q.     So you said you hoped that you were the person who actually signed the documents, was anybody else at USAT authorized to sign on your behalf?

A.     No.

Q.     Was anybody authorized to send e-mails on your behalf?

A.     I believe that the -- they sent everything out over my signature block.  When they send correspondence to students, for example, they send it over my signature block, and I never really thought very much about that one way or the other.

Q.     But you may not have

necessarily been the author of the e-mails, is that what you're saying?

A. I would not have been the author.

Q. Sometimes you were and sometimes you weren't?

A. More often than not on the usual correspondence then I'm not author.

Q. I just want to confirm the e-mail addresses that you use.

A. I (indicating.)

Q. I just want to confirm the e-mail addresses that you use. One I have is O.tulp, which is T-U-L-P, @USAT.edu?

A. That is correct.

Q. And another I've seen is USAT.edu@gmail.com.

A. Yes. That preceded the edu, the Educause domain.

Q. And those are both e-mails addresses you have used?

A. Yes.

Q. And you receive e-mails at

those e-mail addresses?

A.    Yes.

Q.    Since it sounds like you have some uncertainty about whether documents that went to ECFMG with your signature on them weren't necessarily signed by, did you ever raise that concern to ECFMG?

A.    I haven't because as a result of this I became aware of it.

Q.    What do you mean by that?

A.    I was not aware that there were questions before.  15 years we had no glitches.  Not a single glitch.

Q.    I just want to make sure I break that down and understand what you're talking about.

So when you say before this are you talking about before the circumstances that bring us to this deposition today?

A.    Yes.

Q.    And when you say you weren't aware of there being glitches, what do

you mean by a glitch?

A.    The ECFMG is claiming that documents were inaccurate.  I'm unaware of any that were inaccurate when they were sent by me.

Q.    Are you now aware that they were inaccurate at the time?

A.    No.  Because I have not seen proof.

Q.    What steps, if any, is USAT currently taking to make sure that documents that are signed by an authorized signatory sent to ECFMG are accurate?

A.    When Dr. Konyk reviews them she has access to administrative files that I do not.  So she's able to go back and verify names, dates and places that I could not.

Q.    And is that a process that's in place now?

A.    It is.  Yes, it's in place now.

Q.    Was it in place previously

when you were the authorized signatory or a authorized signatory I should say?

A.    We follow FERPA.  And therefore, if you have no need, there's no requirement to see if this particular document, you cannot access that.  So during the process of leading up to this, I can't go in and look at a person's transcript and make a comment on it or edit it or verify things.  Occasionally, I can get them but I'm not authorized to be in that system because I have no need to enter data.  If you can't enter data there's no need to be in there.

Q.    So when you were the authorized signatory, you were also President of USAT signing documents to attest to the veracity of transcripts and diplomas to the ECFMG, but you say that you had no reason to check that they were actually accurate?

A.    I had to reason to doubt that they were correct.  I had no reason to doubt that they were correct or

incorrect because as they were presented to me they've already been through the registrar for verification.

Q. What was the process there? Because my understanding is is that ECFMG would send documents to USAT asking if these are correct, and then they would come back with your signature saying they were.

So at what point was the registrar verifying that they were correct and how do we know that that's true based on the document?

A. At that point I would take the data from the transcript.

Q. Which transcript?

A. The USAT transcript.

Q. Provided from ECFMG?

A. Provided by the registrar.

Q. So you would get a comparison?

A. I'd get it and if they matched they matched. They almost all exclusively did. I don't recall any

times when they did not match.

Q. So how does that play in with FERPA, if you were verifying that the transcripts matched or that the diplomas matched, what is it that you're talking about that you were not accessing?

A. I can't access -- if you come to me as a student and you want me to do a grade, review your file, I can only review what the student brings to me to look at and what their study plan is. I can't review their -- I can't -- I can't calculate on whether they got an A, B, C or a D on a grade because I can't read that part of the -- I can't read that part of the file.

Q. So you as president were not authorized to read those files to make sure that they were accurate?

A. I never asked to be authorized to read that because that's -- I delegate that to the registrars. Those that have a need to be in those files.

Q.    So in fulfilling your role when you were an authorized signatory for ECFMG, when a transcript or a diploma was sent to USAT for primary source of verification you did not access the underlining information --

A.    -- then I would get --

Q.    Hold on.  Let me finish my question.

-- you did not access the underlining information in USAT's system to verify that it was accurate?

A.    I would access it through the registrar.

Q.    What do you mean by that? Physically, how did it work?

A.    I would ask her now to send me a copy of that transcript so that I could verify the accuracy.

Q.    Okay.  So you would.  You would just have a middle person, who would go into the system and get it for you and then you can hold the two next to each other and say, yes, that matches?

A. Right. I can look at it side-by-side and say, yes, they match that's correct.

Q. And do you believe you did that each time that your signature was on a document, to ECFMG as the authorized signatory for either a diploma or a transcript?

A. I believe I did, yes.

Q. If you were permitted by ECFMG now would you continue to serve as an authorized signatory for USAT to ECFMG?

A. I would.

Q. And would you change the process involved to make sure that there were no "glitches?"

A. I would tighten it up.

Q. And how would you tighten it up?

A. I would tighten it up by, you know, request the access to the files at that time so that I can look not just at the transcript but the entire academic

record.

THE WITNESS:  There's one point that you didn't finish with.

MR. REIL:  Wait for a question.

THE WITNESS:  Okay.  All right.

BY MS. MCENROE:

Q.    You testified earlier that Ms. Cruz was dismissed from USAT because of some issues with her performance; is that correct?

A.    She wasn't dismissed she walked off the job.

Q.    Ah, so she quit?

A.    She quit.

Q.    But in any event, you mentioned that she had had some performance issues; is that correct?

A.    Yes.  She had been counseled repeatedly.

Q.    Do you know if any of those errors coming from Ms. Cruz made their way to ECFMG?

A.     I believe they probably did.

Q.     And what role was she playing?

A.     She was the registrar.

Q.     So you would have been relying on --

A.     -- she was the registrar before Mary Hickling.

Q.     So you would have been relying on information from Ms. Cruz --

A.     Yes.

Q.     -- in serving as the authorized --

A.     Right.

Q.     -- signatory to ECFMG?

A.     Right.  We became aware of the errors maybe a year prior to her departure.

Q.     What steps, if any, did you take to rectify those errors with ECFMG?

A.     She was counseled, she was put on probation.

Q.     Did the actual errors that made their way to ECFMG get corrected?

A.    When we found them we would correct them, yes.

Q.    You corrected them with ECFMG directly?

A.    Some, yes.  Some, yes.  I think some probably did get corrected, you know, that way.

Q.    But potential that some of them did not?

A.    But until I became aware of these because -- I became aware of it when I was reviewing some of the transcripts to certify individuals, that there were errors on those transcripts that had slipped through.  Typos, misspellings.  I looked mostly at the signature, the heading of the transcript. The name, make sure the name is correct. And that it matched the application, that it matched all the other parts of the file.  And that's when we discovered that not only was the -- were names being misspelled, careless typing.  Failing to check her work.

Q.   Could there have been substantive errors as well?

A.   There could have been. There could have been.

Q.   And they would have gone to ECFMG under your signature?

A.   They could have before I detected it.

Q.   Is USAT currently operating as a medical school?

A.   It's currently operating, yes, because we have files that we have to attend to and maintain for a number of years.

Q.   Does USAT currently have students enrolled?

A.   I don't believe so.

Q.   When was the last student enrolled attending USAT?

A.   Probably December 31st.

Q.   2018?

A.   Yes.

Q.   Do you know if any students were set to graduate after January 1,

2019?

A.    There were some that would have been eligible in the coming year, yes.

Q.    Do you know what happened to those students?

A.    I believe they've all transferred to other schools.

Q.    Did anyone, in fact, graduate after January 1, 2019?

A.    No.

Q.    Going back to the previous years, 2014, '15, '16.  Prior to the circumstances that bring us here today, when would you USAT hold graduation?

A.    Twice a year.

Q.    When is that?

A.    Mid June and mid December.

Q.    Mid June and mid December.

And typically, how many students would graduate at each of those graduation ceremonies, ballpark?

A.    It would vary depending on how many were -- had completed the

requirements at that point.

Q. And was one was graduation ceremony more common than the other? So would most people graduate in the summer and a couple in December or would it be in --

A. About half and half.

Q. About half and half.

A. It changed over time.

Q. And what do you mean by that?

A. The December graduation became more popular.

Q. Why do you think that?

A. Because that would graduate them in time to go to residency without skipping a year.

Q. And explain to me how that timeframe works, that sort of life cycle?

A. During their fourth, you know, their last year, their fourth year, they would be taking all of the remainder of the USMLE, you know, requirements, and we would like to have them complete those

before they graduate.

Q.    Do they have to complete those before they graduate?

A.    No.

Q.    And what do you mean by that?  So they can still have course work ongoing even if they graduated?

A.    If they're an international student there's no need to take the USMLE.

Q.    Ah, I see.  So you're saying because they may not come to the United States to practice medicine; correct?

A.    They do not all want to come here to practice.

Q.    When USAT had students enrolled, was it possible for a student to graduate before they finished their course work for USAT?

A.    No.

Q.    Typically, how many years would it take a student at USAT to get through the medical curriculum at USAT?

A.    Typically about

three-and-a-half years.

Q.   And you say typically, is that the most common or do you view there as being some other general range?

A.   Some take longer than others.

Q.   And when you say that, would 3.5 years generally be the minimum that it would take for someone to get through --

A.   -- probably the average.

Q.   The average?

A.   Yeah.

Q.   And how quickly could someone get through it if they were doing the course work?

A.   Probably as little as three years because there are no breaks.

Q.   When you say that, you mean that they have accelerated their course work so it would be a little bit more condensed?

A.   There no -- there's no term off.  There's no, you know, in my day we

had the summers off.  Our students don't have the summers off.  Once they start the program it is nonstop until they finish.  So they can complete that four years of, you know, academic work in about three academic -- three calender years.

          Q.    Would it be possible for them to do it faster than three calender years?

          A.    It would be possible but not very -- not very often.  We don't like to graduate them too soon.

          Q.    When you say it would be possible, I'm just trying to understand that -- in my experience, tell me if I'm wrong, there's a certain number of course hours one would need to complete --

          A.    Right.

          Q.    -- usually to get through a curriculum, is that how it was at USAT?

          A.    Yeah, they can.

          Q.    So if you took no terms off would it be possible to condense the

education faster than three calender years?

A. It would be a challenge.

Q. Do you know of students having done that?

A. I believe a few may have but we usually would not encourage them to graduate until after they take that remaining time to finish the USMLE requirements. If they put those off until the end they might be able to finish the academic part a little bit quicker but we want them to do those all before they graduate whenever possible.

Q. And when you say the USMLE requirements, are you talking about examinations?

A. Step one, step two CS at 2CK.

Q. Did USAT have a requirement, a graduation requirement, for its students who were intending to go to the United States to pass any of the steps?

A. They do not have to pass the

USMLE to graduate because the USMLE is not an academic requirement.

Q. Does USAT require it or no?

A. We do not require them to, no.

Q. Do you know how many students graduated from USAT in 2015?

A. I don't recall exactly. Probably about a hundred.

Q. And in 2016?

A. Probably about a hundred.

Q. And 2017?

A. Probably about a hundred.

Q. And 2018?

A. Two hundred and eight -- 2018 was a banner year because of the ECFMG actions.

Q. So how many in 2018?

A. 400.

Q. 400?

A. Yes. Approximately. I don't know the exact number.

Q. And when you say it was a banner year because of the ECFMG actions,

what do you mean?

A. Students who were in that final transitional year, the pressure on them then was to graduate, in some cases, before they had taken the USMLE. Normally, they would have delayed until 2019.

Q. So were all 400 who graduated in 2018 in their final year at USAT?

A. Obviously.

(Brief interpretation.)

THE WITNESS: Sorry. Sorry.

MS. MCENROE: No problem. You can --

THE WITNESS: I thought I put the power off before.

BY MS. MCENROE:

Q. And when -- in 2018, do you know what happened to the non-final year students at USAT, the lower-graded students?

A. They transferred to other schools.

Q.    And how many students transferred?

A.    About a thousand.

Q.    Do you know if any of them transferred to the University of Health and Humanities BVI?

A.    No.  I do not know.

Q.    You don't know one way or the other?

A.    I don't know one way or the other.

Q.    Do you know where the majority of them transferred to?

A.    No, I do not.  I know some of the schools they transferred to but I don't know all of them.

Q.    Was there a primary school or two that they transferred to or was it a mix?

A.    It was a mix.

Q.    Just trying to get an understanding for USAT's operations in terms of tuition from its students.

Did USAT get paid tuition

annually, semiannually, quarterly, how did that work from students?

A.    They had a payment plan. Every student has to sign a payment plan.

Q.    So explain what that means.

A.    They make an agreement when they matriculate of how they're going to pay their tuition.

Q.    Is there a standardized payment plan?

A.    It's tailored to the individual.

Q.    I understand it may be tailored to the individual.  But is there a standard form --

A.    Yes.

Q.    -- of agreement?

A.    Yes.

Q.    And so on the standard form was there a schedule for payment?

A.    Yes.

Q.    Can you explain that schedule, please?

A.    The schedule would be how

much they plan to pay each month and how they plan to pay it.

Q.   So they paid monthly?

A.   Some paid monthly.

Q.   And some paid otherwise?

A.   Some paid on whatever schedule they could agree on.

Q.   How many, percentage-wise, paid monthly?

A.   I do not know.

Q.   Who would know that?

A.   The administrative office in Colorado would know that.

Q.   So is that Ms. Konyk?

A.   That would be Dr. Konyk. Dr. Konyk, yes.

Q.   Oh, it's Dr. Konyk, I'm sorry.

So it sounds to me, and correct me if I'm wrong, that the -- in the usual course for a USAT student before 2018 a student would attend course work?

A.   Right.

Q.     Between three-and-a-half, four years kind of timing?

A.     Typically.

Q.     And they'd remain a USAT student until they got through certain of the USMLE exams?  Certain of the steps?

A.     That was -- that was the plan.

Q.     Did those students continue to pay tuition between when they finished course work and when they finished their USMLE exams?

A.     Some did.

Q.     But some did not?

A.     It was an individual basis.

Q.     But they yet remained enrolled at USAT?

A.     It's an individual basis that they would work out with the vice president.

Q.     Do students pay any additional amount of money upon graduation for the termination of their time at USAT?

A.    No, no.  A graduation fee and that's all they would pay.

Q.    Would USAT graduate students who still had amounts due and owing of USAT?

A.    They could walk for graduation.

Q.    Would you issue a diploma?

A.    No.

Q.    Do you know in 2018 if USAT issued diplomas before students finished paying their tuition?

A.    USAT did not issue diplomas until tuition is paid.  They have to clear all the academic and administrative elements before they receive their certificates.

Q.    Is it fair to say that USAT got paid on a time basis, so monthly or quarterly, whenever the student could, as opposed to an X amount for a medical degree?  So if took a student five years it would cost more than someone who took three years?

A.    No.

Q.    So explain that to me.

A.    The fees are explained in their admission document exactly how much they're going to be and they're locked in at the time of matriculation.

MS. MCENROE:  For purposes of the record, and we can follow up after the deposition, we're going to put in a request for production of at least the standard form tuition agreement with the students.  It's responsive to a number of our document requests in particular, for example, number 12 documents sufficient to show USAT's revenue for calendar years 2003 through 2018.  Copies of and all documents relating to contracts between USAT and USAT students, etcetera.

MR. SWATE:  Send us a formal request.

MS. MCENROE:  Yeah, we'll

send you a letter in writing but I just wanted to put you on notice now.

MR. SWATE:  Send us a formal request.

MS. MCENROE:  Oh, we did already.

MR. SWATE:  Oh, you have?

MS. MCENROE:  Yes, we already sent you a formal request, that's what I'm looking at from February 19, 2019.

MR. SWATE:  Okay.

MR. REIL:  Is that different than what we've answered so far? That's a request that has not been answered?

MS. MCENROE:  It's a request that's been answered like all the rest of your answers that you're not providing us with documents. And I'm specifically telling you, we found out now that there are documents responsive that we

should be able to at least see a copy of the form tuition agreement.

MR. REIL:  I'm certainly not going to agree to that.  But as my cocounsel said, send us the request.

MS. MCENROE:  Well, we already made the request.  But we'll send you a letter clarifying the request.

MR. REIL:  Thank you.

BY MS. MCENROE:

Q.    Do you know when USAT last admitted a student, most recently?

A.    Mid September.

Q.    2018?

A.    2018.

Q.    Do you know what happened to that last admitted student, did they graduate?

A.    Not if they applied in September they wouldn't have graduated, no.

Q.   So I had asked you a question before, if a student took five years to graduate did they pay more than a student who graduated in three years.

A.   No.

Q.   So can you explain that to me?

A.   There are fees, expected fees, that are set when they are admitted.  Those fees are locked in, as University policy, and they will not change for that student.  If the tuition rate changes they got locked in at the original rate quoted to them originally.  They need to plan their budgets just like we need to plan ours.

Q.   Right.  But it sounded like the students got charged on a monthly basis.  And so I'm just trying to understand when you say that they're charged a fee or quoted a fee, is that a lump sum price, it will cost you X amount of dollars to get your medical degree here?

A.    It depends on the student and how many semesters they must complete and what the total cost is predicted to be.  If it goes over that we don't charge them extra.

Q.    If they take longer you don't charge them extra?

A.    Well, some people have to take a leave for a month or a week or a semester for family reasons, for personal reasons, and we don't charge them more money because they had to take a leave, that would be silly.

Q.    So if a student graduated in fewer years, so let's say in four years, did that student pay less tuition than somebody who took longer?

A.    They pay what would be quoted in their admission letter.

Q.    Right.  But I'm still trying to understand.  You had said they would pay on some periodic basis, be it monthly or whatnot.  And I was trying to understand if they were quoted overall

amounts that they're charged?

A. It's based on a predicted enrollment of four years.

Q. Okay. And if they finish in three-and-a-half years would they be charged less?

A. No. Because that would mean they've completed their work faster than prediction. We always try to predict an extra six months or so for each student to be on the safe side. But their tuition is set as the number of semesters they must complete and the amount of course work they must complete, whether it takes them three years or ten years. It's the same.

No one has ever taken ten years thankfully. We'd have a talk before that happens.

Q. I'm sure you would.

A. That's where I come in.

Q. Yes. Okay. So we've been talking a little bit about the money inflowing, so coming into USAT. I just

want to understand, obviously, we're here today because you filed a lawsuit against ECFMG. What is it that you're hoping to get out of this lawsuit?

A. Good resolution.

Q. What do you mean by that?

A. A good resolution. Number one, you've attached me personally. ECFMG has attached me personally without justifying that.

Q. So I'm sorry --

A. -- without proof.

Q. I'm not trying to get at what your allegations are. I think I have a pretty good understanding of your allegations. I'm trying to understand the damages, the outcome, what you're trying to get from ECFMG.

MR. REIL: I'm going to object, that the witness should be allowed to finish his answer. It's a wide-ranging question. But you can answer.

MS. MCENROE: You can

answer.

THE WITNESS:  It's a wide-ranging question.  When the ECFMG posted that warning on the World Directory of Medical Schools on or before September 11, 2018, when it was first reported to me, not by ECFMG but by a student.  At that point, all payments to the University stopped and there was a mass exitus.  You cost us over a thousand students and you cost over a thousand students their medical careers.

BY MS. MCENROE:

Q.  All right.  So I'm just trying to make sure I understand what you're seeking to get out of this lawsuit.  So you said you're not thousand students, right, so you're not here on behalf of their medical careers.  You're here on behalf of yourself; right?

A.  The losses to the University --

Q.   Wait.  Wait.

A.   -- are extraordinary.

Q.   So I'm trying to understand through your lawsuit, Dr. Tulp, what is it you're trying to get from ECFMG?

MR. REIL:  I would request that the witness be allowed to finish his answer without interruption.

MS. MCENROE:  I'm trying to make sure he actually answers my question.

THE WITNESS:  We want a resolution.  I'm not an argumentative person.  We want a resolution.  You gave the University no opportunity to correct whatever deficiencies you found after 15 years of having found none.

MS. MCENROE:  I'm going to move --

THE WITNESS:  That makes no sense to me.

MS. MCENROE:  I'm going to move strike as nonresponsive.

BY MS. MCENROE:

Q.    So what dollar figure are you looking to get from ECFMG?

A.    The uncollectible --

Q.    -- specific dollar --

A.    -- do you want to have a dollar figure?

Q.    Yes, I would like a dollar figure.

A.    The uncollectible tuitions as of October 1st up to, you know, from at that point over $41.2 million.  These are students that are paying a little bit each month as they could, waiting to get their documents.

Q.    Anything else?

A.    Personal damages.

Q.    How much?

A.    It's up to the judge.

Q.    How much would you be seeking?

A.    You destroyed my career.

JA0544

Q.    I'm not --

A.    -- I had spotless career for 50 years.

Q.    Sir, I appreciate that.  I'm asking for a dollar figure.  How much would you be seeking from the court?

MR. REIL:  Objection.  There are intangible damages in the Complaint, that's for the factfinder.  You may answer.

BY MS. MCENROE:

Q.    How much would you be seeking from the court?

A.    We haven't decided.

Q.    Anything else?

A.    We want a resolution.

Q.    What do you mean by resolution?  You've used that multiple times.

A.    We have tried to work with the ECFMG from the first e-mail and they were very dishonest with me.  They said I lied and I did not.  I don't lie.  If there was an error in a form somewhere

along the line that they discovered retrospectively, let's fix the error, let's not destroy the school.  We had the strongest academic record of any school in the Caribbean, that we built.  Because we built it on an academic platform.  You destroyed that.

MS. MCENROE:  Move to strike as nonresponsive.

BY MS. MCENROE:

Q.   So what do you mean by resolution?  You've used that word a couple times.

A.   We want to restore USAT preferentially.

Q.   What do you mean by preferentially?

A.   That would be our first choice to restore USAT.

Q.   Okay.

A.   So they continue to function and continue to provide the diversity of medical education that other schools are not doing.

Q.   So that means through a modification of ECFMG sponsor note?

A.   Through removing the sponsor note that's there that was placed well before we knew, and well before any correspondence from ECFMG.

Q.   Anything else?

A.   I think that's what's called due process.

MS. MCENROE:  Move to strike as nonresponsive.

BY MS. MCENROE:

Q.   Anything else?

A.   What else do you need to know?

Q.   I'm just trying to get a sense of what it is you're seeking through this lawsuit.  I've asked that question a number of times.  We've talked through a number of things.  I'm asking if there's anything else?

A.   We haven't decided the damages.

Q.   You haven't yet decided the

damages?

A.    We have not decided the damages.

Q.    Okay.  Well, we're in discovery --

A.    -- but we must collect the uncollectible tuitions that became uncollectible when that sponsor note went on the World Directory of Medical Schools without warning.

Q.    As of October 1st?

A.    It was there on September 11th.

Q.    And when did you -- no, no, I understand.  But you said that there was a mass exitus but you graduated a whole lot of students in 2018; right?

A.    Those were the ones that completed the requirements or where in their final semester.

Q.    So you graduated a whole lot of students at the end of 2018.  Do you have a sense of how much money USAT took in from the finishing of the medical

education for all those 400 students at the end of 2018?

A.   No, I do not.

Q.   How would we figure that out?  Does USAT keep financial statements?

A.   Yes, but I don't -- I don't keep them.

Q.   Does USAT get audited financial statements?

A.   I believe so.

Q.   Do you know where USAT pays taxes?

A.   Yes, we do pay taxes.

Q.   In which jurisdiction?

A.   The United States.

Q.   USAT pays taxes in the United States --

A.   -- in the United States and in Montserrat.

Q.   Where do you personally pay taxes?

A.   I personally pay taxes?

Q.   Yes, where?

A.    In the US.

Q.    In which state?

A.    Colorado.

Q.    And do you file in any foreign jurisdictions?

A.    I earn no foreign income.

Q.    And do you get paid a salary from USAT?

A.    No.

Q.    How do you get paid from USAT?

A.    I don't get paid by USAT.

Q.    Previously, did you get paid by USAT?

A.    No.

Q.    So how do you earn a living?

A.    I'm retired.  I have a pension.

Q.    When did you retire?

A.    20 years ago.

Q.    Have you ever earned money from USAT?

A.    No.

Q.    So you said you get a

pension, is that from the US Army?

A. I get a military pension and Social Security and a teacher's retirement pension.

Q. And from teaching where?

A. From Drexel. And other institutions.

Q. How long did you teach at Drexel?

A. Over 20 years.

Q. And at what school at Drexel? If I'm saying that the right way. At the medical school, undergraduate?

A. They did not have the medical school then.

Q. Oh, I didn't realize that. Okay. So where were you teaching within Drexel?

A. I was Professor of Nutrition.

Q. From when to when?

A. 1983 until 2004.

Q. And you get a pension from

them as well?

A.    I have teacher's -- from the TIAA.

Q.    Anything else?

A.    No.

Q.    Any other sources of income?

A.    No.

Q.    And you said Social Security as well?

A.    Yes.

Q.    I little bit of housekeeping and then we can take a quick break.  I just want to make sure I have this right.

You have two counsel here representing you today?

A.    Yes, I do.

Q.    You have Tommy Swate --

A.    Yes.

Q.    -- and Bill Reil?

A.    Yes.

Q.    And they're both your lawyers?

A.    Yes.

Q.    And they're lawyers in this

case for you?

A.    Yes.

Q.    And they were lawyers for you before the ECFMG hearing on November 28, 2018?

A.    No.

Q.    They were not?

A.    Oh, yeah.  They were here then.  Yes, yes, yes.

Q.    Okay.  So just to make sure that the record is clear.  For the hearing you attended at ECFMG in November 2018 --

A.    November 28th.

Q.    -- both Tommy Swate and Bill Reil came with you as your counsel?

A.    That is correct.

Q.    And you had engaged them prior to that time; correct?

A.    Yes.

MS. MCENROE:  I'd like to take a quick break.

THE WITNESS:  Sure.

VIDEOGRAPHER:  Off the

record at 10:48 a.m.

(At this time, a short break was taken.)

VIDEOGRAPHER:  We're back on the record at 11:08 a.m.

MS. MCENROE:  Subject to question from counsel, I have nothing further at this time. Thank you very much.

THE WITNESS:  Okay.

- - -

EXAMINATION

- - -

BY MR. SWATE:

Q.    Coronal, I just have a few questions.  I'm calling you Coronal, is that insulting to you?

A.    Not at all.

Q.    Why?

A.    Because I earned the rank of Coronal, professionally approved.

Q.    In the --

A.    -- in the United States Army.

Q.   It wasn't Iraqui Army, it was the United States Army?

A.   United States Army.

Q.   And you didn't get that by filing a few papers?

A.   No, I did not.

Q.   How long did you serve in the United States Army?

A.   Over 40 years.

Q.   40 years.  Now, did you have lawyers hired when you found out about the posting by the ECFMG on this internet site for medical schools?

A.   No.

Q.   Did you have notice it was going to be posted?

A.   No.

MS. MCENROE:  Objection to form.

BY MR. SWATE:

Q.   How did you -- how did you find out it was posted?

A.   A student called me and -- I believe on the 13th of September and

Orien L. Tulp, Ph.D., M.D.

alerted me that it was there.

Q.   You didn't get a certified letter from the ECFMG?

A.   No.

MS. MCENROE:  Objection to form.

THE WITNESS:  No, I did not.

MR. SWATE:  Just to make sure I answer your objection.

BY MR. SWATE:

Q.   Did you get any notice from any party that they were posting this information on the internet?

A.   No.

MS. MCENROE:  Objection to form.

BY MR. SWATE:

Q.   Who posted this information?

MS. MCENROE:  Objection to form.

THE WITNESS:  As I understand it, the posting was from the ECFMG to the World Directory of Medical Schools.

They take their instructions from their sponsors, of which the ECFMG is one.

BY MR. SWATE:

Q. Did you have a hearing prior to this post?

A. No.

Q. So what -- what was the affect of this posting on the USAT?

A. It was dramatic.

Q. Well, dramatic, what do you mean by --

A. -- Dramatic in the sense that up until mid September, I think September 11th was the date that it was actually posted, on or before, up until mid December. Mid September we were getting between 2- and 300 applications per month and admitting maybe 50 of those. They stopped. We haven't had an admission since mid September. And since that posting was on the World Directory of Medical Schools our admissions group tells us that there had only been 12

applicants in all that time, that's eight months.

Q.   Did it -- did any, have any affect on your current students?

A.   Yes.

Q.   What affect did it have?

A.   It was devastating because they saw their medical degree going out the window.

Q.   Did any students leave the school?

A.   About a thousand.  At least a thousand.  I don't have an exact count.

Q.   Now, tell us a little bit about your student population, is it basically 22-year-olds from prominent schools that get admitted or --

A.   -- no.

MS. MCENROE:  Objection to form.

BY MR. SWATE:

Q.   What's your student population?

A.   Student population are --

MS. MCENROE:  Objection to form.

THE WITNESS:  -- adult learners.  The average age coming in is mid 30s.  They range in age from early 20s to over 60.  We do not use any age criteria.  They represent a very diverse group of students culturally and -- as they come from all -- all walks of life literally and all cultures.

About 50 percent or more are minorities that do not have access to medical school in the United States' system for the most part.  And that gives them an opportunity to earn a medical degree and become a physician, which for many of them it's their life dream.

BY MR. SWATE:

Q.    How -- now, one of the criteria of a successful medical schools is how their students perform the test that are administered by the USMLE, which

you can't take the test unless the ECFMG

gives you a certificate.  How do your --

how do your students do on this test,

these tests, these series of tests?

            MS. MCENROE:  Objection to

        form.

            THE WITNESS:  Generally they

        do quite well.

BY MR. SWATE:

        Q.   Well, specifically, can you

tell me specifically how they do?

            MS. MCENROE:  Objection to

        form.

            THE WITNESS:  About 90

        percent pass, which is a very high

        percentage for an international

        school.  The highest score that I

        have seen several years ago was

        290 on an exam out of 292 and 288.

        They do very well.

BY MR. SWATE:

        Q.   Well, how does it compare

with the past rate of American medical

schools?

MS. MCENROE:  Objection to form.

THE WITNESS:  Comparable.  Very comparable.

BY MR. SWATE:

Q.    Now, once the students pass the exams, arduous exams, how do they do on their residency programs?

A.    Very well.

MS. MCENROE:  Objection to form.

BY MR. SWATE:

Q.    What's the acceptance rate for residency?

A.    This year --

MS. MCENROE:  Objection to form.

THE WITNESS:  This year our selection rate was 90 percent for residency in spite of that warning.  It would have been higher but many of them could not get their results released in time to be placed into residency.

BY MR. SWATE:

Q. Well, this lack of notice and lack of hearing that ECFMG participated in, what affect did it have on your students?

MS. MCENROE: Objection to form.

THE WITNESS: It was devastating.

BY MR. SWATE:

Q. By devastating, what do you mean?

A. Devastating because they want information and they have not been able to get accurate information from the case workers.

Q. Well, what affect did it have on applying for residency?

MS. MCENROE: Objection to form.

THE WITNESS: We have --

BY MR. SWATE:

Q. -- if you know?

A. We have 51 signed up for

ERAS only about 20 were approved in time by ECFMG.  And of those 20 I believe 18 have now been placed.

Q.    We talked about the ECFMG. What is the role of the ECFMG in foreign medical graduate education?  Can you tell the jury --

MS. MCENROE:  Objection to form.

BY MR. SWATE:

Q.    -- what the role is?

A.    They have exclusive control over access to the US Medical Licensing Examination.  There's no other way to take that exam except going through the ECFMG.  They're delegated that authority, as I understand it, from various states. And that would seem to make them, cause they're governmental, because the states are governmental.

Q.    Well, Coronal, if I understand what you're telling me, if they don't get a certificate from the ECFMG you cannot enter the United States

medical training?

A.    They cannot.

MS. MCENROE:  Objection to form.

THE WITNESS:  They cannot. Because they also control the residency ERAS, Electronic Residency Application Service, which gates them into applying for specific programs for residency.

BY MR. SWATE:

Q.    The -- what action did the ECFMG take, understand it was a hearing on the 28th, of November the 28th.  Prior to that hearing, what action did the ECFMG take regarding documents they would accept from your medical school, USAT?

MS. MCENROE:  Objection to form.

THE WITNESS:  They, in their statement, they said they would not accept any documents that were after December 31st.  They canceled the exam permits for many

students even though they had been

previously approved to take the

exam.  When they go report in to

take the exam they would discover

that their exams had been canceled

by the ECFMG.

BY MR. SWATE:

Q.    This December 31st date,
that's December 31, 2018?

A.    No, this is in October --
November.

Q.    No, I'm talking about the
date they wouldn't accept any documents
from USAT?

A.    No, they would --

Q.    -- at what date?

MS. MCENROE:  Objection to
form.

THE WITNESS:  The last date
they would accept documents they
had to have everything completed
by December 31st.

BY MR. SWATE:

Q.    Of what year?

A.    Of 2018.

Q.    So on January 1, 2019, after New Year's, it's like Cinderella that turned into a pumpkin.

MS. MCENROE:  Objection to form.

THE WITNESS:  Yeah, it turns into now they can no longer -- after that they can't become certified unless they have completed all the requirements and have the diploma in hand by the end of 2018.

BY MR. SWATE:

Q.    When was this December the 31st deadline imposed?

MS. MCENROE:  Objection to form.

THE WITNESS:  I believe it was in October.

BY MR. SWATE:

Q.    Prior to the November 28th hearing?

A.    Yes.

Q.    So the committee that heard your case didn't make that decision?

MS. MCENROE:  Objection to form.

THE WITNESS:  No, it was already made.

MR. SWATE:  And --

THE WITNESS:  -- the actual date was September 11th as far as I can figure out from looking at the date stamped on the World Directory site.

BY MR. SWATE:

Q.    So you weren't given an opportunity for a hearing and notice of the December 31st --

A.    -- no.

MS. MCENROE:  Objection to form.

THE WITNESS:  Not at all.

BY MR. SWATE:

Q.    Now, you had a hearing on December -- November the 28th; correct?

A.    Correct.

Q.    And who conducted that hearing?

MS. MCENROE:  Objection to form.

THE WITNESS:  Ms. McEnroe.

BY MR. SWATE:

Q.    Ms. McEnroe.  Did any committee member speak?

A.    No, not that I recall.

Q.    Did any committee members talk about any evidence that was being presented against you?

A.    No, not that I recall.

MS. MCENROE:  Objection to form.

BY MR. SWATE:

Q.    Was evidence presented at the hearing that you've never seen before?

MS. MCENROE:  Objection to form.

THE WITNESS:  There was a book placed on the table that I've never seen before.  It was a black

book on a black table, almost

didn't see it when I walked by.

BY MR. SWATE:

Q. Was the committee -- was the hearing adjourned?

A. Yes.

Q. Prior to you giving any testimony?

A. Yes.

Q. Was your lawyer in the process of going through the book when the hearing was adjourned?

A. Yes, he was.

Q. Who was your lawyer?

A. Tommy Swate.

Q. Was Tommy Swate being hostile or aggressive or frightening in his representation of you during that --

A. -- no.

MS. MCENROE: Objection to form.

Wait for him to finish the question.

THE WITNESS: Not at all.

BY MR. SWATE:

Q.    Now, Ms. McEnroe is a witness; correct?

MS. MCENROE:  Objection to form.

THE WITNESS:  She is a witness, yes.

MR. SWATE:  Can I just consult with my counsel a minute? We may be close.

MS. MCENROE:  Sure.  Do you want to take a quick?

MR. SWATE:  Yeah.

VIDEOGRAPHER:  Off the record at 11:20 a.m.

(At this time, a short break was taken.)

VIDEOGRAPHER:  Back on the record at 11:26 a.m.

BY MR. SWATE:

Q.    Just a couple quick questions, Coronal.

In this hearing of the 28th I just want to make it clear that the

committee presented no evidence against you?

A.    No, they did not.

MS. MCENROE:   Objection to form.

BY MR. SWATE:

Q.    And you understand by their agreement that they are required to make a decision based on the preponderance of the evidence?

MS. MCENROE:   Objection to form.

THE WITNESS:   That's what I understand.

BY MR. SWATE:

Q.    Did -- by preponderance of the evidence, could they have made some kind of decision based on the evidence heard in the committee meeting?

A.    No.

MS. MCENROE:   Objection to form.  Calls for a legal conclusion.

BY MR. SWATE:

Q.    Was there any evidence presented in the committee meeting?

MS. MCENROE:  Objection to form.

THE WITNESS:  In the committee meeting that followed the hearing?

BY MR. SWATE:

Q.    No.  The hearing, your --

A.    -- no, there was no evidence presented.

MR. SWATE:  Okay.  I'll pass the witness.

MS. MCENROE:  Thank you.

- - -

EXAMINATION

- - -

BY MS. MCENROE:

Q.    I just have a couple of quick questions.

A.    Okay.

Q.    You were just being questioned by your counsel, Tommy Swate; correct?

A.    Right.  Correct.

Q.    You testified earlier that I'm a witness, meaning Elisa McEnroe, is a witness to the November 28th hearing --

A.    Right.

Q.    -- is that correct?

A.    That's correct.

Q.    So the same would be true for your counsel, Tommy Swate; correct?

A.    No --

Q.    -- he was present?

A.    Yeah, he was present.

Q.    Yup.  And he would be a witness as well?

A.    He would be the witness of the events, yes.

Q.    And Mr. Bill Reil as well was a present at the hearing?

A.    Yes.

Q.    And he would be a witness as well?

A.    That's correct.

Q.    When did you hire your counsel Tommy Swate and Bill Reil?

A. October. I don't know when -- it was after this, you know, after this happened because we weren't --

Q. After what happened?

A. After we received the September 14th, I think was -- the close of business of September 14th, when I received the e-mail from the ECFMG notifying us. So that's at least three days after it was posted.

Q. So you hired counsel in mid September 2018?

A. Sometime around October 1st or thereabouts. It took us a little while to find an attorney who understood the merits of the case.

But I have one question for you.

MR. SWATE: No.

MR. REIL: No.

THE WITNESS: Because you haven't introduced your friends here. And I don't know who they are.

MR. REIL:  Don't worry about that now.  Just answer her questions.

THE WITNESS:  Okay.

BY MS. MCENROE:

Q.  And when you say you hired counsel that was Mr. Tommy Swate and Bill Reil?

A.  Correct.

Q.  So that was sometime maybe early October?

A.  Something like that.  I don't recall the exact date.

Q.  Got it.  And have you personally been sued by any USAT student in connection with the ECFMG sponsor note?

A.  Not yet.

Q.  Have you personally been sued by any USAT student in connection with the finding of irregular behavior against you by ECFMG?

A.  No, not yet.

Q.  And when you say not yet, do

you know of any impending lawsuits at present?

A.   I've heard rumors.

Q.   You've heard rumors.  Do you know about who was going to sue you?

A.   I wouldn't care to disclose that.

Q.   Do you know if USAT has been sued by any student in connection with the sponsor note change for USAT from ECFMG?

A.   I'm not aware of it yet.

Q.   You say you're not aware of it yet, are you aware that USAT has been sued or you don't, or no?

A.   I'm not aware.  I think I would have known if they had been served a suit.  I have not been served a suit.

Q.   Do you know if a suit against USAT has been filed?

A.   I do not know.

MS. MCENROE:  I have no further questions.  Pending counsel's questions.

MR. SWATE: No, we have --

MR. REIL: Nor do I.

MS. MCENROE: Great. Well, thank you everybody. Thank your for your time, Doctor.

VIDEOGRAPHER: This concludes this deposition. The time is 11:30 a.m., we're off the record.

(Video deposition concluded at 11:30 a.m.)

Orien L. Tulp, Ph.D., M.D.

C E R T I F I C A T I O N

I, DANA M. JONES, Professional Court Reporter and Notary Public, certify that the foregoing is a true and accurate transcript of the deposition held before me at the time, place and on the date hereinbefore set forth.

I further certify that I am neither attorney nor counsel for, not related to or employed by, any of the parties to the action in which this deposition was taken; further, that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

_____
                DANA M. JONES

JA0548



# World Directory of Medical Schools

Home | About | Sponsors | Subscription | Search

New Search

Home > Search > School Details

## University of Science, Arts & Technology (USAT) Faculty of Medicine

Montserrat

School Details | Contact Information | Program Details | Sponsor Notes

The information below has been provided by the World Directory's sponsoring organizations.

**Educational Commission for Foreign Medical Graduates (ECFMG), United States of America**

- Students and graduates of this medical school are eligible to apply to ECFMG for ECFMG Certification and for examination, provided that:
  - For medical school students officially enrolled in this school, the graduation years are listed below as "current".
  - For graduates of this medical school, their graduation year is included in the graduation years listed below.
    - Graduation Years:
      - 2003 - 2018
  - All other eligibility requirements are met. Refer to the ECFMG Information Booklet for detailed information.

- Note: As of January 1, 2019, students and graduates of this medical school with a graduation year of 2019 and later are not eligible to apply to ECFMG for ECFMG Certification, which also renders them ineligible to apply to ECFMG for the United States Medical Licensing Examinations (USMLE) as a step toward ECFMG Certification.

- Currently, students and graduates of USAT are subject to enhanced procedures that must be met in order to be eligible to apply for ECFMG Certification related services, including but not limited to: ECFMG Certification, USMLE examinations that lead to ECFMG Certification, and Electronic Residency Application Service (ERAS®) Support Services. ECFMG will provide information and instructions to applicants upon receipt of application.

FAIMER SCHOOL ID: F0000836

ECFMG00000508

CONFIDENTIAL

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DR. ORIEN L. TULP, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:18-cv-05540-WB |
| | ) | |
| v. | ) | Hon. Wendy Beetlestone |
| | ) | |
| EDUCATIONAL COMMISSION FOR | ) | |
| FOREIGN MEDICAL GRADUATES and DR. | ) | |
| WILLIAM W. PINSKY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF KARA CORRADO IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, Kara Corrado, declare as follows:

1.      I am currently employed as the Vice President for Operations at the Educational Commission for Foreign Medical Graduates ("ECFMG").

2.      I make this Declaration in connection with the above-captioned action.  I have personal knowledge of the facts stated herein and if called as a witness could and would testify to those facts.

3.      Pursuant to Section B.7 of ECFMG's Policies and Procedures Regarding Irregular Behavior, Dr. Orien L. Tulp was permitted to appeal the decision of the Medical Education Credentials Committee concerning allegations of irregular behavior by Dr. Tulp.  Dr. Tulp never appealed that decision.

4.      Pursuant to Section B.8 of ECFMG's Policies and Procedures Regarding Irregular Behavior, Dr. Orien L. Tulp was permitted to petition for reconsideration of the Medical

Education Credentials Committee's decision concerning allegations of irregular behavior by Dr. Tulp. Dr. Tulp never petitioned for reconsideration of that decision.

5.      On or around September 24, 2018, ECFMG updated its Sponsor Note for the University of Science, Arts, and Technology Montserrat ("USAT") in the World Directory of Medical Schools to add the following language:

> Currently students and graduates of USAT are subject to enhanced procedures that must be met in order to be eligible for ECFMG Certification related services, including but not limited to:  ECFMG Certification, USMLE examinations that lead to ECFMG certification, and Electronic Residency Application Service (ERAS) Support Services. ECFMG will provide information and instructions to applicants upon receipt of application.

6.      I sent a letter to USAT on or about September 14, 2018 notifying USAT of the "enhanced procedures" described in the updated Sponsor Note.  The document Bates numbered JA0102 is a true and correct copy of that letter.

7.      On or around October 18, 2018, ECFMG updated its Sponsor Note for USAT in the World Directory of Medical Schools to add the following language:

> Note: As of January 1, 2019, students and graduates of this medical school with a graduation year of 2019 and later are not eligible to apply to ECFMG for ECFMG Certification, which also renders them ineligible to apply to ECFMG for the United States medical Licensing Examinations (USMLE) as a step towards ECFMG Certification.

8.      I sent a letter to USAT on or about October 18, 2018 notifying USAT of this change to ECFMG's Sponsor Note for USAT in the World Directory of Medical Schools.  The document Bates numbered JA0113 through JA0114 is a true and correct copy of that letter.

9.      ECFMG has not updated its Sponsor Note for USAT in the World Directory of Medical Schools to reflect the finding of irregular behavior against Dr. Tulp.

2

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge.

EXECUTED:  May 3, 2019

_____
Kara Corrado